This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8111-000001

C0009842

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8111-000002

C0009843



| Forest Service | Rocky Mountain Regional Office | 740 Simms Street<br>Golden, CO 80401-4702<br>Voice: 303-275-5350<br>TDD: 303-275-5367 |
|---|---|---|

**File Code:** 2730
**Route To:**

**Date:** August 30, 2012

**Subject:** Delegation of Authority for the Wolf Creek Village Access and Utility Easement Application

**To:** Forest Supervisor, Rio Grande National Forest

Under the authority of the Alaska National Interest Lands Conservation Act (ANILCA), the proponents of the Village at Wolf Creek have submitted an application for easements across National Forest System (NFS) lands. In the application, the proponents have requested an easement for transportation and utility facilities for access and to facilitate the development of the private parcel of land known as the Village at Wolf Creek.

In accordance with direction at Forest Service Manual 2704.33 and 2733.04c, I hereby delegate to you the authority to evaluate and select the ANILCA access and utilities easement alternative presented in the Wolf Creek Environmental Impact Statement (EIS). The EIS is evaluating three alternatives and the delegation of authority does not prejudge which alternative will be selected. The delegation simply ensures that, if the ANILCA alternative is selected, the Forest Supervisor can make that decision without seeking a delegation at that time of decision or elevating the decision to the Regional Forester.

Various staff members in this office will continue to provide you and your team leader, Tom Malecek, with assistance and expertise in reviewing and critiquing drafts of the various documents being produced as a result of the ongoing environmental analysis of this application. Tom McClure, Acting Director of Physical Resources, will be the primary point of contact regarding the Regional Office's role and assistance in this effort.

As this case moves forward, please keep me, Tom McClure and Kathy Kurtz apprised of issues or concerns that may arise which could impact the Forest Service's obligation to the applicant regarding timely processing of this case. Please also inform us of any issues concerning this case that we may want to bring to the attention of the Washington Office.

You may reach Tom McClure at (303) 275-5374 or tmcclure@fs.fed.us and Kathy Kurtz at (303) 275-5083 or kkurtz@fs.fed.us.

*/s/ Brian Ferebee*
DANIEL J. JIRÓN
Regional Forester



**It's Cool to Be Safe**

Printed on Recycled Paper



C0009944

cc: Thomas Malecek

C0009845

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8111-000004

C0009846

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8111-000005

C0009847

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8111-000006

C0009848

**FS-CARA-help**

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Friday, August 31, 2012 5:56 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | CARA Attention Needed – Potentially Offensive Letter Content Review |

Your Draft EIS Comment for the Village at Wolf Creek Land Exchange Proposal Project has the Public Reading Room turned on and has received Letter #15, which contains terms that have been identified as potentially offensive.

The potentially offensive content HAS NOT been published on your public website. Instead, it has been moved to a holding area where you can review it and decide whether the letter should be published in your public reading room.

To view and manage this letter, log into PALS at this link: http://apps.fs.fed.us/pals/, click on the "CARA Login" button, select your project, and go to the Reading Room Management tool.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

C0009849

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 04, 2012 7:14 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** SCOTT HOBBS [mailto:bowhunter1968@sbcglobal.net]
**Sent:** Saturday, September 01, 2012 11:02 AM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Village at Wolf Creek Access Project DEIS

I discovered the Wolf Creek area back in 2006 and since that first visit I have returned every year for skiing and in the fall to escape the heat of Texas. I enjoy the area so much that I purchased property in neighboring South Fork and have plans to build a home there and eventually retire there. One reason I enjoy Wolf Creek so much is that it is not commercialized like alot of the other ski areas in Colorado. In the fall it is so quiet and peaceful with amazing scenery and I fear that will be compromised if Mr. Mc Combs gets his way. As a visitor to Colorado and as a tax payer in the local community I feel it is my duty to do all I can to preserve the natural beauty that lies in the Wolf Creek area.

I am wondering how the land swap could even be considered. If I understand correctly south western Colorado was chosen as the best place to reintroduce the Lynx back to the wild and millions of dollars have been paid to assure that the Lynx will repopulate in the area. The area around Wolf Creek Pass is one location where the Lynx was reintroduced and newly born off spring have been found in the area.  Another thing is that the Lynx is classified as  Federally Threatened and State Endangered on the Colorado Parks and Wildlife website. It seems that the Lynx is surviving and doing well from everything that I have read. Millions of dollars will go to waste if this land swap goes through and a very rare breed of cat will certainly pay the price. The fact that an endangered species being reintroduced into the area should be enough to stop the development in its tracks and any other development plans in the future.

Water is another consideration as well as the amount of natural snowfall that occurs. There have been many times I have seen as much as three feet of snow fall in one day. The road up to the ski area is another consideration as it would need considerable upgrades and improvements. The tax payers in the local communities would have to shoulder the burden of any and all improvements while Mr McCombs walks away with millions. I do realize that alot of research has been done to see if this is even feasible but, as the care takers of our national lands the Parks and Wildlife is duty bound to save and preserve our public lands.

C0009850

I strongly urge you to please tell Mr McCombs no deal. If he feels that something needs to be done with the property he owns then donating it to the Parks and Wildlife Department is the best option. Please keep Wolf Creek wild and untouched so that we may preserve it for future generations.

Thank you
Scott Hobbs

C0009851

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 04, 2012 7:14 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** John Spiers [mailto:jspiersiii@gmail.com]
**Sent:** Thursday, August 30, 2012 3:19 PM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Village at Wolf Creek Access Project DEIS

I'm a Colorado Native and very supportive of the Village at Wolf Creek. When I see how crowded the ski areas are in Summit County and the amount of people that come up from Southern Colorado, along with Texas, Oklahoma and New Mexico, we clearly need more major resorts down south. I believe a Sothern Colorado resort of this caliber, with the amount of snow that Wolf Creek receives, could become a major skiing destination for many people in Southern Colorado and nearby states. We want to be careful about the environmental impact, but Colorado is ski country and skiers are getting more discouraged all the time with the congestion on I-70.

Regards,

John Spiers

John Spiers
771 Columbine CT
Erie, CO 80516

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 04, 2012 7:15 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Todd [mailto:tcmonson@hotmail.com]
**Sent:** Thursday, August 30, 2012 9:32 AM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Village at Wolf Creek Access Project DEIS

The proposed village at Wolf Creek should not be allowed to move forward.  Such a village would destroy the gorgeous wilderness environment surrounding Wolf Creek Pass.  Any land exchange that facilitates this development in favor of a single land owner would be a tragedy for Wolf Creek Pass and all of the other citizens that enjoy this beautiful mountain setting for a variety of outdoor activities.

Todd Monson
1127 Narcisco St. NE
Albuquerque, NM  87112

C0009853

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 04, 2012 7:15 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek |

++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** David Anton [mailto:davidanton5@gmail.com]
**Sent:** Sunday, September 02, 2012 9:27 AM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village at Wolf Creek

I am commenting on the proposed development at Wolf Creek Pass.  I am very opposed to this development.
It is practically on the Continental Divide at very high altitude.  This means that it is a fragile ecosystem of high
value to localized plants and animals. I hike often in the area from Summit Peak, Montezuma and Long Trek to
Hope, Table and on northwest.  It is a pristine land with a solitude available that is obviously becoming harder
to find every day.   I fully support American property rights but this has to be an exception. Most all Continental
Divide hikers, who really know the area up close, would agree with me that the answer has to be no
development can be allowed at this site.   Thanks for listening,  David Anton,  Santa Fe, NM

C0009854

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 04, 2012 7:16 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** larry [mailto:canoeman45@wildblue.net]
**Sent:** Friday, August 31, 2012 10:08 AM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village at Wolf Creek Access Project

I would like to see **NO ACTION, NO CHANGE FROM CURRENT CONDITIONS**.  I do not believe the project Leavell-McCombs Joint Venture is in the best interest of the environment, wildlife, water resources, the ski area, the public and the local communities.
I would like to see no action and the area be left as it is.
Larry Berger
11333 CR 22
Cortez, Co. 81321
canoeman45@wildblue.net
970-565-3853

C0009855

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 04, 2012 7:34 AM |
| **To:** | Delozier-Trujillo, Sherri L -FS |
| **Subject:** | FW: Request for Appraisal for Wolf Creek Land Swap |

+++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Jim Lincoln [mailto:jrufus@skywerx.com]
**Sent:** Thursday, August 30, 2012 12:01 PM
**To:** Dyer, Harold D -FS
**Subject:** Request for Appraisal for Wolf Creek Land Swap

Dave, Thank you for your help at the meeting in Pagosa Springs on Wednesday evening.

This is a request for a copy or access to the Appraisal for the Land Swap at Wolf Creek in Mineral County, Colorado.

Thank you,    Jim Lincoln   174 Teal Circle, Pagosa Springs, CO  81147.    970-731-0774

C0009856

C0009857

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8128-000001

C0009858

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8128-000002

C0009859

## Susan Cornett

| | |
|---|---|
| **From:** | Susan Cornett |
| **Sent:** | Tuesday, September 04, 2012 11:57 AM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS |
| **Cc:** | Adam Poe; David@westerneco.com |
| **Subject:** | FW: Wolf Creek DEIS |

Tom/Dave,

Please send a copy of the DEIS to Red McCombs at the address listed below.

Thanks!
Susan


Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
susan@westerneco.com  ·  www.westerneco.com

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Tuesday, September 04, 2012 11:46 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Susan,

As of this date, my mailed copies have not yet arrived – I don't know what happened to them – but I now
have a copy David gave to me.  Please have another copy mailed to Red at the following address:

Red McCombs
McCombs Enterprises
755 E Mulberry Ave, Ste 600
San Antonio, TX 78212

Thanks,

**Clint E. Jones**
**President**
**The Village at Wolf Creek, LLC**
**12117 Bee Caves Road**
**Suite 240**
**Austin, TX 78738**

C0009860

**(512) 466-6695**
**clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 12:43 PM
**To:** Clint Jones
**Subject:** RE: Wolf Creek DEIS

Clint,

Per Adam Poe's direction, we had sent two copies of the DEIS to your attention. We did not send a copy to Red McCombs directly and do not have an address for him. The two copies we sent to you have not yet been returned to us by the postal service and the Forest Service has all the remaining copies, so if you provide us an address for Mr. McCombs we will ask the Forest Service send him a copy.

Thanks,
Susan


Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado 80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com · www.westerneco.com*

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Tuesday, September 04, 2012 11:27 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Susan,

Can you also check to see what address you used for sending a copy to Red McCombs in San Antonio. Thanks.

**Clint E. Jones**
**President**
**The Village at Wolf Creek, LLC**
**12117 Bee Caves Road**
**Suite 240**
**Austin, TX 78738**
**(512) 466-6695**
**clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 9:06 AM
**To:** Clint Jones
**Subject:** RE: Wolf Creek DEIS

C0009861

Thank you for the update.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado 80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com · www.westerneco.com*

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Saturday, September 01, 2012 6:36 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Hal Jones Development is no longer there. I am now subletting space from a law firm. Use this address going forward:

Clint Jones
c/o Leighton Law Firm
12117 Bee Caves Road
Suite 3-240
Austin, TX 78738

**Clint E. Jones**
**President**
**The Village at Wolf Creek, LLC**
**12117 Bee Caves Road**
**Suite 240**
**Austin, TX 78738**
**(512) 466-6695**
**clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Wednesday, August 29, 2012 2:30 PM
**To:** Clint Jones
**Subject:** Wolf Creek DEIS

Clint,

David said you did not receive a copy of the DEIS last week. A copy was sent to your attention on August 17, 2012 via first class mail to Hal Jones Development, 12117 Bee Cave Road, Suite 240, Austin, TX 78738, and should have been received by August 21. Please let me know if this address is incorrect.

Susan Cornett
Office Manager



**_WESTERN ECOLOGICAL RESOURCE, INC._**

_711 Walnut Street, Boulder, Colorado  80302_
_303.449.9009 office · 303.449.9038 fax_
_susan@westerneco.com_  ·  _www.westerneco.com_

C0009863

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8132-000001

C0009864

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8132-000002

C0009865

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8132-000003

C0009866

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8132-000004

C0009867

## Malecek, Thomas -FS

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 04, 2012 12:41 PM |
| **To:** | Susan Cornett; Dyer, Harold D -FS |
| **Cc:** | Adam Poe; David@westerneco.com |
| **Subject:** | RE: Wolf Creek DEIS |

Susan, will check with Dave, if we have one, it is about our last and may be hitting you guys up to print some more copies…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 11:57 AM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS
**Cc:** Adam Poe; David@westerneco.com
**Subject:** FW: Wolf Creek DEIS

Tom/Dave,

Please send a copy of the DEIS to Red McCombs at the address listed below.

Thanks!
Susan


Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado 80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com · www.westerneco.com*

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Tuesday, September 04, 2012 11:46 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Susan,

As of this date, my mailed copies have not yet arrived – I don't know what happened to them – but I now have a copy David gave to me.  Please have another copy mailed to Red at the following address:

C0009868

Red McCombs
McCombs Enterprises
755 E Mulberry Ave, Ste 600
San Antonio, TX 78212

Thanks,

**Clint E. Jones
President
The Village at Wolf Creek, LLC
12117 Bee Caves Road
Suite 240
Austin, TX 78738
(512) 466-6695
clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 12:43 PM
**To:** Clint Jones
**Subject:** RE: Wolf Creek DEIS

Clint,

Per Adam Poe's direction, we had sent two copies of the DEIS to your attention.  We did not send a copy to Red McCombs directly and do not have an address for him.  The two copies we sent to you have not yet been returned to us by the postal service and the Forest Service has all the remaining copies, so if you provide us an address for Mr. McCombs we will ask the Forest Service send him a copy.

Thanks,
Susan


Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302
303.449.9009 office · 303.449.9038 fax
susan@westerneco.com   ·   www.westerneco.com*

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Tuesday, September 04, 2012 11:27 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Susan,

Can you also check to see what address you used for sending a copy to Red McCombs in San Antonio.  Thanks.

C0009869

**Clint E. Jones
President
The Village at Wolf Creek, LLC
12117 Bee Caves Road
Suite 240
Austin, TX 78738
(512) 466-6695
clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 9:06 AM
**To:** Clint Jones
**Subject:** RE: Wolf Creek DEIS

Thank you for the update.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com  ·  www.westerneco.com*

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Saturday, September 01, 2012 6:36 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Hal Jones Development is no longer there.  I am now subletting space from a law firm.  Use this address going forward:

Clint Jones
c/o Leighton Law Firm
12117 Bee Caves Road
Suite 3-240
Austin, TX 78738

**Clint E. Jones
President
The Village at Wolf Creek, LLC
12117 Bee Caves Road
Suite 240
Austin, TX 78738
(512) 466-6695
clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Wednesday, August 29, 2012 2:30 PM
**To:** Clint Jones
**Subject:** Wolf Creek DEIS

Clint,

David said you did not receive a copy of the DEIS last week.  A copy was sent to your attention on August 17, 2012 via first class mail to Hal Jones Development, 12117 Bee Cave Road, Suite 240, Austin, TX 78738, and should have been received by August 21.  Please let me know if this address is incorrect.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com  ·  www.westerneco.com*

C0009871

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8133-000001

C0009872

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8133-000002

C0009873

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8133-000003

C0009874

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8133-000004

C0009875

| | |
|---|---|
| **From:** | Malecek, Thomas -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MALECEK, THOMAS94D8BAE2-5D0E-46FD-AB77-77C6A76002FD> |
| **Sent:** | Tuesday, September 04, 2012 12:41 PM |
| **To:** | Susan Cornett; Dyer, Harold D -FS |
| **Cc:** | Adam Poe; David@westerneco.com |
| **Subject:** | RE: Wolf Creek DEIS |
| **Attachments:** | image001.jpg; image002.jpg; image003.jpg; image004.jpg |

Susan, will check with Dave, if we have one, it is about our last and may be hitting you guys up to print some more copies…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 11:57 AM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS
**Cc:** Adam Poe; David@westerneco.com
**Subject:** FW: Wolf Creek DEIS

Tom/Dave,

Please send a copy of the DEIS to Red McCombs at the address listed below.

Thanks!
Susan

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado 80302*
*303.449.9009 office · 303.449.9038 fax*
susan@westerneco.com  ·  www.westerneco.com

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Tuesday, September 04, 2012 11:46 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Susan,

1

C0009876

As of this date, my mailed copies have not yet arrived – I don't know what happened to them – but I now have a copy David gave to me.  Please have another copy mailed to Red at the following address:

Red McCombs
McCombs Enterprises
755 E Mulberry Ave, Ste 600
San Antonio, TX 78212

Thanks,

**Clint E. Jones**
**President**
**The Village at Wolf Creek, LLC**
**12117 Bee Caves Road**
**Suite 240**
**Austin, TX 78738**
**(512) 466-6695**
**clint@thevillageatwolfcreek.com**

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 12:43 PM
**To:** Clint Jones
**Subject:** RE: Wolf Creek DEIS

Clint,

Per Adam Poe's direction, we had sent two copies of the DEIS to your attention.  We did not send a copy to Red McCombs directly and do not have an address for him.  The two copies we sent to you have not yet been returned to us by the postal service and the Forest Service has all the remaining copies, so if you provide us an address for Mr. McCombs we will ask the Forest Service send him a copy.

Thanks,
Susan


Susan Cornett
Office Manager



*WESTERN ECOLOGICAL RESOURCE, INC.*
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
susan@westerneco.com    ·    www.westerneco.com

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Tuesday, September 04, 2012 11:27 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

C0009877

Susan,

Can you also check to see what address you used for sending a copy to Red McCombs in San Antonio.  Thanks.

**Clint E. Jones**
**President**
**The Village at Wolf Creek, LLC**
**12117 Bee Caves Road**
**Suite 240**
**Austin, TX 78738**
**(512) 466-6695**
**clint@thevillageatwolfcreek.com**

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Tuesday, September 04, 2012 9:06 AM
**To:** Clint Jones
**Subject:** RE: Wolf Creek DEIS

Thank you for the update.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com    ·    www.westerneco.com*

---

**From:** Clint Jones [mailto:clint@thevillageatwolfcreek.com]
**Sent:** Saturday, September 01, 2012 6:36 AM
**To:** Susan Cornett
**Subject:** RE: Wolf Creek DEIS

Hal Jones Development is no longer there.  I am now subletting space from a law firm.  Use this address going forward:

Clint Jones
c/o Leighton Law Firm
12117 Bee Caves Road
Suite 3-240
Austin, TX 78738

**Clint E. Jones**
**President**
**The Village at Wolf Creek, LLC**
**12117 Bee Caves Road**
**Suite 240**
**Austin, TX 78738**

C0009878

**(512) 466-6695**
**clint@thevillageatwolfcreek.com**

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Wednesday, August 29, 2012 2:30 PM
**To:** Clint Jones
**Subject:** Wolf Creek DEIS

Clint,

David said you did not receive a copy of the DEIS last week.  A copy was sent to your attention on August 17, 2012 via first class mail to Hal Jones Development, 12117 Bee Cave Road, Suite 240, Austin, TX 78738, and should have been received by August 21.  Please let me know if this address is incorrect.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
*susan@westerneco.com    ·    www.westerneco.com*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0009879

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8134-000001

C0009880

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8134-000002

C0009881

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8134-000003

C0009882

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8134-000004

C0009883

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Wednesday, September 05, 2012 10:41 AM |
| **To:** | Dyer, Helen C -FS |
| **Subject:** | FW: Request for Appraisal for Wolf Creek Land Swap |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Jim Lincoln [mailto:jrufus@skywerx.com]
**Sent:** Thursday, August 30, 2012 12:01 PM
**To:** Dyer, Harold D -FS
**Subject:** Request for Appraisal for Wolf Creek Land Swap

Dave, Thank you for your help at the meeting in Pagosa Springs on Wednesday evening.

This is a request for a copy or access to the Appraisal for the Land Swap at Wolf Creek in Mineral County, Colorado.

Thank you,    Jim Lincoln   174 Teal Circle, Pagosa Springs, CO  81147.     970-731-0774

C0009884

**From:**                    Dyer, Helen C -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DYER, HELEN88043AA1-4FE8-4891-8672-964D43A9E1E4>
**Sent:**                    Wednesday, September 05, 2012 10:47 AM
**To:**                    Gallegos, Marge -FS; Curtis, Tate -FS
**Cc:**                    Dyer, Harold D -FS
**Subject:**             FW: Request for Appraisal for Wolf Creek Land Swap
**Attachments:**     20120830SLVEC_FOIA.pdf; 20120830VistaFOIA.pdf; image001.gif

Marge and Tate, Dave is having difficulty attaching docs. Please call him if you have any questions.
Have a great day.



Helen C. Dyer
RGNF/SLVPLC
GIS Data Services Asst
INFRA Db and
File Structure Coordinator
719.852.6244

---

**From:** Dyer, Harold D -FS
**Sent:** Wednesday, September 05, 2012 10:41 AM
**To:** Dyer, Helen C -FS
**Subject:** FW: Request for Appraisal for Wolf Creek Land Swap


+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Jim Lincoln [mailto:jrufus@skywerx.com]
**Sent:** Thursday, August 30, 2012 12:01 PM
**To:** Dyer, Harold D -FS
**Subject:** Request for Appraisal for Wolf Creek Land Swap

Dave, Thank you for your help at the meeting in Pagosa Springs on Wednesday evening.

This is a request for a copy or access to the Appraisal for the Land Swap at Wolf Creek in Mineral County, Colorado.

Thank you,    Jim Lincoln   174 Teal Circle, Pagosa Springs, CO  81147.      970-731-0774

C0009885



San Luis Valley Public Lands

San Luis Valley
Bureau of Land Management

Rio Grande
National Forest

### -Village at Wolf Creek Access Project DEIS-
### -Written Comment Form-

*Comments are requested by September 30, 2012 in order to be most effectively considered. Please use a pen.*

FOIA Request -
Please provide # a copy
of the Village at Wolf
Creek Access Project Appraisal
SLUEC
to: PO Box 223
Alamosa CO 81101

<table>
<tr><td>Comment forms may be mailed to:<br>Dan Dallas, Forest Supervisor<br>c/o Tom Malecek, Divide District Ranger<br>Rio Grande National Forest<br>13308 West Highway 160<br>Del Norte, CO 81132<br>Fax: 719-657-6035</td><td>Electronic Comments may be submitted to:<br>comments-rocky-mountain-rio-grande-divide@fs.fed.us<br>Please include "Village at Wolf Creek Access Project DEIS"<br>in subject line of email.<br><br>The DEIS is available for review at:<br>http://www.fs.usda.gov/projects/riogrande/landmanagement/projects</td></tr>
</table>

Comments received in response to this solicitation, including names and addresses of those who comment, will be part of the public record for this proposed action. Comments submitted anonymously will be accepted and considered; however, anonymous comments will not provide the respondent with standing to participate in subsequent administrative review or judicial review. (Authority: 40 CFR 1501.7 and 1508.22, 36 CFR 220.5(b) and Forest Service Handbook 1909.15, Section 21).

C0009886



San Luis Valley Public Lands

San Luis Valley
Bureau of Land Management

Rio Grande
National Forest

## -Village at Wolf Creek Access Project DEIS-
## -Written Comment Form-

*Comments are requested by September 30, 2012 in order to be most effectively considered. Please use a pen.*

FOIA Request

Please provide a copy of appraisal for
the Village at Wolf Creek
Access Project DEIS.

Thank you,

Rio de la Vista
P. O. Box 777
Monte Vista CO 81144

Comment forms may be mailed to:
Dan Dallas, Forest Supervisor
c/o Tom Malecek, Divide District Ranger
Rio Grande National Forest
13308 West Highway 160
Del Norte, CO 81132
Fax: 719-657-6035

Electronic Comments may be submitted to:
comments-rocky-mountain-rio-grande-divide@fs.fed.us
Please include "Village at Wolf Creek Access Project DEIS"
in subject line of email.

The DEIS is available for review at:
http://www.fs.usda.gov/projects/riogrande/landmanagement/projects

Comments received in response to this solicitation, including names and addresses of those who comment, will be part of the
public record for this proposed action. Comments submitted anonymously will be accepted and considered; however, anonymous
comments will not provide the respondent with standing to participate in subsequent administrative review or judicial review.
(Authority: 40 CFR 1501.7 and 1508.22, 36 CFR 220.5(b) and Forest Service Handbook 1909.15, Section 21).

C0009887



C0009888



C0009889



C0009890



C0009891



C0009892



C0009893



C0009894



C0009895



C0009896



C0009897



C0009898



C0009899



C0009900



C0009901



C0009902



C0009903



C0009904



C0009905



C0009906



C0009907



C0009908



C0009909

C0009910



C0009911



C0009912



C0009913



C0009914



C0009915

C0009916



C0009917



C0009918



C0009919



C0009920



C0009921



C0009922



C0009923



C0009924



C0009925

**Gallegos, Marge -FS**

| | |
|---|---|
| **From:** | Gallegos, Marge -FS |
| **Sent:** | Wednesday, September 05, 2012 10:52 AM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | FW: Request for Appraisal for Wolf Creek Land Swap |
| **Attachments:** | 20120830SLVEC_FOIA.pdf; 20120830VistaFOIA.pdf |

Hey Dave - - Based on the sign in sheet is there any way you can provide the name of the individuals representing these two organizations?  This will allow me to create entries in FOIAXpress and provide Tate with FOIA tracking numbers, that is unless you can get your computer to cooperate long enough to create the numbers.
Marge

---

**From:** Dyer, Helen C -FS
**Sent:** Wednesday, September 05, 2012 10:47 AM
**To:** Gallegos, Marge -FS; Curtis, Tate -FS
**Cc:** Dyer, Harold D -FS
**Subject:** FW: Request for Appraisal for Wolf Creek Land Swap

Marge and Tate, Dave is having difficulty attaching docs. Please call him if you have any questions.
Have a great day.



Helen C. Dyer
RGNF/SLVPLC
GIS Data Services Asst
INFRA Db and
File Structure Coordinator
719.852.6244

---

**From:** Dyer, Harold D -FS
**Sent:** Wednesday, September 05, 2012 10:41 AM
**To:** Dyer, Helen C -FS
**Subject:** FW: Request for Appraisal for Wolf Creek Land Swap

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Jim Lincoln [mailto:jrufus@skywerx.com]
**Sent:** Thursday, August 30, 2012 12:01 PM

**To:** Dyer, Harold D -FS
**Subject:** Request for Appraisal for Wolf Creek Land Swap

Dave, Thank you for your help at the meeting in Pagosa Springs on Wednesday evening.

This is a request for a copy or access to the Appraisal for the Land Swap at Wolf Creek in Mineral County, Colorado.

Thank you,    Jim Lincoln   174 Teal Circle, Pagosa Springs, CO  81147.     970-731-0774

C0009927



San Luis Valley
Bureau of Land Management

San Luis Valley Public Lands

Rio Grande
National Forest

-Village at Wolf Creek Access Project DEIS-
-Written Comment Form-

*Comments are requested by September 30, 2012 in order to be most effectively considered. Please use a pen.*

FOIA Request -
Please provide # a copy
of the Village at Wolf
Creek Access Project Appraisal
SLUEC
to: PO Box 223
Alamosa CO 81101

Comment forms may be mailed to:
Dan Dallas, Forest Supervisor
c/o Tom Malecek, Divide District Ranger
Rio Grande National Forest
13308 West Highway 160
Del Norte, CO 81132
Fax: 719-657-6035

Electronic Comments may be submitted to:
comments-rocky-mountain-rio-grande-divide@fs.fed.us
Please include "Village at Wolf Creek Access Project DEIS"
in subject line of email.

The DEIS is available for review at:
http://www.fs.usda.gov/projects/riogrande/landmanagement/projects

Comments received in response to this solicitation, including names and addresses of those who comment, will be part of the public record for this proposed action. Comments submitted anonymously will be accepted and considered; however, anonymous comments will not provide the respondent with standing to participate in subsequent administrative review or judicial review. (Authority: 40 CFR 1501.7 and 1508.22, 36 CFR 220.5(b) and Forest Service Handbook 1909.15, Section 21).



San Luis Valley
Bureau of Land Management

San Luis Valley Public Lands

Rio Grande
National Forest

-Village at Wolf Creek Access Project DEIS-
-Written Comment Form-

*Comments are requested by September 30, 2012 in order to be most effectively considered. Please use a pen.*

FOIA Request

Please provide a copy of appraisal for
the Village at Wolf Creek
Access Project DEIS.

Thank you,

Rio de la Vista
P. O. Box 777
Monte Vista CO 81144

Comment forms may be mailed to:
Dan Dallas, Forest Supervisor
c/o Tom Malecek, Divide District Ranger
Rio Grande National Forest
13308 West Highway 160
Del Norte, CO 81132
Fax: 719-657-6035

Electronic Comments may be submitted to:
comments-rocky-mountain-rio-grande-divide@fs.fed.us
Please include "Village at Wolf Creek Access Project DEIS"
in subject line of email.

The DEIS is available for review at:
http://www.fs.usda.gov/projects/riogrande/landmanagement/projects

Comments received in response to this solicitation, including names and addresses of those who comment, will be part of the public record for this proposed action. Comments submitted anonymously will be accepted and considered; however, anonymous comments will not provide the respondent with standing to participate in subsequent administrative review or judicial review.
(Authority: 40 CFR 1501.7 and 1508.22, 36 CFR 220.5(b) and Forest Service Handbook 1909.15, Section 21).



C0009930



C0009931



C0009932



C0009933



C0009934



C0009935



C0009936



C0009937



C0009938





C0009940



C0009941



C0009942



C0009943



C0009944



C0009945



C0009946



C0009947



C0009948



C0009949



C0009950





C0009952



C0009953



C0009954

C0009955



C0009956



C0009957

C0009958



C0009959



C0009960



C0009961



C0009962



C0009963



C0009964



C0009965



C0009966



C0009967

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Wednesday, September 05, 2012 2:45 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | DEIS hard copy request |

We received a request (on my voicemail) to send a hard copy of the VWC DEIS to:
Tom Jameson
1024 Forrester Ave. NW
Albuquerque, NM. 87102

If you need to contact him, he can be reached at 505-346-2489

- Mike

C0009968

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Wednesday, September 05, 2012 4:17 PM |
| **To:** | Ghormley, Randy -FS |
| **Subject:** | 2004 and 2005 notes re: WCPLL crossing locations |
| **Attachments:** | Hwy 160 crossing structure location notes vers 08 18 04.ZIP |

Randy,

Here are 2 somewhat redundant docs. re: the results of our assessment of potential crossing structure locations over Wolf Creek Pass.

The first contains my notes of all potential crossing locations and the second is a letter to Tanya boiling the locations down to those best 7.

Please acknowledge receipt of the attached file(s).
Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0009969

# Western Ecosystems, Inc.
## Ecological Consultants
### 905 West Coach Road, Boulder, Colorado 80302  (303) 442-6144

Feb. 03, 2005

The number, type, and distribution of potential highway crossing structures within the Wolf Creek Pass Lynx Linkage (WCPLL) is based on a limited number of physiographic opportunities to install effective structures and recommendations of other studies (e.g., Clevenger et al. 2002, Barnum 2003). Because of prolonged time intervals between subsequent relocations of radio-collared lynx, little is known about where lynx have been crossing Highway 160. However, based upon (1) the close association of lynx with the subalpine zone, (2) the distribution of local physiographic features (cliff bands, optimal habitat facilitating movements on both sides of the highway, ridges, saddles, and drainage bottoms) that influence lynx movements, (3) that portion of Highway 160 in the WCPLL without existing or proposed crossing structures (USFWS 2003a), and (4) the limited number of physiographic opportunities to install effective structures, the highest quality potential crossing structure locations are described below. These seven structure locations, identified during interagency field reviews, are well distributed throughout the highest elevations of the WCPLL, three west of Wolf Creek Pass and four east of the pass.

## Location C, Mile Marker (MM) 162.8, Wolf Creek Pass USGS Quad, Potential Overpass Site
A prominent ridge on the south side of the highway would likely conduct lynx movements (especially south to north), with good forest connectivity on both side of the highway. This location is the best site on the west side of the Pass for an overpass and, as a result of surrounding physiography, a site that would allow animals to cross the Continental Divide at the head of Lake Creek, approximately one mile north of the highway. The span (i.e., over the highway) would need to be approximately 100 yards long. Clevenger et al. (2002) indicated that an effective, multiple wildlife species (i.e., including carnivores and large ungulates) overpass design is a level, parabolic-shaped overpass, approximately 230 feet wide at the center and 295 feet wide at the ends. Designs for a smaller guild of species, particularly smaller carnivores, could be considerably narrower. Keller (1999) found that width was the only significant parameter determining use of 21 overpasses in four European countries. Wildlife used overpasses <63 feet wide significantly less than wider structures. Medium-sized (47-156 ft. wide) and broad (>156 ft. wide) wildlife overpasses were used more frequently than narrow overpasses. Pfister et al. (1997) and Keller (1999) recommended overpass widths of 156-188 feet for large European mammals, though overpass widths would depend on the target species.

## Location F, MM 164.76, Wolf Creek Pass USGS Quad, Potential Underpass Site
This site offers good potential for an underpass developed via excavating fill below highway and installing a spanning bridge. A medium-sized (13 ft. high x 23 ft. wide; Clevenger et al. 2002) arched culvert could also be used at this site, although it would not be as effective at conducting wildlife movements. Presently, a three-foot diameter culvert conducts water under the four-lane highway. Approximately 25-30 feet of 1:1 fill occurs above the top of the culvert on the south side of highway. Approximately 15 feet of 1:1 fill occurs below the road surface on the north side of the highway. The potential span width across highway and shoulders would be approximately 30 yards. Potential span length along highway would be approximately 30 yards. Forest closely approaches both sides of highway at this site.

C0009970

**Location G, MM 165.5, Wolf Creek Pass USGS Quad, Potential Underpass Site**
This site offers good potential for an underpass developed via installing a spanning bridge or arched culvert ("metal plate"). Presently, three-foot and two-foot diameter culverts occur under the four-lane highway. Another five-foot diameter culvert under the highway is grouted closed approx. 110 feet inside the south opening. Approximately 10 feet of 1:1 fill occurs above the culvert on north side of the highway. Approximately 30 feet of 1:1 fill occurs above the culvert on the south side of the highway. An effective crossing structure would consist of a 26-yard-wide (across highway) spanning bridge or a 42-yard-long box or arched culvert ("metal plate").

**Snow Shed, Wolf Creek Pass USGS Quad, Potential Overpass Site**
The concept at this site is to retrofit the existing snow shed into a highway overpass. If needed, a box culvert would be installed to allow CDOT foot access along south side of the snow shed. A ramp of fill material (e.g., waste rock and soil) would be compacted over box culvert, tying it into a bench on the west, downhill side of the snow shed. Approximately 15 feet of vertical relief occurs between grade and the snow shed's south roof. Concrete wing walls and screening vegetation (conifers) would be installed on east and west approached to the tunnel and on the top, north side of the snow shed (outside the avalanche path) to create acoustic and visual buffers for animals approaching and in overpass. The existing concrete roof would be texturized with black sealant (now in use on roof) to facilitate deer and elk use. This is the best opportunity for an overpass on the east side of the Pass and a site, just north of the proposed Village at Wolf Creek, that might be used by animals deflected around that development.

**Location J, MM 169.27, Wolf Creek Pass USGS Quad, Potential Underpass Site**
This site offers good potential for an underpass developed via installing a spanning bridge or arched culvert ("metal plate"). Excellent forest connectivity occurs across the 18-yard-wide, three lane highway; 11 yards from forest edge to each highway shoulder. The north side of the highway supports a well-used snow storage area that also serves as a winter parking area for daytime winter recreational use (sledding/ dispersed Nordic skiing). Presently, a three-foot diameter culvert conducts flows of a perennial creek under highway. Approximately 20 feet of 1:1 fill occurs above the culvert on the north side of the highway. Up to 30 feet of 1:1 fill occurs above the culvert on the south side of the highway. A low spanning bridge (i.e., with approx. 16-26 ft. of vertical clearance below the bridge) up to 77 yards long (along the highway) and approximately 24 yards wide (across highway) would be optimal. A medium-sized (13 ft. high x 23 ft. wide; Clevenger et al. 2002) arched culvert or "metal plate" might also work, although it would not be as permeable.

**Location K, MM 170.53, Wolf Creek Pass USGS Quad, Photo 29, Potential Underpass Site**
This site offers good potential for an underpass developed via installing a spanning bridge or arched culvert. Up to 30 feet of 1:1 fill occurs on the south side of the highway and 20 feet of fill occurs on the north side. Two, six-foot diameter culverts conducting flows occur under the highway. Forest connectivity is 71-yards-wide across three-lane highway. A 15-yard-wide shoulder occurs on the south side of the highway. Excavating highway fill and installing a low clearance spanning bridge would be optimal. A medium-sized (13 ft. high x 23 ft. wide; Clevenger et al. 2002) arched culvert of "metal plate" would also work, although it would not be as permeable.

**Location L, MM 171, Mount Hope USGS Quad, Potential Underpass Site**
This location supports is a moderately steep, V-shaped, perennial drainage that has been filled for the highway. Thirty feet of fill occurs above the three-foot-diameter culvert on the north side of highway.

C0009971

A long (88 yards), 1:1 boulder fill slope occur on the south side of the highway. The three-lane highway has a nine-yard shoulder on the south side and 16-yard shoulder on the north side. Excavating some of the highway fill and installing a spanning bridge would be optimal. The bridge span could be up to approximately 46-yards-long (along highway) on the north side and up to 73-yards-long on the south side. Access/ departure ramps to and from adjacent hillsides below the south side of the bridge opening would better direct movements and facilitate use.

C0009972

August 18, 2004

Notes from July 28, 2004 survey of Highway 160 over Wolf Creek Pass to identify potential crossing structure locations. This version incorporates Kurt's notes emailed to those below on Aug. 16.

Present:
Kurt Broderdorp, USFWS
Laurel Kagan Wiley, USFS
Jon Holst, CDOT
Rick Thompson, WCV Third Party Consultant

Surveyed from west to east, starting above at the lowest westbound runaway truck ramp (MM 161) on the west side of the pass (i.e., at the eastern end of the extensive highway cut on the north side of the highway forming a formidable cliff barrier) and ending at the tunnel under construction on the east side of the pass. Used a laser rangefinder to measure distances. Photos taken by RT.

## WEST SIDE OF PASS
### Location A, MM 161.29, Saddle Mountain USGS Quad, Photos 1+2, Potential underpass site
Above lowest westbound runaway truck ramp on the west side of the pass. Steep, V-shaped drainage w perennial creek on N side of highway. Three-foot diameter culvert w water under highway, 62 yards long. Steep, deep drop-off on S side of hwy. Limited (~ 6 ft.) vertical clearance below highway surface to top of culvert on uphill side, so little opportunity for crossing structure. 1:1 fill slope on S side, 122 yards from highway shoulder to toe slope.

### Location B, MM 162.44, Wolf Creek Pass USGS Quad, Photos 3+4, Potential underpass site
Three-foot diameter culvert, 74 yards long, with water under highway and toe of highest runaway truck ramp on the west side of the Pass. Approximately 8 feet of fill over top of culvert to approximate downhill (S side) road surface; approx. 6 feet of fill over top of uphill (N side) culvert. Average slope of 3-4%. Limited potential for an overpass and no local physiography that might direct animals to this site.

### Location C, MM 162.8, Photo 6, Wolf Creek Pass USGS Quad, Potential overpass site
Prominent ridge on S side of highway that would likely conduct movements (esp. S to N), with good forest connectivity on both side of the highway. Span would need to be approx. 100 yards long. Excluding any cost considerations, this appears to be the best site on the west side of the Pass for an overpass with high potential for use as a result of surrounding physiography.

### Location D, MM 163.15, Photos 7-9, Wolf Creek Pass USGS Quad, Potential underpass site
Landscape depression on N side of highway; no culverts present. Approximately 8 feet of fill above ground level on N side of highway. Approximately 25 feet of fill above ground level (fill toe slope) on S side of highway. Four lane highway and broad (30 yard) shoulders on each side of highway associated with entrance to Fall Creek Road, a designated snowmobile route. Underpass would need to be approx. 87 yards long.

### Location E, MM 163.36, Wolf Creek Pass USGS Quad, Photos 10+11, Potential underpass site via spanning bridge
Filled drainage; no bridge present; would need to excavate fill below highway and install spanning bridge that would function as a wildlife underpass. Approx. 30 feet of fill on uphill (N) side of highway above culvert. Toe of waterfall on uphill side of highway 23 yards from edge of highway. Would need perpendicular "approach/departure" ramps to road ROW on N side of road for animals to get around

1

waterfall cliff.  Guardrail to guardrail: 21 yards across 4-lane highway.  Potential span width across highway and shoulders: approx. 26 yards.  Potential span length along highway: approx. 41 yards.  Approx. 50 feet of 1:1 fill on S side of highway.  38 yards from road shoulder to fill toe slope on S side.

**Location F, MM 164.76, Wolf Creek Pass USGS Quad, Photos 13+15, Potential underpass site via spanning bridge**
Three-foot diameter culvert w water under 4-lane highway.  Approx. 25-30 feet of 1:1 fill above top of culvert on S side of highway.  Approx. 15 feet of 1:1 fill below road surface on N side of highway.  Good potential for underpass developed via excavating fill below highway and installing a spanning bridge that would function as a wildlife underpass.  Potential span width across highway and shoulders: approx. 30 yards.  Potential span length along highway: approx. 30 yards.  Forest closely approaches both sides of highway.

**Location G, MM 165.5, Wolf Creek Pass USGS Quad, Photo 17, Potential underpass site**
Three-foot and two-foot diameter culverts under 4-lane highway.  Another 5-foot diameter culvert under highway from S side is grouted closed approx. 110 feet inside S opening.  Approx. 10 feet of 1:1 fill above culvert on N side of highway.  Approx. 30 feet of 1:1 fill above culvert on S side of highway.  Limited landscape features that might funnel animals to this site.  Kurt's notes indicate "high potential for movement of wildlife".  Potential for 26 yard wide (across highway) spanning bridge or 42 yard long box or arched culvert ("metal plate").

**Location H, MM 165.8, Wolf Creek Pass USGS Quad, Photo 18, Potential underpass site**
Approx. 8 feet of 1:1 fill above culvert on N side of highway, not conducive to an underpass crossing structure (box or arched culvert ["metal plate"]) with much vertical clearance on N side.  Approx. 40 feet of 1:1 fill on S side of highway.  Good forest habitat connectivity on each side of highway.  Several ridges and drainages funnel to site on N side of highway.  19 yards to closest riparian forest edge from pavement edge on N side of highway.  38 yards to forest edge from pavement edge on S side of highway.  Concave (to the south) highway curve would funnel N-bound animals to crossing structure.  4-lane highway.  Could use vegetation fencing to funnel animals to structure.

**EAST SIDE OF PASS**
**Snowshed, Photos 19-25, Wolf Creek Pass USGS Quad, Potential overpass site**
Approximately 15 feet from walkway on S side of snowshed to top of snowshed roof.  Concept is to retrofit the snowshed into a highway overpass.  Install box culvert on S side of snowshed to provide CDOT access along entire S side.  Install fill over box culvert, tying it into a bench on the west, downhill side of the snowshed.  Extend wing walls and install screening vegetation (conifers) to create acoustic and visual buffers for animals approaching and in overpass.  Texturize the existing concrete roof with black sealant (now in use on roof) to facilitate deer and elk use.  This is the best opportunity for an overpass on the east side of the Pass and a site, just north of the proposed Wolf Creek Village that might be used by animals deflected around that development.

**Location I, MM 169, Wolf Creek Pass USGS Quad**
Not much potential for any type of crossing structure at this site.  Long 1:1 fill slope on downhill (S) side.  Sediment pond on uphill (N) side.  Little reason for a lynx to find its way to this site.

**Location J, MM 169.27, Wolf Creek Pass USGS Quad, Photos 27+28, Potential underpass site via spanning bridge or arched culvert**
Excellent forest connectivity  across highway-11 yards to forest edge from each highway shoulder.  18 yards across 3-lane highway.  Three-foot diameter culvert under highway w perennial creek.  Approx. 20 feet of 1:1 fill above culvert on N side of highway.  Up to 30 feet of 1:1 fill above culvert on S side

C0009974

of highway. A low spanning bridge (i.e., 16-26 feet of vertical clearance below the bridge) up to 77 yards long (along highway) and approx. 24 yards wide (across highway) would be optimal. An arched culvert of "metal plate" might also work, although it would not be as permeable. On the north side of the highway is a well-used snow storage area that also serves as a winter parking area for daytime winter recreational use (sledding/ dispersed Nordic skiing).

**Location K, MM 170.53, Wolf Creek Pass USGS Quad, Photo 29, Potential underpass site**
Up to 30 feet of 1:1 fill on S side of highway and 20 feet of fill on N side. Two, 6-foot diameter culverts under highway-both conducting flows. Forest connectivity 71 yards apart across 3-lane highway. 15 yard wide shoulder on S side of highway. Excavating highway fill and installing a low clearance spanning bridge would be optimal. An arched culvert of "metal plate" would also work, although it would not be as permeable.

**Location L, MM 171, Mount Hope USGS Quad, Photos 30+31, Potential underpass site via spanning bridge**
This is a moderately steep, V-shaped drainage with a perennial creek that has been filled for the highway. 30-feet of fill above 3-foot diameter culvert on N side of highway. Long (88 yards) 1:1 boulder fill slope on S side of highway. 3-lane highway with 9-yard shoulder on S side and 16-yard shoulder on N side. Excavating some of the highway fill and installing a spanning bridge would be optimal. Bridge span would be approx. 46 yards long (along highway) on N side and 73 yards long on S side. Would need to created access/ departure ramps to/from adjacent hillsides below bridge opening to facilitate use.

**Location M, MM 171.38, Mount Hope USGS Quad, Potential underpass site**
Seven-foot diameter culvert 66 yards long with perennial creek and grouted wing walls on N side of highway. Limited opportunity for existing use as underpass. Discussion re: installing a shelf suspended from one wall of the culvert to encourage small-medium animals use (including lynx) without the animal walking up the flowing culvert. Effectiveness questionable.

**Location N, MM 172, Mount Hope USGS Quad, Photos 32+33, Site of Highway 160 lynx road-kill**
Barriers/ restrictions on N side of highway. No potential for crossing structure. Pass Creek Lake per se (i.e., an obstacle) and it dam on its eastern end are the only local landforms that might have encouraged specific use of this site. That is, there are no prominent landscape features that would appear to direct on concentrate lynx crossings at this site.

C0009975

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Thursday, September 06, 2012 8:25 AM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | david@westerneco.com |
| **Subject:** | WCV Project Status Confirmation |

Randy,

I just had my budget approved to prepare the draft BA, so this morning was my first review of the changes that you made to the DEIS as referenced in your email below. Just to clarify the results of the FWS solicitor(s), your OGC, and our Aug. 29 meeting with FWS:

1. Private Village development under Alternative 2 will be considered an indirect effect for NEPA and Section 7 purposes.

2. Private Village development under Alternative 2 will continue to be considered an interrelated and interdependent activity because it meets consultation manual criteria and would not occur "but for" the land exchange (USFWS and NMFS, 1998, p. 4-26).

3. The Applicant will agree to implement a conservation strategy (CS), consisting of conservation measures (CMs) to minimize adverse project effects, that will be developed and agreed to by the three parties (FS, FWS, and Applicant). The finalized CS will be part of the Proposed Action, which means that the effects of implementing the CMs will be considered in the impact assessment. Note that putting the CS in the Proposed Action (rather than in a section [such as "Conservation Measures to Minimize Proposed action Effects] following the impact assessment) will delay BA preparation and warrant further reanalysis of impacts. As the lead agency, the FS will maintain discretionary authority of the CS and project until the land exchange is consummated, after which the FWS will undertake discretionary authority and enforcement.

Please confirm the above and feel free to modify the above text to better reflect the FS's position.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

In a message dated 7/25/2012 4:07:07 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

> All – attached are my latest (and hopefully final) edits to Rick's most recent (July 24, 2012) IDEIS text in which I searched for references to I&I, Section 10, Habitat Conservation Plan, and HCP. I found 6 references I believe where I made a change. Rick – these are all highlighted with a comment so they can be tracked back to your final DEIS and BA text.

This text should be ready to go into the DEIS based on our recent discussions with FWS and OGC.  I would encourage all changes, plus any updates related to traffic analysis corrections, be included in the draft BA that will go to the FWS hopefully around the same time the DEIS goes out to the public, or shortly thereafter.

Just a heads-up to you all as well that I will be on AL August 6-17, back on the 20th.

Randy Ghormley

Wildlife Program Manager

Rio Grande National Forest &

San Luis Valley Public Lands Center

Office: 719.852.6243

Cell: 719.850.2369

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Thursday, September 06, 2012 8:47 AM |
| **To:** | Weiwild@aol.com |
| **Subject:** | RE: 2004 and 2005 notes re: WCPLL crossing locations |

Morning Rick.  I got both your emails and will try to get to them later today.  Will be busy for awhile.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Wednesday, September 05, 2012 4:17 PM
**To:** Ghormley, Randy -FS
**Subject:** 2004 and 2005 notes re: WCPLL crossing locations

Randy,

Here are 2 somewhat redundant docs. re: the results of our assessment of potential crossing structure locations over Wolf Creek Pass.

The first contains my notes of all potential crossing locations and the second is a letter to Tanya boiling the locations down to those best 7.

Please acknowledge receipt of the attached file(s).
Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144;  weiwild@aol.com

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0009978

**Rio de la Vista**

| | |
|---|---|
| **From:** | Rio de la Vista |
| **Sent:** | Thursday, September 06, 2012 11:15 AM |
| **To:** | Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Lewis, Ruth - NRCS, Alamosa, CO; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Rio de la Vista; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS, Greeley, CO; Fairchild, Jody -FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez, Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson; jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute; Jenny Nehring |
| **Cc:** | Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS |
| **Subject:** | SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass |

Dear All,

This message is on behalf of Peter Clark to let you know that our regular meeting will be next Tuesday, September 11th starting at 9 am at the USDA Building on Craft Drive on the west side of Alamosa. Tom Malecek of the US Forest Service (and perhaps another FS person) will be joining us to discuss the Draft EIS on the proposed land trade at Wolf Creek Pass and the wetlands at the site.

 The link to the Draft EIS for your review prior to the meeting is: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/78763_FSPLT2_264507.pdf

Hoping we'll have a good turn out for this important discussion and we appreciate the Forest Service folks making time to meet specifically with our committee on this.

My best,

Rio

C0009980

**Lewis, Ruth - NRCS, Alamosa, CO**

| | |
|---|---|
| **From:** | Lewis, Ruth - NRCS, Alamosa, CO |
| **Sent:** | Thursday, September 06, 2012 11:28 AM |
| **To:** | Rio de la Vista; Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS, Greeley, CO; Fairchild, Jody -FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez, Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson; jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute; Jenny Nehring |
| **Cc:** | Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS |
| **Subject:** | RE: SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass |

I also think that Brian Sullivan from CPW will be attending.

Ruth

---

**From:** Rio de la Vista [mailto:riovista@rmi.net]
**Sent:** Thursday, September 06, 2012 11:15 AM
**To:** Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Lewis, Ruth - NRCS, Alamosa, CO; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Rio de la Vista; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS, Greeley, CO; Fairchild, Jody -FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph

C0009981

Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -
FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez,
Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson;
jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute;
Jenny Nehring
**Cc:** Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS
**Subject:** SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass

Dear All,

This message is on behalf of Peter Clark to let you know that our regular meeting will be next Tuesday,
September 11th starting at 9 am at the USDA Building on Craft Drive on the west side of Alamosa.  Tom
Malacek of the US Forest Service (and perhaps another FS person) will be joining us to discuss the Draft EIS
on the proposed land trade at Wolf Creek Pass and the wetlands at the site.

 The link to the Draft EIS for your review prior to the meeting
is: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/78763
_FSPLT2_264507.pdf

Hoping we'll have a good turn out for this important discussion and we appreciate the Forest Service folks
making time to meet specifically with our committee on this.

My best,
Rio


This electronic message contains information generated by the USDA solely for the intended
recipients. Any unauthorized interception of this message or the use or disclosure of the information it
contains may violate the law and subject the violator to civil or criminal penalties. If you believe you
have received this message in error, please notify the sender and delete the email immediately.

C0009982

**Lewis, Ruth - NRCS, Alamosa, CO**

| | |
|---|---|
| **From:** | Lewis, Ruth - NRCS, Alamosa, CO |
| **Sent:** | Thursday, September 06, 2012 11:28 AM |
| **To:** | Rio de la Vista; Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS, Greeley, CO; Fairchild, Jody -FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez, Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson; jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute; Jenny Nehring |
| **Cc:** | Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS |
| **Subject:** | RE: SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass |

I also think that Brian Sullivan from CPW will be attending.

Ruth

---

**From:** Rio de la Vista [mailto:riovista@rmi.net]
**Sent:** Thursday, September 06, 2012 11:15 AM
**To:** Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Lewis, Ruth - NRCS, Alamosa, CO; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Rio de la Vista; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS, Greeley, CO; Fairchild, Jody -FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph

Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -
FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez,
Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson;
jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute;
Jenny Nehring
**Cc:** Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS
**Subject:** SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass

Dear All,

This message is on behalf of Peter Clark to let you know that our regular meeting will be next Tuesday,
September 11th starting at 9 am at the USDA Building on Craft Drive on the west side of Alamosa.  Tom
Malacek of the US Forest Service (and perhaps another FS person) will be joining us to discuss the Draft EIS
on the proposed land trade at Wolf Creek Pass and the wetlands at the site.

 The link to the Draft EIS for your review prior to the meeting
is: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/78763
_FSPLT2_264507.pdf

Hoping we'll have a good turn out for this important discussion and we appreciate the Forest Service folks
making time to meet specifically with our committee on this.

My best,
Rio

C0009984

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Thursday, September 06, 2012 4:05 PM |
| **To:** | kurt_broderdorp@fws.gov |
| **Subject:** | FW: WCV Project Status Confirmation |

Kurt – please check item #3 below and provide feeback as this is a new twist on how things are usually done. Let's talk on the phone as needed. I'm here until 5:30 today and most of tomorrow (Friday).

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Thursday, September 06, 2012 8:25 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV Project Status Confirmation

Randy,

I just had my budget approved to prepare the draft BA, so this morning was my first review of the changes that you made to the DEIS as referenced in your email below. Just to clarify the results of the FWS solicitor(s), your OGC, and our Aug. 29 meeting with FWS:

1. Private Village development under Alternative 2 will be considered an indirect effect for NEPA and Section 7 purposes.

2. Private Village development under Alternative 2 will continue to be considered an interrelated and interdependent activity because it meets consultation manual criteria and would not occur "but for" the land exchange (USFWS and NMFS, 1998, p. 4-2[rg1] 6).

3. The Applicant will agree to implement a conservation strategy (CS), consisting of conservation measures (CMs) to minimize adverse project effects, that will be developed and agreed to by the three parties (FS, FWS, and Applicant). The finalized CS will be part of the Proposed Action, which means that the effects of implementing the CMs will be considered in the impact assessment. Note that putting the CS in the Proposed Action (rather than in a section [such as "Conservation Measures to Minimize Proposed action Effects] following the impact assessment) will delay BA preparation and warrant further reanalysis of impacts. As the lead agency, the FS will maintain discretionary authority of the CS and project until the land exchange is consummated, after which the FWS will undertake discretionary authority and enforcement.

Please confirm the above and feel free to modify the above text to better reflect the FS's position.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0009985

In a message dated 7/25/2012 4:07:07 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

> All – attached are my latest (and hopefully final) edits to Rick's most recent (July 24, 2012) IDEIS text
> in which I searched for references to I&I, Section 10, Habitat Conservation Plan, and HCP.  I found 6
> references I believe where I made a change.  Rick – these are all highlighted with a comment so they
> can be tracked back to your final DEIS and BA text.
>
> This text should be ready to go into the DEIS based on our recent discussions with FWS and OGC.  I
> would encourage all changes, plus any updates related to traffic analysis corrections, be included in the
> draft BA that will go to the FWS hopefully around the same time the DEIS goes out to the public, or
> shortly thereafter.
>
> Just a heads-up to you all as well that I will be on AL August 6-17, back on the 20th.
>
> Randy Ghormley
> Wildlife Program Manager
> Rio Grande National Forest &
> San Luis Valley Public Lands Center
> Office: 719.852.6243
> Cell: 719.850.2369
>
>
>
> This electronic message contains information generated by the USDA solely for the intended recipients.
> Any unauthorized interception of this message or the use or disclosure of the information it contains may
> violate the law and subject the violator to civil or criminal penalties. If you believe you have received this
> message in error, please notify the sender and delete the email immediately.

_____

[rg1]

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Thursday, September 06, 2012 4:21 PM |
| **To:** | Weiwild@aol.com |
| **Cc:** | david@westerneco.com |
| **Subject:** | RE: WCV Project Status Confirmation |

Rick – I have a call in to FWS for just a little clarification on how the CM relative to the PA, but the process you described is correct.  Please stand by as I clarify things a bit more on Item #3.

Also thanks for the lynx crossing info.  Glad to see that the location I picked up tracks this past winter (MM 169) is one of the potential sites!

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Thursday, September 06, 2012 8:25 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV Project Status Confirmation

Randy,

I just had my budget approved to prepare the draft BA, so this morning was my first review of the changes that you made to the DEIS as referenced in your email below.  Just to clarify the results of the FWS solicitor(s), your OGC, and our Aug. 29 meeting with FWS:

1.  Private Village development under Alternative 2 will be considered an indirect effect for NEPA and Section 7 purposes.

2.  Private Village development under Alternative 2 will continue to be considered an interrelated and interdependent activity because it meets consultation manual criteria and would not occur "but for" the land exchange (USFWS and NMFS, 1998, p. 4-2[rg1] 6).

3.  The Applicant will agree to implement a conservation strategy (CS), consisting of conservation measures (CMs) to minimize adverse project effects, that will be developed and agreed to by the three parties (FS, FWS, and Applicant).  The finalized CS will be part of the Proposed Action, which means that the effects of implementing the CMs will be considered in the impact assessment.  Note that putting the CS in the Proposed Action (rather than in a section [such as "Conservation Measures to Minimize Proposed action Effects] following the impact assessment) will delay BA preparation and warrant further reanalysis of impacts.  As the lead agency, the FS will maintain discretionary authority of the CS and project until the land exchange is consummated, after which the FWS will undertake discretionary authority and enforcement.

Please confirm the above and feel free to modify the above text to better reflect the FS's position.

Thank you,

*Rick Thompson*

C0009987

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

In a message dated 7/25/2012 4:07:07 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

> All – attached are my latest (and hopefully final) edits to Rick's most recent (July 24, 2012) IDEIS text in which I searched for references to I&I, Section 10, Habitat Conservation Plan, and HCP. I found 6 references I believe where I made a change. Rick – these are all highlighted with a comment so they can be tracked back to your final DEIS and BA text.
>
> This text should be ready to go into the DEIS based on our recent discussions with FWS and OGC. I would encourage all changes, plus any updates related to traffic analysis corrections, be included in the draft BA that will go to the FWS hopefully around the same time the DEIS goes out to the public, or shortly thereafter.
>
> Just a heads-up to you all as well that I will be on AL August 6-17, back on the 20th.
>
> Randy Ghormley
> Wildlife Program Manager
> Rio Grande National Forest &
> San Luis Valley Public Lands Center
> Office: 719.852.6243
> Cell: 719.850.2369
>
>
>
> This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

---

[rg1]

| | |
|---|---|
| **From:** | Rinella, Steven -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RINELLA, STEVENC6F2C7C1-D66A-4298-9974-2EC09AA71372> |
| **Sent:** | Friday, September 07, 2012 6:47 AM |
| **To:** | Hesch, Patricia -FS |
| **Subject:** | Delegation of Authority |

Did that delegation for Wolf Creek EIS ever go out?

1

C0009989

**Hesch, Patricia -FS**

| | |
|---|---|
| **From:** | Hesch, Patricia -FS |
| **Sent:** | Friday, September 07, 2012 7:47 AM |
| **To:** | Rinella, Steven -FS |
| **Subject:** | Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village |
| **Attachments:** | Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village .dot |

C0009990



| **Forest** | **Rocky** | **740 Simms Street** |
|---|---|---|
| **Service** | **Mountain** | **Golden, CO 80401-4702** |
| | **Regional Office** | **Voice: 303-275-5350** |
| | | **TDD: 303-275-5367** |

| **File Code:** | 2730 | **Date:** August 30, 2012 |
|---|---|---|
| **Route To:** | | |

**Subject:** Delegation of Authority for the Wolf Creek Village Access and Utility Easement Application

**To:** Forest Supervisor, Rio Grande National Forest

Under the authority of the Alaska National Interest Lands Conservation Act (ANILCA), the proponents of the Village at Wolf Creek have submitted an application for easements across National Forest System (NFS) lands. In the application, the proponents have requested an easement for transportation and utility facilities for access and to facilitate the development of the private parcel of land known as the Village at Wolf Creek.

In accordance with direction at Forest Service Manual 2704.33 and 2733.04c, I hereby delegate to you the authority to evaluate and select the ANILCA access and utilities easement alternative presented in the Wolf Creek Environmental Impact Statement (EIS). The EIS is evaluating three alternatives and the delegation of authority does not prejudge which alternative will be selected. The delegation simply ensures that, if the ANILCA alternative is selected, the Forest Supervisor can make that decision without seeking a delegation at that time of decision or elevating the decision to the Regional Forester.

Various staff members in this office will continue to provide you and your team leader, Tom Malecek, with assistance and expertise in reviewing and critiquing drafts of the various documents being produced as a result of the ongoing environmental analysis of this application. Tom McClure, Acting Director of Physical Resources, will be the primary point of contact regarding the Regional Office's role and assistance in this effort.

As this case moves forward, please keep me, Tom McClure and Kathy Kurtz apprised of issues or concerns that may arise which could impact the Forest Service's obligation to the applicant regarding timely processing of this case. Please also inform us of any issues concerning this case that we may want to bring to the attention of the Washington Office.

You may reach Tom McClure at (303) 275-5374 or tmcclure@fs.fed.us and Kathy Kurtz at
(303) 275-5083 or kkurtz@fs.fed.us.

*/s/ Brian Ferebee*
DANIEL J. JIRÓN



**It's Cool to Be Safe**

Printed on Recycled Paper 

C0009991

Regional Forester


cc:  Thomas Malecek

C0009992

| | |
|---|---|
| **From:** | Rinella, Steven -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=RINELLA, STEVENC6F2C7C1-D66A-4298-9974-2EC09AA71372> |
| **Sent:** | Friday, September 07, 2012 9:08 AM |
| **To:** | Malecek, Thomas -FS |
| **Subject:** | FW: Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village |
| **Attachments:** | Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village .dot |

Assume this found its way to you

**From:** Hesch, Patricia -FS
**Sent:** Friday, September 07, 2012 7:47 AM
**To:** Rinella, Steven -FS
**Subject:** Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village

1



| Forest | Rocky | 740 Simms Street |
|---|---|---|
| Service | Mountain | Golden, CO 80401-4702 |
| | Regional Office | Voice: 303-275-5350 |
| | | TDD: 303-275-5367 |

**File Code:** 2730                                          **Date:** August 30, 2012

**Route To:**

**Subject:** Delegation of Authority for the Wolf Creek Village Access and Utility Easement Application

**To:** Forest Supervisor, Rio Grande National Forest

Under the authority of the Alaska National Interest Lands Conservation Act (ANILCA), the proponents of the Village at Wolf Creek have submitted an application for easements across National Forest System (NFS) lands. In the application, the proponents have requested an easement for transportation and utility facilities for access and to facilitate the development of the private parcel of land known as the Village at Wolf Creek.

In accordance with direction at Forest Service Manual 2704.33 and 2733.04c, I hereby delegate to you the authority to evaluate and select the ANILCA access and utilities easement alternative presented in the Wolf Creek Environmental Impact Statement (EIS). The EIS is evaluating three alternatives and the delegation of authority does not prejudge which alternative will be selected. The delegation simply ensures that, if the ANILCA alternative is selected, the Forest Supervisor can make that decision without seeking a delegation at that time of decision or elevating the decision to the Regional Forester.

Various staff members in this office will continue to provide you and your team leader, Tom Malecek, with assistance and expertise in reviewing and critiquing drafts of the various documents being produced as a result of the ongoing environmental analysis of this application. Tom McClure, Acting Director of Physical Resources, will be the primary point of contact regarding the Regional Office's role and assistance in this effort.

As this case moves forward, please keep me, Tom McClure and Kathy Kurtz apprised of issues or concerns that may arise which could impact the Forest Service's obligation to the applicant regarding timely processing of this case. Please also inform us of any issues concerning this case that we may want to bring to the attention of the Washington Office.

You may reach Tom McClure at (303) 275-5374 or tmcclure@fs.fed.us and Kathy Kurtz at
(303) 275-5083 or kkurtz@fs.fed.us.


*/s/ Brian Ferebee*
DANIEL J. JIRÓN



**It's Cool to Be Safe**                    Printed on Recycled Paper

C0009994

Regional Forester


cc:  Thomas Malecek

C0009995

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Friday, September 07, 2012 11:07 AM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | david@westerneco.com |
| **Subject:** | WCV dBA schedule |

Randy,

Just to give you a heads-up re: the dBA schedule:

By Sept. 14, I hope to have the dBA largely complete and at least a summary letter back to you re: the significant effects that you and the FWS will consider for the development of conservation measures.  It may be easiest for me to just send you a copy of the dBA with active TCs from the pre-DEIS draft that highlights the significant effects, so that you could see them in context.

I will then leave it up to you to forward those effects to FWS/Applicant so that they could use them in their initial development of conservation measures.  I will give them 2 weeks (until Sep. 28) to negotiate and provide me draft text that I will incorporate into the dBA.

During the week of Oct. 1-5, I will submit the dBA to you for review, receive and address your comments, discuss any issues, and send you the final dBA that you can submit to the FWS on Oct. 5.

Hope this helps with your planning.

Please offer any suggested changes.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0009996

| **From:** | Malecek, Thomas -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MALECEK, THOMAS94D8BAE2-5D0E-46FD-AB77-77C6A76002FD> |
| **Sent:** | Friday, September 07, 2012 11:34 AM |
| **To:** | DellaSilva, Sheri A -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | FW: SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass |

Sheri, this is the first meeting of the day next Tuesday, in Alamosa at 0900.  Depending on when you arrive, would be good to attend with me…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Lewis, Ruth - NRCS, Alamosa, CO
**Sent:** Thursday, September 06, 2012 11:28 AM
**To:** Rio de la Vista; Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS, Greeley, CO; Fairchild, Jody - FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez, Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson; jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute; Jenny Nehring
**Cc:** Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS
**Subject:** RE: SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass

I also think that Brian Sullivan from CPW will be attending.

Ruth

---

**From:** Rio de la Vista [mailto:riovista@rmi.net]
**Sent:** Thursday, September 06, 2012 11:15 AM
**To:** Diane Gansauer; Villa, Cynthia - NRCS, Monte Vista, CO; Sue Swift-Miller; Allen Davey; Joanna Lemly; Ty Ryland; Dale Pizel; Lewis, Ruth - NRCS, Alamosa, CO; Tim Wohlgenant; Dave McCammon; Hobart Dixon; Rio de la Vista; Collins, Mike - NRCS, Alamosa, CO; Mike Gibson; Kit Page; Karla Shriver; Kirk Navo; Mike Derrico; Matt Barnes; Mark Smith; Steve Vandiver; Steve Russell; Pat McDermott; Jeanna Paluzzi; Mike Spearman; Jim Rhett; Brian Sullivan; Denise Culver; John Koshak; Michael Wisdom; Dean Swift; Sparks, Richard - NRCS, Monte Vista, CO; Dix, Catherine - NRCS, Alamosa, CO; Bill Mangle; Craig Cotten; Corless, Theresa I -FS; Tony Aloia; Kelli Stone; aarchule@blm.gov; Marymor, Noe - NRCS,

1

C0009997

Greeley, CO; Fairchild, Jody -FS; Corey Deangelis; Damon Gibbons; Renee Rondeau; Pete Magee; Fred Bunch; Kate Booth; Erin Minks; Robert Sanders; Matt Reddy; Dave Smith; Dallas, Dan -FS; Kelley Thompson; Paul Robertson; Rick Basagoitia; Stephanie Steinhoff; Alex Chappell; Elliott, Vern - NRCS, Alamosa, CO; Justin Spring; Guinevere Nelson; Pat Gonzales; Cindy Medina; Bill Noonan; Lisa Cyriacks; Heather Dutton; Brenda Felmlee; Kandiss Bartlett-Horch; Clark, Peter - NRCS, Monte Vista, CO; Dave Montgomery; Mike Blenden; jlucero@blm.gov; Scott Miller; Rick Schnaderbeck; Corey Kanuckel; Ron Garcia; Lisa Carrico; Ralph Curtis; Art Hutchinson; Greg Kernohan; Corinna Hanson; Zeke Ward; Brad Weinmeister; Travis Smith; Gomez, Dale -FS; Davey Pitcher; Dalrymple, Robert -FS; David Anderson; Tim Armstrong; Paul Tigan; John Sanderson; Lopez, Judy - NRCS, Alamosa, CO; Mike Blakeman; Sandra Montoya; Charlotte Bobicki (Bennet); Aaron Derwingson; jim.gammonley@state.co.us; Cary Aloia; Ron Beane; Gloria Gutierrez; Hilldreth Cooper; Nancy Butler; David Klute; Jenny Nehring

**Cc:** Malecek, Thomas -FS; Mike Blakeman; Dyer, Harold D -FS

**Subject:** SLV Wetlands Committee- Tuesday 9-11 meeting --with USFS re proposed land trade at Wolf Creek Pass

Dear All,

This message is on behalf of Peter Clark to let you know that our regular meeting will be next Tuesday, September 11th starting at 9 am at the USDA Building on Craft Drive on the west side of Alamosa.  Tom Malacek of the US Forest Service (and perhaps another FS person) will be joining us to discuss the Draft EIS on the proposed land trade at Wolf Creek Pass and the wetlands at the site.

 The link to the Draft EIS for your review prior to the meeting is: http://a123.g.akamai.net/7/123/11558/abc123/forestservic.download.akamai.com/11558/www/nepa/78763_FSPLT2_264507.pdf

Hoping we'll have a good turn out for this important discussion and we appreciate the Forest Service folks making time to meet specifically with our committee on this.

My best,
Rio

C0009998

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Friday, September 07, 2012 11:48 AM |
| **To:** | Weiwild@aol.com |
| **Cc:** | david@westerneco.com |
| **Subject:** | RE: WCV Project Status Confirmation |

Rick – I spoke with FWS at length about Item 3 this morning and this is pretty much what all is thinking.  A key will be that the FWS and Applicant will have to have the CMs pretty well hammered out to include them up front in the draft BA.  The Applicant has not submitted a first proposal yet and negotiations may take a while.  This may affect timeline to have things negotiated out enough to include up front in the Proposed Action – but applicant should be aware of this so cooperation should be desired.  FWS and FS are still not clear on how the discretionary authority separation will be clarified, but the FS wants this in writing somewhere.  Kurt B will continue to investigate this and get back with us.

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Thursday, September 06, 2012 8:25 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV Project Status Confirmation

Randy,

I just had my budget approved to prepare the draft BA, so this morning was my first review of the changes that you made to the DEIS as referenced in your email below.  Just to clarify the results of the FWS solicitor(s), your OGC, and our Aug. 29 meeting with FWS:

1.  Private Village development under Alternative 2 will be considered an indirect effect for NEPA and Section 7 purposes.

2.  Private Village development under Alternative 2 will continue to be considered an interrelated and interdependent activity because it meets consultation manual criteria and would not occur "but for" the land exchange (USFWS and NMFS, 1998, p. 4-2[rg1] 6).

3.  The Applicant will agree to implement a conservation strategy (CS), consisting of conservation measures (CMs) to minimize adverse project effects, that will be developed and agreed to by the three parties (FS, FWS, and Applicant).  The finalized CS will be part of the Proposed Action, which means that the effects of implementing the CMs will be considered in the impact assessment.  Note that putting the CS in the Proposed Action (rather than in a section [such as "Conservation Measures to Minimize Proposed action Effects] following the impact assessment) will delay BA preparation and warrant further reanalysis of impacts.  As the lead agency, the FS will maintain discretionary authority of the CS and project until the land exchange is consummated, after which the FWS will undertake discretionary authority and enforcement.

Please confirm the above and feel free to modify the above text to better reflect the FS's position.

Thank you,

C0009999

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

In a message dated 7/25/2012 4:07:07 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

> All – attached are my latest (and hopefully final) edits to Rick's most recent (July 24, 2012) IDEIS text in which I searched for references to I&I, Section 10, Habitat Conservation Plan, and HCP. I found 6 references I believe where I made a change. Rick – these are all highlighted with a comment so they can be tracked back to your final DEIS and BA text.
>
> This text should be ready to go into the DEIS based on our recent discussions with FWS and OGC. I would encourage all changes, plus any updates related to traffic analysis corrections, be included in the draft BA that will go to the FWS hopefully around the same time the DEIS goes out to the public, or shortly thereafter.
>
> Just a heads-up to you all as well that I will be on AL August 6-17, back on the 20th.
>
> Randy Ghormley
> Wildlife Program Manager
> Rio Grande National Forest &
> San Luis Valley Public Lands Center
> Office: 719.852.6243
> Cell: 719.850.2369
>
>
>
> This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

[rg1]

**Ghormley, Randy -FS**

| From: | Ghormley, Randy -FS |
|---|---|
| Sent: | Friday, September 07, 2012 11:56 AM |
| To: | Weiwild@aol.com |
| Cc: | david@westerneco.com; Malecek, Thomas -FS; Dyer, Harold D -FS |
| Subject: | RE: WCV dBA schedule |

That sounds good Rick.  After I get the TC document for review, we should clean up the doc for FWS and applicant to review and discuss.  This will be something like a pre-draft BA I suppose.  We can shoot for the 28th and the Oct date thereafter, but the actual dates will be dependent on how negotiations go b/t the FWS and the Applicant.  We want the CMs pretty-well hammered out to include upfront in the proposed action and be associated with some amount of analysis.  Hope this makes sense to all.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 07, 2012 11:07 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV dBA schedule

Randy,

Just to give you a heads-up re: the dBA schedule:

By Sept. 14, I hope to have the dBA largely complete and at least a summary letter back to you re: the significant effects that you and the FWS will consider for the development of conservation measures.  It may be easiest for me to just send you a copy of the dBA with active TCs from the pre-DEIS draft that highlights the significant effects, so that you could see them in context.

I will then leave it up to you to forward those effects to FWS/Applicant so that they could use them in their initial development of conservation measures.  I will give them 2 weeks (until Sep. 28) to negotiate and provide me draft text that I will incorporate into the dBA.

During the week of Oct. 1-5, I will submit the dBA to you for review, receive and address your comments, discuss any issues, and send you the final dBA that you can submit to the FWS on Oct. 5.

Hope this helps with your planning.

Please offer any suggested changes.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Friday, September 07, 2012 11:56 AM |
| **To:** | Weiwild@aol.com |
| **Cc:** | david@westerneco.com; Malecek, Thomas -FS; Dyer, Harold D -FS |
| **Subject:** | RE: WCV dBA schedule |

That sounds good Rick.  After I get the TC document for review, we should clean up the doc for FWS and applicant to review and discuss.  This will be something like a pre-draft BA I suppose.  We can shoot for the 28th and the Oct date thereafter, but the actual dates will be dependent on how negotiations go b/t the FWS and the Applicant.  We want the CMs pretty-well hammered out to include upfront in the proposed action and be associated with some amount of analysis.  Hope this makes sense to all.

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 07, 2012 11:07 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV dBA schedule

Randy,

Just to give you a heads-up re: the dBA schedule:

By Sept. 14, I hope to have the dBA largely complete and at least a summary letter back to you re: the significant effects that you and the FWS will consider for the development of conservation measures.  It may be easiest for me to just send you a copy of the dBA with active TCs from the pre-DEIS draft that highlights the significant effects, so that you could see them in context.

I will then leave it up to you to forward those effects to FWS/Applicant so that they could use them in their initial development of conservation measures.  I will give them 2 weeks (until Sep. 28) to negotiate and provide me draft text that I will incorporate into the dBA.

During the week of Oct. 1-5, I will submit the dBA to you for review, receive and address your comments, discuss any issues, and send you the final dBA that you can submit to the FWS on Oct. 5.

Hope this helps with your planning.

Please offer any suggested changes.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0010003

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Friday, September 07, 2012 4:49 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | VWC comment issues |

I had a call from a guy in South Fork who couldn't submit a comment using the on-line form when using the AOL browser.  He finally got it to work with Internet Explorer.  Seems like our system should be able to work with all browsers.  Do you know who we should bump this issue up to?

C0010004

**Dyer, Harold D -FS**

---

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 6:03 AM |
| **To:** | Blakeman, Mike -FS |
| **Subject:** | RE: VWC comment issues |

Mike,

Send it to our PALS Coordinator in the RO.  That would be Marge Gallegos.

Dave

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Blakeman, Mike -FS
**Sent:** Friday, September 07, 2012 4:49 PM
**To:** Dyer, Harold D -FS
**Subject:** VWC comment issues

I had a call from a guy in South Fork who couldn't submit a comment using the on-line form when using the AOL browser.  He finally got it to work with Internet Explorer.  Seems like our system should be able to work with all browsers.  Do you know who we should bump this issue up to?

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:40 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: "Village at Wolf Creek Access Project DEIS" |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*" - Ben Franklin

---

**From:** Tim M Hogan [mailto:Tim.Hogan@Colorado.EDU]
**Sent:** Monday, September 10, 2012 11:36 AM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** "Village at Wolf Creek Access Project DEIS"

**Village at Wolf Creek Access Project**

To whom this may concern,

As a thirty year resident of Colorado, I am writing regarding the Draft Environmental Impact Statement (DEIS) for the proposed Village at Wolf Creek land exchange.  I have spent considerable time in the San Juans as a sportsman and a botanist.  Over the years I have also worked on a variety of eco-regional planning efforts that have identified the Wolf Creek area as a key linkage for wildlife and an area critical to the ecological integrity of the Southern Rockies.

I appreciate that the DEIS analyzes several impacts of the proposed action such as its effect upon wildlife, wetlands, and economic sustainability for the region.  It is not insignificant that the DEIS finds impacts – both immediate and cumulative - on each of these areas of concern.

In addition, because the Wolf Creek Pass area is such a critical linkage in the Southern Rockies – a point of connectivity between the South San Juan and Weminuche Wilderness Areas – any development in this area deserves the most cautious approach and a substantial level of environmental protection.  As we continue to careen toward greater climate disruption, the maintenance of landscape connectivity is increasingly important toward the ecological integrity and resilience of the region.

Finally, I would have liked to see a more thorough analysis on the feasibility of returning the land to the public estate, either through exchange or fee-simple purchase..  It seems to have been too easily discounted because LMJV is unwilling to enter into such negotiations.

The US Forest Service should take a very critical look at this proposed development and live up to its mandate of being a steward of our public lands.  As this process moves forward, I hope you will remember the words a former chief, Michael Dombeck, who wrote in an open letter to Forest Service

C0010006

employees: "Values such as wilderness and roadless areas, clean water, protection of rare species, old growth forests, naturalness – these are the reasons most Americans cherish their public lands ... First and foremost, we must be loyal to our agency's land ethic.  In fifty years, we will not be remembered for the resources we developed, we will be thanked for those we maintained and restored for future generations."

Thank you for the opportunity to offer these comments.

Sincerely,

Tim Hogan
2540 6th Street
Boulder, CO 80304
10 September, 2012

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:41 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** tailwinds1@aol.com [mailto:tailwinds1@aol.com]
**Sent:** Friday, September 07, 2012 11:28 AM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Village at Wolf Creek Access Project DEIS

My wife and I are strongly opposed to any version of the "Village at Wolf Creek" and we ask you to take no action on the proposals presented in the DEIS.  Alternative 1 (No Action) is the only one of the three alternatives that we can support.

Thank you for allowing us to voice our opinion about this project.  By every measure it is nothing short of damaging madness and allowing it to go forward would be a very great mistake.

Sincerely,

Robert Howard & Carole Howard
Pagosa Springs, CO 81147

C0010008

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:42 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: DEIS Wolf Creek |

+++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** wayne sheldrake [mailto:wayne.sheldrake@hotmail.com]
**Sent:** Thursday, September 06, 2012 10:12 PM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** DEIS Wolf Creek

Dear FS,
Could there be a village at Wolf Creek? Yes, I think there could be, someday. My only question is, should there be any day soon? And why do I ask? I ask because there has been a weird mix of incompetence, uncertainty and obfuscation so far—at least three decades worth. Really it boils down to the propriety of what has been happening since the original (legislatively orchestrated) land swap some years ago (in the early 80"s), which makes this debate now ongoing. Apparently that original land swap was unstudied by the parties involved (Forest Service, Congressional advocates and developer) and to a crippling degree ill-founded —which has led to the present proposal for another land-swap to correct what the Forest Service, Congress, and developer were apparently in agreement with, yet,  between them, still unable to anticipate complications. Did no one understand that irreplaceable wetlands existed and that access issues (including highway on-ramp/off-ramp parameters from the Colorado Department of Transportation) were imminent? Evidently not, which speaks to the inattentiveness that has pervaded this lengthy and painful process. My mere objection to any but the "no action" alternative now presented is based on no mere emotional protest. My objection is to the support of any alternative that perpetuates the illogic and irrational backtracking of an already ill-conceived plan. And so, I request that no action be the result of this most recent review—no swap. And I implore the developer to sell present holdings on Wolf Creek Pass into a conservancy which would preserve it in perpetuity, as is. Perhaps the Rio Grande Headwaters Trust could be helpful in making the arrangements. This is not to say that I am objecting to the possibility of a Village at Wolf Creek. I am, however, objecting to the fiasco of the village scenario over the past 30 years, and the additional land-swap as presently proposed, and also to the machinations of the current land-swap options proposed, which are not solutions at all. Please count me as a "no new options" vote. I believe the conclusions of the original EIS should stand, and the developer should be held accountable to its conclusions. No additional land-swap required or necessary. The developer got exactly what he wanted the first time—and very generously so. His miscalculations are his—as any real estate deal goes, the consequences are unpredictable. You win some; you lose some. This time, he loses. One swap is enough. When does this nonsense end? Now, I hope.
Thanks so much for your time,
Wayne Sheldrake, Del Norte, CO.
author, *Instant Karma: the Heart and Soul of a Ski Bum.*

C0010009

| | |
|---|---|
| **From:** | Dyer, Harold D -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DYER, HAROLD47B6A9DA-8D3C-41A5-B5A3-7DFFD89874C8> |
| **Sent:** | Monday, September 10, 2012 11:42 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

+++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++++
"He who sacrifices freedom for security deserves neither."  - Ben Franklin

-----Original Message-----
From: Brad Gilbert [mailto:bgilbert@peopleproductions.com]
Sent: Wednesday, September 05, 2012 10:44 AM
To: FS-comments-rocky-mountain-rio-grande
Subject: Village at Wolf Creek Access Project DEIS

To Whom it may concern:
As a Colorado citizen who has been skiing at Wolf Creek for the last twenty years and been following the Village proposal during this time I would like to comment on this proposal. While it might be nice to have a modest village at the base of the mountain, this proposal seems to allow for a fairly large development that does not fit at all with the character of the ski area. It's also hard to see how they would deal with the tricky environmental combination of high altitude and huge amounts of snow. It's easy to see how this could turn into a failed project - no nearby town, no nearby airport, and no existing infrastructure to handle a massive influx of people. While I would support a modest development that took into account the difficulty of existing in that environment, the development proposal that is tied to this land exchange does not seem to fit the bill and thus would recommend that the forest service pass on the land swap. Wolf Creek is a special place - let's not ruin it for the sake of profits for an out of state land developer.
Sincerely,
Brad Gilbert
802 Hawthorn Ave
Boulder, CO 80304

C0010010

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:42 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Latest Wolf Creek DEIS comments |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** wayne sheldrake [mailto:wayne.sheldrake@hotmail.com]
**Sent:** Tuesday, September 04, 2012 10:11 PM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Latest Wolf Creek DEIS comments

Could there be a village at Wolf Creek? Yes, I think there could be, someday. My only question is, should there be any day soon? And why do I ask? I ask because there has been a weird mix of incompetence, uncertainty and obfuscation so far—at least three decades worth. Really it boils down to the propriety of what has been happening since the original (legislatively orchestrated) land swap some years ago (in the early 80"s), which makes this debate now ongoing. Apparently that original land swap was unstudied by the parties involved (Forest Service, Congressional advocates and developer) and to a crippling degree ill-founded—which has led to the present proposal for another land-swap to correct what the Forest Service, Congress, and developer were apparently in agreement with, yet,  between them, still unable to anticipate complications. Did no one understand that irreplaceable wetlands existed and that access issues (including highway on-ramp/off-ramp parameters from the Colorado Department of Transportation) were imminent? Evidently not, which speaks to the inattentiveness that has pervaded this lengthy and painful process. My mere objection to any but the "no action" alternative now presented is based on no mere emotional protest. My objection is to the support of any alternative that perpetuates the illogic and irrational backtracking of an already ill-conceived plan. And so, I request that no action be the result of this most recent review—no swap. And I implore the developer to sell present holdings on Wolf Creek Pass into a conservancy which would preserve it in perpetuity, as is. Perhaps the Rio Grande Headwaters Trust could be helpful in making the arrangements. This is not to say that I am objecting to the possibility of a Village at Wolf Creek. I am, however, objecting to the fiasco of the village scenario over the past 30 years, and the additional land-swap as presently proposed, and also to the machinations of the current land-swap options proposed, which are not solutions at all. Please count me as a "no new options" vote. I believe the conclusions of the original EIS should stand, and the developer should be held accountable to its conclusions. No additional land-swap required or necessary. The developer got exactly what he wanted the first time—and very generously so. His miscalculations are his—as any real estate deal goes, the consequences are unpredictable. You win some; you lose some. This time, he loses. One swap is enough. When does this nonsense end? Now, I hope. Thanks so much for your time, Wayne Sheldrake
1761 County Road 17
Del Norte, CO 81132

C0010011

C0010012

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:43 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: The Village at Wolf Creek Access Project |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Marilyn Ochsner [mailto:kinseeker92708@yahoo.com]
**Sent:** Monday, September 10, 2012 9:41 AM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** The Village at Wolf Creek Access Project

Dear Divide Ranger of Rio Grande National Forest:

I am writing in support of the land exchange for the Village at Wolf Creek.  I believe that this alternative will benefit the public and the environment.  I appreciate all the work and investigation the Forest Service personnel have, and are, putting into this project.  Please feel free to use my e-mail address to keep me updated as you see fit.  Thank you for considering my comments.

Sincrely,

Marilyn J. Ochsner
1408 Bear Creek Circle
P.O. Box 1137
South Fork, CO 81154

C0010013

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:44 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Land Exchange at Wolf Creek |
| **Importance:** | High |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Bill James [mailto:bjames@q.com]
**Sent:** Monday, September 10, 2012 7:06 AM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Land Exchange at Wolf Creek
**Importance:** High

**US Forest Service**
**Tom Malecek, Divide District Ranger**
**Rio Grande National Forest**
**13308 West Highway 160**
**Del Norte, CO 81132**

I am writing today in support of the development effort being proposed for the Land Exchange at Wolf Creek.  I have visited the area several times and have enjoyed the great recreation that is available there including golf and fishing.  I am in support of the Land Exchange based on these benefits and merits:

**Ski Area Compatibility**

The Land Exchange moves much of the private development farther away from the ski area. (Draft EIS, pg. 1-5, 1.4)

From a lift and trail capacity perspective, the ski area's lift and trail network are expected to be able to accommodate the additional visitation related to future development on private lands on the inholding under the Alternative 2 Moderate Density Development Concept. (Draft EIS, pg. 4-151-152, 4.11.2.4.2)
The private inholding is completely surrounded by NFS lands managed by the Rio Grande NF. It is inside the WCSA SUP which, according to the 1996 Forest Plan, is within Management Area (MA) 8.22 – Ski Based Resorts. (Draft EIS, pg. 1-14-15, 1.9)
The setting for MA 8.22 – Ski Based Resorts: Existing and Potential is described in the 1996 Revised Forest

C0010014

Plan as follows:

This Prescription is applied to the mountainous area composing the existing Wolf Creek Ski Area, and those lands identified for potential expansion. Associated facilities such as trails, lifts, and lodges are included. This is an area of concentrated use. Visitors can expect to see facilities associated with the ski area. (Draft EIS, pg. 1-15, 1.9)

The Wolf Creek Ski Area has expressed support for the proposed exchange in contrast to the development plan previously approved by Mineral County.

**Increased Tourism Revenues**

At completion of the first phase (Year 2023), Village visitors would generate over $47 million in annual expenditures, inside and outside the Village. Those Year 2023 level of expenditures would be expected to continue in future years. (Draft EIS, pg. 4-193, 4.13.3.2.2)

At completion (Year 2044), Village visitors would generate over $151 million in annual expenditures, inside and outside the Village. The year 2044 level of expenditures would be expected to continue in future years. (Draft EIS, pg. 4-204, 4.13.2)

**Recreational Opportunities**

The direct effects of the transfer of Federal and private lands under Alternative 2 would have a beneficial effect on developed recreation opportunities in the area. Currently, the lower half of the existing Alberta Chairlift and associated ski trails are located within the ±287.5-acre private land inholding, which is made possible because of a ski easement between LMJV and the ski area. Under Alternative 2, approximately 177.8 acres of the private land parcel would come under Federal ownership within the Rio Grande National Forest and incorporated into the existing ski area permit. This would consolidate existing ski area operations as per the 1996 Forest Plan, and eliminate the need for the ski easement. (Draft EIS, pg. 4-146, 4.11.2.1)

**Preferred Alternative**

Alternative 2 (the Land Exchange) is the alternative that best fulfills the Forest Service's statutory mission and responsibilities, giving consideration to economic impacts, environmental impacts, technical criteria, and other factors. (Draft EIS, pg. 2-50, 2.7)

**Public Benefits**

When weighed against the Village's existing ANILCA access right and subsequent request for road access, the exchange proposal is in the public interest for the following reasons:
    Much of the proposed development would be moved further away from Wolf Creek Ski Area
    Increases skiable alpine terrain
    Net gain in wetlands
    Net gain in perennial and intermittent streams (Draft EIS, pg. 1-3,5,1.4)

The merits of completing an exchange must be evaluated in contrast to the grant of an easement for access to the property. The owner has a right of access under ANILCA and has every intention of securing access to the property either through a land exchange or direct easement grant. Based on this analysis, and when weighed against the proponent's existing ANILCA access right and subsequent request for a road easement, this exchange appears in the public interest. The tangible physical resources to be acquired, when accompanied by the intangible benefits of reduced, staged and partially relocated development, make this exchange the preferred

C0010015

option. If faced with the alternative of an easement grant, the Forest Service would receive none of these benefits. (RGNF 2011 Feasibility Analysis, pg. 14).

I look forward with great interest to seeing this effort advance through the approval process toward a positive Record of Decision.

Very Respectfully,
Bill


**Bill James III**
**Personal email**
**E: billjames@q.com**
**M: 612-281-1089**


❝ In any moment of decision, the best thing you can do is the right thing, the next best thing is the wrong thing, and the worst thing you can do is nothing.

*Theodore Roosevelt*

C0010016

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8214-000001

C0010017

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:44 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: VILLAGE AT WOLF CREEK ACCESS PROJECT |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Blake Huguenin [mailto:campnskico@hotmail.com]
**Sent:** Sunday, September 09, 2012 10:27 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** VILLAGE AT WOLF CREEK ACCESS PROJECT

Wolf Creek offers local Coloradoan and visitors so many diverse opportunities.  My family and friends enjoy visiting the area and skiing, hiking, camping and back packing.

Recreational Opportunities
The direct effects of the transfer of Federal and private lands under Alternative 2 would have a beneficial effect on developed recreation opportunities in the area. Currently, the lower half of the existing Alberta Chairlift and associated ski trails are located within the ±287.5-acre private land inholding, which is made possible because of a ski easement between LMJV and the ski area. Under Alternative 2, approximately 177.8 acres of the private land parcel would come under Federal ownership within the Rio Grande National Forest and incorporated into the existing ski area permit. This would consolidate existing ski area operations as per the 1996 Forest Plan, and eliminate the need for the ski easement. (Draft EIS, pg. 4-146, 4.11.2.1)
- I am approving this notion

Thanks,
Blake Huguenin
48017 Bridle Pass Dr
Colorado Springs, CO 80923
(719) 313-7085

C0010018

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:44 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: The Village at Wolf Creek Development Project |

++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Tdawson895 [mailto:tdawson895@aol.com]
**Sent:** Sunday, September 09, 2012 8:46 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** charlotte_bobicki@bennet.senate.gov; Brenda_Felmlee@mail.house.gov; erin_minks@markudall.senate.gov
**Subject:** The Village at Wolf Creek Development Project

To:  Rio Grande National Forest Ranger

RE:  Village at Wolf Creek Access Project

I am in favor of the land exchange project at Wolf Creek for the following reasons:

Tourism Increase

Providing legal entitled access to the Village will create an opportunity for lodging on the mountain that will result in more people enjoying the recreational experience at Wolf Creek. Lodging on the mountain will allow tourists to enjoy skiing at Wolf Creek without having to drive daily up Wolf Creek Pass in sometimes adverse conditions.

New tourists will consider Wolf Creek for their destination after lodging is available on the mountain.

More public (tourists) will have the opportunity to recreate on public lands.

Recreational Opportunities

The direct effects of the transfer of Federal and private lands under Alternative 2 would have a beneficial effect on developed recreation opportunities in the area. Currently, the lower half of the existing Alberta Chairlift and associated ski trails are located within the ±287.5-acre private land inholding, which is made possible because of a ski easement between LMJV and the ski area. Under Alternative 2, approximately 177.8 acres of the private land parcel would come under Federal ownership within the Rio Grande National Forest and incorporated into the existing ski area permit. This would consolidate existing ski area operations as per the 1996 Forest Plan, and eliminate the need for the ski easement. (Draft EIS, pg. 4-146, 4.11.2.1)

C0010019

Public Benefits

When weighed against the Village's existing ANILCA access right and subsequent request for road access, the exchange proposal is in the public interest for the following reasons:

    Much of the proposed development would be moved further away from Wolf Creek Ski Area

    Increases skiable alpine terrain

    Net gain in wetlands

    Net gain in perennial and intermittent streams (Draft EIS, pg. 1-3,5,1.4)

Thank you in advance for taking my viewpoint into consideration with this important decision.

Sincerely,

Trudy C. Dawson
12910 Black Lane
Colorado Springs, CO  80908

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Monday, September 10, 2012 11:44 AM |
| **To:** | Lloyd, Brian A -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | FW: Wolf Creek Pass MRR |

Here's a link to the final June 2012 remediation report.

**From:** Flurkey, Andy [mailto:Andy.Flurkey@dot.state.co.us]
**Sent:** Monday, September 10, 2012 10:33 AM
**To:** Custer, Matthew S -FS
**Subject:** FW: Wolf Creek Pass MRR

Here is the final copy of the June sampling event at Wolf Creek Pass.  Apparently the file is too large to send in one piece.  You can download the pdf file (not the excel file) fairly easily.

Andy

---

**From:** Barkmann, Peter [mailto:Peter.Barkmann@state.co.us]
**Sent:** Monday, September 10, 2012 7:56 AM
**To:** Flurkey, Andy
**Subject:** RE: Wolf Creek Pass MRR

Andy go to:

ftp://165.127.23.92/TempStore/

Username: dnrgisdata
Password:  TDavis_30
Look in Wolf Creek folder

Peter B.

---

**From:** Flurkey, Andy [mailto:Andy.Flurkey@dot.state.co.us]
**Sent:** Monday, September 10, 2012 7:34 AM
**To:** Barkmann, Peter
**Subject:** RE: Wolf Creek Pass MRR

Peter, I just need one hard copy.  I will need the electronic copy so I can forward it on to the new contractor.

Andy

---

**From:** Barkmann, Peter [mailto:Peter.Barkmann@state.co.us]
**Sent:** Friday, September 07, 2012 9:15 AM
**To:** Flurkey, Andy
**Subject:** RE: Wolf Creek Pass MRR

Andy,
How many hard copies do you need?  And it looks like we were sending hard copy to Kirk at USFS and

Davey at Wolf Creek.

Peter B.

---

**From:** Flurkey, Andy [mailto:Andy.Flurkey@dot.state.co.us]
**Sent:** Friday, August 24, 2012 4:31 PM
**To:** Barkmann, Peter
**Subject:** Wolf Creek Pass MRR

Peter,

I reviewed the most recent MRR for the Wolf Creek Pass site and have the following comments.

1. SS-E and SS-W on two of the maps needs to be defined in the text as well as on the maps.
2. Nick Watterson should be removed as the CGS contact. I suggest you use a permanent member of the staff as the CGS contact.
3. Rich Marquez has moved to Pueblo I believe. The CDOT point of contact is probably Kenneth Martinez these days.

Andy Flurkey
Property Management Program
Project Manager, Hazardous Waste Unit
303-512-5520 (office)
303-325-4120 (cell)
303-512-5550 (fax)

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:45 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: The Village at Wolf Creek support |

++++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest 1803 W. Highway 160 Monte Vista, CO 81144 719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++++
"He who sacrifices freedom for security deserves neither." - Ben Franklin

-----Original Message-----
From: Patsy Miller [mailto:glenn_pat@me.com]
Sent: Saturday, September 08, 2012 11:36 AM
To: FS-comments-rocky-mountain-rio-grande-divide
Subject: The Village at Wolf Creek support

I think Wolf Creek Village would be a great addition to our economic condition here in South Fork. We have been in residence in South Fork for the last 18 years and the community heavily depends on tourism. So the addition of a first class ski community would be a great support for our area.
Glenn Miller

C0010023

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:45 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project |

++++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest 1803 W. Highway 160 Monte Vista, CO 81144 719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++++
"He who sacrifices freedom for security deserves neither." - Ben Franklin

-----Original Message-----
From: Jody Anschutz [mailto:jatonto@cox.net]
Sent: Friday, September 07, 2012 4:45 PM
To: FS-comments-rocky-mountain-rio-grande-divide
Cc: Mark Udall
Subject: Village at Wolf Creek Access Project

Dear Rio Grande National Forest,

As a part time resident of South Fork, CO and avid hiker, fly fisher, and outdoor lover I am writing to say I am in complete favor of the Village at Wolf Creek and specifically the land exchange for the following reasons!!

1)Wetlands

The public will gain ± 40.4 acres of wetlands, which includes ± 22.7 acres of fen wetlands, eight springs and ± 14,733 linear feet of perennial and intermittent streams. (Draft EIS, pg. 4-75, 4.7.1.2.1)

The major source of groundwater for the Central Alberta Park Wetland Complex is from slopes to the west and this recharge area would not be impacted by the project. (Draft EIS, pg. 4-77, 4.7.1.2.2)

2)Surface Water - Streams

There would be a net gain of ±8,641 linear feet of perennial streams and ±6.092 linear feet of intermittent streams. (Draft EIS, pg. 2-15, Table 2.6-2)

Thus, the proposed land exchange would result in a net increase of ±14,733 linear feet of stream habitats for fish and macroinvertebrates under management of the Rio Grande NF, and these streams would be managed in accordance with the Forest Plan watershed standards in order to protect stream health. (Draft EIS, pg. 4-5, 4.1.3.1.2; pg. 4-85, 4.8.1.2.1)

C0010024

3)Needless to say that the economic growth that would be seen in the local communities would also be a huge benefit!

Please do all you can to assure this process moves along in a timely fashion.
Thanks for listening,

Jody Anschutz
South Fork, CO

Sent from my iPad

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:46 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Village Project |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Harry Nickel [mailto:wnickel@yahoo.com]
**Sent:** Friday, September 07, 2012 4:31 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** dhicks@vanion.com
**Subject:** Village at Wolf Creek Village Project

I support the agency's land exchange for the village at Wolf Creek Access Project.
I visit the South Fork area every summer for at least two months. I really appreciate the effort spent on this study to improve the Wolf Creek Ski area. The benefit to those of us that visit in the winter season will be only minor compared to the benefit to those who live in the area. Thanks for allowing us to comment on this project.
Harry Nickel
Granbury, TX

C0010026

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:48 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Randy Phillips [mailto:randy_phillips@msn.com]
**Sent:** Thursday, September 06, 2012 12:49 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village at Wolf Creek Access Project

  I support the land exchange being considered by the Forest Service.  First, I am very much in favor of the Village at Wolf Creek.  I have a vacation home in South Fork and spend much of the summer and some of the winter in the South Fork area.  I have friends that enjoy coming to Wolf Creek to ski, but often complain that they wished there was more accommodations at the ski area.  The Village at Wolf Creek will be a big economic benefit to the area.

   This exchange makes much more sense than building the Village at the original location, because it reduces the need to build roads and access through National Forest land.  It is a win-win situation.

  Thank you for your consideration.

                                                                  Randy M. Phillips

| | |
|---|---|
| **From:** | Dyer, Harold D -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DYER, HAROLD47B6A9DA-8D3C-41A5-B5A3-7DFFD89874C8> |
| **Sent:** | Monday, September 10, 2012 11:50 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creel Access Project |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Kathy Ridley [mailto:shaye5@att.net]
**Sent:** Thursday, September 06, 2012 8:59 AM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village at Wolf Creek Access Project

I fully support this project and look forward to visiting when completed.

1

C0010028

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:50 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: VILLAGE AT WOLF CREEK ACCESS PROJECT |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** NVELOP@aol.com [mailto:NVELOP@aol.com]
**Sent:** Wednesday, September 05, 2012 9:53 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** Brenda.Felmlee@mail.house.gov; erin_minks@markudall.senate.gov; charlotte_bobicki@bennet.senate.gov
**Subject:** VILLAGE AT WOLF CREEK ACCESS PROJECT

I strongly support the development of the VILLAGE AT WOLF CREEK ACCESS
PROJECT.  We have spent time in the area and understand the need for this
project to improve the attractiveness of the area as a tourist destination, as well as a
tremendous asset for the citizens of South Fork and surrounding communities.

Thanks for your consideration.

Sincerely,
Preston Miller

nvelop@aol.com
602-363-1272

9985 N 78th Place
Scottsdale, AZ 858258

C0010029

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Monday, September 10, 2012 11:51 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village @ Wolf Creek Access Project |
| **Attachments:** | Wetlands.docx |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Bob Takeda [mailto:btakeda@comcast.net]
**Sent:** Wednesday, September 05, 2012 2:28 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village @ Wolf Creek Access Project

Mr. Tom Malecek, District Ranger;

Please find attached my comments in support of the above referenced project.

**Robert M. Takeda, P.E.**

**RMT**echnical Solutions LLC
8731 S. Cedarwood Ln
Highlands Ranch, CO  80126

Cell # 303-918-5762

C0010030

Wetlands

The public will gain ± 40.4 acres of wetlands, which includes ± 22.7 acres of fen wetlands, eight springs and ± 14,733 linear feet of perennial and intermittent streams. (Draft EIS, pg. 4-75, 4.7.1.2.1)

The major source of groundwater for the Central Alberta Park Wetland Complex is from slopes to the west and this recharge area would not be impacted by the project. (Draft EIS, pg. 4-77, 4.7.1.2.2)

Surface Water - Streams

There would be a net gain of ±8,641 linear feet of perennial streams and ±6.092 linear feet of intermittent streams. (Draft EIS, pg. 2-15, Table 2.6-2)

Thus, the proposed land exchange would result in a net increase of ±14,733 linear feet of stream habitats for fish and macroinvertebrates under management of the Rio Grande NF, and these streams would be managed in accordance with the Forest Plan watershed standards in order to protect stream health. (Draft EIS, pg. 4-5, 4.1.3.1.2; pg. 4-85, 4.8.1.2.1)

Water Quality

This transfer of ±14,733 feet of stream segments which are tributary to North and South Pass Creeks from private ownership without a water quality management plan, to public ownership with a detailed water quality management plan, is expected to preserve the overall water quality of the watershed (especially South Pass Creek) into the future. (Draft EIS, pg. 4-4, 4.1.3.1.1)

Overall, water quality as related to wastewater treatment plant-type pollutants is predicted to remain below the ISWQS set by the WQCD. (Draft EIS, pg. 4-7, 4.1.3.2.2)


The wastewater discharges attributable to the WWTP alone are not expected to have a measurable effect on stream channel stability. (Draft EIS, pg. 4-10)

Water Rights

There are no identified direct environmental consequences related to water rights on the Rio Grande National Forest as a result of the Proposed Action. (Draft EIS, pg. 4-40, 4.4.1.2.1)

Therefore, from a water right perspective, the Alternative 2 Maximum Density Development Concept could be developed without causing injury to other water right users in the Rio Grande basin. (Draft EIS, pg. 4-43, 4.4.1.2.2)

## Malecek, Thomas -FS

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 10, 2012 12:21 PM |
| **To:** | shines@blm.gov |
| **Cc:** | dhicks@vanion.com; Rinella, Steven -FS |
| **Subject:** | RE: Village Exchandge Boundary Survey |

Sean, Adam just took off for 2 weeks vacation, so am ccing this to Dusty Hicks who should be able to best answer your ????'s.  Also to Steve Rinella, who may have some insight as the appraisal contract needed to be fairly specific and don't want to assume something we may not be able to…..

Let me know if we need to discuss via a conf call…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Hines, Sean J [mailto:shines@blm.gov]
**Sent:** Monday, September 10, 2012 12:03 PM
**To:** apoe@westernlandgroup.com
**Cc:** Scholl, Kyle K; Velasquez, Joe -FS; Malecek, Thomas -FS
**Subject:** Village Exchandge Boundary Survey

Adam,

My name is Sean Hines, I am a Cadastral Surveyor with the BLM and I am the surveyor assigned to the Wolf Creek Village Land Exchange property boundary survey.  I currently have an AutoCAD drawing that shows the proposed land exchange parcels that I received from Dan Russell, a local surveyor who has been working on this project,  who tells me that the drawing came from Western.  This particular drawing doesn't seem to fit anything on the ground as far as known points are concerned  and appears to have multiple problems with the line work.  I was curious who created this drawing and how strict we need to be with following this exact boundary.  I have designed a boundary that fits with what is on the ground and I attempted to keep the distances and acreages the same or as close to the same as possible.  If we do decide to go with this modified boundary, I would like all participating parties to sign and agree to a plan before I set any monuments.

If you could please contact me or direct me to someone who I should speak with to iron out these details I would appreciate it, time is a factor here because of the pending weather conditions.

Thank You for Your Time,

Sean Hines
Cadastral Surveyor
San Luis Valley Public Lands Center
1803 Hwy. 160
Monte Vista, CO 81144
Office:  719-852-6269
Cell:  719-431-3728

Email: shines@blm.gov

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 10, 2012 12:21 PM |
| **To:** | shines@blm.gov |
| **Cc:** | dhicks@vanion.com; Rinella, Steven -FS |
| **Subject:** | RE: Village Exchandge Boundary Survey |

Sean, Adam just took off for 2 weeks vacation, so am ccing this to Dusty Hicks who should be able to best answer your ????'s.  Also to Steve Rinella, who may have some insight as the appraisal contract needed to be fairly specific and don't want to assume something we may not be able to…..

Let me know if we need to discuss via a conf call…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Hines, Sean J [mailto:shines@blm.gov]
**Sent:** Monday, September 10, 2012 12:03 PM
**To:** apoe@westernlandgroup.com
**Cc:** Scholl, Kyle K; Velasquez, Joe -FS; Malecek, Thomas -FS
**Subject:** Village Exchandge Boundary Survey

Adam,

My name is Sean Hines, I am a Cadastral Surveyor with the BLM and I am the surveyor assigned to the Wolf Creek Village Land Exchange property boundary survey.  I currently have an AutoCAD drawing that shows the proposed land exchange parcels that I received from Dan Russell, a local surveyor who has been working on this project,  who tells me that the drawing came from Western.  This particular drawing doesn't seem to fit anything on the ground as far as known points are concerned  and appears to have multiple problems with the line work.  I was curious who created this drawing and how strict we need to be with following this exact boundary.  I have designed a boundary that fits with what is on the ground and I attempted to keep the distances and acreages the same or as close to the same as possible.  If we do decide to go with this modified boundary, I would like all participating parties to sign and agree to a plan before I set any monuments.

If you could please contact me or direct me to someone who I should speak with to iron out these details I would appreciate it, time is a factor here because of the pending weather conditions.

Thank You for Your Time,

Sean Hines
Cadastral Surveyor
San Luis Valley Public Lands Center
1803 Hwy. 160
Monte Vista, CO 81144
Office:  719-852-6269
Cell:  719-431-3728

C0010034

Email:  shines@blm.gov

C0010035

| | |
|---|---|
| **From:** | shines@blm.gov |
| **Sent:** | Monday, September 10, 2012 12:24 PM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | dhicks@vanion.com; Rinella, Steven -FS |
| **Subject:** | RE: Village Exchandge Boundary Survey |

Thank you Tom,

I am also currently speaking with Clint Jones on this issue and he will be getting back to me to clear up these boundary
issues shortly.  I will keep you updated.

Sean Hines
Cadastral Surveyor
San Luis Valley Public Lands Center
1803 Hwy. 160
Monte Vista, CO 81144
Office:  719-852-6269
Cell:  719-431-3728
Email:  shines@blm.gov

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Monday, September 10, 2012 12:21 PM
**To:** Hines, Sean J
**Cc:** dhicks@vanion.com; Rinella, Steven
**Subject:** RE: Village Exchandge Boundary Survey

Sean, Adam just took off for 2 weeks vacation, so am ccing this to Dusty Hicks who should be able to best answer your
????'s.  Also to Steve Rinella, who may have some insight as the appraisal contract needed to be fairly specific and don't
want to assume something we may not be able to…..

Let me know if we need to discuss via a conf call…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Hines, Sean J [mailto:shines@blm.gov]
**Sent:** Monday, September 10, 2012 12:03 PM
**To:** apoe@westernlandgroup.com
**Cc:** Scholl, Kyle K; Velasquez, Joe -FS; Malecek, Thomas -FS
**Subject:** Village Exchandge Boundary Survey

Adam,

My name is Sean Hines, I am a Cadastral Surveyor with the BLM and I am the surveyor assigned to the Wolf Creek Village
Land Exchange property boundary survey.  I currently have an AutoCAD drawing that shows the proposed land exchange
parcels that I received from Dan Russell, a local surveyor who has been working on this project,  who tells me that the
drawing came from Western.  This particular drawing doesn't seem to fit anything on the ground as far as known points

1

C0010036

are concerned  and appears to have multiple problems with the line work.  I was curious who created this drawing and how strict we need to be with following this exact boundary.   I have designed a boundary that fits with what is on the ground and I attempted to keep the distances and acreages the same or as close to the same as possible.  If we do decide to go with this modified boundary, I would like all participating parties to sign and agree to a plan before I set any monuments.

If you could please contact me or direct me to someone who I should speak with to iron out these details I would appreciate it, time is a factor here because of the pending weather conditions.

Thank You for Your Time,

Sean Hines
Cadastral Surveyor
San Luis Valley Public Lands Center
1803 Hwy. 160
Monte Vista, CO 81144
Office:  719-852-6269
Cell:  719-431-3728
Email:  shines@blm.gov

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010037

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 10, 2012 12:25 PM |
| **To:** | Dyer, Harold D -FS; McGinn, Diana -FS |
| **Subject:** | RE: VILLAGE AT WOLF CREEK ACCESS PROJECT |

Dusty obviously "got the word out" as he said he needed to do…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Dyer, Harold D -FS **On Behalf Of** FS-comments-rocky-mountain-rio-grande-divide
**Sent:** Monday, September 10, 2012 11:50 AM
**To:** Malecek, Thomas -FS; McGinn, Diana -FS
**Subject:** FW: VILLAGE AT WOLF CREEK ACCESS PROJECT

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** NVELOP@aol.com [mailto:NVELOP@aol.com]
**Sent:** Wednesday, September 05, 2012 9:53 AM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** Brenda.Felmlee@mail.house.gov; erin_minks@markudall.senate.gov; charlotte_bobicki@bennet.senate.gov
**Subject:** VILLAGE AT WOLF CREEK ACCESS PROJECT

I strongly support the development of the VILLAGE AT WOLF CREEK ACCESS
PROJECT.  We have spent time in the area and understand the need for this
project to improve the attractiveness of the area as a tourist destination, as well as a
tremendous asset for the citizens of South Fork and surrounding communities.

Thanks for your consideration.

Sincerely,
Preston Miller

nvelop@aol.com
602-363-1272

C0010038

9985 N 78th Place
Scottsdale, AZ 858258

C0010039

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 10, 2012 1:05 PM |
| **To:** | Ghormley, Randy -FS; Dyer, Harold D -FS |
| **Subject:** | FW: Village at Wolf Creek Section 7 Applicant-Committed Measures |
| **Attachments:** | Village Letter to USFWS re Conservation Measures.pdf |

Fyi, haven't looked at it, and pls consider this confidential....

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Sandi Snodgrass [mailto:SSnodgrass@hollandhart.com]
**Sent:** Monday, September 10, 2012 9:58 AM
**To:** kurt_broderdorp@fws.gov
**Cc:** Patty_Gelatt@fws.gov; Malecek, Thomas -FS; clint@thevillageatwolfcreek.com; dhicks@vanion.com; apoe@westernlandgroup.com
**Subject:** Village at Wolf Creek Section 7 Applicant-Committed Measures

Dear Mr. Broderdorp,

Attached is a letter from the Village at Wolf Creek following up on the August 29 ESA Section 7 consultation meeting in Pagosa Springs.  Please feel free to contact Clint or me if you have any questions.

Sandi Snodgrass



Sandi Snodgrass
Holland & Hart LLP
555 17th Street, Suite 3200
Denver, CO 80202
Phone (303) 295-8326
Fax (303) 295-8261
E-mail: ssnodgrass@hollandhart.com



**CONFIDENTIALITY NOTICE:** This message is confidential and may be privileged. If you believe that this email has been sent to you in error, please reply to the sender that you received the message in error; then please delete this e-mail. Thank you.

C0010040

C0010041

**HOLLAND&HART**
THE LAW OUT WEST

C0010042



**Sandra A. Snodgrass**
**Partner**
**Phone** 303-295-8326
**Fax** 303-975-5491
SSnodgrass@hollandhart.com

September 10, 2012

**VIA E-MAIL**

Kurt Broderdorp
U.S. Fish & Wildlife Service
764 Horizon Drive, Building B
Grand Junction, CO 81506-3946

<div align="center">

**Re:    ESA Section 7 Consultation – Village at Wolf Creek**

</div>

Dear Mr. Broderdorp:

The purpose of this letter is to follow up on issues discussed at the Endangered Species Act (ESA) Section 7 consultation meeting hosted by the U.S. Forest Service on August 29, 2012, in Pagosa Springs regarding a request by the Village at Wolf Creek (Village or Applicant) for access to its inholding within the Rio Grande National Forest. At that meeting, the Village agreed to submit to you for your consideration its proposed Applicant-committed conservation measures to benefit the Canada lynx.

The following proposals are based upon the recently issued draft environmental impact statement for the Project in which the Forest Service stated that its preferred alternative for providing the requested access is a land exchange as opposed to an access easement. It is also our understanding that the Forest Service and the U.S. Fish and Wildlife Service (USFWS) have determined that the Section 7 consultation will cover both the land exchange and the subsequent development of the Village without the need for a separate ESA Section 10 permit for such development.

We further understand that the USFWS anticipates the inclusion in its biological opinion for the Project of a reasonable and prudent measure (RPM) that would provide for the establishment of a technical panel of experts in lynx biology, traffic, and other relevant disciplines (Panel) to identify measures for appropriate minimization of incidental take of lynx that may result from the Project, particularly with respect to Project-related traffic on Highway 160. We appreciate the USFWS's discussion of this topic with us, consistent with the policy articulated in the Section 7 Consultation Handbook, which recommends that reasonable and prudent measures, and their implementing terms and conditions, be developed in coordination with the action agency and applicant to ensure that such measures are reasonable, cause only minor changes to the project, and are within the legal authority of the action agency and applicant. Endangered Species Consultation Handbook at 4-50 (USFWS and NMFS 1998).

**Holland & Hart** LLP **Attorneys at Law**

Phone (303)295-8000  Fax (303)295-8261  **www.hollandhart.com**

555 17th Street Suite 3200 Denver, CO 80202-3979 Mailing Address Post Office Box 8749 Denver, CO 80201-8749

Aspen Billings Boise Boulder Carson City Cheyenne Colorado Springs Denver Denver Tech Center Jackson Hole Las Vegas Reno Salt Lake City Santa Fe Washington, D.C.

C0010043



September 10, 2012
Page 2

At the August 29 meeting, the agencies and the Applicant discussed the 2005 biological opinion that was issued by the USFWS for the Village's previous access request. While the currently proposed development would cause impacts to more acres of lynx habitat as compared to the 2005 proposal, other features of the current proposal would reduce the potential for overall impacts to the lynx. Those features include the following: (1) there no longer will be a grade-separated interchange required at the highway; (2) the highway's relocation further south will eliminate the need for retaining walls on federal land on the north side of the highway that might be a barrier to wildlife migration; and (3) there will be less traffic due to significant reductions in the number of occupants anticipated at the Village. We believe the 2005 biological opinion is a good starting point for the new biological opinion, but some modifications are appropriate in light of the differences between the previous and current proposals. Consistent with that conclusion, the Village at Wolf Creek proposes to ensure funding for lynx conservation measures as follows.

The Village would commit to provide funding for implementation of lynx conservation measures identified by the Panel and approved by USFWS and the Village, consistent with the provisions of the RPM. Funding will be assured in the minimum cap amount of $500 per housing unit, and in the maximum cap amount of $1000 per housing unit, such minimum and maximum cap amounts being subject to adjustment in the future by the CPI for the region at the time of payment. Furthermore, the minimum and maximum cap amounts may be adjusted for future phases in the amount that actual traffic monitoring demonstrates that Village-associated traffic is either greater or less than the volume of traffic projected to result from the Project, as considered and analyzed in the USFWS biological opinion.

The mechanism and timing for Village funding of lynx conservation measures and related costs as proposed by the Applicant are as follows:

1. The Applicant agrees to fund the conservation measures up to 50% of the minimum cap amount, or $250 per unit, at the time of final plat approval and recordation of the plat for Phase 1 of the Village (or subsequent phases should they occur) for the payment or performance by the Village of approved lynx conservation measures and to address administrative costs of the Panel. By "agrees to fund," we mean either pay into an approved lynx conservation fund, or use directly to perform approved lynx conservation measures, as contemplated by the RPM.

2. The Village will advance funds against the above-referenced initial $250 per unit amount prior to final plat approval and recordation by Mineral County, Colorado, as necessary to cover costs, if any, associated with the convening of the proposed Panel.

3. The Applicant agrees to fund lynx conservation measures with the balance of the initial $250 per unit amount at the time of final plat approval and recordation by Mineral County for each phase.

C0010044



September 10, 2012
Page 3

4.  The Applicant agrees to fund lynx conservation measures, consistent with the RPM, with the balance of the minimum $500 per unit amount at the time of issuance of a building permit by Mineral County, Colorado to commence construction of each unit.

5.  At the beginning of each calendar year, the Village will work with the USFWS and the technical panel to develop and agree upon a budget for lynx conservation measures to be performed during the ensuing year, including all expense items and revenue resources necessary to pay for such measures.

6.  <u>Potential Increase of Per Unit Cap</u>.  To the extent the approved budget identifies the need for additional revenue resources from the Village, the minimum cap of $500 per unit amount may be increased to a maximum cap of $1,000 per unit for all future phases.

7.  <u>Adjustment of Per Unit Cap to Reflect Actual Traffic Contributions</u>.  The minimum and maximum cap amounts identified above are based on the projected traffic levels associated with the Village that are considered and analyzed in the biological opinion. If actual traffic monitoring data demonstrate that the Village is responsible for either a smaller or greater share of traffic on Highway 160 than is predicted at the time of the biological opinion, the minimum and maximum cap amounts (as appropriate) will be adjusted to reflect the proportionate reduction or increase by which actual traffic contribution differs from anticipated traffic contribution.  In other words, should actual Village-generated traffic share on Highway 160 be 10% greater or less than anticipated in the biological opinion, the minimum or maximum cap amounts would be increased or decreased by 10%.  Such adjusted minimum or maximum cap amounts would be applied to all units included in future phases of the Village, payable as outlined above.

It is anticipated that for Phase 1 of the Project, the funding available for conservation measures, at the caps discussed above, will be a minimum of $248,500 (497 units at $500 per unit), and a maximum of $497,000 (497 units at $1,000 per unit).  Future phases will be funded at similar rates as adjusted for the CPI and changes in traffic volumes.

In addition to the foregoing funding-commitment mechanism, the Village commits to conduct worker orientation concerning Canada lynx conservation and to implementing an education program designed to educate both Village workforce (construction and operation) and Village guests and owners regarding the conservation needs of lynx and, in particular, threats to lynx from traffic and measures to reduce such threats through safe driving practices.  The Applicant will also bus workers to and from the project site to minimize potential impacts to lynx related to construction traffic during the infrastructure development period.  In Phase 1 and subsequent phases of the development, the Applicant will provide some employee housing at the development to minimize traffic impacts from those employees.  Furthermore, throughout the life of the development, the Applicant will offer bus service to its construction, development, and

C0010045



September 10, 2012
Page 4

operations workforce. Both the lynx education program, and the provision by the Village of
workforce mass transit to reduce traffic generation, could perhaps be incorporated into the
biological opinion as reasonable and prudent measures.

In addition to the proposed funding mechanism and other Applicant-committed measures
outlined above, the 2005 biological opinion included terms and conditions that we anticipate will
be applicable to the current proposal, such as details regarding the make up and implementation
of the Panel and monitoring and reporting requires. We would be happy to discuss further with
you any of those terms and conditions or the conservation measures outlined above.

Sincerely,

*Sandra A. Snodgrass*

Sandra A. Snodgrass
of Holland & Hart LLP

SAS

cc:      Patty Schrader Gelatt (USFWS)
         Tom Malecek (U.S. Forest Service)
         Clint Jones (Village at Wolf Creek)
         Dusty Hicks (Village at Wolf Creek)
         Adam Poe (Western Land Group)

C0010046

**Miller, Jeffrey H -FS**

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Monday, September 10, 2012 2:01 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | Fw: Wolf Creek development plans |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/10/2012 01:59 PM -----

| Joshua Cooley | To | Mailroom R2 Rio Grande |
|---|---|---|
| <primaloutdoors@gmail.com> | cc | |
| 09/09/2012 11:12 AM | Subject | Wolf Creek development plans |

Dear Dan,

I'm writing to oppose the Wolf Creek development plans of Mr. McCombs. I'm a frequent skier of Wolf Creek. It's such an amazing place to visit, and way off the beaten path. I live in Breckenridge, Colorado, and drive to Wolf Creek because it's one of the last authentic, unspoiled ski areas left in the Mountain West. No condos, townhouses, restaurants and hotels spoil the natural beauty. That's why my friends and I drive 400 miles roundtrip to ski Wolf Creek. While I do respect the rights of Mr. McCombs to do whatever he wishes on his private property, I think the line needs to be drawn in the snow, and the proposed land swap should be denied. The impact of thousands of residents living at the top of Wolf Creek Pass would be too detrimental to the environment in my opinion, and it would ruin Wolf Creek forever. This is a pristine area that should be left pristine. Please deny the land swap and do not allow this expansion.

Sincerely,

Josh Cooley

--
*Primal Outdoors*
*MountainGetaway*
*OnTheSnow*
*Wyoming Business Report*
*cell: (307) 421-5782*
*1013 South 4th Street*
*Laramie, WY 82070*
*"The mountains are calling and I must go"*

C0010047

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8246-000001

C0010048

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8246-000002

C0010049

## Miller, Jeffrey H -FS

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Monday, September 10, 2012 2:02 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | Fw: No to wolf creek |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/10/2012 02:01 PM -----

<ryanossola@yahoo.com>    To Mailroom R2 Rio Grande
                          cc
09/09/2012 10:28 PM       Subject No to wolf creek

Hey just wanted to give my support against the development of Wolf Creek.  This
place should remain the way it is,with a solid wilderness aspect and a low key
draw.  It's more about the land then the ski runs.

Save it Dan,

Thanks

Sent from my iPad

C0010050

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8247-000001

C0010051

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8247-000002

C0010052

**Miller, Jeffrey H -FS**

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Monday, September 10, 2012 2:03 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | Fw: Wolf Creek development |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/10/2012 02:01 PM -----

Jeff Johannsen
&lt;johannsen.jeff@gmail.com&gt;

09/10/2012 07:32 AM

To Mailroom R2 Rio Grande
cc
Subject Wolf Creek development

To Mr. Dan Dallas,
I am urging you to please vote NO to the proposed Wolf Creek development.  Thank you for your time.
Jeff Johannsen

C0010053

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8248-000001

C0010054

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8248-000002

C0010055

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 11, 2012 6:03 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Wolf Creek development |
| **Attachments:** | pic11192.gif |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 10, 2012 2:03 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: Wolf Creek development

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/10/2012 02:01 PM -----

|  |  |
|---|---|
| **Jeff Johannsen**<br><johannsen.jeff@gmail.com><br>09/10/2012 07:32 AM | To  Mailroom R2 Rio Grande<br>cc<br>Subject Wolf Creek development |

To Mr. Dan Dallas,
I am urging you to please vote NO to the proposed Wolf Creek development.  Thank you for your time.
Jeff Johannsen

C0010056

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8249-000001

C0010057

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8249-000002

C0010058

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8249-000003

C0010059

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Tuesday, September 11, 2012 6:04 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: No to wolf creek |
| **Attachments:** | pic21098.gif |

+++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 10, 2012 2:02 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: No to wolf creek

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/10/2012 02:01 PM -----

<u>ryanossola@yahoo.com</u>>          To Mailroom R2 Rio Grande
09/09/2012 10:28 PM                         cc
                                      Subject No to wolf creek

```
Hey just wanted to give my support against the development of Wolf Creek.  This
place should remain the way it is,with a solid wilderness aspect and a low key
draw.  It's more about the land then the ski runs.

Save it Dan,

Thanks

Sent from my iPad
```

C0010060

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8250-000001

C0010061

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8250-000002

C0010062

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8250-000003

C0010063

| | |
|---|---|
| **From:** | Dyer, Harold D -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DYER, HAROLD47B6A9DA-8D3C-41A5-B5A3-7DFFD89874C8> |
| **Sent:** | Tuesday, September 11, 2012 6:04 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Wolf Creek development plans |
| **Attachments:** | pic13210.gif; image001.png; image002.png |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
*"He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 10, 2012 2:01 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: Wolf Creek development plans

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/10/2012 01:59 PM -----

| **Joshua Cooley** <primaloutdoors@gmail.com> | To | Mailroom R2 Rio Grande |
|---|---|---|
| 09/09/2012 11:12 AM | cc | |
| | Subject | Wolf Creek development plans |

Dear Dan,

I'm writing to oppose the Wolf Creek development plans of Mr. McCombs. I'm a frequent skier of Wolf Creek. It's such an amazing place to visit, and way off the beaten path. I live in Breckenridge, Colorado, and drive to Wolf Creek because it's one of the last authentic, unspoiled ski areas left in the Mountain West. No condos, townhouses, restaurants and hotels spoil the natural beauty. That's why my friends and I drive 400 miles roundtrip to ski Wolf Creek. While I do respect the rights of Mr. McCombs to do whatever he wishes on his private property, I think the line needs to be drawn in the snow, and the proposed land swap should be denied. The impact of thousands of residents living at the top of Wolf Creek Pass would be too detrimental to the environment in my opinion, and it would ruin Wolf Creek forever. This is a pristine area that should be left pristine. Please deny the land swap and do not allow this expansion.

Sincerely,

1

C0010064

Josh Cooley

--
*Primal Outdoors*
*MountainGetaway*
*OnTheSnow*
*Wyoming Business Report*
*cell: (307) 421-5782*
*1013 South 4th Street*
*Laramie, WY 82070*
*"The mountains are calling and I must go"*

C0010065

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8251-000001

C0010066

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8251-000002

C0010067

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8251-000003

C0010068

**From:**          Miller, Jeffrey H -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP
                   (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MILLER, JEFFREY6CDA61BB-
                   D641-4DE0-9707-C2EDABCD204E>
**Sent:**          Tuesday, September 11, 2012 3:45 PM
**To:**            Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:**       Fw: Wolf Creek Ski area delv
**Attachments:**   pic18382.gif; ecblank.gif

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/11/2012 03:44 PM -----

**Dylan Gilbert**
<**gilbertdylan@hotmail.com**>                    ToMailroom R2 Rio Grande

09/10/2012 07:12 PM                              cc

                                                 SubjectWolf Creek Ski area delv

Dan Dallas


I would like to voice my opinion against this. First off Wolf creek is one the best untouched ski areas and mountains left in Colorado. Wolf Creek has remained un-developed and left for people that really love to be in the outdoors. Not like other places that are way out of the average persons income to enjoy. I am sure you ended up in the line of work partial due to you enjoy the outdoors? Well I do and have enjoyed skiing and snowboarding at Wolf Creek for thirty years. Don't get me wrong there is a place for everything and Would Creek isn't one of those places.
Fore instants when I was a child my father was a Contractor and he was part of developing and building in Telluride Co. I see first had what that has done to an amazing little town. For the average person to enjoy this place is a thing of the past.


Thank you for taking my opinion into consideration

Dylan Gilbert

1

C0010069

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8255-000001

C0010070

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8255-000002

C0010071

**Dow, Robert R -FS**

| | |
|---|---|
| **From:** | Dow, Robert R -FS |
| **Sent:** | Tuesday, September 11, 2012 3:51 PM |
| **To:** | Blakeman, Mike -FS |
| **Cc:** | Shaw, Adam -FS; Dyer, Harold D -FS; Gallegos, Marge -FS |
| **Subject:** | FW: VWC comment issues |

Mike,

It took a little while to get the answer back about the AOL browser, and it is not supported.  One of the issues is that browsers have different versions that gradually become obsolete and the company stops supporting them, even though some people may still use them.  I don't know if that's the case with your guy, but that's where we are.  This is the first time this has come up, and we will put it on the list of potential enhancements.  Priority will depend on how many people it becomes an issue for.  Thanks for bringing it to our attention.

Bob Dow, Program Analyst
WO-EMC-NEPA Services Group (NSG)
2222 W. 2300 S.
Salt Lake City, UT 84119
801-975-3356

**From:** James Freeman [mailto:jfreeman@phaseonecg.com]
**Sent:** Tuesday, September 11, 2012 3:02 PM
**To:** Dow, Robert R -FS; FS-SUPPORT
**Subject:** RE: VWC comment issues

Bob,

Per FS requirements. CARA is only designed to work with IE8. It does work with Chrome and firefox, but we've never tested it against any AOL browser.

James

**From:** Blakeman, Mike -FS
**Sent:** Friday, September 07, 2012 4:49 PM
**To:** Dyer, Harold D -FS
**Subject:** VWC comment issues

I had a call from a guy in South Fork who couldn't submit a comment using the on-line form when using the AOL browser.  He finally got it to work with Internet Explorer.  Seems like our system should be able to work with all browsers.  Do you know who we should bump this issue up to?

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 11, 2012 8:56 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | FW: Wolf Creek Ski area delv |
| **Attachments:** | pic18382.gif |

Fore instants, you are also taking care of these coming in email to our mailroom, as I have been reading em all and deleting, assuming you are keeping for the record and review.  Just makin sure…thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Tuesday, September 11, 2012 3:45 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: Wolf Creek Ski area delv

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/11/2012 03:44 PM -----

| | |
|---|---|
| **Dylan Gilbert** <gilbertdylan@hotmail.com> 09/10/2012 07:12 PM | To Mailroom R2 Rio Grande cc Subject Wolf Creek Ski area delv |

Dan Dallas


I would like to voice my opinion against this. First off Wolf creek is one the best untouched ski areas and mountains left in Colorado. Wolf Creek has remained un-developed and left for people that really love to be in the outdoors. Not like other places that are way out of the average persons income to enjoy. I am sure you ended up in the line of work partial due to you enjoy the outdoors? Well I do and have enjoyed skiing and snowboarding at Wolf Creek for thirty years. Don't get me wrong there is a place for everything and Would Creek isn't one of those places.
Fore instants when I was a child my father was a Contractor and he was part of developing and building in Telluride Co. I see first had what that has done to an amazing little town. For the average person to enjoy this place is a thing of the past.


Thank you for taking my opinion into consideration

Dylan Gilbert

C0010073

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8256-000001

C0010074

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8256-000002

C0010075

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8256-000003

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Wednesday, September 12, 2012 6:01 AM |
| **To:** | Malecek, Thomas -FS |
| **Subject:** | RE: Wolf Creek Ski area delv |

Tom,

I am keeping a record of the ones I am sending to you and Diana is getting them as well.

Dave

+++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 11, 2012 8:56 PM
**To:** Dyer, Harold D -FS
**Subject:** FW: Wolf Creek Ski area delv

Fore instants, you are also taking care of these coming in email to our mailroom, as I have been reading em all and deleting, assuming you are keeping for the record and review.  Just makin sure…thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Tuesday, September 11, 2012 3:45 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: Wolf Creek Ski area delv

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/11/2012 03:44 PM -----

| Dylan Gilbert | To | Mailroom R2 Rio Grande |
|---|---|---|
| <gilbertdylan@hotmail.com> | cc | |
| 09/10/2012 07:12 PM | Subject | Wolf Creek Ski area delv |

Dan Dallas

C0010077

I would like to voice my opinion against this. First off Wolf creek is one the best untouched ski areas and mountains left in Colorado. Wolf Creek has remained un-developed and left for people that really love to be in the outdoors. Not like other places that are way out of the average persons income to enjoy. I am sure you ended up in the line of work partial due to you enjoy the outdoors? Well I do and have enjoyed skiing and snowboarding at Wolf Creek for thirty years. Don't get me wrong there is a place for everything and Would Creek isn't one of those places.
Fore instants when I was a child my father was a Contractor and he was part of developing and building in Telluride Co. I see first had what that has done to an amazing little town. For the average person to enjoy this place is a thing of the past.


Thank you for taking my opinion into consideration

Dylan Gilbert

C0010078

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8259-000001

C0010079

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8259-000002

C0010080

| | |
|---|---|
| **From:** | Malecek, Thomas -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MALECEK, THOMAS94D8BAE2-5D0E-46FD-AB77-77C6A76002FD> |
| **Sent:** | Wednesday, September 12, 2012 9:08 AM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | RE: Wolf Creek Ski area delv |
| **Attachments:** | image001.png; image002.png |

Thanks, I know you are with the ones that get into our comments address, but it seems a few are going directly to the mailroom, and then jeff is forwarding it onto you and me and dan, like this one below.  I assume you are keeping these as well, ie, all electronic comments regardless of how we get them???!!!

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Dyer, Harold D -FS
**Sent:** Wednesday, September 12, 2012 6:01 AM
**To:** Malecek, Thomas -FS
**Subject:** RE: Wolf Creek Ski area delv

Tom,

I am keeping a record of the ones I am sending to you and Diana is getting them as well.

Dave

+++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 11, 2012 8:56 PM
**To:** Dyer, Harold D -FS
**Subject:** FW: Wolf Creek Ski area delv

Fore instants, you are also taking care of these coming in email to our mailroom, as I have been reading em all and deleting, assuming you are keeping for the record and review.  Just makin sure...thanks

Tom Malecek
Divide District Ranger
Rio Grande NF

C0010081

(719) 657-6007; cell 850-2356

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Tuesday, September 11, 2012 3:45 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: Wolf Creek Ski area delv

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/11/2012 03:44 PM -----

| | | |
|---|---|---|
| **Dylan Gilbert** <**gilbertdylan@hotmail.com**> | To | Mailroom R2 Rio Grande |
| 09/10/2012 07:12 PM | cc | |
| | Subject | Wolf Creek Ski area delv |

Dan Dallas

I would like to voice my opinion against this. First off Wolf creek is one the best untouched ski areas and mountains left in Colorado. Wolf Creek has remained un-developed and left for people that really love to be in the outdoors. Not like other places that are way out of the average persons income to enjoy. I am sure you ended up in the line of work partial due to you enjoy the outdoors? Well I do and have enjoyed skiing and snowboarding at Wolf Creek for thirty years. Don't get me wrong there is a place for everything and Would Creek isn't one of those places.
Fore instants when I was a child my father was a Contractor and he was part of developing and building in Telluride Co. I see first had what that has done to an amazing little town. For the average person to enjoy this place is a thing of the past.

Thank you for taking my opinion into consideration

Dylan Gilbert

2

C0010082

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8261-000001

C0010083

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8261-000002

C0010084

**Muenchow, Kurt A -FS**

| | |
|---|---|
| **From:** | Muenchow, Kurt A -FS |
| **Sent:** | Wednesday, September 12, 2012 9:29 AM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | Lloyd, Brian A -FS; Rinella, Steven -FS |
| **Subject:** | WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report |

I am sending you the latest report from CGS (CDOT's "contractor") updating the technical status of CDOT's Wolf Creek Pass fuel tank cleanup.

In summary, this report:

- Confirms that surface water is NOT impacted by the groundwater BTEX plume;
- Confirms that various remediation approaches have had minimal affect on the BTEX plume;
- Confirms that contamination (mainly benzene) is still present in the GW plume at concentrations that exceed applicable regulatory thresholds & preclude potable use of impacted water;
- Confirms that CDOT/CGS is proceeding with design/installation of a more-aggressive cleanup technology (sent the USFS a copy of their plan – I previously-forwarded to the District); and
- Continues to stress that, "there are no existing downgradient water supply wells within 2,500 feet of the source."

Please let me know if any questions or concerns, or if there's something more I can help with.

C0010085

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Wednesday, September 12, 2012 12:32 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | david@westerneco.com |
| **Subject:** | WCV Sect 7 |

Randy,

When you have a chance, would you, or have Kurt, provide me with some explanatory text and a reference (you could also forward me the underlying document/strategy), that FWS is using to consider Village effects as indirect under section 7?  While FWS may provide this as part of the Conservation Strategy (CS), I need that now (I have a growing number of placeholders in the draft BA) rather than in the weeks ahead when that CS may be forthcoming.

Thanks,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144;  weiwild@aol.com

C0010086

**Miller, Jeffrey H -FS**

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Wednesday, September 12, 2012 4:08 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | Fw: NO TO WOLF CREEK DEVELOPMENT!!! |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/12/2012 04:06 PM -----

| Kelli Keith<br><atlantevour@gmail.com> | To | Mailroom R2 Rio Grande |
|---|---|---|
| | cc | |
| 09/12/2012 01:04 AM | Subject | NO TO WOLF CREEK DEVELOPMENT!!! |

PLEASE!!!!!

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8265-000001

C0010088

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8265-000002

C0010089

**Wehrli, Christopher L -FS**

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Thursday, September 13, 2012 9:22 AM |
| **To:** | Miller, Matthew D -FS |
| **Subject:** | Correspondence Database |
| **Attachments:** | Ms Elizabeth Greene.docx |

Matt,

Please enter the attached letter into the database for Dan Jiron's signature, with me, and Kathy as reviewers.

See me with questions.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

C0010090

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.157208-000001

C0010091

Ms Elizabeth Greene

P O Bob 3782

Pagosa Springs CO 81147

Dear Ms. Greene,

I received your comments regarding the proposed Village to Wolf Creek Access Project. Thank you for your interest in the National Forests here in the Rocky Mountain Region and specifically the Rio Grande National Forest in southern Colorado.

Your comments will be included in the project record and will be fully considered, along with all comments received on the Village to Wolf Creek Access Project prior to the final decision.

For further information please contact the Divide District Ranger, Tom Malecek at (719) 657-6007.

Sincerely,

Dan Jiron

Regional Forester

**Miller, Matthew D -FS**

| | |
|---|---|
| **From:** | Miller, Matthew D -FS |
| **Sent:** | Thursday, September 13, 2012 10:48 AM |
| **To:** | Wehrli, Christopher L -FS |
| **Subject:** | Please review Correspondence: File Code 1950--Village to Wolf Creek Access Project |

File Code: 1950--Village to Wolf Creek Access Project

Click on the following link to view the document->

C0010093

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.157209-000001

C0010094

**Wehrli, Christopher L -FS**

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Thursday, September 13, 2012 10:50 AM |
| **To:** | Kurtz, Kathy -FS |
| **Subject:** | Please review Correspondence: File Code 1950--Village to Wolf Creek Access Project |

File Code: 1950--Village to Wolf Creek Access Project

Click on the following link to view the document->

C0010095

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.135546-000001

C0010096

**Kurtz, Kathy -FS**

| | |
|---|---|
| **From:** | Kurtz, Kathy -FS |
| **Sent:** | Thursday, September 13, 2012 10:51 AM |
| **To:** | Miller, Matthew D -FS |
| **Subject:** | Please review Correspondence: File Code 1950--Village to Wolf Creek Access Project |

File Code: 1950--Village to Wolf Creek Access Project

Click on the following link to view the document->

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.135547-000001

C0010098

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:15 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS" |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Karen Skelly [mailto:karen@karenskellyphoto.com]
**Sent:** Thursday, September 13, 2012 5:35 PM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Village at Wolf Creek Access Project DEIS"

## Wolf Creek Pass is located too high in elevation and too far from an established town and airport to be practical for a resort development

- Visitors from out of state will have difficulties with the effects of altitude as the proposed Village at Wolf Creek is at approximately 10,500 feet. Without time to acclimate, guests may suffer from altitude sickness and may be forced to descend to access the emergency services of Pagosa Springs or Del Norte.
- Traffic safety on top of a 10,500-foot pass that receives the most annual snowfall in the state of Colorado will range from difficult to dangerous, especially during the winter months.

I also wish to add that I am a photographer.  It has become increasingly difficult to find beautiful places to photograph or to take families to photograph with beautiful backdrops.  Everywhere you look there are houses, telephone lines, other buildings, etc.  Leave some beautiful places alone.

Thanks, Karen Skelly CPP
Karen Skelly Photography
www.karenskellyphoto.com
970.884.5292
www.facebook.com/KarenSkellyPhotography

C0010099

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:15 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: the village at wolf creek |

++++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest 1803 W. Highway 160 Monte Vista, CO 81144 719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++++
"He who sacrifices freedom for security deserves neither." - Ben Franklin


-----Original Message-----
From: Terri Watson [mailto:97hillside@earthlink.net]
Sent: Thursday, September 13, 2012 3:15 PM
To: FS-comments-rocky-mountain-rio-grande
Subject: the village at wolf creek

To Whom it May Concern:

This is preposterous plan...to damage the beautiful scenery of Wolf Creek with a planned development.

Two concerns certainly come to mind when I think of the Forest Service exchanging land with the Texas developer that will allow this development to move forward.

I lived in Durango for nearly 40 years and I am familiar with the Wolf Creek area. I know that most people who have lived in that part of the Four Corner area treasure the uniqueness of Wolf Creek's wild, untamed boundaries.
Local folks have enjoyed and reveled in the untrammeled areas, visitors have experienced the quiet beauty of it's mountain vistas. Many people seek out Wolf Creek Ski Area for it's uniquely undeveloped atmosphere. The Wolf Creek should remain a wild, beautifully scenic area.


Anyone who has traveled over Wolf Creek knows the extremely dangerous driving conditions that can be experienced, especially during the
winter months. I have made trips in total white outs conditions-
creeping slowly along, trusting myself and my Subaru to make the trip safely. It is NOT a drive that should ever be taken lightly. It is difficult to comprehend that a "Village" would be built where new out-of-state residents would have to be trusted to handle unexpected winter weather events, or any unusual driving events that may occur at any time on a mountain pass. I feel strongly that allowing a development such as this will further challenge the safety of travel on Wolf Creek Pass.

C0010100

This development has NO PLACE AT WOLF CREEK. I would respectfully ask you that you deny this disastrous plan from moving forward.

Terri Watson

C0010101

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:16 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: village at wolf creek access project deis |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Randy [mailto:huckwagon@gmail.com]
**Sent:** Thursday, September 13, 2012 11:30 AM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** village at wolf creek access project deis

Dear Sirs;

This project should never have been allowed to start in the first place.....ie.. the trade of land that started this mess.

Wolf Creek Ski Area lies between two of the largest wilderness areas in CO.  It is a corridor for animal and bird movement.  The more

development on the pass area the more disturbance of wildlife.

The development of a village at over 10,000 ft for tourists is something only a flatlander would dream up.

There are to many environmental problems associated with this project to allow it to move forward.

C0010102

The highest and best use for this land is already in effect.


Thank you,


Randy Waslien

Kristen Nielsen

Durango, CO

C0010103

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:16 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Jessi Marlatt [mailto:jessi@ouraynews.com]
**Sent:** Monday, September 10, 2012 1:47 PM
**To:** FS-comments-rocky-mountain-rio-grande
**Subject:** Village at Wolf Creek Access Project DEIS

As a former instructor at Wolf Creek, I feel that a village at the top of the mountain would take away from the pristine experience of deep Rocky Mountain powder days as well as hurt the economies of the regional towns that depend on ski and snowboard tourism during the winter months. A village would keep people on the mountain and away from the towns.
Thank you for considering my opinion during this decision process.

Jessi Marlatt
jessi@ouraynews.com
Ouray County Plaindealer
Reporter
970.708.7335

C0010104

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:17 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village of Wolf Creek Access Project |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*" - Ben Franklin

**From:** Karen McCraney [mailto:karenmccraney@yahoo.com]
**Sent:** Thursday, September 13, 2012 5:14 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village of Wolf Creek Access Project

Subject: Village of Wolf Creek Access Project
Date: Tue, 13 Sep 2012
I would like to state my complete support of the agencies land exchange for the Wolf Creek Access Project.  I feel this will  provide a much needed boost to our local economy as well as provide a beautiful environment for recreation and tourism.  In addition the public will gain +40.4 acres of wetlands and the project will generate much needed employment for the area.

I appreciate the professional public process that the Forest Service has provided in the environmental impact study.

Karen McCraney
Gainesville GA

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:19 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project DEIS |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Jennifer Martin [mailto:pagosagym@hotmail.com]
**Sent:** Wednesday, September 12, 2012 12:04 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide; Jennifer Martin
**Subject:** Village at Wolf Creek Access Project DEIS

Dan Dallas, Tom Malecek and to whom it may concern:

I am writing in regards to the proposed land exchange.  I am against the land exchange as well as against any large scale development on the top of Wolf Creek Pass.

On a fundamental level, Colorado in my opinion, does not need another Vail, Aspen, Beaver Creek, Breckenridge, etc.  We already have all of those.  People come to live, visit and enjoy this part of southwest Colorado precisely because we are NOT the same as all of those resorts.  We can offer something different, unique and more pristine.

On a practical level a large development on the top of the pass could have many detrimental effects.  I understand the developers have proposed a "smaller" plan if the exchange goes through, but there is no guarantee and I don't trust that.  I also understand that the forest service is required to give access. However, to me, this land exchange is a sneaky way to gain immediate access and start building whatever they want.  Ideally if the land exchange did not take place, the land owners would be forced to look at another parcel to exchange as the existing land is not friendly to develop and the easement to the current parcel not feasible.

The development no matter where it is at the current site would increase traffic similar to the I-70 corridor, except would stall traffic in severe avalanche terrain.  The harm to wetlands and high alpine zone would be irreplaceable. Native and endangered wildlife would be displaced.  Sewage disposal could be potentially disastrous for the Rio Grande watershed.  Furthermore, the economic impact I think would be harmful rather than stimulate the surrounding areas as amenities atop the pass would draw visits from the local areas.

The developer has not expressed concern for any of these issues, so I cannot believe they will build with respect to the local environment or its citizens.

Therefore, I would like to see Wolf Creek Pass remain unique and special.  It is what drew me and many others to this area.

Thank you for your time and consideration.  I appreciate you placing value on public input.

C0010106

Sincerely,

Jennifer Martin
2001 Catchpole Drive
Pagosa Springs, Co 81147

*Jennifer Martin*
*Hour Exchange Pagosa*
*"Transforming Time..."*
*www.pagosatimebank.com*

C0010107

| | |
|---|---|
| **From:** | Dyer, Harold D -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DYER, HAROLD47B6A9DA-8D3C-41A5-B5A3-7DFFD89874C8> |
| **Sent:** | Friday, September 14, 2012 6:20 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Village at Wolf Creek Access Project |
| **Attachments:** | image001.jpg; image002.jpg |

++++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++++
*"He who sacrifices freedom for security deserves neither."*  - Ben Franklin

**From:** Glynn Polter [mailto:glynn@mountainlighthouse.com]
**Sent:** Monday, September 10, 2012 8:45 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** Village at Wolf Creek Access Project

Dear Sir,
As a business owner in South Fork Colorado, land owner, homeowner, and President of the South Fork Chamber of Commerce, I am in Favor of the Wolf Creek Land Exchange !
There are so many economic benefits for our entire Valley that it is mind-boggling.

I appreciate your support of this truly monumental decision for the future of the San Luis Valley.
Thank you!

Glynn Polter
6827 Snead Lane
South Fork, CO 81154

*Glynn Polter*



1

C0010108



C0010109

C0010110

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:20 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: FW: |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Charles Dees [mailto:chas_dees@msn.com]
**Sent:** Tuesday, September 11, 2012 5:46 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Subject:** FW:

---

Subject: Village of Wolf Creek Access Project
Date: Tue, 11 Sep 2012 12:16:19 -0500

I would like to state my complete support of the agencies land exchange for the Wolf Creek Access Project.  I feel this will  provide a much needed boost to our local economy as well as provide a beautiful environment for recreation and tourism.  In addition the public will gain +40.4 acres of wetlands and the project will generate much needed employment for the area.

I appreciate the professional public process that the Forest Service has provided in the environmental impact study.

Rebecca E. Dees
South Fork, CO

C0010111

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:21 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Support for the Wolf Creek Village |
| **Attachments:** | Support Letter.doc |

+++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
+++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Micheal Kerley [mailto:kerley.michaeld@gmail.com]
**Sent:** Tuesday, September 11, 2012 1:12 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** Brenda.Felmlee@mail.house.gov; erin_minks@markudall.senate.gov; charlotte_bobicki@bennet.senate.gov
**Subject:** Support for the Wolf Creek Village

Attached you will find my letter of support for the development of the Village at Wolf Creek. Please do all you
can to move this project forward in the soonest possible time frame.

Thank you

Michael D Kerley

To Whom It May Concern:

Please count me among those strongly in favor of the development of the Village at Wolf Creek for the following reasons. This project should be given all the support it obviously deserves.

Wetlands

The public will gain ± 40.4 acres of wetlands, which includes ± 22.7 acres of fen wetlands, eight springs and ± 14,733 linear feet of perennial and intermittent streams. (Draft EIS, pg. 4-75, 4.7.1.2.1)

The major source of groundwater for the Central Alberta Park Wetland Complex is from slopes to the west and this recharge area would not be impacted by the project. (Draft EIS, pg. 4-77, 4.7.1.2.2)

Surface Water - Streams

There would be a net gain of ±8,641 linear feet of perennial streams and ±6.092 linear feet of intermittent streams. (Draft EIS, pg. 2-15, Table 2.6-2)

Thus, the proposed land exchange would result in a net increase of ±14,733 linear feet of stream habitats for fish and macroinvertebrates under management of the Rio Grande NF, and these streams would be managed in accordance with the Forest Plan watershed standards in order to protect stream health. (Draft EIS, pg. 4-5, 4.1.3.1.2; pg. 4-85, 4.8.1.2.1)

Groundwater

Transferring ±177.8 acres of land with a high groundwater discharge potential to the Rio Grande National Forest would preserve and protect this groundwater system as it would be managed in accordance with the Forest Plan. (Draft EIS, pg. 4-24,4.2.1.2)

Water Quality

This transfer of ±14,733 feet of stream segments which are tributary to North and South Pass Creeks from private ownership without a water quality management plan, to public ownership with a detailed water quality management plan, is expected to preserve the overall water quality of the watershed (especially South Pass Creek) into the future. (Draft EIS, pg. 4-4, 4.1.3.1.1)

Overall, water quality as related to wastewater treatment plant-type pollutants is predicted to remain below the ISWQS set by the WQCD. (Draft EIS, pg. 4-7, 4.1.3.2.2)

The wastewater discharges attributable to the WWTP alone are not expected to have a measurable effect on stream channel stability. (Draft EIS, pg. 4-10)

Water Rights
There are no identified direct environmental consequences related to water rights on the Rio Grande National Forest as a result of the Proposed Action. (Draft EIS, pg. 4-40, 4.4.1.2.1)

Therefore, from a water right perspective, the Alternative 2 Maximum Density Development Concept could be developed without causing injury to other water right users in the Rio Grande basin. (Draft EIS, pg. 4-43, 4.4.1.2.2)

C0010113

Please do all in your power to support this, so very worthwhile, project.

Thank you,

Michael D Kerley
49 Rio Grande Avenue
Southfork, CO, 81154

C0010114

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:21 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Full Support for the Preferred Alternative 2 - the Land Exchange - for the village at Wolf Creek |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

---

**From:** Michael J. Walsh [mailto:mwalsh@pacbell.net]
**Sent:** Tuesday, September 11, 2012 12:56 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** charlotte_bobicki@bennet.senate.gov; Brenda_Felmlee@mail.house.gov; erin_minks@markudall.senate.gov
**Subject:** Full Support for the Preferred Alternative 2 - the Land Exchange - for the village at Wolf Creek

Dear Divide Ranger, Rio Grande National Forest,

I am writing in full support of the Land Exchange, Alternative 2, for the development of the Village at Wolf Creek.

Our family purchased our home in South Fork in 2004, and we believe that the numerous benefits derived from this project deserve our full support.

It is clear that a lot of thought and hard work has gone into this important project, and we hereby voice our full support for the following reasons:

Purpose and Need
The Purpose and Need for Action is to allow the non-Federal party to access its property as legally entitled, while minimizing environmental effects to natural resources within the project area. The legal entitlement is defined by ANILCA and Forest Service regulations as a right of access to non-Federal land within the boundaries of the NFS to secure to the owner the reasonable use and enjoyment thereof. The non-Federal party has proposed a land exchange to satisfy their access needs in addition to their application for road access. The Forest Service is evaluating the land exchange as a means of meeting the legal requirements for access. (Draft EIS, pg. 1-3, 1.3)

Preferred Alternative
Alternative 2 (the Land Exchange) is the alternative that best fulfills the Forest Service's statutory mission and responsibilities, giving consideration to economic impacts, environmental impacts,

C0010115

technical criteria, and other factors. (Draft EIS, pg. 2-50,2.7)


Public Benefits

When weighed against the Village's existing ANILCA access right and subsequent request for road access, the exchange proposal is in the public interest for the following reasons:

    Much of the proposed development would be moved further away from Wolf Creek Ski Area

    Increases skiable alpine terrain

    Net gain in wetlands

    Net gain in perennial and intermittent streams (Draft EIS, pg. 1-3,5,1.4)


The merits of completing an exchange must be evaluated in contrast to the grant of an easement for access to the property. The owner has a right of access under ANILCA and has every intention of securing access to the property either through a land exchange or direct easement grant. Based on this analysis, and when weighed against the proponent's existing ANILCA access right and subsequent request for a road easement, this exchange appears in the public interest. The tangible physical resources to be acquired, when accompanied by the intangible benefits of reduced, staged and partially relocated development, make this exchange the preferred option. If faced with the alternative of an easement grant, the Forest Service would receive none of these benefits. (RGNF 2011 Feasibility Analysis, pg. 14).


Thank you for your consideration of our comments to the proposed Land Exchange plan.


We are in full support !!


The Michael & Christie Walsh Family

0852 Soaring Eagle Lane

South Fork, CO 81154

C0010116

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Friday, September 14, 2012 6:22 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: The Village at Wolf Creek Access Project |
| **Attachments:** | thevillageatwolfcreek.wps |

++++++++++++++++++++++++++++++++++++++++++++++++++++
Harold D "Dave" Dyer - Forest Planner
USDA Forest Service - Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO  81144
719-852-6215
++++++++++++++++++++++++++++++++++++++++++++++++++++
"*He who sacrifices freedom for security deserves neither.*"  - Ben Franklin

**From:** Dan Street [mailto:easystree2@aol.com]
**Sent:** Monday, September 10, 2012 12:28 PM
**To:** FS-comments-rocky-mountain-rio-grande-divide
**Cc:** charlotte_bobicki@bennet.senate.gov; erin_minks@markudall.senate.gov
**Subject:** The Village at Wolf Creek Access Project

From: Dan Street easystree2@aol.com

C0010117

Image not available for this document, ID: 0.7.329.8674-000001

**Gallegos, Marge -FS**

| | |
|---|---|
| **From:** | Gallegos, Marge -FS |
| **Sent:** | Friday, September 14, 2012 2:33 PM |
| **To:** | Curtis, Tate -FS |
| **Cc:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blakeman, Mike -FS; Gallegos, Marge -FS |
| **Subject:** | FW: appraisal values |

Tate - - Please see Tom Malecek's request below.  It might be easier to post the four different versions released on the O drive and indicate which was released to which requester.  It sounds like this may be of some interest, so please let me know where you are posting them.  This was I can retain a copy for my records.

Tom/Dave/Mike - - Please be aware any additional requests of copies of this or any other appraisal will need to be forwarded to Tate.  All appraisal releases are handled by the Director of Lands in the RO.

THANKS!!!!!
Marge

---

**From:** Malecek, Thomas -FS
**Sent:** Friday, September 14, 2012 2:29 PM
**To:** Blakeman, Mike -FS
**Cc:** Gallegos, Marge -FS
**Subject:** appraisal values

Fyi…marge says they are sending cd's to the requestors today, so don't expect to get them till Monday, so reporters on tues/wed or perhaps an article in the papers by then.

Marge, could you send a cd to us as well?  Or have you already??? If not, pls to the forest in care of mike Blakeman or dave dyer.  thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Rinella, Steven -FS
**Sent:** Tuesday, May 08, 2012 11:30 AM
**To:** Malecek, Thomas -FS; Dallas, Dan -FS
**Subject:** Wolf Creek

We have approved values

Non-Federal 177.6 acres - $1,510,000
Federal with Area B  204.4 acres -$1,430,000
Federal without Area B 182.5 acres - $1,280,000

C0010119

**Miller, Matthew D -FS**

| | |
|---|---|
| **From:** | Miller, Matthew D -FS |
| **Sent:** | Friday, September 14, 2012 2:44 PM |
| **To:** | Wehrli, Christopher L -FS |
| **Cc:** | FS-Mailroom R2 Rio Grande |
| **Subject:** | 1950; Village to Wolf Creek Access Project |
| **Attachments:** | FS_correspondence.doc |

FYI _ to be forwarded to Forest Supervisor

The following Correspondence is archived in the Records database. Any enclosures will follow the letter in this message.

*(See attached file: FS_correspondence.doc)*

To open this document in the Records database, click on this link ->

To access all documents in the National Records Database, click on this link ->

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.157211-000001

C0010121

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.157211-000002

C0010122



| United States | Forest | Rocky | 740 Simms Street |
|---|---|---|---|
| Department of | Service | Mountain | Golden, CO 80401 |
| Agriculture | | Region | Voice: 303-275-5350 |
| | | | TDD:  303-275-5367 |

**File Code:** 1950
**Date:** September 14, 2012

Ms. Elizabeth Greene
P.O. Box 3782
Pagosa Springs, CO 81147

Dear Ms. Greene:

I received your comments regarding the proposed Village to Wolf Creek Access Project. Thank
you for your interest in the National Forests here in the Rocky Mountain Region and specifically
the Rio Grande National Forest in southern Colorado.

Your comments will be included in the project record and will be fully considered, along with all
comments received on the Village to Wolf Creek Access Project prior to the final decision.

For further information please contact the Divide District Ranger, Tom Malecek at (719) 657-
6007.

Sincerely,


*/s/ Brian Ferebee (for):*
DANIEL J. JIRÓN
Regional Forester


cc: Mailroom R2 Rio Grande



**It's Cool to Be Safe**

Printed on Recycled Paper



C0010123

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Friday, September 14, 2012 3:44 PM |
| **To:** | Gallegos, Marge -FS; Curtis, Tate -FS |
| **Cc:** | Dyer, Harold D -FS; Blakeman, Mike -FS |
| **Subject:** | RE: appraisal values |

Thanks Marge, just ??? why we have 4 different versions…I take that to mean we released the only version to 4 different people??

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Gallegos, Marge -FS
**Sent:** Friday, September 14, 2012 2:33 PM
**To:** Curtis, Tate -FS
**Cc:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blakeman, Mike -FS; Gallegos, Marge -FS
**Subject:** FW: appraisal values

Tate - - Please see Tom Malecek's request below.  It might be easier to post the four different versions released on the O drive and indicate which was released to which requester.  It sounds like this may be of some interest, so please let me know where you are posting them.  This was I can retain a copy for my records.

Tom/Dave/Mike - - Please be aware any additional requests of copies of this or any other appraisal will need to be forwarded to Tate.  All appraisal releases are handled by the Director of Lands in the RO.

THANKS!!!!!
Marge

---

**From:** Malecek, Thomas -FS
**Sent:** Friday, September 14, 2012 2:29 PM
**To:** Blakeman, Mike -FS
**Cc:** Gallegos, Marge -FS
**Subject:** appraisal values

Fyi…marge says they are sending cd's to the requestors today, so don't expect to get them till Monday, so reporters on tues/wed or perhaps an article in the papers by then.

Marge, could you send a cd to us as well?  Or have you already??? If not, pls to the forest in care of mike Blakeman or dave dyer.  thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Rinella, Steven -FS
**Sent:** Tuesday, May 08, 2012 11:30 AM
**To:** Malecek, Thomas -FS; Dallas, Dan -FS
**Subject:** Wolf Creek

We have approved values

Non-Federal 177.6 acres - $1,510,000
Federal with Area B  204.4 acres -$1,430,000
Federal without Area B 182.5 acres - $1,280,000

C0010125

**Miller, Jeffrey H -FS**

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Friday, September 14, 2012 4:03 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS |
| **Subject:** | Fw: 1950; Village to Wolf Creek Access Project |
| **Attachments:** | FS_correspondence.doc |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/14/2012 04:01 PM -----

**Mailroom R2**             ToChristopher L Wehrli/R2/USDAFS@BPOS
Sent by: Matthew D          ccMailroom R2 Rio Grande@FSNOTES
Miller/R2/USDAFS            Subject1950; Village to Wolf Creek Access Project

09/14/2012 02:43
PM

FYI _ to be forwarded to Forest Supervisor

The following Correspondence is archived in the Records database. Any enclosures will follow the letter in this message.

*(See attached file: FS_correspondence.doc)*

To open this document in the Records database, click on this link -> 

To access all documents in the National Records Database, click on this link ->

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8689-000001

C0010127

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8689-000002

C0010128

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8689-000003

C0010129

 **United States Department of Agriculture**    **Forest Service**    **Rocky Mountain Region**    **740 Simms Street Golden, CO 80401 Voice: 303-275-5350 TDD: 303-275-5367**

**File Code:** 1950
**Date:** September 14, 2012

Ms. Elizabeth Greene
P.O. Box 3782
Pagosa Springs, CO 81147

Dear Ms. Greene:

I received your comments regarding the proposed Village to Wolf Creek Access Project. Thank you for your interest in the National Forests here in the Rocky Mountain Region and specifically the Rio Grande National Forest in southern Colorado.

Your comments will be included in the project record and will be fully considered, along with all comments received on the Village to Wolf Creek Access Project prior to the final decision.

For further information please contact the Divide District Ranger, Tom Malecek at (719) 657-6007.

Sincerely,


*/s/ Brian Ferebee (for):*
DANIEL J. JIRÓN
Regional Forester


cc: Mailroom R2 Rio Grande



**It's Cool to Be Safe**    Printed on Recycled Paper    

C0010130

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8689-000005

C0010131

**Susan Cornett**

| | |
|---|---|
| **From:** | Susan Cornett |
| **Sent:** | Friday, September 14, 2012 4:22 PM |
| **To:** | Dyer, Harold D -FS |
| **Cc:** | Malecek, Thomas -FS |
| **Subject:** | Wolf Creek DEIS |

Dave,

Ten copies of the DEIS have been shipped to you today via Fedex ground.  The other ten copies will be shipped to you on Monday.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
susan@westerneco.com  ·  www.westerneco.com

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8687-000001

C0010133

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 16, 2012 6:18 PM |
| **To:** | Susan Cornett; Dyer, Harold D -FS |
| **Subject:** | RE: Wolf Creek DEIS |

Thanks susan!

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Friday, September 14, 2012 4:22 PM
**To:** Dyer, Harold D -FS
**Cc:** Malecek, Thomas -FS
**Subject:** Wolf Creek DEIS

Dave,

Ten copies of the DEIS have been shipped to you today via Fedex ground.  The other ten copies will be
shipped to you on Monday.

Susan Cornett
Office Manager



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
susan@westerneco.com   ·   www.westerneco.com

This electronic message contains information generated by the USDA solely for the intended
recipients. Any unauthorized interception of this message or the use or disclosure of the information it
contains may violate the law and subject the violator to civil or criminal penalties. If you believe you
have received this message in error, please notify the sender and delete the email immediately.

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8691-000001

C0010135

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 16, 2012 6:18 PM |
| **To:** | Susan Cornett; Dyer, Harold D -FS |
| **Subject:** | RE: Wolf Creek DEIS |

Thanks susan!

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Susan Cornett [mailto:susan@westerneco.com]
**Sent:** Friday, September 14, 2012 4:22 PM
**To:** Dyer, Harold D -FS
**Cc:** Malecek, Thomas -FS
**Subject:** Wolf Creek DEIS

Dave,

Ten copies of the DEIS have been shipped to you today via Fedex ground.  The other ten copies will be shipped to you on Monday.

Susan Cornett
Office Manager



**_WESTERN ECOLOGICAL RESOURCE, INC._**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
susan@westerneco.com   ·   www.westerneco.com

C0010136

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8688-000001

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 16, 2012 7:37 PM |
| **To:** | Muenchow, Kurt A -FS |
| **Cc:** | Lloyd, Brian A -FS; Rinella, Steven -FS; Custer, Matthew S -FS |
| **Subject:** | RE: WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report |

Thanks Kurt….Matt says we will be getting a request to allow more wells to be drilled, some close to or may need access thru eventual Village property should the exchange go thru…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Muenchow, Kurt A -FS
**Sent:** Wednesday, September 12, 2012 9:29 AM
**To:** Malecek, Thomas -FS
**Cc:** Lloyd, Brian A -FS; Rinella, Steven -FS
**Subject:** WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report

I am sending you the latest report from CGS (CDOT's "contractor") updating the technical status of CDOT's Wolf Creek Pass fuel tank cleanup.

In summary, this report:

- Confirms that surface water is NOT impacted by the groundwater BTEX plume;
- Confirms that various remediation approaches have had minimal affect on the BTEX plume;
- Confirms that contamination (mainly benzene) is still present in the GW plume at concentrations that exceed applicable regulatory thresholds & preclude potable use of impacted water;
- Confirms that CDOT/CGS is proceeding with design/installation of a more-aggressive cleanup technology (sent the USFS a copy of their plan – I previously-forwarded to the District); and
- Continues to stress that, "there are no existing downgradient water supply wells within 2,500 feet of the source."

Please let me know if any questions or concerns, or if there's something more I can help with.

C0010138

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 16, 2012 8:13 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: WCV dBA schedule |

Randy, do you have the draft yet?

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Ghormley, Randy -FS
**Sent:** Friday, September 07, 2012 11:56 AM
**To:** Weiwild@aol.com
**Cc:** david@westerneco.com; Malecek, Thomas -FS; Dyer, Harold D -FS
**Subject:** RE: WCV dBA schedule

That sounds good Rick. After I get the TC document for review, we should clean up the doc for FWS and applicant to review and discuss. This will be something like a pre-draft BA I suppose. We can shoot for the 28th and the Oct date thereafter, but the actual dates will be dependent on how negotiations go b/t the FWS and the Applicant. We want the CMs pretty-well hammered out to include upfront in the proposed action and be associated with some amount of analysis. Hope this makes sense to all.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 07, 2012 11:07 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV dBA schedule

Randy,

Just to give you a heads-up re: the dBA schedule:

By Sept. 14, I hope to have the dBA largely complete and at least a summary letter back to you re: the significant effects that you and the FWS will consider for the development of conservation measures. It may be easiest for me to just send you a copy of the dBA with active TCs from the pre-DEIS draft that highlights the significant effects, so that you could see them in context.

I will then leave it up to you to forward those effects to FWS/Applicant so that they could use them in their initial development of conservation measures. I will give them 2 weeks (until Sep. 28) to negotiate and provide me draft text that I will incorporate into the dBA.

During the week of Oct. 1-5, I will submit the dBA to you for review, receive and address your comments, discuss any issues, and send you the final dBA that you can submit to the FWS on Oct. 5.

Hope this helps with your planning.

Please offer any suggested changes.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0010140

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 16, 2012 8:14 PM |
| **To:** | Delozier-Trujillo, Sherri L -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | FW: Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village |
| **Attachments:** | Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village .dot |

Have you seen this and can Dave and I get copies??

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Rinella, Steven -FS
**Sent:** Friday, September 07, 2012 9:08 AM
**To:** Malecek, Thomas -FS
**Subject:** FW: Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village

Assume this found its way to you

---

**From:** Hesch, Patricia -FS
**Sent:** Friday, September 07, 2012 7:47 AM
**To:** Rinella, Steven -FS
**Subject:** Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village



| | | |
|---|---|---|
| **Forest**<br>**Service** | **Rocky**<br>**Mountain**<br>**Regional Office** | **740 Simms Street**<br>**Golden, CO 80401-4702**<br>**Voice: 303-275-5350**<br>**TDD: 303-275-5367** |

| **File Code:** | 2730 | **Date:** August 30, 2012 |
|---|---|---|
| **Route To:** | | |

**Subject:** Delegation of Authority for the Wolf Creek Village Access and Utility Easement Application

**To:** Forest Supervisor, Rio Grande National Forest

Under the authority of the Alaska National Interest Lands Conservation Act (ANILCA), the proponents of the Village at Wolf Creek have submitted an application for easements across National Forest System (NFS) lands. In the application, the proponents have requested an easement for transportation and utility facilities for access and to facilitate the development of the private parcel of land known as the Village at Wolf Creek.

In accordance with direction at Forest Service Manual 2704.33 and 2733.04c, I hereby delegate to you the authority to evaluate and select the ANILCA access and utilities easement alternative presented in the Wolf Creek Environmental Impact Statement (EIS). The EIS is evaluating three alternatives and the delegation of authority does not prejudge which alternative will be selected. The delegation simply ensures that, if the ANILCA alternative is selected, the Forest Supervisor can make that decision without seeking a delegation at that time of decision or elevating the decision to the Regional Forester.

Various staff members in this office will continue to provide you and your team leader, Tom Malecek, with assistance and expertise in reviewing and critiquing drafts of the various documents being produced as a result of the ongoing environmental analysis of this application. Tom McClure, Acting Director of Physical Resources, will be the primary point of contact regarding the Regional Office's role and assistance in this effort.

As this case moves forward, please keep me, Tom McClure and Kathy Kurtz apprised of issues or concerns that may arise which could impact the Forest Service's obligation to the applicant regarding timely processing of this case. Please also inform us of any issues concerning this case that we may want to bring to the attention of the Washington Office.

You may reach Tom McClure at (303) 275-5374 or tmcclure@fs.fed.us and Kathy Kurtz at
(303) 275-5083 or kkurtz@fs.fed.us.


*/s/ Brian Ferebee*
DANIEL J. JIRÓN



**It's Cool to Be Safe**                    Printed on Recycled Paper

C0010142

Regional Forester

cc:  Thomas Malecek

C0010143

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 16, 2012 8:37 PM |
| **To:** | Delozier-Trujillo, Sherri L -FS; Dyer, Harold D -FS |
| **Subject:** | FW: Forest Supervisor: 2730; Delegation of Authority for the Wolf Creek Village Access and Utility Easement Application |
| **Attachments:** | FS_correspondence.doc |

Here it is, so forget my last request…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Taylor, Judy A -FS **On Behalf Of** FS-Mailroom R2
**Sent:** Thursday, August 30, 2012 2:04 PM
**To:** FS-Mailroom R2 Rio Grande
**Cc:** Malecek, Thomas -FS; Hesch, Patricia -FS
**Subject:** TO: Forest Supervisor: 2730; Delegation of Authority for the Wolf Creek Village Access and Utility Easement Application

The following Correspondence is archived in the Records database. Any enclosures will follow the letter in this message.

*(See attached file: FS_correspondence.doc)*

To open this document in the Records database, click on this link ->

To access all documents in the National Records Database, click on this link ->

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8695-000001

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8695-000002

C0010146



| Forest | Rocky | 740 Simms Street |
|---|---|---|
| Service | Mountain | Golden, CO 80401-4702 |
| | Regional Office | Voice: 303-275-5350 |
| | | TDD: 303-275-5367 |

**File Code:** 2730                                       **Date:** August 30, 2012
**Route To:**

**Subject:**  Delegation of Authority for the Wolf Creek Village Access and Utility Easement
              Application

**To:**  Forest Supervisor, Rio Grande National Forest

Under the authority of the Alaska National Interest Lands Conservation Act (ANILCA), the proponents of the Village at Wolf Creek have submitted an application for easements across National Forest System (NFS) lands. In the application, the proponents have requested an easement for transportation and utility facilities for access and to facilitate the development of the private parcel of land known as the Village at Wolf Creek.

In accordance with direction at Forest Service Manual 2704.33 and 2733.04c, I hereby delegate to you the authority to evaluate and select the ANILCA access and utilities easement alternative presented in the Wolf Creek Environmental Impact Statement (EIS). The EIS is evaluating three alternatives and the delegation of authority does not prejudge which alternative will be selected. The delegation simply ensures that, if the ANILCA alternative is selected, the Forest Supervisor can make that decision without seeking a delegation at that time of decision or elevating the decision to the Regional Forester.

Various staff members in this office will continue to provide you and your team leader, Tom Malecek, with assistance and expertise in reviewing and critiquing drafts of the various documents being produced as a result of the ongoing environmental analysis of this application. Tom McClure, Acting Director of Physical Resources, will be the primary point of contact regarding the Regional Office's role and assistance in this effort.

As this case moves forward, please keep me, Tom McClure and Kathy Kurtz apprised of issues or concerns that may arise which could impact the Forest Service's obligation to the applicant regarding timely processing of this case. Please also inform us of any issues concerning this case that we may want to bring to the attention of the Washington Office.

You may reach Tom McClure at (303) 275-5374 or tmcclure@fs.fed.us and Kathy Kurtz at (303) 275-5083 or kkurtz@fs.fed.us.


*/s/ Brian Ferebee*
DANIEL J. JIRÓN
Regional Forester




**It's Cool to Be Safe**                        Printed on Recycled Paper



C0010147

cc: Thomas Malecek

C0010148

**Delozier-Trujillo, Sherri L -FS**

| | |
|---|---|
| **From:** | Delozier-Trujillo, Sherri L -FS |
| **Sent:** | Monday, September 17, 2012 6:57 AM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village |
| **Attachments:** | Sherri De'Lozier Trujillo.vcf |

No I have not seen this, and I am confused can't you just print it, I did and it worked fine.



**From:** Malecek, Thomas -FS
**Sent:** Sunday, September 16, 2012 8:14 PM
**To:** Delozier-Trujillo, Sherri L -FS
**Cc:** Dyer, Harold D -FS
**Subject:** FW: Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village

Have you seen this and can Dave and I get copies??

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Rinella, Steven -FS
**Sent:** Friday, September 07, 2012 9:08 AM
**To:** Malecek, Thomas -FS
**Subject:** FW: Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village

Assume this found its way to you

**From:** Hesch, Patricia -FS
**Sent:** Friday, September 07, 2012 7:47 AM
**To:** Rinella, Steven -FS
**Subject:** Document in (Read-Only) Correspondence: Delegation of Authority for the Wolf Creek Village

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8699-000001

C0010150

# Sherri De'Lozier Trujillo

## Executive Assistant

**719-852-6237 ( Work Voice )**

**sldelozier-trujillo@fs.fed.us ( Preferred Internet )**

**Version**
2.1

**X-MS-SIGNATURE**
YES

**Name**
*Family:* De'Lozier Trujillo
*First:* Sherri
*Middle:*
*Prefix:*
*Suffix:*

**Formatted Name**
Sherri De'Lozier Trujillo

**Title**
Executive Assistant

**Telephone Number** ( Work Voice )
719-852-6237

**X-MS-OL-DEFAULT-POSTAL-ADDRESS**
0

**Electronic Mail Address** ( Preferred Internet )
sldelozier-trujillo@fs.fed.us

**X-MS-CARDPICTURE** ( TYPE=JPEG;ENCODING=BASE64 )

/9j/4AAQSkZJRgABAQEAYABgAAD/2wBDAAYEBQYFBAYGBQYHBwYIChAKCgkJChQODwwQFxQY
GBcUFhYaHSUfGhsjHBYWICwgIyYnKSopGR8tMC0oMCUoKSj/2wBDAQcHBwoIChMKChMoGhYa
KCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCgoKCj/wAAR
CAApADYDASIAAhEBAxEB/8QAHwAAAQUBAQEBAQEAAAAAAAAAAAECAwQFBgcICQoL/8QAtRAA
AgEDAwIEAwUFBAQAAAF9AQIDAAQRBRIhMUEGE1FhByJxFDKBkaEII0KxwRVS0fAkM2JyggkK
FhcYGRolJicoKSo0NTY3ODk6Q0RFRkdISUpTVFVWV1hZWmNkZWZnaGlqc3R1dnd4eXqDhIWG
h4iJipKTlJWWl5iZmqKjpKWmp6ipqrKztLW2t7i5usLDxMXGx8jJytLT1NXW19jZ2uHi4+Tl
5ufo6erx8vP09fb3+Pn6/8QAHwEAAwEBAQEBAQEBAQAAAAAAAAECAwQFBgcICQoL/8QAtREA
AgECBAQDBAcFBAQAAQJ3AAECAxEEBSExBhJBUQdhcRMiMoEIFEKRobHBCSMzUvAVYnLRChYk
NOEl8RcYGRomJygpKjU2Nzg5OkNERUZHSElKU1RVVldYWVpjZGVmZ2hpanN0dXZ3eHl6goOE
hYaHiImKkpOUlZaXmJmaoqOkpaanqKmqsrO0tba3uLm6wsPExcbHyMnK0tPU1dbX2Nna4uPk
5ebn6Onq8vP09fb3+Pn6/9oADAMBAAIRAxEAPwCuLSQIGjUYc5xnt0qb7N8+8MVZeQp/i5xW
4LeFcRGNsKuNxOec5/xqwLeASmVwrK3QkdAK5FFnNZnBeMVdNJ8p7Z5UYg/uzg98E/QhaydU
P9kDToEZftN7DFMd5O2LzFDKG49DnjPBruPE9nb6msFkZTb2sciz3hHVYN4Vse5J4+hrjbWP

/hIda8Q+JtLs5I9E0y3SQRzPkqoCxogPPIUZ/wCA10QheOpskmtS7qljHYStALq1u2jxve0k
3ryAR6EHnviqBiE3yLnJ6fX0rc0PSfPtReEL5l6yzsyNkRqF2qM98YGfqav2OIbbhpVIk2c5
P8Q6/wCfxrNrUzUVF3ODvLGdGyQDk/dI6UV6CmlI2fLXcT145/zzRRcVjpUtxIxIz83Ujvjt
USRRiKTkkjKg5x1Jp5SVGCg8j0HrUjQHeqgc4DMOnJ4/pXNqa3E0iOyePV0uXO6aOKOU4/hG
8qAfcl/yqv4ktbLw98FfFCaWFLTmNJHVQGCs6j5j1PGR+P410+jpa3OkaxpkrRxSTlHhkOAR
IAcDP48ZrlvElq+hfCO70bWjG/iXWEVvs24EoBIoDfUnB/H2Nd1OV4oqxz/w0tZo/CMT3Kn5
ywiDf3CxOfxOa3p0EVu6xnqOvtg8Vc0O3FnpFnYOwMltEsROOCcDmrBtVIB4/d+9cznqRbmZ
zlzffZSANqp0BJ6/rRWgNMivYszAFVb5fmxx2/rRRzlVl3OiZY1YhlwABznn606GCPAds/N9
3jof8mkX/Un/AK5/1NTj/Vf8CH9au12W0Q6ZcQ6dq0dzdwmWONizRjqTzg8+hxWXrJtfEWr6
hfXTSC6MkZgReiqpBAz74H5Vbvu/1T+lULf/AI+H+ifzNNOysTe2hcjT542I+bHOeOnSrbqp
j27sbhjiq4+7+H9anb/ll/vf41DCL1OeZxbFvMMmAQAScZz/APqoq9q33G/66f40VCQcp//Z

**X-MS-OL-DESIGN** ( CHARSET=utf-8 )

        <card xmlns="http://schemas.microsoft.com/office/outlook/12/electronicbusinesscards" ver="1.0"
layout="left" bgcolor="80ffff"><img xmlns="" align="tleft" area="25" use="cardpicture"/><fld xmlns=""
prop="name" align="left" dir="ltr" style="b" color="000000" size="10"/><fld xmlns="" prop="title" align="left"
dir="ltr" color="000000" size="8"/><fld xmlns="" prop="blank" size="8"/><fld xmlns="" prop="telwork"
align="left" dir="ltr" color="000000" size="8"><label align="right" color="626262">Work</label></fld><fld
xmlns="" prop="email" align="left" dir="ltr" color="000000" size="8"/><fld xmlns="" prop="blank"
size="8"/><fld xmlns="" prop="blank" size="8"/><fld xmlns="" prop="blank" size="8"/><fld xmlns=""
prop="blank" size="8"/><fld xmlns="" prop="blank" size="8"/><fld xmlns="" prop="blank" size="8"/><fld
xmlns="" prop="blank" size="8"/><fld xmlns="" prop="blank" size="8"/><fld xmlns="" prop="blank"
size="8"/><fld xmlns="" prop="blank" size="8"/><fld xmlns="" prop="blank" size="8"/></card>

**Last Revision**
        20120913T152315Z

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 17, 2012 12:55 PM |
| **To:** | Michael whiting |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: Hungry Logger Meeting |

Michael, it certainly was over a year ago, just tried to find the date but couldn't and am about to head out for the week.  Am cc'ing Dave Dyer, and think he can get you that date, but it may be a day or 2.  Thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Monday, September 17, 2012 12:51 PM
**To:** Malecek, Thomas -FS
**Subject:** Re: Hungry Logger Meeting

Tom,
Can you remind me of the date we had that first V@WC meeting at the Hungry Logger in South Fork? Seems that it was over a year ago.

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

---

**From:** "Malecek, Thomas -FS" <tmalecek@fs.fed.us>
**To:** Michael whiting <whitinginpagosa@yahoo.com>
**Sent:** Tuesday, January 24, 2012 2:37 PM
**Subject:** RE: Preliminary EIS for V@WC

Hi Michael, no the prelim EIS (we call it a draft) will not be available for several months yet.  Dan sent a ltr back to Archuleta County, asking for any input you would like for us to consider including in the DEIS.  I did not get a response, so assume you had nothing to submit.  If you do, now is the time.  Give me a call anytime should you care to discuss.  thanks

Tom Malecek
Divide District Ranger & Field Manager
Rio Grande NF & San Luis Valley BLM
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Saturday, January 21, 2012 9:02 AM
**To:** Malecek, Thomas -FS

C0010153

**Cc:** Dallas, Dan -FS
**Subject:** Preliminary EIS for V@WC

Hello Tom and Dan,
My County email is down today so I thought I would drop you a note. Is the Preliminary EIS on the "Village" land exchange available? I would like to get a jump on it.

*Michael E. Whiting, Archuleta County Commissioner*

C0010154

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 17, 2012 12:55 PM |
| **To:** | Michael whiting |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: Hungry Logger Meeting |

Michael, it certainly was over a year ago, just tried to find the date but couldn't and am about to head out for the week.  Am cc'ing Dave Dyer, and think he can get you that date, but it may be a day or 2.  Thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Monday, September 17, 2012 12:51 PM
**To:** Malecek, Thomas -FS
**Subject:** Re: Hungry Logger Meeting

Tom,
Can you remind me of the date we had that first V@WC meeting at the Hungry Logger in South Fork? Seems that it was over a year ago.

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

**From:** "Malecek, Thomas -FS" <tmalecek@fs.fed.us>
**To:** Michael whiting <whitinginpagosa@yahoo.com>
**Sent:** Tuesday, January 24, 2012 2:37 PM
**Subject:** RE: Preliminary EIS for V@WC

Hi Michael, no the prelim EIS (we call it a draft) will not be available for several months yet.  Dan sent a ltr back to Archuleta County, asking for any input you would like for us to consider including in the DEIS.  I did not get a response, so assume you had nothing to submit.  If you do, now is the time.  Give me a call anytime should you care to discuss.  thanks

Tom Malecek
Divide District Ranger & Field Manager
Rio Grande NF & San Luis Valley BLM
(719) 657-6007; cell 850-2356

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Saturday, January 21, 2012 9:02 AM
**To:** Malecek, Thomas -FS

**Cc:** Dallas, Dan -FS
**Subject:** Preliminary EIS for V@WC

Hello Tom and Dan,
My County email is down today so I thought I would drop you a note. Is the Preliminary EIS on the "Village" land exchange available? I would like to get a jump on it.

*Michael E. Whiting, Archuleta County Commissioner*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010156

**Michael whiting**

| | |
|---|---|
| **From:** | Michael whiting |
| **Sent:** | Monday, September 17, 2012 1:01 PM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | Re: Hungry Logger Meeting |

Sorry Tom,
Just located my notes (almost lost) with the date: May 26th 2011. Thanks!

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

---

**From:** "Malecek, Thomas -FS" <tmalecek@fs.fed.us>
**To:** Michael whiting <whitinginpagosa@yahoo.com>
**Cc:** "Dyer, Harold D -FS" <hdyer@fs.fed.us>
**Sent:** Monday, September 17, 2012 12:55 PM
**Subject:** RE: Hungry Logger Meeting

Michael, it certainly was over a year ago, just tried to find the date but couldn't and am about to head out for the week.  Am cc'ing Dave Dyer, and think he can get you that date, but it may be a day or 2.  Thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Monday, September 17, 2012 12:51 PM
**To:** Malecek, Thomas -FS
**Subject:** Re: Hungry Logger Meeting

Tom,
Can you remind me of the date we had that first V@WC meeting at the Hungry Logger in South Fork? Seems that it was over a year ago.

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

C0010157

**From:** "Malecek, Thomas -FS" <tmalecek@fs.fed.us>
**To:** Michael whiting <whitinginpagosa@yahoo.com >
**Sent:** Tuesday, January 24, 2012 2:37 PM
**Subject:** RE: Preliminary EIS for V@WC

Hi Michael, no the prelim EIS (we call it a draft) will not be available for several months yet.  Dan sent a ltr back to Archuleta County, asking for any input you would like for us to consider including in the DEIS.  I did not get a response, so assume you had nothing to submit.  If you do, now is the time.  Give me a call anytime should you care to discuss.  thanks

Tom Malecek
Divide District Ranger & Field Manager
Rio Grande NF & San Luis Valley BLM
(719) 657-6007; cell 850-2356

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Saturday, January 21, 2012 9:02 AM
**To:** Malecek, Thomas -FS
**Cc:** Dallas, Dan -FS
**Subject:** Preliminary EIS for V@WC

Hello Tom and Dan,
My County email is down today so I thought I would drop you a note. Is the Preliminary EIS on the "Village" land exchange available? I would like to get a jump on it.

*Michael E. Whiting, Archuleta County Commissioner*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Vargas, Michael A -FS**

| | |
|---|---|
| **From:** | Vargas, Michael A -FS |
| **Sent:** | Monday, September 17, 2012 2:18 PM |
| **To:** | Dyer, Harold D -FS |
| **Cc:** | Malecek, Thomas -FS |
| **Subject:** | Village request |

Hello Dave,
I have a request for a hard copy of the Draft EIS Village project.
Tom said you have hard copies coming in and would like one sent to:

Denise Rue-Pastin
265 Sunshine Drive
Pagosa Springs, CO. 81147
970-731-9672
970-746-9024 (cell)

Thanks,
Michael

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MILLER, JEFFREY6CDA61BB-D641-4DE0-9707-C2EDABCD204E> |
| **Sent:** | Monday, September 17, 2012 4:18 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS |
| **Subject:** | Fw: Wolf Creek Development |
| **Attachments:** | pic19812.gif; ecblank.gif |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:17 PM -----

**Heather Balogh**
<**heather.balogh@gmail.com**>         To Mailroom R2 Rio Grande

09/15/2012 06:00 PM                                        cc

                                                      Subject Wolf Creek Development

I just wanted to put in my quick 2 cents re: the proposed development of Wolf Creek by Mr. McCombs. As a Colorado native, I have seen every single ski resort in the state turn more and more commercial over the past 30 years, and it breaks my heart that the last mountain standing is under fire. Please don't allow this one authentic ski location to go commercial and developed, all for the sake of money. There are plenty of other developed resorts, and we most certainly don't need another.

Thanks,
Heather Balogh

1

C0010160

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8704-000001

C0010161

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8704-000002

C0010162

| **From:** | Miller, Jeffrey H -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MILLER, JEFFREY6CDA61BB-D641-4DE0-9707-C2EDABCD204E> |
| **Sent:** | Monday, September 17, 2012 4:19 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS |
| **Attachments:** | pic20615.gif; ecblank.gif |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:18 PM -----

**david mcewen
<mcewen.david@gmail.com>**        To Mailroom R2 Rio Grande

09/16/2012 04:48 PM                          cc

                                                      Subject

Please stop the proposed Wolf Creek develpment. This is a pristine
area, relatively speaking and what makes it so special is the lack of
"Vailness" and "Breckenridgness". Leave a spot of CO unmolested
please.

Dr. Dave Mcewen

1

C0010163

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8703-000001

C0010164

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8703-000002

C0010165

| | |
|---|---|
| **From:** | Dallas, Dan -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DALLAS, DAN4909BFAE-5DA1-4890-96B5-E132A5E179AE> |
| **Sent:** | Monday, September 17, 2012 6:03 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | Fw: Rare plant analysis  BA/BE (WER 2012) |
| **Attachments:** | pic07926.gif; ecblank.gif; 10934029.jpg |

**From**: FS-Mailroom R2 Rio Grande
**Sent**: Monday, September 17, 2012 05:20 PM
**To**: Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject**: Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | |
|---|---|
| **Julia Hanson <jhanson@sme-env.com>** 09/17/2012 10:27 AM | To Mailroom R2 Rio Grande |
| | cc |
| | Subject Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

1

C0010166

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8705-000001

C0010167

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8705-000002

C0010168

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8705-000003

C0010169

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Tuesday, September 18, 2012 7:32 AM |
| **To:** | Day, Ronnie -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Dave would be the right person to weigh in on that question.

---

**From:** Day, Ronnie -FS
**Sent:** Monday, September 17, 2012 5:08 PM
**To:** Blakeman, Mike -FS
**Subject:** FW: Rare plant analysis BA/BE (WER 2012)

How would you suggest we respond to this ??    Is it FOIA or just interest in the Draft EIS ??

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | | |
|---|---|---|
| Julia Hanson <jhanson@sme-env.com> 09/17/2012 10:27 AM | To | Mailroom R2 Rio Grande |
| | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person

C0010170

responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

C0010171

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.8707-000001

C0010172

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8707-000002

C0010173

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8707-000003

C0010174

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Tuesday, September 18, 2012 8:28 AM |
| **To:** | Weiwild@aol.com |
| **Subject:** | RE: Draft WCV BA |

Got it Rick.  Sorry – been off a few days and forgot to respond to your other note for wording on CMs prior to departing.  I'll touch bases later today.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 14, 2012 9:10 AM
**To:** Ghormley, Randy -FS
**Subject:** Draft WCV BA

Randy,

Attached is a largely complete draft BA that would go to the FWS.  Track changes are active.  This is an update of the "WCVBA Aug2712 preNEPA draft final" (the last version that you commented on) where I accepted all of those changes before starting the update.  I have made all the revisions that we discussed at the public hearings (and many more).

As a result of now considering private Village effects as indirect under section 7 rather than reasonably certain under section 10, I found one substantive change to project effects from the prior analysis.  I tentatively find Alternative 2's direct effects to be inconsistent with SRLMD (2009) Objective LINK O1.  Please see the discussion on Pages 122 and 123 (which I have carried to other portions of the document).

You might also review section 3.2.4 Alt. 2 Conservation Strategy (pp. 25-27) that I brought into the Proposed Action.  The basis of the CMs in that section are those adverse effects that would likely result from implementation of the Proposed Action at full build out.  Those adverse project effects are summarized to facilitate CM development by the three parties.  Some CMs are fleshed out where they may be needed to ameliorate or achieve Alternative 2 consistency with SRLMD (2009).  After your review and agreement, I will revise that section into a several page document that you can submit to the FWS and Applicant so that they understand what the impacts are so they can develop appropriate CMs.  I will organize those impacts by which Federal agency would hold discretionary authority over their implementation and enforcement of the CMs.

Please call or email me if you have any questions.

Please acknowledge receipt of the attached file(s).

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Tuesday, September 18, 2012 8:45 AM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: WCV dBA schedule |

Just back in the office this morning and see it in my inbox.  Will be touching bases with Rick later today I hope.

---

**From:** Malecek, Thomas -FS
**Sent:** Sunday, September 16, 2012 8:13 PM
**To:** Ghormley, Randy -FS
**Cc:** Dyer, Harold D -FS
**Subject:** RE: WCV dBA schedule

Randy, do you have the draft yet?

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Ghormley, Randy -FS
**Sent:** Friday, September 07, 2012 11:56 AM
**To:** Weiwild@aol.com
**Cc:** david@westerneco.com; Malecek, Thomas -FS; Dyer, Harold D -FS
**Subject:** RE: WCV dBA schedule

That sounds good Rick.  After I get the TC document for review, we should clean up the doc for FWS and applicant to review and discuss.  This will be something like a pre-draft BA I suppose.  We can shoot for the 28th and the Oct date thereafter, but the actual dates will be dependent on how negotiations go b/t the FWS and the Applicant.  We want the CMs pretty-well hammered out to include upfront in the proposed action and be associated with some amount of analysis.  Hope this makes sense to all.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 07, 2012 11:07 AM
**To:** Ghormley, Randy -FS
**Cc:** david@westerneco.com
**Subject:** WCV dBA schedule

Randy,

Just to give you a heads-up re: the dBA schedule:

By Sept. 14, I hope to have the dBA largely complete and at least a summary letter back to you re: the significant effects that you and the FWS will consider for the development of conservation measures.  It may be easiest for me to just send you a copy of the dBA with active TCs from the pre-DEIS draft that highlights the significant effects, so that you could see them in context.

C0010177

I will then leave it up to you to forward those effects to FWS/Applicant so that they could use them in their initial development of conservation measures.  I will give them 2 weeks (until Sep. 28) to negotiate and provide me draft text that I will incorporate into the dBA.

During the week of Oct. 1-5, I will submit the dBA to you for review, receive and address your comments, discuss any issues, and send you the final dBA that you can submit to the FWS on Oct. 5.

Hope this helps with your planning.

Please offer any suggested changes.

Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0010178

**Day, Ronnie -FS**

| | |
|---|---|
| **From:** | Day, Ronnie -FS |
| **Sent:** | Tuesday, September 18, 2012 8:53 AM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | FW: Wolf Creek Village DEIS |

Dave, what is your opinion on how to help this person ??   They want the plants BE/BA with plant survey data.   Is that all in the public domain as part of the draft ????

---

**From:** Julia Hanson [mailto:jhanson@sme-env.com]
**Sent:** Tuesday, September 18, 2012 8:31 AM
**To:** Day, Ronnie -FS
**Subject:** RE: Wolf Creek Village DEIS

That would be great!  I am working on the CDOT lease renewal project to the west of the proposed Village and the  BA information would be great. Specifically, I am looking for plant survey info. My mailing address is below if the document is too large as an attachment. I can receive 10 MB. Also wondering if you know of any field work conducted near La Manga Pass? I will be conducting a field survey there as well. Thank you!

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f)  970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged.  If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

---

**From:** Day, Ronnie -FS [mailto:rday@fs.fed.us]
**Sent:** Monday, September 17, 2012 4:33 PM
**To:** Julia Hanson
**Subject:** Wolf Creek Village DEIS

I have it on CD if you want me to mail you one ????

C0010179

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010180

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8710-000001

C0010181

| | |
|---|---|
| **From:** | Custer, Matthew S -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CUSTER, MATTHEW5789663A-2826-4939-9F2C-1FB02F7F3E7B> |
| **Sent:** | Tuesday, September 18, 2012 10:03 AM |
| **To:** | Dyer, Harold D -FS; Malecke, Thomas -FS; Muenchow, Kurt A -FS |
| **Cc:** | Powell, Crystal L -FS |
| **Subject:** | FW: PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739 |
| **Attachments:** | 13HAA48563 (C).pdf |

Kurt: can you clarify for us what NEPA is required for a clean-up action?  CDoT has applied for a permit for their wells, plus an easement to get to three existing and three proposed wells.  We are proposing issuing a special use permit for this.

**From:** Flurkey, Andy [mailto:Andy.Flurkey@dot.state.co.us]
**Sent:** Tuesday, September 18, 2012 9:26 AM
**To:** Mike Dimino (mdimino@senecaco.com)
**Cc:** Santangelo, Theresa; Fischer, Travis; Campano, Ralph; Mallonee, Franchesca; Martinez, Kenneth; Custer, Matthew S -FS
**Subject:** FW: PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739

Mike,

You are hereby authorized to begin work on the groundwater monitoring and remediation of the Wolf Creek Pass maintenance site per the attached contract.  I would appreciate it if you would let me know of your work schedule in advance.  Contact Kenneth Martinez at (719) 587-6403 to make arrangements for site visits and work.  Let me know if you have any questions.

Andy Flurkey
CDOT Property Management

_____
**From:** Kelly, Megan
**Sent:** Monday, September 17, 2012 11:09 AM
**To:** Flurkey, Andy
**Cc:** Young, Scott; Gendron, Shane; Meadows, Yvette
**Subject:** PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739

Good morning Andy,

The requested Contract (hydrocarbon remediation & ground water monitoring) for this vendor has been fully executed, and a copy is attached for your records.

Vendor Name:  Seneca Companies, Inc., 13 HAA 48563, 201000739

This PDF is a:      ___x___ Contract        for the above referenced contract.

The original has been mailed to the Vendor. Any Required Notice-To-Proceed has **NOT** been sent to the vendor.

The Notice-To-Proceed **IS** the responsibility of the Project Manager.

1

C0010182

Thank you,

Megan

**Megan Kelly**
*Contracts Administrator*
Colorado Dept. of Transportation
Center for Procurement Services
303-757-9861 (Office)
303-757-9669 (Fax)
Megan.Kelly@dot.state.co.us (Email)

C0010183

Hydrocarbon Remediation & Ground Water Monitoring (MK)

CDOT-P-STD-R-11-09

Routing # 13 HAA 48563
CDOT #201000739

---

# STATE OF COLORADO
## Department of Transportation
## Contract
## with
## Seneca Companies, Inc.

---

## TABLE OF CONTENTS

1. PARTIES ..................................................................................................................................1
2. EFFECTIVE DATE AND NOTICE OF NONLIABILITY..............................................................1
3. RECITALS ...............................................................................................................................1
4. DEFINITIONS...........................................................................................................................2
5. TERM and EARLY TERMINATION ...........................................................................................2
6. STATEMENT OF WORK............................................................................................................3
7. PAYMENTS TO CONTRACTOR................................................................................................3
8. REPORTING-NOTIFICATION...................................................................................................4
9. CONTRACTOR RECORDS .......................................................................................................4
10. CONFIDENTIAL INFORMATION-STATE RECORDS...............................................................5
11. CONFLICT OF INTEREST .......................................................................................................6
12. REPRESENTATIONS AND WARRANTIES ...............................................................................6
13. INSURANCE.............................................................................................................................6
14. BREACH ..................................................................................................................................7
15. REMEDIES...............................................................................................................................8
16. NOTICES and REPRESENTATIVES.........................................................................................9
17. RIGHTS IN DATA, DOCUMENTS, AND COMPUTER SOFTWARE..........................................10
18. GOVERNMENTAL IMMUNITY................................................................................................10
19. STATEWIDE CONTRACT MANAGEMENT SYSTEM ..............................................................10
20. GENERAL PROVISIONS.........................................................................................................10
21. COLORADO SPECIAL PROVISIONS ......................................................................................13
22. SIGNATURE PAGE..................................................................................................................15
EXHIBIT A – STATEMENT OF WORK ..........................................................................................16
EXHIBIT B – PRICE AND COST BREAKOUT ...............................................................................31
EXHIBIT C – SAMPLE OPTION LETTER ......................................................................................33

## 1. PARTIES

This Contract (hereinafter called "Contract") is entered into by and between Seneca Companies, Inc., a Iowa corporation (hereinafter called "Contractor"), and the STATE OF COLORADO acting by and through the Department of Transportation (hereinafter called the "State" or "CDOT"). Contractor and the State hereby agree to the following terms and conditions.

## 2. EFFECTIVE DATE AND NOTICE OF NONLIABILITY.

This Contract shall not be effective or enforceable until it is approved and signed by the Colorado State Controller or its designee (hereinafter called the "Effective Date"). The State shall not be liable to pay or reimburse Contractor for any performance hereunder including, but not limited to, costs or expenses incurred, or be bound by any provision hereof prior to the Effective Date.

## 3. RECITALS

### A. Authority, Appropriation, and Approval

Authority to enter into this Contract exists in CRS §§24-103-202 and 43-1-106, and funds have been budgeted, appropriated and otherwise made available and a sufficient unencumbered balance thereof remains available for payment. Required approvals, clearance and coordination have been accomplished from and with appropriate agencies.

### B. Contractor Selection

C0010784

Contractor was selected in accordance with Colorado law and State Procurement Rules pursuant to the State's issuance of an Invitation for Bid, IFB # HAA 13-013 MM .

**C. Consideration**

The Parties acknowledge that the mutual promises and covenants contained herein and other good and valuable consideration are sufficient and adequate to support this Contract.

**D. Contract Purpose**

The Colorado Department of Transportation is seeking work by a qualified environmental remediation contractor to conduct petroleum remediation in soil and groundwater and conduct semi-annual groundwater monitoring at its Wolf Creek Pass East Highway Maintenance Facility in Mineral County, Colorado.

**E. References**

All references in this Contract to sections (whether spelled out or using the § symbol), subsections, exhibits or other attachments, are references to sections, subsections, exhibits or other attachments contained herein or incorporated as a part hereof, unless otherwise noted.

**4. DEFINITIONS**

The following terms as used herein shall be construed and interpreted as follows:

**A. Budget**

"Budget" means the budget for the Work described in Exhibit A.

**B. Contract**

"Contract" means this Contract for Goods and Services, its provisions, attached exhibits, documents incorporated by reference under the terms of this Contract, and any future modifying agreements, exhibits, attachments or references incorporated herein pursuant to Colorado State law, Fiscal Rules, and State Controller Policies.

**C. Contract Funds**

"Contract Funds" means funds available for payment by the State to Contractor pursuant to this Contract.

**D. Evaluation**

"Evaluation" means the process of examining Contractor's Work and rating it based on criteria established in **§6, §19**, and **Exhibit A.**

**E. Exhibits and other Attachments**

The following are attached hereto and incorporated by reference herein: **Exhibit A** (Statement of Work), **Exhibit B** (Prices and Rates), and **Exhibit C** (Sample Option Letter).

**F. Goods**

"Goods" means tangible material acquired, produced, or delivered by Contractor either separately or in conjunction with the Services Contractor renders hereunder.

**G. Party or Parties**

"Party" means the State or Contractor and "Parties" means both the State and Contractor.

**H. Review**

"Review" means examining Contractor's Work to ensure that it is adequate, accurate, correct and in accordance with the criteria established in **§6** and **Exhibit A.**

**I. Services**

"Services" means the required services to be performed by Contractor pursuant to this Contract.

**J. Subcontractor**

"Subcontractor" means third-parties, if any, engaged by Contractor to aid in performance of its obligations.

**K. Work**

"Work" means the tasks and activities Contractor is required to perform to fulfill its obligations under this Contract and **Exhibit A**, including the performance of the Services and delivery of the Goods.

**L. Work Product**

"Work Product" means the tangible or intangible results of Contractor's Work, including, but not limited to, software, research, reports, studies, data, photographs, negatives or other finished or unfinished documents, drawings, models, surveys, maps, materials, or work product of any type, including drafts.

**5. TERM and EARLY TERMINATION**

**A. Initial Term-Work Commencement**

C0010185

The Parties' respective performances under this Contract shall commence on the Effective Date of this Contract. This Contract shall extend for twelve (12) months from the Effective Date unless sooner terminated or further extended as specified elsewhere herein.

**B. Two Month Extension**

The State, at its sole discretion upon written notice to Contractor as provided in **§16,** may unilaterally extend the term of this Contract for a period not to exceed two months if the Parties are negotiating a replacement Contract (and not merely seeking a term extension) at or near the end of any initial term or renewal term. The provisions of this Contract in effect when such notice is given, including, but not limited to prices, rates, and delivery requirements, shall remain in effect during the two-month extension. The two month extension shall immediately terminate when and if a replacement Contract is approved and signed by the Colorado State Controller.

**C. State's Option to Extend**

At its sole discretion, the State, upon written notice to Contractor in a form substantially equivalent to **Exhibit C,** may unilaterally require continued performance of this Contract for up to one (1) additional one (1) year period, at the same rates and terms specified in the Contract. The State shall exercise the option by written notice to the Contractor within 30 to 60 days prior to the end of the current contract term. If exercised, the provisions of the Option Letter shall become part of and be incorporated into the Contract. The total duration of this Contract, including the exercise of any options, shall not exceed two (2) years.

## 6. STATEMENT OF WORK

**A. Completion**

Contractor shall complete the Work and its other obligations as described herein and in **Exhibit A** within the Term specified in **§5.** The State shall not be liable to compensate Contractor for any Work performed prior to the Effective Date or after the termination of this Contract.

**B. Goods and Services**

Contractor shall procure Goods and Services necessary to complete the Work. Such procurement shall be accomplished using the Contract Funds and shall not increase the maximum amount payable hereunder by the State.

**C. Employees**

All persons employed by Contractor or Subcontractors to perform Work under this Contract shall be Contractor's or Subcontractors' employee(s) for all purposes hereunder and shall not be employees of the State for any purpose as a result of this Contract.

## 7. PAYMENTS TO CONTRACTOR

The State shall, in accordance with the provisions of this **§7,** pay Contractor in the amounts and using the methods set forth below:

**A. Maximum Amount**

The maximum amount payable under this Contract to Contractor by the State is **$248,985.00,** as determined by the State from available funds. Payments to Contractor are limited to the unpaid obligated balance of the Contract set forth in **Exhibit B.**

**B. Payment**

**i. Advance, Interim and Final Payments**

Any advance payment allowed under this Contract or in **Exhibit B** shall comply with State Fiscal Rules and be made in accordance with the provisions of this Contract or such Exhibit. Contractor shall initiate any payment requests by submitting invoices to the State in the form and manner set forth in approved by the State and shall attach receipts or other documentation as required in **Exhibit A.**

**ii. Interest**

The State shall fully pay each invoice within 45 days of receipt thereof if the amount invoiced represents performance by Contractor previously accepted by the State. Uncontested amounts not paid by the State within 45 days shall bear interest on the unpaid balance beginning on the 46th day at a rate not to exceed one percent per month until paid in full; provided, however, that interest shall not accrue on unpaid amounts that are subject to a good faith dispute. Contractor shall invoice the State separately for accrued interest on delinquent amounts. The billing shall reference the delinquent payment, the number of day's interest to be paid and the interest rate.

**iii. Available Funds-Contingency-Termination**

C0010186

The State is prohibited by law from making commitments beyond the term of the State's current fiscal year. Therefore, Contractor's compensation beyond the State's current Fiscal Year is contingent upon the continuing availability of State appropriations as provided in the Colorado Special Provisions. If federal funds are used to fund this Contract, in whole or in part, the State's performance hereunder is contingent upon the continuing availability of such funds. Payments pursuant to this Contract shall be made only from available funds encumbered for this Contract and the State's liability for such payments shall be limited to the amount remaining of such encumbered funds. If State or federal funds are not appropriated, or otherwise become unavailable to fund this Contract, the State may terminate this Contract immediately, in whole or in part, without further liability in accordance with the provisions hereof.

**iv. Erroneous Payments**

At the State's sole discretion, payments made to Contractor in error for any reason, including, but not limited to overpayments or improper payments, and unexpended or excess funds received by Contractor, may be recovered from Contractor by deduction from subsequent payments under this Contract or other contracts, grants or agreements between the State and Contractor or by other appropriate methods and collected as a debt due to the State. Such funds shall not be paid to any party other than the State.

**C. Use of Funds**

Contract Funds shall be used only for eligible costs identified herein and/or in the Budget.

**D. State Option to Increase/Decrease**

**i. Increase/Decrease Quantities**

At its sole discretion, the State, upon written notice to the Contractor in a form substantially equivalent to **Exhibit C**, may unilaterally increase/decrease the quantity of goods/services described in **Exhibit A** at the unit prices established in the contract. The State shall exercise the option by providing a fully executed option to the Contractor within 30 to 60 days before the option begins. Delivery/performance of the goods/services shall continue at the same rate and under the same terms as established in the contract.

**ii. Increase/Decrease Total Contract Price**

At its sole discretion, the State, upon written notice to the Contractor in a form substantially equivalent to **Exhibit C**, may unilaterally increase/decrease the maximum amount payable under this contract based upon the unit prices established in the contract and the schedule of services required, as set by the State. The State shall exercise the option by providing a fully executed option to the Contractor. Delivery/performance of the goods/services shall continue at the same rate and under the same terms as established in the contract.

**E. Price**

Contractor's cost/price, detailed in Exhibit B, shall be firm through the entire term of the contract.

# 8. REPORTING-NOTIFICATION

Reports, Evaluations, and Reviews required under this **§8** shall be in accordance with the procedures of and in such form as prescribed by the State and in accordance with **§19**, if applicable.

**A. Performance, Progress, Personnel, and Funds**

Contractor shall comply with all reporting requirements, if any, set forth in **Exhibit A**.

**B. Litigation Reporting**

Within 10 days after being served with any pleading in a legal action filed with a court or administrative agency, related to this Contract or which may affect Contractor's ability to perform its obligations hereunder, Contractor shall notify the State of such action and deliver copies of such pleadings to the State's principal representative as identified herein. If the State's principal representative is not then serving, such notice and copies shall be delivered to the Executive Director of CDOT.

**C. Noncompliance**

Contractor's failure to provide reports and notify the State in a timely manner in accordance with this **§8** may result in the delay of payment of funds and/or termination as provided under this Contract.

**D. Subcontracts**

Copies of any and all subcontracts entered into by Contractor to perform its obligations hereunder shall be submitted to the State or its principal representative upon request by the State. Any and all subcontracts entered into by Contractor related to its performance hereunder shall comply with all applicable federal and state laws and shall provide that such subcontracts be governed by the laws of the State of Colorado.

# 9. CONTRACTOR RECORDS

C0010187

**A. Maintenance**

Contractor shall make, keep, maintain, and allow inspection and monitoring by the State of a complete file of all records, documents, communications, notes and other written materials, electronic media files, and communications, pertaining in any manner to the Work or the delivery of Services or Goods hereunder. Contractor shall maintain such records until the last to occur of: **(i)** a period of three years after the date this Contract expires or is sooner terminated, or **(ii)** final payment is made hereunder, or **(iii)** the resolution of any pending Contract matters, or **(iv)** if an audit is occurring, or Contractor has received notice that an audit is pending, until such audit has been completed and its findings have been resolved (collectively, the "Record Retention Period").

**B. Inspection**

Contractor shall permit the State, the federal government and any other duly authorized agent of a governmental agency to audit, inspect, examine, excerpt, copy and/or transcribe Contractor's records related to this Contract during the Record Retention Period for a period of three years following termination of this Contract or final payment hereunder, whichever is later, to assure compliance with the terms hereof or to evaluate performance hereunder. The State reserves the right to inspect the Work at all reasonable times and places during the term of this Contract, including any extensions or renewals. If the Work fails to conform to the requirements of this Contract, the State may require Contractor promptly to bring the Work into conformity with Contract requirements, at Contractor's sole expense. If the Work cannot be brought into conformance by re-performance or other corrective measures, the State may require Contractor to take necessary action to ensure that future performance conforms to Contract requirements and exercise the remedies available under this Contract, at law or in equity, in lieu of or in conjunction with such corrective measures.

**C. Monitoring**

Contractor shall permit the State, the federal government, and governmental agencies having jurisdiction, in their sole discretion, to monitor all activities conducted by Contractor pursuant to the terms of this Contract using any reasonable procedure, including, but not limited to: internal evaluation procedures, examination of program data, special analyses, on-site checking, formal audit examinations, or any other procedures. All monitoring controlled by the State shall be performed in a manner that shall not unduly interfere with Contractor's performance hereunder.

**D. Final Audit Report**

If an audit is performed on Contractor's records for any fiscal year covering a portion of the term of this Contract, Contractor shall submit a copy of the final audit report to the State or its principal representative at the address specified herein.

**10. CONFIDENTIAL INFORMATION-STATE RECORDS**

Contractor shall comply with the provisions on this **§10** if it becomes privy to confidential information in connection with its performance hereunder. Confidential information includes, but is not necessarily limited to, any state records, personnel records, and information concerning individuals. Such information shall not include information required to be disclosed pursuant to the Colorado Open Records Act, CRS §24-72-101, et seq.

**A. Confidentiality**

Contractor shall keep all State records and information confidential at all times and complies with all laws and regulations concerning confidentiality of information. Any request or demand by a third party for State records and information in the possession of Contractor shall be immediately forwarded to the State's principal representative.

**B. Notification**

Contractor shall notify its agent, employees, Subcontractors and assigns that may come into contact with State records and confidential information that each is subject to the confidentiality requirements set forth herein, and shall provide each with a written explanation of such requirements before permitting them to access such records and information.

**C. Use, Security, and Retention**

Confidential information of any kind shall not be distributed or sold to any third party or used by Contractor or its agents in any way except as authorized by this Contract or approved in writing by the State. Contractor shall provide and maintain a secure environment that ensures confidentiality of all State records and other

C0010188

confidential information wherever located. Confidential information shall not be retained in any files or otherwise by Contractor or its agents, except as permitted in this Contract or approved in writing by the State.

**D. Disclosure-Liability**

Disclosure of State records or other confidential information by Contractor for any reason may be cause for legal action by third parties against Contractor, the State or their respective agents. Contractor shall indemnify, save, and hold harmless the State, its employees and agents, against any and all claims, damages, liability and court awards including costs, expenses, and attorney fees and related costs, incurred as a result of any act or omission by Contractor, or its employees, agents, Subcontractors, or assignees pursuant to this **§10**.

## 11. CONFLICT OF INTEREST

Contractor shall not engage in any business or personal activities or practices or maintain any relationships which conflict in any way with the full performance of Contractor's obligations hereunder. Contractor acknowledges that with respect to this Contract, even the appearance of a conflict of interest is harmful to the State's interests. Absent the State's prior written approval, Contractor shall refrain from any practices, activities or relationships that reasonably appear to be in conflict with the full performance of Contractor's obligations to the State hereunder. If a conflict or appearance exists, or if Contractor is uncertain whether a conflict or the appearance of a conflict of interest exists, Contractor shall submit to the State a disclosure statement setting forth the relevant details for the State's consideration. Failure to promptly submit a disclosure statement or to follow the State's direction in regard to the apparent conflict constitutes a breach of this Contract.

## 12. REPRESENTATIONS AND WARRANTIES

Contractor makes the following specific representations and warranties, each of which was relied on by the State in entering into this Contract.

**A. Standard and Manner of Performance**

Contractor shall perform its obligations hereunder in accordance with the highest standards of care, skill and diligence in Contractor's industry, trade, or profession and in the sequence and manner set forth in this Contract.

**B. Legal Authority – Contractor Signatory**

Contractor warrants that it possesses the legal authority to enter into this Contract and that it has taken all actions required by its procedures, and by-laws, and/or applicable laws to exercise that authority, and to lawfully authorize its undersigned signatory to execute this Contract, or any part thereof, and to bind Contractor to its terms. If requested by the State, Contractor shall provide the State with proof of Contractor's authority to enter into this Contract within 15 days of receiving such request.

**C. Licenses, Permits, Etc.**

Contractor represents and warrants that as of the Effective Date it has, and that at all times during the term hereof it shall have and maintain, at its sole expense, all licenses, certifications, approvals, insurance, permits, and other authorizations required by law to perform its obligations hereunder. Contractor warrants that it shall maintain all necessary licenses, certifications, approvals, insurance, permits, and other authorizations required to properly perform this Contract, without reimbursement by the State or other adjustment in Contract Funds. Additionally, all employees, agents, and Subcontractors of Contractor performing Services under this Contract shall hold all required licenses or certifications, if any, to perform their responsibilities. Contractor, if a foreign corporation or other foreign entity transacting business in the State of Colorado, further warrants that it currently has obtained and shall maintain any applicable certificate of authority to transact business in the State of Colorado and has designated a registered agent in Colorado to accept service of process. Any revocation, withdrawal or non-renewal of licenses, certifications, approvals, insurance, permits or any such similar requirements necessary for Contractor to properly perform the terms of this Contract is a material breach by Contractor and constitutes grounds for termination of this Contract.

## 13. INSURANCE

Contractor and its Subcontractors shall obtain and maintain insurance as specified in this section at all times during the term of this Contract. All policies evidencing the insurance coverage required hereunder shall be issued by insurance companies satisfactory to Contractor and the State.

**A. Contractor**

**i. Public Entities**

If Contractor is a "public entity" within the meaning of the Colorado Governmental Immunity Act, CRS §24-10-101, et seq., as amended (the "GIA"), then Contractor shall maintain at all times during the term

C0010189

of this Contract such liability insurance, by commercial policy or self-insurance, as is necessary to meet its liabilities under the GIA. Contractor shall show proof of such insurance satisfactory to the State, if requested by the State. Contractor shall require each contract with a Subcontractor that is a public entity, to include the insurance requirements necessary to meet such Subcontractor's liabilities under the GIA

**ii. Non-Public Entities**

If Contractor is not a "public entity" within the meaning of the GIA, Contractor shall obtain and maintain during the term of this Contract insurance coverage and policies meeting the same requirements set forth in **§13(B)** with respect to subcontractors that are not "public entities".

**B. Contractors - Subcontractors**

Contractor shall require each contract with subcontractors other than those that are public entities, providing Goods or Services in connection with this Contract, to include insurance requirements substantially similar to the following:

**i. Worker's Compensation**

Worker's Compensation Insurance as required by State statute, and Employer's Liability Insurance covering all of Contractor or subcontractor employees acting within the course and scope of their employment.

**ii. General Liability**

Commercial General Liability Insurance written on ISO occurrence form CG 00 01 10/93 or equivalent, covering premises operations, fire damage, independent contractors, products and completed operations, blanket contractual liability, personal injury, and advertising liability with minimum limits as follows: **(a)** $1,000,000 each occurrence; **(b)** $1,000,000 general aggregate; **(c)** $1,000,000 products and completed operations aggregate; and **(d)** $50,000 any one fire.

**iii. Automobile Liability**

Automobile Liability Insurance covering any auto (including owned, hired and non-owned autos) with a minimum limit of $1,000,000 each accident combined single limit.

**iv. Additional Insured**

The State shall be named as additional insured on all Commercial General Liability Insurance policies (leases and construction contracts require additional insured coverage for completed operations on endorsements CG 2010 11/85, CG 2037, or equivalent) required of Contractor and any subcontractors hereunder.

**v. Primacy of Coverage**

Coverage required of Contractor and subcontractor shall be primary over any insurance or self-insurance program carried by Contractor or the State.

**vi. Cancellation**

The above insurance policies shall include provisions preventing cancellation or non-renewal without at least 30 days prior notice to Contractor and Contractor shall forward such notice to the State in accordance with **§16** (Notices and Representatives) within seven days of Contractor's receipt of such notice.

**vii. Subrogation Waiver**

All insurance policies in any way related to this Contract and secured and maintained by Contractor or its subcontractors as required herein shall include clauses stating that each carrier shall waive all rights of recovery, under subrogation or otherwise, against Contractor or the State, its agencies, institutions, organizations, officers, agents, employees, and volunteers.

**C. Certificates**

Contractor and all subcontractors shall provide certificates showing insurance coverage required hereunder to the State within seven business days of the Effective Date of this Contract. No later than 15 days prior to the expiration date of any such coverage, Contractor and each subcontractors shall deliver to the State or Contractor certificates of insurance evidencing renewals thereof. In addition, upon request by the State at any other time during the term of this Contract or any sub-contract, Contractor and each subcontractors shall, within 10 days of such request, supply to the State evidence satisfactory to the State of compliance with the provisions of this **§13**.

## 14. BREACH

**A. Defined**

In addition to any breaches specified in other sections of this Contract, the failure of either Party to perform any of its material obligations hereunder in whole or in part or in a timely or satisfactory manner constitutes a

C0010190

breach. The institution of proceedings under any bankruptcy, insolvency, reorganization or similar law, by or against Contractor, or the appointment of a receiver or similar officer for Contractor or any of its property, which is not vacated or fully stayed within 20 days after the institution or occurrence thereof, shall also constitute a breach.

**B. Notice and Cure Period**

In the event of a breach, notice of such shall be given in writing by the aggrieved Party to the other Party in the manner provided in **§16**. If such breach is not cured within 30 days of receipt of written notice, or if a cure cannot be completed within 30 days, or if cure of the breach has not begun within 30 days and pursued with due diligence, the State may exercise any of the remedies set forth in **§15**. Notwithstanding anything to the contrary herein, the State, in its sole discretion, need not provide advance notice or a cure period and may immediately terminate this Contract in whole or in part if reasonably necessary to preserve public safety or to prevent immediate public crisis.

## 15. REMEDIES

If Contractor is in breach under any provision of this Contract, the State shall have all of the remedies listed in this **§15** in addition to all other remedies set forth in other sections of this Contract following the notice and cure period set forth in **§14(B)**. The State may exercise any or all of the remedies available to it, in its sole discretion, concurrently or consecutively.

**A. Termination for Cause and/or Breach**

The State may terminate this entire Contract or any part of this Contract. Exercise by the State of this right shall not be a breach of its obligations hereunder. Contractor shall continue performance of this Contract to the extent not terminated, if any.

**i. Obligations and Rights**

To the extent specified in any termination notice, Contractor shall not incur further obligations or render further performance hereunder past the effective date of such notice, and shall terminate outstanding orders and subcontracts with third parties. However, Contractor shall complete and deliver to the State all Work, Services and Goods not cancelled by the termination notice and may incur obligations as are necessary to do so within this Contract's terms. At the sole discretion of the State, Contractor shall assign to the State all of Contractor's right, title, and interest under such terminated orders or subcontracts. Upon termination, Contractor shall take timely, reasonable and necessary action to protect and preserve property in the possession of Contractor in which the State has an interest. All materials owned by the State in the possession of Contractor shall be immediately returned to the State. All Work Product, at the option of the State, shall be delivered by Contractor to the State and shall become the State's property.

**ii. Payments**

The State shall reimburse Contractor only for accepted performance up to the date of termination. If, after termination by the State, it is determined that Contractor was not in breach or that Contractor's action or inaction was excusable, such termination shall be treated as a termination in the public interest and the rights and obligations of the Parties shall be the same as if this Contract had been terminated in the public interest, as described herein.

**iii. Damages and Withholding**

Notwithstanding any other remedial action by the State, Contractor shall remain liable to the State for any damages sustained by the State by virtue of any breach under this Contract by Contractor and the State may withhold any payment to Contractor for the purpose of mitigating the State's damages, until such time as the exact amount of damages due to the State from Contractor is determined. The State may withhold any amount that may be due Contractor as the State deems necessary to protect the State against loss, including loss as a result of outstanding liens, claims of former lien holders, or for the excess costs incurred in procuring similar goods or services. Contractor shall be liable for excess costs incurred by the State in procuring from third parties replacement Work, Services or substitute Goods as cover.

**B. Early Termination in the Public Interest**

The State is entering into this Contract for the purpose of carrying out the public policy of the State of Colorado, as determined by its Governor, General Assembly, and/or Courts. If this Contract ceases to further the public policy of the State, the State, in its sole discretion, may terminate this Contract in whole or in part. Exercise by the State of this right shall not constitute a breach of the State's obligations hereunder. This subsection shall not apply to a termination of this Contract by the State for cause or breach by Contractor, which shall be governed by **§15(A)** or as otherwise specifically provided for herein.

**i. Method and Content**

C0010191

The State shall notify Contractor of such termination in accordance with **§16.** The notice shall specify the effective date of the termination and whether it affects all or a portion of this Contract.

### ii. Obligations and Rights

Upon receipt of a termination notice, Contractor shall be subject to and comply with the same obligations and rights set forth in **§15(A) (i).**

### iii. Payments

If this Contract is terminated by the State pursuant to this **§15(B)**, Contractor shall be paid an amount which bears the same ratio to the total reimbursement under this Contract as Contractor's obligations that were satisfactorily performed bear to the total obligations set forth in this Contract, less payments previously made. Additionally, if this Contract is less than 60% completed, the State may reimburse Contractor for a portion of actual out-of-pocket expenses (not otherwise reimbursed under this Contract) incurred by Contractor which are directly attributable to the uncompleted portion of Contractor's obligations hereunder; provided that the sum of any and all reimbursement shall not exceed the maximum amount payable to Contractor hereunder.

## C. Remedies Not Involving Termination

The State, its sole discretion, may exercise one or more of the following remedies in addition to other remedies available to it:

### i. Suspend Performance

Suspend Contractor's performance with respect to all or any portion of this Contract pending necessary corrective action as specified by the State without entitling Contractor to an adjustment in price/cost or performance schedule. Contractor shall promptly cease performance and incurring costs in accordance with the State's directive and the State shall not be liable for costs incurred by Contractor after the suspension of performance under this provision.

### ii. Withhold Payment

Withhold payment to Contractor until corrections in Contractor's performance are satisfactorily made and completed.

### iii. Deny Payment

Deny payment for those obligations not performed that due to Contractor's actions or inactions cannot be performed or, if performed, would be of no value to the State; provided, that any denial of payment shall be reasonably related to the value to the State of the obligations not performed.

### iv. Removal

Notwithstanding any other provision herein, the State may demand immediate removal of any of Contractor's employees, agents, or subcontractors whom the State deems incompetent, careless, insubordinate, unsuitable, or otherwise unacceptable, or whose continued relation to this Contract is deemed to be contrary to the public interest or the State's best interest.

### v. Intellectual Property

If Contractor infringes on a patent, copyright, trademark, trade secret or other intellectual property right while performing its obligations under this Contract, Contractor shall, at the State's option **(a)** obtain for the State or Contractor the right to use such products and services; **(b)** replace any Goods, Services, or other product involved with non-infringing products or modify them so that they become non-infringing; or, **(c)** if neither of the foregoing alternatives are reasonably available, remove any infringing Goods, Services, or products and refund the price paid therefore to the State.

## 16. NOTICES and REPRESENTATIVES

Each individual identified below is the principal representative of the designating Party. All notices required to be given hereunder shall be hand delivered with receipt required or sent by certified or registered mail to such Party's principal representative at the address set forth below. In addition to, but not in lieu of a hard-copy notice, notice also may be sent by e-mail to the e-mail addresses, if any, set forth below. Either Party may from time to time designate by written notice substitute addresses or persons to whom such notices shall be sent. Unless otherwise provided herein, all notices shall be effective upon receipt.

**A. CDOT:**                                          **and CDOT:**

**Andy Flurkey**                                     **Procurement Director**
Property Management                                  Procurement and Contract Services
15285 S. Golden Rd. Bldg. 47                         4201 E. Arkansas Ave. Room 150
Golden, CO 80401                                     Denver, CO 80222
Phone: 303-512-5520                                  Phone: 303-757-9236

C0010192

Email: Andy.Flurkey@dot.state.co.us

**B.  Contractor:**

**Kyle Baber**
Seneca Companies, Inc.
200 S. Raritan St.
Denver, CO 80223
Phone: 515-262-5000
Email: kbaber@senecaco.com

## 17. RIGHTS IN DATA, DOCUMENTS, AND COMPUTER SOFTWARE

Any software, research, reports, studies, data, photographs, negatives or other documents, drawings, models, materials, or Work Product of any type, including drafts, prepared by Contractor in the performance of its obligations under this Contract shall be the exclusive property of the State and, all Work Product shall be delivered to the State by Contractor upon completion or termination hereof. The State's exclusive rights in such Work Product shall include, but not be limited to, the right to copy, publish, display, transfer, and prepare derivative works. Contractor shall not use, willingly allow, cause or permit such Work Product to be used for any purpose other than the performance of Contractor's obligations hereunder without the prior written consent of the State.

## 18. GOVERNMENTAL IMMUNITY

Liability for claims for injuries to persons or property arising from the negligence of the State of Colorado, its departments, institutions, agencies, boards, officials, and employees is controlled and limited by the provisions of the Governmental Immunity Act §24-10-101, et seq. and the risk management statutes, CRS §24-30-1501, et seq., as amended.

## 19. STATEWIDE CONTRACT MANAGEMENT SYSTEM

If the maximum amount payable to Contractor under this Contract is $100,000 or greater, either on the Effective Date or at anytime thereafter, this §19 applies.

Contractor agrees to be governed, and to abide, by the provisions of CRS §24-102-205, §24-102-206, §24-103-601, §24-103.5-101 and §24-105-102 concerning the monitoring of vendor performance on state contracts and inclusion of contract performance information in a statewide contract management system.

Contractor's performance shall be subject to Evaluation and Review in accordance with the terms and conditions of this Contract, State law, including CRS §24-103.5-101, and State Fiscal Rules, Policies and Guidance. Evaluation and Review of Contractor's performance shall be part of the normal contract administration process and Contractor's performance will be systematically recorded in the statewide Contract Management System. Areas of Evaluation and Review shall include, but shall not be limited to quality, cost and timeliness. Collection of information relevant to the performance of Contractor's obligations under this Contract shall be determined by the specific requirements of such obligations and shall include factors tailored to match the requirements of Contractor's obligations. Such performance information shall be entered into the statewide Contract Management System at intervals established herein and a final Evaluation, Review and Rating shall be rendered within 30 days of the end of the Contract term. Contractor shall be notified following each performance Evaluation and Review, and shall address or correct any identified problem in a timely manner and maintain work progress.

Should the final performance Evaluation and Review determine that Contractor demonstrated a gross failure to meet the performance measures established hereunder, the Executive Director of the Colorado Department of Personnel and Administration (Executive Director), upon request by the CDOT, and showing of good cause, may debar Contractor and prohibit Contractor from bidding on future contracts. Contractor may contest the final Evaluation, Review and Rating by: (a) filing rebuttal statements, which may result in either removal or correction of the evaluation (CRS §24-105-102(6)), or (b) under CRS §24-105-102(6), exercising the debarment protest and appeal rights provided in CRS §§24-109-106, 107, 201 or 202, which may result in the reversal of the debarment and reinstatement of Contractor, by the Executive Director, upon showing of good cause.

## 20. GENERAL PROVISIONS

C0010193

**A. Assignment and Subcontracts**

Contractor's rights and obligations hereunder are personal and may not be transferred, assigned or subcontracted without the prior, written consent of the State. Any attempt at assignment, transfer, subcontracting without such consent shall be void. All assignments, subcontracts, or subcontractors approved by Contractor or the State are subject to all of the provisions hereof. Contractor shall be solely responsible for all aspects of subcontracting arrangements and performance.

**B. Binding Effect**

Except as otherwise provided in **§20(A)**, all provisions herein contained, including the benefits and burdens, shall extend to and be binding upon the Parties' respective heirs, legal representatives, successors, and assigns.

**C. Captions**

The captions and headings in this Contract are for convenience of reference only, and shall not be used to interpret, define, or limit its provisions.

**D. Counterparts**

This Contract may be executed in multiple identical original counterparts, all of which shall constitute one agreement.

**E. Entire Understanding**

This Contract represents the complete integration of all understandings between the Parties and all prior representations and understandings, oral or written, are merged herein. Prior or contemporaneous additions, deletions, or other changes hereto shall not have any force or affect whatsoever, unless embodied herein.

**F. Indemnification**

Contractor shall indemnify, save, and hold harmless the State, its employees and agents, against any and all claims, damages, liability and court awards including costs, expenses, and attorney fees and related costs, incurred as a result of any act or omission by Contractor, or its employees, agents, subcontractors, or assignees pursuant to the terms of this Contract; however, the provisions hereof shall not be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protection, or other provisions, of the Colorado Governmental Immunity Act, CRS §24-10-101 et seq., or the Federal Tort Claims Act, 28 U.S.C. 2671 et seq., as applicable, as now or hereafter amended.

**G. Jurisdiction and Venue**

All suits or actions related to this Contract shall be filed and proceedings held in the State of Colorado and exclusive venue shall be in the City and County of Denver.

**H. Modification**

   **i. By the Parties**

   Except as specifically provided in this Contract, modifications of this Contract shall not be effective unless agreed to in writing by both parties in an amendment to this Contract, properly executed and approved in accordance with applicable Colorado State law, State Fiscal Rules. Modifications permitted under this Contract, other than contract amendments, shall be conform the Policies of the Office of the State Controller, including, but not limited to, the policy entitled MODIFICATIONS OF CONTRACTS - TOOLS AND FORMS.

   **ii. By Operation of Law**

   This Contract is subject to such modifications as may be required by changes in Federal or Colorado State law, or their implementing regulations. Any such required modification automatically shall be incorporated into and be part of this Contract on the effective date of such change, as if fully set forth herein.

**I. Order of Precedence**

The provisions of this Contract shall govern the relationship of the State and Contractor. In the event of conflicts or inconsistencies between this Contract and its exhibits and attachments, including, but not limited to, those provided by Contractor, such conflicts or inconsistencies shall be resolved by reference to the documents in the following order of priority:

   **i. Colorado Special Provisions,**

   **ii. The provisions of the main body of this Contract,**

   **iii. Exhibit A,**

   **iv. Exhibit B,**

   **v. All executed Option Letter(s).**

C0010194

**J. Severability**

Provided this Contract can be executed and performance of the obligations of the Parties accomplished within its intent, the provisions hereof are severable and any provision that is declared invalid or becomes inoperable for any reason shall not affect the validity of any other provision hereof, provided that the Parties can continue to perform their obligations under this Contract in accordance with its intent.

**K. Survival of Certain Agreement Terms**

Notwithstanding anything herein to the contrary, provisions of this Contract requiring continued performance, compliance, or effect after termination hereof, shall survive such termination and shall be enforceable by the State if Contractor fails to perform or comply as required.

**L. Taxes**

The State is exempt from all federal excise taxes under IRC Chapter 32 (No. 84-730123K) and from all State and local government sales and use taxes under CRS §§39-26-101 and 201 et seq. Such exemptions apply when materials are purchased or services are rendered to benefit the State; provided however, that certain political subdivisions (e.g., City of Denver) may require payment of sales or use taxes even though the product or service is provided to the State. Contractor shall be solely liable for paying such taxes as the State is prohibited from paying or reimbursing Contractor for such taxes.

**M. Third Party Beneficiaries**

Enforcement of this Contract and all rights and obligations hereunder are reserved solely to the Parties. Any services or benefits which third parties receive as a result of this Contract are incidental to the Contract, and do not create any rights for such third parties.

**N. Waiver**

Waiver of any breach under a term, provision, or requirement of this Contract, or any right or remedy hereunder, whether explicitly or by lack of enforcement, shall not be construed or deemed a waiver of any subsequent breach of such term, provision or requirement, or of any other term, provision, or requirement.

**O. CORA Disclosure**

To the extent not prohibited by federal law, this Contract and the performance measures and standards under CRS §24-103.5-101, if any, are subject to public release through the Colorado Open Records Act, CRS §24-72-101, et seq.

**THE REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK**

C0010195

## 21. COLORADO SPECIAL PROVISIONS

The Special Provisions apply to all Contracts except where noted in italics.

A. **CONTROLLER'S APPROVAL. CRS §24-30-202(1).** This contract shall not be valid until it has been approved by the Colorado State Controller or designee.

B. **FUND AVAILABILITY. CRS §24-30-202(5.5).** Financial obligations of the State payable after the current fiscal year are contingent upon funds for that purpose being appropriated, budgeted, and otherwise made available..

C. **GOVERNMENTAL IMMUNITY.** No term or condition of this contract shall be construed or interpreted as a waiver, express or implied, of any of the immunities, rights, benefits, protections, or other provisions, of the Colorado Governmental Immunity Act, CRS §24-10-101 et seq., or the Federal Tort Claims Act, 28 U.S.C. §§1346(b) and 2671 et seq., as applicable now or hereafter amended.

D. **INDEPENDENT CONTRACTOR.** Contractor shall perform its duties hereunder as an independent contractor and not as an employee. Neither Contractor nor any agent or employee of Contractor shall be deemed to be an agent or employee of the State. Contractor and its employees and agents are not entitled to unemployment insurance or workers compensation benefits through the State and the State shall not pay for or otherwise provide such coverage for Contractor or any of its agents or employees. Unemployment insurance benefits will be available to Contractor and its employees and agents only if such coverage is made available by Contractor or a third party. Contractor shall pay when due all applicable employment taxes and income taxes and local head taxes incurred pursuant to this contract. Contractor shall not have authorization, express or implied, to bind the State to any agreement, liability or understanding, except as expressly set forth herein. Contractor shall **(a)** provide and keep in force workers' compensation and unemployment compensation insurance in the amounts required by law, **(b)** provide proof thereof when requested by the State, and **(c)** be solely responsible for its acts and those of its employees and agents.

E. **COMPLIANCE WITH LAW.** Contractor shall strictly comply with all applicable federal and State laws, rules, and regulations in effect or hereafter established, including, without limitation, laws applicable to discrimination and unfair employment practices.

F. **CHOICE OF LAW.** Colorado law, and rules and regulations issued pursuant thereto, shall be applied in the interpretation, execution, and enforcement of this contract. Any provision included or incorporated herein by reference which conflicts with said laws, rules, and regulations shall be null and void. Any provision incorporated herein by reference which purports to negate this or any other Special Provision in whole or in part shall not be valid or enforceable or available in any action at law, whether by way of complaint, defense, or otherwise. Any provision rendered null and void by the operation of this provision shall not invalidate the remainder of this contract, to the extent capable of execution.

G. **BINDING ARBITRATION PROHIBITED.** The State of Colorado does not agree to binding arbitration by any extra-judicial body or person. Any provision to the contrary in this contact or incorporated herein by reference shall be null and void.

H. **SOFTWARE PIRACY PROHIBITION. Governor's Executive Order D 002 00.** State or other public funds payable under this contract shall not be used for the acquisition, operation, or maintenance of computer software in violation of federal copyright laws or applicable licensing restrictions. Contractor hereby certifies and warrants that, during the term of this contract and any extensions, Contractor has and shall maintain in place appropriate systems and controls to prevent such improper use of public funds. If the State determines that Contractor is in violation of this provision, the State may exercise any remedy available at law or in equity or under this contract, including, without limitation, immediate termination of this contract and any remedy consistent with federal copyright laws or applicable licensing restrictions.

I. **EMPLOYEE FINANCIAL INTEREST/CONFLICT OF INTEREST. CRS §§24-18-201 and 24-50-507.** The signatories aver that to their knowledge, no employee of the State has any personal or beneficial interest whatsoever in the service or property described in this contract. Contractor has no interest and shall not acquire any interest, direct or indirect, that would conflict in any manner or degree with the performance of Contractor's services and Contractor shall not employ any person having such known interests.

J. **VENDOR OFFSET. CRS §§24-30-202(1) and 24-30-202.4. [***Not Applicable to intergovernmental agreements***]** Subject to CRS §24-30-202.4 (3.5), the State Controller may withhold payment under the State's vendor offset intercept system for debts owed to State agencies for: **(a)** unpaid child support debts or child support arrearages; **(b)** unpaid balances of tax, accrued interest, or other charges specified in CRS §39-21-101, et seq.; **(c)** unpaid loans due to the Student Loan Division of the Department of Higher Education; **(d)**

C0010196

amounts required to be paid to the Unemployment Compensation Fund; and **(e)** other unpaid debts owing to the State as a result of final agency determination or judicial action.

**K.  PUBLIC CONTRACTS FOR SERVICES. CRS §8-17.5-101.** [*Not Applicable to agreements relating to the offer, issuance, or sale of securities, investment advisory services or fund management services, sponsored projects, intergovernmental agreements, or information technology services or products and services*] Contractor certifies, warrants, and agrees that it does not knowingly employ or contract with an illegal alien who will perform work under this contract and will confirm the employment eligibility of all employees who are newly hired for employment in the United States to <u>perform work under this contract</u>, through participation in the E-Verify Program or the Department program established pursuant to CRS §8-17.5-102(5)(c), Contractor shall not knowingly employ or contract with an illegal alien to <u>perform work under this contract</u> or enter into a contract with a subcontractor that fails to certify to Contractor that the subcontractor shall not knowingly employ or contract with an illegal alien to <u>perform work under this contract</u>. Contractor **(a)** shall not use E-Verify Program or Department program procedures to undertake pre-employment screening of job applicants while this contract is being performed, **(b)** shall notify the subcontractor and the contracting State agency within three days if Contractor has actual knowledge that a subcontractor is employing or contracting with an illegal alien for work under this contract, **(c)** shall terminate the subcontract if a subcontractor does not stop employing or contracting with the illegal alien within three days of receiving the notice, and **(d)** shall comply with reasonable requests made in the course of an investigation, undertaken pursuant to CRS §8-17.5-102(5), by the Colorado Department of Labor and Employment. If Contractor participates in the Department program, Contractor shall deliver to the contracting State agency, Institution of Higher Education or political subdivision a written, notarized affirmation, affirming that Contractor has examined the legal work status of such employee, and shall comply with all of the other requirements of the Department program. If Contractor fails to comply with any requirement of this provision or CRS §8-17.5-101 et seq., the contracting State agency, institution of higher education or political subdivision may terminate this contract for breach and, if so terminated, Contractor shall be liable for damages.

**L.  PUBLIC CONTRACTS WITH NATURAL PERSONS. CRS §24-76.5-101.** Contractor, if a natural person eighteen (18) years of age or older, hereby swears and affirms under penalty of perjury that he or she **(a)** is a citizen or otherwise lawfully present in the United States pursuant to federal law, **(b)** shall comply with the provisions of CRS §24-76.5-101 et seq., and **(c)** has produced one form of identification required by CRS §24-76.5-103 prior to the effective date of this contract.

<div align="right">Revised 1/1/09</div>

<div align="center">**THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK**</div>

C0010197

## 22. SIGNATURE PAGE

### THE PARTIES HERETO HAVE EXECUTED THIS CONTRACT

> \* Persons signing for Contractor hereby swear and affirm that they are authorized to act on Contractor's behalf and acknowledge that the State is relying on their representations to that effect.

| CONTRACTOR | STATE OF COLORADO |
|---|---|
| Seneca Companies, Inc. | John W. Hickenlooper, GOVERNOR |
| By: _Kyle C. Baber_ <br> Name of Authorized Individual | Department of Transportation <br> (for) Donald E. Hunt, Executive Director |
| Title: _Branch Manager_ <br> Official Title of Authorized Individual | By: Timothy J. Harris, P.E., Chief Engineer <br> Name and Title |
| _*Signature_ | _Signature_ |
| Date: _SEPT 4, 2012_ | Date: _9/10/12_ |
| 2nd Contractor Signature if Needed | |
| By: _____ <br> Name of Authorized Individual | |
| Title: _____ <br> Official Title of Authorized Individual | LEGAL REVIEW <br> John W. Suthers, Attorney General |
| _*Signature_ | By: _N/A_ <br> Signature - Assistant Attorney General |
| Date: _____ | Date: _____ |

### ALL CONTRACTS REQUIRE APPROVAL by the STATE CONTROLLER

CRS §24-30-202 requires the State Controller to approve all State Contracts. This Contract is not valid until signed and dated below by the State Controller or delegate. Contractor is not authorized to begin performance until such time. If Contractor begins performing prior thereto, the State of Colorado is not obligated to pay Contractor for such performance or for any goods and/or services provided hereunder.

**STATE CONTROLLER**
David J. McDermott, CPA

By: _____

Department of Transportation

Date: _9/13/12_

C0010198

**EXHIBIT A**

## STATEMENT OF WORK

The Colorado Department of Transportation is seeking work by a qualified environmental remediation contractor to conduct petroleum remediation in soil and groundwater and conduct semi-annual groundwater monitoring at its Wolf Creek Pass East Highway Maintenance Facility in Mineral County, Colorado. The site is at an elevation of 10,560 feet above sea level and is served by overhead and buried utilities. The site is on Highway 160 at mile marker 167.7. The CDOT site is part of a lease from the Rio Grande National Forest, in part, jointly held with the Wolf Creek Ski Area. The two parties are separated by a steep slope covered by a mix of imported rock and native material. Portions of both the Ski Area and CDOT areas are paved.

Four petroleum (diesel and gasoline) underground storage tanks were excavated and removed from the upper bench (Ski Area) of the site in September 1989. Since that time, 20 groundwater monitoring wells and 25 soil borings have been installed throughout both sides of the site as well as offsite. Several attempts at remediation have been undertaken, all with mixed results. A review of site conditions and remedial efforts has been done by Tetra Tech EC, Inc. in a document titled "File Review and Remedial Strategy Evaluation for CDOT Wolf Creek Pass East Maintenance Facility", dated March 30, 2012 (incorporated herein as part of Exhibit A).

In addition, other documents for this site are available <u>by appointment</u> for review at the following facilities in Denver: Colorado Department of Transportation Central Files at 4201 E. Arkansas (303-757-9312), and at the Colorado Department of Labor and Employment, Division of Oil and Public Safety (DOPS), 633 17th St, Suite 500 (303-318-8525, event ID is 7414).

The Tetra Tech file review and remedial strategy evaluation document will be the basis for remediation work on this site. The work involves treating two separate areas at the site using material to be acquired from Remediation Products, Inc (RPI). An estimated mixture of 10,500 lbs of RPIs Trap and Treat BOS 200® and 20 gallons of microorganisms will be injected into the upper source area. The second area is an injection barrier which will be installed just below well MW-17. This barrier will be injected with an estimated 10,140 lbs of RPIs Trap and Treat BOS 200®, 5,000 lbs of supplemental gypsum and 20 gallons of microorganisms.

The source area injections on the upper bench will be from 10 ft deep to refusal in injection points located in a 10-ft triangular pattern. Six discrete injections on average will be done with each point. There is an estimated space for 70 injection points in the source area. The barrier in the second injection area (lower bench) will be approximately 120 feet long with the barrier itself operating between depths of 15 to 28 feet.

The Tetra Tech report also identifies some data gaps in the study area. For the purpose of this project, these data gaps will be ignored and not included in this scope of work.

At the conclusion of the remedial injections a summary report will be submitted to the CDOT project manager. The draft of the report will be in an electronic format. Upon review of the draft report by CDOT and revisions by the contractor, one final report will be submitted to CDOT as a hard copy and one as electronic to the CDOT project manager.

Groundwater monitoring will be conducted on a semi-annual basis for two years. The spring events will take place in either May or June 2013 and 2014. The fall events will be done in either September or October in 2012 and 2013. The following 14 wells will be included in this sampling program: MW-1, MW-3, MW-5, MW-9 through MW-12 and MW-14 through MW-20. Seep WD-1 on the south side of Highway 160 will also be sampled. The contractor will include a trip blank with each monitoring event. All wells, the trip blank and the seep will be sampled for BTEX and TVPH. The analysis will be performed by a reputable lab using EPA SW-846 methods 8260 (BTEX) and 8015B (TVPH). All wells will also be sampled for the following groundwater parameters: dissolved oxygen (mg/L), temperature (°C), pH, and specific conductance (μS/cm). Depth to water measurement will also be recorded for each well. All data will be included in the DOPS Monitoring and Remediation Report (MRR) format. Each MRR will include all historical data from the year 2000 to the present. Each MRR will include a narrative letter report describing the work done, date of the work, review of the analysis and conclusions and recommendations. All MRRs will be distributed electronically to the CDOT project manager in draft form within 2 months of the sampling event. Upon CDOT's review, corrected MRRs will be distributed electronically by the contractor to OPS and the CDOT project manager. In addition, one hard copy of each

C0010199

finalized MRR will be sent to the CDOT project manager. Previous MRRs are available electronically from the Colorado Geological Survey (303-866-2611 x 8314).

All work for this project will be invoiced in the DOPS format. No other invoices will be accepted without a cost breakdown in the DOPS format.

**Required Experience – Qualifications;**
Contractor is required to document minimum of 5 years' experience successfully performing this type of service.


**THE REST OF THIS PAGE INTENTIONALLY LEFT BLANK**

C0010200



**TETRA TECH** EC, INC.

March 30, 2012
TTDN-CDOT4-12-574(X)DRAFT

Mr. Andrew Fluckey
Property Management Section
Colorado Department of Transportation
15285 South Golden Road, Building 47
Golden, Colorado 80401

Subject: File Review and Remedial Strategy Evaluation for CDOT Wolf Creek Pass East Maintenance Facility

Dear Mr. Fluckey:

Tetra Tech EC, Inc. (TtEC) has completed a file review and evaluation of remediation strategies for the Colorado Department of Transportation (CDOT) Wolf Creek Pass East Maintenance Facility in Mineral County, Colorado. This site has been through more than 20 years of characterization and remediation activities. Remediation efforts to date have been unsuccessful. The extent of the plume is generally static, and dissolved hydrocarbon concentrations have been resistant to attenuation. The purpose of TtEC's task was to further the understanding of site history and conditions, identify data gaps, and determine a feasible path forward to achieving closure. Based on our findings, the development of a Corrective Action Plan (CAP) and Economic Feasibility Study (EFS) would be premature at this time; however, a suggested remediation option is presented.

Methodology

Through coordination with CDOT, specific historical reports were obtained from the Colorado Geological Survey (CGS). These reports were reviewed by TtEC to develop a working understanding of the hydrogeological conditions, contaminant distribution, and previous remedial measures employed at the site. A list of these documents is attached to this document as Table 1. In addition, TtEC consulted with Remediation Products, Inc. (RPI) regarding the applicability of their Trap and Treat® technology to the site.

Site Background

Based on the Initial Site Assessment Report prepared by CGS on November 14, 1989, a diesel and leaded gasoline fuel release was detected during the removal of four underground storage tanks (USTs) at the site in September 1989. The quantity of the petroleum released from the USTs is unknown. Previous known petroleum releases at the site (prior to 1989), according to CGS, were in excess of 100 gallons of diesel fuel resulting from broken pump hoses and spills (CGS, March 5, 2003). During tank removal, 234 cubic yards of petroleum contaminated soil were removed from the excavation and disposed off-site. Free product was discovered in monitoring well MW-12 on May 15, 2000. A small amount of free product and oil-cut purge water was recovered from the well using bailers, absorbent socks and a passive oil skimmer; and free product has not been observed in the well since 2005.

143 Union Boulevard, Suite 1010, Lakewood, CO  80228-1675
Tel 303 988 2202   Fax 303 980 3539
www.tteci.com

C0010201

Mr. Andrew Flurkey
March 30, 2012
Page 2

## Site Hydrogeology

The hydrogeology of the site is complex. Unconsolidated soils consist of poorly sorted sand with silt and fine gravel underlain by tuff bedrock. The uppermost saturated zone consists of unconsolidated colluvium and weathered tuff bedrock. Where the tuff bedrock is competent, there is little, if any, primary porosity. Based on boring logs, the tuff bedrock appears to be interbedded with older colluvium at some locations.

Groundwater flow within the uppermost saturated zone is controlled by the topographic surface of the underlying competent bedrock. Predominant groundwater flow direction is toward the southeast and generally mimics the topography (Figure 1). Depth to groundwater varies from approximately 6 ft to 34 ft. Hydraulic gradient ranges from 0.15 to 0.24. Due to the relatively low permeabilities of the subsurface materials, seepage velocities are expected to be relatively low. Low permeabilities are likely a significant contributing factor towards the limited extent of the plume and the observed relative stability of contaminant concentrations.

## Contaminant Distribution

The dissolved-phase groundwater plume is approximately 700 ft in length by 200 ft in width, as depicted in Figure 2 (CGS, October 2010). Benzene concentrations exceed Colorado Basic Standards for Groundwater (CBSGs) on and off-site, although contaminant trends have slightly decreased over the 11-year monitoring period at downgradient and source area locations (Figure 3). Most notably, benzene concentrations at off-site, downgradient well MW-09 ranged from a high of 111 micrograms per liter ($\mu$g/L) in October 2000 to a low of 3.5 $\mu$g/L in June 2010. The concentration rose slightly to 14 $\mu$g/L during the October 2010 sampling event.

The contaminant source area has been defined primarily through the interpretation of photo-ionization detector (PID) measurements. Source materials are primarily within a smear zone directly downgradient of the former UST location (Figure 4).

## Previous Remediation Efforts

Aside from the removal of the four USTs and 234 cubic yards of contaminated soil in 1989, multiple remediation efforts have been undertaken at the site beginning in 2004. These efforts were as follows:

➢ On September 14 and 15, 2004, enhanced fluid recovery (EFR) testing was performed over a period of 8 hours at monitoring well MW-05, using a vacuum truck which moved up to 500 cubic feet of air per minute (cfm) under a vacuum of 27 inches of mercury. During the test, 500 gallons of contaminated groundwater were extracted. In addition, water level dropped 2.8 ft in well MW-05, and a 1-ft drop was observed 60 ft away in well MW-01. However, no vacuum was detected in any of the surrounding monitoring wells.

➢ An oxygen diffuser system was installed in December 2005. Six application wells were constructed downgradient of the former tank basin and within the heart of the benzene plume (Figure 5). The application wells were installed in two 3-well lines perpendicular to the axis of the groundwater plume. The wells were designated URB-1 through URB-3 and LRB-1 through LRB-3, with the "U" series installed on the upper topographic bench near MW-05, and the "L" series on the lower bench near MW-17. The wells were equipped with in-situ submerged oxygen curtains (iSOCs) designed to super-saturate the groundwater with dissolved oxygen. The iSOCs were operational through 2010, during which time no discernible reductions in the concentrations of benzene were observed in wells MW-05, MW-17 or MW-15 along the axis of the plume. The iSOC installation has been ineffective at reducing benzene concentrations in groundwater.

**TETRA TECH EC, INC.**

C0010202

Mr. Andrew Flurkey
March 30, 2012
Page 3

➢ Pilot and bench scale testing and further delineation of the source area were performed by CGS and their subcontractor Remington Technologies (Remington) from July through September 2010 (CGS, February 2011). Pilot test application borings were drilled near monitoring well MW-05 at 10, 15 and 20-ft offsets (MW-05 has historically had high benzene concentrations and is the closest downgradient well to the former tank basin). The application borings, designated as IP-1, IP-2 and IP-3, were used to pressure inject 1,000 gallons of a 10-percent solution of calcium peroxide into the groundwater. In addition, a bench-scale test was performed using various oxidant solutions to determine the most effective solution at reducing benzene and total petroleum hydrocarbons (TPH) levels in soil and groundwater through enhanced biodegradation. The chemical oxidants used in the bench-scale test included: sodium persulfate, PermeOx, calcium peroxide, hydrogen peroxide, Fe-EDTA and RegenOx. Results of the pilot testing indicated that the radius of influence of the calcium peroxide solution was 20 ft; however, analytical results provide no evidence that concentrations of benzene were reduced at MW-05. Bench-scale testing was largely inconclusive, due in part to questionable results, which included a conspicuously high (order of magnitude) reduction of benzene concentration in one sample and benzene and TPH reductions in the control sample that were greater than those realized in some of the treated samples.

## Potential Remediation Option

Several remediation techniques have been attempted at the site and each has been determined to be ineffective. An additional remedial option initially considered by TtEC was soil vapor extraction (SVE); however, the 2004 EFR testing indicated an extremely limited area of influence for applied vacuum. Moreover, mechanical systems that require the periodic attention of a technician are less attractive due to logistical issues associated with the site. Important considerations that should be kept in mind for any contemplated remedial option include the site's remote location, the expense associated with mobilization, and a very brief "field season." Accordingly, a "set and forget" option is most desirable for this site.

An attractive alternative for this site would be to conduct source treatment and couple this with installation of a barrier type installation across the plume and perpendicular to its axis near MW-17. Trap & Treat BOS 200® is marketed by Remediation Products, Inc. (RPI) of Golden, Colorado. According to RPI, BOS 200® was designed to work in both aerobic and anaerobic environments for the trapping and degradation of petroleum hydrocarbons. BOS 200® is a blend of activated carbon, sulfate reduction media and micronutrients, which can be injected into source areas or as barriers across hydrocarbon plumes. A proprietary mixture of naturally occurring microbes (Trap & Treat® Bacteria Concentrate) is added to speed up the remediation process.

### *Source Area Treatment*

As discussed above, delineation of the source area was based primarily on soil PID data, which were used to delineate a preliminary source treatment area (Figure 6). The depth to groundwater here is roughly 12 ft, and injection points would be installed from 10 ft down to refusal, which is anticipated to range from 16 to 22 ft. On average, it is expected that six discrete injections would be made at each point. Injection points would be located using a 10-ft triangular pattern. The shaded region is estimated to encompass approximately 7,000 ft², so there would be roughly 70 injection points within the area. Preliminary calculations indicate the volume of materials required for source control injections would approximate the following:

➢ 10,500 lbs BOS 200®
➢ 20 gallons of microorganisms

**TETRA TECH** EC, INC.

C0010203

Mr. Andrew Flurkey
March 30, 2012
Page 4

### *Barrier Installation*

Currently, the highest benzene concentrations in groundwater are being observed at MW-17 (2,100 μg/L, October 10, 2010); therefore, groundwater treatment in this vicinity would likely have a significant impact on contaminant mass. Concentrations downgradient from this location at MW-12 and MW-15 drop off significantly. A preliminary depiction of the length and orientation of a barrier installation is depicted in Figure 7. Accessibility for injection points at this location appears to be excellent. For estimation purposes, the installation is presumed to be 120 ft long and extend from a depth of 15 to 28 ft, with a thickness of 13 ft. Preliminary calculations indicate the volume of materials required for barrier injections would approximate the following:

- ➢ 10,140 lbs BOS 200[D]
- ➢ 5,000 lbs supplemental gypsum to address long term mass
- ➢ 20 gallons of microorganisms

### *Predicted Performance*

Source Area Treatment—Injections in this area are designed to quickly reduce dissolved hydrocarbon concentrations to levels below the applicable state standards. According to RPI, benzene in groundwater should rapidly fall below 5 μg/L and no rebound is anticipated. Further, no additional injection events are anticipated. For design purposes, benzene concentration in groundwater at MW-5 was presumed to be 600 μg/L.

Barrier Type Installations—These installations are designed to rapidly reduce contaminant concentrations within the barrier itself to levels below applicable standards so that clean groundwater begins to emanate from the downgradient side almost immediately. The installation should continue to function so that contaminant mass flux entering the barrier will be actively degraded within the barrier for as long as needed. In other words, the installation is designed to support an active "bio-barrier" for as long as food in the form of hydrocarbons is available.

Considering the mid-plume barrier at MW-17 and groundwater seepage velocity of 0.25 ft/day (91 ft/year), it may take 2 to 3 years for the benefits of the barrier installation to reach the property line at MW-12 or MW-15. This is because the wells are roughly 140 ft away from MW-17 and it will take 1.5 years for groundwater to traverse this distance, and a couple of pore volumes will likely be needed to flush existing contamination from the formation. As a result, changes in the downgradient groundwater will manifest themselves slowly over time. If CDOT desires more rapid results at the property boundary, this could be accomplished with the installation of an additional barrier at the property boundary. Alternatively, CDOT may wish to ignore the source area and mid-plume and focus the effort at the property line so that improvements can be realized off-site in a relatively short period of time.

### Data Gaps

Variations in the extent of soil impacts in the source area could significantly change the required number of injections and amount of material needed in this area, and several soil borings are highly recommended. For example, injection loadings can likely be reduced in the vicinity of MW-1; however, injections at a few of the points near SB-10 will require 50 to 70 lbs per injection over the 16' to 19' depth horizon because of soil impacts. Refining the understanding of source conditions will help avoid the placement of treatment materials in areas where they may not be needed and help focus on areas where the greatest impact can be made.

**TETRA TECH EC, INC.**

C0010204

Mr. Andrew Flurkey
March 30, 2012
Page 5

Additionally, plume width in the vicinity of MW-17, and MW-15 if a property-boundary installation is desired, could be better defined. The installation and sampling of several 1-inch monitoring wells would assist in determining plume width more precisely and, again, help focus the injections on areas where the greatest impact can be made. It is estimated that an investigation designed to address these data gaps could be completed for a cost ranging from $15,000 to $25,000.

Preliminary Estimation of Costs

Capital costs for this technology are substantial in comparison with those for more conventional technologies such as SVE and air sparging. However, operational and maintenance costs are essentially non-existent. Given the travel and climatological considerations associated with this site, post-installation operation and maintenance costs for more conventional alternatives are expected to be considerable, making the Trap & Treat® technology more attractive. A preliminary cost estimate for corrective action, including source control and one barrier installation in the vicinity of MW-17, is as follows:

| | |
|---|---|
| Consulting and Reporting (includes expenses): | $30,000 |
| Materials and Injection: | $167,000 |
| Travel, Mobilization and Expenses (subs): | $17,000 |
| | $214,000 |

These estimated costs are preliminary in nature and are not based on firm bids from subcontractors. Injection costs are based on the use of direct-push drilling, which may be limited in its capacity to penetrate deep enough in some portions of the project area. Actual costs may vary, based on additional information obtained through any investigative actions taken to address data gaps.

TtEC appreciates the opportunity to assist CDOT with this project. If you have any questions or require any additional information, please feel free to contact me at 303.980.3764 or charlie.senz@tetratech.com.

Sincerely,
Tetra Tech EC, Inc.

Charles D. Senz, PG
Manager, Commercial Projects

CDS:bl
Attachments
Cc:  CDOT File

**TETRA TECH** EC, INC.

C0010205

Mr. Andrew Flurkey
March 30, 2012
Page 6

**Table 1.  Documents Reviewed – CDOT Wolf Creek Pass**

Colorado Geological Survey, November 14, 1989. Initial Site Assessment Report, CDOT Wolf Creek Pass
    Maintenance Facility.

Colorado Geological Survey, March 5, 2003. CDOT Wolf Creek Pass Site Characterization Report (SCR)
    (Event ID 7414).

Colorado Geological Survey, February 9, 2004. 2003 Monitoring Report for CDOT's Wolf Creek Pass
    Highway Maintenance Facility in Mineral County, Colorado. (Event ID 7414).

Colorado Geological Survey, September 10, 2004. Corrective Action Plan for the CDOT Wolf Creek Pass
    Maintenance Facility (Event ID 7414).

Colorado Geological Survey, December 17, 2004. September 2004 Monitoring Report for CDOT's Wolf
    Creek Pass Highway Maintenance Facility in Mineral County, Colorado. (Event ID 7414).

Colorado Geological Survey, May 21, 2008. MTBE Limited Level Assessment Report  for CDOT's Wolf
    Creek Pass Highway Maintenance Facility in Mineral County,  Colorado. (Event ID 7414).

Colorado Geological Survey, February 18, 2009. Remediation Economic Feasibility Summary - Wolf Creek
    Pass Maintenance Facility (Event ID 7414).

Colorado Geological Survey, February 18, 2009. CAP Mod and EFS for CDOT's Wolf Creek Pass Highway
    Maintenance Facility in Mineral County, Colorado (Event ID 7414).

Colorado Geological Survey, October 30, 2009. September 2009 Monitoring Report for CDOT's Wolf Creek
    Pass Highway Maintenance Facility in Mineral County,  Colorado. (Event ID 7414).

Colorado Geological Survey, October 2010. Monitoring and Remediation Report (MRR) for 2nd Half 2010 -
    Wolf Creek Pass Maintenance Facility (Event ID 7414).

Colorado Geological Survey, February 4, 2011. Interpretation of Pilot and Bench Scale Test Results and
    Source Area Delineation for CDOT's Wolf Creek Pass Maintenance Facility (Event ID 7414).

**TETRA TECH** EC, INC.

        Exhibit A - Routing #13 HAA 48563

C0010206

Figure 1. Potentiometric Surface, October 2010

    Exhibit A - Routing #13 HAA 48563

C0010207



Figure 2. Benzene Plume as of September 2009

C0010208



Figure 3.  Contamination Trend Graphs as of 2nd Half 2010

Exhibit A - Routing #13 HAA 48563

C0010209

Figure 4. Contaminant Source Area, Based on PID Readings



C0010210



Figure 5. In-Situ Submerged Oxygen Curtain (iSOC) Locations

Exhibit A - Routing #13 HAA 48563

C0010211

Figure 6. Potential Location for Trap & Treat® Source Area Treatment



C0010212



Figure 7. Potential Location for Trap & Treat® Barrier

Exhibit A - Routing #13 HAA 48563

C0010213

**EXHIBIT B**

## PRICES AND RATES

**Total Cost for Entire Project: $248,985.00**



C0010214

| Site Name: CDOT Wolf Creek Pass East Maintenance Facility | | | | | | Event ID: | | 7414 |
| Site Address: Mile Marker 167.7 Hwy. 160, Mineral County, CO | | | | | | Submittal Date: | | 08/02/12 |
| Remediation Method(s): BOS 200 Injections, Semi-Annual | | | | | | Effective Date: | | |
| Groundwater Sampling and Reporting | | | | | | Projected Closure Date: | | 6/31/2014 |
| | | | | | | EFS Start Date: 10/00/10 | EFS End Date: | 6/31/2014 |

**3E. Remediation system startup & implementation report**

Start Date: 08/23/12    End Date: 08/24/12

e. System startup

Labor

| 3E | e. | 5.3 | project manager | hours | 1 | $ | 108.00 | $ | 108 | | | $ | 108.00 |
| 3E | e. | 5.4 | project engineer / scientist | hours | 2 | $ | 83.50 | $ | 178 | | | $ | 178.00 |
| 3E | e. | 5.5 | staff engineer / scientist | hours | 24 | $ | 75.00 | $ | 1,000 | | | $ | 1,800.00 |
| 3E | e. | 5.6 | senior technician | hours | 6 | $ | 69.00 | $ | 354 | | | $ | 354.00 |
| 3E | e. | 5.7 | CAD | hours | 6 | $ | 47.00 | $ | 282 | | | $ | 282.00 |
| 3E | e. | 5.9 | clerical and courier | hours | 1 | $ | 43.00 | $ | 43 | | | $ | 43.00 |
| | | | TLC-5 group - Labor Subtotal | | | | | | | | $ | 2,761.00 | |
| | | | | | | | | | **TOTAL 3E COSTS:** | | | **$ 2,761.00** |

**3G. Monitoring plan implementation report & report preparation**

Start Date: 10/1/2012    End date: 7/31/2014    # Events: 4

GW Monitoring plan implementation: 4 semi-annual events with 15 wells (16 samples) per event: MW-1, +3, +5, +9, +10, +11, +12, +14, +15, +16, +17, +18, +19 and MW-20 plus Seep WD-1 and trip blank.

| 3G | g. | 4.1 | sample incl. 4 semiannual events with 15 wells per event MW-1, +3, +5, +9, +10, +11, +12, +14, +15, +16, +17, +18, +19 and MW-20 plus Seep WD-1 and trip blank = 64 | wells | 64 | $ | 76.00 | $ | 4,864.00 | | | $ | 4,401.00 |
| | | | TLC-4 group - Groundwater Sampling Subtotal | | | | | | | | $ | 4,864.00 | |

Labor

| 3G | g. | 5.3 | project manager (1 hour/event) | hours | 4 | $ | 108.00 | $ | 424.00 | | | $ | 424.00 |
| 3G | g. | 5.4 | project engineer / scientist (2 hour/event) | hours | 8 | $ | 88.00 | $ | 704.00 | | | $ | 704.00 |
| 3G | g. | 5.5 | staff engineer / scientist (2 hour/event) | hours | 8 | $ | 75.00 | $ | 600.00 | | | $ | 600.00 |
| 3G | g. | 5.6 | senior technician - (16 hour/event) | hours | 64 | $ | 69.00 | $ | 3,770.00 | | | $ | 3,770.00 |
| 3G | g. | 5.9 | staff technician (1 hour/event) | hours | 4 | $ | 47.00 | $ | 188.00 | | | $ | 188.00 |
| 3G | g. | 5.9 | clerical and courier (1 hour/event) | hours | 4 | $ | 43.00 | $ | 172.00 | | | $ | 172.00 |
| | | | TLC-5 group - Labor Subtotal | | | | | | | | $ | 5,854.00 | |

Laboratory Analysis

| 3G | g. | 6.7 | BTEX/TVPH (60 wells + 4 t/p blanks) = 64 | samples | 64 | $ | 35.00 | $ | 2,200.00 | $ | 336.00 | $ | 2,570.00 |
| | | | TLC-6 group - Laboratory Analyses | | | | | | | | $ | 2,570.00 | |

Travel

| 3G | g. | 8.2 | lodging (1 night per event) | days | 4 | $ | 77.00 | $ | 308.00 | | | $ | 308.00 |
| 3G | g. | 8.3 | meals (1 night per event) | days | 4 | $ | 46.00 | $ | 184.00 | | | $ | 184.00 |
| 3G | g. | 8.4 | mileage @500 miles/event | miles | 2200 | $ | 0.55 | $ | 1,210.00 | | | $ | 1,110.00 |
| | | | TLC-8 group - Travel Subtotal | | | | | | | | $ | 1,702.00 | |

Field Instrumentation

| 3G | g. | 12.1 | misc field supplies (2 days / event) | days | 8 | $ | 12.00 | $ | 96.00 | | | $ | 96.00 |
| 3G | g. | 12.14 | well parameter water quality meter (2 days / event) | s | 8 | $ | 116.00 | $ | 900.00 | $ | 92.00 | $ | 1,012.00 |
| | | | TLC-12 group - Field Instrumentation Subtotal | | | | | | | | $ | 1,108.00 | |
| | | | Activity Code g. Subtotal | | | | | | | | $10,114.00 | | |

**3G  l. Data review & reporting: 4 semi annual events**

Labor

| 3G | l. | 5.3 | project manager (2 hrs/event) | hours | 8 | $ | 108.00 | $ | 848.00 | | | $ | 848.00 |
| 3G | l. | 5.4 | project engineer / scientist (2 hrs/event) | hours | 8 | $ | 88.00 | $ | 704.00 | | | $ | 704.00 |
| 3G | l. | 5.5 | staff engineer / scientist (8 hours/event) | hours | 32 | $ | 75.00 | $ | 2,400.00 | | | $ | 2,400.00 |
| 3G | l. | 5.6 | senior technician (4 hrs/event) | hours | 16 | $ | 69.00 | $ | 944.00 | | | $ | 944.00 |
| 3G | l. | 5.8 | draftsperson (4 hrs/event) | hours | 16 | $ | 47.00 | $ | 752.00 | | | $ | 752.00 |
| 3G | l. | 5.9 | clerical and courier (2 hrs/event) | hours | 8 | $ | 43.00 | $ | 344.00 | | | $ | 344.00 |
| | | | TLC-5 group - Labor Subtotal | | | | | | | | $ | 5,992.00 | |
| | | | Activity Code l. Subtotal | | | | | | | | $5,992.00 | | |
| | | | | | | | | | **TOTAL 3G COSTS:** | | | **$22,108.00** |

**PHASE OF WORK COST SUMMARY**

| PHASE OF WORK CODE AND DESCRIPTION | | EFS TOTAL COSTS |
| 3D | Remediation system installation/excavation | $ | 224,118.00 |
| 3E | Remediation system startup & implementation report | $ | 2,761.00 |
| 3G | Monitoring plan implementation & report preparation | $ | 22,106.00 |
| | | $ | 248,985.00 |

C0010215

**EXHIBIT C**

## SAMPLE OPTION LETTER

| Date: | State Fiscal Year: | Option Letter No. | Routing # |
|-------|--------------------|--------------------|-----------|
|       |                    |                    |           |

1) **OPTIONS:** *(Choose all applicable options listed in §1 and in §2 and delete the rest.)*
   - *(a)*    **Option to renew only for an additional term.**
   - *(b)*    **Change in the amount of goods within current term**
   - *(c)*    **Change in amount of goods in conjunction with renewal for additional term**
   - *(d)*    **Level of service change within current term**
   - *(e)*    **Level of service change in conjunction with renewal for additional term**
   - *(f)*    **Option to initiate next phase in a contract**

2) **PROVISIONS**: *(All Option Letters shall contain the appropriate provisions set forth below :)*
   *(For use with Options 1(a-e) :)* In accordance with Section(s)          of the original Contract routing number          between the State of Colorado, Department of Transportation, and Contractor's Name, covering the term Insert Orig start date through Insert Current ending date, the State hereby exercises its option for an additional term beginning Insert Option start date and ending on Insert New ending date at a cost/price specified in Identify the Section, Schedule, Attachment, Exhibit etc, AND/OR an increase/decrease in the amount of goods/services at the same rate(s) as specified in Identify the Section, Schedule, Attachment, Exhibit etc.
   *(For use with Option 1(f), please use the following :)* In accordance with Section(s)          of the Original Contract routing number          between the State of Colorado, Department of Transportation, and Contractor's Name, the State hereby exercises its option to initiate Phase indicate Phase: 2, 3, etc for the term beginning Insert start date and ending on Insert ending date at the cost/price specified in Section          .
   *(For use with all Options 1(a-f) :)* The amount of the current Fiscal Year contract Choose Language (*if change to contract value* is increased/decreased by $ amount of change to a new) (*if time only* remains unchanged with a) contract Choose Language of Insert New $ Amt to as consideration for services/goods ordered under the contract for the current fiscal year indicate Fiscal Year. (*if change to contract value* The first sentence in Section          is hereby modified accordingly.)

| Requisition # | CDOT Document # | Doc Line # | WBS or Fund Center # | Change Amount |
|---------------|-----------------|------------|----------------------|---------------|
|               |                 |            |                      |               |

   The total contract value including all previous amendments, option letters, etc. is Insert New $ Amt.

3) **EFFECTIVE DATE.** The effective date of this Option Letter is upon approval of the State Controller or whichever is later.

> **STATE OF COLORADO**
> **John W. Hickenlooper, GOVERNOR**
> Department of Transportation
>
> By: _____
>
> (For)  Donald E. Hunt, Executive Director
>
> Date: _____

---

**ALL CONTRACTS REQUIRE APPROVAL BY THE STATE CONTROLLER**

CRS §24-30-202 requires the State Controller to approve all State Contracts. This Contract is not valid until signed and dated below by the State Controller or delegate. Contractor is not authorized to begin performance until such time. If Contractor begins performing prior thereto, the State of Colorado is not obligated to pay Contractor for such performance or for any goods and/or services provided hereunder.

---

> **STATE CONTROLLER**
> **David J. McDermott, CPA**
>
> By: _____
>
> Department of Transportation
>
> Date: _____

C0010216

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Tuesday, September 18, 2012 10:11 AM |
| **To:** | Lloyd, Brian A -FS |
| **Cc:** | Muenchow, Kurt A -FS; Dyer, Harold D -FS |
| **Subject:** | NEPA for remedial actions |

Brian – I kicked this to Kurt, too, not sure whom to ask. For the remedial action at Wolf Creek what, if any, NEPA is required? We want to issue them a special use permit for the clean-up wells, but are not sure how to do it. My reading of EPA regulations and RCRA info leads me to think that Colorado's Division of Oil and Public Safety's (which was delegated authority to cleanup and monitor LUSTS as of 2007 by EPA) cleanup plans are "functionally equivalent" to our NEPA docs and can be used as by the Authorized Officer to make decisions on actions.

What say you?

Thanks,

Matt Custer
Realty Specialist
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144
719-852-6206

C0010217

**Muenchow, Kurt A -FS**

| | |
|---|---|
| **From:** | Muenchow, Kurt A -FS |
| **Sent:** | Tuesday, September 18, 2012 11:07 AM |
| **To:** | Custer, Matthew S -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Cc:** | Powell, Crystal L -FS; Lloyd, Brian A -FS |
| **Subject:** | RE: PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739 |

In this particular instance, I understand that CDOT is cleaning up a release of petroleum fuels to the subsurface from an underground storage tank(s) on lands managed by the NFS under SUP regulations.

SO, the Forest/District would be the unit to determine what NEPA is required for the requested use!

Sorry to turn this back to you, but, unless I am mistaken, for this case, there would be no "special" cleanup authority for either the USFS or CDOT – we follow our SUP regulations.

If you want further clarification, feel free to give me a call on 303-324-6297.

---

**From:** Custer, Matthew S -FS
**Sent:** Tuesday, September 18, 2012 10:03 AM
**To:** Dyer, Harold D -FS; Malecek, Thomas -FS; Muenchow, Kurt A -FS
**Cc:** Powell, Crystal L -FS
**Subject:** FW: PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739

Kurt: can you clarify for us what NEPA is required for a clean-up action? CDoT has applied for a permit for their wells, plus an easement to get to three existing and three proposed wells. We are proposing issuing a special use permit for this.

---

**From:** Flurkey, Andy [mailto:Andy.Flurkey@dot.state.co.us]
**Sent:** Tuesday, September 18, 2012 9:26 AM
**To:** Mike Dimino (mdimino@senecaco.com)
**Cc:** Santangelo, Theresa; Fischer, Travis; Campano, Ralph; Mallonee, Franchesca; Martinez, Kenneth; Custer, Matthew S -FS
**Subject:** FW: PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739

Mike,

You are hereby authorized to begin work on the groundwater monitoring and remediation of the Wolf Creek Pass maintenance site per the attached contract. I would appreciate it if you would let me know of your work schedule in advance. Contact Kenneth Martinez at (719) 587-6403 to make arrangements for site visits and work. Let me know if you have any questions.

Andy Flurkey
CDOT Property Management

---

**From:** Kelly, Megan
**Sent:** Monday, September 17, 2012 11:09 AM
**To:** Flurkey, Andy
**Cc:** Young, Scott; Gendron, Shane; Meadows, Yvette
**Subject:** PDF of contract document - Seneca Companies, Inc., 13 HAA 48563, 201000739

C0010218

Good morning Andy,

The requested Contract (hydrocarbon remediation & ground water monitoring) for this vendor has been fully executed, and a copy is attached for your records.

Vendor Name:  Seneca Companies, Inc., 13 HAA 48563, 201000739

This PDF is a:        __x__ Contract        for the above referenced contract.

The original has been mailed to the Vendor. Any Required <u>Notice -To-Proceed</u> has **NOT** been sent to the vendor.

The Notice -To-Proceed **IS** the responsibility of the Project Manager.

Thank you,

Megan

**Megan Kelly**
*Contracts Administrator*
Colorado Dept. of Transportation
Center for Procurement Services
303 -757 -9861 (Office)
303 -757 -9669 (Fax)
<u>Megan.Kelly@dot.state.co.us</u>  (Email)

**Rinella, Steven -FS**

| | |
|---|---|
| **From:** | Rinella, Steven -FS |
| **Sent:** | Tuesday, September 18, 2012 2:35 PM |
| **To:** | Malecek, Thomas -FS; Muenchow, Kurt A -FS |
| **Cc:** | Lloyd, Brian A -FS; Custer, Matthew S -FS |
| **Subject:** | RE: WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report |

Still waiting for what and where from CDOT.  Absent anything soon, if this exchange goes through, CDOT will be on their own on dealing with the Village for access.

---

**From:** Malecek, Thomas -FS
**Sent:** Sunday, September 16, 2012 7:37 PM
**To:** Muenchow, Kurt A -FS
**Cc:** Lloyd, Brian A -FS; Rinella, Steven -FS; Custer, Matthew S -FS
**Subject:** RE: WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report

Thanks Kurt….Matt says we will be getting a request to allow more wells to be drilled, some close to or may need access thru eventual Village property should the exchange go thru…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Muenchow, Kurt A -FS
**Sent:** Wednesday, September 12, 2012 9:29 AM
**To:** Malecek, Thomas -FS
**Cc:** Lloyd, Brian A -FS; Rinella, Steven -FS
**Subject:** WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report

I am sending you the latest report from CGS (CDOT's "contractor") updating the technical status of CDOT's Wolf Creek Pass fuel tank cleanup.

In summary, this report:

- Confirms that surface water is NOT impacted by the groundwater BTEX plume;
- Confirms that various remediation approaches have had minimal affect on the BTEX plume;
- Confirms that contamination (mainly benzene) is still present in the GW plume at concentrations that exceed applicable regulatory thresholds & preclude potable use of impacted water;
- Confirms that CDOT/CGS is proceeding with design/installation of a more-aggressive cleanup technology (sent the USFS a copy of their plan – I previously-forwarded to the District); and
- Continues to stress that, "there are no existing downgradient water supply wells within 2,500 feet of the source."

Please let me know if any questions or concerns, or if there's something more I can help with.

**Rinella, Steven -FS**

| | |
|---|---|
| **From:** | Rinella, Steven -FS |
| **Sent:** | Tuesday, September 18, 2012 2:45 PM |
| **To:** | Malecek, Thomas -FS |
| **Subject:** | RE: Village Exchandge Boundary Survey |

Adam is on e-mail. Forward to him

---

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 10, 2012 12:21 PM
**To:** shines@blm.gov
**Cc:** dhicks@vanion.com; Rinella, Steven -FS
**Subject:** RE: Village Exchandge Boundary Survey

Sean, Adam just took off for 2 weeks vacation, so am ccing this to Dusty Hicks who should be able to best answer your ????'s.  Also to Steve Rinella, who may have some insight as the appraisal contract needed to be fairly specific and don't want to assume something we may not be able to…..

Let me know if we need to discuss via a conf call…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Hines, Sean J [mailto:shines@blm.gov]
**Sent:** Monday, September 10, 2012 12:03 PM
**To:** apoe@westernlandgroup.com
**Cc:** Scholl, Kyle K; Velasquez, Joe -FS; Malecek, Thomas -FS
**Subject:** Village Exchandge Boundary Survey

Adam,

My name is Sean Hines, I am a Cadastral Surveyor with the BLM and I am the surveyor assigned to the Wolf Creek Village Land Exchange property boundary survey.  I currently have an AutoCAD drawing that shows the proposed land exchange parcels that I received from Dan Russell, a local surveyor who has been working on this project,  who tells me that the drawing came from Western.  This particular drawing doesn't seem to fit anything on the ground as far as known points are concerned  and appears to have multiple problems with the line work.  I was curious who created this drawing and how strict we need to be with following this exact boundary.  I have designed a boundary that fits with what is on the ground and I attempted to keep the distances and acreages the same or as close to the same as possible.  If we do decide to go with this modified boundary, I would like all participating parties to sign and agree to a plan before I set any monuments.

If you could please contact me or direct me to someone who I should speak with to iron out these details I would appreciate it, time is a factor here because of the pending weather conditions.

Thank You for Your Time,

Sean Hines

C0010221

Cadastral Surveyor
San Luis Valley Public Lands Center
1803 Hwy. 160
Monte Vista, CO 81144
Office:  719-852-6269
Cell:  719-431-3728
Email:  shines@blm.gov

C0010222

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Tuesday, September 18, 2012 5:37 PM |
| **To:** | Weiwild@aol.com |
| **Subject:** | RE: Draft WCV BA |

Rick – will get to this by the end of the week.  Will be in the field all day tomorrow, back in on Thursday.  Will talk with you then.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 14, 2012 9:10 AM
**To:** Ghormley, Randy -FS
**Subject:** Draft WCV BA

Randy,

Attached is a largely complete draft BA that would go to the FWS.  Track changes are active.  This is an update of the "WCVBA Aug2712 preNEPA draft final" (the last version that you commented on) where I accepted all of those changes before starting the update.  I have made all the revisions that we discussed at the public hearings (and many more).

As a result of now considering private Village effects as indirect under section 7 rather than reasonably certain under section 10, I found one substantive change to project effects from the prior analysis.  I tentatively find Alternative 2's direct effects to be inconsistent with SRLMD (2009) Objective LINK O1.  Please see the discussion on Pages 122 and 123 (which I have carried to other portions of the document).

You might also review section 3.2.4 Alt. 2 Conservation Strategy (pp. 25-27) that I brought into the Proposed Action.  The basis of the CMs in that section are those adverse effects that would likely result from implementation of the Proposed Action at full build out.  Those adverse project effects are summarized to facilitate CM development by the three parties.  Some CMs are fleshed out where they may be needed to ameliorate or achieve Alternative 2 consistency with SRLMD (2009).  After your review and agreement, I will revise that section into a several page document that you can submit to the FWS and Applicant so that they understand what the impacts are so they can develop appropriate CMs.  I will organize those impacts by which Federal agency would hold discretionary authority over their implementation and enforcement of the CMs.

Please call or email me if you have any questions.

Please acknowledge receipt of the attached file(s).

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010224

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Wednesday, September 19, 2012 10:13 AM |
| **To:** | Rinella, Steven -FS |
| **Cc:** | Muenchow, Kurt A -FS; Lloyd, Brian A -FS; Malecek, Thomas -FS; Powell, Crystal L -FS |
| **Subject:** | RE: WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report |
| **Attachments:** | application_signed_cleanup.pdf; Wolf Creek Remediation Narrative_Sept12_2012.docx; Wolf Creek Proposed Remediation Area3.tiff |

Last Friday they did get me an application.  See above.

**From:** Rinella, Steven -FS
**Sent:** Tuesday, September 18, 2012 2:35 PM
**To:** Malecek, Thomas -FS; Muenchow, Kurt A -FS
**Cc:** Lloyd, Brian A -FS; Custer, Matthew S -FS
**Subject:** RE: WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report

Still waiting for what and where from CDOT.  Absent anything soon, if this exchange goes through, CDOT will be on their own on dealing with the Village for access.

**From:** Malecek, Thomas -FS
**Sent:** Sunday, September 16, 2012 7:37 PM
**To:** Muenchow, Kurt A -FS
**Cc:** Lloyd, Brian A -FS; Rinella, Steven -FS; Custer, Matthew S -FS
**Subject:** RE: WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report

Thanks Kurt….Matt says we will be getting a request to allow more wells to be drilled, some close to or may need access thru eventual Village property should the exchange go thru…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Muenchow, Kurt A -FS
**Sent:** Wednesday, September 12, 2012 9:29 AM
**To:** Malecek, Thomas -FS
**Cc:** Lloyd, Brian A -FS; Rinella, Steven -FS
**Subject:** WOLF CREEK PASS CDOT UST cleanup - Sept, 2012 Technical Report

I am sending you the latest report from CGS (CDOT's "contractor") updating the technical status of CDOT's Wolf Creek Pass fuel tank cleanup.

In summary, this report:

- Confirms that surface water is NOT impacted by the groundwater BTEX plume;
- Confirms that various remediation approaches have had minimal affect on the BTEX plume;
- Confirms that contamination (mainly benzene) is still present in the GW plume at concentrations that

C0010225

exceed applicable regulatory thresholds & preclude potable use of impacted water;

- Confirms that CDOT/CGS is proceeding with design/installation of a more-aggressive cleanup technology (sent the USFS a copy of their plan – I previously-forwarded to the District); and
- Continues to stress that, "there are no existing downgradient water supply wells within 2,500 feet of the source."

Please let me know if any questions or concerns, or if there's something more I can help with.

C0010226

STANDARD FORM 299 (5/2009)
Prescribed by DOI/USDA/DOT
P.L. 96-487 and Federal
Register Notice 5-22-95

**APPLICATION FOR TRANSPORTATION AND
UTILITY SYSTEMS AND FACILITIES
ON FEDERAL LANDS**

FORM APPROVED
OMB NO. 1004-0189
Expires: April 30, 2012

| FOR AGENCY USE ONLY |
|---|
| Application Number |
| Date filed |

NOTE: Before completing and filing the application, the applicant should completely review this package and schedule a preapplication meeting with representatives of the agency responsible for processing the application. Each agency may have specific and unique requirements to be met in preparing and processing the application. Many times, with the help of the agency representative, the application can be completed at the preapplication meeting.

| 1. Name and address of applicant (include zip code) | 2. Name, title, and address of authorized agent if different from Item 1 (include zip code) | 3. TELEPHONE (area code) |
|---|---|---|
| **Kenneth Martinez**<br>**Colorado Department of Transportation**<br>**1205 West Avenue**<br>**Alamosa, CO 81101** | **If you have someone representing you for this project, place their name here. The FS will need a letter from you saying who the agent is, and to what extent he or she represents you.** | Applicant<br>**719.587.6403**<br>Authorized Agent |

| 4. As applicant are you? (check one) | 5. Specify what application is for: (check one) |
|---|---|
| a. ☐ Individual | a. ☐ New authorization |
| b. ☐ Corporation* | b. ☐ Renewing existing authorization No. |
| c. ☐ Partnership/Association* | c. ☐ Amend existing authorization No. |
| d. ☑ State Government/State Agency | d. ☐ Assign existing authorization No. |
| e. ☐ Local Government | e. ☑ Existing use for which no authorization has been received* |
| f. ☐ Federal Agency | f. ☐ Other* |
| * If checked, complete supplemental page | *If checked provide details under Item 7 |

6. If an individual, or partnership are you a citizen(s) of the United States? ☐ Yes ☐ No

7. Project description (describe in detail): (a) Type of system or facility, (e.g., canal, pipeline, road); (b) related structures and facilities; (c) physical specifications (length, width, grading, etc.); (d) term of years needed; (e) time of year of use or operation; (f) Volume or amount of product to be transported; (g) duration and timing of construction; and (h) temporary work areas needed for construction (Attach additional sheets, if additional space is needed.)

This application is for the continuance of clean-up operations regarding the contamination plume originating at the Wolf Creek Pass Highway Camp. Clean-up and remediation efforts have been ongoing for several years, and it's possible that a few more years are needed to completely return the environment to its original state. In any case, CDOT has been proactive in this effort and has been allied with various environmental entities and agencies at significant expense to CDOT. Issuance of a Special Use Permit would enable CDOT to continue remediation efforts to completion.

8. Attach a map covering area and show location of project proposal

9. State or local government approval: ☐ Attached ☐ Applied for ☑ Not required

10. Nonreturnable application fee. ☐ Attached ☐ Not required    This will be determined after applying.

11. Does project cross international boundary or affect international waterways? ☐ Yes ☐ No    (If "yes," indicate on map)

12. Give statement of your technical and financial capability to construct, operate, maintain, and terminate system for which authorization is being requested.

As an agency of the State of Colorado, CDOT controls sufficient resources which can be committed to the maintenance and operation of this project. CDOT has taken the responsibility to eliminate the pollutant source and clean up all residue resulting from the point source pollution. As mentioned above, CDOT has assumed the costs of this operation.

(Continued on page 2 )    This form is authorized for local reproduction.

C0010227

13a. Describe other reasonable alternative routes and modes considered.

**The clean-up must be conducted in this exact area.**

b. Why were these alternatives not selected?

**The clean-up must be conducted in this exact area**

c. Give explanation as to why it is necessary to cross Federal Lands

**The clean-up must be conducted in this exact area**

14. List authorizations and pending applications filed for similar projects which may provide information to the authorizing agency. *(Specify number, date, code, or name)*

15. Provide statement of need for project, including the economic feasibility and items such as: (a) cost of proposal *(construction, operation, and maintenance)*; (b) estimated cost of next best alternative; and (c) expected public benefits.

**The project has been in place for a number of years. In the interests of continuity and completion of the clean-up, a Special Use Permit would allow CDOT the ability to keep monitoring and remediation wells in place until the clean-up has been concluded.**

16. Describe probable effects on the population in the area, including the social and economic aspects, and the rural lifestyles.

**CDOT is sensitive to environmental issues and recognizes the need to remove pollutants to ground and water, particularly in Federal Lands. Everyone benefits by this corporate social responsibility, particularly the population in the general area. Water quality will be assured, along with land values. Socio-economic demands of any area drive the need to clean up and remove any pollutants.**

17. Describe likely environmental effects that the proposed project will have on: (a) air quality; (b) visual impact; (c) surface and ground water quality and quantity; (d) the control or structural change on any stream or other body of water; (e) existing noise levels; and (f) the surface of the land, including vegetation, permafrost, soil, and soil stability.

**The purpose of this clean-up is to ensure any environmental impacts will be minimal. Air quality will not be affected, visual impact is minimal, surface and ground water are being returned to a natural state. Noise will not be an issue. Soil in the area is also to be returned to a natural state. The entire goal of this effort is to remove any and all pollutants from the area.**

18. Describe the probable effects that the proposed project will have on (a) populations of fish, plantlife, wildlife, and marine life, including threatened and endangered species; and (b) marine mammals, including hunting, capturing, collecting, or killing these animals.

**Clean-up operations at this site will have little effect on any fish, marine life, wildlife, or plants and vegetation. The clean-up and remediation will benefit all plants, fish, animals, etc.**

19. State whether any hazardous material, as defined in this paragraph, will be used, produced, transported or stored on or within the right-of-way or any of the right-of-way facilities, or used in the construction, operation, maintenance or termination of the right-of-way or any of its facilities. "Hazardous material" means any substance, pollutant or contaminant that is listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. 9601 et seq., and its regulations. The definition of hazardous substances under CERCLA includes any "hazardous waste" as defined in the Resource Conservation and Recovery Act of 1976 (RCRA), as amended, 42 U.S.C. 9601 et seq., and its regulations. The term hazardous materials also includes any nuclear or byproduct material as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq. The term does not include petroleum, including crude oil or any fraction thereof that is not otherwise specifically listed or designated as a hazardous substance under CERCLA Section 101(14), 42 U.S.C. 9601(14), nor does the term include natural gas.

**Hazardous materials as defined in this paragraph will not be used, produced, transported, or stored pursuant to CDOT's operation and maintenance of this project.**

20. Name all the Department(s)/Agency(ies) where this application is being filed.

I HEREBY CERTIFY, That I am of legal age and authorized to do business in the State and that I have personally examined the information contained in the application and believe that the information submitted is correct to the best of my knowledge.

| Signature of Applicant | | Date |
|---|---|---|

Title 18, U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on page 3 )

(SF-299, page 2)

STANDARD FORM 299 (5/2009)
Prescribed by DOI/USDA/DOT
P.L. 96487 and Federal
Register Notice 5-22-95

**APPLICATION FOR TRANSPORTATION AND
UTILITY SYSTEMS AND FACILITIES
ON FEDERAL LANDS**

FORM APPROVED
OMB NO. 1004-0189
Expires: April 30, 2012

| FOR AGENCY USE ONLY |
|---|
| Application Number |
| Date filed |

NOTE: Before completing and filing the application, the applicant should completely review this package and schedule a preapplication meeting with representatives of the agency responsible for processing the application. Each agency may have specific and unique requirements to be met in preparing and processing the application. Many times, with the help of the agency representative, the application can be completed at the preapplication meeting.

| 1. Name and address of applicant (include zip code) | 2. Name, title, and address of authorized agent if different from Item 1 (include zip code) | 3. TELEPHONE (area code) |
|---|---|---|
| **Kenneth Martinez**<br>**Colorado Department of Transportation**<br>**1205 West Avenue**<br>**Alamosa, CO 81101** | **If you have someone representing you for this project, place their name here. The FS will need a letter from you saying who the agent is, and to what extent he or she represents you.** | Applicant<br>**719.587.6403**<br>Authorized Agent |

| 4. As applicant are you? (check one) | 5. Specify what application is for: (check one) |
|---|---|
| a. ☐ Individual | a. ☐ New authorization |
| b. ☐ Corporation* | b. ☑ Renewing existing authorization No. |
| c. ☐ Partnership/Association* | c. ☐ Amend existing authorization No. |
| d. ☑ State Government/State Agency | d. ☐ Assign existing authorization No. |
| e. ☐ Local Government | e. ☐ Existing use for which no authorization has been received* |
| f. ☐ Federal Agency | f. ☐ Other* |
| * If checked, complete supplemental page | *If checked provide details under Item 7 |

6. If an individual, or partnership are you a citizen(s) of the United States? ☐ Yes  ☐ No

7. Project description (describe in detail): (a) Type of system or facility, (e.g., canal, pipeline, road); (b) related structures and facilities; (c) physical specifications (length, width, grading, etc.); (d) term of years needed; (e) time of year of use or operation; (f) Volume or amount of product to be transported; (g) duration and timing of construction; and (h) temporary work areas needed for construction (Attach additional sheets, if additional space is needed.)

This request is for authorization to continue the current arrangement between CDOT and the USFS with regard to location of the Wolf Creek Pass Highway Camp. The camp has been in operation for many decades, and has been previously under a Special Use Permit with the USFS. The camp consists of a 28' by 70' duplex for employee housing, a 50' by 60' metal building for road equipment storage, a 10,000 gallon above ground fuel storage tank, and a 20' by 80' sand storage shed. A spring which provides water to the facility is located on the approximately 5 acre compound. There are two buildings which have been designated as 'joint use' between CDOT and the Wolf Creek Ski Area also on the premises. There are monitoring wells on site which shall be under a separate SUP per the USFS.

8. Attach a map covering area and show location of project proposal

9. State or local government approval: ☐ Attached  ☐ Applied for  ☐ Not required

10. Nonreturnable application fee. ☐ Attached  ☐ Not required    This will be determined after applying.

11. Does project cross international boundary or affect international waterways? ☐ Yes  ☐ No  (If "yes," indicate on map)

12. Give statement of your technical and financial capability to construct, operate, maintain, and terminate system for which authorization is being requested.

As an agency of the State of Colorado, CDOT controls sufficient resources which can be committed to the maintenance and operation of this facility. Personnel assigned to operate this facility and the equipment designated to operate in the area are integral to the mission of keeping the road (Highway 160) open in all weather. Personnel and equipment must be readily available during and immediately after snow events. The safety of the travelling public is foremost in the CDOT mission; extensive efforts are made and the necessary resources committed to the efficient and effective operation of this highway maintenance facility.

(Continued on page 2 )

This form is authorized for local reproduction.

C0010229

13a. Describe other reasonable alternative routes and modes considered.

**There are no other suitable locations for this facility. Its location at the top of the pass is ideal and permits immediate response to any emergency event from a traffic incident to an extreme snow event.**

b. Why were these alternatives not selected?

**There are no other suitable locations.**

c. Give explanation as to why it is necessary to cross Federal Lands

**The current placement of this CDOT facility is ideal. Hwy 160 is a well-travelled road in year-round use by the general public. Federal Lands make up the majority of property in the area, with USFS lands comprising the largest portion. Federal agencies, along with CDOT, have a vested interest in keeping the highways open and safe for the travelling public. Hwy 160 is the only viable east to west road in the southern Colorado area.**

14. List authorizations and pending applications filed for similar projects which may provide information to the authorizing agency.    *(Specify number, date, code, or name)*

15. Provide statement of need for project, including the economic feasibility and items such as: (a) cost of proposal *(construction, operation, and maintenance)*; (b) estimated cost of next best alternative; and (c) expected public benefits.

**The cost for this facility is minimal as it's already in place. Moving the facility would be accomplished at significant cost to CDOT. Allowing the highway camp to remain in place will facilitate CDOT's ability to keep the road open in an efficient manner, thereby benefitting the travelling public by ensuring a safe roadway with a minimum of delays.**

16. Describe probable effects on the population in the area, including the social and economic aspects, and the rural lifestyles.

**Merchants, the ski area, and the travelling public drive the demand to keep roads open during the winter. Road closures due to maintenance and snow removal issues must be resolved quickly: Revenue is lost when roads close for any length of time. Local businesses are particularly impacted, especially those that base their incomes on seasonal winter activities. For this reason, CDOT is sensitive to the importance of maintenance and snow removal on public highways, underscoring the need for the existing site.**

17. Describe likely environmental effects that the proposed project will have on: (a) air quality; (b) visual impact; (c) surface and ground water quality and quantity; (d) the control or structural change on any stream or other body of water; (e) existing noise levels; and (f) the surface of the land, including vegetation, permafrost, soil, and soil stability.

**Environmental impacts will be minimal as this facility exists solely for maintenance. Air quality will not be affected, visual impact is minimal, surface and ground water are now minimally disturbed. Noise will not be an issue. The facility is paved, so vegetation in the area will be impacted very little.**

18. Describe the probable effects that the proposed project will have on (a) populations of fish, plantlife, wildlife, and marine life, including threatened and endangered species; and (b) marine mammals, including hunting, capturing, collecting, or killing these animals.

**Maintenance activities at this site will have a minimum of effect on any fish, marine life, wildlife, or plants and vegetation.**

19. State whether any hazardous material, as defined in this paragraph, will be used, produced, transported or stored on or within the right-of-way or any of the right-of-way facilities, or used in the construction, operation, maintenance or termination of the right-of-way or any of its facilities. "Hazardous material" means any substance, pollutant or contaminant that is listed as hazardous under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. 9601 et seq., and its regulations. The definition of hazardous substances under CERCLA includes any "hazardous waste" as defined in the Resource Conservation and Recovery Act of 1976 (RCRA), as amended, 42 U.S.C. 9601 et seq., and its regulations. The term hazardous materials also includes any nuclear or byproduct material as defined by the Atomic Energy Act of 1954, as amended, 42 U.S.C. 2011 et seq. The term does not include petroleum, including crude oil or any fraction thereof that is not otherwise specifically listed or designated as a hazardous substance under CERCLA Section 101(14), 42 U.S.C. 9601(14), nor does the term include natural gas.

**Hazardous materials as defined in this paragraph will not be used, produced, transported, or stored pursuant to CDOT's operation and maintenance of this facility.**

20. Name all the Department(s)/Agency(ies) where this application is being filed.

I HEREBY CERTIFY, That I am of legal age and authorized to do business in the State and that I have personally examined the information contained in the application and believe that the information submitted is correct to the best of my knowledge.

| Signature of Applicant | Date 10 September 2012 |
|---|---|
| *[signature]* for CDOT | |

Title 18, U.S.C. Section 1001 and Title 43 U.S.C. Section 1212, make it a crime for any person knowingly and willfully to make to any department or agency of the United States any false, fictitious, or fraudulent statements or representations as to any matter within its jurisdiction.

(Continued on page 3 )

(SF-299, page 2)

C0010230



<u>Wolf Creek Remediation Special Use Permit Project Description Narrative</u>

**Background**

This application is for the continuance of clean-up operations regarding the contamination plume originating at the Wolf Creek Pass Highway Camp (see attached conceptual map).  The area encompasses approximately 23 acres near the top of Wolf Creek Pass, including and adjacent to the Colorado Department of Transportation (CDOT) Highway Camp.  To date, 21 ground water monitoring wells currently exist in the proposed permitted area.   CDOT anticipates installing three additional monitoring wells.   Clean-up and remediation efforts using oxygen diffuser wells have been ongoing for several years relative to event ID 7414.  It is likely that a few more years are needed to completely return the environment to its original state, however, the specific   amount of time needed is not known at this time.  In any case, CDOT has been proactive in this effort and has been allied with various environmental entities and agencies including Colorado Department of Natural Resources Geological Survey.

**Ongoing and Proposed Activities**

CDOT activities in association with this permit include access to existing monitoring wells to collect groundwater and/or soil samples and the installation, operation and maintenance of the proposed BOS 200 remediation system.  Further detail of this system is provided in in the most current corrective action plan currently under review by the Division of Oil and Public Safety at the Colorado Department of Labor and Employment.  Sample collection and maintenance usually occurs intermittently through late spring and early fall when the site is typically snow free.

Proposed well installation activities include the access of water well drilling equipment to install a well screen, casing and cap at an anticipated depth of 40-75 feet as necessary to access the groundwater table at 3 locations south of Highway 160.  Drilling activities will last up to two weeks.  CDOT proposes to use an existing abandoned road for drilling activities and will reclaim the disturbed area with seed tack and mulch.   Issuance of a Special Use Permit would enable CDOT to continue remediation efforts to completion.  At some point in the near future, CDOT anticipates requesting a permanent easement for these activities.

C0010232

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Thursday, September 20, 2012 10:41 AM |
| **To:** | Gomez, Dale -FS |
| **Cc:** | Clark, Douglas T -FS |
| **Subject:** | FW: 2011 Wolf Creek Cover Board Results |
| **Attachments:** | 2011 WC Lynx Cover Boards.xlsx |

Results as recorded for WCV using the new form.

---

**From:** Jerry Powell [mailto:jerry.powell@wildlifespecialtiesllc.com]
**Sent:** Monday, October 03, 2011 3:57 PM
**To:** Ghormley, Randy
**Cc:** 'David Johnson'; Weiwild@aol.com
**Subject:** 2011 Wolf Creek Cover Board Results

Hi Randy,
Rick and I completed the cover board surveys of the Federal and Private parcels included in the proposed land exchange. We conducted lynx habitat quantitative assessment at eight (8) locations on the Federal parcel and four (4) on the private parcel, as we discussed prior to the field data collection. The results of the habitat assessment are included in the attached Excel document. To summarize, the average cover board density in the 0-6 foot range (representing snowshoe hare summer forage) was 46.21% (greater than the 35% 'hinge' value reported by Squires in Montana) on the Federal parcel and 33.05% (less than the 35% value) on the private parcel. Interestingly, both the Federal and private parcels, at the plots surveyed, both exceeded the 35% 'hinge' value with values of 37.58% on the Federal parcel and 39.54% on the private parcel in the 6-12 foot range (representing winter forage).

So, now we have an apples-to-apples comparison of the value of the two parcels for providing habitat for the snowshoe hare, and therefore lynx.

Please let me know if you have any questions. Thanks again for the use of your cover board.
Jerry

Jerry Powell, M.S.
Certified Wildlife Biologist
Certified Ecologist
Wildlife Specialties, L.L.C.
P.O. Box 1231, Lyons, CO
Ph.: 303-710-1286
Fax: 303-479-9754
www.wildlifespecialtiesllc.com

C0010233

| Plot | North 0-6 feet | North 6-12 feet | East 0-6 feet | East 6-12 feet | South 0-6 feet | South 6-12 feet |
|---|---|---|---|---|---|---|
| WC FED1 | 85 | 75 | 10 | 15 | 50 | 5 |
| WC FED1 | 95 | 75 | 0 | 10 | 15 | 10 |
| WC FED1 | 95 | 90 | 0 | 55 | 0 | 0 |
| WC FED1 | 90 | 85 | 5 | 60 | 0 | 0 |
| Average | 91.25 | 81.25 | 3.75 | 35 | 16.25 | 3.75 |
| | | | | | | |
| WC FED2 | 60 | 0 | 35 | 0 | 100 | 60 |
| WC FED2 | 10 | 0 | 35 | 0 | 90 | 25 |
| WC FED2 | 0 | 0 | 35 | 0 | 90 | 40 |
| WC FED2 | 0 | 0 | 0 | 0 | 45 | 85 |
| Average | 17.5 | 0 | 26.25 | 0 | 81.25 | 52.5 |
| | | | | | | |
| WC FED3 | 35 | 0 | 25 | 45 | 40 | 25 |
| WC FED3 | 60 | 0 | 35 | 65 | 25 | 20 |
| WC FED3 | 0 | 0 | 25 | 90 | 25 | 20 |
| WC FED3 | 0 | 0 | 40 | 75 | 20 | 25 |
| Average | 23.75 | 0 | 31.25 | 68.75 | 27.5 | 22.5 |
| | | | | | | |
| WC FED4 | 15 | 40 | 0 | 0 | 0 | 0 |
| WC FED4 | 50 | 20 | 0 | 0 | 0 | 0 |
| WC FED4 | 45 | 15 | 0 | 0 | 0 | 0 |
| WC FED4 | 30 | 15 | 0 | 0 | 0 | 25 |
| Average | 35 | 22.5 | 0 | 0 | 0 | 6.25 |
| | | | | | | |
| WC FED5 | 65 | 70 | 55 | 0 | 75 | 15 |
| WC FED5 | 80 | 85 | 55 | 0 | 65 | 30 |
| WC FED5 | 60 | 80 | 15 | 0 | 35 | 5 |
| WC FED5 | 95 | 75 | 0 | 5 | 30 | 25 |
| Average | 75 | 77.5 | 31.25 | 1.25 | 51.25 | 18.75 |
| | | | | | | |
| WC FED6 | 100 | 80 | 70 | 55 | 90 | 55 |
| WC FED6 | 100 | 75 | 70 | 60 | 85 | 85 |
| WC FED6 | 80 | 70 | 80 | 55 | 95 | 70 |
| WC FED6 | 85 | 90 | 60 | 50 | 40 | 40 |
| Average | 91.25 | 78.75 | 70 | 55 | 77.5 | 62.5 |
| | | | | | | |
| WC FED7 | 80 | 25 | 80 | 15 | 10 | 5 |
| WC FED7 | 65 | 25 | 95 | 20 | 0 | 5 |
| WC FED7 | 55 | 25 | 80 | 35 | 0 | 10 |
| WC FED7 | 50 | 25 | 50 | 95 | 5 | 20 |
| Average | 62.5 | 25 | 76.25 | 41.25 | 3.75 | 10 |
| | | | | | | |
| WC FED8 | 70 | 15 | 55 | 15 | 90 | 30 |
| WC FED8 | 55 | 0 | 50 | 10 | 55 | 85 |
| WC FED8 | 50 | 20 | 50 | 10 | 10 | 25 |
| WC FED8 | 50 | 40 | 45 | 10 | 5 | 10 |

C0010234

| | | | | | |
|---|---|---|---|---|---|
| Average | 56.25 | 18.75 | 50 | 11.25 | 40 | 37.5 |

| | | | | | | |
|---|---|---|---|---|---|---|
| WC PVT1 | 50 | 25 | 75 | 35 | 30 | 30 |
| WC PVT1 | 70 | 20 | 70 | 25 | 30 | 40 |
| WC PVT1 | 75 | 55 | 45 | 5 | 75 | 40 |
| WC PVT1 | 15 | 80 | 50 | 5 | 20 | 30 |
| Average | 52.5 | 45 | 60 | 17.5 | 38.75 | 35 |
| | | | | | | |
| WC PVT2 | 0 | 0 | 5 | 30 | 25 | 25 |
| WC PVT2 | 0 | 0 | 25 | 30 | 30 | 50 |
| WC PVT2 | 0 | 0 | 50 | 15 | 65 | 95 |
| WC PVT2 | 0 | 0 | 25 | 10 | 25 | 75 |
| Average | 0 | 0 | 26.25 | 21.25 | 36.25 | 61.25 |
| | | | | | | |
| WC PVT3 | 85 | 40 | 20 | 75 | 20 | 35 |
| WC PVT3 | 60 | 25 | 15 | 75 | 15 | 15 |
| WC PVT3 | 35 | 20 | 20 | 95 | 15 | 35 |
| WC PVT3 | 35 | 15 | 60 | 95 | 70 | 85 |
| Average | 53.75 | 25 | 28.75 | 85 | 30 | 42.5 |
| | | | | | | |
| WC PVT4 | 30 | 0 | 5 | 85 | 25 | 20 |
| WC PVT4 | 5 | 0 | 0 | 100 | 5 | 25 |
| WC PVT4 | 0 | 0 | 0 | 100 | 5 | 30 |
| WC PVT4 | 0 | 0 | 5 | 95 | 10 | 35 |
| Average | 8.75 | 0 | 2.5 | 95 | 11.25 | 27.5 |

C0010235

| West 0-6 feet | West 6-12 feet |
|---|---|
| 75 | 100 |
| 100 | 100 |
| 100 | 100 |
| 100 | 100 |
| 93.75 | 100 |
|  |  |
| 90 | 40 |
| 85 | 70 |
| 90 | 60 |
| 70 | 100 |
| 83.75 | 67.5 |
|  |  |
| 100 | 85 |
| 95 | 90 |
| 90 | 90 |
| 95 | 70 |
| 95 | 83.75 |
|  |  |
| 95 | 90 |
| 75 | 85 |
| 85 | 85 |
| 95 | 75 |
| 87.5 | 83.75 |
|  |  |
| 45 | 70 |
| 15 | 55 |
| 75 | 30 |
| 70 | 20 |
| 51.25 | 43.75 |
|  |  |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 25 |
| 0 | 6.25 |
|  |  |
| 0 | 95 |
| 0 | 60 |
| 0 | 60 |
| 30 | 80 |
| 7.5 | 73.75 |
|  |  |
| 50 | 20 |
| 10 | 15 |
| 10 | 10 |
| 15 | 10 |

| | |
|---|---|
| 21.25 | 13.75 |
| | |
| 70 | 95 |
| 70 | 90 |
| 65 | 95 |
| 70 | 60 |
| 68.75 | 85 |
| | |
| 50 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 0 |
| 12.5 | 0 |
| | |
| 100 | 75 |
| 100 | 90 |
| 95 | 100 |
| 90 | 100 |
| 96.25 | 91.25 |
| | |
| 10 | 0 |
| 0 | 0 |
| 0 | 0 |
| 0 | 5 |
| 2.5 | 1.25 |

C0010237

| Plot | North #1 | East #1 | South #1 | West #1 | | |
|------|----------|---------|----------|---------|---|---|
| WC FED1 | 85 | 10 | 50 | 75 | | |
| WC FED1 | 95 | 0 | 15 | 100 | | |
| WC FED1 | 95 | 0 | 0 | 100 | | |
| WC FED1 | 90 | 5 | 0 | 100 | | |
| Average | 91.25 | 3.75 | 16.25 | 93.75 | 51.25 | |
| | | | | | | |
| WC FED2 | 60 | 35 | 100 | 90 | | Average FE |
| WC FED2 | 10 | 35 | 90 | 85 | | 46.21 |
| WC FED2 | 0 | 35 | 90 | 90 | | |
| WC FED2 | 0 | 0 | 45 | 70 | | |
| Average | 17.5 | 26.25 | 81.25 | 83.75 | 52.19 | |
| | | | | | | |
| WC FED3 | 35 | 25 | 40 | 100 | | |
| WC FED3 | 60 | 35 | 25 | 95 | | |
| WC FED3 | 0 | 25 | 25 | 90 | | |
| WC FED3 | 0 | 40 | 20 | 95 | | |
| Average | 23.75 | 31.25 | 27.5 | 95 | 44.38 | |
| | | | | | | |
| WC FED4 | 15 | 0 | 0 | 95 | | |
| WC FED4 | 50 | 0 | 0 | 75 | | |
| WC FED4 | 45 | 0 | 0 | 85 | | |
| WC FED4 | 30 | 0 | 0 | 95 | | |
| Average | 35 | 0 | 0 | 87.5 | 30.63 | |
| | | | | | | |
| WC FED5 | 65 | 55 | 75 | 45 | | |
| WC FED5 | 80 | 55 | 65 | 15 | | |
| WC FED5 | 60 | 15 | 35 | 75 | | |
| WC FED5 | 95 | 0 | 30 | 70 | | |
| Average | 75 | 31.25 | 51.25 | 51.25 | 52.19 | |
| | | | | | | |
| WC FED6 | 100 | 70 | 90 | 0 | | |
| WC FED6 | 100 | 70 | 85 | 0 | | |
| WC FED6 | 80 | 80 | 95 | 0 | | |
| WC FED6 | 85 | 60 | 40 | 0 | | |
| Average | 91.25 | 70 | 77.5 | 0 | 59.69 | |
| | | | | | | |
| WC FED7 | 80 | 80 | 10 | 0 | | |
| WC FED7 | 65 | 95 | 0 | 0 | | |
| WC FED7 | 55 | 80 | 0 | 0 | | |
| WC FED7 | 50 | 50 | 5 | 30 | | |
| Average | 62.5 | 76.25 | 3.75 | 7.5 | 37.50 | |
| | | | | | | |
| WC FED8 | 70 | 55 | 90 | 50 | | |
| WC FED8 | 55 | 50 | 55 | 10 | | |
| WC FED8 | 50 | 50 | 10 | 10 | | |
| WC FED8 | 50 | 45 | 5 | 15 | | |

C0010238

| | | | | | | |
|---|---|---|---|---|---|---|
| Average | 56.25 | 50 | 40 | 21.25 | 41.88 | |
| | | | | | | |
| WC PVT1 | 50 | 75 | 30 | 70 | | |
| WC PVT1 | 70 | 70 | 30 | 70 | | |
| WC PVT1 | 75 | 45 | 75 | 65 | | |
| WC PVT1 | 15 | 50 | 20 | 70 | | |
| Average | 52.5 | 60 | 38.75 | 68.75 | 55.00 | |
| | | | | | | |
| WC PVT2 | 0 | 5 | 25 | 50 | | Average PV |
| WC PVT2 | 0 | 25 | 30 | 0 | | 33.05 |
| WC PVT2 | 0 | 50 | 65 | 0 | | |
| WC PVT2 | 0 | 25 | 25 | 0 | | |
| Average | 0 | 26.25 | 36.25 | 12.5 | 18.75 | |
| | | | | | | |
| WC PVT3 | 85 | 20 | 20 | 100 | | |
| WC PVT3 | 60 | 15 | 15 | 100 | | |
| WC PVT3 | 35 | 20 | 15 | 95 | | |
| WC PVT3 | 35 | 60 | 70 | 90 | | |
| Average | 53.75 | 28.75 | 30 | 96.25 | 52.19 | |
| | | | | | | |
| WC PVT4 | 30 | 5 | 25 | 10 | | |
| WC PVT4 | 5 | 0 | 5 | 0 | | |
| WC PVT4 | 0 | 0 | 5 | 0 | | |
| WC PVT4 | 0 | 5 | 10 | 0 | | |
| Average | 8.75 | 2.5 | 11.25 | 2.5 | 6.25 | |

C0010239

D 0-6 feet

C0010240

'T 0-6 feet

C0010241

| Plot | North #2 | East #2 | South #2 | West #2 | | |
|------|----------|---------|----------|---------|---|---|
| WC FED1 | 75 | 15 | 5 | 100 | | |
| WC FED1 | 75 | 10 | 10 | 100 | | |
| WC FED1 | 90 | 55 | 0 | 100 | | |
| WC FED1 | 85 | 60 | 0 | 100 | | |
| Average | 81.25 | 35 | 3.75 | 100 | 55 | |
| | | | | | | |
| WC FED2 | 0 | 0 | 60 | 40 | | |
| WC FED2 | 0 | 0 | 25 | 70 | | |
| WC FED2 | 0 | 0 | 40 | 60 | | |
| WC FED2 | 0 | 0 | 85 | 100 | | |
| Average | 0 | 0 | 52.5 | 67.5 | 30 | |
| | | | | | | |
| WC FED3 | 0 | 45 | 25 | 85 | | |
| WC FED3 | 0 | 65 | 20 | 90 | | |
| WC FED3 | 0 | 90 | 20 | 90 | | |
| WC FED3 | 0 | 75 | 25 | 70 | | Average FE |
| Average | 0 | 68.75 | 22.5 | 83.75 | 43.75 | 37.58 |
| | | | | | | |
| WC FED4 | 40 | 0 | 0 | 90 | | |
| WC FED4 | 20 | 0 | 0 | 85 | | |
| WC FED4 | 15 | 0 | 0 | 85 | | |
| WC FED4 | 15 | 0 | 25 | 75 | | |
| Average | 22.5 | 0 | 6.25 | 83.75 | 28.13 | |
| | | | | | | |
| WC FED5 | 70 | 0 | 15 | 70 | | |
| WC FED5 | 85 | 0 | 30 | 55 | | |
| WC FED5 | 80 | 0 | 5 | 30 | | |
| WC FED5 | 75 | 5 | 25 | 20 | | |
| Average | 77.5 | 1.25 | 18.75 | 43.75 | 35.31 | |
| | | | | | | |
| WC FED6 | 80 | 55 | 55 | 0 | | |
| WC FED6 | 75 | 60 | 85 | 0 | | |
| WC FED6 | 70 | 55 | 70 | 0 | | |
| WC FED6 | 90 | 50 | 40 | 25 | | |
| Average | 78.75 | 55 | 62.5 | 6.25 | 50.63 | |
| | | | | | | |
| WC FED7 | 25 | 15 | 5 | 95 | | |
| WC FED7 | 25 | 20 | 5 | 60 | | |
| WC FED7 | 25 | 35 | 10 | 60 | | |
| WC FED7 | 25 | 95 | 20 | 80 | | |
| Average | 25 | 41.25 | 10 | 73.75 | 37.50 | |
| | | | | | | |
| WC FED8 | 15 | 15 | 30 | 20 | | |
| WC FED8 | 0 | 10 | 85 | 15 | | |
| WC FED8 | 20 | 10 | 25 | 10 | | |
| WC FED8 | 40 | 10 | 10 | 10 | | |

| Average | 18.75 | 11.25 | 37.5 | 13.75 | 20.31 | |
|---|---|---|---|---|---|---|
| WC PVT1 | 25 | 35 | 30 | 95 | | |
| WC PVT1 | 20 | 25 | 40 | 90 | | |
| WC PVT1 | 55 | 5 | 40 | 95 | | |
| WC PVT1 | 80 | 5 | 30 | 60 | | |
| Average | 45 | 17.5 | 35 | 85 | 45.63 | |
| | | | | | | Average PV |
| WC PVT2 | 0 | 30 | 25 | 0 | | 39.54 |
| WC PVT2 | 0 | 30 | 50 | 0 | | |
| WC PVT2 | 0 | 15 | 95 | 0 | | |
| WC PVT2 | 0 | 10 | 75 | 0 | | |
| Average | 0 | 21.25 | 61.25 | 0 | 20.63 | |
| WC PVT3 | 40 | 75 | 35 | 75 | | |
| WC PVT3 | 25 | 75 | 15 | 90 | | |
| WC PVT3 | 20 | 95 | 35 | 100 | | |
| WC PVT3 | 15 | 95 | 85 | 100 | | |
| Average | 25 | 85 | 42.5 | 91.25 | 60.94 | |
| WC PVT4 | 0 | 85 | 20 | 0 | | |
| WC PVT4 | 0 | 100 | 25 | 0 | | |
| WC PVT4 | 0 | 100 | 30 | 0 | | |
| WC PVT4 | 0 | 95 | 35 | 5 | | |
| Average | 0 | 95 | 27.5 | 1.25 | 30.94 | |

C0010243

D 6-12 feet

C0010244

'T 6-12 feet

C0010245

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Thursday, September 20, 2012 3:52 PM |
| **To:** | kurt_broderdorp@fws.gov |
| **Cc:** | Ghormley, Randy -FS; david@westerneco.com |
| **Subject:** | WCV Sect 7 |

Kurt,

In addition to those acreages that we discussed on the phone today, the acreage of primary vegetation that would occur on the resulting private parcel under Alternative 2 would be 288.74 ac.

I will send you the results of our 2004 assessment of potential crossing structure locations over Wolf Creek Pass in a separate email.

When you get a chance, would you provide me some explanatory text and a reference (you could also forward me the underlying document/strategy), that FWS is using to consider Village effects as indirect under section 7?

We will try to get you the draft BA ASAP.

Thanks,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

C0010246

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Thursday, September 20, 2012 4:20 PM |
| **To:** | Rick Thompson (weiwild@aol.com) |
| **Subject:** | Cover Board Methodology Used at WCV Land Exchange |

Rick – could you please resend me the detailed description and the methods used for the cover board surveys for this project. I have the spreadsheet of results, and realize you utilized the 2011 R2 draft protocol, but if there is another document describing how that methodology was utilized for WCV I seem to have misplaced it. Thanks.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Friday, September 21, 2012 8:14 AM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | david@westerneco.com |
| **Subject:** | Re: Cover Board Methodology Used at WCV Land Exchange |
| **Attachments:** | Cover_Board_Methods_Results.doc |

Here you go.

Rick

In a message dated 9/20/2012 4:32:09 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

> Rick – could you please resend me the detailed description and the methods used for the cover board
> surveys for this project.  I have the spreadsheet of results, and realize you utilized the 2011 R2 draft
> protocol, but if there is another document describing how that methodology was utilized for WCV I seem to
> have misplaced it.  Thanks.
>
>
>
> This electronic message contains information generated by the USDA solely for the intended recipients. Any
> unauthorized interception of this message or the use or disclosure of the information it contains may violate
> the law and subject the violator to civil or criminal penalties. If you believe you have received this message in
> error, please notify the sender and delete the email immediately.

C0010248

**Cover Board Analysis**
**Wolf Creek Village Land Exchange EIS**
**October, 2011**

## Methods

Dense horizontal cover is an important determinant of snowshoe hare presence and abundance within lynx habitat. This cover may occur in both young structure and multi-storied stands with the later being more important to lynx during the winter period. Assessment of this cover element at the project level is important in determining whether these areas are likely to provide important foraging habitat for lynx. The objective is to determine whether multi-storied stands provide winter snowshoe hare cover above a threshold value. If the threshold value is met or exceeded then the stands are subject to the provisions of Standard VEG S6 in the Northern Rockies Lynx Management Direction Record of Decision (USFS 2007).

Research in Montana (Squires XXXX) showed a 'hinge' value in both winter and summer snowshoe hare foraging habitat. This 'hinge' value is a quantified value of 35% horizontal structure cover for hare winter foraging and 48% horizontal structure cover for summer foraging. Stands at or above these values represent suitable snowshoe hare foraging habitat, stands below these values represent habitat that is lacking in snowshoe hare foraging habitat.

The use of cover boards is the standardized method of quantifying horizontal cover. Cover boards are narrow 'boards' with bands of alternating colors that define vertical bands (Photo x). The cover board used in this assessment was six feet in height and broken into four layers (bottom, middle bottom, middle top, and top). Summer horizontal cover estimates were made with the bottom of the cover board resting on the ground or substrate present; winter cover estimates were made by holding the cover board at six feet above ground. The following direction for conducting cover board surveys is taken from the 2011FS Draft Cover Board Protocol document:

1. establish (1 ) 22.4 m transect centered at plot center and oriented north / south
2. stand at plot center on the substrate (snow, litter, rock, etc) to record cover measurements
3. record cover board measurements at the transect termini (11.2 m from plot center; the north and south readings) and 2 points perpendicular to the transect and 11.2 m from plot center (the east and west readings); 4 cover board readings per plot
4. for winter sampling, estimate visual obstruction of the cover board at 0.5 m increments (0 – 0.5, 0.5 – 1.0, 1.0 – 1.5, 1.5 – 2.0) from the substrate (snow surface, ground, etc) to the top of the cover board [4 readings total].
5. Record snow depth in either cm or inches at plot center
6. for summer sampling, use 2 cover boards sewn together and estimate visual obstruction in 0.5 m increments from the ground to the top of the 2nd cover board [8 readings total]

C0010249

7. record cover board measurements in increments of 5% (i.e., 0, 5, 10, 15, 20,…)
8. regardless of season, the following procedures will be followed:
     a. do not attempt to adjust angle of view from observer to the cover board when measuring the higher sections of the cover board. This will result in higher recorded measurements than would be observed when viewing each cover board section directly, but will control for potential variation and should decrease sampling time.
     b. On slopes >10%, record percent slope from the observer to the cover board. This information may be used to develop and apply a correction factor to adjust the measurements.
     c. record all visual obstructions from plot center; do not exclude tree boles or dead material and do not move from plot center if tree boles or other obstructions occur near plot center
     d. do not attempt to raise cover boards above the ground; cover board measurements will begin at the substrate surface regardless of substrate (snow, litter, bare rock, etc)
9. record photographs to document general stand conditions. Photographs should include an 8.5*11" paper **with** site ID (e.g., unit #, plot #) in the photo foreground for reference and general scale. Stand photographs do not need to be taken from plot center; rather they should capture the 'essence' of the stand. When practical, at least one stand photo should include a cover board for general reference.
10. record one photograph from plot center to the cover board for each cover board measurement (N, E, S, W)


Cover board surveys were conducted on September 22 and 23, 2011. Prior to conducting the surveys the project area was analyzed in GIS to provide an accurate assessment of acres of potentially suitable spruce-fir habitat both on the Federal and private parcels. The Southern Rockies Lynx Amendment Implementation Guide for Habitat Monitoring directs the use of randomized plot locations. In order to identify the correct number of randomized plots per parcel while obtaining an 80% confidence level the following equation was used for each parcel:

Acres of suitable habitat x 0.20/10 = # of cover plot measurements needed

GIS analysis of the two parcels identified 169.7 and 97 acres of suitable spruce-fir habitat on the federal and private parcels, respectively. Using the above equation it was determined that eight and two plots were needed at the federal and private parcels, respectively. Discussion with the Forest Biologist confirmed these values, however, it was decided that on the private parcel two additional plot locations were necessary. These locations were necessary based on conversations in the field between the FS and USFWS regarding the value of stands likely to be greater than the 35% winter 'hinge' value which could provide suitable snowshoe hare foraging habitat if they were not impacted by ski use associated with the Wolf Creek Ski Area. These additional locations were not randomly located. All plot sample locations are shown in Figure X.

C0010250

**Results**

Fifty percent of the sampled federal and private parcel plots did not meet or exceed the 48% cover hinge value representing suitable summer (0-6 ft.) snowshoe hare foraging habitat. The two plots within the private parcel that did meet or exceed the summer value were the two non-randomly located plots. Average summer cover densities for the federal and private parcels are 46 and 33%, respectively. Three of the eight federal parcels did not meet or exceed the 35% winter hinge value. These plot locations (Federal number 2, 4 and 8) had cover values of 30, 28, and 20%. The average winter cover density for the federal parcel was 37%. Fifty percent of the sampled private parcel plots exceeded the 35% hinge value. These values were recorded at the non-randomly selected parcels. The average winter cover density for the private parcel was 39%.

C0010251

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Friday, September 21, 2012 1:27 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | david@westerneco.com |
| **Subject:** | Re: RG Comments on 9/14 Draft WCV BA |

Randy,

I will accept all of the changes that I made that you did not comment on, address your comments, and send you back a draft that shows my responses to your comments. We can then finalize it and send it to FWS, though a few unimportant holes will remain.

Have a good weekend.

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

In a message dated 9/21/2012 12:28:27 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

> Hi Rick. Attached are my comments on the Sept 14 draft WCV BA. Primary comments involve the CMs section and the SRLA consistency section. You'll see that in the CMs section, I would like to see a general addition that offers other compensatory measures (funding research efforts to inform future CMs that are more associated with the section 7 "take" issue i.e. like the lynx winter rec study, camera sets or snow track efforts to better fine-tune lynx crossing areas, etc). Now that we have reversed course and determined that the village build-out effects are an indirect effect of the land exchange decision (interrelated/interdependent) the consistency analysis should mirror Alt. 3 like you had it previously. The biggest change here is that Alt. 2 is now inconsistent with Standard ALL S1, which will require a site-specific plan amendment.
>
> I will be off at 2 pm today. In the office most of next week. I'm sure I'll be talking with you soon.
>
> Talk to you soon.
>
> _____
>
> **From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
> **Sent:** Friday, September 14, 2012 9:10 AM

C0010252

**To:** Ghormley, Randy -FS
**Subject:** Draft WCV BA

Randy,

Attached is a largely complete draft BA that would go to the FWS.  Track changes are active.  This is an update of the "WCVBA Aug2712 preNEPA draft final" (the last version that you commented on) where I accepted all of those changes before starting the update.  I have made all the revisions that we discussed at the public hearings (and many more).

As a result of now considering private Village effects as indirect under section 7 rather than reasonably certain under section 10, I found one substantive change to project effects from the prior analysis.  I tentatively find Alternative 2's direct effects to be inconsistent with SRLMD (2009) Objective LINK O1.  Please see the discussion on Pages 122 and 123 (which I have carried to other portions of the document).

You might also review section 3.2.4 Alt. 2 Conservation Strategy (pp. 25-27) that I brought into the Proposed Action.  The basis of the CMs in that section are those adverse effects that would likely result from implementation of the Proposed Action at full build out.  Those adverse project effects are summarized to facilitate CM development by the three parties.  Some CMs are fleshed out where they may be needed to ameliorate or achieve Alternative 2 consistency with SRLMD (2009).  After your review and agreement, I will revise that section into a several page document that you can submit to the FWS and Applicant so that they understand what the impacts are so they can develop appropriate CMs.  I will organize those impacts by which Federal agency would hold discretionary authority over their implementation and enforcement of the CMs.

Please call or email me if you have any questions.

Please acknowledge receipt of the attached file(s).

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Friday, September 21, 2012 1:56 PM |
| **To:** | jhanson@sme-env.com |
| **Cc:** | Dyer, Harold D -FS; Dallas, Dan -FS |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Julia, just got your email today.  Can you tell me what plant survey and for whom are you working?  I will look
into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | | |
|---|---|---|
| **Julia Hanson** <**jhanson@sme-env.com**> | To | Mailroom R2 Rio Grande |
| | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |
| 09/17/2012 10:27 AM | | |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation
that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within
the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010255

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8726-000001

C0010256

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8726-000002

C0010257

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8726-000003

C0010258

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Friday, September 21, 2012 1:56 PM |
| **To:** | jhanson@sme-env.com |
| **Cc:** | Dyer, Harold D -FS; Dallas, Dan -FS |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Julia, just got your email today. Can you tell me what plant survey and for whom are you working? I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | | |
|---|---|---|
| Julia Hanson <jhanson@sme-env.com> 09/17/2012 10:27 AM | To | Mailroom R2 Rio Grande |
| | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this

C0010259

communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

C0010260

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8724-000001

C0010261

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8724-000002

C0010262

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.8724-000003

C0010263

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Friday, September 21, 2012 2:06 PM |
| **To:** | Vargas, Michael A -FS; Dyer, Harold D -FS |
| **Cc:** | McGinn, Diana -FS; Malecek, Thomas -FS |
| **Subject:** | RE: Village request |

Do you know if this was done?

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Vargas, Michael A -FS
**Sent:** Monday, September 17, 2012 2:18 PM
**To:** Dyer, Harold D -FS
**Cc:** Malecek, Thomas -FS
**Subject:** Village request

Hello Dave,
I have a request for a hard copy of the Draft EIS Village project.
Tom said you have hard copies coming in and would like one sent to:

Denise Rue-Pastin
265 Sunshine Drive
Pagosa Springs, CO. 81147
970-731-9672
970-746-9024 (cell)

Thanks,
Michael

C0010264

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Friday, September 21, 2012 2:20 PM |
| **To:** | Ghormley, Randy -FS |
| **Subject:** | FW: Rare plant analysis BA/BE (WER 2012) |

You didn't send her anything, did ya?

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Malecek, Thomas -FS
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** 'jhanson@sme-env.com'
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today.  Can you tell me what plant survey and for whom are you working?  I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| Julia Hanson <jhanson@sme-env.com> 09/17/2012 10:27 AM | To | Mailroom R2 Rio Grande |
|---|---|---|
| | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

Julia Hanson
Biologist/Botanist

C0010265



679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee
(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person
responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify us immediately by
telephone and destroy this email and attachments.

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29438-000001

C0010267

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29438-000002

C0010268

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29438-000003

C0010269

**Ghormley, Randy -FS**

---

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Friday, September 21, 2012 2:22 PM |
| **To:** | Malecek, Thomas -FS |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Nope.  Was waiting to talk to you and/or Dave about it.

---

**From:** Malecek, Thomas -FS
**Sent:** Friday, September 21, 2012 2:20 PM
**To:** Ghormley, Randy -FS
**Subject:** FW: Rare plant analysis BA/BE (WER 2012)

You didn't send her anything, did ya?

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Malecek, Thomas -FS
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** 'jhanson@sme-env.com'
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today.  Can you tell me what plant survey and for whom are you working?  I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | | |
|---|---|---|
| Julia Hanson <jhanson@sme-env.com> 09/17/2012 10:27 AM | To | Mailroom R2 Rio Grande |
| | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within

C0010270

the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee
(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person
responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify us immediately by
telephone and destroy this email and attachments.

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.19319-000001

C0010272

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.19319-000002

C0010273

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.19319-000003

C0010274

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Friday, September 21, 2012 2:23 PM |
| **To:** | Dyer, Harold D -FS; Blakeman, Mike -FS |
| **Subject:** | DOH! Homer Simpson moment. |

I submitted my comments to the Village Exchange via the website and screwed it up.  The first comment can, and should, be deleted as I mistakenly attached partial notes from a meeting.  The second comment is the correct one.  DOH!!

Matt Custer
Realty Specialist
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO 81144
719-852-6206

C0010275

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Friday, September 21, 2012 2:54 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | Martinez, Kenneth |
| **Subject:** | FW: Cost Estimate for BE at Wolf Creek |

Randy – can you answer Ken's question below about how many botanical BE-BAs are needed?

---

**From:** Martinez, Kenneth [mailto:Ken.Martinez@DOT.STATE.CO.US]
**Sent:** Friday, September 21, 2012 2:51 PM
**To:** Custer, Matthew S -FS
**Cc:** Mallonee, Franchesca; Campano, Ralph; Cady, Tony; Fischer, Travis
**Subject:** FW: Cost Estimate for BE at Wolf Creek

Hi Matt,

Would you confirm exactly how many botanical evaluations we'll need, please?  I'm thinking one for the Wolf Creek 'complex' (Camp & Contamination Plume), and one for the Cumbres-La Manga facility. We shouldn't need one for the La Manga materials storage; no vegetation on site.  Have a great weekend.

Ken

---

**From:** Mallonee, Franchesca
**Sent:** Thursday, September 20, 2012 2:51 PM
**To:** Cady, Tony
**Cc:** Martinez, Kenneth; Fischer, Travis
**Subject:** RE: Cost Estimate for BE at Wolf Creek

Ken is going to confirm with Matt Custer whether the botanical evaluations are needed for the other sites. He thinks they will just need one more for La Manga, but maybe not.

---

**From:** Cady, Tony
**Sent:** Thursday, September 20, 2012 2:46 PM
**To:** Mallonee, Franchesca
**Cc:** Martinez, Kenneth; Fischer, Travis
**Subject:** Re: Cost Estimate for BE at Wolf Creek

Yes.  I need maps showing the locations of the other sites to send to SME.  Can someone send those to me?

Thx

Sent from my iPhone

On Sep 20, 2012, at 2:44 PM, "Mallonee, Franchesca" <Franchesca.Mallonee@dot.state.co.us> wrote:

Tony,

Ken would like environmental to pick up the cost for the Wolf Creek Botanical Evaluation.  MTCE will pick up the cost for the others.  Can SME get this done before the snow flies?

Fran

---

**From:** Cady, Tony
**Sent:** Friday, September 07, 2012 2:55 PM
**To:** Martinez, Kenneth; Mallonee, Franchesca; Fischer, Travis
**Subject:** Cost Estimate for BE at Wolf Creek

Ken- attached is a preliminary cost estimate for the Biological work on the Wolf Creek site.  This would encompass both SUPs for that site.  It is over the $5000.00, so I may need to pay for this one, if you can pick up the others which should be less than $5000.00 each.  How does that sound?

C0010277

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Friday, September 21, 2012 2:54 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | Martinez, Kenneth |
| **Subject:** | FW: Cost Estimate for BE at Wolf Creek |

Randy – can you answer Ken's question below about how many botanical BE-BAs are needed?

---

**From:** Martinez, Kenneth [mailto:Ken.Martinez@DOT.STATE.CO.US]
**Sent:** Friday, September 21, 2012 2:51 PM
**To:** Custer, Matthew S -FS
**Cc:** Mallonee, Franchesca; Campano, Ralph; Cady, Tony; Fischer, Travis
**Subject:** FW: Cost Estimate for BE at Wolf Creek

Hi Matt,

Would you confirm exactly how many botanical evaluations we'll need, please?  I'm thinking one for the Wolf Creek 'complex' (Camp & Contamination Plume), and one for the Cumbres-La Manga facility. We shouldn't need one for the La Manga materials storage; no vegetation on site.  Have a great weekend.

Ken

---

**From:** Mallonee, Franchesca
**Sent:** Thursday, September 20, 2012 2:51 PM
**To:** Cady, Tony
**Cc:** Martinez, Kenneth; Fischer, Travis
**Subject:** RE: Cost Estimate for BE at Wolf Creek

Ken is going to confirm with Matt Custer whether the botanical evaluations are needed for the other sites. He thinks they will just need one more for La Manga, but maybe not.

---

**From:** Cady, Tony
**Sent:** Thursday, September 20, 2012 2:46 PM
**To:** Mallonee, Franchesca
**Cc:** Martinez, Kenneth; Fischer, Travis
**Subject:** Re: Cost Estimate for BE at Wolf Creek

Yes.  I need maps showing the locations of the other sites to send to SME.  Can someone send those to me?

Thx

Sent from my iPhone

On Sep 20, 2012, at 2:44 PM, "Mallonee, Franchesca" <Franchesca.Mallonee@dot.state.co.us> wrote:

Tony,

C0010278

Ken would like environmental to pick up the cost for the Wolf Creek Botanical Evaluation.  MTCE
will pick up the cost for the others.  Can SME get this done before the snow flies?

Fran

**From:** Cady, Tony
**Sent:** Friday, September 07, 2012 2:55 PM
**To:** Martinez, Kenneth; Mallonee, Franchesca; Fischer, Travis
**Subject:** Cost Estimate for BE at Wolf Creek

Ken- attached is a preliminary cost estimate for the Biological work on the Wolf Creek site.  This
would encompass both SUPs for that site.  It is over the $5000.00, so I may need to pay for this
one, if you can pick up the others which should be less than $5000.00 each.  How does that
sound?

This electronic message contains information generated by the USDA solely for the intended
recipients. Any unauthorized interception of this message or the use or disclosure of the information it
contains may violate the law and subject the violator to civil or criminal penalties. If you believe you
have received this message in error, please notify the sender and delete the email immediately.

C0010279

**FS-CARA-help**

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Sunday, September 23, 2012 8:21 AM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | CARA Attention Needed – Potentially Offensive Letter Content Review |

Your Draft EIS Comment for the Village at Wolf Creek Land Exchange Proposal Project has the Public Reading Room turned on and has received Letter #38, which contains terms that have been identified as potentially offensive.

The potentially offensive content HAS NOT been published on your public website. Instead, it has been moved to a holding area where you can review it and decide whether the letter should be published in your public reading room.

To view and manage this letter, log into PALS at this link: http://apps.fs.fed.us/pals/, click on the "CARA Login" button, select your project, and go to the Reading Room Management tool.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

C0010280

**FS-CARA-help**

---

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Sunday, September 23, 2012 3:44 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | CARA Attention Needed – Potentially Offensive Letter Content Review |

Your Draft EIS Comment for the Village at Wolf Creek Land Exchange Proposal Project has the Public Reading Room turned on and has received Letter #44, which contains terms that have been identified as potentially offensive.

The potentially offensive content HAS NOT been published on your public website. Instead, it has been moved to a holding area where you can review it and decide whether the letter should be published in your public reading room.

To view and manage this letter, log into PALS at this link: http://apps.fs.fed.us/pals/, click on the "CARA Login" button, select your project, and go to the Reading Room Management tool.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

**FS-CARA-help**

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Sunday, September 23, 2012 5:03 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | CARA Attention Needed – Potentially Offensive Letter Content Review |

Your Draft EIS Comment for the Village at Wolf Creek Land Exchange Proposal Project has the Public Reading Room turned on and has received Letter #47, which contains terms that have been identified as potentially offensive.

The potentially offensive content HAS NOT been published on your public website. Instead, it has been moved to a holding area where you can review it and decide whether the letter should be published in your public reading room.

To view and manage this letter, log into PALS at this link: http://apps.fs.fed.us/pals/, click on the "CARA Login" button, select your project, and go to the Reading Room Management tool.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

| | |
|---|---|
| **From:** | Malecek, Thomas -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MALECEK, THOMAS94D8BAE2-5D0E-46FD-AB77-77C6A76002FD> |
| **Sent:** | Monday, September 24, 2012 8:57 AM |
| **To:** | Julia Hanson |
| **Cc:** | Ghormley, Randy -FS |
| **Subject:** | RE: Rare plant analysis  BA/BE (WER 2012) |
| **Attachments:** | image001.jpg; image002.gif; image003.gif |

Julia, thanks for the info, we can get you what you are looking for, and will likely send a hard copy rather than electronic, unless you will be in the area and can pick it up.  Let me know, thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Julia Hanson [mailto:jhanson@sme-env.com]
**Sent:** Monday, September 24, 2012 8:46 AM
**To:** Malecek, Thomas -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Tom
I am working on the CDOT lease renewal parcel on Wolf Creek Pass, specifically plant surveys. The plant analysis and survey info within the Proposed Wolf Creek Village DEIS and BA/BE is helpful due to the adjacent location. I have reviewed the DEIS and was looking for the BA/BE. Thanks!


**Julia Hanson**
**Biologist/Botanist**



679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

C0010283

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** Julia Hanson
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today. Can you tell me what plant survey and for whom are you working? I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | | |
|---|---|---|
| **Julia Hanson** <**jhanson@sme-env.com**> 09/17/2012 10:27 AM | To | Mailroom R2 Rio Grande |
| | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



ENVIRONMENTAL CONSULTANTS
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly

C0010284

prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010285

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.29436-000001

C0010286

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29436-000002

C0010287

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29436-000003

C0010288

| | |
|---|---|
| **From:** | McGinn, Diana -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MCGINN, DIANABF83DDA0-6B1C-448D-935A-331782E32919> |
| **Sent:** | Monday, September 24, 2012 8:58 AM |
| **To:** | Malecek, Thomas -FS; Vargas, Michael A -FS; Dyer, Harold D -FS |
| **Subject:** | RE: Village request |

Done on both.

---

**From:** Malecek, Thomas -FS
**Sent:** Friday, September 21, 2012 2:06 PM
**To:** Vargas, Michael A -FS; Dyer, Harold D -FS
**Cc:** McGinn, Diana -FS; Malecek, Thomas -FS
**Subject:** RE: Village request

Do you know if this was done?

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Vargas, Michael A -FS
**Sent:** Monday, September 17, 2012 2:18 PM
**To:** Dyer, Harold D -FS
**Cc:** Malecek, Thomas -FS
**Subject:** Village request

Hello Dave,
I have a request for a hard copy of the Draft EIS Village project.
Tom said you have hard copies coming in and would like one sent to:

Denise Rue-Pastin
265 Sunshine Drive
Pagosa Springs, CO. 81147
970-731-9672
970-746-9024 (cell)

Thanks,
Michael

C0010289

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Monday, September 24, 2012 9:18 AM |
| **To:** | Malecek, Thomas -FS; Dallas, Dan -FS; Dyer, Harold D -FS |
| **Subject:** | FW: Article about the Village at Wolf Creek |
| **Attachments:** | Pity the Poor Pika.doc |

This was supposed to be in Sunday's Durango Herald.

-----Original Message-----
From: Richard Grossman [mailto:richard@population-matters.org]
Sent: Thursday, September 20, 2012 2:48 PM
To: Blakeman, Mike -FS
Subject: Article about the Village at Wolf Creek

Thank you, Mike, for talking to me this afternoon! The article that will appear in the Durango Herald on Sunday.

Richard

C0010290

## Pity the Poor Pika
© Richard Grossman MD, 2012

Earlier this month I went where I had been told that there were pikas, the cold-loving relatives of rabbits, near the Wolf Creek Ski Area. I saw one little critter harvesting grasses for the winter. How much longer would this animal be able to live there before he gets roasted-out by climate change?

Even before climate change makes his rock pile too hot, my little friend will probably be rousted out by human incursion. His home is close to the proposed and hotly contested "Village" at Wolf Creek.

Wolf Creek is already suffering from climate change; bark beetles are destroying the spruces. In places, all the mature trees look dead. The only green trees are small; it will be decades before the forest is healthy again, if ever.

Billionaire "Red" McCombs' money bought 288 acres of land just north of the ski area. For 25 years his people have been trying to make that land into a lucrative venture. They want to build a city there that would dwarf Pagosa Springs on one side of the pass and South Fork on the other. In fact, if McCombs got his way, with the "maximum density development concept" the "Village" would be almost four times the population of both those communities combined!

Let's look at the practicalities of building a recreational city just below the most dangerous pass in Colorado. The first problem is access. There is only a single lane forest road leading from highway 160 to the parcel. The Forest Service is considering a proposal by McCombs' people to trade some of his land for land along the highway. His stingy offer is to trade 178 acres of his land for 204 acres of public property.

The closest commercial airports are Durango and Alamosa, each about an hour and a half away with good road conditions. Stevens Field in Pagosa is closer, but doesn't have commercial flights because it is beset by mountains and bad weather.

The infrastructure for a posh resort is also problematic. The current electric grid is not sufficient to supply the proposed resort. There are no natural gas lines up there, but apparently the plan is to truck in natural gas. Gas might be used for generating electricity as well as for heat during the subzero winter nights. It might be practical to get big trucks up there in the summer, but unreliable in the winter when most needed. Although there is adequate water, the "Village" would require a completely reliable wastewater treatment plant that can function in arctic conditions. A malfunction would pollute the headwaters of the Rio Grande River and a beautiful trout lake, Alberta Park Reservoir, below this pipedream.

Health is the most important reason I hope that the "Village" doesn't get built. This beautiful parcel of land at 10,400 feet would be a magnet for rich people from sea level. Most of these tourists would fly in and drive rental cars directly to the "Village". We locals are accustomed to high altitude, but many of these visitors, especially the obese and elderly, will encounter problems. Some will have to drive to lower altitudes, but a few will become acutely and critically ill. They will have to be evacuated by ambulance or helicopter, but there are times

C0010291

when access by either will be impossible. The closest hospital is in Pagosa Springs, over half an hour drive with good road conditions, but it doesn't have an ICU.

Mr. McCombs must be a clever person to have gotten so rich. I am sure that he has hired a first-rate staff to look at the problems of building the "Village". I can only surmise that they are familiar with all the problems mentioned above. Perhaps Mr. McCombs just doesn't want to admit that it is impractical to make a resort out of his 288 acres in Mineral County.

In order to get direct access to the highway, McCombs has offered the above unequal trade. Not only does this deal seem unfair, it would also bring the "Village" a step closer to reality. The Forest Service is accepting comments on this proposal. I suggest that you learn about the possible land exchange and send your comments about the Village at Wolf Creek Access Project to: comments-rocky-mountain-rio-grande@fs.fed.us. The deadline is October first. I hope that you will agree with me that the Forest Service would be wisest to choose "NO ACTION" as the best possibility for us, for the health of possible visitors—and for my pika friend.

Version: Herald 9-19-2012

C0010292

| | |
|---|---|
| **From:** | Malecek, Thomas -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MALECEK, THOMAS94D8BAE2-5D0E-46FD-AB77-77C6A76002FD> |
| **Sent:** | Monday, September 24, 2012 10:51 AM |
| **To:** | Adam Carroll |
| **Cc:** | Dyer, Harold D -FS; McGinn, Diana -FS |
| **Subject:** | RE: Wolf Creek DEIS |

Adam, thanks for the email....we will send you a hard copy, and mail it out next Monday.  Comments need to be in pretty soon, postmarked by October 1.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Adam Carroll [mailto:acarroll@rams.colostate.edu]
**Sent:** Tuesday, September 18, 2012 12:30 PM
**To:** Malecek, Thomas -FS
**Subject:** Wolf Creek DEIS

Thomas,

I recently became aware that the draft EIS is out on the proposed land exchange at Wolf Creek.  I have limited internet access and would like to know if it is possible to send a hard copy?  Also, by when and where should comments be submitted?  My address is:

35860 E. Kings Canyon Road
Dunlap, CA 93621

Thank you,

Adam Carroll

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010293

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 24, 2012 10:51 AM |
| **To:** | Adam Carroll |
| **Cc:** | Dyer, Harold D -FS; McGinn, Diana -FS |
| **Subject:** | RE: Wolf Creek DEIS |

Adam, thanks for the email....we will send you a hard copy, and mail it out next Monday.  Comments need to be in pretty soon, postmarked by October 1.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Adam Carroll [mailto:acarroll@rams.colostate.edu]
**Sent:** Tuesday, September 18, 2012 12:30 PM
**To:** Malecek, Thomas -FS
**Subject:** Wolf Creek DEIS

Thomas,

I recently became aware that the draft EIS is out on the proposed land exchange at Wolf Creek.  I have limited internet access and would like to know if it is possible to send a hard copy?  Also, by when and where should comments be submitted?  My address is:

35860 E. Kings Canyon Road
Dunlap, CA 93621

Thank you,

Adam Carroll

C0010294

| | |
|---|---|
| **From:** | Malecek, Thomas -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MALECEK, THOMAS94D8BAE2-5D0E-46FD-AB77-77C6A76002FD> |
| **Sent:** | Monday, September 24, 2012 1:08 PM |
| **To:** | Dyer, Harold D -FS |
| **Cc:** | Dallas, Dan -FS; david@westerneco.com; Medina, Annie -FS; Blakeman, Mike -FS |
| **Subject:** | WCV DEIS comments |

Well, Annie logged 55 letters in today, as well as approximately twice that amount previous to today.  Since this is her last week, will have her make two copies of each letter, so we have 3 total for every letter, unless there is need for more…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010295

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 24, 2012 1:08 PM |
| **To:** | Dyer, Harold D -FS |
| **Cc:** | Dallas, Dan -FS; david@westerneco.com; Medina, Annie -FS; Blakeman, Mike -FS |
| **Subject:** | WCV DEIS comments |

Well, Annie logged 55 letters in today, as well as approximately twice that amount previous to today.  Since this is her last week, will have her make two copies of each letter, so we have 3 total for every letter, unless there is need for more…

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010296

**Weiwild@aol.com**

| | |
|---|---|
| **From:** | Weiwild@aol.com |
| **Sent:** | Monday, September 24, 2012 1:23 PM |
| **To:** | kurt_broderdorp@fws.gov |
| **Cc:** | Ghormley, Randy -FS; david@westerneco.com |
| **Subject:** | WCV - FHU Traffic study |
| **Attachments:** | FHU 2012 Traffic Study.pdf |

Kurt,

At your request, please find the FHU (2012) traffic study for WCV.

Please call or email me if you have any questions.

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

# THE VILLAGE AT WOLF CREEK
# TRAFFIC IMPACT STUDY

**Prepared for:**

The Village at Wolf Creek, LLC
12117 Bee Caves Road, Suite 240
Austin, TX, 78738

**Prepared by:**

Felsburg Holt & Ullevig
6300 South Syracuse Way, Suite 600
Centennial, CO 80111
303/721-1440

Project Manager: Jeff Ream, P.E., PTOE

FHU Reference No. 11-044
February, 2012

C0010298

*The Village at Wolf Creek*                                    *Traffic Impact Study*

## TABLE OF CONTENTS

Page

I.  INTRODUCTION ------------------------------------------------------------------------------- 1
II. EXISTING CONDITIONS ------------------------------------------------------------------- 4
    A.  Surrounding Land Uses----------------------------------------------------------------- 4
    B.  Existing Roadway Network ------------------------------------------------------------ 4
    C.  Existing Traffic Volumes --------------------------------------------------------------- 4
III. PROJECT TRAFFIC --------------------------------------------------------------------------- 6
    A.  Site Trip Generation ---------------------------------------------------------------------- 6
    B.  Internally Captured Trips -------------------------------------------------------------- 8
    C.  Peak Day External Trip Generation------------------------------------------------- 9
    D.  Typical Day External Trip Generation---------------------------------------------10
    E.  Trip Distribution and Assignment---------------------------------------------------11
IV. FUTURE TRAFFIC CONDITIONS-----------------------------------------------------------15
    A.  Background Traffic Volumes ---------------------------------------------------------15
    B.  2035 Background Conditions---------------------------------------------------------15
    C.  2035 Conditions with Phase 1 of the Project-------------------------------------15
    D.  2035 Conditions with Buildout of the Project ------------------------------------16
    E.  Auxiliary Lane Needs-------------------------------------------------------------------17
V.  SUMMARY AND RECOMMENDATIONS --------------------------------------------------21


APPENDIX A    TRAFFIC COUNTS
APPENDIX B    TRIP GENERATION AND INTERNAL CAPTURE CALCULATIONS
APPENDIX C    TRAFFIC ANALYSIS WORKSHEETS
APPENDIX D    PRELIMINARY VILLAGE ACCESS INTERSECTION DESIGN


FELSBURG
HOLT &
ULLEVIG

C0010299

*The Village at Wolf Creek*                                    *Traffic Impact Study*

## LIST OF FIGURES

Page

Figure 1.   Vicinity Map....................................................................................................2
Figure 2.   Site Plan........................................................................................................3
Figure 3.   Existing Traffic Conditions ............................................................................5
Figure 4.   Peak Day Trip Distribution and Assignment ................................................13
Figure 5.   Typical Day Trip Distribution and Assignment .............................................14
Figure 6.   2035 Background Traffic Conditions............................................................18
Figure 7.   2035 Peak Day Traffic Conditions with the Project......................................19
Figure 8.   2035 Typical Day Traffic Conditions with the Project...................................20

## LIST OF TABLES

Table 1.   Village at Wolf Creek Land Uses ...................................................................6
Table 2.   Overall Village at Wolf Creek Trip Generation, Including Trips Internal to the Ski Area and Village .................................................................................................7
Table 3.   Village at Wolf Creek Trip Generation at the SH 160 Access Intersection on a Peak Activity Day .............................................................................................10
Table 4.   Village at Wolf Creek Trip Generation at the SH 160 Access Intersection on a Typical Day ....................................................................................................11


FELSBURG
H O L T  &
U L L E V I G

*The Village at Wolf Creek*                                    *Traffic Impact Study*

## I.    INTRODUCTION

This traffic study analyzes the traffic impacts associated with The Village at Wolf Creek, a proposed new base village east of the Alberta lift at the Wolf Creek Ski Area that would include 1,373 condominiums/townhomes, 138 single family homes, 200 hotel rooms and 221,100 SF of commercial development that would support the needs of village residents and guests, and Wolf Creek skiers. The site currently is undeveloped.  Access to the site would be provided via a full movement intersection on SH 160, approximately 0.4 miles east of the existing Wolf Creek Ski Area access intersection.  An internal road (Tranquility Road) would also be constructed that connects the existing ski area parking lots with the new base village, with traffic on that road restricted to skier shuttles and resort-supportive vehicles only.

The project would be constructed in two distinct phases, with phase 1 consisting of 364 condominiums/townhomes, 62 single family homes, 71 hotel rooms and 49,600 SF of commercial development.

**Figure 1** shows the site vicinity and **Figure 2** shows the proposed site plan.

This analysis documents the existing roadway network and existing peak hour traffic conditions, presents site-generated traffic volume forecasts, analyzes the effect of the site-generated traffic in combination with the background traffic growth, and recommends improvements to the road system to accommodate project traffic.


FELSBURG
HOLT &
ULLEVIG

C0010301



**Figure 1**
Vicinity Map

C0010302



**Figure 2**
Site Plan

NORTH

FELSBURG HOLT & ULLEVIG

Village at Wolf Creek, 11-044-01, 2/27/12

C0010303

*The Village at Wolf Creek*                                    *Traffic Impact Study*

## II.    EXISTING CONDITIONS

### A.    Surrounding Land Uses

The area around the site consists of the Wolf Creek Ski Area to the west, a CDOT facility for SH 160 maintenance operations on the north side of SH 160 opposite the ski area, and undeveloped forest service land elsewhere.

### B.    Existing Roadway Network

The existing roadway system in the vicinity consists of SH 160, the primary east-west connection across southern Colorado that connects to Pagosa Springs and Durango to the West, and Alamosa and I-25 to the east.  In the vicinity of the site, SH 160 has two lanes westbound (uphill) and one lane eastbound (downhill), with a posted speed limit of 35 mph.

### C.    Existing Traffic Volumes

Although SH 160 has a prominent role in connecting the communities of southern Colorado, traffic volumes at the top of Wolf Creek Pass are relatively low, even during the ski season. Existing traffic volumes in the vicinity of the site are presented in Figure 3 and are included in Appendix A.  The volumes were collected in from March 13-23, 2009, which covered the spring break peak period of the Wolf Creek Ski Area.  The peak day traffic analysis (on which the Village Wolf Creek access Intersection design was based) was based on a combination of traffic volumes from the peak traffic day of the ski area during the 10-day data collection period (Tuesday, March 17, 2009) and the peak traffic day for through traffic on US 160 (Sunday, March 15, 2009), to present a conservative, yet reasonable, scenario wherein the peak ski day occurs on a weekend when highway through traffic is higher.  Based on 2008 skier data (skier data was not collected in 2009), there are approximately 5,800 skiers on a peak skier day.

An additional analysis was also conducted to assess traffic operations on a more typical day during the peak portion of the ski season.  For these conditions, the average hourly volumes from Saturday, March 15, 2008 (1,456 skiers) and Sunday, March 16, 2008 (3,536 skiers) were used for the analysis, because the average number of skiers between those days was most similar to the average number of skiers on the mountain during the two weeks that data was collected at the ski area (2,657 skiers).

As Figure 3 indicates, peak day traffic volumes range from 2,800 vpd east of the ski area, where the Village access intersection would be located, to 3,500 vpd west of the ski area.  Typical daily traffic volumes during ski season range from 2,300 vpd east of the ski area to 3,200 vpd west of the ski area.  These volume levels are generally similar to those of a collector roadway in an urban environment.



FELSBURG
HOLT &
ULLEVIG

C0010304



**Peak Day**



**Typical Day**

| LEGEND | |
| --- | --- |
| XXX(XXX) = | AM(PM) Peak Hour Traffic Volumes |
| **XXXX** = | Daily Traffic Volumes |

**Figure 3**
Existing Traffic Volumes

FELSBURG
HOLT &
ULLEVIG

**NORTH**

Village at Wolf Creek, 11-044-01, 2/27/12

C0010305

*The Village at Wolf Creek*                                         *Traffic Impact Study*

## III.    PROJECT TRAFFIC

### A.    Site Trip Generation

**Table 1** shows the proposed land use totals for the Village at Wolf Creek.  While there are several methodologies available for forecasting traffic volumes at ski resorts (such as projecting the number of future skiers, guests, residents and other visitors to the resort based on mountain capacity, bed base, lodging occupancy percentages and commercial space, then making assumptions on arrival and departure patterns and vehicle occupancy to convert people to vehicle trips), per discussions with CDOT Region 5, the traffic analysis for the project was to adhere to the guidelines outlined in the CDOT State Highway Access Code to the closest extent possible, so the number of vehicle-trips generated by the proposed development was estimated based on the procedures documented in Trip Generation, by the Institute of Transportation Engineers (ITE), Eight Edition, 2008.  Based on traffic counts at the Wolf Creek Ski Area driveway, on peak skier days the morning traffic peak occurs between 8-9 AM and the afternoon traffic peak occurs between 4-5 PM, so the trip rates for the Peak Hour of Adjacent Street Traffic (one hour between 7-9 AM and 4-6 PM) were used.

### Table 1.    Village at Wolf Creek Land Uses

| Land Use | ITE Land Use Code | Description | Size | | Internal Capture PH 1/Buildout |
|---|---|---|---|---|---|
| | | | Phase 1 | Buildout | |
| **Residential** | | | | | |
| Recreational Condo/Townhomes | 260 | Recreational Homes | 371 Units | 1,373 Units | 2%/8% |
| Recreational Homes | 260 | Recreational Homes | 55 Units | 138 Units | 2%/8% |
| **Lodging** | | | | | |
| Hotel with 30,000 SF Conference Facility | 310 | Hotel | -- | 129 Units | 2%/8% |
| Resort Hotel | 330 | Resort Hotel | 71 Units | 71 Units | 2%/8% |
| **Commercial** | | | | | |
| Retail-Based | 820 | Shopping Center | 41,200 SF | 139,600 SF | 65%/65%[1] 65%/50%[2] |
| Office-Based | 710 | General Office | 8,400 SF | 51,400 SF | 2%/8% |

1. Peak day internal capture
2. Typical day internal capture

As noted in Table 1, ITE land use codes (LUC) 260 – Recreational Homes were used for both the condos and single family dwellings, LUC 310 - Hotel was used for the hotel with the conference facility, LUC 330 – Resort Hotel was used for the hotel without the conference facility, LUC 710 was used for office-based commercial space, and LUC 820 – Shopping Center was used for retail-based commercial space.  No occupancy percentages were applied to the ITE trip rates for Recreational Homes and Hotels (to calibrate those values to projected village occupancy), since Trip Generation does not document the occupancy levels on which the published rates were based.



C0010306

*The Village at Wolf Creek*                                                                 *Traffic Impact Study*

**Table 2** summarizes the anticipated number of trips generated by Phase 1 and buildout of the Village.  As show, Phase 1 would generate approximately 3,790 daily vehicle trips, 144 trips during the morning peak period of ski area arrival, and 308 trips during the afternoon peak departure period from the ski area. Full buildout would generate 12,970 daily trips, 556 morning peak trips and 1,097 afternoon peak trips.  It should be noted, however, that these trip values include trips between the Village and the ski area, such as skiing trips by Village residents and visits to the commercial establishments in the Village by both Village residents and guests and skiers on the mountain. These types of trips would be internal to the ski area/Village and therefore would <u>not</u> be reflected as additional traffic volumes on the Village Access Road or on SH 160.

**Table 2.       Overall Village at Wolf Creek Trip Generation, Including Trips Internal to the Ski Area and Village**

| Phase 1 Land Uses | LUC | Size | Daily Trips | AM Peak | | | PM Peak | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | In | Out | Total | In | Out | Total |
| Recreational Condo/Townhomes | 260 | 364 Units | 1,150 | 39 | 19 | 58 | 39 | 56 | 95 |
| Recreational Homes | 260 | 62 Units | 200 | 7 | 3 | 10 | 7 | 9 | 16 |
| Resort Hotel | 330 | 71 Rooms | 580 | 16 | 6 | 22 | 13 | 17 | 30 |
| **Commercial Development** | | | | | | | | | |
| Retail-based | 820 | 41,200 SF | 1,770 | 25 | 16 | 41 | 75 | 79 | 154 |
| Office-based | 710 | 8,400 SF | 90 | 11 | 2 | 13 | 2 | 11 | 13 |
| **Total** | | **49,600 SF** | **3,790** | **98** | **46** | **144** | **136** | **172** | **308** |
| Full Buildout Land Uses | LUC | Size | Daily Trips | AM Peak | | | PM Peak | | |
| | | | | In | Out | Total | In | Out | Total |
| Recreational Condo/Townhomes | 260 | 1,373 Units | 4,340 | 147 | 73 | 220 | 146 | 211 | 357 |
| Recreational Homes | 260 | 138 Units | 440 | 15 | 7 | 22 | 15 | 21 | 36 |
| Resort Hotel | 330 | 71 Rooms | 580 | 16 | 6 | 22 | 13 | 17 | 30 |
| Hotel with 30 KSF Conference Facility | 310 | 129 Rooms | 1,050 | 44 | 28 | 72 | 40 | 36 | 76 |
| **Commercial Development** | | | | | | | | | |
| Retail-based | 820 | 139,600 SF | 5,990 | 85 | 55 | 140 | 255 | 266 | 521 |
| Office-based | 710 | 51,400 SF | 570 | 70 | 10 | 80 | 13 | 64 | 77 |
| **Total** | | **191,000 SF** | **12,970** | **377** | **179** | **556** | **482** | **615** | **1,097** |

Note also that employee trips to and from the Village are included in the trip generation values for the hotel, office and retail development.   The current development plan would accommodate approximately 50 employees at buildout in on-site employee housing (no employee housing is planned for Phase 1), and the internal capture calculations for the non-residential development account for the internalization of the destination end of those work trips.  However, given the relatively small number of employees that would be housed on site, and that recreational homes generate fewer trips per unit than primary homes, no attempt was made to reduce the condo/townhome trip generation to reflect that some of those units would be where employees reside (i.e., the origination of the work trip).



C0010307

*The Village at Wolf Creek*                                    *Traffic Impact Study*

From the traffic analysis perspective, those trips that flow through the SH 160/Village Access intersection are of a critical concern, since they would determine the size, configuration and operation of that external access point. Through discussions with CDOT Region 5 staff, it was agreed that two sets of operational analyses would be conducted at the SH 160/access intersection; peak day conditions and typical day conditions. Peak day conditions would be used to define the size and laneage needs at the intersection, and typical day conditions would be used to assess typical traffic operations there.

**B.    Internally Captured Trips**

As noted above, a significant portion of the trips generated by the Village would either stay within the development as shopping trips, dining trips, etc. or occur between the Village and the ski area as skiing trips. To determine the appropriate volume for these internal trips the following methodology was employed:

*Peak Day Internal Capture*

On a peak day, the capture rates for the housing, lodging and office-based commercial establishments were based on the rates outlined in the State Highway Access Code (i.e., two percent in the morning and eight percent in the afternoon). These capture rates are relatively low, and are indicative of conditions where one set of Village residents and guests are departing in the morning and a new set is arriving in the afternoon.

For retail-based commercial trips (including food service), the internal capture rate was tied to the total number of persons at the Village and ski area, which recognizes that the village retail establishments are primarily geared toward skiers and Village residents and guests, but that beyond a certain level of commercial development, additional off-site customers would be needed for those establishments to be financially viable. The key assumptions on which the internal capture rates were based include:

- The total number of customers for the retail establishments was based on ITE daily trip rates, and an average vehicle occupancy of 1.5 persons per vehicle, which is based on the average vehicle occupancy for shopping and dining trips from the 1998 Denver Regional Council of Governments (DRCOG) household survey. Thus the total number of retail customers would be 1,770 for Phase 1, and 5,990 for buildout.

- The total persons at the Village was based on the proposed residential and lodging unit and bedroom counts for Phase 1 and buildout (2,610 persons and 8,650 persons, respectively), while the total persons at the ski area was based on 2008 skier count data extrapolated at a growth rate of 1.25 percent per year out to 2035 (8,150 persons). Thus, the total persons at the Village/ski area = 10,760 for Phase 1, 16,800 at buildout.

- Based on the 1998 DRCOG household survey, shopping and dining trips account for 16 percent of all trips, so it was assumed that the Village retail/dining establishments would capture up to 16 percent of the total persons at the Village/ski area (1,570 for Phase 1, 5,300 at buildout).



C0010308

*The Village at Wolf Creek*                                    *Traffic Impact Study*

- The potential customers based on the persons at the resort was then compared with the total retail customers as determined by ITE trip rates, and any deficit was assigned as external trips coming from down mountain.

- During the middle of the day, 100 percent of the day skiers visiting the Village would do so by skiing in directly from the mountain, but for the morning and afternoon peak, it was assumed that 60 percent of the day skiers would ski over from the mountain and the other 40 percent would fold the Village trip into their arrival or departure trip. The customers visiting directly from the mountain were treated as internal trips, while the customers visiting as part of their ski day arrival or departure trip were treated as external trips.

- The number of employees at the Village was forecast based on information from the US Department of Energy's 2006 Commercial Business Energy Consumption Survey (150 employees in Phase 1 and 575 at buildout). In Phase 1, all of the employee trips would come from off the mountain and therefore be external trips. At buildout, approximately 50 employees would live in employee housing at the Village (internal trips), and the remaining employees would come from off the mountain (external). It was further assumed that there would be 1.5 employees per vehicle for off-mountain trips, which is slightly less than the current 1.7 employees per vehicle occupancy rate at Wolf Creek to present a slightly more conservative analysis.

**Appendix B** tabulates the calculation of internal trip capture rates for the commercial development portion of the project, as well as the trip generation for phase 1 and buildout of the Village with the internal capture rates applied.

*Typical Day Internal Capture*

For the typical day analysis the internal capture rate for residential and lodging properties was increased to of 70 percent. This percentage is based on data from other ski resorts that suggests the typical lodging stay at ski resorts is approximately one week, and that during that period, residents and guest typically ski between four and five times. It was presumed that guests that are not skiing would leave the Village to site-see, so the 70 percent reflects guests staying on site five days out of seven.

The internal capture rate assumptions for office-based commercial and retail-based commercial remained the same on a typical day as they are for the peak day.

**C.    *Peak Day External Trip Generation***

As noted above, the **Peak Day** analysis assessed traffic conditions during a peak activity day at the Village and ski area, which is akin to a weekend day during spring break or a weekend powder day, when there not only are many day skiers at the ski area, but also a large number of the housing units at the Village are turning over (i.e., guests are departing and arriving). These conditions would represent a worse case traffic scenario at the access intersection, and were used to help define the laneage needs and configuration at that location.



C0010309

*The Village at Wolf Creek*                                    *Traffic Impact Study*

**Table 3** shows the number of trips that would flow through the access intersection under that scenario; when the trips in **Table 3** are compared with those in **Table 2**, it is apparent that even during high bed turnover days at the Village (when the majority of Village guests are arriving or departing and therefore would not be skiing), trips between the Village and the mountain still make up about ¼ of the overall trip generation. Thus, when Phase 1 of the project is complete, the Village access intersection and SH 160 would see an increase in traffic of 2,700 daily trips, 118 trips during the morning peak period of ski area arrival and 204 trips during the afternoon peak departure period from the ski area, while full buildout of the Village would increase traffic at the intersection by 9,540 daily trips, 472 morning peak trips and 764 afternoon peak trips.

**Table 3**.    **Village at Wolf Creek Trip Generation at the SH 160 Access Intersection on a Peak Activity Day**

| Phase 1 Land Uses | Size | Daily Trips | AM Peak | | | PM Peak | | |
|---|---|---|---|---|---|---|---|---|
| | | | In | Out | Total | In | Out | Total |
| Recreational Condo/Townhomes | 364 Units | 1,130 | 38 | 19 | 57 | 36 | 51 | 87 |
| Recreational Homes | 62 Units | 200 | 7 | 3 | 10 | 6 | 9 | 15 |
| Resort Hotel | 71 Rooms | 570 | 16 | 6 | 22 | 12 | 16 | 28 |
| | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Commercial Development** | | | | | | | | |
| Retail-based | 41,200 SF | 710 | 8 | 8 | 16 | 32 | 30 | 62 |
| Office-based | 8,400 SF | 90 | 11 | 2 | 13 | 2 | 10 | 12 |
| **Total** | **49,600 SF** | **2,700** | **80** | **38** | **118** | **88** | **116** | **204** |
| **Full Buildout Land Uses** | **Size** | **Daily Trips** | **AM Peak** | | | **PM Peak** | | |
| | | | **In** | **Out** | **Total** | **In** | **Out** | **Total** |
| Recreational Condo/Townhomes | 1,373 Units | 4,250 | 145 | 71 | 216 | 134 | 194 | 328 |
| Recreational Homes | 138 Units | 430 | 15 | 7 | 22 | 14 | 19 | 33 |
| Resort Hotel | 71 Rooms | 570 | 16 | 6 | 22 | 12 | 16 | 28 |
| Hotel with 30 KSF Conference Facility | 129 Rooms | 1,030 | 43 | 28 | 71 | 37 | 33 | 70 |
| **Commercial Development** | | | | | | | | |
| Retail-based | 139,600 SF | 2,700 | 32 | 31 | 63 | 119 | 115 | 234 |
| Office-based | 51,400 SF | 560 | 69 | 9 | 78 | 12 | 59 | 71 |
| **Total** | **191,000 SF** | **9,540** | **320** | **152** | **472** | **328** | **436** | **764** |

**D.    Typical Day External Trip Generation**

The **Typical Day** analysis assessed traffic conditions during a day at the Village and ski area akin to a mid-season, weekend day when there are not as many day skiers on the mountain as during spring break, and most people staying at the Village are remaining on site to ski, shop, etc. These conditions would represent a typical traffic day at Village and ski area, and were used to assess traffic operations at the Village access intersection on a day-to-day basis.



C0010310

*The Village at Wolf Creek*                                                    *Traffic Impact Study*

**Table 4** shows the number of trips that would flow through the access intersection under that scenario, and indicate that on most days, trips between the Village and the mountain make up about 60 percent of the overall trip generation. Thus, when Phase 1 of the project is complete, on a typical day the Village access intersection and SH 160 would see an increase in traffic of 1,290 daily trips, 54 trips during the morning peak period of ski area arrival and 110 trips during the afternoon peak departure period from the ski area, while full buildout of the Village would increase traffic at the intersection by 5,480 daily trips, 250 morning peak trips and 482 afternoon peak trips.

**Table 4.**    **Village at Wolf Creek Trip Generation at the SH 160 Access Intersection on a Typical Day**

| Phase 1 Land Uses | Size | Daily Trips | AM Peak | | | PM Peak | | |
|---|---|---|---|---|---|---|---|---|
| | | | In | Out | Total | In | Out | Total |
| Recreational Condo/Townhomes | 364 Units | 350 | 11 | 6 | 17 | 12 | 17 | 29 |
| Recreational Homes | 62 Units | 60 | 2 | 1 | 3 | 2 | 3 | 5 |
| Resort Hotel | 71 Rooms | 170 | 5 | 2 | 7 | 4 | 5 | 9 |
| **Commercial Development** | | | | | | | | |
| Retail-based | 41,200 SF | 620 | 7 | 7 | 14 | 28 | 26 | 54 |
| Office-based | 8,400 SF | 90 | 11 | 2 | 13 | 2 | 11 | 13 |
| **Total** | **49,600 SF** | **1,290** | **36** | **18** | **54** | **48** | **62** | **110** |
| Full Buildout Land Uses | Size | Daily Trips | AM Peak | | | PM Peak | | |
| | | | In | Out | Total | In | Out | Total |
| Recreational Condo/Townhomes | 1,373 Units | 1,300 | 44 | 22 | 66 | 44 | 63 | 107 |
| Recreational Homes | 138 Units | 130 | 5 | 2 | 7 | 5 | 6 | 11 |
| Resort Hotel | 71 Rooms | 170 | 5 | 2 | 7 | 4 | 5 | 9 |
| Hotel with 30 KSF Conference Facility | 129 Rooms | 320 | 13 | 9 | 22 | 12 | 11 | 23 |
| **Commercial Development** | | | | | | | | |
| Retail-based | 139,600 SF | 3,000 | 36 | 34 | 70 | 133 | 128 | 261 |
| Office-based | 51,400 SF | 560 | 69 | 9 | 78 | 12 | 59 | 71 |
| **Total** | **191,000 SF** | **5,480** | **172** | **78** | **250** | **210** | **272** | **482** |

### E.    *Trip Distribution and Assignment*

Trip distribution percentages for the Village were based on the directional flow of existing traffic at the Wolf Creek Ski Area driveway. Based on this, the following distribution was used:

- 66 percent oriented to/from the west on US 160 (Durango, Pagosa Springs, etc.)
- 33 percent oriented to/from the east on US 160 (South Fork, Alamosa, etc.)


FELSBURG
HOLT &
ULLEVIG

C0010311

*The Village at Wolf Creek*                                    *Traffic Impact Study*

**Figure 4** visually depicts how the trips generated by the Village on a **peak day** are distributed to the ski area and to SH 160. Note that the figure not only assigns trips to the external road system, but also between the Village and the ski runs, and between the Village and the ski area parking lots.  The latter trip assignment accounts for the unique nature of the area--where the commercial development is not located along the walking route between the ski lifts and the parking area--and recognizes that while some day skiers will ski over to the Village directly from the mountain to eat/drink/shop (and ski back during the middle of the day or take a shuttle back after the lifts have closed), other would, at the end of their ski day, elect to ski down to their car, drive over to the Village to eat/drink/shop, and depart the area directly from the Village afterward.  Note also that the values in the figure are vehicle trips (or vehicle equivalent trips in the case of village-to-ski hill and village-to-parking lots), and not person trips; this approach was used on the figure so that the trip values are consistent with the values in **Tables 3** and **4**.

**Figure 5** shows how trips generated by the Village on a **typical day** are distributed to the ski area and to SH 160 and indicates a significant increase in trips between the Village and the ski hill as compared with **Figure 4**.  This reflects that on a typical day, the majority of Village guests are travel between the Village and the ski area rather than leaving the resort.



*Page 12*

C0010312



**Figure 4**

Peak Day Trip Distribution and Assignment

**NORTH**

To
South Fork
**33%**

160

4,600
6,700

**Buildout**

105(90)
45(145)
105(290)
210(235)

**Phase 1**

25(20)
10(40)
30(75)
55(70)

Village at
Wolf Creek

2,800[140]/[220]
700[35]/[50]

600[20]/[55]
1,300[55]/[120]

1,100[25]/[105]
3,400[90]/[340]

Wolf Creek
Ski Area

Parking
Lot

Ski Hill

160

6,300
10,400

1,400[65]/[100]
5,500[275]/[420]

To
Pagosa
Springs
**66%**

**Village Total Trips**

|          | Daily  | Morning Peak | Evening Peak |
|----------|--------|--------------|--------------|
| Phase 1  | 3,800  | 145          | 310          |
| Buildout | 13,000 | 555          | 1,100        |

**LEGEND**

Phase 1 = Daily(AM)[PM]
Buildout = Daily(AM)[PM]

XXXX = Phase 1 Daily Traffic Volumes
XXXX = Buildout Daily Traffic Volumes
XX% = External Trip Distribution

FELSBURG
HOLT &
ULLEVIG

Village at Wolf Creek, 11-044-01, 2/27/12

C0010313



**Figure 5**

Typical Day Trip Distribution and Assignment

NORTH

**Village Total Trips**

|          | Daily  | Morning Peak | Evening Peak |
|----------|--------|--------------|--------------|
| Phase 1  | 3,800  | 145          | 310          |
| Buildout | 13,000 | 555          | 1,100        |

To South Fork **33%**

To Pagosa Springs **66%**

Village at Wolf Creek

Wolf Creek Ski Area

Parking Lot

Ski Hill

160

160

**3,800**
*5,000*

**5,000**
*7,400*

**Phase 1**
10(10)
↑ 5(20)
15(40)
25(40)

**Buildout**
55(60)
↑ 25(90)
55(180)
115(145)

300(10)[20]/
1,400[55]/[15]

500(20)[50]
1,400(60)/[735]

2,500(90)[200]
7,500[305][625]

500(25)[40]
2,700(125)[230]

**LEGEND**

Phase 1 = *Daily(AM)[PM]* (blue double arrow)
Buildout = *Daily(AM)[PM]* (blue double arrow)

**XXXX** = *Phase 1 Daily Traffic Volumes*
*XXXX* = *Buildout Daily Traffic Volumes*
**XX%** = *External Trip Distribution*

FELSBURG HOLT & ULLEVIG

Village at Wolf Creek, 11-044-01, 2/27/12

C0010314

*The Village at Wolf Creek*                                    *Traffic Impact Study*

## IV.    FUTURE TRAFFIC CONDITIONS

### A.    Background Traffic Volumes

The year 2035 was used as the long term traffic planning year to be consistent with the 20-year future growth condition typically used in transportation planning.  Per discussions with CDOT Region 5, both Phase 1 and full buildout were analyzed in that design year; although Phase 1 is likely to be completed earlier than 2035, CDOT requested an assessment of that Phase in the long term planning year in the event that the project develops more slowly than anticipated, or does not proceed beyond the initial development phase.  A traffic growth rate of 1.25 percent (from the CDOT website) was used to project both US 160 background traffic volumes and Wolf Creek Ski Area day skier traffic to 2035 conditions. Based on the peak day traffic counts and vehicle occupancy counts at the Wolf Creek driveway provided by CDOT and the ski area, the 1.25 percent growth rate equates to an additional approximately 565 vehicles and 2,300 skiers on a peak day at the ski area in 2035 and 265 additional vehicles and 1,060 additional skiers on a typical day.

While the ski area intends on submitting plans that would expand the terrain and uphill capacity of the ski hill, that information is not known at this time, so a general assumption on skier growth is more appropriate for this analysis.  Furthermore, it is anticipated that the Village population would account for the additional skiers (beyond those generated by the 1.25 percent traffic growth assumption) when the ski area is expanded (as noted in the previous section, there would be 2,600 guests/potential skiers staying in the Village for Phase 1 and 8,650 guests/potential skiers staying in the Village at buildout).

### B.    2035 Background Conditions

**Figure 6** shows the traffic volumes in the vicinity of the ski area on a peak day and on a typical day in 2035, along with the number of skiers at the ski area under both conditions.  As shown, peak day background traffic (8,150 skiers) on SH 160 ranges from 3,900 vpd east of the ski area to 4,900 vpd west of the ski area, while typical day traffic (3,700 skiers) ranges from 3,500 vpd to 4,500 vpd.

### C.    2035 Conditions with Phase 1 of the Project

Operational analyses of the Village access intersection were performed according the techniques documented in the Highway Capacity Manual (HCM), by the Transportation Research Board (TRB), Third Edition, 2000 (HCM-2000).  The result of such an analysis is a level of service (LOS) rating, which is a qualitative assessment of the traffic flow based on the average stopped delay per vehicle at an intersection.  Levels of service are described by a letter designation ranging from "A" to "F," with LOS A representing essentially uninterrupted flow, and LOS F representing a breakdown of traffic flow with excessive congestion and delay. Unsignalized intersection analyses report a level of service rating for movements that must yield right-of-way to other traffic movements.  Per discussions with CDOT Region 5, the Peak Hour Factor (PHF) for the intersection was assumed to be 0.87 for all movements, based on the existing PHF at the ski area driveway from the 2009 counts. All other default values outlined in the HCM were used in the analyses.



FELSBURG
HOLT &
ULLEVIG

C0010315

*The Village at Wolf Creek*                                                    *Traffic Impact Study*

**Figure 7** shows Phase 1 traffic operations at the Village Access intersection on a **peak day** at the ski area. As shown, during the afternoon peak period (the most congested period of the day) the outbound left and right turns movements at the Village Access intersection would operate at LOS B, while both inbound movements would operate at LOS A.  In the morning peak, when traffic volumes aren't quite as intense as in the afternoon, all movements at the intersection would operate at LOS A.  These levels of service are considered acceptable operations by CDOT.

**Figure 8** shows traffic conditions on a **typical day** at the ski area, when the majority of Village guests are skiing and returning to the Village rather than leaving the area.  The corresponding decrease in traffic at the access intersection is reflected in the improved operations there; only the outbound left turn would operate at LOS B on a typical day, and that movement would have less delay and shorter queues than on a peak day.

### D.    2035 Conditions with Buildout of the Project

**Figure 7** also shows buildout traffic operations at the Village Access intersection on a **peak day** at the ski area.  When the Village is fully constructed, the northbound left turn out of the Village would operate at LOS B during the morning peak period and LOS C during the afternoon peak period, while the outbound right turn would operate at LOS A in the morning and LOS B in the afternoon.  Both inbound movements would operate at LOS A during both peak periods.  All of these levels of service are considered acceptable operations by CDOT.

**Figure 8** also shows buildout traffic conditions on a **typical day** at the ski area, when the majority of Village guests are skiing and returning to the Village rather than leaving the area.  As with Phase 1, the decrease in traffic at the access intersection on a typical day is reflected in the improved operations there; the outbound left turn would operate at LOS B during both the morning and afternoon peaks, with less delay and shorter queues than on a peak day.  The outbound right turn would operate at the same levels of service as on peak days (LOS A in the morning, LOS B in the afternoon), but would also have less delay and shorter queues than on a peak day.

**Appendix C** contains the level of service analysis sheets for both peak day and typical day traffic conditions.



C0010316

*The Village at Wolf Creek*                                              *Traffic Impact Study*

### E.    Auxiliary Lane Needs

Based on Colorado Department of Transportation (CDOT) <u>Access Code</u> requirements, inbound left and right turn lanes and outbound left and right turn acceleration lanes are required on SH 160 at the site driveway due to the peak day, peak hour volumes for those movement.  After further discussions with CDOT Region 5 staff, it was agreed that the inbound right turn deceleration lane and the outbound left turn acceleration lane west of the access intersection would be constructed as continuous accel/decel lanes between the Wolf Creek Ski Area driveway and the Village Access intersection.  The left turn deceleration lane and the right turn acceleration lane east of the Village Access intersection were designed to CDOT Access Code standards for a 35 mph Access Category R-A roadway with a six percent downgrade to the east, away from the intersection.

**Appendix D** contains the preliminary design for the Village Access intersection with SH 160.



C0010317



160    4,900

160

240(275)
55(320)

3,900

160

*Wolf Creek Ski Area*

8,150 SKIERS

**Peak Day**



160    4,500

160

140(140)
70(210)

3,500

*Wolf Creek Ski Area*

3,700 SKIERS

**Typical Day**

**LEGEND**

XXX(XXX)  =  AM(PM) Peak Hour Traffic Volumes

**XXXX**  =  Daily Traffic Volumes

**Figure 6**
2035 Background Traffic Volumes



FELSBURG
H O L T &
ULLEVIG

**NORTH**

Village at Wolf Creek, 11-044-01, 2/27/12

C0010318

**Figure 7**

2035 Peak Day Traffic Conditions with the Project

### Village Total Trips

|  | Daily | Morning Peak | Evening Peak |
|---|---|---|---|
| Phase 1 | 3,800 | 145 | 310 |
| Buildout | 13,000 | 555 | 1,100 |

**LEGEND**

Phase 1 = Daily(AM)[PM] Traffic Volumes

Buildout = Daily(AM)[PM] Traffic Volumes

XXXX = Phase 1 Daily Traffic Volumes

XXXX = Buildout Daily Traffic Volumes

FELSBURG
HOLT &
ULLEVIG

Village at Wolf Creek, 11-044-01, 2/27/12

C0010319



**Figure 8**

2035 Typical Day Traffic Conditions with the Project

*The Village at Wolf Creek*                                        *Traffic Impact Study*

## V.    SUMMARY AND RECOMMENDATIONS

This traffic study analyzes the traffic impacts associated with The Village at Wolf Creek, a proposed new base village east of the Alberta lift at the Wolf Creek Ski Area that would include 1,373 condominiums/townhomes, 138 single family homes, 200 hotel rooms and 221,100 SF of commercial development that would support the needs of village residents and guests, and Wolf Creek skiers.  The project would be constructed in two distinct phases, with phase 1 consisting of 364 condominiums/townhomes, 62 single family homes, 71 hotel rooms and 49,600 SF of commercial development.

The following highlights the findings of the traffic analysis:

- On a peak day at the Village and ski area (i.e., a weekend day during spring break or a weekend powder day, when there not only are many day skiers at the ski area, but also a large number of guests at the Village are departing and arriving), Phase 1 of the Village at Wolf Creek would add 2,700 new daily trips to SH 160, with 118 new trips occurring during the morning peak period of ski area arrival and 204 occurring trips during the afternoon peak departure period from the ski area. Full buildout of the Village would add 9,540 new daily trips to SH 160 on peak days, including 472 new morning peak trips and 764 new afternoon peak trips.

- During the afternoon peak period (the most congested period of the day) on peak days with Phase 1 of the project, the outbound left and right turns movements at the Village Access intersection would operate at LOS B, while both inbound movements would operate at LOS A.  In the morning peak, when traffic volumes aren't quite as intense as in the afternoon, all movements at the intersection would operate at LOS A.  All of these levels of service are considered acceptable operations by CDOT.

- On peak days when the Village is fully constructed, the northbound left turn out of the Village would operate at LOS B during the morning peak period and LOS C during the afternoon peak period, the outbound right turn would operate at LOS A in the morning and LOS B in the afternoon, and both inbound movements would operate at LOS A during both peak periods.  All of these levels of service are also considered acceptable operations by CDOT.

- On a more typical day at the Village and ski area (i.e., a mid-season, weekend day when there are not as many day skiers on the mountain as during spring break, and most people staying at the Village are remaining on site to ski, shop, etc), Phase 1 of the Village at Wolf Creek would add 1,290 new daily trips to SH 160, with 54 new trips occurring during the morning peak period of ski area arrival and 110 occurring trips during the afternoon peak departure period from the ski area. Full buildout of the Village would add 5,480 new daily trips to SH 160, including 250 new morning peak trips and 482 new afternoon peak trips.

- On typical days with Phase 1 of the Village, all movements at the Village Access intersection would operate at LOS A throughout the day, with the exception of the outbound left turn, which would operate at LOS B in the afternoon peak. All of these levels of service are considered acceptable operations by CDOT.



FELSBURG
HOLT &
ULLEVIG

C0010321

*The Village at Wolf Creek*                                          *Traffic Impact Study*

- On typical days at buildout of the Village, the outbound left turn would operate at LOS B during both the morning and afternoon peaks, the outbound right turn would operate at LOS A in the morning and LOS B in the afternoon, and the inbound left and right turns would operate at LOS A during both peaks. All of these levels of service are also considered acceptable operations by CDOT.

- Based on Colorado Department of Transportation (CDOT) <u>Access Code</u> requirements, inbound left and right turn lanes and outbound left and right turn acceleration lanes are required on SH 160 at the site driveway due to the peak day, peak hour volumes for those movement. After further discussions with CDOT Region 5 staff, it was agreed that the inbound right turn deceleration lane and the outbound left turn acceleration lane west of the access intersection would be constructed as continuous accel/decel lanes between the Wolf Creek Ski Area driveway and the Village Access intersection. The left turn deceleration lane and the right turn acceleration lane east of the Village Access intersection were designed to CDOT Access Code standards for a 35 mph, Access Category R-A roadway with a six percent downgrade to the east, away from the intersection.



C0010322

*The Village at Wolf Creek*                                    *Traffic Impact Study*

**APPENDIX A**     **TRAFFIC COUNTS**



*Appendix A*

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

Page 1

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

| Start Time | 13-Mar-09 Fri | EB | WB | Total |
|---|---|---|---|---|
| 12:00 AM | | 2 | 9 | 11 |
| 01:00 | | 9 | 11 | 20 |
| 02:00 | | 1 | 3 | 4 |
| 03:00 | | 6 | 12 | 18 |
| 04:00 | | 7 | 14 | 21 |
| 05:00 | | 18 | 8 | 26 |
| 06:00 | | 23 | 18 | 41 |
| 07:00 | | 50 | 22 | 72 |
| 08:00 | | 112 | 20 | 132 |
| 09:00 | | **149** | 38 | **187** |
| 10:00 | | 120 | **52** | 172 |
| 11:00 | | 128 | 50 | 178 |
| 12:00 PM | | **118** | 69 | 187 |
| 01:00 | | 79 | 93 | 172 |
| 02:00 | | 85 | 118 | 203 |
| 03:00 | | 81 | 138 | 219 |
| 04:00 | | 69 | **200** | **269** |
| 05:00 | | 56 | 88 | 144 |
| 06:00 | | 69 | 52 | 121 |
| 07:00 | | 29 | 40 | 69 |
| 08:00 | | 27 | 38 | 65 |
| 09:00 | | 17 | 34 | 51 |
| 10:00 | | 18 | 27 | 45 |
| 11:00 | | 5 | 21 | 26 |
| Total | | 1278 | 1175 | 2453 |
| Percent | | 52.1% | 47.9% | |
| AM Peak | | 09:00 | 10:00 | 09:00 |
| Vol. | | 149 | 52 | 187 |
| PM Peak | | 12:00 | 16:00 | 16:00 |
| Vol. | | 118 | 200 | 269 |

C0010324

Page 2

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

14-Mar-09 Sat

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 4 | 12 | 16 |
| 01:00 | 6 | 9 | 15 |
| 02:00 | 7 | 8 | 15 |
| 03:00 | 1 | 7 | 8 |
| 04:00 | 4 | 2 | 6 |
| 05:00 | 14 | 8 | 22 |
| 06:00 | 24 | 16 | 40 |
| 07:00 | 61 | 18 | 79 |
| 08:00 | 135 | 29 | 164 |
| 09:00 | 187 | 37 | 224 |
| 10:00 | 152 | 41 | 193 |
| 11:00 | 103 | 55 | 158 |
| 12:00 PM | 84 | 89 | 173 |
| 01:00 | 56 | 84 | 140 |
| 02:00 | 54 | 129 | 183 |
| 03:00 | 61 | 191 | 252 |
| 04:00 | 65 | 299 | 364 |
| 05:00 | 42 | 95 | 137 |
| 06:00 | 18 | 50 | 68 |
| 07:00 | 14 | 34 | 48 |
| 08:00 | 19 | 40 | 59 |
| 09:00 | 10 | 16 | 26 |
| 10:00 | 9 | 17 | 26 |
| 11:00 | 11 | 10 | 21 |
| Total | 1141 | 1296 | 2437 |
| Percent | 46.8% | 53.2% | |
| AM Peak | 09:00 | 11:00 | 09:00 |
| Vol. | 187 | 55 | 224 |
| PM Peak | 12:00 | 16:00 | 16:00 |
| Vol. | 84 | 299 | 364 |

C0010325

Page 3

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

15-Mar-09 Sun

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 2 | 11 | 13 |
| 01:00 | 3 | 6 | 9 |
| 02:00 | 6 | 11 | 17 |
| 03:00 | 5 | 6 | 11 |
| 04:00 | 6 | 5 | 11 |
| 05:00 | 11 | 8 | 19 |
| 06:00 | 10 | 2 | 12 |
| 07:00 | 98 | 12 | 110 |
| 08:00 | 268 | 22 | 290 |
| 09:00 | 238 | 38 | 276 |
| 10:00 | 146 | 36 | 182 |
| 11:00 | 138 | 43 | 181 |
| 12:00 PM | 128 | 72 | 200 |
| 01:00 | 82 | 115 | 197 |
| 02:00 | 61 | 141 | 202 |
| 03:00 | 97 | 315 | 412 |
| 04:00 | 72 | 462 | 534 |
| 05:00 | 61 | 399 | 460 |
| 06:00 | 37 | 100 | 137 |
| 07:00 | 18 | 65 | 83 |
| 08:00 | 17 | 46 | 63 |
| 09:00 | 10 | 28 | 38 |
| 10:00 | 15 | 23 | 38 |
| 11:00 | 1 | 7 | 8 |
| Total | 1530 | 1973 | 3503 |
| Percent | 43.7% | 56.3% | |
| AM Peak | 08:00 | 11:00 | 08:00 |
| Vol. | 268 | 43 | 290 |
| PM Peak | 12:00 | 16:00 | 16:00 |
| Vol. | 128 | 462 | 534 |

C0010326

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

Page 4

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

| Start Time | 16-Mar-09 Mon EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 4 | 6 | 10 |
| 01:00 | 4 | 8 | 12 |
| 02:00 | 6 | 5 | 11 |
| 03:00 | 6 | 13 | 19 |
| 04:00 | 6 | 10 | 16 |
| 05:00 | 11 | 16 | 27 |
| 06:00 | 20 | 24 | 44 |
| 07:00 | 139 | 29 | 168 |
| 08:00 | 389 | 36 | 425 |
| 09:00 | 383 | 41 | 424 |
| 10:00 | 152 | 43 | 195 |
| 11:00 | 120 | 53 | 173 |
| 12:00 PM | 96 | 69 | 165 |
| 01:00 | 61 | 72 | 133 |
| 02:00 | 67 | 105 | 172 |
| 03:00 | 91 | 258 | 349 |
| 04:00 | 73 | 407 | 480 |
| 05:00 | 50 | 496 | 546 |
| 06:00 | 23 | 108 | 131 |
| 07:00 | 9 | 20 | 29 |
| 08:00 | 17 | 33 | 50 |
| 09:00 | 24 | 24 | 48 |
| 10:00 | 19 | 22 | 41 |
| 11:00 | 4 | 6 | 10 |
| Total | 1774 | 1904 | 3678 |
| Percent | 48.2% | 51.8% | |
| AM Peak | 08:00 | 11:00 | 08:00 |
| Vol. | 389 | 53 | 425 |
| PM Peak | 12:00 | 17:00 | 17:00 |
| Vol. | 96 | 496 | 546 |

C0010327

Page 5

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

17-Mar-09
Tue

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 1 | 8 | 9 |
| 01:00 | 8 | 8 | 16 |
| 02:00 | 2 | 6 | 8 |
| 03:00 | 2 | 16 | 18 |
| 04:00 | 9 | 8 | 17 |
| 05:00 | 9 | 13 | 22 |
| 06:00 | 31 | 18 | 49 |
| 07:00 | 148 | 21 | 169 |
| 08:00 | 378 | 34 | 412 |
| 09:00 | 345 | 56 | 401 |
| 10:00 | 152 | 35 | 187 |
| 11:00 | 128 | 54 | 182 |
| 12:00 PM | 119 | 63 | 182 |
| 01:00 | 76 | 63 | 139 |
| 02:00 | 44 | 104 | 148 |
| 03:00 | 75 | 235 | 310 |
| 04:00 | 86 | 366 | 452 |
| 05:00 | 56 | 427 | 483 |
| 06:00 | 27 | 106 | 133 |
| 07:00 | 18 | 39 | 57 |
| 08:00 | 18 | 37 | 55 |
| 09:00 | 14 | 19 | 33 |
| 10:00 | 15 | 18 | 33 |
| 11:00 | 5 | 3 | 8 |
| Total | 1766 | 1757 | 3523 |
| Percent | 50.1% | 49.9% | |
| AM Peak | 08:00 | 09:00 | 08:00 |
| Vol. | 378 | 56 | 412 |
| PM Peak | 12:00 | 17:00 | 17:00 |
| Vol. | 119 | 427 | 483 |

C0010328

Page 6

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

18-Mar-09 Wed

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 4 | 10 | 14 |
| 01:00 | 5 | 13 | 18 |
| 02:00 | 1 | 5 | 6 |
| 03:00 | 6 | 7 | 13 |
| 04:00 | 2 | 8 | 10 |
| 05:00 | 7 | 16 | 23 |
| 06:00 | 27 | 24 | 51 |
| 07:00 | 150 | 27 | 177 |
| 08:00 | 368 | 41 | 409 |
| 09:00 | 287 | 55 | 342 |
| 10:00 | 149 | 50 | 199 |
| 11:00 | 101 | 68 | 169 |
| 12:00 PM | 102 | 62 | 164 |
| 01:00 | 63 | 83 | 146 |
| 02:00 | 57 | 86 | 143 |
| 03:00 | 104 | 234 | 338 |
| 04:00 | 85 | 319 | 404 |
| 05:00 | 60 | 424 | 484 |
| 06:00 | 30 | 147 | 177 |
| 07:00 | 19 | 43 | 62 |
| 08:00 | 11 | 23 | 34 |
| 09:00 | 22 | 44 | 66 |
| 10:00 | 8 | 18 | 26 |
| 11:00 | 7 | 11 | 18 |
| Total | 1675 | 1818 | 3493 |
| Percent | 48.0% | 52.0% | |
| AM Peak | 08:00 | 11:00 | 08:00 |
| Vol. | 368 | 68 | 409 |
| PM Peak | 15:00 | 17:00 | 17:00 |
| Vol. | 104 | 424 | 484 |

C0010329

Page 7

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

19-Mar-09 Thu

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 8 | 11 | 19 |
| 01:00 | 7 | 9 | 16 |
| 02:00 | 2 | 9 | 11 |
| 03:00 | 6 | 13 | 19 |
| 04:00 | 7 | 8 | 15 |
| 05:00 | 5 | 8 | 13 |
| 06:00 | 17 | 13 | 30 |
| 07:00 | 155 | 17 | 172 |
| 08:00 | 256 | 45 | 301 |
| 09:00 | 254 | 57 | 311 |
| 10:00 | 144 | 50 | 194 |
| 11:00 | 137 | 63 | 200 |
| 12:00 PM | 100 | 51 | 151 |
| 01:00 | 94 | 82 | 176 |
| 02:00 | 61 | 74 | 135 |
| 03:00 | 94 | 197 | 291 |
| 04:00 | 104 | 292 | 396 |
| 05:00 | 84 | 357 | 441 |
| 06:00 | 47 | 102 | 149 |
| 07:00 | 42 | 46 | 88 |
| 08:00 | 31 | 30 | 61 |
| 09:00 | 23 | 28 | 51 |
| 10:00 | 13 | 27 | 40 |
| 11:00 | 9 | 11 | 20 |
| Total | 1700 | 1600 | 3300 |
| Percent | 51.5% | 48.5% | |
| AM Peak | 08:00 | 11:00 | 09:00 |
| Vol. | 256 | 63 | 311 |
| PM Peak | 16:00 | 17:00 | 17:00 |
| Vol. | 104 | 357 | 441 |

C0010330

Page 8

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

| Start Time | 20-Mar-09 Fri EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 6 | 11 | 17 |
| 01:00 | 5 | 13 | 18 |
| 02:00 | 8 | 12 | 20 |
| 03:00 | 9 | 11 | 20 |
| 04:00 | 5 | 6 | 11 |
| 05:00 | 9 | 11 | 20 |
| 06:00 | 11 | 14 | 25 |
| 07:00 | 104 | 31 | 135 |
| 08:00 | 181 | 31 | 212 |
| 09:00 | 199 | 52 | 251 |
| 10:00 | 167 | 47 | 214 |
| 11:00 | 121 | 55 | 176 |
| 12:00 PM | 109 | 67 | 176 |
| 01:00 | 88 | 67 | 155 |
| 02:00 | 65 | 118 | 183 |
| 03:00 | 105 | 157 | 262 |
| 04:00 | 121 | 233 | 354 |
| 05:00 | 91 | 294 | 385 |
| 06:00 | 42 | 104 | 146 |
| 07:00 | 31 | 52 | 83 |
| 08:00 | 29 | 48 | 77 |
| 09:00 | 24 | 50 | 74 |
| 10:00 | 17 | 28 | 45 |
| 11:00 | 7 | 18 | 25 |
| Total | 1554 | 1530 | 3084 |
| Percent | 50.4% | 49.6% | |
| AM Peak | 09:00 | 11:00 | 09:00 |
| Vol. | 199 | 55 | 251 |
| PM Peak | 16:00 | 17:00 | 17:00 |
| Vol. | 121 | 294 | 385 |

C0010331

Page 9

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

21-Mar-09 Sat

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 13 | 18 | 31 |
| 01:00 | 4 | 10 | 14 |
| 02:00 | 0 | 3 | 3 |
| 03:00 | 7 | 6 | 13 |
| 04:00 | 2 | 10 | 12 |
| 05:00 | 8 | 14 | 22 |
| 06:00 | 22 | 11 | 33 |
| 07:00 | 79 | 27 | 106 |
| 08:00 | 139 | 35 | 174 |
| 09:00 | 140 | 51 | 191 |
| 10:00 | 171 | 56 | 227 |
| 11:00 | 102 | 55 | 157 |
| 12:00 PM | 118 | 60 | 178 |
| 01:00 | 89 | 104 | 193 |
| 02:00 | 70 | 136 | 206 |
| 03:00 | 77 | 188 | 265 |
| 04:00 | 51 | 209 | 260 |
| 05:00 | 46 | 148 | 194 |
| 06:00 | 41 | 92 | 133 |
| 07:00 | 30 | 59 | 89 |
| 08:00 | 26 | 32 | 58 |
| 09:00 | 23 | 22 | 45 |
| 10:00 | 10 | 20 | 30 |
| 11:00 | 7 | 8 | 15 |
| Total | 1275 | 1374 | 2649 |
| Percent | 48.1% | 51.9% | |
| AM Peak | 10:00 | 10:00 | 10:00 |
| Vol. | 171 | 56 | 227 |
| PM Peak | 12:00 | 16:00 | 15:00 |
| Vol. | 118 | 209 | 265 |

C0010332

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

Page 10

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

| Start Time | 22-Mar-09 Sun | EB | WB | Total |
|---|---|---|---|---|
| 12:00 AM | | 5 | 6 | 11 |
| 01:00 | | 6 | 6 | 12 |
| 02:00 | | 6 | 6 | 12 |
| 03:00 | | 4 | 5 | 9 |
| 04:00 | | 8 | 4 | 12 |
| 05:00 | | 4 | 3 | 7 |
| 06:00 | | 23 | 7 | 30 |
| 07:00 | | 66 | 9 | 75 |
| 08:00 | | 114 | 24 | 138 |
| 09:00 | | 165 | 45 | 210 |
| 10:00 | | 148 | 63 | 211 |
| 11:00 | | 155 | 56 | 211 |
| 12:00 PM | | 164 | 100 | 264 |
| 01:00 | | 130 | 127 | 257 |
| 02:00 | | 116 | 155 | 271 |
| 03:00 | | 79 | 229 | 308 |
| 04:00 | | 76 | 221 | 297 |
| 05:00 | | 67 | 188 | 255 |
| 06:00 | | 38 | 103 | 141 |
| 07:00 | | 28 | 71 | 99 |
| 08:00 | | 26 | 33 | 59 |
| 09:00 | | 15 | 31 | 46 |
| 10:00 | | 13 | 16 | 29 |
| 11:00 | | 13 | 8 | 21 |
| Total | | 1469 | 1516 | 2985 |
| Percent | | 49.2% | 50.8% | |
| AM Peak | | 09:00 | 10:00 | 10:00 |
| Vol. | | 165 | 63 | 211 |
| PM Peak | | 12:00 | 15:00 | 15:00 |
| Vol. | | 164 | 229 | 308 |

C0010333

Page 11

Site Code: 1
Station ID: 1
SH160 W-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

23-Mar-09
Mon

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 9 | 6 | 15 |
| 01:00 | 1 | 5 | 6 |
| 02:00 | 5 | 6 | 11 |
| 03:00 | 6 | 5 | 11 |
| 04:00 | 8 | 9 | 17 |
| 05:00 | 8 | 12 | 20 |
| 06:00 | 19 | 15 | 34 |
| 07:00 | 39 | 22 | 61 |
| 08:00 | 124 | 27 | 151 |
| 09:00 | 188 | 33 | 221 |
| 10:00 | 186 | 59 | 245 |
| 11:00 | 149 | 62 | 211 |
| 12:00 PM | 135 | 72 | 207 |
| 01:00 | 91 | 91 | 182 |
| 02:00 | 76 | 112 | 188 |
| 03:00 | 51 | 157 | 208 |
| 04:00 | 41 | 169 | 210 |
| 05:00 | 50 | 119 | 169 |
| 06:00 | 46 | 77 | 123 |
| 07:00 | 18 | 30 | 48 |
| 08:00 | 9 | 26 | 35 |
| 09:00 | 27 | 40 | 67 |
| 10:00 | 13 | 14 | 27 |
| 11:00 | 8 | 16 | 24 |
| Total | 1307 | 1184 | 2491 |
| Percent | 52.5% | 47.5% | |
| AM Peak | 09:00 | 11:00 | 10:00 |
| Vol. | 188 | 62 | 245 |
| PM Peak | 12:00 | 16:00 | 16:00 |
| Vol. | 135 | 169 | 210 |
| Grand Total | 16469 | 17127 | 33596 |
| Percent | 49.0% | 51.0% | |
| ADT | ADT 3,114 | AADT 3,114 | |

C0010334

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

Page 1

Site Code:: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

13-Mar-09 Fri

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 3 | 4 | 7 |
| 01:00 | 6 | 0 | 6 |
| 02:00 | 2 | 1 | 3 |
| 03:00 | 4 | 1 | 5 |
| 04:00 | 8 | 2 | 10 |
| 05:00 | 5 | 2 | 7 |
| 06:00 | 14 | 9 | 23 |
| 07:00 | 22 | 41 | 63 |
| 08:00 | 47 | 45 | 92 |
| 09:00 | 61 | 61 | 122 |
| 10:00 | 77 | 60 | 137 |
| 11:00 | 86 | 54 | 140 |
| 12:00 PM | 86 | 78 | 164 |
| 01:00 | 80 | 100 | 180 |
| 02:00 | 68 | 88 | 156 |
| 03:00 | 86 | 74 | 160 |
| 04:00 | 112 | 95 | 207 |
| 05:00 | 48 | 64 | 112 |
| 06:00 | 43 | 61 | 104 |
| 07:00 | 26 | 52 | 78 |
| 08:00 | 10 | 28 | 38 |
| 09:00 | 12 | 14 | 26 |
| 10:00 | 14 | 21 | 35 |
| 11:00 | 4 | 16 | 20 |
| Total | 924 | 971 | 1895 |
| Percent | 48.8% | 51.2% | |
| AM Peak | 11:00 | 09:00 | 11:00 |
| Vol. | 86 | 61 | 140 |
| PM Peak | 16:00 | 13:00 | 16:00 |
| Vol. | 112 | 100 | 207 |

C0010335

Page 2

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

Site Code:: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

14-Mar-09 Sat

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 5 | 5 | 10 |
| 01:00 | 3 | 6 | 9 |
| 02:00 | 3 | 2 | 5 |
| 03:00 | 4 | 4 | 8 |
| 04:00 | 2 | 5 | 7 |
| 05:00 | 4 | 4 | 8 |
| 06:00 | 15 | 15 | 30 |
| 07:00 | 23 | 57 | 80 |
| 08:00 | 45 | 85 | 130 |
| 09:00 | 50 | 78 | 128 |
| 10:00 | 62 | 138 | 200 |
| 11:00 | 70 | 78 | 148 |
| 12:00 PM | 44 | 100 | 144 |
| 01:00 | 70 | 59 | 129 |
| 02:00 | 66 | 69 | 135 |
| 03:00 | 103 | 95 | 198 |
| 04:00 | 134 | 121 | 255 |
| 05:00 | 69 | 78 | 147 |
| 06:00 | 40 | 42 | 82 |
| 07:00 | 30 | 28 | 58 |
| 08:00 | 15 | 18 | 33 |
| 09:00 | 17 | 11 | 28 |
| 10:00 | 15 | 12 | 27 |
| 11:00 | 8 | 9 | 17 |
| Total | 897 | 1119 | 2016 |
| Percent | 44.5% | 55.5% | |
| AM Peak | 11:00 | 10:00 | 10:00 |
| Vol. | 70 | 138 | 200 |
| PM Peak | 16:00 | 16:00 | 16:00 |
| Vol. | 134 | 121 | 255 |

C0010336

Page 3

Site Code:: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

| Start Time | 15-Mar-09 Sun | EB | WB | Total |
|---|---|---|---|---|
| 12:00 AM | | 7 | 5 | 12 |
| 01:00 | | 3 | 4 | 7 |
| 02:00 | | 2 | 4 | 6 |
| 03:00 | | 0 | 0 | 0 |
| 04:00 | | 1 | 2 | 3 |
| 05:00 | | 3 | 10 | 13 |
| 06:00 | | 8 | 12 | 20 |
| 07:00 | | 17 | 89 | 106 |
| 08:00 | | 40 | **137** | **177** |
| 09:00 | | 64 | 101 | 165 |
| 10:00 | | 70 | 88 | 158 |
| 11:00 | | **73** | 94 | 167 |
| 12:00 PM | | 83 | 86 | 169 |
| 01:00 | | 100 | 99 | 199 |
| 02:00 | | 100 | 96 | 196 |
| 03:00 | | 140 | 178 | 318 |
| 04:00 | | 167 | **200** | 367 |
| 05:00 | | **209** | 168 | **377** |
| 06:00 | | 52 | 64 | 116 |
| 07:00 | | 30 | 28 | 58 |
| 08:00 | | 30 | 36 | 66 |
| 09:00 | | 16 | 21 | 37 |
| 10:00 | | 17 | 14 | 31 |
| 11:00 | | 14 | 18 | 32 |
| Total | | 1246 | 1554 | 2800 |
| Percent | | 44.5% | 55.5% | |
| AM Peak | | 11:00 | 08:00 | 08:00 |
| Vol. | | 73 | 137 | 177 |
| PM Peak | | 17:00 | 16:00 | 17:00 |
| Vol. | | 209 | 200 | 377 |

C0010337

Page 4

Site Code: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

16-Mar-09 Mon

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 5 | 5 | 10 |
| 01:00 | 0 | 0 | 0 |
| 02:00 | 2 | 2 | 4 |
| 03:00 | 2 | 5 | 7 |
| 04:00 | 2 | 4 | 6 |
| 05:00 | 8 | 11 | 19 |
| 06:00 | 16 | 30 | 46 |
| 07:00 | 20 | 114 | 134 |
| 08:00 | 31 | 204 | 235 |
| 09:00 | 74 | 121 | 195 |
| 10:00 | 59 | 69 | 128 |
| 11:00 | 116 | 115 | 231 |
| 12:00 PM | 92 | 89 | 181 |
| 01:00 | 28 | 56 | 84 |
| 02:00 | 89 | 61 | 150 |
| 03:00 | 147 | 118 | 265 |
| 04:00 | 170 | 142 | 312 |
| 05:00 | 188 | 130 | 318 |
| 06:00 | 76 | 32 | 108 |
| 07:00 | 37 | 9 | 46 |
| 08:00 | 26 | 15 | 41 |
| 09:00 | 17 | 22 | 39 |
| 10:00 | 16 | 18 | 34 |
| 11:00 | 5 | 3 | 8 |
| Total | 1226 | 1375 | 2601 |
| Percent | 47.1% | 52.9% | |
| AM Peak | 11:00 | 08:00 | 08:00 |
| Vol. | 116 | 204 | 235 |
| PM Peak | 17:00 | 16:00 | 17:00 |
| Vol. | 188 | 142 | 318 |

C0010338

Page 5

Site Code:: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

| Start Time | 17-Mar-09 Tue EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 6 | 1 | 7 |
| 01:00 | 4 | 8 | 12 |
| 02:00 | 1 | 2 | 3 |
| 03:00 | 2 | 2 | 4 |
| 04:00 | 2 | 9 | 11 |
| 05:00 | 7 | 9 | 16 |
| 06:00 | 12 | 20 | 32 |
| 07:00 | 26 | 120 | 146 |
| 08:00 | 47 | 179 | 226 |
| 09:00 | 73 | 145 | 218 |
| 10:00 | 66 | 89 | 155 |
| 11:00 | 94 | 115 | 209 |
| 12:00 PM | 87 | 110 | 197 |
| 01:00 | 72 | 70 | 142 |
| 02:00 | 99 | 64 | 163 |
| 03:00 | 115 | 91 | 206 |
| 04:00 | 177 | 93 | 270 |
| 05:00 | 241 | 94 | 335 |
| 06:00 | 71 | 25 | 96 |
| 07:00 | 34 | 16 | 50 |
| 08:00 | 26 | 16 | 42 |
| 09:00 | 22 | 13 | 35 |
| 10:00 | 11 | 14 | 25 |
| 11:00 | 4 | 4 | 8 |
| Total | 1299 | 1309 | 2608 |
| Percent | 49.8% | 50.2% | |
| AM Peak | 11:00 | 08:00 | 08:00 |
| Vol. | 94 | 179 | 226 |
| PM Peak | 17:00 | 12:00 | 17:00 |
| Vol. | 241 | 110 | 335 |

Page 6

Site Code: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

18-Mar-09 Wed

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 10 | 3 | 13 |
| 01:00 | 3 | 4 | 7 |
| 02:00 | 1 | 1 | 2 |
| 03:00 | 2 | 5 | 7 |
| 04:00 | 3 | 2 | 5 |
| 05:00 | 10 | 7 | 17 |
| 06:00 | 17 | 25 | 42 |
| 07:00 | 40 | 126 | 166 |
| 08:00 | 67 | 166 | 233 |
| 09:00 | 66 | 114 | 180 |
| 10:00 | 76 | 78 | 154 |
| 11:00 | 93 | 93 | 186 |
| 12:00 PM | 79 | 94 | 173 |
| 01:00 | 79 | 58 | 137 |
| 02:00 | 99 | 53 | 152 |
| 03:00 | 129 | 99 | 228 |
| 04:00 | 156 | 71 | 227 |
| 05:00 | 247 | 52 | 299 |
| 06:00 | 60 | 27 | 87 |
| 07:00 | 32 | 18 | 50 |
| 08:00 | 34 | 10 | 44 |
| 09:00 | 27 | 20 | 47 |
| 10:00 | 18 | 8 | 26 |
| 11:00 | 9 | 7 | 16 |
| Total | 1357 | 1141 | 2498 |
| Percent | 54.3% | 45.7% | |
| AM Peak | 11:00 | 08:00 | 08:00 |
| Vol. | 93 | 166 | 233 |
| PM Peak | 17:00 | 15:00 | 17:00 |
| Vol. | 247 | 99 | 299 |

C0010340

Page 7

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

Site Code:: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

| Start Time | 19-Mar-09 Thu | EB | WB | Total |
|---|---|---|---|---|
| 12:00 AM | | 9 | 8 | 17 |
| 01:00 | | 0 | 7 | 7 |
| 02:00 | | 4 | 2 | 6 |
| 03:00 | | 3 | 5 | 8 |
| 04:00 | | 4 | 7 | 11 |
| 05:00 | | 16 | 4 | 20 |
| 06:00 | | 11 | 15 | 26 |
| 07:00 | | 34 | 110 | 144 |
| 08:00 | | 72 | **139** | **211** |
| 09:00 | | 86 | 124 | 210 |
| 10:00 | | **100** | 111 | 211 |
| 11:00 | | 78 | 96 | 174 |
| 12:00 PM | | 86 | **92** | 178 |
| 01:00 | | 95 | 87 | 182 |
| 02:00 | | 103 | 56 | 159 |
| 03:00 | | 120 | 77 | 197 |
| 04:00 | | 173 | 76 | 249 |
| 05:00 | | **256** | 71 | **327** |
| 06:00 | | 92 | 44 | 136 |
| 07:00 | | 42 | 38 | 80 |
| 08:00 | | 31 | 29 | 60 |
| 09:00 | | 30 | 21 | 51 |
| 10:00 | | 14 | 12 | 26 |
| 11:00 | | 12 | 9 | 21 |
| Total | | 1471 | 1240 | 2711 |
| Percent | | 54.3% | 45.7% | |
| AM Peak | | 10:00 | 08:00 | 08:00 |
| Vol. | | 100 | 139 | 211 |
| PM Peak | | 17:00 | 12:00 | 17:00 |
| Vol. | | 256 | 92 | 327 |

C0010341

Page 8

Site Code: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge,CO 80033
www.alltrafficdata.net

| Start Time | 20-Mar-09 Fri EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 5 | 5 | 10 |
| 01:00 | 4 | 4 | 8 |
| 02:00 | 2 | 8 | 10 |
| 03:00 | 4 | 9 | 13 |
| 04:00 | 5 | 4 | 9 |
| 05:00 | 11 | 9 | 20 |
| 06:00 | 19 | 10 | 29 |
| 07:00 | 43 | 87 | 130 |
| 08:00 | 90 | 105 | 195 |
| 09:00 | 91 | 108 | 199 |
| 10:00 | 83 | 102 | 185 |
| 11:00 | **111** | **112** | **223** |
| 12:00 PM | 110 | 84 | 194 |
| 01:00 | 90 | 81 | 171 |
| 02:00 | 89 | 60 | 149 |
| 03:00 | 141 | 81 | 222 |
| 04:00 | 181 | **125** | 306 |
| 05:00 | **256** | 108 | **364** |
| 06:00 | 65 | 36 | 101 |
| 07:00 | 49 | 29 | 78 |
| 08:00 | 32 | 26 | 58 |
| 09:00 | 31 | 22 | 53 |
| 10:00 | 14 | 15 | 29 |
| 11:00 | 5 | 7 | 12 |
| Total | 1531 | 1237 | 2768 |
| Percent | 55.3% | 44.7% | |
| AM Peak | 11:00 | 11:00 | 11:00 |
| Vol. | 111 | 112 | 223 |
| PM Peak | 17:00 | 16:00 | 17:00 |
| Vol. | 256 | 125 | 364 |

Page 9

Site Code:: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

21-Mar-09 Sat

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 7 | 12 | 19 |
| 01:00 | 1 | 3 | 4 |
| 02:00 | 2 | 0 | 2 |
| 03:00 | 6 | 7 | 13 |
| 04:00 | 5 | 2 | 7 |
| 05:00 | 10 | 8 | 18 |
| 06:00 | 29 | 20 | 49 |
| 07:00 | 49 | 65 | 114 |
| 08:00 | 66 | 108 | 174 |
| 09:00 | 89 | 84 | 173 |
| 10:00 | 102 | 89 | 191 |
| 11:00 | 86 | 94 | 180 |
| 12:00 PM | 84 | 99 | 183 |
| 01:00 | 54 | 51 | 105 |
| 02:00 | 73 | 65 | 138 |
| 03:00 | 97 | 113 | 210 |
| 04:00 | 91 | 117 | 208 |
| 05:00 | 122 | 63 | 185 |
| 06:00 | 52 | 38 | 90 |
| 07:00 | 33 | 27 | 60 |
| 08:00 | 22 | 24 | 46 |
| 09:00 | 24 | 21 | 45 |
| 10:00 | 14 | 9 | 23 |
| 11:00 | 7 | 7 | 14 |
| Total | 1125 | 1126 | 2251 |
| Percent | 50.0% | 50.0% | |
| AM Peak | 10:00 | 08:00 | 10:00 |
| Vol. | 102 | 108 | 191 |
| PM Peak | 17:00 | 16:00 | 15:00 |
| Vol. | 122 | 117 | 210 |

C0010343

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

Page 10

Site Code: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

22-Mar-09 Sun

| Start Time | EB | WB | Total |
|---|---|---|---|
| 12:00 AM | 4 | 4 | 8 |
| 01:00 | 6 | 5 | 11 |
| 02:00 | 1 | 5 | 6 |
| 03:00 | 4 | 3 | 7 |
| 04:00 | 3 | 8 | 11 |
| 05:00 | 6 | 3 | 9 |
| 06:00 | 18 | 21 | 39 |
| 07:00 | 26 | 39 | 65 |
| 08:00 | 48 | 37 | 85 |
| 09:00 | 80 | 50 | 130 |
| 10:00 | 100 | 76 | 176 |
| 11:00 | 116 | 73 | 189 |
| 12:00 PM | 84 | 81 | 165 |
| 01:00 | 78 | 90 | 168 |
| 02:00 | 83 | 67 | 150 |
| 03:00 | 106 | 150 | 256 |
| 04:00 | 85 | 120 | 205 |
| 05:00 | 86 | 145 | 231 |
| 06:00 | 45 | 80 | 125 |
| 07:00 | 27 | 26 | 53 |
| 08:00 | 29 | 24 | 53 |
| 09:00 | 17 | 14 | 31 |
| 10:00 | 10 | 12 | 22 |
| 11:00 | 5 | 12 | 17 |
| Total | 1067 | 1145 | 2212 |
| Percent | 48.2% | 51.8% | |
| AM Peak | 11:00 | 10:00 | 11:00 |
| Vol. | 116 | 76 | 189 |
| PM Peak | 15:00 | 15:00 | 15:00 |
| Vol. | 106 | 150 | 256 |

Site Code: 3
Station ID: 3
SH160 E-O WOLF CREEK ENTRANCE

All Traffic Data Services, Inc
9660 W 44th Ave
Wheat Ridge, CO 80033
www.alltrafficdata.net

| Start Time | EB | WB | Total |
|---|---|---|---|
| 23-Mar-09 Mon | | | |
| 12:00 AM | 6 | 9 | 15 |
| 01:00 | 1 | 1 | 2 |
| 02:00 | 5 | 4 | 9 |
| 03:00 | 4 | 5 | 9 |
| 04:00 | 0 | 8 | 8 |
| 05:00 | 3 | 8 | 11 |
| 06:00 | 8 | 18 | 26 |
| 07:00 | 24 | 32 | 56 |
| 08:00 | 31 | 56 | 87 |
| 09:00 | 51 | 64 | 115 |
| 10:00 | 65 | 65 | 130 |
| 11:00 | 87 | 88 | 175 |
| 12:00 PM | 62 | 85 | 147 |
| 01:00 | 68 | 54 | 122 |
| 02:00 | 62 | 60 | 122 |
| 03:00 | 65 | 74 | 139 |
| 04:00 | 67 | 77 | 144 |
| 05:00 | 64 | 42 | 106 |
| 06:00 | 48 | 43 | 91 |
| 07:00 | 18 | 17 | 35 |
| 08:00 | 11 | 10 | 21 |
| 09:00 | 15 | 12 | 27 |
| 10:00 | 6 | 12 | 18 |
| 11:00 | 3 | 8 | 11 |
| Total | 774 | 852 | 1626 |
| Percent | 47.6% | 52.4% | |
| AM Peak | 11:00 | 11:00 | 11:00 |
| Vol. | 87 | 88 | 175 |
| PM Peak | 13:00 | 12:00 | 12:00 |
| Vol. | 68 | 85 | 147 |
| Grand Total | 12917 | 13069 | 25986 |
| Percent | 49.7% | 50.3% | |
| ADT | ADT 2,409 | AADT 2,409 | |

C0010345



WWW.ALLTRAFFICDATA.NET

File Name  : #1 WOLF CREEK & US 160 3-13 AM
Site Code  : 00000000
Start Date  : 3/13/2009
Page No    : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 0 | 4 | 3 | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 0 | 0 | 12 |
| 07:15 AM | 0 | 0 | 0 | 0 | 0 | 1 | 8 | 0 | 1 | 0 | 0 | 0 | 4 | 6 | 0 | 0 | 20 |
| 07:30 AM | 1 | 0 | 0 | 0 | 0 | 10 | 4 | 0 | 1 | 0 | 0 | 0 | 6 | 8 | 0 | 0 | 30 |
| 07:45 AM | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 1 | 0 | 0 | 13 | 5 | 0 | 0 | 29 |
| Total | 1 | 0 | 0 | 0 | 0 | 20 | 20 | 0 | 2 | 1 | 0 | 0 | 25 | 22 | 0 | 0 | 91 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 4 | 6 | 0 | 1 | 0 | 0 | 0 | 8 | 10 | 0 | 0 | 29 |
| 08:15 AM | 0 | 0 | 0 | 1 | 0 | 5 | 9 | 0 | 0 | 0 | 0 | 0 | 14 | 14 | 0 | 0 | 43 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 3 | 8 | 0 | 0 | 0 | 0 | 0 | 19 | 11 | 0 | 0 | 41 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 5 | 8 | 0 | 1 | 0 | 0 | 0 | 20 | 11 | 0 | 0 | 45 |
| Total | 0 | 0 | 0 | 1 | 0 | 17 | 31 | 0 | 2 | 0 | 0 | 0 | 61 | 46 | 0 | 0 | 158 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 9 | 13 | 0 | 0 | 0 | 1 | 0 | 23 | 13 | 0 | 0 | 59 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 8 | 2 | 0 | 1 | 0 | 2 | 0 | 21 | 16 | 0 | 0 | 50 |
| 09:30 AM | 0 | 0 | 1 | 0 | 1 | 4 | 5 | 0 | 0 | 0 | 1 | 0 | 31 | 15 | 0 | 0 | 58 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 15 | 9 | 0 | 3 | 0 | 1 | 0 | 10 | 14 | 0 | 0 | 52 |
| Total | 0 | 0 | 1 | 0 | 1 | 36 | 29 | 0 | 4 | 0 | 5 | 0 | 85 | 58 | 0 | 0 | 219 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 1 | 0 | 1 | 1 | 1 | 73 | 80 | 0 | 8 | 1 | 5 | 0 | 171 | 126 | 0 | 0 | 468 |
| Apprch % | 33.3 | 0 | 33.3 | 33.3 | 0.6 | 47.4 | 51.9 | 0 | 57.1 | 7.1 | 35.7 | 0 | 57.6 | 42.4 | 0 | 0 | |
| Total % | 0.2 | 0 | 0.2 | 0.2 | 0.2 | 15.6 | 17.1 | 0 | 1.7 | 0.2 | 1.1 | 0 | 36.5 | 26.9 | 0 | 0 | |

C0010346



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-13 AM
Site Code : 00000000
Start Date : 3/13/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 09:00 AM | | | | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 13 | 0 | 22 | 0 | 0 | 1 | 0 | 1 | 23 | 13 | 0 | 0 | 36 | 59 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 2 | 0 | 10 | 1 | 0 | 2 | 0 | 3 | 21 | 16 | 0 | 0 | 37 | 50 |
| 09:30 AM | 0 | 0 | 1 | 0 | 1 | 1 | 4 | 5 | 0 | 10 | 0 | 0 | 1 | 0 | 1 | 31 | 15 | 0 | 0 | 46 | 58 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 9 | 0 | 24 | 3 | 0 | 1 | 0 | 4 | 10 | 14 | 0 | 0 | 24 | 52 |
| Total Volume | 0 | 0 | 1 | 0 | 1 | 1 | 36 | 29 | 0 | 66 | 4 | 0 | 5 | 0 | 9 | 85 | 58 | 0 | 0 | 143 | 219 |
| % App. Total | 0 | 0 | 100 | 0 | | 1.5 | 54.5 | 43.9 | 0 | | 44.4 | 0 | 55.6 | 0 | | 59.4 | 40.6 | 0 | 0 | | |
| PHF | .000 | .000 | .250 | .000 | .250 | .250 | .600 | .558 | .000 | .688 | .333 | .000 | .625 | .000 | .563 | .685 | .906 | .000 | .000 | .777 | .928 |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-13 AM
Site Code : 00000000
Start Date : 3/13/2009
Page No : 3



C0010348



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-13 PM
Site Code : 00000000
Start Date : 3/13/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 2 | 0 | 11 | 0 | 1 | 17 | 0 | 0 | 47 |
| 03:15 PM | 0 | 1 | 0 | 0 | 0 | 14 | 0 | 0 | 6 | 0 | 17 | 0 | 2 | 19 | 0 | 0 | 59 |
| 03:30 PM | 0 | 0 | 0 | 0 | 0 | 15 | 2 | 0 | 8 | 0 | 26 | 0 | 2 | 16 | 0 | 0 | 69 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 18 | 1 | 0 | 7 | 0 | 18 | 0 | 2 | 18 | 0 | 0 | 64 |
| Total | 0 | 1 | 0 | 0 | 0 | 63 | 3 | 0 | 23 | 0 | 72 | 0 | 7 | 70 | 0 | 0 | 239 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 29 | 0 | 0 | 15 | 0 | 27 | 0 | 0 | 16 | 0 | 0 | 87 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 16 | 0 | 39 | 0 | 2 | 14 | 0 | 0 | 97 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 16 | 3 | 0 | 15 | 0 | 22 | 0 | 1 | 14 | 0 | 0 | 71 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 21 | 2 | 0 | 16 | 0 | 25 | 0 | 3 | 15 | 1 | 0 | 83 |
| Total | 0 | 0 | 0 | 0 | 0 | 92 | 5 | 0 | 62 | 0 | 113 | 0 | 6 | 59 | 1 | 0 | 338 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 0 | 0 | 0 | 0 | 20 | 2 | 0 | 7 | 0 | 11 | 0 | 0 | 13 | 0 | 0 | 53 |
| 05:15 PM | 0 | 1 | 0 | 0 | 0 | 22 | 0 | 0 | 1 | 0 | 4 | 0 | 2 | 16 | 0 | 0 | 46 |
| 05:30 PM | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 2 | 0 | 2 | 0 | 0 | 9 | 0 | 0 | 28 |
| 05:45 PM | 0 | 0 | 0 | 0 | 0 | 10 | 0 | 0 | 0 | 0 | 3 | 0 | 0 | 12 | 0 | 0 | 25 |
| Total | 0 | 1 | 0 | 0 | 0 | 67 | 2 | 0 | 10 | 0 | 20 | 0 | 2 | 50 | 0 | 0 | 152 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 2 | 0 | 0 | 0 | 222 | 10 | 0 | 95 | 0 | 205 | 0 | 15 | 179 | 1 | 0 | 729 |
| Apprch % | 0 | 100 | 0 | 0 | 0 | 95.7 | 4.3 | 0 | 31.7 | 0 | 68.3 | 0 | 7.7 | 91.8 | 0.5 | 0 | |
| Total % | 0 | 0.3 | 0 | 0 | 0 | 30.5 | 1.4 | 0 | 13 | 0 | 28.1 | 0 | 2.1 | 24.6 | 0.1 | 0 | |

C0010349



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-13 PM
Site Code : 00000000
Start Date : 3/13/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 04:00 PM | | | | | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 0 | 0 | 29 | 15 | 0 | 27 | 0 | 42 | 0 | 16 | 0 | 0 | 16 | 87 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 26 | 16 | 0 | 39 | 0 | 55 | 2 | 14 | 0 | 0 | 16 | 97 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 0 | 16 | 3 | 0 | 19 | 15 | 0 | 22 | 0 | 37 | 1 | 14 | 0 | 0 | 15 | 71 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 21 | 2 | 0 | 23 | 16 | 0 | 25 | 0 | 41 | 3 | 15 | 1 | 0 | 19 | 83 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 0 | 92 | 5 | 0 | 97 | 62 | 0 | 113 | 0 | 175 | 6 | 59 | 1 | 0 | 66 | 338 |
| % App. Total | 0 | 0 | 0 | 0 | | 0 | 94.8 | 5.2 | 0 | | 35.4 | 0 | 64.6 | 0 | | 9.1 | 89.4 | 1.5 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .000 | .793 | .417 | .000 | .836 | .969 | .000 | .724 | .000 | .795 | .500 | .922 | .250 | .000 | .868 | .871 |

C0010350



### WWW.ALLTRAFFICDATA.NET

File Name  : #1 WOLF CREEK & US 160 3-13 PM
Site Code  : 00000000
Start Date : 3/13/2009
Page No    : 3





WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-14 AM
Site Code : 00000000
Start Date : 3/14/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 0 | 0 | 0 | 3 | 3 | 0 | 0 | 16 |
| 07:15 AM | 0 | 0 | 0 | 0 | 0 | 4 | 8 | 0 | 0 | 0 | 0 | 0 | 3 | 4 | 0 | 0 | 19 |
| 07:30 AM | 1 | 0 | 0 | 0 | 2 | 1 | 10 | 0 | 0 | 0 | 0 | 0 | 11 | 5 | 0 | 0 | 30 |
| 07:45 AM | 1 | 0 | 0 | 1 | 0 | 6 | 18 | 0 | 2 | 1 | 0 | 0 | 17 | 12 | 0 | 0 | 58 |
| Total | 2 | 0 | 0 | 1 | 2 | 16 | 41 | 0 | 2 | 1 | 0 | 0 | 34 | 24 | 0 | 0 | 123 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 7 | 10 | 0 | 0 | 0 | 0 | 0 | 11 | 10 | 0 | 0 | 38 |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 6 | 12 | 0 | 0 | 0 | 1 | 0 | 30 | 8 | 0 | 0 | 57 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 4 | 15 | 0 | 0 | 0 | 3 | 0 | 26 | 14 | 0 | 0 | 62 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 9 | 18 | 0 | 0 | 0 | 1 | 0 | 21 | 11 | 0 | 0 | 60 |
| Total | 0 | 0 | 0 | 0 | 0 | 26 | 55 | 0 | 0 | 0 | 5 | 0 | 88 | 43 | 0 | 0 | 217 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 4 | 11 | 0 | 1 | 2 | 2 | 0 | 42 | 9 | 0 | 0 | 71 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 6 | 13 | 0 | 2 | 0 | 3 | 1 | 27 | 17 | 0 | 0 | 69 |
| 09:30 AM | 0 | 1 | 0 | 0 | 0 | 9 | 11 | 0 | 2 | 0 | 4 | 1 | 37 | 8 | 0 | 0 | 73 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 8 | 10 | 0 | 0 | 0 | 2 | 0 | 24 | 12 | 0 | 0 | 56 |
| Total | 0 | 1 | 0 | 0 | 0 | 27 | 45 | 0 | 5 | 2 | 11 | 2 | 130 | 46 | 0 | 0 | 269 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 2 | 1 | 0 | 1 | 2 | 69 | 141 | 0 | 7 | 3 | 16 | 2 | 252 | 113 | 0 | 0 | 609 |
| Apprch % | 50 | 25 | 0 | 25 | 0.9 | 32.5 | 66.5 | 0 | 25 | 10.7 | 57.1 | 7.1 | 69 | 31 | 0 | 0 | |
| Total % | 0.3 | 0.2 | 0 | 0.2 | 0.3 | 11.3 | 23.2 | 0 | 1.1 | 0.5 | 2.6 | 0.3 | 41.4 | 18.6 | 0 | 0 | |

C0010352



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-14 AM
Site Code : 00000000
Start Date : 3/14/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:45 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 18 | 0 | 27 | 0 | 0 | 1 | 0 | 1 | 21 | 11 | 0 | 0 | 32 | 60 |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 11 | 0 | 15 | 1 | 2 | 2 | 0 | 5 | 42 | 9 | 0 | 0 | 51 | 71 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 13 | 0 | 19 | 2 | 0 | 3 | 1 | 6 | 27 | 17 | 0 | 0 | 44 | 69 |
| 09:30 AM | 0 | 1 | 0 | 0 | 1 | 0 | 9 | 11 | 0 | 20 | 2 | 0 | 4 | 1 | 7 | 37 | 8 | 0 | 0 | 45 | 73 |
| Total Volume | 0 | 1 | 0 | 0 | 1 | 0 | 28 | 53 | 0 | 81 | 5 | 2 | 10 | 2 | 19 | 127 | 45 | 0 | 0 | 172 | 273 |
| % App. Total | 0 | 100 | 0 | 0 | | 0 | 34.6 | 65.4 | 0 | | 26.3 | 10.5 | 52.6 | 10.5 | | 73.8 | 26.2 | 0 | 0 | | |
| PHF | .000 | .250 | .000 | .000 | .250 | .000 | .778 | .736 | .000 | .750 | .625 | .250 | .625 | .500 | .679 | .756 | .662 | .000 | .000 | .843 | .935 |

C0010353



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-14 AM
Site Code : 00000000
Start Date : 3/14/2009
Page No    : 3



C0010354



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-14 PM
Site Code : 00000000
Start Date : 3/14/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 22 | 5 | 0 | 14 | 0 | 13 | 0 | 2 | 13 | 0 | 0 | 69 |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 19 | 1 | 0 | 15 | 0 | 25 | 2 | 6 | 10 | 0 | 0 | 78 |
| 03:30 PM | 0 | 1 | 0 | 1 | 0 | 19 | 0 | 0 | 11 | 0 | 36 | 1 | 4 | 12 | 0 | 0 | 85 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 24 | 6 | 0 | 24 | 0 | 44 | 1 | 6 | 7 | 0 | 0 | 112 |
| Total | 0 | 1 | 0 | 1 | 0 | 84 | 12 | 0 | 64 | 0 | 118 | 4 | 18 | 42 | 0 | 0 | 344 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 26 | 4 | 0 | 16 | 0 | 63 | 0 | 7 | 10 | 0 | 0 | 126 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 20 | 5 | 0 | 36 | 0 | 59 | 0 | 2 | 7 | 2 | 0 | 131 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 24 | 3 | 0 | 32 | 0 | 38 | 1 | 2 | 14 | 0 | 0 | 114 |
| 04:45 PM | 0 | 2 | 0 | 0 | 0 | 32 | 3 | 0 | 10 | 1 | 27 | 0 | 2 | 10 | 0 | 0 | 87 |
| Total | 0 | 2 | 0 | 0 | 0 | 102 | 15 | 0 | 94 | 1 | 187 | 1 | 13 | 41 | 2 | 0 | 458 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 0 | 0 | 0 | 0 | 21 | 1 | 0 | 20 | 0 | 16 | 0 | 4 | 9 | 0 | 0 | 71 |
| 05:15 PM | 0 | 1 | 0 | 0 | 1 | 17 | 3 | 0 | 6 | 1 | 8 | 0 | 0 | 8 | 0 | 0 | 45 |
| 05:30 PM | 0 | 0 | 0 | 0 | 0 | 14 | 1 | 0 | 4 | 0 | 3 | 0 | 2 | 9 | 0 | 0 | 33 |
| 05:45 PM | 0 | 0 | 0 | 0 | 0 | 17 | 2 | 0 | 1 | 0 | 3 | 0 | 0 | 9 | 0 | 0 | 32 |
| Total | 0 | 1 | 0 | 0 | 1 | 69 | 7 | 0 | 31 | 1 | 30 | 0 | 6 | 35 | 0 | 0 | 181 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 4 | 0 | 1 | 1 | 255 | 34 | 0 | 189 | 2 | 335 | 5 | 37 | 118 | 2 | 0 | 983 |
| Apprch % | 0 | 80 | 0 | 20 | 0.3 | 87.9 | 11.7 | 0 | 35.6 | 0.4 | 63.1 | 0.9 | 23.6 | 75.2 | 1.3 | 0 | |
| Total % | 0 | 0.4 | 0 | 0.1 | 0.1 | 25.9 | 3.5 | 0 | 19.2 | 0.2 | 34.1 | 0.5 | 3.8 | 12 | 0.2 | 0 | |



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-14 PM
Site Code : 00000000
Start Date : 3/14/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 03:45 PM | | | | | | | | | | | | | | | | | | | | | |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 6 | 0 | 30 | 24 | 0 | 44 | 1 | 69 | 6 | 7 | 0 | 0 | 13 | 112 |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 4 | 0 | 30 | 16 | 0 | 63 | 0 | 79 | 7 | 10 | 0 | 0 | 17 | 126 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 20 | 5 | 0 | 25 | 36 | 0 | 59 | 0 | 95 | 2 | 7 | 2 | 0 | 11 | 131 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 3 | 0 | 27 | 32 | 0 | 38 | 1 | 71 | 2 | 14 | 0 | 0 | 16 | 114 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 0 | 94 | 18 | 0 | 112 | 108 | 0 | 204 | 2 | 314 | 17 | 38 | 2 | 0 | 57 | 483 |
| % App. Total | 0 | 0 | 0 | 0 | | 0 | 83.9 | 16.1 | 0 | | 34.4 | 0 | 65 | 0.6 | | 29.8 | 66.7 | 3.5 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .000 | .904 | .750 | .000 | .933 | .750 | .000 | .810 | .500 | .826 | .607 | .679 | .250 | .000 | .838 | .922 |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-14 PM
Site Code : 00000000
Start Date : 3/14/2009
Page No    : 3



C0010357



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-15 AM
Site Code : 00000000
Start Date : 3/15/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 0 | 3 | 9 | 0 | 0 | 0 | 0 | 0 | 11 | 2 | 0 | 0 | 25 |
| 07:15 AM | 0 | 0 | 0 | 2 | 0 | 5 | 13 | 0 | 1 | 0 | 0 | 0 | 12 | 5 | 0 | 0 | 38 |
| 07:30 AM | 1 | 0 | 0 | 0 | 0 | 2 | 12 | 0 | 2 | 0 | 0 | 0 | 15 | 2 | 0 | 0 | 34 |
| 07:45 AM | 1 | 0 | 0 | 0 | 0 | 4 | 42 | 0 | 0 | 0 | 0 | 0 | 42 | 8 | 0 | 0 | 97 |
| Total | 2 | 0 | 0 | 2 | 0 | 14 | 76 | 0 | 3 | 0 | 0 | 0 | 80 | 17 | 0 | 0 | 194 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 2 | 49 | 0 | 0 | 0 | 1 | 0 | 51 | 6 | 0 | 0 | 109 |
| 08:15 AM | 0 | 1 | 0 | 0 | 0 | 6 | 37 | 0 | 2 | 0 | 2 | 1 | 58 | 8 | 0 | 0 | 115 |
| 08:30 AM | 0 | 1 | 0 | 0 | 0 | 4 | 21 | 0 | 3 | 1 | 1 | 0 | 58 | 6 | 0 | 0 | 95 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 3 | 21 | 0 | 2 | 0 | 2 | 0 | 67 | 10 | 0 | 0 | 105 |
| Total | 0 | 2 | 0 | 0 | 0 | 15 | 128 | 0 | 7 | 1 | 6 | 1 | 234 | 30 | 0 | 0 | 424 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 5 | 25 | 0 | 2 | 0 | 4 | 0 | 40 | 14 | 0 | 0 | 90 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 3 | 21 | 0 | 0 | 0 | 4 | 0 | 55 | 15 | 0 | 0 | 98 |
| 09:30 AM | 1 | 0 | 0 | 0 | 1 | 8 | 14 | 0 | 1 | 1 | 3 | 0 | 39 | 12 | 0 | 0 | 80 |
| 09:45 AM | 0 | 1 | 0 | 1 | 0 | 8 | 14 | 0 | 5 | 0 | 6 | 0 | 34 | 18 | 0 | 0 | 87 |
| Total | 1 | 1 | 0 | 1 | 1 | 24 | 74 | 0 | 8 | 1 | 17 | 0 | 168 | 59 | 0 | 0 | 355 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 3 | 3 | 0 | 3 | 1 | 53 | 278 | 0 | 18 | 2 | 23 | 1 | 482 | 106 | 0 | 0 | 973 |
| Apprch % | 33.3 | 33.3 | 0 | 33.3 | 0.3 | 16 | 83.7 | 0 | 40.9 | 4.5 | 52.3 | 2.3 | 82 | 18 | 0 | 0 | |
| Total % | 0.3 | 0.3 | 0 | 0.3 | 0.1 | 5.4 | 28.6 | 0 | 1.8 | 0.2 | 2.4 | 0.1 | 49.5 | 10.9 | 0 | 0 | |



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-15 AM
Site Code : 00000000
Start Date : 3/15/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:00 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 49 | 0 | 51 | 0 | 0 | 1 | 0 | 1 | 51 | 6 | 0 | 0 | 57 | 109 |
| 08:15 AM | 0 | 1 | 0 | 0 | 1 | 0 | 6 | 37 | 0 | 43 | 2 | 0 | 2 | 1 | 5 | 58 | 8 | 0 | 0 | 66 | 115 |
| 08:30 AM | 0 | 1 | 0 | 0 | 1 | 0 | 4 | 21 | 0 | 25 | 3 | 1 | 1 | 0 | 5 | 58 | 6 | 0 | 0 | 64 | 95 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 21 | 0 | 24 | 2 | 0 | 2 | 0 | 4 | 67 | 10 | 0 | 0 | 77 | 105 |
| Total Volume | 0 | 2 | 0 | 0 | 2 | 0 | 15 | 128 | 0 | 143 | 7 | 1 | 6 | 1 | 15 | 234 | 30 | 0 | 0 | 264 | 424 |
| % App. Total | 0 | 100 | 0 | 0 | | 0 | 10.5 | 89.5 | 0 | | 46.7 | 6.7 | 40 | 6.7 | | 88.6 | 11.4 | 0 | 0 | | |
| PHF | .000 | .500 | .000 | .000 | .500 | .000 | .625 | .653 | .000 | .701 | .583 | .250 | .750 | .250 | .750 | .873 | .750 | .000 | .000 | .857 | .922 |



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-15 AM
Site Code : 00000000
Start Date : 3/15/2009
Page No   : 3





## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-15 PM
Site Code : 00000000
Start Date : 3/15/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 27 | 3 | 0 | 14 | 0 | 20 | 0 | 7 | 20 | 0 | 0 | 91 |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 47 | 1 | 0 | 14 | 0 | 39 | 0 | 11 | 18 | 0 | 0 | 130 |
| 03:30 PM | 0 | 1 | 0 | 0 | 0 | 41 | 5 | 0 | 25 | 0 | 47 | 1 | 11 | 9 | 0 | 0 | 140 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 45 | 2 | 0 | 31 | 0 | 45 | 0 | 10 | 13 | 0 | 0 | 146 |
| Total | 0 | 1 | 0 | 0 | 0 | 160 | 11 | 0 | 84 | 0 | 151 | 1 | 39 | 60 | 0 | 0 | 507 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 46 | 6 | 0 | 37 | 0 | 67 | 0 | 13 | 9 | 0 | 0 | 178 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 40 | 4 | 0 | 21 | 1 | 69 | 0 | 8 | 14 | 0 | 0 | 157 |
| 04:30 PM | 1 | 0 | 1 | 0 | 3 | 42 | 3 | 0 | 34 | 2 | 41 | 0 | 7 | 11 | 1 | 0 | 146 |
| 04:45 PM | 0 | 1 | 0 | 0 | 0 | 53 | 3 | 0 | 33 | 1 | 96 | 0 | 3 | 5 | 0 | 0 | 195 |
| Total | 1 | 1 | 1 | 0 | 3 | 181 | 16 | 0 | 125 | 4 | 273 | 0 | 31 | 39 | 1 | 0 | 676 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 2 | 0 | 0 | 0 | 58 | 1 | 0 | 28 | 0 | 55 | 0 | 3 | 14 | 0 | 0 | 161 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 34 | 1 | 0 | 52 | 0 | 78 | 0 | 1 | 18 | 0 | 0 | 184 |
| 05:30 PM | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 42 | 0 | 61 | 0 | 2 | 15 | 0 | 0 | 161 |
| 05:45 PM | 0 | 0 | 0 | 0 | 0 | 29 | 0 | 0 | 34 | 0 | 55 | 0 | 1 | 11 | 0 | 0 | 130 |
| Total | 0 | 2 | 0 | 0 | 0 | 162 | 2 | 0 | 156 | 0 | 249 | 0 | 7 | 58 | 0 | 0 | 636 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 1 | 4 | 1 | 0 | 3 | 503 | 29 | 0 | 365 | 4 | 673 | 1 | 77 | 157 | 1 | 0 | 1819 |
| Apprch % | 16.7 | 66.7 | 16.7 | 0 | 0.6 | 94 | 5.4 | 0 | 35 | 0.4 | 64.5 | 0.1 | 32.8 | 66.8 | 0.4 | 0 | |
| Total % | 0.1 | 0.2 | 0.1 | 0 | 0.2 | 27.7 | 1.6 | 0 | 20.1 | 0.2 | 37 | 0.1 | 4.2 | 8.6 | 0.1 | 0 | |

C0010361



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-15 PM
Site Code : 00000000
Start Date : 3/15/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 04:45 PM | | | | | | | | | | | | | | | | | | | | | |
| 04:45 PM | 0 | 1 | 0 | 0 | 1 | 0 | 53 | 3 | 0 | 56 | 33 | 1 | 96 | 0 | 130 | 3 | 5 | 0 | 0 | 8 | 195 |
| 05:00 PM | 0 | 2 | 0 | 0 | 2 | 0 | 58 | 1 | 0 | 59 | 28 | 0 | 55 | 0 | 83 | 3 | 14 | 0 | 0 | 17 | 161 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 34 | 1 | 0 | 35 | 52 | 0 | 78 | 0 | 130 | 1 | 18 | 0 | 0 | 19 | 184 |
| 05:30 PM | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 0 | 0 | 41 | 42 | 0 | 61 | 0 | 103 | 2 | 15 | 0 | 0 | 17 | 161 |
| Total Volume | 0 | 3 | 0 | 0 | 3 | 0 | 186 | 5 | 0 | 191 | 155 | 1 | 290 | 0 | 446 | 9 | 52 | 0 | 0 | 61 | 701 |
| % App. Total | 0 | 100 | 0 | 0 | | 0 | 97.4 | 2.6 | 0 | | 34.8 | 0.2 | 65 | 0 | | 14.8 | 85.2 | 0 | 0 | | |
| PHF | .000 | .375 | .000 | .000 | .375 | .000 | .802 | .417 | .000 | .809 | .745 | .250 | .755 | .000 | .858 | .750 | .722 | .000 | .000 | .803 | .899 |

C0010362



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-15 PM
Site Code : 00000000
Start Date : 3/15/2009
Page No : 3



C0010363



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-16 AM
Site Code : 00000000
Start Date : 3/16/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 5 | 2 | 7 | 6 | 0 | 0 | 2 | 1 | 1 | 6 | 7 | 3 | 0 | 40 |
| 07:15 AM | 1 | 0 | 0 | 4 | 1 | 3 | 14 | 0 | 1 | 2 | 0 | 3 | 14 | 5 | 1 | 0 | 49 |
| 07:30 AM | 1 | 0 | 0 | 0 | 0 | 9 | 17 | 0 | 0 | 0 | 0 | 0 | 27 | 9 | 0 | 0 | 63 |
| 07:45 AM | 0 | 0 | 0 | 2 | 0 | 6 | 49 | 0 | 0 | 3 | 1 | 2 | 62 | 2 | 1 | 0 | 128 |
| Total | 2 | 0 | 0 | 11 | 3 | 25 | 86 | 0 | 1 | 7 | 2 | 6 | 109 | 23 | 5 | 0 | 280 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 1 | 0 | 6 | 53 | 0 | 2 | 1 | 4 | 2 | 67 | 4 | 0 | 0 | 140 |
| 08:15 AM | 0 | 1 | 0 | 3 | 0 | 6 | 40 | 1 | 2 | 0 | 0 | 2 | 105 | 5 | 1 | 2 | 168 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 5 | 50 | 0 | 5 | 0 | 2 | 0 | 91 | 7 | 0 | 1 | 161 |
| 08:45 AM | 0 | 1 | 0 | 0 | 0 | 10 | 38 | 0 | 1 | 0 | 0 | 0 | 98 | 9 | 0 | 0 | 157 |
| Total | 0 | 2 | 0 | 4 | 0 | 27 | 181 | 1 | 10 | 1 | 6 | 4 | 361 | 25 | 1 | 3 | 626 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 1 | 0 | 6 | 28 | 0 | 1 | 0 | 6 | 0 | 89 | 11 | 0 | 0 | 142 |
| 09:15 AM | 1 | 0 | 0 | 1 | 0 | 9 | 19 | 0 | 1 | 0 | 4 | 0 | 83 | 14 | 1 | 0 | 133 |
| 09:30 AM | 0 | 0 | 0 | 0 | 1 | 10 | 17 | 0 | 1 | 0 | 1 | 1 | 71 | 21 | 0 | 0 | 123 |
| 09:45 AM | 0 | 1 | 0 | 0 | 0 | 6 | 19 | 0 | 1 | 0 | 2 | 1 | 61 | 22 | 0 | 0 | 113 |
| Total | 1 | 1 | 0 | 2 | 1 | 31 | 83 | 0 | 4 | 0 | 13 | 2 | 304 | 68 | 1 | 0 | 511 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 3 | 3 | 0 | 17 | 4 | 83 | 350 | 1 | 15 | 8 | 21 | 12 | 774 | 116 | 7 | 3 | 1417 |
| Apprch % | 13 | 13 | 0 | 73.9 | 0.9 | 18.9 | 79.9 | 0.2 | 26.8 | 14.3 | 37.5 | 21.4 | 86 | 12.9 | 0.8 | 0.3 | |
| Total % | 0.2 | 0.2 | 0 | 1.2 | 0.3 | 5.9 | 24.7 | 0.1 | 1.1 | 0.6 | 1.5 | 0.8 | 54.6 | 8.2 | 0.5 | 0.2 | |

C0010364



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-16 AM
Site Code : 00000000
Start Date : 3/16/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:15 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:15 AM | 0 | 1 | 0 | 3 | 4 | 0 | 6 | 40 | 1 | 47 | 2 | 0 | 0 | 2 | 4 | 105 | 5 | 1 | 2 | 113 | 168 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 50 | 0 | 55 | 5 | 0 | 2 | 0 | 7 | 91 | 7 | 0 | 1 | 99 | 161 |
| 08:45 AM | 0 | 1 | 0 | 0 | 1 | 0 | 10 | 38 | 0 | 48 | 1 | 0 | 0 | 0 | 1 | 98 | 9 | 0 | 0 | 107 | 157 |
| 09:00 AM | 0 | 0 | 0 | 1 | 1 | 0 | 6 | 28 | 0 | 34 | 1 | 0 | 6 | 0 | 7 | 89 | 11 | 0 | 0 | 100 | 142 |
| Total Volume | 0 | 2 | 0 | 4 | 6 | 0 | 27 | 156 | 1 | 184 | 9 | 0 | 8 | 2 | 19 | 383 | 32 | 1 | 3 | 419 | 628 |
| % App. Total | 0 | 33.3 | 0 | 66.7 | | 0 | 14.7 | 84.8 | 0.5 | | 47.4 | 0 | 42.1 | 10.5 | | 91.4 | 7.6 | 0.2 | 0.7 | | |
| PHF | .000 | .500 | .000 | .333 | .375 | .000 | .675 | .780 | .250 | .836 | .450 | .000 | .333 | .250 | .679 | .912 | .727 | .250 | .375 | .927 | .935 |



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-16 AM
Site Code : 00000000
Start Date : 3/16/2009
Page No : 3





### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-16 PM
Site Code : 00000000
Start Date : 3/16/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 2 | 1 | 1 | 2 | 18 | 4 | 0 | 20 | 2 | 32 | 2 | 9 | 15 | 0 | 0 | 108 |
| 03:15 PM | 0 | 1 | 1 | 1 | 0 | 17 | 7 | 1 | 18 | 1 | 36 | 0 | 5 | 12 | 0 | 0 | 100 |
| 03:30 PM | 0 | 0 | 1 | 0 | 0 | 28 | 10 | 0 | 22 | 0 | 44 | 0 | 9 | 14 | 0 | 0 | 128 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 25 | 4 | 0 | 23 | 0 | 56 | 0 | 9 | 17 | 0 | 0 | 134 |
| Total | 0 | 3 | 3 | 2 | 2 | 88 | 25 | 1 | 83 | 3 | 168 | 2 | 32 | 58 | 0 | 0 | 470 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 1 | 0 | 1 | 0 | 26 | 7 | 0 | 32 | 0 | 80 | 1 | 12 | 14 | 0 | 0 | 174 |
| 04:15 PM | 2 | 1 | 0 | 1 | 0 | 23 | 6 | 0 | 24 | 0 | 69 | 1 | 8 | 9 | 0 | 0 | 144 |
| 04:30 PM | 0 | 0 | 0 | 2 | 0 | 30 | 10 | 0 | 44 | 0 | 84 | 0 | 3 | 11 | 1 | 2 | 187 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 24 | 9 | 0 | 31 | 1 | 73 | 0 | 6 | 8 | 0 | 0 | 152 |
| Total | 2 | 2 | 0 | 4 | 0 | 103 | 32 | 0 | 131 | 1 | 306 | 2 | 29 | 42 | 1 | 2 | 657 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 1 | 1 | 0 | 1 | 0 | 24 | 8 | 0 | 44 | 0 | 96 | 0 | 4 | 9 | 0 | 0 | 188 |
| 05:15 PM | 0 | 1 | 0 | 0 | 0 | 29 | 6 | 0 | 45 | 0 | 126 | 0 | 2 | 8 | 0 | 0 | 217 |
| 05:30 PM | 1 | 0 | 0 | 2 | 0 | 37 | 6 | 0 | 53 | 1 | 90 | 4 | 4 | 14 | 0 | 0 | 212 |
| 05:45 PM | 1 | 0 | 1 | 0 | 0 | 32 | 3 | 0 | 36 | 3 | 63 | 5 | 0 | 11 | 0 | 0 | 155 |
| Total | 3 | 2 | 1 | 3 | 0 | 122 | 23 | 0 | 178 | 4 | 375 | 9 | 10 | 42 | 0 | 0 | 772 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 5 | 7 | 4 | 9 | 2 | 313 | 80 | 1 | 392 | 8 | 849 | 13 | 71 | 142 | 1 | 2 | 1899 |
| Apprch % | 20 | 28 | 16 | 36 | 0.5 | 79 | 20.2 | 0.3 | 31.1 | 0.6 | 67.3 | 1 | 32.9 | 65.7 | 0.5 | 0.9 | |
| Total % | 0.3 | 0.4 | 0.2 | 0.5 | 0.1 | 16.5 | 4.2 | 0.1 | 20.6 | 0.4 | 44.7 | 0.7 | 3.7 | 7.5 | 0.1 | 0.1 | |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-16 PM
Site Code : 00000000
Start Date : 3/16/2009
Page No : 2



| | WOLF CREEK RD<br>Southbound | | | | | US 160<br>Westbound | | | | | WOLF CREEK RD<br>Northbound | | | | | US 160<br>Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 05:00 PM | | | | | | | | | | | | | | | | | | | | | |
| 05:00 PM | 1 | 1 | 0 | 1 | 3 | 0 | 24 | 8 | 0 | 32 | 44 | 0 | 96 | 0 | 140 | 4 | 9 | 0 | 0 | 13 | 188 |
| 05:15 PM | 0 | 1 | 0 | 0 | 1 | 0 | 29 | 6 | 0 | 35 | 45 | 0 | 126 | 0 | 171 | 2 | 8 | 0 | 0 | 10 | 217 |
| 05:30 PM | 1 | 0 | 0 | 2 | 3 | 0 | 37 | 6 | 0 | 43 | 53 | 1 | 90 | 4 | 148 | 4 | 14 | 0 | 0 | 18 | 212 |
| 05:45 PM | 1 | 0 | 1 | 0 | 2 | 0 | 32 | 3 | 0 | 35 | 36 | 3 | 63 | 5 | 107 | 0 | 11 | 0 | 0 | 11 | 155 |
| Total Volume | 3 | 2 | 1 | 3 | 9 | 0 | 122 | 23 | 0 | 145 | 178 | 4 | 375 | 9 | 566 | 10 | 42 | 0 | 0 | 52 | 772 |
| % App. Total | 33.3 | 22.2 | 11.1 | 33.3 | | 0 | 84.1 | 15.9 | 0 | | 31.4 | 0.7 | 66.3 | 1.6 | | 19.2 | 80.8 | 0 | 0 | | |
| PHF | .750 | .500 | .250 | .375 | .750 | .000 | .824 | .719 | .000 | .843 | .840 | .333 | .744 | .450 | .827 | .625 | .750 | .000 | .000 | .722 | .889 |

C0010368



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-16 PM
Site Code : 00000000
Start Date : 3/16/2009
Page No : 3





### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-17 PM
Site Code : 00000000
Start Date : 3/17/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 1 | 0 | 0 | 0 | 15 | 2 | 0 | 10 | 0 | 30 | 0 | 7 | 13 | 0 | 0 | 78 |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 27 | 2 | 0 | 12 | 0 | 24 | 0 | 4 | 13 | 0 | 0 | 82 |
| 03:30 PM | 0 | 0 | 0 | 0 | 0 | 17 | 3 | 0 | 17 | 0 | 42 | 0 | 9 | 13 | 0 | 0 | 101 |
| 03:45 PM | 0 | 1 | 0 | 0 | 0 | 20 | 3 | 0 | 30 | 1 | 53 | 0 | 10 | 5 | 0 | 0 | 123 |
| Total | 0 | 2 | 0 | 0 | 0 | 79 | 10 | 0 | 69 | 1 | 149 | 0 | 30 | 44 | 0 | 0 | 384 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 1 | 1 | 0 | 0 | 1 | 18 | 14 | 0 | 32 | 0 | 61 | 0 | 3 | 15 | 0 | 0 | 146 |
| 04:15 PM | 1 | 0 | 0 | 0 | 0 | 20 | 4 | 0 | 26 | 0 | 64 | 0 | 4 | 21 | 1 | 0 | 141 |
| 04:30 PM | 0 | 1 | 0 | 0 | 0 | 14 | 4 | 0 | 28 | 0 | 75 | 0 | 4 | 11 | 0 | 0 | 137 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 17 | 7 | 0 | 27 | 0 | 96 | 0 | 6 | 16 | 1 | 0 | 170 |
| Total | 2 | 2 | 0 | 0 | 1 | 69 | 29 | 0 | 113 | 0 | 296 | 0 | 17 | 63 | 2 | 0 | 594 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 1 | 0 | 1 | 0 | 0 | 17 | 1 | 0 | 49 | 0 | 77 | 0 | 5 | 13 | 0 | 0 | 164 |
| 05:15 PM | 0 | 0 | 1 | 0 | 1 | 15 | 5 | 0 | 45 | 0 | 113 | 0 | 2 | 7 | 0 | 0 | 189 |
| 05:30 PM | 0 | 1 | 1 | 0 | 0 | 21 | 5 | 0 | 61 | 0 | 112 | 0 | 3 | 14 | 0 | 0 | 218 |
| 05:45 PM | 1 | 0 | 0 | 0 | 0 | 25 | 3 | 0 | 41 | 2 | 63 | 0 | 1 | 13 | 0 | 0 | 149 |
| Total | 2 | 1 | 3 | 0 | 1 | 78 | 14 | 0 | 196 | 2 | 365 | 0 | 11 | 47 | 0 | 0 | 720 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 4 | 5 | 3 | 0 | 2 | 226 | 53 | 0 | 378 | 3 | 810 | 0 | 58 | 154 | 2 | 0 | 1698 |
| Apprch % | 33.3 | 41.7 | 25 | 0 | 0.7 | 80.4 | 18.9 | 0 | 31.7 | 0.3 | 68 | 0 | 27.1 | 72 | 0.9 | 0 | |
| Total % | 0.2 | 0.3 | 0.2 | 0 | 0.1 | 13.3 | 3.1 | 0 | 22.3 | 0.2 | 47.7 | 0 | 3.4 | 9.1 | 0.1 | 0 | |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-17 PM
Site Code : 00000000
Start Date : 3/17/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 04:45 PM | | | | | | | | | | | | | | | | | | | | | |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 7 | 0 | 24 | 27 | 0 | 96 | 0 | 123 | 6 | 16 | 1 | 0 | 23 | 170 |
| 05:00 PM | 1 | 0 | 1 | 0 | 2 | 0 | 17 | 1 | 0 | 18 | 49 | 0 | 77 | 0 | 126 | 5 | 13 | 0 | 0 | 18 | 164 |
| 05:15 PM | 0 | 0 | 1 | 0 | 1 | 1 | 15 | 5 | 0 | 21 | 45 | 0 | 113 | 0 | 158 | 2 | 7 | 0 | 0 | 9 | 189 |
| 05:30 PM | 0 | 1 | 1 | 0 | 2 | 0 | 21 | 5 | 0 | 26 | 61 | 0 | 112 | 0 | 173 | 3 | 14 | 0 | 0 | 17 | 218 |
| Total Volume | 1 | 1 | 3 | 0 | 5 | 1 | 70 | 18 | 0 | 89 | 182 | 0 | 398 | 0 | 580 | 16 | 50 | 1 | 0 | 67 | 741 |
| % App. Total | 20 | 20 | 60 | 0 | | 1.1 | 78.7 | 20.2 | 0 | | 31.4 | 0 | 68.6 | 0 | | 23.9 | 74.6 | 1.5 | 0 | | |
| PHF | .250 | .250 | .750 | .000 | .625 | .250 | .833 | .643 | .000 | .856 | .746 | .000 | .881 | .000 | .838 | .667 | .781 | .250 | .000 | .728 | .850 |

C0010371



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-17 PM
Site Code : 00000000
Start Date : 3/17/2009
Page No   : 3





WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-17 AM
Site Code : 00000000
Start Date : 3/17/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 2 | 1 | 1 | 6 | 0 | 1 | 0 | 0 | 0 | 6 | 4 | 3 | 0 | 24 |
| 07:15 AM | 1 | 2 | 0 | 10 | 1 | 5 | 15 | 0 | 1 | 3 | 0 | 0 | 9 | 6 | 2 | 0 | 55 |
| 07:30 AM | 0 | 0 | 0 | 2 | 0 | 9 | 23 | 0 | 1 | 0 | 0 | 0 | 43 | 7 | 0 | 0 | 85 |
| 07:45 AM | 0 | 0 | 0 | 1 | 1 | 5 | 50 | 0 | 1 | 2 | 0 | 1 | 63 | 6 | 0 | 0 | 130 |
| Total | 1 | 2 | 0 | 15 | 3 | 20 | 94 | 0 | 4 | 5 | 0 | 1 | 121 | 23 | 5 | 0 | 294 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 1 | 0 | 7 | 56 | 0 | 5 | 0 | 0 | 0 | 87 | 12 | 0 | 0 | 168 |
| 08:15 AM | 0 | 1 | 0 | 2 | 0 | 8 | 37 | 0 | 2 | 1 | 2 | 0 | 93 | 7 | 0 | 0 | 153 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 6 | 32 | 0 | 1 | 0 | 5 | 0 | 97 | 7 | 0 | 0 | 148 |
| 08:45 AM | 1 | 0 | 0 | 0 | 0 | 5 | 35 | 0 | 2 | 0 | 2 | 0 | 76 | 10 | 0 | 0 | 131 |
| Total | 1 | 1 | 0 | 3 | 0 | 26 | 160 | 0 | 10 | 1 | 9 | 0 | 353 | 36 | 0 | 0 | 600 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 11 | 40 | 0 | 0 | 0 | 6 | 0 | 85 | 14 | 0 | 0 | 156 |
| 09:15 AM | 0 | 0 | 0 | 0 | 1 | 8 | 22 | 0 | 0 | 0 | 3 | 1 | 67 | 10 | 0 | 0 | 112 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 6 | 17 | 0 | 2 | 0 | 7 | 0 | 74 | 24 | 0 | 0 | 130 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 12 | 21 | 0 | 1 | 0 | 2 | 0 | 41 | 17 | 0 | 0 | 94 |
| Total | 0 | 0 | 0 | 0 | 1 | 37 | 100 | 0 | 3 | 0 | 18 | 1 | 267 | 65 | 0 | 0 | 492 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 2 | 3 | 0 | 18 | 4 | 83 | 354 | 0 | 17 | 6 | 27 | 2 | 741 | 124 | 5 | 0 | 1386 |
| Apprch % | 8.7 | 13 | 0 | 78.3 | 0.9 | 18.8 | 80.3 | 0 | 32.7 | 11.5 | 51.9 | 3.8 | 85.2 | 14.3 | 0.6 | 0 | |
| Total % | 0.1 | 0.2 | 0 | 1.3 | 0.3 | 6 | 25.5 | 0 | 1.2 | 0.4 | 1.9 | 0.1 | 53.5 | 8.9 | 0.4 | 0 | |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-17 AM
Site Code : 00000000
Start Date : 3/17/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:00 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 1 | 1 | 0 | 7 | 56 | 0 | 63 | 5 | 0 | 0 | 0 | 5 | 87 | 12 | 0 | 0 | 99 | 168 |
| 08:15 AM | 0 | 1 | 0 | 2 | 3 | 0 | 8 | 37 | 0 | 45 | 2 | 1 | 2 | 0 | 5 | 93 | 7 | 0 | 0 | 100 | 153 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 32 | 0 | 38 | 1 | 0 | 5 | 0 | 6 | 97 | 7 | 0 | 0 | 104 | 148 |
| 08:45 AM | 1 | 0 | 0 | 0 | 1 | 0 | 5 | 35 | 0 | 40 | 2 | 0 | 2 | 0 | 4 | 76 | 10 | 0 | 0 | 86 | 131 |
| Total Volume | 1 | 1 | 0 | 3 | 5 | 0 | 26 | 160 | 0 | 186 | 10 | 1 | 9 | 0 | 20 | 353 | 36 | 0 | 0 | 389 | 600 |
| % App. Total | 20 | 20 | 0 | 60 | | 0 | 14 | 86 | 0 | | 50 | 5 | 45 | 0 | | 90.7 | 9.3 | 0 | 0 | | |
| PHF | .250 | .250 | .000 | .375 | .417 | .000 | .813 | .714 | .000 | .738 | .500 | .250 | .450 | .000 | .833 | .910 | .750 | .000 | .000 | .935 | .893 |



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-17 AM
Site Code : 00000000
Start Date : 3/17/2009
Page No   : 3



C0010375



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-18 PM
Site Code : 00000000
Start Date : 3/18/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 3 | 0 | 0 | 0 | 17 | 4 | 0 | 12 | 2 | 22 | 0 | 7 | 25 | 0 | 0 | 92 |
| 03:15 PM | 0 | 1 | 0 | 3 | 0 | 21 | 5 | 0 | 10 | 1 | 40 | 0 | 6 | 14 | 0 | 0 | 101 |
| 03:30 PM | 0 | 2 | 0 | 1 | 0 | 20 | 1 | 0 | 15 | 0 | 40 | 0 | 5 | 22 | 0 | 0 | 106 |
| 03:45 PM | 0 | 0 | 0 | 1 | 1 | 20 | 4 | 0 | 13 | 0 | 48 | 0 | 5 | 16 | 0 | 0 | 108 |
| Total | 0 | 6 | 0 | 5 | 1 | 78 | 14 | 0 | 50 | 3 | 150 | 0 | 23 | 77 | 0 | 0 | 407 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 1 | 1 | 0 | 5 | 0 | 14 | 3 | 0 | 23 | 0 | 67 | 0 | 4 | 11 | 0 | 0 | 129 |
| 04:15 PM | 1 | 1 | 0 | 1 | 0 | 16 | 4 | 0 | 18 | 0 | 52 | 0 | 3 | 16 | 0 | 0 | 112 |
| 04:30 PM | 1 | 1 | 1 | 0 | 0 | 14 | 6 | 0 | 30 | 1 | 69 | 0 | 8 | 18 | 1 | 0 | 150 |
| 04:45 PM | 0 | 0 | 0 | 1 | 0 | 19 | 2 | 0 | 26 | 0 | 55 | 0 | 5 | 15 | 0 | 0 | 123 |
| Total | 3 | 3 | 1 | 7 | 0 | 63 | 15 | 0 | 97 | 1 | 243 | 0 | 20 | 60 | 1 | 0 | 514 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 2 | 0 | 0 | 0 | 11 | 2 | 0 | 49 | 2 | 85 | 3 | 5 | 14 | 0 | 0 | 173 |
| 05:15 PM | 0 | 1 | 1 | 0 | 1 | 7 | 0 | 0 | 48 | 0 | 112 | 1 | 5 | 9 | 0 | 0 | 185 |
| 05:30 PM | 0 | 0 | 0 | 2 | 0 | 8 | 0 | 0 | 62 | 0 | 120 | 1 | 1 | 17 | 0 | 0 | 211 |
| 05:45 PM | 3 | 4 | 0 | 5 | 0 | 20 | 0 | 0 | 34 | 1 | 52 | 1 | 2 | 10 | 0 | 0 | 132 |
| Total | 3 | 7 | 1 | 7 | 1 | 46 | 2 | 0 | 193 | 3 | 369 | 6 | 13 | 50 | 0 | 0 | 701 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 6 | 16 | 2 | 19 | 2 | 187 | 31 | 0 | 340 | 7 | 762 | 6 | 56 | 187 | 1 | 0 | 1622 |
| Apprch % | 14 | 37.2 | 4.7 | 44.2 | 0.9 | 85 | 14.1 | 0 | 30.5 | 0.6 | 68.3 | 0.5 | 23 | 76.6 | 0.4 | 0 | |
| Total % | 0.4 | 1 | 0.1 | 1.2 | 0.1 | 11.5 | 1.9 | 0 | 21 | 0.4 | 47 | 0.4 | 3.5 | 11.5 | 0.1 | 0 | |

C0010376



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-18 PM
Site Code : 00000000
Start Date : 3/18/2009
Page No   : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 05:00 PM | | | | | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 2 | 0 | 0 | 2 | 0 | 11 | 2 | 0 | 13 | 49 | 2 | 85 | 3 | 139 | 5 | 14 | 0 | 0 | 19 | 173 |
| 05:15 PM | 0 | 1 | 1 | 0 | 2 | 1 | 7 | 0 | 0 | 8 | 48 | 0 | 112 | 1 | 161 | 5 | 9 | 0 | 0 | 14 | 185 |
| 05:30 PM | 0 | 0 | 0 | 2 | 2 | 0 | 8 | 0 | 0 | 8 | 62 | 0 | 120 | 1 | 183 | 1 | 17 | 0 | 0 | 18 | 211 |
| 05:45 PM | 3 | 4 | 0 | 5 | 12 | 0 | 20 | 0 | 0 | 20 | 34 | 1 | 52 | 1 | 88 | 2 | 10 | 0 | 0 | 12 | 132 |
| Total Volume | 3 | 7 | 1 | 7 | 18 | 1 | 46 | 2 | 0 | 49 | 193 | 3 | 369 | 6 | 571 | 13 | 50 | 0 | 0 | 63 | 701 |
| % App. Total | 16.7 | 38.9 | 5.6 | 38.9 | | 2 | 93.9 | 4.1 | 0 | | 33.8 | 0.5 | 64.6 | 1.1 | | 20.6 | 79.4 | 0 | 0 | | |
| PHF | .250 | .438 | .250 | .350 | .375 | .250 | .575 | .250 | .000 | .613 | .778 | .375 | .769 | .500 | .780 | .650 | .735 | .000 | .000 | .829 | .831 |

C0010377



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-18 PM
Site Code : 00000000
Start Date : 3/18/2009
Page No   : 3





**WWW.ALLTRAFFICDATA.NET**

File Name : #1 WOLF CREEK & US 160 3-18 AM
Site Code : 00000000
Start Date : 3/18/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 1 | 7 | 2 | 0 | 1 | 1 | 1 | 0 | 8 | 8 | 5 | 0 | 34 |
| 07:15 AM | 1 | 0 | 0 | 0 | 2 | 3 | 12 | 0 | 1 | 1 | 0 | 0 | 12 | 12 | 1 | 0 | 45 |
| 07:30 AM | 0 | 2 | 0 | 0 | 1 | 11 | 34 | 0 | 0 | 0 | 0 | 0 | 33 | 9 | 0 | 0 | 90 |
| 07:45 AM | 0 | 0 | 0 | 0 | 0 | 3 | 48 | 0 | 0 | 2 | 1 | 0 | 58 | 10 | 0 | 0 | 122 |
| Total | 1 | 2 | 0 | 0 | 4 | 24 | 96 | 0 | 2 | 4 | 2 | 0 | 111 | 39 | 6 | 0 | 291 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 11 | 47 | 0 | 0 | 0 | 3 | 0 | 57 | 11 | 0 | 0 | 129 |
| 08:15 AM | 0 | 1 | 0 | 0 | 0 | 5 | 23 | 0 | 5 | 1 | 2 | 0 | 78 | 14 | 0 | 0 | 129 |
| 08:30 AM | 0 | 1 | 0 | 0 | 0 | 6 | 34 | 0 | 2 | 0 | 2 | 0 | 70 | 17 | 0 | 0 | 132 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 7 | 27 | 0 | 3 | 0 | 3 | 0 | 87 | 17 | 0 | 0 | 144 |
| Total | 0 | 2 | 0 | 0 | 0 | 29 | 131 | 0 | 10 | 1 | 10 | 0 | 292 | 59 | 0 | 0 | 534 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 1 | 0 | 0 | 1 | 12 | 30 | 0 | 9 | 0 | 3 | 0 | 68 | 10 | 0 | 0 | 134 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 9 | 19 | 0 | 1 | 0 | 4 | 0 | 49 | 16 | 0 | 0 | 98 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 7 | 16 | 0 | 0 | 1 | 5 | 0 | 62 | 14 | 0 | 0 | 105 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 11 | 17 | 0 | 1 | 0 | 3 | 0 | 44 | 17 | 0 | 0 | 93 |
| Total | 0 | 1 | 0 | 0 | 1 | 39 | 82 | 0 | 11 | 1 | 15 | 0 | 223 | 57 | 0 | 0 | 430 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 1 | 5 | 0 | 0 | 5 | 92 | 309 | 0 | 23 | 6 | 27 | 0 | 626 | 155 | 6 | 0 | 1255 |
| Apprch % | 16.7 | 83.3 | 0 | 0 | 1.2 | 22.7 | 76.1 | 0 | 41.1 | 10.7 | 48.2 | 0 | 79.5 | 19.7 | 0.8 | 0 | |
| Total % | 0.1 | 0.4 | 0 | 0 | 0.4 | 7.3 | 24.6 | 0 | 1.8 | 0.5 | 2.2 | 0 | 49.9 | 12.4 | 0.5 | 0 | |



**WWW.ALLTRAFFICDATA.NET**

File Name : #1 WOLF CREEK & US 160 3-18 AM
Site Code : 00000000
Start Date : 3/18/2009
Page No : 2



| Start Time | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:15 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:15 AM | 0 | 1 | 0 | 0 | 1 | 0 | 5 | 23 | 0 | 28 | 5 | 1 | 2 | 0 | 8 | 78 | 14 | 0 | 0 | 92 | 129 |
| 08:30 AM | 0 | 1 | 0 | 0 | 1 | 0 | 6 | 34 | 0 | 40 | 2 | 0 | 2 | 0 | 4 | 70 | 17 | 0 | 0 | 87 | 132 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 27 | 0 | 34 | 3 | 0 | 3 | 0 | 6 | 87 | 17 | 0 | 0 | 104 | 144 |
| 09:00 AM | 0 | 1 | 0 | 0 | 1 | 1 | 12 | 30 | 0 | 43 | 9 | 0 | 3 | 0 | 12 | 68 | 10 | 0 | 0 | 78 | 134 |
| Total Volume | 0 | 3 | 0 | 0 | 3 | 1 | 30 | 114 | 0 | 145 | 19 | 1 | 10 | 0 | 30 | 303 | 58 | 0 | 0 | 361 | 539 |
| % App. Total | 0 | 100 | 0 | 0 | | 0.7 | 20.7 | 78.6 | 0 | | 63.3 | 3.3 | 33.3 | 0 | | 83.9 | 16.1 | 0 | 0 | | |
| PHF | .000 | .750 | .000 | .000 | .750 | .250 | .625 | .838 | .000 | .843 | .528 | .250 | .833 | .000 | .625 | .871 | .853 | .000 | .000 | .868 | .936 |

C0010380



**WWW.ALLTRAFFICDATA.NET**

File Name : #1 WOLF CREEK & US 160 3-18 AM
Site Code : 00000000
Start Date : 3/18/2009
Page No : 3





WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-19 PM
Site Code : 00000000
Start Date : 3/19/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 1 | 0 | 0 | 1 | 0 | 16 | 3 | 0 | 10 | 0 | 19 | 0 | 6 | 22 | 0 | 0 | 78 |
| 03:15 PM | 0 | 0 | 1 | 2 | 0 | 24 | 2 | 0 | 8 | 0 | 27 | 0 | 3 | 19 | 0 | 0 | 86 |
| 03:30 PM | 0 | 0 | 0 | 0 | 0 | 15 | 1 | 0 | 10 | 0 | 36 | 0 | 6 | 13 | 0 | 0 | 81 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 15 | 2 | 0 | 17 | 0 | 44 | 0 | 10 | 19 | 0 | 0 | 107 |
| Total | 1 | 0 | 1 | 3 | 0 | 70 | 8 | 0 | 45 | 0 | 126 | 0 | 25 | 73 | 0 | 0 | 352 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 17 | 4 | 0 | 14 | 0 | 36 | 0 | 6 | 19 | 0 | 0 | 96 |
| 04:15 PM | 1 | 0 | 0 | 1 | 1 | 12 | 1 | 0 | 21 | 1 | 56 | 0 | 10 | 21 | 0 | 0 | 125 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 34 | 0 | 60 | 0 | 3 | 16 | 0 | 0 | 131 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 20 | 2 | 0 | 34 | 0 | 62 | 0 | 3 | 21 | 1 | 0 | 143 |
| Total | 1 | 0 | 0 | 1 | 1 | 67 | 7 | 0 | 103 | 1 | 214 | 0 | 22 | 77 | 1 | 0 | 495 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 1 | 0 | 0 | 1 | 0 | 17 | 4 | 0 | 33 | 0 | 66 | 0 | 4 | 17 | 0 | 0 | 143 |
| 05:15 PM | 0 | 2 | 1 | 0 | 0 | 17 | 1 | 0 | 74 | 0 | 94 | 0 | 4 | 20 | 0 | 0 | 213 |
| 05:30 PM | 0 | 0 | 1 | 1 | 0 | 11 | 0 | 0 | 41 | 0 | 75 | 0 | 3 | 14 | 0 | 0 | 146 |
| 05:45 PM | 2 | 4 | 0 | 11 | 0 | 23 | 0 | 0 | 24 | 0 | 60 | 0 | 1 | 23 | 0 | 0 | 148 |
| Total | 3 | 6 | 2 | 13 | 0 | 68 | 5 | 0 | 172 | 0 | 295 | 0 | 12 | 74 | 0 | 0 | 650 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 5 | 6 | 3 | 17 | 1 | 205 | 20 | 0 | 320 | 1 | 635 | 0 | 59 | 224 | 1 | 0 | 1497 |
| Apprch % | 16.1 | 19.4 | 9.7 | 54.8 | 0.4 | 90.7 | 8.8 | 0 | 33.5 | 0.1 | 66.4 | 0 | 20.8 | 78.9 | 0.4 | 0 | |
| Total % | 0.3 | 0.4 | 0.2 | 1.1 | 0.1 | 13.7 | 1.3 | 0 | 21.4 | 0.1 | 42.4 | 0 | 3.9 | 15 | 0.1 | 0 | |

C0010382



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-19 PM
Site Code : 00000000
Start Date : 3/19/2009
Page No   : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 05:00 PM | | | | | | | | | | | | | | | | | | | | | |
| 05:00 PM | 1 | 0 | 0 | 1 | 2 | 0 | 17 | 4 | 0 | 21 | 33 | 0 | 66 | 0 | 99 | 4 | 17 | 0 | 0 | 21 | 143 |
| 05:15 PM | 0 | 2 | 1 | 0 | 3 | 0 | 17 | 1 | 0 | 18 | 74 | 0 | 94 | 0 | 168 | 4 | 20 | 0 | 0 | 24 | 213 |
| 05:30 PM | 0 | 0 | 1 | 1 | 2 | 0 | 11 | 0 | 0 | 11 | 41 | 0 | 75 | 0 | 116 | 3 | 14 | 0 | 0 | 17 | 146 |
| 05:45 PM | 2 | 4 | 0 | 11 | 17 | 0 | 23 | 0 | 0 | 23 | 24 | 0 | 60 | 0 | 84 | 1 | 23 | 0 | 0 | 24 | 148 |
| Total Volume | 3 | 6 | 2 | 13 | 24 | 0 | 68 | 5 | 0 | 73 | 172 | 0 | 295 | 0 | 467 | 12 | 74 | 0 | 0 | 86 | 650 |
| % App. Total | 12.5 | 25 | 8.3 | 54.2 | | 0 | 93.2 | 6.8 | 0 | | 36.8 | 0 | 63.2 | 0 | | 14 | 86 | 0 | 0 | | |
| PHF | .375 | .375 | .500 | .295 | .353 | .000 | .739 | .313 | .000 | .793 | .581 | .000 | .785 | .000 | .695 | .750 | .804 | .000 | .000 | .896 | .763 |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-19 PM
Site Code : 00000000
Start Date : 3/19/2009
Page No : 3





WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-19 AM
Site Code : 00000000
Start Date : 3/19/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 2 | 0 | 4 | 5 | 0 | 0 | 2 | 0 | 3 | 9 | 12 | 2 | 0 | 39 |
| 07:15 AM | 0 | 0 | 0 | 5 | 0 | 2 | 6 | 0 | 1 | 0 | 0 | 5 | 17 | 8 | 3 | 0 | 47 |
| 07:30 AM | 1 | 0 | 0 | 0 | 0 | 2 | 18 | 0 | 0 | 0 | 1 | 0 | 33 | 7 | 0 | 0 | 62 |
| 07:45 AM | 0 | 0 | 0 | 2 | 0 | 8 | 62 | 0 | 2 | 1 | 0 | 0 | 47 | 8 | 0 | 0 | 130 |
| Total | 1 | 0 | 0 | 9 | 0 | 16 | 91 | 0 | 3 | 3 | 1 | 8 | 106 | 35 | 5 | 0 | 278 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 1 | 0 | 0 | 0 | 8 | 27 | 0 | 1 | 0 | 4 | 0 | 38 | 16 | 0 | 0 | 95 |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 15 | 28 | 0 | 1 | 1 | 1 | 0 | 33 | 15 | 0 | 0 | 94 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 6 | 31 | 0 | 6 | 0 | 0 | 0 | 58 | 18 | 0 | 0 | 119 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 8 | 23 | 0 | 0 | 1 | 2 | 0 | 61 | 12 | 0 | 0 | 107 |
| Total | 0 | 1 | 0 | 0 | 0 | 37 | 109 | 0 | 8 | 2 | 7 | 0 | 190 | 61 | 0 | 0 | 415 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 1 | 0 | 0 | 0 | 8 | 30 | 0 | 4 | 0 | 4 | 0 | 41 | 18 | 0 | 0 | 106 |
| 09:15 AM | 0 | 0 | 0 | 0 | 1 | 14 | 24 | 0 | 0 | 0 | 5 | 0 | 58 | 13 | 0 | 0 | 115 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 6 | 22 | 0 | 1 | 0 | 6 | 0 | 36 | 28 | 0 | 0 | 99 |
| 09:45 AM | 0 | 1 | 0 | 0 | 1 | 8 | 14 | 0 | 2 | 0 | 3 | 0 | 43 | 19 | 0 | 0 | 91 |
| Total | 0 | 2 | 0 | 0 | 2 | 36 | 90 | 0 | 7 | 0 | 18 | 0 | 178 | 78 | 0 | 0 | 411 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 1 | 3 | 0 | 9 | 2 | 89 | 290 | 0 | 18 | 5 | 26 | 8 | 474 | 174 | 5 | 0 | 1104 |
| Apprch % | 7.7 | 23.1 | 0 | 69.2 | 0.5 | 23.4 | 76.1 | 0 | 31.6 | 8.8 | 45.6 | 14 | 72.6 | 26.6 | 0.8 | 0 | |
| Total % | 0.1 | 0.3 | 0 | 0.8 | 0.2 | 8.1 | 26.3 | 0 | 1.6 | 0.5 | 2.4 | 0.7 | 42.9 | 15.8 | 0.5 | 0 | |



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-19 AM
Site Code : 00000000
Start Date : 3/19/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:30 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 31 | 0 | 37 | 6 | 0 | 0 | 0 | 6 | 58 | 18 | 0 | 0 | 76 | 119 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 23 | 0 | 31 | 0 | 1 | 2 | 0 | 3 | 61 | 12 | 0 | 0 | 73 | 107 |
| 09:00 AM | 0 | 1 | 0 | 0 | 1 | 0 | 8 | 30 | 0 | 38 | 4 | 0 | 4 | 0 | 8 | 41 | 18 | 0 | 0 | 59 | 106 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 1 | 14 | 24 | 0 | 39 | 0 | 0 | 5 | 0 | 5 | 58 | 13 | 0 | 0 | 71 | 115 |
| Total Volume | 0 | 1 | 0 | 0 | 1 | 1 | 36 | 108 | 0 | 145 | 10 | 1 | 11 | 0 | 22 | 218 | 61 | 0 | 0 | 279 | 447 |
| % App. Total | 0 | 100 | 0 | 0 | | 0.7 | 24.8 | 74.5 | 0 | | 45.5 | 4.5 | 50 | 0 | | 78.1 | 21.9 | 0 | 0 | | |
| PHF | .000 | .250 | .000 | .000 | .250 | .250 | .643 | .871 | .000 | .929 | .417 | .250 | .550 | .000 | .688 | .893 | .847 | .000 | .000 | .918 | .939 |



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-19 AM
Site Code : 00000000
Start Date : 3/19/2009
Page No : 3





### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-20 PM
Site Code : 00000000
Start Date : 3/20/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 19 | 1 | 0 | 7 | 0 | 19 | 0 | 0 | 34 | 0 | 0 | 80 |
| 03:15 PM | 1 | 0 | 0 | 0 | 0 | 19 | 2 | 0 | 6 | 0 | 24 | 0 | 0 | 24 | 0 | 0 | 76 |
| 03:30 PM | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 13 | 0 | 11 | 0 | 4 | 27 | 0 | 0 | 73 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 11 | 0 | 26 | 0 | 1 | 12 | 0 | 0 | 74 |
| Total | 1 | 0 | 0 | 0 | 0 | 80 | 3 | 0 | 37 | 0 | 80 | 0 | 5 | 97 | 0 | 0 | 303 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 2 | 0 | 0 | 31 | 3 | 0 | 16 | 1 | 23 | 0 | 6 | 38 | 0 | 0 | 120 |
| 04:15 PM | 1 | 0 | 0 | 0 | 1 | 34 | 4 | 0 | 14 | 0 | 23 | 0 | 3 | 16 | 0 | 0 | 96 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 15 | 3 | 0 | 19 | 0 | 35 | 0 | 2 | 28 | 1 | 0 | 103 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 31 | 0 | 0 | 19 | 0 | 36 | 0 | 3 | 29 | 0 | 0 | 118 |
| Total | 1 | 0 | 2 | 0 | 1 | 111 | 10 | 0 | 68 | 1 | 117 | 0 | 14 | 111 | 1 | 0 | 437 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 1 | 1 | 0 | 0 | 29 | 2 | 0 | 45 | 0 | 39 | 0 | 2 | 18 | 0 | 0 | 137 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 05:30 PM | 0 | 1 | 1 | 0 | 0 | 23 | 1 | 0 | 36 | 0 | 53 | 0 | 0 | 26 | 0 | 0 | 141 |
| 05:45 PM | 0 | 0 | 1 | 0 | 0 | 23 | 2 | 0 | 35 | 0 | 44 | 0 | 2 | 27 | 0 | 0 | 134 |
| Total | 0 | 2 | 3 | 0 | 0 | 75 | 5 | 0 | 116 | 0 | 136 | 0 | 4 | 71 | 0 | 0 | 412 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 2 | 2 | 5 | 0 | 1 | 266 | 18 | 0 | 221 | 1 | 333 | 0 | 23 | 279 | 1 | 0 | 1152 |
| Apprch % | 22.2 | 22.2 | 55.6 | 0 | 0.4 | 93.3 | 6.3 | 0 | 39.8 | 0.2 | 60 | 0 | 7.6 | 92.1 | 0.3 | 0 | |
| Total % | 0.2 | 0.2 | 0.4 | 0 | 0.1 | 23.1 | 1.6 | 0 | 19.2 | 0.1 | 28.9 | 0 | 2 | 24.2 | 0.1 | 0 | |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-20 PM
Site Code : 00000000
Start Date : 3/20/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 04:15 PM | | | | | | | | | | | | | | | | | | | | | |
| 04:15 PM | 1 | 0 | 0 | 0 | 1 | 1 | 34 | 4 | 0 | 39 | 14 | 0 | 23 | 0 | 37 | 3 | 16 | 0 | 0 | 19 | 96 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 0 | 15 | 3 | 0 | 18 | 19 | 0 | 35 | 0 | 54 | 2 | 28 | 1 | 0 | 31 | 103 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 31 | 0 | 0 | 31 | 19 | 0 | 36 | 0 | 55 | 3 | 29 | 0 | 0 | 32 | 118 |
| 05:00 PM | 0 | 1 | 1 | 0 | 2 | 0 | 29 | 2 | 0 | 31 | 45 | 0 | 39 | 0 | 84 | 2 | 18 | 0 | 0 | 20 | 137 |
| Total Volume | 1 | 1 | 1 | 0 | 3 | 1 | 109 | 9 | 0 | 119 | 97 | 0 | 133 | 0 | 230 | 10 | 91 | 1 | 0 | 102 | 454 |
| % App. Total | 33.3 | 33.3 | 33.3 | 0 | | 0.8 | 91.6 | 7.6 | 0 | | 42.2 | 0 | 57.8 | 0 | | 9.8 | 89.2 | 1 | 0 | | |
| PHF | .250 | .250 | .250 | .000 | .375 | .250 | .801 | .563 | .000 | .763 | .539 | .000 | .853 | .000 | .685 | .833 | .784 | .250 | .000 | .797 | .828 |

C0010389



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-20 PM
Site Code : 00000000
Start Date : 3/20/2009
Page No : 3



C0010390



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-20 AM
Site Code : 00000000
Start Date : 3/20/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 1 | 9 | 4 | 0 | 0 | 1 | 1 | 0 | 3 | 14 | 0 | 0 | 33 |
| 07:15 AM | 0 | 0 | 0 | 0 | 0 | 4 | 6 | 0 | 0 | 2 | 0 | 0 | 9 | 9 | 3 | 0 | 33 |
| 07:30 AM | 1 | 0 | 0 | 0 | 1 | 8 | 8 | 0 | 1 | 2 | 1 | 0 | 30 | 12 | 0 | 0 | 64 |
| 07:45 AM | 0 | 0 | 0 | 0 | 1 | 10 | 36 | 0 | 0 | 0 | 1 | 0 | 19 | 9 | 0 | 0 | 76 |
| Total | 1 | 0 | 0 | 0 | 3 | 31 | 54 | 0 | 1 | 5 | 3 | 0 | 61 | 44 | 3 | 0 | 206 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 4 | 16 | 0 | 1 | 0 | 0 | 0 | 16 | 14 | 0 | 0 | 51 |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 8 | 24 | 0 | 0 | 0 | 2 | 0 | 14 | 24 | 0 | 0 | 72 |
| 08:30 AM | 0 | 1 | 1 | 0 | 0 | 6 | 14 | 0 | 1 | 0 | 1 | 0 | 32 | 23 | 1 | 0 | 80 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 7 | 21 | 0 | 2 | 0 | 2 | 0 | 31 | 21 | 0 | 0 | 84 |
| Total | 0 | 1 | 1 | 0 | 0 | 25 | 75 | 0 | 4 | 0 | 5 | 0 | 93 | 82 | 1 | 0 | 287 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 9 | 15 | 0 | 2 | 0 | 6 | 0 | 35 | 29 | 0 | 0 | 96 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 11 | 25 | 0 | 0 | 0 | 1 | 0 | 29 | 20 | 0 | 0 | 86 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 6 | 17 | 0 | 2 | 0 | 4 | 0 | 30 | 19 | 0 | 0 | 78 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 11 | 13 | 0 | 2 | 0 | 2 | 0 | 19 | 16 | 0 | 0 | 63 |
| Total | 0 | 0 | 0 | 0 | 0 | 37 | 70 | 0 | 6 | 0 | 13 | 0 | 113 | 84 | 0 | 0 | 323 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 1 | 1 | 1 | 0 | 3 | 93 | 199 | 0 | 11 | 5 | 21 | 0 | 267 | 210 | 4 | 0 | 816 |
| Apprch % | 33.3 | 33.3 | 33.3 | 0 | 1 | 31.5 | 67.5 | 0 | 29.7 | 13.5 | 56.8 | 0 | 55.5 | 43.7 | 0.8 | 0 | |
| Total % | 0.1 | 0.1 | 0.1 | 0 | 0.4 | 11.4 | 24.4 | 0 | 1.3 | 0.6 | 2.6 | 0 | 32.7 | 25.7 | 0.5 | 0 | |

C0010391



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-20 AM
Site Code : 00000000
Start Date : 3/20/2009
Page No : 2



| Start Time | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:30 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:30 AM | 0 | 1 | 1 | 0 | 2 | 0 | 6 | 14 | 0 | 20 | 1 | 0 | 1 | 0 | 2 | 32 | 23 | 1 | 0 | 56 | 80 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 21 | 0 | 28 | 2 | 0 | 2 | 0 | 4 | 31 | 21 | 0 | 0 | 52 | 84 |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 15 | 0 | 24 | 2 | 0 | 6 | 0 | 8 | 35 | 29 | 0 | 0 | 64 | 96 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 25 | 0 | 36 | 0 | 0 | 1 | 0 | 1 | 29 | 20 | 0 | 0 | 49 | 86 |
| Total Volume | 0 | 1 | 1 | 0 | 2 | 0 | 33 | 75 | 0 | 108 | 5 | 0 | 10 | 0 | 15 | 127 | 93 | 1 | 0 | 221 | 346 |
| % App. Total | 0 | 50 | 50 | 0 | | 0 | 30.6 | 69.4 | 0 | | 33.3 | 0 | 66.7 | 0 | | 57.5 | 42.1 | 0.5 | 0 | | |
| PHF | .000 | .250 | .250 | .000 | .250 | .000 | .750 | .750 | .000 | .750 | .625 | .000 | .417 | .000 | .469 | .907 | .802 | .250 | .000 | .863 | .901 |

C0010392



**WWW.ALLTRAFFICDATA.NET**

File Name : #1 WOLF CREEK & US 160 3-20 AM
Site Code : 00000000
Start Date : 3/20/2009
Page No : 3



C0010393



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-21 PM
Site Code : 00000000
Start Date : 3/21/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 28 | 0 | 0 | 6 | 0 | 20 | 0 | 2 | 18 | 0 | 0 | 74 |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 27 | 0 | 0 | 7 | 0 | 20 | 0 | 6 | 18 | 0 | 0 | 78 |
| 03:30 PM | 2 | 0 | 0 | 0 | 1 | 26 | 3 | 0 | 8 | 0 | 23 | 0 | 3 | 18 | 1 | 0 | 85 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 28 | 1 | 0 | 8 | 0 | 18 | 0 | 1 | 12 | 0 | 0 | 68 |
| Total | 2 | 0 | 0 | 0 | 1 | 109 | 4 | 0 | 29 | 0 | 81 | 0 | 12 | 66 | 1 | 0 | 305 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 23 | 0 | 23 | 0 | 3 | 11 | 0 | 0 | 86 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 25 | 4 | 0 | 11 | 0 | 21 | 0 | 3 | 12 | 0 | 0 | 76 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 30 | 1 | 0 | 8 | 0 | 21 | 0 | 1 | 8 | 1 | 0 | 70 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 32 | 0 | 0 | 14 | 0 | 30 | 0 | 1 | 8 | 0 | 0 | 85 |
| Total | 0 | 0 | 0 | 0 | 0 | 113 | 5 | 0 | 56 | 0 | 95 | 0 | 8 | 39 | 1 | 0 | 317 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 10 | 0 | 26 | 0 | 3 | 12 | 0 | 0 | 66 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 32 | 0 | 25 | 0 | 0 | 10 | 0 | 0 | 84 |
| 05:30 PM | 0 | 1 | 0 | 0 | 0 | 15 | 1 | 0 | 17 | 1 | 20 | 0 | 0 | 5 | 0 | 0 | 60 |
| 05:45 PM | 0 | 1 | 0 | 0 | 0 | 14 | 0 | 0 | 13 | 0 | 12 | 0 | 0 | 20 | 0 | 0 | 60 |
| Total | 0 | 2 | 0 | 0 | 0 | 61 | 1 | 0 | 72 | 1 | 83 | 0 | 3 | 47 | 0 | 0 | 270 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 2 | 2 | 0 | 0 | 1 | 283 | 10 | 0 | 157 | 1 | 259 | 0 | 23 | 152 | 2 | 0 | 892 |
| Apprch % | 50 | 50 | 0 | 0 | 0.3 | 96.3 | 3.4 | 0 | 37.6 | 0.2 | 62.1 | 0 | 13 | 85.9 | 1.1 | 0 | |
| Total % | 0.2 | 0.2 | 0 | 0 | 0.1 | 31.7 | 1.1 | 0 | 17.6 | 0.1 | 29 | 0 | 2.6 | 17 | 0.2 | 0 | |

C0010394



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-21 PM
Site Code : 00000000
Start Date : 3/21/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 03:15 PM | | | | | | | | | | | | | | | | | | | | | |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 27 | 0 | 0 | 27 | 7 | 0 | 20 | 0 | 27 | 6 | 18 | 0 | 0 | 24 | 78 |
| 03:30 PM | 2 | 0 | 0 | 0 | 2 | 1 | 26 | 3 | 0 | 30 | 8 | 0 | 23 | 0 | 31 | 3 | 18 | 1 | 0 | 22 | 85 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 28 | 1 | 0 | 29 | 8 | 0 | 18 | 0 | 26 | 1 | 12 | 0 | 0 | 13 | 68 |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 0 | 26 | 0 | 0 | 26 | 23 | 0 | 23 | 0 | 46 | 3 | 11 | 0 | 0 | 14 | 86 |
| Total Volume | 2 | 0 | 0 | 0 | 2 | 1 | 107 | 4 | 0 | 112 | 46 | 0 | 84 | 0 | 130 | 13 | 59 | 1 | 0 | 73 | 317 |
| % App. Total | 100 | 0 | 0 | 0 | | 0.9 | 95.5 | 3.6 | 0 | | 35.4 | 0 | 64.6 | 0 | | 17.8 | 80.8 | 1.4 | 0 | | |
| PHF | .250 | .000 | .000 | .000 | .250 | .250 | .955 | .333 | .000 | .933 | .500 | .000 | .913 | .000 | .707 | .542 | .819 | .250 | .000 | .760 | .922 |

C0010395



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-21 PM
Site Code : 00000000
Start Date : 3/21/2009
Page No : 3



C0010396



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-21 AM
Site Code : 00000000
Start Date : 3/21/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 0 | 7 | 7 | 0 | 1 | 0 | 0 | 0 | 5 | 14 | 0 | 0 | 34 |
| 07:15 AM | 0 | 1 | 0 | 0 | 0 | 6 | 6 | 0 | 0 | 0 | 0 | 0 | 8 | 7 | 1 | 0 | 29 |
| 07:30 AM | 1 | 1 | 0 | 0 | 1 | 8 | 9 | 0 | 3 | 1 | 0 | 0 | 5 | 14 | 0 | 0 | 43 |
| 07:45 AM | 0 | 1 | 0 | 0 | 0 | 8 | 16 | 0 | 0 | 0 | 0 | 0 | 12 | 7 | 0 | 0 | 44 |
| Total | 1 | 3 | 0 | 0 | 1 | 29 | 38 | 0 | 4 | 1 | 0 | 0 | 30 | 42 | 1 | 0 | 150 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 10 | 22 | 0 | 2 | 0 | 0 | 0 | 12 | 13 | 0 | 0 | 59 |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 7 | 18 | 0 | 0 | 2 | 1 | 0 | 13 | 11 | 0 | 0 | 52 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 5 | 15 | 0 | 2 | 1 | 1 | 0 | 33 | 18 | 0 | 0 | 75 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 0 | 0 | 0 | 1 | 0 | 24 | 17 | 0 | 0 | 66 |
| Total | 0 | 0 | 0 | 0 | 0 | 30 | 71 | 0 | 4 | 3 | 3 | 0 | 82 | 59 | 0 | 0 | 252 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 8 | 5 | 0 | 3 | 0 | 1 | 0 | 16 | 15 | 0 | 0 | 48 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 9 | 17 | 0 | 3 | 0 | 3 | 0 | 26 | 18 | 0 | 0 | 76 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 6 | 16 | 0 | 2 | 0 | 1 | 0 | 11 | 16 | 0 | 0 | 52 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 16 | 10 | 0 | 1 | 0 | 0 | 0 | 18 | 26 | 0 | 0 | 71 |
| Total | 0 | 0 | 0 | 0 | 0 | 39 | 48 | 0 | 9 | 0 | 5 | 0 | 71 | 75 | 0 | 0 | 247 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 1 | 3 | 0 | 0 | 1 | 98 | 157 | 0 | 17 | 4 | 8 | 0 | 183 | 176 | 1 | 0 | 649 |
| Apprch % | 25 | 75 | 0 | 0 | 0.4 | 38.3 | 61.3 | 0 | 58.6 | 13.8 | 27.6 | 0 | 50.8 | 48.9 | 0.3 | 0 | |
| Total % | 0.2 | 0.5 | 0 | 0 | 0.2 | 15.1 | 24.2 | 0 | 2.6 | 0.6 | 1.2 | 0 | 28.2 | 27.1 | 0.2 | 0 | |

C0010397



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-21 AM
Site Code : 00000000
Start Date : 3/21/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:30 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 15 | 0 | 20 | 2 | 1 | 1 | 0 | 4 | 33 | 18 | 0 | 0 | 51 | 75 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 16 | 0 | 24 | 0 | 0 | 1 | 0 | 1 | 24 | 17 | 0 | 0 | 41 | 66 |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 5 | 0 | 13 | 3 | 0 | 1 | 0 | 4 | 16 | 15 | 0 | 0 | 31 | 48 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 17 | 0 | 26 | 3 | 0 | 3 | 0 | 6 | 26 | 18 | 0 | 0 | 44 | 76 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 0 | 30 | 53 | 0 | 83 | 8 | 1 | 6 | 0 | 15 | 99 | 68 | 0 | 0 | 167 | 265 |
| % App. Total | 0 | 0 | 0 | 0 | | 0 | 36.1 | 63.9 | 0 | | 53.3 | 6.7 | 40 | 0 | | 59.3 | 40.7 | 0 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .000 | .833 | .779 | .000 | .798 | .667 | .250 | .500 | .000 | .625 | .750 | .944 | .000 | .000 | .819 | .872 |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-21 AM
Site Code : 00000000
Start Date : 3/21/2009
Page No : 3





### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-22 PM
Site Code : 00000000
Start Date : 3/22/2009
Page No : 1

**Groups Printed- Class 1**

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 29 | 3 | 0 | 9 | 0 | 14 | 0 | 2 | 21 | 0 | 0 | 78 |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 38 | 3 | 0 | 5 | 0 | 21 | 0 | 3 | 14 | 0 | 0 | 84 |
| 03:30 PM | 0 | 0 | 1 | 0 | 0 | 35 | 2 | 0 | 7 | 0 | 24 | 0 | 2 | 24 | 0 | 0 | 95 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 41 | 1 | 0 | 7 | 0 | 24 | 0 | 0 | 16 | 0 | 0 | 89 |
| Total | 0 | 0 | 1 | 0 | 0 | 143 | 9 | 0 | 28 | 0 | 83 | 0 | 7 | 75 | 0 | 0 | 346 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 40 | 2 | 0 | 9 | 0 | 34 | 0 | 2 | 15 | 0 | 0 | 102 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 25 | 2 | 0 | 4 | 0 | 22 | 0 | 2 | 13 | 0 | 0 | 68 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 33 | 0 | 0 | 8 | 0 | 28 | 0 | 1 | 15 | 0 | 0 | 85 |
| 04:45 PM | 0 | 0 | 0 | 0 | 1 | 25 | 0 | 0 | 6 | 0 | 12 | 0 | 1 | 19 | 1 | 0 | 65 |
| Total | 0 | 0 | 0 | 0 | 1 | 123 | 4 | 0 | 27 | 0 | 96 | 0 | 6 | 62 | 1 | 0 | 320 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 1 | 0 | 0 | 0 | 0 | 40 | 2 | 0 | 7 | 0 | 21 | 0 | 2 | 16 | 1 | 0 | 90 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 31 | 2 | 0 | 4 | 0 | 15 | 0 | 1 | 14 | 0 | 0 | 67 |
| 05:30 PM | 1 | 1 | 0 | 0 | 0 | 23 | 0 | 0 | 4 | 1 | 15 | 1 | 0 | 20 | 0 | 0 | 66 |
| 05:45 PM | 0 | 0 | 0 | 0 | 0 | 37 | 1 | 0 | 7 | 0 | 7 | 0 | 0 | 12 | 0 | 0 | 64 |
| Total | 2 | 1 | 0 | 0 | 0 | 131 | 5 | 0 | 22 | 1 | 58 | 1 | 3 | 62 | 1 | 0 | 287 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 2 | 1 | 1 | 0 | 1 | 397 | 18 | 0 | 77 | 1 | 237 | 1 | 16 | 199 | 2 | 0 | 953 |
| Apprch % | 50 | 25 | 25 | 0 | 0.2 | 95.4 | 4.3 | 0 | 24.4 | 0.3 | 75 | 0.3 | 7.4 | 91.7 | 0.9 | 0 | |
| Total % | 0.2 | 0.1 | 0.1 | 0 | 0.1 | 41.7 | 1.9 | 0 | 8.1 | 0.1 | 24.9 | 0.1 | 1.7 | 20.9 | 0.2 | 0 | |

C0010400



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-22 PM
Site Code : 00000000
Start Date : 3/22/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 03:15 PM | | | | | | | | | | | | | | | | | | | | | |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 38 | 3 | 0 | 41 | 5 | 0 | 21 | 0 | 26 | 3 | 14 | 0 | 0 | 17 | 84 |
| 03:30 PM | 0 | 0 | 1 | 0 | 1 | 0 | 35 | 2 | 0 | 37 | 7 | 0 | 24 | 0 | 31 | 2 | 24 | 0 | 0 | 26 | 95 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 41 | 1 | 0 | 42 | 7 | 0 | 24 | 0 | 31 | 0 | 16 | 0 | 0 | 16 | 89 |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 0 | 40 | 2 | 0 | 42 | 9 | 0 | 34 | 0 | 43 | 2 | 15 | 0 | 0 | 17 | 102 |
| Total Volume | 0 | 0 | 1 | 0 | 1 | 0 | 154 | 8 | 0 | 162 | 28 | 0 | 103 | 0 | 131 | 7 | 69 | 0 | 0 | 76 | 370 |
| % App. Total | 0 | 0 | 100 | 0 | | 0 | 95.1 | 4.9 | 0 | | 21.4 | 0 | 78.6 | 0 | | 9.2 | 90.8 | 0 | 0 | | |
| PHF | .000 | .000 | .250 | .000 | .250 | .000 | .939 | .667 | .000 | .964 | .778 | .000 | .757 | .000 | .762 | .583 | .719 | .000 | .000 | .731 | .907 |

C0010401



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-22 PM
Site Code : 00000000
Start Date : 3/22/2009
Page No : 3



C0010402



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-22 AM
Site Code : 00000000
Start Date : 3/22/2009
Page No : 1

**Groups Printed- Class 1**

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 0 | 3 | 4 | 0 | 1 | 0 | 0 | 0 | 2 | 7 | 0 | 0 | 17 |
| 07:15 AM | 0 | 1 | 0 | 0 | 2 | 2 | 4 | 0 | 0 | 0 | 0 | 0 | 7 | 5 | 0 | 0 | 21 |
| 07:30 AM | 2 | 0 | 0 | 0 | 1 | 3 | 2 | 0 | 0 | 0 | 0 | 0 | 11 | 7 | 0 | 0 | 26 |
| 07:45 AM | 0 | 0 | 0 | 0 | 0 | 3 | 11 | 0 | 0 | 0 | 0 | 0 | 18 | 8 | 0 | 0 | 40 |
| Total | 2 | 1 | 0 | 0 | 3 | 11 | 21 | 0 | 1 | 0 | 0 | 0 | 38 | 27 | 0 | 0 | 104 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 2 | 9 | 0 | 0 | 0 | 1 | 0 | 15 | 6 | 0 | 0 | 33 |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 1 | 4 | 0 | 0 | 0 | 2 | 0 | 18 | 11 | 0 | 0 | 36 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 5 | 8 | 0 | 2 | 0 | 2 | 0 | 16 | 14 | 0 | 0 | 47 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 6 | 0 | 0 | 0 | 0 | 4 | 0 | 12 | 12 | 0 | 0 | 34 |
| Total | 0 | 0 | 0 | 0 | 0 | 14 | 21 | 0 | 2 | 0 | 9 | 0 | 61 | 43 | 0 | 0 | 150 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 9 | 8 | 0 | 2 | 0 | 1 | 0 | 25 | 7 | 0 | 0 | 52 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 2 | 0 | 0 | 0 | 26 | 20 | 0 | 0 | 58 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 9 | 1 | 0 | 2 | 0 | 3 | 0 | 25 | 17 | 0 | 0 | 57 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 11 | 9 | 0 | 0 | 0 | 3 | 0 | 13 | 28 | 0 | 0 | 64 |
| Total | 0 | 0 | 0 | 0 | 0 | 35 | 22 | 0 | 6 | 0 | 7 | 0 | 89 | 72 | 0 | 0 | 231 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 2 | 1 | 0 | 0 | 3 | 60 | 64 | 0 | 9 | 0 | 16 | 0 | 188 | 142 | 0 | 0 | 485 |
| Apprch % | 66.7 | 33.3 | 0 | 0 | 2.4 | 47.2 | 50.4 | 0 | 36 | 0 | 64 | 0 | 57 | 43 | 0 | 0 | |
| Total % | 0.4 | 0.2 | 0 | 0 | 0.6 | 12.4 | 13.2 | 0 | 1.9 | 0 | 3.3 | 0 | 38.8 | 29.3 | 0 | 0 | |



## WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-22 AM
Site Code : 00000000
Start Date : 3/22/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 09:00 AM | | | | | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 8 | 0 | 17 | 2 | 0 | 1 | 0 | 3 | 25 | 7 | 0 | 0 | 32 | 52 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 6 | 4 | 0 | 10 | 2 | 0 | 0 | 0 | 2 | 26 | 20 | 0 | 0 | 46 | 58 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 1 | 0 | 10 | 2 | 0 | 3 | 0 | 5 | 25 | 17 | 0 | 0 | 42 | 57 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 11 | 9 | 0 | 20 | 0 | 0 | 3 | 0 | 3 | 13 | 28 | 0 | 0 | 41 | 64 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 0 | 35 | 22 | 0 | 57 | 6 | 0 | 7 | 0 | 13 | 89 | 72 | 0 | 0 | 161 | 231 |
| % App. Total | 0 | 0 | 0 | 0 | | 0 | 61.4 | 38.6 | 0 | | 46.2 | 0 | 53.8 | 0 | | 55.3 | 44.7 | 0 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .000 | .795 | .611 | .000 | .713 | .750 | .000 | .583 | .000 | .650 | .856 | .643 | .000 | .000 | .875 | .902 |

C0010404



**WWW.ALLTRAFFICDATA.NET**

File Name : #1 WOLF CREEK & US 160 3-22 AM
Site Code : 00000000
Start Date : 3/22/2009
Page No   : 3





### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-23 PM
Site Code : 00000000
Start Date : 3/23/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 03:00 PM | 0 | 0 | 0 | 0 | 0 | 15 | 0 | 0 | 2 | 0 | 15 | 0 | 0 | 9 | 0 | 0 | 41 |
| 03:15 PM | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 3 | 0 | 18 | 0 | 1 | 12 | 0 | 0 | 51 |
| 03:30 PM | 0 | 0 | 0 | 0 | 0 | 19 | 1 | 0 | 5 | 0 | 22 | 0 | 1 | 11 | 0 | 0 | 59 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 6 | 0 | 29 | 0 | 1 | 14 | 0 | 0 | 68 |
| Total | 0 | 0 | 0 | 0 | 0 | 69 | 1 | 0 | 16 | 0 | 84 | 0 | 3 | 46 | 0 | 0 | 219 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 3 | 0 | 22 | 0 | 0 | 10 | 0 | 0 | 59 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 10 | 0 | 15 | 0 | 2 | 12 | 0 | 0 | 61 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 17 | 0 | 0 | 6 | 0 | 23 | 0 | 0 | 9 | 0 | 0 | 55 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 16 | 2 | 0 | 6 | 0 | 28 | 0 | 0 | 9 | 0 | 0 | 61 |
| Total | 0 | 0 | 0 | 0 | 0 | 79 | 2 | 0 | 25 | 0 | 88 | 0 | 2 | 40 | 0 | 0 | 236 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 6 | 1 | 20 | 0 | 0 | 7 | 0 | 0 | 39 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 14 | 0 | 0 | 8 | 0 | 26 | 0 | 1 | 17 | 0 | 0 | 66 |
| 05:30 PM | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 4 | 0 | 21 | 0 | 1 | 6 | 0 | 0 | 50 |
| 05:45 PM | 0 | 0 | 0 | 0 | 0 | 7 | 0 | 0 | 4 | 0 | 8 | 0 | 1 | 14 | 0 | 0 | 34 |
| Total | 0 | 0 | 0 | 0 | 0 | 44 | 0 | 0 | 22 | 1 | 75 | 0 | 3 | 44 | 0 | 0 | 189 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 0 | 0 | 0 | 0 | 192 | 3 | 0 | 63 | 1 | 247 | 0 | 8 | 130 | 0 | 0 | 644 |
| Apprch % | 0 | 0 | 0 | 0 | 0 | 98.5 | 1.5 | 0 | 20.3 | 0.3 | 79.4 | 0 | 5.8 | 94.2 | 0 | 0 | |
| Total % | 0 | 0 | 0 | 0 | 0 | 29.8 | 0.5 | 0 | 9.8 | 0.2 | 38.4 | 0 | 1.2 | 20.2 | 0 | 0 | |

C0010406



## WWW.ALLTRAFFICDATA.NET

File Name  : #1 WOLF CREEK & US 160 3-23 PM
Site Code  : 00000000
Start Date : 3/23/2009
Page No    : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 03:30 PM | | | | | | | | | | | | | | | | | | | | | |
| 03:30 PM | 0 | 0 | 0 | 0 | 0 | 0 | 19 | 1 | 0 | 20 | 5 | 0 | 22 | 0 | 27 | 1 | 11 | 0 | 0 | 12 | 59 |
| 03:45 PM | 0 | 0 | 0 | 0 | 0 | 0 | 18 | 0 | 0 | 18 | 6 | 0 | 29 | 0 | 35 | 1 | 14 | 0 | 0 | 15 | 68 |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 0 | 24 | 0 | 0 | 24 | 3 | 0 | 22 | 0 | 25 | 0 | 10 | 0 | 0 | 10 | 59 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 0 | 22 | 0 | 0 | 22 | 10 | 0 | 15 | 0 | 25 | 2 | 12 | 0 | 0 | 14 | 61 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 0 | 83 | 1 | 0 | 84 | 24 | 0 | 88 | 0 | 112 | 4 | 47 | 0 | 0 | 51 | 247 |
| % App. Total | 0 | 0 | 0 | 0 | | 0 | 98.8 | 1.2 | 0 | | 21.4 | 0 | 78.6 | 0 | | 7.8 | 92.2 | 0 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .000 | .865 | .250 | .000 | .875 | .600 | .000 | .759 | .000 | .800 | .500 | .839 | .000 | .000 | .850 | .908 |



WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-23 PM
Site Code : 00000000
Start Date : 3/23/2009
Page No : 3



C0010408



### WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-23 AM
Site Code : 00000000
Start Date : 3/23/2009
Page No : 1

Groups Printed- Class 1

| Start Time | WOLF CREEK RD Southbound | | | | US 160 Westbound | | | | WOLF CREEK RD Northbound | | | | US 160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | Rght | Thru | Left | Other | |
| 07:00 AM | 0 | 0 | 0 | 0 | 0 | 5 | 3 | 0 | 0 | 0 | 0 | 0 | 5 | 7 | 0 | 0 | 20 |
| 07:15 AM | 0 | 0 | 0 | 0 | 0 | 4 | 5 | 0 | 2 | 0 | 0 | 0 | 1 | 2 | 0 | 0 | 14 |
| 07:30 AM | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 0 | 1 | 0 | 0 | 0 | 0 | 5 | 0 | 0 | 10 |
| 07:45 AM | 0 | 1 | 0 | 0 | 0 | 9 | 6 | 0 | 1 | 0 | 1 | 0 | 12 | 5 | 0 | 0 | 35 |
| Total | 0 | 1 | 0 | 0 | 0 | 20 | 16 | 0 | 4 | 0 | 1 | 0 | 18 | 19 | 0 | 0 | 79 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 0 | 6 | 13 | 0 | 0 | 0 | 1 | 0 | 9 | 4 | 0 | 0 | 33 |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 4 | 7 | 0 | 0 | 0 | 0 | 0 | 19 | 4 | 0 | 0 | 34 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 5 | 5 | 0 | 0 | 1 | 0 | 0 | 22 | 7 | 0 | 0 | 40 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 9 | 8 | 0 | 1 | 0 | 0 | 0 | 41 | 11 | 0 | 0 | 70 |
| Total | 0 | 0 | 0 | 0 | 0 | 24 | 33 | 0 | 1 | 1 | 1 | 0 | 91 | 26 | 0 | 0 | 177 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 5 | 18 | 0 | 4 | 0 | 1 | 0 | 29 | 11 | 0 | 0 | 68 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 7 | 3 | 0 | 1 | 0 | 0 | 0 | 34 | 5 | 0 | 0 | 50 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 8 | 11 | 0 | 1 | 0 | 0 | 0 | 42 | 18 | 0 | 0 | 80 |
| 09:45 AM | 0 | 0 | 0 | 0 | 0 | 9 | 5 | 0 | 0 | 0 | 1 | 0 | 23 | 9 | 0 | 0 | 47 |
| Total | 0 | 0 | 0 | 0 | 0 | 29 | 37 | 0 | 6 | 0 | 2 | 0 | 128 | 43 | 0 | 0 | 245 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 1 | 0 | 0 | 0 | 73 | 86 | 0 | 11 | 1 | 4 | 0 | 237 | 88 | 0 | 0 | 501 |
| Apprch % | 0 | 100 | 0 | 0 | 0 | 45.9 | 54.1 | 0 | 68.8 | 6.2 | 25 | 0 | 72.9 | 27.1 | 0 | 0 | |
| Total % | 0 | 0.2 | 0 | 0 | 0 | 14.6 | 17.2 | 0 | 2.2 | 0.2 | 0.8 | 0 | 47.3 | 17.6 | 0 | 0 | |



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-23 AM
Site Code : 00000000
Start Date : 3/23/2009
Page No : 2



| | WOLF CREEK RD Southbound | | | | | US 160 Westbound | | | | | WOLF CREEK RD Northbound | | | | | US 160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Rght | Thru | Left | Other | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:45 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 0 | 9 | 8 | 0 | 17 | 1 | 0 | 0 | 0 | 1 | 41 | 11 | 0 | 0 | 52 | 70 |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 0 | 5 | 18 | 0 | 23 | 4 | 0 | 1 | 0 | 5 | 29 | 11 | 0 | 0 | 40 | 68 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 3 | 0 | 10 | 1 | 0 | 0 | 0 | 1 | 34 | 5 | 0 | 0 | 39 | 50 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 11 | 0 | 19 | 1 | 0 | 0 | 0 | 1 | 42 | 18 | 0 | 0 | 60 | 80 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 0 | 29 | 40 | 0 | 69 | 7 | 0 | 1 | 0 | 8 | 146 | 45 | 0 | 0 | 191 | 268 |
| % App. Total | 0 | 0 | 0 | 0 | | 0 | 42 | 58 | 0 | | 87.5 | 0 | 12.5 | 0 | | 76.4 | 23.6 | 0 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .000 | .806 | .556 | .000 | .750 | .438 | .000 | .250 | .000 | .400 | .869 | .625 | .000 | .000 | .796 | .838 |



# WWW.ALLTRAFFICDATA.NET

File Name : #1 WOLF CREEK & US 160 3-23 AM
Site Code : 00000000
Start Date : 3/23/2009
Page No : 3



C0010411

2007-2008 Parking Lot Counts- Spring Break

| Date | Skier Count | Parking Lot Count | Average Skiers Per Car | Employee Car Count | Average Employees Per Car | Average Number of Employees Working |
|---|---|---|---|---|---|---|
| 3/9/2008 | 1,244 | no data | no data | 81 | 1.7 | 270 |
| 3/10/2008 | 1,536 | no data | no data | 97 | 1.57 | 290 |
| 3/11/2008 | 1,757 | no data | no data | 94 | 1.66 | 290 |
| 3/12/2008 | 1,328 | no data | no data | 96 | 1.55 | 290 |
| 3/13/2008 | 1,217 | no data | no data | 70 | 1.65 | 270 |
| 3/14/2008 | 998 | no data | no data | 76 | 1.89 | 270 |
| 3/15/2008 | 1,456 | no data | no data | 95 | 2.03 | 290 |
| 3/16/2008 | 3,536 | no data | no data | 85 | 1.77 | 290 |
| 3/17/2008 | 5,197 | 1,220 | 4.25 | 87 | 1.74 | 290 |
| 3/182008 | 5,830 | 1,413 | 4.12 | 113 | 1.6 | 290 |
| 3/19/2008 | 4,486 | 1,119 | 4.01 | 109 | 1.71 | 290 |
| 3/20/2008 | 3,544 | 874 | 4.05 | 98 | 1.62 | 290 |
| 3/21/2008 | 2,414 | 540 | 4.47 | 71 | 1.69 | 290 |

SW/NM/xls.3-25-08

C0010412



File Name : SH160&WOLFCREEKAM3-15
Site Code : 00000000
Start Date : 3/15/2008
Page No   : 1

Groups Printed- Unshifted

| Start Time | WOLF CREEK ENTRANCE Southbound | | | | SH160 Westbound | | | | WOLF CREEK ENTRANCE Northbound | | | | SH160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | |
| 07:00 AM | 0 | 0 | 0 | 0 | 8 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 | 2 | 0 | 20 |
| 07:15 AM | 0 | 0 | 0 | 0 | 7 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 4 | 5 | 0 | 22 |
| 07:30 AM | 0 | 0 | 0 | 0 | 10 | 6 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 4 | 11 | 0 | 32 |
| 07:45 AM | 0 | 0 | 0 | 0 | 15 | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 12 | 17 | 0 | 47 |
| Total | 0 | 0 | 0 | 0 | 40 | 18 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 27 | 35 | 0 | 121 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 16 | 2 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 16 | 23 | 0 | 58 |
| 08:15 AM | 0 | 0 | 0 | 0 | 8 | 5 | 0 | 0 | 1 | 0 | 2 | 0 | 0 | 12 | 19 | 0 | 47 |
| 08:30 AM | 0 | 0 | 0 | 0 | 9 | 4 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 18 | 21 | 0 | 55 |
| 08:45 AM | 0 | 0 | 0 | 0 | 11 | 6 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 15 | 0 | 49 |
| Total | 0 | 0 | 0 | 0 | 44 | 17 | 0 | 0 | 5 | 0 | 2 | 0 | 0 | 63 | 78 | 0 | 209 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 14 | 1 | 0 | 0 | 3 | 0 | 0 | 0 | 0 | 14 | 24 | 0 | 56 |
| 09:15 AM | 0 | 0 | 0 | 0 | 12 | 11 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 17 | 19 | 0 | 60 |
| 09:30 AM | 0 | 0 | 0 | 0 | 10 | 9 | 0 | 0 | 4 | 0 | 5 | 1 | 0 | 14 | 29 | 0 | 72 |
| 09:45 AM | 0 | 0 | 0 | 0 | 9 | 4 | 0 | 0 | 2 | 0 | 1 | 0 | 0 | 10 | 22 | 0 | 48 |
| Total | 0 | 0 | 0 | 0 | 45 | 25 | 0 | 0 | 9 | 0 | 7 | 1 | 0 | 55 | 94 | 0 | 236 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 0 | 0 | 0 | 129 | 60 | 0 | 0 | 14 | 0 | 10 | 1 | 0 | 145 | 207 | 0 | 566 |
| Apprch % | 0 | 0 | 0 | 0 | 68.3 | 31.7 | 0 | 0 | 56 | 0 | 40 | 4 | 0 | 41.2 | 58.8 | 0 | |
| Total % | 0 | 0 | 0 | 0 | 22.8 | 10.6 | 0 | 0 | 2.5 | 0 | 1.8 | 0.2 | 0 | 25.6 | 36.6 | 0 | |



File Name : SH160&WOLFCREEKAM3-15
Site Code : 00000000
Start Date : 3/15/2008
Page No : 2



| | WOLF CREEK ENTRANCE Southbound | | | | | SH160 Westbound | | | | | WOLF CREEK ENTRANCE Northbound | | | | | SH160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:45 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 11 | 6 | 0 | 0 | 17 | 0 | 0 | 0 | 0 | 0 | 0 | 17 | 15 | 0 | 32 | 49 |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 14 | | | | | | | | | | | | | | | 60 |
| 09:15 AM | 0 | 0 | 0 | 0 | 0 | 12 | 11 | 0 | 0 | 23 | 0 | 0 | 1 | 0 | 1 | 0 | 17 | 19 | 0 | 36 | 60 |
| 09:30 AM | 0 | 0 | 0 | 0 | 0 | 10 | 9 | 0 | 0 | 19 | 4 | | 5 | 1 | 10 | 0 | 14 | 29 | | 43 | 72 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 47 | 27 | 0 | 0 | 74 | 7 | 0 | 6 | 1 | 14 | 0 | 62 | 87 | 0 | 149 | 237 |
| % App. Total | 0 | 0 | 0 | 0 | | 63.5 | 36.5 | 0 | 0 | | 50 | 0 | 42.9 | 7.1 | | 0 | 41.6 | 58.4 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .839 | .614 | .000 | .000 | .804 | .438 | .000 | .300 | .250 | .350 | .000 | .912 | .750 | .000 | .866 | .823 |



File Name : SH160&WOLFCREEKAM3-15
Site Code : 00000000
Start Date : 3/15/2008
Page No : 3



C0010415



File Name : SH160&WOLFCREEKPM3-15
Site Code : 00000000
Start Date : 3/15/2008
Page No    : 1

Groups Printed- Unshifted

| Start Time | WOLF CREEK ENTRANCE Southbound | | | | SH160 Westbound | | | | WOLF CREEK ENTRANCE Northbound | | | | SH160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | |
| 03:00 PM | 0 | 0 | 0 | 0 | 6 | 27 | 0 | 0 | 20 | 0 | 13 | 0 | 0 | 11 | 3 | 0 | 80 |
| 03:15 PM | 0 | 0 | 0 | 0 | 3 | 17 | 0 | 0 | 16 | 0 | 13 | 0 | 0 | 14 | 3 | 0 | 66 |
| 03:30 PM | 0 | 0 | 0 | 0 | 4 | 18 | 0 | 0 | 26 | 0 | 11 | 0 | 0 | 6 | 9 | 0 | 74 |
| 03:45 PM | 0 | 0 | 0 | 0 | 1 | 29 | 0 | 0 | 25 | 0 | 19 | 0 | 0 | 7 | 1 | 0 | 82 |
| Total | 0 | 0 | 0 | 0 | 14 | 91 | 0 | 0 | 87 | 0 | 56 | 0 | 0 | 38 | 16 | 0 | 302 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 3 | 20 | 0 | 0 | 26 | 0 | 12 | 0 | 0 | 11 | 2 | 0 | 74 |
| 04:15 PM | 0 | 0 | 0 | 0 | 1 | 23 | 0 | 0 | 40 | 0 | 9 | 0 | 0 | 14 | 4 | 0 | 91 |
| 04:30 PM | 0 | 0 | 0 | 0 | 3 | 20 | 0 | 0 | 34 | 0 | 23 | 0 | 0 | 4 | 1 | 0 | 85 |
| 04:45 PM | 0 | 0 | 0 | 0 | 1 | 15 | 0 | 0 | 30 | 1 | 11 | 0 | 0 | 12 | 3 | 0 | 73 |
| Total | 0 | 0 | 0 | 0 | 8 | 78 | 0 | 0 | 130 | 1 | 55 | 0 | 0 | 41 | 10 | 0 | 323 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 0 | 0 | 0 | 2 | 26 | 0 | 0 | 36 | 0 | 23 | 0 | 0 | 8 | 1 | 0 | 96 |
| 05:15 PM | 0 | 0 | 0 | 0 | 0 | 13 | 0 | 0 | 31 | 0 | 13 | 0 | 0 | 16 | 0 | 0 | 73 |
| 05:30 PM | 0 | 0 | 0 | 0 | 1 | 28 | 0 | 0 | 21 | 0 | 12 | 0 | 0 | 6 | 0 | 0 | 68 |
| 05:45 PM | 0 | 0 | 0 | 0 | 1 | 23 | 0 | 0 | 7 | 0 | 7 | 1 | 0 | 6 | 0 | 0 | 45 |
| Total | 0 | 0 | 0 | 0 | 4 | 90 | 0 | 0 | 95 | 0 | 55 | 1 | 0 | 36 | 1 | 0 | 282 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 0 | 0 | 0 | 26 | 259 | 0 | 0 | 312 | 1 | 166 | 1 | 0 | 115 | 27 | 0 | 907 |
| Apprch % | 0 | 0 | 0 | 0 | 9.1 | 90.9 | 0 | 0 | 65 | 0.2 | 34.6 | 0.2 | 0 | 81 | 19 | 0 | |
| Total % | 0 | 0 | 0 | 0 | 2.9 | 28.6 | 0 | 0 | 34.4 | 0.1 | 18.3 | 0.1 | 0 | 12.7 | 3 | 0 | |



File Name : SH160&WOLFCREEKPM3-15
Site Code : 00000000
Start Date : 3/15/2008
Page No : 2



| | WOLF CREEK ENTRANCE Southbound | | | | | SH160 Westbound | | | | | WOLF CREEK ENTRANCE Northbound | | | | | SH160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 05:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 04:15 PM | | | | | | | | | | | | | | | | | | | | | |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 1 | 23 | 0 | 0 | 24 | 40 | | | | | | 14 | 4 | | 18 | 91 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 3 | | | | | | 23 | | | | | | | | | |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 1 | 15 | 0 | 0 | 16 | 30 | 1 | 11 | 0 | 42 | 0 | 12 | 3 | 0 | 15 | 73 |
| 05:00 PM | 0 | 0 | 0 | 0 | 0 | 2 | 26 | 0 | 0 | 28 | 36 | 0 | 23 | 0 | 59 | 0 | 8 | 1 | 0 | 9 | 96 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 7 | 84 | 0 | 0 | 91 | 140 | 1 | 66 | 0 | 207 | 0 | 38 | 9 | 0 | 47 | 345 |
| % App. Total | 0 | 0 | 0 | 0 | | 7.7 | 92.3 | 0 | 0 | | 67.6 | 0.5 | 31.9 | 0 | | 0 | 80.9 | 19.1 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .583 | .808 | .000 | .000 | .813 | .875 | .250 | .717 | .000 | .877 | .000 | .679 | .563 | .000 | .653 | .898 |

C0010417



File Name : SH160&WOLFCREEKPM3-15
Site Code : 00000000
Start Date : 3/15/2008
Page No    : 3





File Name : SH160&WOLFCREEKAM3-17
Site Code : 00000000
Start Date : 3/17/2008
Page No   : 1

**Groups Printed- Unshifted**

| Start Time | WOLF CREEK ENTRANCE Southbound | | | | SH160 Westbound | | | | WOLF CREEK ENTRANCE Northbound | | | | SH160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | |
| 07:00 AM | 0 | 0 | 0 | 0 | 8 | 6 | 0 | 0 | 0 | 0 | 2 | 0 | 1 | 2 | 6 | 0 | 25 |
| 07:15 AM | 0 | 0 | 0 | 0 | 14 | 2 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 5 | 8 | 0 | 31 |
| 07:30 AM | 0 | 0 | 0 | 0 | 26 | 5 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | 3 | 30 | 0 | 66 |
| 07:45 AM | 0 | 0 | 0 | 0 | 31 | 10 | 0 | 0 | 3 | 0 | 1 | 0 | 0 | 5 | 56 | 0 | 106 |
| Total | 0 | 0 | 0 | 0 | 79 | 23 | 0 | 0 | 4 | 0 | 6 | 0 | 1 | 15 | 100 | 0 | 228 |
| | | | | | | | | | | | | | | | | | |
| 08:00 AM | 0 | 0 | 0 | 0 | 34 | 4 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 5 | 76 | 0 | 121 |
| 08:15 AM | 0 | 0 | 0 | 0 | 38 | 4 | 0 | 0 | 0 | 3 | 0 | 0 | 0 | 3 | 81 | 0 | 129 |
| 08:30 AM | 0 | 0 | 0 | 0 | 45 | 3 | 0 | 0 | 1 | 0 | 1 | 0 | 0 | 3 | 78 | 0 | 131 |
| 08:45 AM | 0 | 0 | 0 | 0 | 51 | 7 | 0 | 0 | 8 | 0 | 3 | 0 | 0 | 10 | 98 | 0 | 177 |
| Total | 0 | 0 | 0 | 0 | 168 | 18 | 0 | 0 | 10 | 4 | 4 | 0 | 0 | 21 | 333 | 0 | 558 |
| | | | | | | | | | | | | | | | | | |
| 09:00 AM | 0 | 0 | 0 | 0 | 26 | 1 | 0 | 0 | 7 | 0 | 1 | 0 | 0 | 5 | 98 | 0 | 138 |
| 09:15 AM | 0 | 0 | 0 | 0 | 17 | 5 | 0 | 0 | 6 | 0 | 1 | 1 | 0 | 11 | 73 | 0 | 114 |
| 09:30 AM | 0 | 0 | 0 | 0 | 35 | 5 | 0 | 0 | 5 | 0 | 3 | 0 | 0 | 9 | 66 | 0 | 123 |
| 09:45 AM | 0 | 0 | 0 | 0 | 15 | 11 | 0 | 0 | 3 | 0 | 4 | 0 | 0 | 9 | 45 | 0 | 87 |
| Total | 0 | 0 | 0 | 0 | 93 | 22 | 0 | 0 | 21 | 0 | 9 | 1 | 0 | 34 | 282 | 0 | 462 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 0 | 0 | 0 | 340 | 63 | 0 | 0 | 35 | 4 | 19 | 1 | 1 | 70 | 715 | 0 | 1248 |
| Apprch % | 0 | 0 | 0 | 0 | 84.4 | 15.6 | 0 | 0 | 59.3 | 6.8 | 32.2 | 1.7 | 0.1 | 8.9 | 91 | 0 | |
| Total % | 0 | 0 | 0 | 0 | 27.2 | 5 | 0 | 0 | 2.8 | 0.3 | 1.5 | 0.1 | 0.1 | 5.6 | 57.3 | 0 | |



File Name : SH160&WOLFCREEKAM3-17
Site Code : 00000000
Start Date : 3/17/2008
Page No : 2



| | WOLF CREEK ENTRANCE Southbound | | | | | SH160 Westbound | | | | | WOLF CREEK ENTRANCE Northbound | | | | | SH160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Int. Total |
| Peak Hour Analysis From 07:00 AM to 09:45 AM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 08:15 AM | | | | | | | | | | | | | | | | | | | | | |
| 08:15 AM | 0 | 0 | 0 | 0 | 0 | 38 | 4 | 0 | 0 | 42 | 0 | 3 | 0 | 0 | 3 | 0 | 3 | 81 | 0 | 84 | 129 |
| 08:30 AM | 0 | 0 | 0 | 0 | 0 | 45 | 3 | 0 | 0 | 48 | 1 | 0 | 1 | 0 | 2 | 0 | 3 | 78 | 0 | 81 | 131 |
| 08:45 AM | 0 | 0 | 0 | 0 | 0 | 51 | 7 | 0 | 0 | 58 | 8 | | 3 | | 11 | 0 | 10 | 98 | 0 | 108 | 177 |
| 09:00 AM | 0 | 0 | 0 | 0 | 0 | 26 | 1 | 0 | 0 | 27 | 7 | 0 | 1 | 0 | 8 | 0 | 5 | 98 | 0 | 103 | 138 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 160 | 15 | 0 | 0 | 175 | 16 | 3 | 5 | 0 | 24 | 0 | 21 | 355 | 0 | 376 | 575 |
| % App. Total | 0 | 0 | 0 | 0 | | 91.4 | 8.6 | 0 | 0 | | 66.7 | 12.5 | 20.8 | 0 | | 0 | 5.6 | 94.4 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .784 | .536 | .000 | .000 | .754 | .500 | .250 | .417 | .000 | .545 | .000 | .525 | .906 | .000 | .870 | .812 |

C0010420



File Name : SH160&WOLFCREEKAM3-17
Site Code : 00000000
Start Date : 3/17/2008
Page No : 3





File Name : SH160&WOLFCREEKPM3-17
Site Code : 00000000
Start Date : 3/17/2008
Page No : 1

Groups Printed- Unshifted

| Start Time | WOLF CREEK ENTRANCE Southbound | | | | SH160 Westbound | | | | WOLF CREEK ENTRANCE Northbound | | | | SH160 Eastbound | | | | Int. Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | Left | Thru | Right | Peds | |
| 03:00 PM | 0 | 0 | 0 | 0 | 2 | 19 | 0 | 0 | 31 | 0 | 10 | 0 | 0 | 2 | 5 | 0 | 69 |
| 03:15 PM | 0 | 0 | 0 | 0 | 10 | 11 | 0 | 0 | 44 | 0 | 19 | 1 | 0 | 10 | 3 | 0 | 98 |
| 03:30 PM | 0 | 0 | 0 | 0 | 2 | 22 | 0 | 0 | 40 | 1 | 22 | 0 | 0 | 5 | 6 | 1 | 99 |
| 03:45 PM | 0 | 0 | 0 | 0 | 3 | 19 | 0 | 0 | 67 | 0 | 9 | 0 | 0 | 9 | 4 | 0 | 111 |
| Total | 0 | 0 | 0 | 0 | 17 | 71 | 0 | 0 | 182 | 1 | 60 | 1 | 0 | 26 | 18 | 1 | 377 |
| | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 6 | 8 | 0 | 0 | 71 | 1 | 18 | 0 | 0 | 7 | 2 | 0 | 113 |
| 04:15 PM | 0 | 0 | 0 | 0 | 4 | 26 | 0 | 0 | 55 | 0 | 36 | 0 | 0 | 9 | 9 | 0 | 139 |
| 04:30 PM | 0 | 0 | 0 | 0 | 2 | 15 | 0 | 0 | 96 | 0 | 45 | 0 | 0 | 10 | 6 | 0 | 174 |
| 04:45 PM | 0 | 0 | 0 | 0 | 3 | 8 | 0 | 0 | 140 | 0 | 56 | 1 | 0 | 5 | 3 | 0 | 216 |
| Total | 0 | 0 | 0 | 0 | 15 | 57 | 0 | 0 | 362 | 1 | 155 | 1 | 0 | 31 | 20 | 0 | 642 |
| | | | | | | | | | | | | | | | | | |
| 05:00 PM | 0 | 0 | 0 | 0 | 3 | 17 | 0 | 0 | 131 | 0 | 59 | 2 | 0 | 9 | 3 | 0 | 224 |
| 05:15 PM | 0 | 0 | 0 | 0 | 1 | 15 | 0 | 0 | 93 | 0 | 48 | 0 | 0 | 3 | 1 | 0 | 161 |
| 05:30 PM | 0 | 0 | 0 | 0 | 7 | 8 | 0 | 0 | 75 | 0 | 38 | 0 | 0 | 15 | 0 | 0 | 143 |
| 05:45 PM | 0 | 0 | 0 | 0 | 1 | 11 | 0 | 0 | 25 | 0 | 22 | 0 | 0 | 7 | 1 | 0 | 67 |
| Total | 0 | 0 | 0 | 0 | 12 | 51 | 0 | 0 | 324 | 0 | 167 | 2 | 0 | 34 | 5 | 0 | 595 |
| | | | | | | | | | | | | | | | | | |
| Grand Total | 0 | 0 | 0 | 0 | 44 | 179 | 0 | 0 | 868 | 2 | 382 | 4 | 0 | 91 | 43 | 1 | 1614 |
| Apprch % | 0 | 0 | 0 | 0 | 19.7 | 80.3 | 0 | 0 | 69.1 | 0.2 | 30.4 | 0.3 | 0 | 67.4 | 31.9 | 0.7 | |
| Total % | 0 | 0 | 0 | 0 | 2.7 | 11.1 | 0 | 0 | 53.8 | 0.1 | 23.7 | 0.2 | 0 | 5.6 | 2.7 | 0.1 | |



File Name : SH160&WOLFCREEKPM3-17
Site Code : 00000000
Start Date : 3/17/2008
Page No : 2



| | WOLF CREEK ENTRANCE Southbound | | | | | SH160 Westbound | | | | | WOLF CREEK ENTRANCE Northbound | | | | | SH160 Eastbound | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Start Time | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Left | Thru | Right | Peds | App. Total | Int. Total |
| Peak Hour Analysis From 03:00 PM to 04:45 PM - Peak 1 of 1 | | | | | | | | | | | | | | | | | | | | | |
| Peak Hour for Entire Intersection Begins at 04:00 PM | | | | | | | | | | | | | | | | | | | | | |
| 04:00 PM | 0 | 0 | 0 | 0 | 0 | 6 | | | | | | 1 | 18 | 0 | 90 | 0 | 7 | 2 | 0 | 9 | 113 |
| 04:15 PM | 0 | 0 | 0 | 0 | 0 | 4 | 26 | 0 | 0 | 30 | 55 | 0 | 36 | 0 | 91 | 0 | 9 | 9 | 0 | 18 | 139 |
| 04:30 PM | 0 | 0 | 0 | 0 | 0 | 2 | 15 | 0 | 0 | 17 | 96 | 0 | 45 | 0 | 141 | 0 | 10 | 6 | 0 | 16 | 174 |
| 04:45 PM | 0 | 0 | 0 | 0 | 0 | 3 | 8 | 0 | 0 | 11 | 140 | | 56 | 1 | 197 | 0 | 5 | 3 | 0 | 8 | 216 |
| Total Volume | 0 | 0 | 0 | 0 | 0 | 15 | 57 | 0 | 0 | 72 | 362 | 1 | 155 | 1 | 519 | 0 | 31 | 20 | 0 | 51 | 642 |
| % App. Total | 0 | 0 | 0 | 0 | | 20.8 | 79.2 | 0 | 0 | | 69.7 | 0.2 | 29.9 | 0.2 | | 0 | 60.8 | 39.2 | 0 | | |
| PHF | .000 | .000 | .000 | .000 | .000 | .625 | .548 | .000 | .000 | .600 | .646 | .250 | .692 | .250 | .659 | .000 | .775 | .556 | .000 | .708 | .743 |

C0010423



File Name : SH160&WOLFCREEKPM3-17
Site Code : 00000000
Start Date : 3/17/2008
Page No : 3



*The Village at Wolf Creek*                                            *Traffic Impact Study*

## APPENDIX B    TRIP GENERATION AND INTERNAL CAPTURE CALCULATIONS



*Appendix B*

C0010425

**Village at Wolf Creek Peak Day Trip Generation**

| Phase 1 | | | | Gross Trips | | | | | | | | External Trips | | | | | | | | | CBECS | Village |
| Land Use | LUC | Size | | Daily Trips | AM Peak (7-9 AM) | | | PM Peak (4-6 PM) | | | | Daily Trips | Internal Capture | AM Peak (7-9 AM) | | | Internal Capture | PM Peak (4-6 PM) | | | Employee Projections | Population |
| | | | | | In | Out | Total | In | Out | Total | | | | In | Out | Total | | In | Out | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreational Condo/Townhomes | 260 | 371 | Units | 1,170 | 40 | 19 | 59 | 39 | 57 | 96 | | 1,150 | 2% | 39 | 19 | 58 | 8% | 36 | 52 | 88 | 72 | 1869 |
| Recreational Homes | 260 | 55 | Units | 170 | 6 | 3 | 9 | 6 | 8 | 14 | | 170 | 2% | 6 | 3 | 9 | 8% | 5 | 8 | 13 | 11 | 419 |
| Resort Hotel | 330 | 71 | Rooms | 580 | 16 | 6 | 22 | 13 | 17 | 30 | | 570 | 2% | 16 | 6 | 22 | 8% | 12 | 16 | 28 | 14 | 320 |
| Hotel with Conference Facility | 310 | | Rooms | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 2% | 0 | 0 | 0 | 8% | 0 | 0 | 0 | 0 | |
| Commercial Development | | | | | | | | | | | | | | | | | | | | | | |
| Retail-based | 820 | 41,200 | SF | 1,770 | 25 | 16 | 41 | 75 | 79 | 154 | 65% | 620 | 65% | 7 | 7 | 14 | 65% | 28 | 26 | 54 | 37 | |
| Office-based | 710 | 8,400 | SF | 90 | 11 | 2 | 13 | 2 | 11 | 13 | | 90 | 2% | 11 | 2 | 13 | 8% | 2 | 10 | 12 | 19 | |
| Total | | 49,600 | | 3,780 | 98 | 46 | 144 | 135 | 172 | 307 | | 2,600 | | 79 | 37 | 116 | | 83 | 112 | 195 | 153 | 2608 |
| | | | | | | | | | | | | | | | | | | | | | | |
| Commercial Trips | | | | 1,860 | 36 | 18 | 54 | 77 | 90 | 167 | | 710 | | 18 | 9 | 27 | | 30 | 36 | 66 | | |
| Residential/Lodging Trips | | | | 1,920 | 62 | 28 | 90 | 58 | 82 | 140 | | 1,890 | | 61 | 28 | 89 | | 53 | 76 | 129 | | |
| Overall Internal Capture | | | | | | | | | | | | 31% | | | | 19% | | | | 36% | | |
| Commercial Internal Capture | | | | | | | | | | | | 62% | | | | 50% | | | | 60% | | |
| Residential Internal Capture | | | | | | | | | | | | 2% | | | | 2% | | | | 8% | | |

| Full Buildout | | | | Gross Trips | | | | | | | | External Trips | | | | | | | | | CBECS | Village |
| Land Use | LUC | Size | | Daily Trips | AM Peak (7-9 AM) | | | PM Peak (4-6 PM) | | | | Daily Trips | Internal Capture | AM Peak (7-9 AM) | | | Internal Capture | PM Peak (4-6 PM) | | | Employee Projections | Population |
| | | | | | In | Out | Total | In | Out | Total | | | | In | Out | Total | | In | Out | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreational Condo/Townhomes | 260 | 1,373 | Units | 4,340 | 147 | 73 | 220 | 146 | 211 | 357 | | 4,250 | 2% | 145 | 71 | 216 | 8% | 134 | 194 | 328 | 265 | 6875 |
| Recreational Homes | 260 | 138 | Units | 440 | 15 | 7 | 22 | 15 | 21 | 36 | | 430 | 2% | 15 | 7 | 22 | 8% | 14 | 19 | 33 | 27 | 1195 |
| Resort Hotel | 330 | 71 | Rooms | 580 | 16 | 6 | 22 | 13 | 17 | 30 | | 570 | 2% | 16 | 6 | 22 | 8% | 12 | 16 | 28 | 14 | 320 |
| Hotel with 30 KSF Conference Facility | 310 | 129 | Rooms | 1,050 | 44 | 28 | 72 | 40 | 36 | 76 | | 1,030 | 2% | 43 | 28 | 71 | 8% | 37 | 33 | 70 | 25 | 258 |
| Commercial Development | | | | | | | | | | | | | | | | | | | | | | |
| Retail-based | 820 | 139,600 | SF | 5,990 | 85 | 55 | 140 | 255 | 266 | 521 | 65% | 2,100 | 65% | 25 | 24 | 49 | 65% | 93 | 89 | 182 | 126 | |
| Office-based | 710 | 51,400 | SF | 570 | 70 | 10 | 80 | 13 | 64 | 77 | | 560 | 2% | 69 | 9 | 78 | 8% | 12 | 59 | 71 | 118 | |
| Total | | 191,000 | | 12,970 | 377 | 179 | 556 | 482 | 615 | 1,097 | | 8,940 | | 313 | 145 | 458 | | 302 | 410 | 712 | 575 | 8648 |
| | | | | | | | | | | | | | | | | | | | | | | |
| Commercial Trips | | | | 6,560 | 155 | 65 | 220 | 268 | 330 | 598 | | 2,660 | | 94 | 33 | 127 | | 105 | 148 | 253 | | |
| Residential/Lodging Trips | | | | 6,410 | 222 | 114 | 336 | 214 | 285 | 499 | | 6,280 | | 219 | 112 | 331 | | 197 | 262 | 459 | | |
| Overall Internal Capture | | | | | | | | | | | | 31% | | | | 18% | | | | 35% | | |
| Commercial Internal Capture | | | | | | | | | | | | 59% | | | | 42% | | | | 58% | | |
| Residential Internal Capture | | | | | | | | | | | | 2% | | | | 1% | | | | 8% | | |

C0010426

## Internal Capture Rate Calculations - Peak Day

| Line | Persons at the Village/Ski Area | Phase 1 | Buildout | Comment |
|---|---|---|---|---|
| 1 | Popluation in Village at full occupancy | 2,608 | 8,648 | Based on current development plan |
| 2 | Employees in Village | 153 | 575 | Based on USDOE's 2006 CBECS[1] (includes retail, office, hotel and housing services employees) |
| 3 | Design day skier count at Wolf Creek Ski Area | 8,150 | 8,150 | Assumes a 1.25% annual growth in skiers and employees at Wolf Creek Ski Area between 2008 and 2035 |
| | **Potential Commercial Visitors based on Persons at the Village/ski area** | | | |
| 4 | Percentage of skiers who ski in/ski out or shuttle to the Village core | 60% | 60% | During the AM/PM peak; the other 40% drive over from the day skier lots as part of their arrival/departure |
| 5 | Potential commercial visitors from Village | 2,608 | 8,648 | Line 1 |
| 6 | From Ski Runs | 4,890 | 4,890 | Line 3 * Line 4 |
| 7 | From Parking Lots (drive in) | 3,260 | 3,260 | Line 3 - Line 6 |
| 8 | Total Potential Commercial Visitors | 10,758 | 16,798 | Line 5 + Line 6 + Line 7 |
| | **Potential Commercial Visitors based on ITE Trip Generation** | | | |
| 9 | Total Gross Daily Retail-Based Commercial Trips | 1,770 | 5,990 | Based on ITE LUC 820, Shopping Center |
| 10 | Percent of commercial employee trips coming from down mountain | 100% | 90% | Reflects approximately 50 employees living in employee housing at the Village at buildout |
| 11 | Average employee and customer vehicle occupancy | 1.5 | 1.5 | From 1998 DRCOG Household Travel Survey |
| 12 | Village employee down mountain trips | 200 | 690 | (Line 2 * Line 10) / Line 11 * 2 trips |
| 13 | Total non-employee retail trips (customer trips) | 1,570 | 5,300 | Line 9 - Line 12 |
| 14 | Vehicles | 785 | 2,650 | Line 13 / 2 |
| 15 | Commercial visitors based on ITE Trip info | 1,180 | 3,975 | Line 14 * Line 11 |
| 16 | Percent of total potential commercial visitors | 11% | 24% | Line 15 / Line 8 |
| 17 | Percent of daily trips to shop/eat (from DRCOG household survey) | 16% | 16% | This represents a reasonable estimate of the percentage of skiers and village guests that would patronize the commercial establishments |
| 18 | Difference | -5% | 8% | Line 16 - Line 17.  Represents the additional customers needed to reach ITE trip forecasts (coming from down mountain) |
| 19 | Percent of commercial visitor trips coming from down mountain | 0% | 10% | Line 17 rounded to the nearest 5 percent |
| | **Internal and External Retail Trip Percentages** | | | |
| 20 | Employee down mountain trips | 200 | 690 | Line 12 |
| 21 | Commercial visitor down mountain trips | 0 | 530 | Line 13 * Line 19 |
| 22 | Total down mountain trips | 200 | 1,220 | Line 20 + Line 21 |
| 23 | Percent of retail trips from down mountain (External) | 10% | 20% | Line 22 / Line 9 |
| 24 | Percent from day skier lots (External) | 25% | 15% | (1 - Line 23) * (Line 7 / Line 8) |
| 25 | Percent from Village (Internal Capture) | 65% | 65% | 1 - Line 24 - Line 23 |

1   US Department of Energy, Commercial Building Energy Consuption Survey.

Trips by Purpose (Travel in the Denver Region, DRCOG, 1998)

| | |
|---|---|
| Home | 34.1% |
| Work | 16.9% |
| Shopping | 11.5% |
| Drop Off/Pickup | 9.2% |
| Personal Business | 8.7% |
| Coscial/RecrationSocial/Recreation | 7.0% |
| School | 6.2% |
| Dining | 4.6% |
| Other | 1.8% |
| | 100.0% |
| Shopping+dining (commercial trips within Village) | 16.1% |

## Village at Wolf Creek Typcial Day Trip Generation

**Phase 1**

| Land Use | LUC | Size | | Gross Trips Daily Trips | AM Peak (7-9 AM) In | Out | Total | PM Peak (4-6 PM) In | Out | Total | | External Trips Daily Trips | Internal Capture | AM Peak (7-9 AM) In | Out | Total | Internal Capture | PM Peak (4-6 PM) In | Out | Total | CBECS Employee Projections | Village Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreational Condo/Townhomes | 260 | 364 | Units | 1,150 | 39 | 19 | 58 | 39 | 56 | 95 | | 350 | 70% | 11 | 6 | 17 | 70% | 12 | 17 | 29 | 70 | 1869 |
| Recreational Homes | 260 | 62 | Units | 200 | 7 | 3 | 10 | 7 | 9 | 16 | | 60 | 70% | 2 | 1 | 3 | 70% | 2 | 3 | 5 | 12 | 419 |
| Resort Hotel | 330 | 71 | Rooms | 580 | 16 | 6 | 22 | 13 | 17 | 30 | | 170 | 70% | 5 | 2 | 7 | 70% | 4 | 5 | 9 | 14 | 320 |
| Hotel with Conference Facility | 310 | | Rooms | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0 | 70% | 0 | 0 | 0 | 70% | 0 | 0 | 0 | 0 | |
| Commercial Development | | | | | | | | | | | | | | | | | | | | | | |
| Retail-based | 820 | 41,200 | SF | 1,770 | 25 | 16 | 41 | 75 | 79 | 154 | 65% | 620 | 65% | 7 | 7 | 14 | 65% | 28 | 26 | 54 | 37 | |
| Office-based | 710 | 8,400 | SF | 90 | 11 | 2 | 13 | 2 | 11 | 13 | | 90 | 2% | 11 | 2 | 13 | 2% | 2 | 11 | 13 | 19 | |
| Total | | 49,600 | | 3,790 | 98 | 46 | 144 | 136 | 172 | 308 | | 1,290 | | 36 | 18 | 54 | | 48 | 62 | 110 | 152 | 2608 |
| | | | | | | | | | | | | | | | | | | | | | | |
| Commercial Trips | | | | 1,860 | 36 | 18 | 54 | 77 | 90 | 167 | | 710 | | 18 | 9 | 27 | | 30 | 37 | 67 | | |
| Residential/Lodging Trips | | | | 1,930 | 62 | 28 | 90 | 59 | 82 | 141 | | 580 | | 18 | 9 | 27 | | 18 | 25 | 43 | | |
| Overall Internal Capture | | | | | | | | | | | | 66% | | | | 63% | | | | 64% | | |
| Commercial Internal Capture | | | | | | | | | | | | 62% | | | | 50% | | | | 60% | | |
| Residential Internal Capture | | | | | | | | | | | | 70% | | | | 70% | | | | 70% | | |

**Full Buildout**

| Land Use | LUC | Size | | Gross Trips Daily Trips | AM Peak (7-9 AM) In | Out | Total | PM Peak (4-6 PM) In | Out | Total | | External Trips Daily Trips | Internal Capture | AM Peak (7-9 AM) In | Out | Total | Internal Capture | PM Peak (4-6 PM) In | Out | Total | CBECS Employee Projections | Village Population |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Recreational Condo/Townhomes | 260 | 1,373 | Units | 4,340 | 147 | 73 | 220 | 146 | 211 | 357 | | 1,300 | 70% | 44 | 22 | 66 | 70% | 44 | 63 | 107 | 265 | 6875 |
| Recreational Homes | 260 | 138 | Units | 440 | 15 | 7 | 22 | 15 | 21 | 36 | | 130 | 70% | 5 | 2 | 7 | 70% | 5 | 6 | 11 | 27 | 1195 |
| Resort Hotel | 330 | 71 | Rooms | 580 | 16 | 6 | 22 | 13 | 17 | 30 | | 170 | 70% | 5 | 2 | 7 | 70% | 4 | 5 | 9 | 14 | 320 |
| Hotel with 30 KSF Conference Facility | 310 | 129 | Rooms | 1,050 | 44 | 28 | 72 | 40 | 36 | 76 | | 320 | 70% | 13 | 9 | 22 | 70% | 12 | 11 | 23 | 25 | 258 |
| Commercial Development | | | | | | | | | | | | | | | | | | | | | | |
| Retail-based | 820 | 139,600 | SF | 5,990 | 85 | 55 | 140 | 255 | 266 | 521 | 50% | 3,000 | 50% | 36 | 34 | 70 | 50% | 133 | 128 | 261 | 126 | |
| Office-based | 710 | 51,400 | SF | 570 | 70 | 10 | 80 | 13 | 64 | 77 | | 560 | 2% | 69 | 9 | 78 | 8% | 12 | 59 | 71 | 118 | |
| Total | | 191,000 | | 12,970 | 377 | 179 | 556 | 482 | 615 | 1,097 | | 5,480 | | 172 | 78 | 250 | | 210 | 272 | 482 | 575 | 8648 |
| | | | | | | | | | | | | | | | | | | | | | | |
| Commercial Trips | | | | 6,560 | 155 | 65 | 220 | 268 | 330 | 598 | | 3,560 | | 105 | 43 | 148 | | 145 | 187 | 332 | | |
| Residential/Lodging Trips | | | | 6,410 | 222 | 114 | 336 | 214 | 285 | 499 | | 1,920 | | 67 | 35 | 102 | | 65 | 85 | 150 | | |
| Overall Internal Capture | | | | | | | | | | | | 58% | | | | 55% | | | | 56% | | |
| Commercial Internal Capture | | | | | | | | | | | | 46% | | | | 33% | | | | 44% | | |
| Residential Internal Capture | | | | | | | | | | | | 70% | | | | 70% | | | | 70% | | |

C0010428

**Internal Capture Rate Calculations - Typical Day**

| Line | Persons at the Village/Ski Area | Phase 1 | Buildout | Comment |
|---|---|---|---|---|
| 1 | Popluation in Village at full occupancy | 1,730 | 5,415 | Based on current development plan |
| 2 | Employees in Village | 150 | 570 | Based on USDOE's 2006 CBECS[1] (includes retail, office, hotel and housing services employees) |
| 3 | Design day skier count at Wolf Creek Ski Area | 3,720 | 3,720 | Assumes a 1.25% annual growth in skiers and employees at Wolf Creek Ski Area between 2008 and 2035 |
| | **Potential Commercial Visitors based on Persons at the Village/ski area** | | | |
| 4 | Percentage of skiers who ski in/ski out or shuttle to the Village core | 60% | 60% | During the AM/PM peak; the other 40% drive over from the day skier lots as part of their arrival/departure |
| 5 | Potential commercial visitors from Village | 1,730 | 5,415 | Line 1 |
| 6 | From Ski Runs | 2,232 | 2,232 | Line 3 * Line 4 |
| 7 | From Parking Lots (drive in) | 1,488 | 1,488 | Line 3 - Line 6 |
| 8 | Total Potential Commercial Visitors | 5,450 | 9,135 | Line 5 + Line 6 + Line 7 |
| | **Potential Commercial Visitors based on ITE Trip Generation** | | | |
| 9 | Total Gross Daily Retail-Based Commercial Trips | 1,770 | 5,990 | Based on ITE LUC 820, Shopping Center |
| 10 | Percent of commercial employee trips coming from down mountain | 100% | 90% | Reflects approximately 50 employees living in employee housing at the Village at buildout |
| 11 | Average employee and customer vehicle occupancy | 1.5 | 1.5 | From 1998 DRCOG Household Travel Survey |
| 12 | Village employee down mountain trips | 200 | 680 | (Line 2 * Line 10) / Line 11 * 2 trips |
| 13 | Total non-employee retail trips (customer trips) | 1,570 | 5,310 | Line 9 - Line 12 |
| 14 | Vehicles | 785 | 2,655 | Line 13 / 2 |
| 15 | Commercial visitors based on ITE Trip info | 1,180 | 3,985 | Line 14 * Line 11 |
| 16 | Percent of total potential commercial visitors | 22% | 44% | Line 15 / Line 8 |
| 17 | Percent of daily trips to shop/eat (from DRCOG household survey) | 16% | 16% | This represents a reasonable estimate of the percentage of skiers and village guests that would patronize the commercial establishments |
| 18 | Difference | 6% | 28% | Line 16 - Line 17.  Represents the additional customers needed to reach ITE trip forecasts (coming from down mountain) |
| 19 | Percent of commercial visitor trips coming from down mountain | 5% | 30% | Line 17 rounded to the nearest 5 percent |
| | **Internal and External Retail Trip Percentages** | | | |
| 20 | Employee down mountain trips | 200 | 680 | Line 12 |
| 21 | Commercial visitor down mountain trips | 80 | 1,590 | Line 13 * Line 19 |
| 22 | Total down mountain trips | 280 | 2,270 | Line 20 + Line 21 |
| 23 | Percent of retail trips from down mountain (External) | 15% | 40% | Line 22 / Line 9 |
| 24 | Percent from day skier lots (External) | 20% | 10% | (1 - Line 23) * (Line 7 / Line 8) |
| 25 | Percent from Village (Internal Capture) | 65% | 50% | 1 - Line 24 - Line 23 |

1    US Department of Energy, Commercial Building Engergy Consuption Survey.

Trips by Purpose (Travel in the Denver Region, DRCOG, 1998)

| | |
|---|---|
| Home | 34.1% |
| Work | 16.9% |
| Shopping | 11.5% |
| Drop Off/Pickup | 9.2% |
| Personal Business | 8.7% |
| Coscial/RecrationSocial/Recreation | 7.0% |
| School | 6.2% |
| Dining | 4.6% |
| Other | 1.8% |
| | 100.0% |
| Shopping+dining (commercial trips within Village) | 16.1% |

C0010429

*The Village at Wolf Creek*                                            *Traffic Impact Study*

## APPENDIX C     TRAFFIC ANALYSIS WORKSHEETS



*Appendix C*

## HCM Unsignalized Intersection Capacity Analysis
## 2: Village Access & US 160

11/11/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↗ | ↱ | ↑↑ | ↰ | ↱ |
| Volume (veh/h) | 55 | 55 | 25 | 240 | 30 | 10 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 63 | 63 | 29 | 276 | 34 | 11 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 126 | | 259 | 63 |
| vC1, stage 1 conf vol | | | | | 63 | |
| vC2, stage 2 conf vol | | | | | 195 | |
| vCu, unblocked vol | | | 126 | | 259 | 63 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 98 | | 96 | 99 |
| cM capacity (veh/h) | | | 1458 | | 772 | 988 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 63 | 63 | 29 | 138 | 138 | 34 | 11 |
| Volume Left | 0 | 0 | 29 | 0 | 0 | 34 | 0 |
| Volume Right | 0 | 63 | 0 | 0 | 0 | 0 | 11 |
| cSH | 1700 | 1700 | 1458 | 1700 | 1700 | 772 | 988 |
| Volume to Capacity | 0.04 | 0.04 | 0.02 | 0.08 | 0.08 | 0.04 | 0.01 |
| Queue Length 95th (ft) | 0 | 0 | 2 | 0 | 0 | 4 | 1 |
| Control Delay (s) | 0.0 | 0.0 | 7.5 | 0.0 | 0.0 | 9.9 | 8.7 |
| Lane LOS | | | A | | | A | A |
| Approach Delay (s) | 0.0 | | 0.7 | | | 9.6 | |
| Approach LOS | | | | | | A | |

| Intersection Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Delay | | | 1.4 | | | | |
| Intersection Capacity Utilization | | | 18.1% | | ICU Level of Service | | A |
| Analysis Period (min) | | | 15 | | | | |

C0010431

HCM Unsignalized Intersection Capacity Analysis
2: Village Access & US 160

11/11/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↗ | ↱ | ↑↑ | ↱ | ↱ |
| Volume (veh/h) | 310 | 70 | 20 | 275 | 75 | 40 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 356 | 80 | 23 | 316 | 86 | 46 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 437 | | 560 | 356 |
| vC1, stage 1 conf vol | | | | | 356 | |
| vC2, stage 2 conf vol | | | | | 204 | |
| vCu, unblocked vol | | | 437 | | 560 | 356 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 98 | | 86 | 93 |
| cM capacity (veh/h) | | | 1119 | | 616 | 640 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 356 | 80 | 23 | 158 | 158 | 86 | 46 |
| Volume Left | 0 | 0 | 23 | 0 | 0 | 86 | 0 |
| Volume Right | 0 | 80 | 0 | 0 | 0 | 0 | 46 |
| cSH | 1700 | 1700 | 1119 | 1700 | 1700 | 616 | 640 |
| Volume to Capacity | 0.21 | 0.05 | 0.02 | 0.09 | 0.09 | 0.14 | 0.07 |
| Queue Length 95th (ft) | 0 | 0 | 2 | 0 | 0 | 12 | 6 |
| Control Delay (s) | 0.0 | 0.0 | 8.3 | 0.0 | 0.0 | 11.8 | 11.1 |
| Lane LOS | | | A | | | B | B |
| Approach Delay (s) | 0.0 | | 0.6 | | | 11.5 | |
| Approach LOS | | | | | | B | |

| Intersection Summary | | | | |
|---|---|---|---|---|
| Average Delay | | 1.9 | | |
| Intersection Capacity Utilization | | 27.4% | ICU Level of Service | A |
| Analysis Period (min) | | 15 | | |

C0010432

HCM Unsignalized Intersection Capacity Analysis
2: Village Access & US 160

11/29/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↑ | ↱ | ↱ | ↱ | ↱ |
| Volume (veh/h) | 55 | 210 | 105 | 235 | 105 | 45 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 63 | 241 | 121 | 270 | 121 | 52 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 305 | | 440 | 63 |
| vC1, stage 1 conf vol | | | | | 63 | |
| vC2, stage 2 conf vol | | | | | 376 | |
| vCu, unblocked vol | | | 305 | | 440 | 63 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 90 | | 79 | 95 |
| cM capacity (veh/h) | | | 1253 | | 581 | 988 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 63 | 241 | 121 | 135 | 135 | 121 | 52 |
| Volume Left | 0 | 0 | 121 | 0 | 0 | 121 | 0 |
| Volume Right | 0 | 241 | 0 | 0 | 0 | 0 | 52 |
| cSH | 1700 | 1700 | 1253 | 1700 | 1700 | 581 | 988 |
| Volume to Capacity | 0.04 | 0.14 | 0.10 | 0.08 | 0.08 | 0.21 | 0.05 |
| Queue Length 95th (ft) | 0 | 0 | 8 | 0 | 0 | 19 | 4 |
| Control Delay (s) | 0.0 | 0.0 | 8.2 | 0.0 | 0.0 | 12.8 | 8.8 |
| Lane LOS | | | A | | | B | A |
| Approach Delay (s) | 0.0 | | 2.5 | | | 11.6 | |
| Approach LOS | | | | | | B | |

| Intersection Summary | | | | | | |
|---|---|---|---|---|---|---|
| Average Delay | | 3.4 | | | | |
| Intersection Capacity Utilization | | 25.5% | | ICU Level of Service | | A |
| Analysis Period (min) | | 15 | | | | |

C0010433

## HCM Unsignalized Intersection Capacity Analysis
## 2: Village Access & US 160

11/11/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↑ | ↱ | ↱ | ↱ | ↱ |
| Volume (veh/h) | 300 | 235 | 90 | 275 | 290 | 145 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 345 | 270 | 103 | 316 | 333 | 167 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 615 | | 710 | 345 |
| vC1, stage 1 conf vol | | | | | 345 | |
| vC2, stage 2 conf vol | | | | | 365 | |
| vCu, unblocked vol | | | 615 | | 710 | 345 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 89 | | 36 | 74 |
| cM capacity (veh/h) | | | 961 | | 521 | 651 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 345 | 270 | 103 | 158 | 158 | 333 | 167 |
| Volume Left | 0 | 0 | 103 | 0 | 0 | 333 | 0 |
| Volume Right | 0 | 270 | 0 | 0 | 0 | 0 | 167 |
| cSH | 1700 | 1700 | 961 | 1700 | 1700 | 521 | 651 |
| Volume to Capacity | 0.20 | 0.16 | 0.11 | 0.09 | 0.09 | 0.64 | 0.26 |
| Queue Length 95th (ft) | 0 | 0 | 9 | 0 | 0 | 112 | 25 |
| Control Delay (s) | 0.0 | 0.0 | 9.2 | 0.0 | 0.0 | 23.4 | 12.4 |
| Lane LOS | | | A | | | C | B |
| Approach Delay (s) | 0.0 | | 2.3 | | | 19.7 | |
| Approach LOS | | | | | | C | |

| Intersection Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Delay | | | 7.0 | | | | |
| Intersection Capacity Utilization | | | 46.8% | | ICU Level of Service | | A |
| Analysis Period (min) | | | 15 | | | | |

C0010434

## HCM Unsignalized Intersection Capacity Analysis
## 2: Village Access & US 160

11/29/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↑ | ↗ | ↑ | ↗ | ↗ |
| Volume (veh/h) | 70 | 25 | 10 | 140 | 15 | 5 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 80 | 29 | 11 | 161 | 17 | 6 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 109 | | 184 | 80 |
| vC1, stage 1 conf vol | | | | | 80 | |
| vC2, stage 2 conf vol | | | | | 103 | |
| vCu, unblocked vol | | | 109 | | 184 | 80 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 99 | | 98 | 99 |
| cM capacity (veh/h) | | | 1479 | | 850 | 963 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 80 | 29 | 11 | 80 | 80 | 17 | 6 |
| Volume Left | 0 | 0 | 11 | 0 | 0 | 17 | 0 |
| Volume Right | 0 | 29 | 0 | 0 | 0 | 0 | 6 |
| cSH | 1700 | 1700 | 1479 | 1700 | 1700 | 850 | 963 |
| Volume to Capacity | 0.05 | 0.02 | 0.01 | 0.05 | 0.05 | 0.02 | 0.01 |
| Queue Length 95th (ft) | 0 | 0 | 1 | 0 | 0 | 2 | 0 |
| Control Delay (s) | 0.0 | 0.0 | 7.5 | 0.0 | 0.0 | 9.3 | 8.8 |
| Lane LOS | | | A | | | A | A |
| Approach Delay (s) | 0.0 | | 0.5 | | | 9.2 | |
| Approach LOS | | | | | | A | |

| Intersection Summary | | | |
|---|---|---|---|
| Average Delay | | 1.0 | |
| Intersection Capacity Utilization | | 17.2% | ICU Level of Service | A |
| Analysis Period (min) | | 15 | |

C0010435

## HCM Unsignalized Intersection Capacity Analysis
## 2: Village Access & US 160

11/15/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↑ | ↖ | ↑ | ↖ | ↗ |
| Volume (veh/h) | 205 | 40 | 10 | 140 | 40 | 20 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 236 | 46 | 11 | 161 | 46 | 23 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 282 | | 339 | 236 |
| vC1, stage 1 conf vol | | | | | 236 | |
| vC2, stage 2 conf vol | | | | | 103 | |
| vCu, unblocked vol | | | 282 | | 339 | 236 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 99 | | 94 | 97 |
| cM capacity (veh/h) | | | 1278 | | 737 | 766 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 236 | 46 | 11 | 80 | 80 | 46 | 23 |
| Volume Left | 0 | 0 | 11 | 0 | 0 | 46 | 0 |
| Volume Right | 0 | 46 | 0 | 0 | 0 | 0 | 23 |
| cSH | 1700 | 1700 | 1278 | 1700 | 1700 | 737 | 766 |
| Volume to Capacity | 0.14 | 0.03 | 0.01 | 0.05 | 0.05 | 0.06 | 0.03 |
| Queue Length 95th (ft) | 0 | 0 | 1 | 0 | 0 | 5 | 2 |
| Control Delay (s) | 0.0 | 0.0 | 7.8 | 0.0 | 0.0 | 10.2 | 9.8 |
| Lane LOS | | | A | | | B | A |
| Approach Delay (s) | 0.0 | | 0.5 | | | 10.1 | |
| Approach LOS | | | | | | B | |

| Intersection Summary | | | | | | | |
|---|---|---|---|---|---|---|---|
| Average Delay | | | 1.5 | | | | |
| Intersection Capacity Utilization | | | 20.8% | | ICU Level of Service | | A |
| Analysis Period (min) | | | 15 | | | | |

C0010436

## HCM Unsignalized Intersection Capacity Analysis
## 2: Village Access & US 160

11/29/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↑ | ↱ | ↱ | ↱ | |
| Volume (veh/h) | 70 | 115 | 55 | 140 | 55 | 25 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 80 | 132 | 63 | 161 | 63 | 29 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 213 | | 287 | 80 |
| vC1, stage 1 conf vol | | | | | 80 | |
| vC2, stage 2 conf vol | | | | | 207 | |
| vCu, unblocked vol | | | 213 | | 287 | 80 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 95 | | 91 | 97 |
| cM capacity (veh/h) | | | 1355 | | 738 | 963 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 80 | 132 | 63 | 80 | 80 | 63 | 29 |
| Volume Left | 0 | 0 | 63 | 0 | 0 | 63 | 0 |
| Volume Right | 0 | 132 | 0 | 0 | 0 | 0 | 29 |
| cSH | 1700 | 1700 | 1355 | 1700 | 1700 | 738 | 963 |
| Volume to Capacity | 0.05 | 0.08 | 0.05 | 0.05 | 0.05 | 0.09 | 0.03 |
| Queue Length 95th (ft) | 0 | 0 | 4 | 0 | 0 | 7 | 2 |
| Control Delay (s) | 0.0 | 0.0 | 7.8 | 0.0 | 0.0 | 10.3 | 8.9 |
| Lane LOS | | | A | | | B | A |
| Approach Delay (s) | 0.0 | | 2.2 | | | 9.9 | |
| Approach LOS | | | | | | A | |

| Intersection Summary | | | |
|---|---|---|---|
| Average Delay | | 2.6 | |
| Intersection Capacity Utilization | | 19.7% | ICU Level of Service | A |
| Analysis Period (min) | | 15 | |

C0010437

HCM Unsignalized Intersection Capacity Analysis
2: Village Access & US 160

11/15/2011

| Movement | EBT | EBR | WBL | WBT | NBL | NBR |
|---|---|---|---|---|---|---|
| Lane Configurations | ↑ | ↑ | �George | ↑ | ↟ | |
| Volume (veh/h) | 205 | 145 | 60 | 140 | 180 | 90 |
| Sign Control | Free | | | Free | Stop | |
| Grade | -6% | | | 6% | 0% | |
| Peak Hour Factor | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 | 0.87 |
| Hourly flow rate (vph) | 236 | 167 | 69 | 161 | 207 | 103 |
| Pedestrians | | | | | | |
| Lane Width (ft) | | | | | | |
| Walking Speed (ft/s) | | | | | | |
| Percent Blockage | | | | | | |
| Right turn flare (veh) | | | | | | |
| Median type | TWLTL | | | TWLTL | | |
| Median storage veh) | 2 | | | 2 | | |
| Upstream signal (ft) | | | | | | |
| pX, platoon unblocked | | | | | | |
| vC, conflicting volume | | | 402 | | 454 | 236 |
| vC1, stage 1 conf vol | | | | | 236 | |
| vC2, stage 2 conf vol | | | | | 218 | |
| vCu, unblocked vol | | | 402 | | 454 | 236 |
| tC, single (s) | | | 4.1 | | 6.8 | 6.9 |
| tC, 2 stage (s) | | | | | 5.8 | |
| tF (s) | | | 2.2 | | 3.5 | 3.3 |
| p0 queue free % | | | 94 | | 69 | 86 |
| cM capacity (veh/h) | | | 1153 | | 661 | 766 |

| Direction, Lane # | EB 1 | EB 2 | WB 1 | WB 2 | WB 3 | NB 1 | NB 2 |
|---|---|---|---|---|---|---|---|
| Volume Total | 236 | 167 | 69 | 80 | 80 | 207 | 103 |
| Volume Left | 0 | 0 | 69 | 0 | 0 | 207 | 0 |
| Volume Right | 0 | 167 | 0 | 0 | 0 | 0 | 103 |
| cSH | 1700 | 1700 | 1153 | 1700 | 1700 | 661 | 766 |
| Volume to Capacity | 0.14 | 0.10 | 0.06 | 0.05 | 0.05 | 0.31 | 0.14 |
| Queue Length 95th (ft) | 0 | 0 | 5 | 0 | 0 | 33 | 12 |
| Control Delay (s) | 0.0 | 0.0 | 8.3 | 0.0 | 0.0 | 12.9 | 10.4 |
| Lane LOS | | | A | | | B | B |
| Approach Delay (s) | 0.0 | | 2.5 | | | 12.1 | |
| Approach LOS | | | | | | B | |

| Intersection Summary | | | |
|---|---|---|---|
| Average Delay | | 4.6 | |
| Intersection Capacity Utilization | | 34.1% | ICU Level of Service | A |
| Analysis Period (min) | | 15 | |

C0010438

*The Village at Wolf Creek*                                      *Traffic Impact Study*

## APPENDIX D    PRELIMINARY VILLAGE ACCESS INTERSECTION DESIGN



*Appendix D*



AT GRADE  INTERSECTION

FULL ACCESS FOR
SKI AREA

HWY 160

CONTINUOUS
CLIMBING
LANE

TRANQUILITY

PROPOSED
EDGE OF PAVEMENT

CONTINUOUS
ACCEL/DECEL
LANE

EXISTING EDGE
OF PAVEMENT

ACCEL LANE

FULL ACCESS FOR
VILLAGE

RETAINING WALL

DECEL LANE

VILLAGE ACCESS ROAD

DECEMBER 2011

VILLAGE AT WOLF CREEK

REISBURG
HOLT &
ULLEVIG

C0010440

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, September 24, 2012 2:04 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS |
| **Cc:** | Blakeman, Mike -FS; Wehrli, Christopher L -FS |
| **Subject:** | FW: request for comment period extension |
| **Attachments:** | 20120921 Wolf Creek comment period extension request letter.docx |

We had discussed this earlier and recommended against any extension as we have been playing this game for 8 years now.  However, the decision is Dan's to make.  Scoping officially closes a week from today.  We have not yet entered into the consultation timeline with FWS and once we have, the 120 day timeline begins.  A 30 day extension would put us thru Nov 1, 2012, and would obviously push back our response to comments and the FEIS until after the new year…..

Dan, let me know if we need to discuss, or set up a meeting, or….

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Josh Pollock [mailto:josh@rockymountainwild.org]
**Sent:** Friday, September 21, 2012 9:49 PM
**To:** FS-Mailroom R2 Rio Grande; FS-comments-rocky-mountain-rio-grande; Malecek, Thomas -FS
**Subject:** request for comment period extension

Mr. Malecek,
Please see the attached letter requesting an extension of the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement.  Thank you for your consideration.

--
**Josh Pollock**
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202
(303) 546-0214 x2
(303) 454-3382 - direct
(303) 552-6001 - cell

**Protecting wild lands for wildlife**

C0010441

Colorado Environmental Coalition * Colorado Mountain Club * Rocky Mountain Wild * San Juan Citizens
Alliance * San Luis Valley Ecosystem Council

September 21, 2012

Village at Wolf Creek Access Project
c/o Tom Malecek, Divide District Ranger
Rio Grande National Forest
1803 West Highway 160
Monte Vista, CO 81144

Dear Mr. Malecek,

The below-signed organizations respectfully request an extension of thirty days to the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement. Our members and other citizens we have communicated with are highly interested in the proposed land exchange, and have indicated a strong interest in thoroughly understanding the DEIS and providing substantive comments from their own perspective on the proposed action.  We are aware that you have already received a number of comments from the public, but we believe there are more who are interested in doing so who are limited by the short 45 day comment window and the length of the document in question (nearly 500 pages).  Furthermore, as organizations representing thousands of residents across Colorado and the region, we are also interested in providing substantive comments of our own, and yet the regulatory and environmental ramifications of the proposed action deserve more careful consideration than the current comment period allows.

A thirty-day extension to the current public comment period would provide a greater opportunity for us and others to provide more valuable public input to the process and is therefore in the public interest.  Thank you for your consideration.

Sincerely,

Josh Pollock
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202

On behalf of:

Elise Jones, Executive Director
Colorado Environmental Coalition

Scott Braden, Conservation Director
Colorado Mountain Club

Dan Randolf, Executive Director
San Juan Citizens Alliance

Christine Canaly, Executive Director
San Luis Valley Ecosystem Council

CC:    Dan Dallas, Forest Supervisor, Rio Grande National Forest
       13308 West Highway 160
       Del Norte, CO 81132

C0010443

**Wehrli, Christopher L -FS**

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Monday, September 24, 2012 2:10 PM |
| **To:** | Malecek, Thomas -FS; Dallas, Dan -FS; Dyer, Harold D -FS |
| **Cc:** | Blakeman, Mike -FS |
| **Subject:** | RE: request for comment period extension |

Just to be clear… you mean the **45-Day Comment** period not the "scoping" period officially closes a week from today, correct?



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 24, 2012 2:04 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS
**Cc:** Blakeman, Mike -FS; Wehrli, Christopher L -FS
**Subject:** FW: request for comment period extension

We had discussed this earlier and recommended against any extension as we have been playing this game for 8 years now.  However, the decision is Dan's to make.  Scoping officially closes a week from today.  We have not yet entered into the consultation timeline with FWS and once we have, the 120 day timeline begins.  A 30 day extension would put us thru Nov 1, 2012, and would obviously push back our response to comments and the FEIS until after the new year…..

Dan, let me know if we need to discuss, or set up a meeting, or….

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Josh Pollock [mailto:josh@rockymountainwild.org]
**Sent:** Friday, September 21, 2012 9:49 PM
**To:** FS-Mailroom R2 Rio Grande; FS-comments-rocky-mountain-rio-grande; Malecek, Thomas -FS
**Subject:** request for comment period extension

Mr. Malecek,
Please see the attached letter requesting an extension of the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement.  Thank you for your consideration.

C0010444

--
**Josh Pollock**
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202
(303) 546-0214 x2
(303) 454-3382 - direct
(303) 552-6001 - cell

**Protecting wild lands for wildlife**

C0010445

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.9621-000001

C0010446

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=MILLER, JEFFREY6CDA61BB-D641-4DE0-9707-C2EDABCD204E> |
| **Sent:** | Monday, September 24, 2012 4:04 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | Fw: request for comment period extension |
| **Attachments:** | pic20888.gif; ecblank.gif; 20120921 Wolf Creek comment period extension request letter.docx |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/24/2012 04:03 PM -----

**Josh Pollock**
<josh@rockymountainwild.org>

09/21/2012 09:49 PM

ToMailroom R2 Rio Grande, comments-rocky-mountain-rio-grande, Thomas Malecek/R2/USDAFS

cc

Subjectrequest for comment period extension

Mr. Malecek,
Please see the attached letter requesting an extension of the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement.  Thank you for your consideration.

--
**Josh Pollock**
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202
(303) 546-0214 x2
(303) 454-3382 - direct
(303) 552-6001 - cell

**Protecting wild lands for wildlife**
*(See attached file: 20120921 Wolf Creek comment period extension request letter.docx)*

1

C0010447

Colorado Environmental Coalition * Colorado Mountain Club * Rocky Mountain Wild * San Juan Citizens
Alliance * San Luis Valley Ecosystem Council

September 21, 2012

Village at Wolf Creek Access Project
c/o Tom Malecek, Divide District Ranger
Rio Grande National Forest
1803 West Highway 160
Monte Vista, CO 81144

Dear Mr. Malecek,

   The below-signed organizations respectfully request an extension of thirty days to the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement. Our members and other citizens we have communicated with are highly interested in the proposed land exchange, and have indicated a strong interest in thoroughly understanding the DEIS and providing substantive comments from their own perspective on the proposed action.  We are aware that you have already received a number of comments from the public, but we believe there are more who are interested in doing so who are limited by the short 45 day comment window and the length of the document in question (nearly 500 pages).  Furthermore, as organizations representing thousands of residents across Colorado and the region, we are also interested in providing substantive comments of our own, and yet the regulatory and environmental ramifications of the proposed action deserve more careful consideration than the current comment period allows.

   A thirty-day extension to the current public comment period would provide a greater opportunity for us and others to provide more valuable public input to the process and is therefore in the public interest.  Thank you for your consideration.

Sincerely,

Josh Pollock
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202

   On behalf of:

Elise Jones, Executive Director
Colorado Environmental Coalition


Scott Braden, Conservation Director
Colorado Mountain Club


Dan Randolf, Executive Director
San Juan Citizens Alliance


Christine Canaly, Executive Director
San Luis Valley Ecosystem Council



CC:    Dan Dallas, Forest Supervisor, Rio Grande National Forest
       13308 West Highway 160
       Del Norte, CO 81132

C0010449

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9627-000002

C0010450

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9627-000003

C0010451

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Monday, September 24, 2012 6:02 PM |
| **To:** | Malecek, Thomas -FS; Julia Hanson |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Hi folks.  The plant BE for WCV Land Exchange proposal has been reviewed and the contractor has made the final edits.  So it's basically complete.  Please let me know if I need to mail a hardcaopy and I will do so.

---

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 24, 2012 8:57 AM
**To:** Julia Hanson
**Cc:** Ghormley, Randy -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, thanks for the info, we can get you what you are looking for, and will likely send a hard copy rather than electronic, unless you will be in the area and can pick it up.  Let me know, thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Julia Hanson [mailto:jhanson@sme-env.com]
**Sent:** Monday, September 24, 2012 8:46 AM
**To:** Malecek, Thomas -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Tom
I am working on the CDOT lease renewal parcel on Wolf Creek Pass, specifically plant surveys. The plant analysis and survey info within the Proposed Wolf Creek Village DEIS and BA/BE is helpful due to the adjacent location. I have reviewed the DEIS and was looking for the BA/BE. Thanks!

**Julia Hanson**
**Biologist/Botanist**



ENVIRONMENTAL CONSULTANTS
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by

telephone and destroy this email and attachments.

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** Julia Hanson
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today.  Can you tell me what plant survey and for whom are you working?  I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | |
|---|---|
| Julia Hanson <jhanson@sme-env.com> 09/17/2012 10:27 AM | To Mailroom R2 Rio Grande cc Subject Rare plant analysis BA/BE (WER 2012) |

Dan

I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

C0010453

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010454

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29947-000001

C0010455

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29947-000002

C0010456

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29947-000003

C0010457

**FS-CARA-help**

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Monday, September 24, 2012 11:00 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | [CARA] Comment period ending on 9/30/2012 for Village at Wolf Creek Land Exchange Proposal - Draft EIS Comment |

This email notification is auto generated by CARA to inform you that the Formal comment period Draft EIS Comment within the Village at Wolf Creek Land Exchange Proposal project is ending on 9/30/2012.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

C0010458

**Julia Hanson**

| | |
|---|---|
| **From:** | Julia Hanson |
| **Sent:** | Tuesday, September 25, 2012 8:27 AM |
| **To:** | Ghormley, Randy -FS |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Hi Randy
That would be great, thanks!

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f)  970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged.  If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

---

**From:** Ghormley, Randy -FS [mailto:rghormley@fs.fed.us]
**Sent:** Monday, September 24, 2012 6:02 PM
**To:** Malecek, Thomas -FS; Julia Hanson
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Hi folks.  The plant BE for WCV Land Exchange proposal has been reviewed and the contractor has made the final edits.  So it's basically complete.  Please let me know if I need to mail a hardcaopy and I will do so.

---

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 24, 2012 8:57 AM
**To:** Julia Hanson
**Cc:** Ghormley, Randy -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, thanks for the info, we can get you what you are looking for, and will likely send a hard copy rather than electronic, unless you will be in the area and can pick it up.  Let me know, thanks

Tom Malecek
Divide District Ranger
Rio Grande NF

(719) 657-6007; cell 850-2356

---

**From:** Julia Hanson [mailto:jhanson@sme-env.com]
**Sent:** Monday, September 24, 2012 8:46 AM
**To:** Malecek, Thomas -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Tom
I am working on the CDOT lease renewal parcel on Wolf Creek Pass, specifically plant surveys. The plant analysis and survey info within the Proposed Wolf Creek Village DEIS and BA/BE is helpful due to the adjacent location. I have reviewed the DEIS and was looking for the BA/BE. Thanks!

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** Julia Hanson
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today. Can you tell me what plant survey and for whom are you working? I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

Julia Hanson          To Mailroom R2 Rio Grande

C0010460

<**jhanson@sme-env.com**>
09/17/2012
10:27 AM

cc

SubjectRare plant analysis BA/BE (WER 2012)

Dan

I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010461

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29446-000001

C0010462

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29446-000002

C0010463

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29446-000003

C0010464

**kurt_broderdorp@fws.gov**

| | |
|---|---|
| **From:** | kurt_broderdorp@fws.gov |
| **Sent:** | Tuesday, September 25, 2012 11:36 AM |
| **To:** | Ghormley, Randy -FS; Dyer, Harold D -FS |
| **Subject:** | Information request |

Hi guys, I have been trying to reach you both by phone, but have been unsuccessful. I have an information request, and am in need of some discussion. I would like to talk with both of you as soon as possible. We are starting to get requests for our response to the LMJV mitigation proposal, but I need some information to inform my response. Please contact me at your earliest convenience. Thank you,

Kurt Broderdorp
Fish and Wildlife Biologist
Western Colorado Field Office
U.S. Fish and Wildlife Service
(970) 243-2778 extension 24
FAX (970) 245-6933

C0010465

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 25, 2012 12:47 PM |
| **To:** | Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS |
| **Subject:** | 10 day extension to our WCV comment period deadline |

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010466

**Wehrli, Christopher L -FS**

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Tuesday, September 25, 2012 12:53 PM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |

Technically yes, we need to put it the Fed Register. I'll get back to you after I double check the process.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010467

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9632-000001

C0010468

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 25, 2012 1:01 PM |
| **To:** | Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |

Please do as we already have been tried by register protocol, and if we send it in by this Friday and it
publishes next Friday, would only have 4 days left to comment

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Wehrli, Christopher L -FS
**Sent:** Tuesday, September 25, 2012 12:53 PM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline

Technically yes, we need to put it the Fed Register. I'll get back to you after I double check the process.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that
needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.9630-000001

C0010470

## Wehrli, Christopher L -FS

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Tuesday, September 25, 2012 1:13 PM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |

Check… 36 CFR 220.5 (f)(3)

*"When the responsible official determines that an extension of the review period on a draft EIS is appropriate, notice shall be given in the same manner used for inviting comments on the draft."*

We need to get it to the Fed Reg by 14:00 Eastern Daylight Time tomorrow (09/26/2012) for it to be published on Monday October 1.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010471

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9631-000001

C0010472

**Miller, Jeffrey H -FS**

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Tuesday, September 25, 2012 4:09 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | Fw: Please help stop the development at Wolf Creek |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/25/2012 04:08 PM -----

| Miles <miles.beckler@gmail.com> | To | Mailroom R2 Rio Grande |
|---|---|---|
| | cc | |
| 09/24/2012 04:33 PM | Subject | Please help stop the development at Wolf Creek |

At some point, somewhere in our country, someone must stand up for keeping an area natural.... At least once.

Wolf Creek is an amazing location with amazing snow and it is somewhere that I make my way to at least once or twice a season, from the north shore of Tahoe.  I go there specifically because it is peaceful and quiet without any lodging near by.  I mean, your in the middle of the San Juan's out there and it is simply amazing.  If a hotel and shopping go up, all the way up there at the ski resort, I assure you that I will not return.

Thanks for taking the time to understand my point of view.... And, please, don't allow anyone to pillage wolf creek.

--
Miles

C0010473

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9633-000001

C0010474

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9633-000002

C0010475

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 25, 2012 8:44 PM |
| **To:** | Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |
| **Attachments:** | FR-2012-20248.pdf |
| **Importance:** | High |

Chris, not sure if Dave will be in tomorrow, as he wasn't today and he doesn't know about this yet…Attached is the original notice. Would be much obliged if you could help out with the minimal info/wording/format needed for the FR notice (amendment?) in order for it to be in by noon Wednesday in order to be published next Monday, October 1, as that is the current end of comment period for the project. What we would like to do is add 10 additional days onto the scoping period, so that the scoping would then end on 10/11.

Please and thanks, plus, will be avail by cell to discuss after 0700

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Wehrli, Christopher L -FS
**Sent:** Tuesday, September 25, 2012 1:13 PM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline

Check… 36 CFR 220.5 (f)(3)

"When the responsible official determines that an extension of the review period on a draft EIS is appropriate, notice shall be given in the same manner used for inviting comments on the draft. "

We need to get it to the Fed Reg by 14:00 Eastern Daylight Time tomorrow (09/26/2012) for it to be published on Monday October 1.



U.S. Forest Service • Rocky Mountain Region

Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

C0010476

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010477

operation of the U.S. electric power supply system under normal and contingency conditions, and any other factors that DOE may consider relevant to the public interest.

DOE has determined that the potential impacts from the Route for the Double-Circuit 230-kV Transmission Line are expected to be small, as discussed above.

For the reasons stated above, DOE will issue Presidential Permit PP–334 to authorize ESJ to construct, operate, maintain, and connect the Energia Sierra Juarez U.S. Double-Circuit 230-kV Transmission Line across the U.S. border. Presidential Permit PP–334 will limit the project to a maximum of 400 MW.

Issued in Washington, DC, on August 13, 2012.

**Patricia A. Hoffman,**

*Assistant Secretary of Energy Electricity, Delivery and Energy Reliability.*

[FR Doc. 2012–20234 Filed 8–16–12; 8:45 am]

**BILLING CODE 6450–01–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

[ER–FRL–9004–5]

### Environmental Impacts Statements; Notice of Availability

*Responsible Agency:* Office of Federal Activities, General Information (202) 564–7146 or *http://www.epa.gov/ compliance/nepa/.*

Weekly receipt of Environmental Impact Statements Filed 08/06/2012 Through 08/10/2012

Pursuant to 40 CFR 1506.9

### Notice

Section 309(a) of the Clean Air Act requires that EPA make public its comments on EISs issued by other Federal agencies. EPA's comment letters on EISs are available at: *http://www.epa. gov/compliance/nepa/eisdata.html.*

**SUPPLEMENTARY INFORMATION:** Starting October 1, 2012, EPA will not accept paper copies or CDs of EISs for filing purposes; all submissions on or after October 1, 2012 must be made through e-NEPA. While this system eliminates the need to submit paper or CD copies to EPA to meet filing requirements, electronic submission does not eliminate requirements for distribution of EISs for public review and comment. To begin using e-NEPA, you must first register with EPA's electronic reporting site— *https://cdx.epa.gov/epa_home.asp.*

*EIS No. 20120264, Final EIS, USFS, CA,* On Top Hazardous Fuels Reduction Project, To Disclose the Environmental Effects of a Federal Proposal on National Forest System (NFS) Land, Plumas National Forest, Feather River Ranger District, Plumas, Butte Counties, CA, Review Period Ends: 09/17/2012, Contact: Carol Spinos 530–534–6500.

*EIS No. 20120265, Draft EIS, FHWA, MT,* Billings Bypass Improvements, Connecting Interstate 90 (I–90) east of Billings with Old Highway (Old Hwy 312), Possible USACE Section 10 and 404 Permits, Yellowstone County, MT, Comment Period Ends: 10/01/2012, Contact: Brian Hasselbach 406–441–3908.

*EIS No. 20120266, Draft EIS, USFS, CO,* Village at Wolf Creek Access Project, Conveyance of Non-Federal Land to the U.S. in Exchange for National Forest System Lands Managed by the Rio Grande National Forest, Mineral County, CO, Comment Period Ends: 10/01/2012, Contact: Harold Dyer 719–852–6215.

*EIS No. 20120267, Draft EIS, USN, VA,* Outdoor Research, Development, Test and Evaluation Activities within the Potomac River Test Range and Explosives Experimental Area Complexes, the Mission Area and Special-Use Airspace at Naval Support Facility Dahlgren, Expansion, Dahlgren, VA, Comment Period Ends: 10/01/2012, Contact: Jennifer Boyd 540–653–8695.

### Amended Notices

*EIS No. 20120184, Draft EIS, NOAA, 00,* Issuing Annual Quotas to the Alaska Eskimo Whaling Commission (AEWC) for a Subsistence Hunt on Bowhead Whales for the Years 2013 through 2017/2018, Comment Period Ends: 08/31/2012, Contact: Ellen Sebastian 907–586–7247. Revision to FR Notice Published 06/15/2012; Extending Comment Period from 08/14/2012 to 08/31/2012.

*EIS No. 20120197, Draft EIS, USFS, ID,* Golden Hand No. 1 and No. 2 Lode Mining Claims Project, Krassel Ranger District, Payette National Forest, Valley and Idaho Counties, ID, Comment Period Ends: 08/13/2012, Contact: Jeff Hunteman 208–634–0434. Revision to FR Notice Published 06/29/2012; Extending Comments Period from 08/13/2012 to 09/17/2012.

*EIS No. 20120263, Final EIS, USFS, CA,* Barren Ridge Renewable Transmission Project, Construct, Operate, Maintain, and Upgrade 220kV Electrical Transmission Lines and Switching Stations, Kern and Los Angeles Counties, CA, Review Period Ends: 09/10/2012, Contact: Justin Seastrand 626–574–5278(AFS), Lynette Elser 951–697–5233(BLM).

Revision to FR Notice Published 08/10/2012; Review Period ends 09/10/212. More information on the U.S. Forest Service's appeal process is available at *http://www.ladwp.com/barrenridge.*

Dated: July 14, 2012.

**Aimee Hessert,**

*Deputy Director, NEPA Compliance Division, Office of Federal Activities.*

[FR Doc. 2012–20248 Filed 8–16–12; 8:45 am]

**BILLING CODE 6560–50–P**

---

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OPP–2012–0442; FRL–9356–5]

### FIFRA Pesticide Registration Review and ESA Consultation Processes; Proposal Regarding Stakeholder Input; Request for Comment

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of availability.

**SUMMARY:** EPA is seeking public comment on a proposal to enhance opportunities for stakeholders to provide input during its review of pesticide registrations under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) and associated consultations under Section 7 of the Endangered Species Act (ESA). The proposal was jointly prepared by EPA, the U.S. Department of Agriculture (USDA), the National Marine Fisheries Service (NMFS) in the U.S. Department of Commerce and the Fish and Wildlife Service (USFWS) in the U.S. Department of Interior. The proposal describes significant changes to EPA's registration review process which are intended to facilitate ESA pesticide consultations and coordination across these Federal agencies, and calls for a greater role for USDA.

**DATES:** Comments must be received on or before October 16, 2012.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number EPA–HQ–OPP–2012–0442, by one of the following methods:

• *Federal eRulemaking Portal: http:// www.regulations.gov.* Follow the online instructions for submitting comments. Do not submit electronically any information you consider to be Confidential Business Information (CBI) or other information whose disclosure is restricted by statute.

• *Mail:* OPP Docket, Environmental Protection Agency Docket Center (EPA/ DC), Mail Code: 28221T, 1200



U.S. Forest Service • Rocky Mountain Region

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 25, 2012 9:34 PM |
| **To:** | Blakeman, Mike -FS; Dallas, Dan -FS; Dyer, Harold D -FS; Wehrli, Christopher L -FS |
| **Cc:** | Delozier-Trujillo, Sherri L -FS; Rinella, Steven -FS |
| **Subject:** | FW: request for comment period extension & draft response |
| **Attachments:** | pic20888.gif; 20120921 Wolf Creek comment period extension request letter.docx; 092612 response to rockymtnwild.doc |

Fyi, here is my response to rocky mtn wild, for your editing pleasure…..however the response is crafted, will also be the bulk of mike's news release as well, I imagine.  Working to ensure this gets into the fed register by noon Wednesday….

Sherri, listed you as co-author…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 24, 2012 4:04 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: request for comment period extension

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/24/2012 04:03 PM -----

| | |
|---|---|
| Josh Pollock<br><josh@rockymountainwild.org><br>09/21/2012 09:49 PM | To Mailroom R2 Rio Grande, comments-rocky-mountain-rio-grande, Thomas Malecek/R2/USDAFS<br>cc<br>Subject request for comment period extension |

Mr. Malecek,
Please see the attached letter requesting an extension of the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement.  Thank you for your consideration.

--
**Josh Pollock**
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202
(303) 546-0214 x2
(303) 454-3382 - direct
(303) 552-6001 - cell

**Protecting wild lands for wildlife**

C0010480

*(See attached file: 20120921 Wolf Creek comment period extension request letter.docx)*

C0010481



| United States Department of Agriculture | Forest Service | Rio Grande National Forest | Divide Ranger District 13308 West Highway 160 Del Norte, CO 81132 (719)657-3321 (719)657-6038 TTY http://www.fs.fed.us/r2/riogrande |
|---|---|---|---|

**File Code:** 1950
**Date:**

Josh Pollock
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202

Dear Mr. Pollock:

Thank you for your letter of September 21, requesting an additional 30 days to comment on the land exchange DEIS. As stated in your letter, regarding this DEIS, there are many highly interested people who want to make sure they have a thorough understanding of the project and document in order to make substantive comments.

To date, we have received hundreds of comments from a wide variety of interested publics who have taken the time to understand the project and draft EIS in order to provide their comments within the 45 day comment period. And while I do appreciate your request for an additional 30 days to comment, I feel the 45 day comment period, which included 3 public meetings, is sufficient as I have received so many comments to date.

However, in the interest of ensuring a thorough understanding and wanting to receive substantive comments from as diverse a public as possible, I am willing to extend the comment period an additional 10 days. This would push the deadline for email comments to October 11, and hard mail comments would need to be postmarked by this date.

In order to facilitate a thorough understanding, and as stated at the public meetings, my staff and I are available to answer questions, whether over the phone or computer, or by attending and discussing with any interested group.

Thank you for your interest in this project.

Sincerely,

THOMAS M. MALECEK
District Ranger



**It's Cool to Be Safe**

Printed on Recycled Paper 

C0010483

Colorado Environmental Coalition * Colorado Mountain Club * Rocky Mountain Wild * San Juan Citizens Alliance * San Luis Valley Ecosystem Council

September 21, 2012

Village at Wolf Creek Access Project
c/o Tom Malecek, Divide District Ranger
Rio Grande National Forest
1803 West Highway 160
Monte Vista, CO 81144

Dear Mr. Malecek,

The below-signed organizations respectfully request an extension of thirty days to the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement. Our members and other citizens we have communicated with are highly interested in the proposed land exchange, and have indicated a strong interest in thoroughly understanding the DEIS and providing substantive comments from their own perspective on the proposed action.  We are aware that you have already received a number of comments from the public, but we believe there are more who are interested in doing so who are limited by the short 45 day comment window and the length of the document in question (nearly 500 pages).  Furthermore, as organizations representing thousands of residents across Colorado and the region, we are also interested in providing substantive comments of our own, and yet the regulatory and environmental ramifications of the proposed action deserve more careful consideration than the current comment period allows.

A thirty-day extension to the current public comment period would provide a greater opportunity for us and others to provide more valuable public input to the process and is therefore in the public interest.  Thank you for your consideration.

Sincerely,

Josh Pollock
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202

On behalf of:

Elise Jones, Executive Director
Colorado Environmental Coalition


Scott Braden, Conservation Director
Colorado Mountain Club


Dan Randolf, Executive Director
San Juan Citizens Alliance


Christine Canaly, Executive Director
San Luis Valley Ecosystem Council



CC:    Dan Dallas, Forest Supervisor, Rio Grande National Forest
       13308 West Highway 160
       Del Norte, CO 81132

C0010485

C0010486

C0010487



C0010488

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Tuesday, September 25, 2012 9:38 PM |
| **To:** | Wehrli, Christopher L -FS |
| **Subject:** | RE: request for comment period extension |

yes

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Wehrli, Christopher L -FS
**Sent:** Monday, September 24, 2012 2:10 PM
**To:** Malecek, Thomas -FS; Dallas, Dan -FS; Dyer, Harold D -FS
**Cc:** Blakeman, Mike -FS
**Subject:** RE: request for comment period extension

Just to be clear... you mean the **45-Day Comment** period not the "scoping" period officially closes a week from today, correct?



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 24, 2012 2:04 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS
**Cc:** Blakeman, Mike -FS; Wehrli, Christopher L -FS
**Subject:** FW: request for comment period extension

We had discussed this earlier and recommended against any extension as we have been playing this game for 8 years now.  However, the decision is Dan's to make.  Scoping officially closes a week from today.  We have not yet entered into the consultation timeline with FWS and once we have, the 120 day timeline begins.  A 30 day extension would put us thru Nov 1, 2012, and would obviously push back our response to comments and the FEIS until after the new year.....

Dan, let me know if we need to discuss, or set up a meeting, or....

Tom Malecek
Divide District Ranger

C0010489

Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Josh Pollock [mailto:josh@rockymountainwild.org]
**Sent:** Friday, September 21, 2012 9:49 PM
**To:** FS-Mailroom R2 Rio Grande; FS-comments-rocky-mountain-rio-grande; Malecek, Thomas -FS
**Subject:** request for comment period extension

Mr. Malecek,
Please see the attached letter requesting an extension of the public comment period for the Village at Wolf
Creek Access Project Draft Environmental Impact Statement.  Thank you for your consideration.

--
**Josh Pollock**
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202
(303) 546-0214 x2
(303) 454-3382 - direct
(303) 552-6001 - cell

**Protecting wild lands for wildlife**

C0010490

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.51622-000001

C0010491

**Dyer, Harold D -FS**

| | |
|---|---|
| **From:** | Dyer, Harold D -FS |
| **Sent:** | Wednesday, September 26, 2012 6:33 AM |
| **To:** | Malecek, Thomas -FS; McGinn, Diana -FS |
| **Subject:** | FW: Please help stop the development at Wolf Creek |
| **Attachments:** | pic03822.gif |

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Tuesday, September 25, 2012 4:09 PM
**To:** Dyer, Harold D -FS
**Subject:** Fw: Please help stop the development at Wolf Creek

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/25/2012 04:08 PM -----

| | | |
|---|---|---|
| **Miles**<br><miles.beckler@gmail.com><br>09/24/2012 04:33 PM | To | Mailroom R2 Rio Grande |
| | cc | |
| | Subject | Please help stop the development at Wolf Creek |

At some point, somewhere in our country, someone must stand up for keeping an area natural.... At least once.

Wolf Creek is an amazing location with amazing snow and it is somewhere that I make my way to at least once or twice a season, from the north shore of Tahoe.  I go there specifically because it is peaceful and quiet without any lodging near by.  I mean, your in the middle of the San Juan's out there and it is simply amazing.  If a hotel and shopping go up, all the way up there at the ski resort, I assure you that I will not return.

Thanks for taking the time to understand my point of view.... And, please, don't allow anyone to pillage wolf creek.

--
Miles

C0010492

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9635-000001

C0010493

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9635-000002

C0010494

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9635-000003

C0010495

## Wehrli, Christopher L -FS

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Wednesday, September 26, 2012 7:27 AM |
| **To:** | Malecek, Thomas -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |

*I'm looking at it now... give me a little time and I'll call.*



U.S. Forest Service • Rocky Mountain Region

Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 8:44 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline
**Importance:** High

Chris, not sure if Dave will be in tomorrow, as he wasn't today and he doesn't know about this yet...Attached is the original notice. Would be much obliged if you could help out with the minimal info/wording/format needed for the FR notice (amendment?) in order for it to be in by noon Wednesday in order to be published next Monday, October 1, as that is the current end of comment period for the project. What we would like to do is add 10 additional days onto the scoping period, so that the scoping would then end on 10/11.

Please and thanks, plus, will be avail by cell to discuss after 0700

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Wehrli, Christopher L -FS
**Sent:** Tuesday, September 25, 2012 1:13 PM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline

Check... 36 CFR 220.5 (f)(3)

*"When the responsible official determines that an extension of the review period on a draft EIS is appropriate, notice shall be given in the same manner used for inviting comments on the draft."*

C0010496

We need to get it to the Fed Reg by 14:00 Eastern Daylight Time tomorrow (09/26/2012) for it to be published on Monday October 1.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010497

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.55805-000001

C0010498

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Wednesday, September 26, 2012 8:25 AM |
| **To:** | Malecek, Thomas -FS; Dallas, Dan -FS; Dyer, Harold D -FS; Wehrli, Christopher L -FS |
| **Cc:** | Delozier-Trujillo, Sherri L -FS; Rinella, Steven -FS |
| **Subject:** | RE: request for comment period extension & draft response |
| **Attachments:** | 092612 response to rockymtnwild mb edits.doc |

Attached are my edits for your consideration.

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 9:34 PM
**To:** Blakeman, Mike -FS; Dallas, Dan -FS; Dyer, Harold D -FS; Wehrli, Christopher L -FS
**Cc:** Delozier-Trujillo, Sherri L -FS; Rinella, Steven -FS
**Subject:** FW: request for comment period extension & draft response

Fyi, here is my response to rocky mtn wild, for your editing pleasure…..however the response is crafted, will also be the bulk of mike's news release as well, I imagine.  Working to ensure this gets into the fed register by noon Wednesday….

Sherri, listed you as co-author…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 24, 2012 4:04 PM
**To:** Dallas, Dan -FS; Dyer, Harold D -FS; Malecek, Thomas -FS
**Subject:** Fw: request for comment period extension

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/24/2012 04:03 PM -----

| | |
|---|---|
| Josh Pollock <[josh@rockymountainwild.org](mailto:josh@rockymountainwild.org)> 09/21/2012 09:49 PM | To Mailroom R2 Rio Grande, comments-rocky-mountain-rio-grande, Thomas Malecek/R2/USDAFS |
| | cc |
| | Subject request for comment period extension |

Mr. Malecek,
Please see the attached letter requesting an extension of the public comment period for the Village at Wolf Creek Access Project Draft Environmental Impact Statement.  Thank you for your consideration.

--
**Josh Pollock**
Executive Director
Rocky Mountain Wild

1536 Wynkoop Street, Suite 303
Denver, CO 80202
(303) 546-0214 x2
(303) 454-3382 - direct
(303) 552-6001 - cell

**Protecting wild lands for wildlife**
*(See attached file: 20120921 Wolf Creek comment period extension request letter.docx)*



| United States Department of Agriculture | Forest Service | Rio Grande National Forest | Divide Ranger District 13308 West Highway 160 Del Norte, CO 81132 (719)657-3321 (719)657-6038 TTY http://www.fs.fed.us/r2/riogrande |
|---|---|---|---|

**File Code:** 1950
**Date:**

Josh Pollock
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202

Dear Mr. Pollock:

Thank you for your letter, dated September 21, requesting an additional 30 days to comment on the Village at Wolf Creek Access DEIS. As stated in your letter, there are many people highly interested in the DEIS who want to make sure they have a thorough understanding of the project and document in order to make substantive comments.

To date, we have received hundreds of comments from a wide variety of interested publics who have taken the time to understand the project and draft EIS in order to provide their comments within the 45 day comment period. While I appreciate your request for an additional 30 days to comment, I feel the 45-day comment period, which included three public meetings, is sufficient as I have received so many comments to date.

However, in the interest of ensuring a thorough understanding, and wanting to receive substantive comments from as diverse a public as possible, I am willing to extend the comment period an additional 10 days. This would push the deadline for email comments to October 11, and hardcopy comments would need to be faxed or postmarked by this date.

As always, my staff and I are available by phone, email, or in person to answer questions concerning the DEIS. Thank you for your interest in this project.

Sincerely,

THOMAS M. MALECEK
District Ranger



**It's Cool to Be Safe**

Printed on Recycled Paper 

C0010501

C0010502

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.9636-000002

C0010503

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9636-000003

C0010504

**Gaulke, Peter T -FS**

| | |
|---|---|
| **From:** | Gaulke, Peter T -FS |
| **Sent:** | Wednesday, September 26, 2012 8:39 AM |
| **To:** | Wehrli, Christopher L -FS |
| **Attachments:** | 04-26052.pdf |

C0010505



**ACTION:** Notice.

The Administrator, Foreign Agricultural Service (FAS), today terminated the certification of a petition for trade adjustment assistance (TAA) that was filed by the Catfish Farmers of America and certified on November 25, 2003. Catfish producers in Alabama, Arkansas, Florida, Georgia, Idaho, Illinois, Kansas, Kentucky, Louisiana, Mississippi, Missouri, Nevada, North Carolina, Ohio, Oklahoma, South Carolina, Texas, and Utah will not be eligible for TAA benefits in fiscal year 2005.

**SUPPLEMENTARY INFORMATION:** Upon investigation, the Administrator determined that domestic producer prices did not decline at least 20 percent during the 2003 marketing year (January–December), when compared to average prices during the 5-year base period ending December 2001. In addition, during the 2003 marketing year, imports did not increase, but declined by 16.2 percent. Both conditions, a decline in prices of at least 20 percent and an increase in imports, are required for re-certifying a petition for TAA.

**FOR FURTHER INFORMATION, CONTACT:** Jean-Louis Pajot, Coordinator, Trade Adjustment Assistance for Farmers, FAS, USDA, (202) 720–2916, e-mail: *trade.adjustment@fas.usda.gov*.

Dated: November 10, 2004.

**A. Ellen Terpstra,**
*Administrator, Foreign Agricultural Service.*
[FR Doc. 04–26085 Filed 11–23–04; 8:45 am]
**BILLING CODE 3410–10–P**

---

# DEPARTMENT OF AGRICULTURE

## Foreign Agricultural Service

## Trade Adjustment Assistance for Farmers

**AGENCY:** Foreign Agricultural Service, USDA.

**ACTION:** Notice.

The Administrator, Foreign Agricultural Service (FAS), re-certified the trade adjustment assistance (TAA) petition that was filed by the Georgia Shrimp Association on behalf of Georgia shrimpers and initially certified on November 19, 2003. Shrimpers who land their catch in Georgia will be eligible to apply for fiscal year 2005 benefits during a 90-day period beginning on November 29, 2004. The application period closes on February 28, 2005.

**SUPPLEMENTARY INFORMATION:** Upon investigation, the Administrator

determined that continued increases in imports of like or directly competitive products contributed importantly to a decline in the average landed price of shrimp in Georgia by 37.7 percent during the 2003 marketing period (January–December), compared to the 1997–2001 base period. Eligible producers may request technical assistance from the Extension Service at no cost and receive an adjustment assistance payment, if certain program criteria are satisfied. Producers in fiscal year 2005 who did not receive technical assistance under the fiscal year 2004 TAA program must obtain the technical assistance from the Extension Service by May 31, 2005, in order to be eligible for financial payments.

Producers of raw agricultural commodities wishing to learn more about TAA and how they may apply should contact the Department of Agriculture at the addresses provided below for General Information.

*Producers Certified as Eligible for TAA, Contact:* Farm Service Agency service centers.

*For General Information About TAA, Contact:* Jean-Louis Pajot, Coordinator, Trade Adjustment Assistance for Farmers, FAS, USDA, (202) 720–2916, e-mail: *trade.adjustment@fas.usda.gov*.

Dated: November 10, 2004.

**A. Ellen Terpstra,**
*Administrator, Foreign Agricultural Service.*
[FR Doc. 04–26086 Filed 11–23–04; 8:45 am]
**BILLING CODE 3410–10–P**

---

# DEPARTMENT OF AGRICULTURE

## Forest Service

## Extension of Comment Period; Application for Transportation and Utility Systems and Facilities for the Village at Wolf Creek Draft Environmental Impact Statement

**AGENCY:** Forest Service, Rio Grande National Forest.

**ACTION:** Extension of comment period.

**SUMMARY:** The United States Department of Agriculture (USDA) Forest Service (USFS), Rio Grande National Forest (RGNF) announces the extension of the comment period for the Application for Transportation and Utility Systems and Facilities for the Village at Wolf Creek Draft Environmental Impact Statement (EIS). The comment period ends December 6, 2004.

**FOR FURTHER INFORMATION CONTACT:** Contact Mr. Robert Dalrymple, Forest Planner, USDA–USFS, Rio Grande National Forest, (719) 852–5941.

Dated: November 16, 2004.
**Peter L. Clark,**
*Forest Supervisor.*
[FR Doc. 04–26052 Filed 11–23–04; 8:45 am]
**BILLING CODE 3410–11–M**

---

# DEPARTMENT OF AGRICULTURE

## Forest Service

## Black Hills National Forest, Bearlodge Ranger District, Wyoming, Dean Project Area Proposal and Analysis

**AGENCY:** Forest Service, USDA.

**ACTION:** Notice of intent to prepare an environmental impact statement.

**SUMMARY:** The Forest Service will prepare an environmental impact statement on a proposal to implement multiple resource management actions within the Dean Area as directed by the Black Hills National Forest Land and Resource Management Plan. The Dean Project Area covers about 12,468 acres of National Forest System land and about 2,256 acres of interspersed private land within the Redwater Creek watershed directly north of Sundance, Wyoming. Proposed actions would modify the structure of forest stands across the planning area to reduce fuel loads, potential for uncharacteristically intense wildfire behavior, and risk of insect outbreaks; provide for diverse wildlife habitat and restore hardwoods; and provide a mix of motorized and non-motorized use opportunities.

**DATES:** Comments concerning the scope of the analysis must be received by December 22, 2004. The draft environmental impact statement is expected to be available for public review by March 2005 and the final environmental impact statement is expected to be completed by June 2005.

**ADDRESSES:** Send written comments to Steve Kozel, District Ranger, Black Hills National Forest, Bearlodge Ranger District, 121 S. 21st Street, Sundance, Wyoming 82729. Telephone Number: (307) 283–1361. E-mail: *comments-rocky-mountain-black-hills-bearlodge@fs.fed.us* with "Dean Project" as subject.

**FOR FURTHER INFORMATION CONTACT:** Janis Bouma, Project Coordinator, Black Hills National Forest, Bearlodge Ranger District, at above address, phone (307) 283–1361.

**SUPPLEMENTARY INFORMATION:** The actions are proposed in direct response to management direction provided by the Black Hills National Forest Land and Resource Management Plan (Forest Plan). The site-specific actions are based on Forest Plan Standards and

**Gaulke, Peter T -FS**

| | |
|---|---|
| **From:** | Gaulke, Peter T -FS |
| **Sent:** | Wednesday, September 26, 2012 8:40 AM |
| **To:** | Wehrli, Christopher L -FS |
| **Attachments:** | 04-27342.pdf |

**74492**

# Notices

**Federal Register**

Vol. 69, No. 239

Tuesday, December 14, 2004

This section of the FEDERAL REGISTER contains documents other than rules or proposed rules that are applicable to the public. Notices of hearings and investigations, committee meetings, agency decisions and rulings, delegations of authority, filing of petitions and applications and agency statements of organization and functions are examples of documents appearing in this section.

---

## JOINT BOARD FOR THE ENROLLMENT OF ACTUARIES

### Meeting of the Advisory Committee

**AGENCY:** Joint Board for the Enrollment of Actuaries.

**ACTION:** Notice of Federal Advisory Committee meeting.

**SUMMARY:** The Executive Director of the Joint Board for the Enrollment of Actuaries gives notice of a meeting of the Advisory Committee on Actuarial Examinations (portions of which will be open to the public) in Washington, DC at the Office of Professional Responsibility on January 10 and 11, 2005.

**DATES:** Monday, January 10, 2005, from 9 a.m. to 5 p.m., and Tuesday, January 11, 2005, from 8:30 a.m. to 5 p.m.

**ADDRESSES:** The meeting will be held in Room 6505IR, Internal Revenue Service, 1111 Constitution Avenue, NW., Washington, DC.

**FOR FURTHER INFORMATION CONTACT:** Patrick W. McDonough, Executive Director of the Joint Board for the Enrollment of Actuaries, 202–622–8225.

**SUPPLEMENTARY INFORMATION:** Notice is hereby given that the Advisory Committee on Actuarial Examinations will meet in Room 6505IR, 1111 Constitution Avenue, NW., Washington, DC on Monday, January 10, 2005, from 9 a.m. to 5 p.m., and Tuesday, January 11, 2005, from 8:30 a.m. to 5 p.m.

The purpose of the meeting is to discuss topics and questions which may be recommended for inclusion on future Joint Board examinations in actuarial mathematics and methodology referred to in 29 U.S.C. 1242(a)(1)(B) and to review the November 2004 Pension (EA–2A) Joint Board Examination in order to make recommendations relative thereto, including the minimum acceptable pass score. Topics for inclusion on the syllabus for the Joint Board's examination program for the May 2005 Basic (EA–1) Examination and the May 2005 Pension (EA–2B) Examination will be discussed.

A determination has been made as required by section 10(d) of the Federal Advisory Committee Act, 5 U.S.C. App., that the portions of the meeting dealing with the discussion of questions which may appear on the Joint Board's examinations and review of the November 2004 Joint Board examination fall within the exceptions to the open meeting requirement set forth in 5 U.S.C. 552b(c)(9)(B), and that the public interest requires that such portions be closed to public participation.

The portion of the meeting dealing with the discussion of the other topics will commence at 1 p.m. on January 10 and will continue for as long as necessary to complete the discussion, but not beyond 3 p.m. Time permitting, after the close of this discussion by Committee members, interested persons may make statements germane to this subject. Persons wishing to make oral statements should notify the Executive Director in writing prior to the meeting in order to aid in scheduling the time available and should submit the written text, or at a minimum, an outline of comments they propose to make orally. Such comments will be limited to 10 minutes in length. All persons planning to attend the public session should notify the Executive Director in writing to obtain building entry. Notifications of intent to make an oral statement or to attend must be faxed, no later than December 31, 2004, to 202–622–8300, Attn: Executive Director. Any interested person also may file a written statement for consideration by the Joint Board and the Committee by sending it to the Executive Director: Joint Board for the Enrollment of Actuaries, c/o Internal Revenue Service, Attn: Executive Director SE:OPR, 1111 Constitution Avenue, NW., Washington, DC 20224.

Dated: December 7, 2004.

**Patrick W. McDonough,**

*Executive Director, Joint Board for the Enrollment of Actuaries.*

[FR Doc. 04–27372 Filed 12–13–04; 8:45 am]

**BILLING CODE 4830–01–P**

---

## DEPARTMENT OF AGRICULTURE

### Forest Service

### Extension of Comment Period; Application for Transportation and Utility Systems and Facilities for the Village at Wolf Creek Draft Environmental Impact Statement

**AGENCY:** Forest Service, Rio Grande National Forest.

**ACTION:** Extension of comment period.

**SUMMARY:** The United States Department of Agriculture (USDA) Forest Service (USFS), Rio Grande National Forest (RGNF) announces an additional extension of the comment period for the *Application for Transportation and Utility Systems and Facilities for the Village at Wolf Creek Draft Environmental Impact Statement* (EIS). The comment period ends January 5, 2005.

**FOR FURTHER INFORMATION CONTACT:** Mr. Robert Dalrymple, Forest Planner, USDA–USFS, Rio Grande National Forest, (719) 852–5941.

Dated: December 6, 2004.

**Peter L. Clark,**

*Forest Supervisor.*

[FR Doc. 04–27342 Filed 12–13–04; 8:45 am]

**BILLING CODE 3410–11–M**

---

## DEPARTMENT OF COMMERCE

### Foreign-Trade Zones Board

**[Docket 57–2004]**

### Foreign-Trade Zone 222—Montgomery, AL; Application for Expansion

An application has been submitted to the Foreign-Trade Zones (FTZ) Board (the Board) by the Montgomery Area Chamber of Commerce, grantee of FTZ 222, requesting authority to expand its zone in Montgomery County, Alabama, adjacent to the Birmingham Customs port of entry. The application was submitted pursuant to the provisions of the Foreign-Trade Zones Act, as amended (19 U.S.C. 81a–81u), and the regulations of the Board (15 CFR part 400). It was formally filed on December 8, 2004.

FTZ 222 was approved on May 30, 1997 (Board Order 888, 62 FR 32290, 6/13/97). The general-purpose zone project currently consists of 2 sites

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=WEHRLI, CHRISTOPHER881BA740-2C8E-4A90-8E99-74374CC68733> |
| **Sent:** | Wednesday, September 26, 2012 8:49 AM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |
| **Attachments:** | image001.png |

*So in digging into this I found an appropriate example..*

**DEPARTMENT OF AGRICULTURE**
**Forest Service**
**Extension of Comment Period;**
**Application for Transportation and**
**Utility Systems and Facilities for the**
**Village at Wolf Creek Draft**
**Environmental Impact Statement**
**AGENCY:** Forest Service, Rio Grande
National Forest.
**ACTION:** Extension of comment period.
**SUMMARY:** The United States Department
of Agriculture (USDA) Forest Service
(USFS), Rio Grande National Forest
(RGNF) announces the extension of the
comment period for the Application for
Transportation and Utility Systems and
Facilities for the Village at Wolf Creek
Draft Environmental Impact Statement
(EIS). The comment period ends
December 6, 2004.
**FOR FURTHER INFORMATION CONTACT:**
Contact Mr. Robert Dalrymple, Forest
Planner, USDA–USFS, Rio Grande
National Forest, (719) 852–5941.
Dated: November 16, 2004.
**Peter L. Clark,**
*Forest Supervisor.*
[FR Doc. 04–26052 Filed 11–23–04; 8:45 am]
**BILLING CODE 3410–11–M**



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 8:44 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS

1

**Subject:** RE: 10 day extension to our WCV comment period deadline
**Importance:** High

Chris, not sure if Dave will be in tomorrow, as he wasn't today and he doesn't know about this yet…Attached is the original notice. Would be much obliged if you could help out with the minimal info/wording/format needed for the FR notice (amendment?) in order for it to be in by noon Wednesday in order to be published next Monday, October 1, as that is the current end of comment period for the project. What we would like to do is add 10 additional days onto the scoping period, so that the scoping would then end on 10/11.

Please and thanks, plus, will be avail by cell to discuss after 0700

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Wehrli, Christopher L -FS
**Sent:** Tuesday, September 25, 2012 1:13 PM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline

Check… 36 CFR 220.5 (f)(3)

*"When the responsible official determines that an extension of the review period on a draft EIS is appropriate, notice shall be given in the same manner used for inviting comments on the draft. "*

We need to get it to the Fed Reg by 14:00 Eastern Daylight Time tomorrow (09/26/2012) for it to be published on Monday October 1.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger

C0010510

Rio Grande NF
(719) 657-6007; cell 850-2356

C0010511

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9638-000001

C0010512

**Wehrli, Christopher L -FS**

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Wednesday, September 26, 2012 9:04 AM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |

Sorry I forgot to include that it needs to include a cover letter and be formatted per the example I sent.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 8:44 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline
**Importance:** High

Chris, not sure if Dave will be in tomorrow, as he wasn't today and he doesn't know about this yet...Attached is the original notice. Would be much obliged if you could help out with the minimal info/wording/format needed for the FR notice (amendment?) in order for it to be in by noon Wednesday in order to be published next Monday, October 1, as that is the current end of comment period for the project. What we would like to do is add 10 additional days onto the scoping period, so that the scoping would then end on 10/11.

Please and thanks, plus, will be avail by cell to discuss after 0700

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Wehrli, Christopher L -FS
**Sent:** Tuesday, September 25, 2012 1:13 PM
**To:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline

Check... 36 CFR 220.5 (f)(3)

C0010513

*"When the responsible official determines that an extension of the review period on a draft EIS is appropriate, notice shall be given in the same manner used for inviting comments on the draft. "*

We need to get it to the Fed Reg by 14:00 Eastern Daylight Time tomorrow (09/26/2012) for it to be published on Monday October 1.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010514

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9639-000001

C0010515

**Wehrli, Christopher L -FS**

| | |
|---|---|
| **From:** | Wehrli, Christopher L -FS |
| **Sent:** | Wednesday, September 26, 2012 9:10 AM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS |
| **Subject:** | RE: 10 day extension to our WCV comment period deadline |
| **Attachments:** | ddh.pdf |

Sorry again for piece-mealing this... I'm learning too...

Chapter 5 of the **Federal Register Document Drafting Handbook** (attached) gives details on how to file electronically.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 8:44 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS; Blakeman, Mike -FS; Dallas, Dan -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline
**Importance:** High

Chris, not sure if Dave will be in tomorrow, as he wasn't today and he doesn't know about this yet...Attached is the original notice. Would be much obliged if you could help out with the minimal info/wording/format needed for the FR notice (amendment?) in order for it to be in by noon Wednesday in order to be published next Monday, October 1, as that is the current end of comment period for the project. What we would like to do is add 10 additional days onto the scoping period, so that the scoping would then end on 10/11.

Please and thanks, plus, will be avail by cell to discuss after 0700

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Wehrli, Christopher L -FS
**Sent:** Tuesday, September 25, 2012 1:13 PM

C0010516

**To:** Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** RE: 10 day extension to our WCV comment period deadline

Check… 36 CFR 220.5 (f)(3)

*"When the responsible official determines that an extension of the review period on a draft EIS is appropriate, notice shall be given in the same manner used for inviting comments on the draft. "*

We need to get it to the Fed Reg by 14:00 Eastern Daylight Time tomorrow (09/26/2012) for it to be published on Monday October 1.



Christopher Wehrli
US Forest Service, Rocky Mountain Region
Regional Environmental Coordinator
Office 303-275-5108
Fax 303-275-5134

---

**From:** Malecek, Thomas -FS
**Sent:** Tuesday, September 25, 2012 12:47 PM
**To:** Wehrli, Christopher L -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS
**Cc:** Rinella, Steven -FS
**Subject:** 10 day extension to our WCV comment period deadline

In response to a request for a 30 day extension, we will be granting a 10 day extension and wondered if that needs to be a legal notice or not…..

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

C0010517



# National Archives and Records Administration

## Office of the Federal Register

# Federal Register Document Drafting Handbook

October 1998 Revision

C0010518



# National Archives and Records Administration

## Office of the Federal Register

# Federal Register Document Drafting Handbook

October 1998 Revision; Chapters 5 and 6, 2011 Revision

# Table of Contents

I.  FEDERAL REGISTER PUBLICATION REQUIREMENTS

A. Introduction..................................................................................................iii

B. Examples used in this version of the Document Drafting Handbook ...................iii

C. How do I know what is an Office of the Federal Register requirement
versus recommendation?........................................................................... iv

D. How Do I Provide Feedback, Comments, and Suggestions? ...................................iv

E. What is the Federal Register/Code of Federal Regulations publication system? ···.iv

Chapter 1 :   How do I write a document for the proposed rules category?  ................ 1-1

Chapter 2 :   How do I write a document for the rules category?................................. 2-1

Chapter 3 :   How do I write a document for the notices category?  ............................ 3-1

Chapter 4 :   How do I correct my document?............................................................ 4-1

Chapter 5 :   Can I Submit a Computer File?  ........................................................... 5-1

Chapter 6 :   What is Incorporation by Reference, and how do I do it?  ..................... 6-1

Chapter 7 :   Illustrations, Forms, Footnotes, Appendices, and Tables ....................... 7-1

Chapter 8 :   Frequently Asked Questions  ............................................................... 8-1

Appendix A:   Model letters  ....................................................................................... A-1

Appendix B:   What Services Does the Office of the Federal Register Provide?  ..........B-1

Appendix C:   Laws That Affect Federal Register Publication  ....................................C-1

Appendix D:   What's New in this October 1998 Revision?.........................................D-1

Appendix E:   Procedure for Submittal of Documents to the Federal Register During a
Continuity Emergency  .......................................................................E-1

II.  MAKING REGULATIONS READABLE  ................................................................ MRR-1

C0010519

# Federal Register Document Drafting Handbook

October 1998 Revision

# Introduction

## A. What is the Document Drafting Handbook (DDH)?

The DDH provides Federal agencies with guidance and examples for complying with the Office of the Federal Register's format and editorial requirements for Federal Register documents.

All the information you need to prepare a particular type of document (proposed rule, rule, or notice) is in one place. For example, to write a proposed rule, refer to "Chapter 1: How do I write a document for the proposed rules category?"

To download this handbook or refer to it on-line, from http://www.nara.gov/fedreg, select "Document Drafting Resources," and then "Document Drafting Handbook." Because we distribute this book as PDF (Portable Document Format) files, you need Acrobat Reader, published by Adobe Systems Inc., to read or print it. You can download Acrobat Reader from http://www.adobe.com.

To help you comply with the President's Memorandum of June 1, 1998 -- Plain Language in Government Writing, see Part II of the DDH, "Making Regulations Readable." In addition, the National Partnership for Reinventing Government (NPR), Office of Information and Regulatory Affairs (Office of Management and Budget), the OFR, and other agencies developed expanded guidance, "Writing User-Friendly Documents," available at http://www.plainlanguage.gov.

This edition of the Document Drafting Handbook was prepared by Laurice Clark, Vince Greenwald, Sandra Jablonski, Ernie Sowada, and Barbara Suhre.

It is issued under the Federal Register Act (44 U.S.C. chapter 15) and the rules of the Administrative Committee of the Federal Register (1 CFR chapter I).

## B. How do I know what is required versus recommended?

Whenever we present requirements from the Administrative Committee of the Federal Register's regulations in 1 CFR, we use "must" instead of "shall" because "must" imposes a legal obligation. We use "may" instead of "should" to indicate discretion to act. We use "should" to indicate when we strongly recommend that you comply with a procedure that is optional.

iii

C0010520

## C. How Does this October 1998 Revision Differ from the April 1997 Revision?

In this edition, we have expanded our coverage of several topics, and provided more detailed examples of how to format certain types of documents.

We rewrote many sections in plain language, using active voice and personal pronouns, and phrasing titles as questions.

For a complete list of changes, see Appendix D.

## D. How Do I Provide Feedback, Comments, and Suggestions?

We want to provide a useful tool for persons who prepare documents for the *Federal Register*. To achieve this goal, we need to know how well this publication meets your needs.

Send comments and suggestions to info@fedreg.nara.gov, or to

FEDERAL REGISTER (NF)
NATIONAL ARCHIVES AND RECORDS ADMINISTRATION
700 PENNSYLVANIA AVE NW
WASHINGTON DC 20408-0001

## E. What is the Federal Register/Code of Federal Regulations publication system?

The Federal Register system is composed of two major publications, the annually revised Code of Federal Regulations and the daily *Federal Register*. Together, the two publications provide a current version of each Federal agency's regulations.

**The Code of Federal Regulations.** The Code of Federal Regulations (CFR) is the foundation of the Federal Register publication system. The CFR is an annual codification of the rules of each Federal agency.

**The Federal Register.** The daily *Federal Register* (FR) contains four categories of documents: regulations (rules), proposed rules, notices, and Presidential documents. Rules published in the *Federal Register* keep the CFR current. Proposed rules solicit public comment on an agency's rules and encourage public participation in the rulemaking process. Notices provide information of interest to the public.

iv

# Federal Register Document Drafting Handbook

October 1998 Revision

# Chapter 1: How do I write a document for the proposed rules category?

1.1 What types of documents go in the proposed rules category? . . . . . . . . . . . . . . . . . . . . . .  1-3

1.2 What are the requirements for a document in the proposed rules category?  . . . . . . . . . . .  1-3

*Billing Code*

1.3 What is a billing code and how do I get one?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-4

*Headings*

1.4 What information should go in the headings section at the beginning of my proposed rule?  1-4

*Preamble*

1.5 What are the preamble requirements for a document in the proposed rules category? . . . .  1-6
- AGENCY caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-7
- ACTION caption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-7
- SUMMARY caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-8
- DATES caption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-8
- ADDRESSES caption . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-10
- FOR FURTHER INFORMATION CONTACT caption  . . . . . . . . . . . . . . . . . .  1-12
- SUPPLEMENTARY INFORMATION caption . . . . . . . . . . . . . . . . . . . . . . . . . .  1-12

*List of Subjects*

1.6 What is the List of Subjects and what am I required to do with it?  . . . . . . . . . . . . . . . . .  1-13

*Words of Issuance*

1.7 What are "words of issuance"?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1-15

C0010522

### *Regulatory Text*

1.8 What do I include in the regulatory text? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-15

1.9 Headings  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-15

1.10 Table of contents  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-17

1.11 Authority citation  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-18

1.12 Numbering of rules  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-22

1.13 Amendatory language  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-24

1.14 Asterisks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-33

1.15 Cross-references  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-37

### *Signature Block*

1.16 Who can sign my document?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-40

1.17 Do I need a signature date?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-41

### *Style and Format Requirements*

1.18 What should my proposed rule document look like?  . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-42

1.19 Example of a proposed rule document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-46

1.20 Checklist for proposed rule documents.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-49

C0010523

# Chapter 1: How do I write a document for the proposed rules category?

**Notes:** In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration, and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this chapter as models for style, not content. Although many of these are single-spaced for visual impact, you must double-space your document.

## 1.1 What types of documents go in the proposed rules category?

This category contains documents that propose changes to your agency's regulations in the Code of Federal Regulations (CFR) and request public comment on those proposed changes. Your document may propose regulatory text or describe the subjects and issues involved. The OFR publishes in the proposed rules any document that serves as the first public notice of a rulemaking proceeding and invites public input. Typical documents in this category are:

- Advance notices of proposed rulemaking, notices of inquiry, notices of intent.
- Proposed rules.
- Petitions for rulemaking.
- Unified Agenda of Federal Regulatory and Deregulatory Actions.
- Documents that affect other documents previously published in the proposed rules category. These documents:
  - Extend the comment deadline.
  - Announce a meeting or hearing.
  - Publish or announce the availability of supplemental information.
  - Withdraw or terminate a proposed rule.
  - Correct a previously published proposed rule.
- Negotiated rulemaking documents. These documents:
  - Establish committees.
  - Announce committee meetings.

## 1.2 What are the requirements for a document in the proposed rules category?

A document published in the proposed rules category should include the following items:
- Billing Code.
- Headings.
- Preamble.
- List of Subjects.
- Words of Issuance.
- Regulatory Text.
- Signature Block.

Remember, your document may propose regulatory text or describe the subjects and issues involved.

C0010524

## *Billing Code*

### 1.3 What is a billing code and how do I get one?

The Government Printing Office (GPO) assigns each agency that publishes in the *Federal Register* a billing code which GPO uses to bill your agency for printing costs. Your agency must identify an individual as your Printing Officer, the liaison between your agency and GPO for all billing matters. GPO gives your Printing Officer the billing code for your agency.

Your billing code must appear on each document submitted for publication in the *Federal Register.*

- Obtain your billing code from your agency Printing Officer.
- Type the billing code at the top of the first page of the original(s) and the certified copies of each document.
- Type a "P" (WordPerfect), "F" (Coded), or "U" (Uncoded or ASCII) after your billing code when submitting a disk with your document. (See chapter 5.)
- Remember that your billing code may change each year.

## *Headings*

### 1.4 What information should go in the headings section at the beginning of my proposed rule?

Begin each proposed rule document with headings that identify your agency and the subject matter of your document. The headings of a proposed rule document also identify the CFR title and part your document proposes to amend. Present the headings for a proposed rule document in this format.

- Department Name.
- Subagency Name.
- CFR Citation.
- Agency Docket Number (optional).
- Regulation Identifier Number (RIN).
- Subject Heading.

or

- Agency Name.
- CFR Citation.
- Agency Docket Number (optional).
- Regulation Identifier Number (RIN).
- Subject Heading.

The "Department" and "Subagency" headings for a document must reflect the department and subagency names as shown in the CFR chapter the document that proposes to amend. If your agency is not a cabinet-level department, do not use a subagency heading.

C0010525

If the CFR chapter is assigned to a subagency of a cabinet-level department, the department name must still appear in the document headings. (See example 1.)

The "CFR Citation" heading contains the number of the CFR title and the number of each part the document proposes to amend. Even if the document affects only one paragraph within a part, include that part number.

The "Agency Docket Number" heading is the internal file number your agency may assign. This heading is optional.

The "RIN Number" is assigned by the Regulatory Information Service Center and identifies each regulatory action listed in the Unified Agenda of Federal Regulatory and Deregulatory Actions.

The "Subject Heading" is a brief statement describing the document. You may use the CFR part heading if it describes the content of the document. However, use more specific information when the document amends several parts or when the part heading is too general.

Example 1: Headings for a proposed rule document from a cabinet-level department.

| | |
|---|---|
| DEPARTMENT OF COMMERCE | Department Name |
| National Oceanic and Atmospheric Administration | Subagency Name |
| 15 CFR Part 946 | CFR Citation |
| RIN 0648-AI90 | RIN Number |
| Coastal Energy Impact Program | Subject Heading |

Example 2: Headings for a proposed rule document from a non-cabinet agency.

| | |
|---|---|
| FEDERAL RESERVE SYSTEM | Agency Name |
| 12 CFR Part 220 | CFR Citation |
| [No. 85-959] | Agency Docket Number (Optional) |
| RIN 0648-FR22 | RIN Number |
| Credit by Brokers and Dealers | Subject Heading |

C0010526

If you issue a follow-up document, duplicate the headings of the earlier document, and add a distinguishing phrase to the subject heading.

Example 3: Headings for a follow-up proposed rule document.

| | |
|---|---|
| FEDERAL RESERVE SYSTEM | Agency Name |
| 12 CFR Part 220 | CFR Citation |
| [No. 85-959] | Agency Docket Number (Optional) |
| RIN 0648-FR22 | RIN Number |
| Credit by Brokers and Dealers; Extension of Time for Comments | Subject Heading |

If there are multiple agencies and CFR citations in the heading, see section 8.14.

## *Preamble*

## 1.5 What are the preamble requirements for a document in the proposed rules category?

Each agency document published in the proposed rules category of the *Federal Register* must contain a preamble. The preamble follows the subject heading of the document. It explains the basis and purpose of the regulatory text, but contains no regulatory text. It arranges basic information on the "who, what, where, when, and why" of a document for the reader's convenience. The preamble captions are:

- AGENCY:
- ACTION:
- SUMMARY:
- DATES:
- ADDRESSES:
- FOR FURTHER INFORMATION CONTACT:
- SUPPLEMENTARY INFORMATION:

These captions must appear in the order shown. An explanation and examples of what must appear within each caption follow.

C0010527

## AGENCY caption.

The AGENCY caption states the "who" of a document by identifying the agency issuing it.

This caption usually repeats the name of the agency as carried in the document's headings. When the name of a subagency and cabinet-level department appear together, carry the subagency name first and then the department's commonly used acronym or shortened name. For organizational clarity, you may choose to include in this caption the name of an office which is not listed in the document's headings.

Example 4.

```
AGENCY: Office of the Secretary, USDA.
AGENCY: National Archives and Records Administration.
AGENCY: Consumer Product Safety Commission.
AGENCY: Environmental Protection Agency.
AGENCY: National Park Service, Interior.
AGENCY: Bureau of Public Debt, Fiscal Service, Treasury.
```

## ACTION caption.

The ACTION caption identifies the type of document. It does not summarize the substance of a document.

The following examples represent typical captions for a proposed rule document. Others are possible.

Example 5.

```
ACTION: Proposed rule.
ACTION: Proposed rule; extension of comment period.
ACTION: Proposed rule; correction.
ACTION: Proposed rule; notice of hearing (or meeting).
ACTION: Proposed rule; withdrawal (or termination).
ACTION: Notice of proposed rulemaking.
ACTION: Advance notice of proposed rulemaking.
ACTION: Petition for rulemaking.
ACTION: Petition for rulemaking; denial.
ACTION: Petition for rulemaking; withdrawal.
ACTION: Proposed policy statement.
ACTION: Proposed rule; availability of supplemental information.
```

1-7

## SUMMARY caption.

Under the SUMMARY caption you explain the "what," "why," and "effect" of the document. In the SUMMARY, you must answer these three questions:

- What action is being taken?
- Why is this action necessary?
- What is the intended effect of this action?

Use the following guidelines in preparing a SUMMARY.

- Use language a non-expert will understand.
- Describe what the document does, not how it affects the CFR.
- Refer to an act of Congress by the popular name of the act.
- Do not use legal citations.
- State what your document does; do not include regulatory history or extensive background.
- Do not include qualifications, exceptions, or specific details.
- Be brief.

You may not use the SUMMARY to prove a point or argue a case. Supporting information, details, discussion of the regulatory history, and precise legal citations are essential in an adequate preamble but do not belong in the SUMMARY. Extended discussion of the proposed rule belongs in the SUPPLEMENTARY INFORMATION section.

Example 6.

SUMMARY: The Coast Guard proposes to amend the uninspected vessel rules by requiring emergency position indicating radio beacons (EPIRBs). The Emergency Position Indicating Radio Beacons on Uninspected Vessels Requirements Act amends the shipping laws of the United States by requiring uninspected commercial vessels to have the number and type of EPIRBs prescribed by rule. These rules will ensure rapid and effective search and rescue during emergency situations.

## DATES caption.

The DATES caption presents the "when" of a document. Include the dates that are essential to the document.

Include the following dates, if appropriate:
- Comment deadlines.
- Extension of comment deadlines.
- Request for a hearing (or meeting) deadline.
- Public hearing (or meeting) dates.
- Other dates the public may need to know.

OFR computes and inserts dates tied to *Federal Register* publication or OFR filing using the "Table of Effective Dates and Time Periods." This table appears in the Reader Aids section of the

C0010529

first *Federal Register* issue each month. In computing the date, we count the day after publication as the first day. When a date falls on a weekend or a Federal holiday, we use the next Federal business day. If we are to compute and insert a date, present the date as shown in example 7. We compute dates based **only** on OFR filing or publication in the *Federal Register.*

Example 7.

DATES: Submit comments on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Example 8.

DATES: The agency must receive comments on or before October 20, 199x.

A public hearing will be held at 9 a.m., October 9, 199x.

Submit requests to present oral testimony on or before October 2, 199x.

Place no more than four dates under the captions "DATES."

Example 9: Format in proposed rule with four dates.

DATES: The hearing dates are:

1. March 26, 199x, 9:30 a.m. to 5 p.m., Philadelphia, PA.

2. April 3, 199x, 9:30 a.m. to 5 p.m., Chicago, IL.

3. April 8, 199x, 9:30 a.m. to 5 p.m., Atlanta, GA.

4. April 15, 199x, 9:30 a.m. to 5 p.m., Denver, CO.

If you have more than four dates, place them in the SUPPLEMENTARY INFORMATION section of the preamble under a heading such as "Public Participation" or "Hearings." **This requirement generally does not apply to comment deadlines.**

Example 10.

DATES: See Supplementary Information section for hearing dates.

Do not include information other than dates in the DATES caption. Place any discussion of meeting agenda, content of material available for inspection, etc. in the SUPPLEMENTARY INFORMATION section.

Remember that DATES and ADDRESSES are separate captions. All date information must appear in the DATES caption.

C0010530

## ADDRESSES caption.

The ADDRESSES caption contains the "where" of the document. Include any address that the public needs to know. You may include addresses for:

- Mailing public comments.
- Hand-delivering public comments.
- Attending a public hearing (or meeting).
- Examining any material available for public inspection.

Do not include information other than addresses in the ADDRESSES caption. Place any discussion of how to submit comments, how to register for a meeting, meeting agenda, content of material available for inspection, etc. in the SUPPLEMENTARY INFORMATION section. If you are accepting electronic comments, place electronic addresses in the ADDRESSES section, and detailed requirements in the SUPPLEMENTARY INFORMATION section. (See examples 15 and 16.)

Place no more than four addresses under the caption "ADDRESSES."

Example 11: Format in proposed rule with four addresses.

ADDRESSES: The hearing locations are:

1. Philadelphia -- Ramada Inn (Meadows Ballroom, Section A & B), 76 Industrial Highway, Essington, PA 19029.

2. Chicago -- O'Hare Ramada Inn (Penthouse Ballroom, 9th Floor), 6600 Mannheim Road, Des Plaines, IL 60018.

3. Atlanta -- Ramada Inn Central (Georgian Ballroom), I-85 at Monroe Drive, Atlanta, GA 30324.

4. Denver -- Main Post Office Building (2nd Floor Auditorium, Room 269), 1823 Stout Street, Denver, CO 80202.

If you have more than four addresses, place them in the SUPPLEMENTARY INFORMATION section of the preamble under a heading such as "Public Participation" or "Hearings."

Example 12.

ADDRESSES: See Supplementary Information section for hearing addresses.

1-10

C0010531

Remember that ADDRESSES and DATES are separate captions. All address information must
appear in the ADDRESSES caption.

Example 13.

ADDRESSES: Address all comments concerning this proposed rule to Nell C.
Commentary, Commissioner, Rehabilitation Services Administration, Mary
E. Switzer Building, Room 3325, 330 C Street SW., Washington, DC
20202-2735.

   Send a copy of any comments that concern information collection
requirements to the Office of Information and Regulatory Affairs, OMB,
Room 3002, New Executive Office Building, Washington, DC 20503;
Attention: Daniel J. Information.

Example 14.

ADDRESSES: Mail comments and requests to testify to Hearing Clerk, Room
000, Department of XXXXX, Washington, DC 20000; the hearing will be held
in Room 000, 000 Independence Avenue, SW., Washington, DC.

Place detailed information about electronic access and filing in the SUPPLEMENTARY
INFORMATION section of the preamble under a heading such as "Electronic Access and Filing
Addresses."

Example 15.

ADDRESSES: Submit electronic comments and other data to
oppdocket@epamail.epa.gov. See SUPPLEMENTARY INFORMATION for file
formats and other information about electronic filing.

Example 16.

SUPPLEMENTARY INFORMATION:

* * * * *                                    [Asterisks Indicate Text Not Reprinted.]

                          Electronic Access and Filing

   You may submit comments and data by sending electronic mail (E-mail)
to: oppdocket@epamail.epa.gov.

   Submit comments as an ASCII file avoiding the use of special
characters and any form of encryption. The OPP also accepts comments and
data on disks in WordPerfect 5.1 file format or ASCII file format.
Identify all comments and data in electronic form by the docket number
[PP 4F4327/R2253]. You may file electronic comments on this proposed
rule online at many Federal Depository Libraries. File an electronic
copy of objections and hearing requests with the Hearing Clerk at:
oppdocket@epamail.epa.gov.

C0010532

## FOR FURTHER INFORMATION CONTACT caption.

Under the FOR FURTHER INFORMATION CONTACT caption, you must include the name and telephone number of a person within your agency who can answer questions about the document. You may list two or more persons to contact concerning different aspects of a document.

Example 17.

FOR FURTHER INFORMATION CONTACT: John Regwriter, 202-000-0000.

**or**

FOR FURTHER INFORMATION CONTACT:

Technical information: John Regwriter, 202-000-0000.

Legal information: Mary Regulatory, 202-000-0001.

## SUPPLEMENTARY INFORMATION caption.

In this section, include the regulatory history of this rulemaking proceeding. You should present the background information and detail necessary to give adequate notice of the issues to be commented on as required by the Administrative Procedure Act. Present this information in language that the reader can easily understand, with descriptive headings to highlight and organize topics. If a reference to the *Federal Register* or Code of Federal Regulations is necessary, use the format shown in examples 66 and 67.

You may use the SUPPLEMENTARY INFORMATION section to provide additional information that is required by law, agency policy, or Executive order.

Answering some of these questions may help you draft your SUPPLEMENTARY INFORMATION.

- What law or directive authorizes the rulemaking?
- What existing regulations address the problem?
- What problem does the rulemaking address?
  - What issues are connected with the problem?
  - What facts, surveys, or studies identify and define the problem?
- How does this rulemaking attempt to solve the problem?
  - Were other solutions considered?
  - Why was this solution chosen?
  - Is this solution cost-effective?
  - How will this solution affect the regulated parties?

1-12

C0010533

- Does this rulemaking contain penalties for noncompliance?
  - Are penalty provisions essential?
  - Can the requirements be monitored?
  - Can the penalty provisions be enforced?
- Have you identified other documents in this rulemaking, and included their *Federal Register* citations? (See example 66.)
  - Did you publish an Advance Notice of Proposed Rulemaking?
  - Have you announced meetings or hearings?
- Have you discussed all necessary regulatory analysis and review requirements?
- What other statutes apply to this rulemaking?
- How will public participation be handled?
  - Are there special instructions for mailing public comments?
  - Are there formal or informal hearings?
  - Are there procedures for requesting a public hearing?
  - Are there any instructions for filing comments or making oral presentations?
  - Will transcripts of the hearing be made available?
- Have you used subject headings to break up a lengthy SUPPLEMENTARY INFORMATION section? For example:
  - Background.
  - Statutory authority.
  - Request for comments.
  - Related documents.
  - Topical headings.
  - Drafting information.
  - Public participation.

*List of Subjects*

## 1.6 What is the List of Subjects and what am I required to do with it?

Each proposed rule document must contain a list of index terms (List of Subjects) for each CFR part number cited in the document's heading. These terms are contained in the "Federal Register Thesaurus of Indexing Terms," available at http://www.nara.gov/fedreg/, under "Document Drafting Resources." The terms provide a common vocabulary for indexing the rulemaking documents of all agencies and are the basis of the "CFR Index" prepared by the OFR. We will provide you with a list of appropriate terms for its existing CFR parts. For new CFR parts, you should select appropriate terms from the Thesaurus. You may include additional terms not contained in the Thesaurus for either existing or new CFR parts as long as you also include appropriate Thesaurus terms. When you select a term that is not in the Thesaurus, ask yourself, "Would I search for the subject matter using this term?"

The List of Subjects is the last item in the SUPPLEMENTARY INFORMATION section of the preamble. Put the List of Subjects terms in alphabetical order and separate them with commas. Capitalize only the first word of each term. End the terms with a period. (See example 18.)

C0010534

You do not need a list of subjects for a document that:

- Has no regulatory text.
- Only presents nomenclature changes.
- Corrects a previous document.

You must include all the established Thesaurus terms for a part that you are removing from the CFR. A List of Subjects is set out separately for each CFR part affected. (See example 19.) However, if the terms used are identical for several CFR parts, you may consolidate. (See example 19.)

Example 18: List of subjects in a document citing a single CFR part.

List of Subjects in 40 CFR Part 262

Hazardous waste, Imports, Labeling, Packaging and containers, Reporting and recordkeeping requirements.

Example 19: List of subjects in a document citing two or more CFR parts.

List of Subjects

15 CFR Part 370

Administrative practice and procedure, Exports.

15 CFR Parts 372 and 386

Exports, Reporting and recordkeeping requirements.

1-14

*Words of Issuance*

## 1.7 What are "words of issuance"?

The words of issuance provide:

- The tie between this proposed rule and the CFR units that could be affected.
- The bridge between the preamble of this document and the regulatory changes that it proposes.

Words of issuance are always in the present tense.

Example 20.

For the reasons stated in the preamble, the Federal Energy Regulatory Commission proposes to amend 18 CFR chapter I as set forth below:

For the reasons discussed in the preamble, the Nuclear Regulatory Commission proposes to amend 10 CFR part 430 as follows:

*Regulatory Text*

## 1.8 What do I include in the regulatory text?

Regulatory text is the section of your document that sets out your agency's proposed changes to the CFR. It can include:

- Headings.
- Table of Contents.
- Authority citation.
- Numbering of rules.
- Amendatory language.
- Asterisks.
- Cross-references.

## 1.9 Headings.

Provide a heading for each part, subpart, section, and appendix that you propose to amend. You may use a heading for a paragraph. A heading is a brief statement that accurately describes the content of the CFR unit. A change in the heading requires an amendment to the CFR.

C0010536

Example 21: Headings in regulatory text.

| | |
|---|---|
| PART 970--DEEP SEABED MINING REGULATIONS FOR EXPLORATION LICENSES | Part |
| Subpart A--What Applications Must I complete to Obtain My Exploration Licenses? | Subpart Heading (Optional) |
| §970.103 Which deep seabed mining activities are prohibited and which ones are restricted? | Section |

**Part.** Each part heading should contain subject terms that identify the agency's rules in a manner consistent with the terms used by other agencies to identify similar material. The OFR has developed a thesaurus of subject terms that we use to index the CFR and related publications. Use the Thesaurus to obtain subject terms that identify the content of the proposed rule document, and use the appropriate subject terms in the part heading.

**Subpart.** You may use subpart headings to separate ideas within a part. Subparts are not required.

**Undesignated Center Heading.** You may use undesignated center headings to break up a large subpart and group together sections concerning a particular subject area. Undesignated center headings are not required.

**Appendix.** An appendix may appear at the section, subpart, or part level. Designate each appendix with a capital letter, identify whether it belongs to a section, subpart, or part, and give it a descriptive heading. Do not carry the heading for an appendix to a section in the table of contents. If your agency has established a uniform designation system for its appendices, follow the established system. (See chapter 7.)

Example 22: Appendix headings.

Appendix B to Subpart A of Part 915 -- Illustrations of Infant Highchair Designs

Appendix A to §315.2 --Model Air Pollution Control Plan

Appendix A to Part 2 -- Flammability Statistics for Floor-Cleaning Fluids

**Section.** Descriptive section headings are signposts for the reader. They help readers identify the particular regulatory text that applies to them. End each section heading with a period or question mark.

1-16

C0010537

**Paragraph.** You may use headings at the paragraph level. Be consistent. If you use a heading for one paragraph, be sure to use a heading for all paragraphs at that level. End paragraph headings with a period and underline them in the document. In the *Federal Register,* the underlined headings are printed in italics.

## 1.10 Table of contents.

You need a table of contents for a document that:

- Adds a new part or subpart, or
- Revises an existing part or subpart.

Include the following in your table of contents:

- Section headings,
- Subpart headings,
- Undesignated center headings, and
- Appendix headings to parts and subparts.

Table of contents entries are identical to the section headings, subpart headings, undesignated center headings, and appendix headings in the regulatory text. Do not list paragraph headings or appendix-to-section headings in the table of contents.

Do not provide a table of contents in a document that adds or amends a single section or miscellaneous sections. We change the table of contents when these amendments are included in the CFR.

C0010538

## 1.11 Authority citation.

You must cite the authority that authorizes your agency to change the CFR. Give the authority citation in the shortest form. Placement of the authority citation depends on what unit of the CFR you are amending.

There are two types of authority:

- Statutory:
  - Public law.
  - United States Code.
- Nonstatutory:
  - Presidential Executive order.
  - Presidential Administrative order.
  - Presidential Memorandum.
  - Agency delegation, policy, or directive.
  - Office of Management and Budget circular.
  - CFR regulations.

Your agency is responsible for maintaining accurate and current authority citations.

Present the authority citation at one of two central places:

- Part level, or
- Subpart level.

You may give citations of authority for particular subparts and sections within the central authority citation. (See examples 23 and 24.)

Example 23.

```
Authority: 42 U.S.C. 2201; 45 U.S.C. 5841.
Subpart A also issued under 5 U.S.C. 552; 31 U.S.C. 9701.
Subpart B also issued under 5 U.S.C. 552a.
Subpart C also issued under 5 U.S.C. 552b.
```

Example 24.

```
Authority: 42 U.S.C. 2111, 2112, 2201, 2232, 2233, 2236, 2282, 5841,
5842, 5846.
Section 30.7 also issued under 42 U.S.C. 5851.
Section 30.34(b)also issued under 42 U.S.C. 2234.
Section 30.61 also issued under 42 U.S.C. 2237.
```

C0010539

## Statutory authority.

Each citation of statutory authority must use the United States Code citation, if one exists. To determine the United States Code citation, use one of the following:

- The current edition of the United States Code or its supplement.
- The slip law, for recently signed public laws.

Example 25.

> Authority: 44 U.S.C. 2101-2118; 50 U.S.C. 6909.

We generally recommend that you use only the United States Code citation. (See example 25.). When a United States Code citation does not exist (for example, for appropriations laws), you must cite the section of the public law, if appropriate, the public law, and the U.S. Statutes at Large. Do not cite the popular name of a public law. (See example 26.)

Example 26.

> Authority: Sec. 8067, Pub. L. 98-473, 98 Stat. 1937.

If you choose to cite the public law and the U.S. Statutes at Large in addition to the United States Code, present them in the order shown in example 27.

Example 27.

> Authority: Sec. 8, Pub. L. 98-328, 82 Stat. 470 (34 U.S.C. 21).

If you cite two different laws where one has a United States Code citation and the other does not, place the United States Code citation first. (See example 28.)

Example 28.

> Authority: 42 U.S.C. 2996; Pub. L. 104-208, 110 Stat. 3009; Pub. L. 104-134, 110 Stat. 1321.

## Nonstatutory authority.

Cite nonstatutory authority by document designation, *Federal Register* citation, and CFR citation. (See example 29.)

Example 29.

> Authority: E.O. 12731, 55 FR 42547, 3 CFR, 1990 Comp., p. 306; 5 CFR 2635.105.

If you include both statutory and nonstatutory citations in the same authority citation, place the statutory citation first. (See example 30.)

1-19

C0010540

Example 30.

   Authority: 8 U.S.C. 1161(f); 29 U.S.C. 1801-1872; Secretary's Order
   6-84, 49 FR 32473.

If you need to deviate from the standard authority citation format, submit a letter requesting the
deviation and explaining the need to the Director of the Federal Register.

## Placement of the authority citation.

**Whole CFR part.** If a document adds or revises an entire CFR part, place the authority citation
directly after the table of contents and before the regulatory text. (See example 31.)

Example 31.

PART 54--ALLOTMENTS FOR CHILD AND SPOUSAL SUPPORT

Sec.
54.1 Purpose.
54.2 Applicability and scope.
54.3 Definitions.
54.4 Policy.
54.5 Responsibilities.
54.6 Procedures.

   Authority: 15 U.S.C. 1673; 37 U.S.C. 101; 42 U.S.C. 665.

**CFR section.** If a document amends only certain sections within a CFR part, set out the authority
citation for the part as the **first numbered item** in the list of amendments for the part. (See
examples 32 and 33.)

Example 32.

PART 4--SERVICES TO THE PUBLIC

   1. The authority citation for part 4 is revised to read as follows:

   Authority: 44 U.S.C. 1508.

C0010541

Example 33.

PART 4--SERVICES TO THE PUBLIC

   1. The authority citation for part 4 continues to read as follows:

   Authority: 44 U.S.C. 1502.

**Subparts.** If a document adds or revises an entire subpart, using the **same** authority citation as the CFR part, set out the authority citation for the part as the first numbered item in the list of amendments for the part. (See examples 32 and 33.)

If a document adds or revises an entire subpart using a **different** authority citation, set out the authority citation for the subpart directly after the heading to the subpart and before the regulatory text of the subpart. (See example 34.)

Example 34.

| | |
|---|---|
| Subpart B--Supportive Services for Minority, Disadvantaged, and Women Business Enterprises | Table of Contents |
| Sec.<br>230.201 Purpose.<br>230.202 Definitions.<br>230.203 Policy. | |
| Subpart B--Supportive Services for Minority, Disadvantaged, and Women Business Enterprises | Subpart Heading |
|    Authority: 23 U.S.C. 101, 140(c), 304, 315; 49 CFR 1.48(b). | Subpart B Authority Citation |
| §230.201 Purpose. | Text of Section |
|    This subpart prescribes the policies, procedures, and guidance to develop, conduct, and administer supportive services assistance programs for minority, disadvantaged, and women business enterprises. | |
| * * * * * | [Asterisks Indicate Text Not Reprinted.] |

1-21

C0010542

**Parts removed.** If you propose to remove a part, you must give your agency's authority for the action. Place the authority in the "words of issuance." (See examples 35 and 36.)

Example 35.

Accordingly, under the authority 10 U.S.C. 8013, the XXX Agency proposes to amend XX CFR chapter VII by removing part 837.

Example 36.

Under 42 U.S.C. 541 and as discussed in the preamble, the Department of the XXX proposes to amend XX CFR chapter II as follows:

## 1.12 Numbering of rules.

The regulatory text of your document must conform with the structure of the CFR.

**Code of Federal Regulations structure.** The basic structure of the CFR consists of a hierarchy of designated CFR units. The CFR numbering system is **not** based on a decimal numbering system. The following table illustrates the CFR structure.

| CFR Unit | CFR Designation | Description |
|----------|-----------------|-------------|
| Title | 12 | Broad area subject to Federal regulation |
| Chapter | III | Rules of a single issuing agency |
| Part | 303 | Unified body of rules concerning a single function or specific subject |
| Section | 303.1 | Short presentation of one regulatory function. The section is the basic unit of the CFR. The content of a section is a short, simple presentation of a single regulatory function. |

Each section number includes the number of the part followed by a period and a sequential number.

Example 37: Section number.

§25.1.

Hyphenated numbers (§117–2.1 or §117–3.15) or numbers with alpha characters (part 115a, §115a.1, or §115.1a) are not permitted in designating units within the CFR system.

The Director of the OFR must approve any deviation from standard CFR structure. Submit a request for approval in writing before you begin drafting.

1–22

C0010543

**Paragraph structure of a section.** If you have more than one paragraph, designate each one as show in example 38. Indent each designated paragraph within a section.

The paragraph structure within a section allows six levels of designation. **We strongly recommend that you do not use more than 3 paragraph levels.** Use of more than 3 paragraph levels makes your rule hard to read and use. Use more sections as a drafting technique to avoid using excessive paragraph levels. Use the paragraph structure chart in example 38.

Sections consisting of a single paragraph or the introductory text of a section do not require a designation. However, we no longer permit an undesignated concluding paragraph.

Indicate italics by underlining in a typewritten document.

Example 38: Paragraph structure of a section.

```
level 1      (a), (b), (c), etc.
level 2      (1), (2), (3), etc.
level 3      (i), (ii), (iii), etc.
level 4      (A), (B), (C), etc.
level 5      (1), (2), (3), etc.
level 6      (i), (ii), (iii), etc.
```

**Definitions.** For a discussion of definitions, see section 8.15.

**Notes.** Label notes in CFR text to show whether they apply to the whole section or to the preceding paragraph. (See example 39.)

Example 39.

```
Note to §30.1.
Note to paragraph (f).
Note to paragraph (b)(2).
```

1-23

C0010544

## 1.13 Amendatory language.

A proposed rule document usually proposes to make changes or additions to the CFR. The regulatory text of a document must fit into the current text of the CFR. You should precisely identify and describe the changes made to the CFR. While the words of issuance describe the general effect of the document, the amendatory language uses standard terms to give specific instructions on how to change the CFR. Do not include in the amendatory language a discussion of why the changes are made. This belongs in the SUPPLEMENTARY INFORMATION section.

Your agency's current CFR text is not necessarily what appears in the latest edition of the CFR, since your agency publishes changes to the CFR in the daily *Federal Register.*

The "List of CFR Sections Affected" (LSA) is a cumulative **monthly** numerical index to rules and proposed rules. Use it to determine if any changes have been made since the revision date of your CFR. The "CFR Parts Affected" is a cumulative **daily** numerical index to rules and proposed rules published in the Reader Aids section of the *Federal Register.* Use it to check for changes in any month not covered by the LSA.

Before you begin drafting amendatory language, consult the latest version of the CFR and the LSA, and the latest *Federal Register* for any month not covered by your LSA. This gives you the current and official version of the CFR regulations you are changing.

Base amendatory language on the current text of a rule. You must:

- Identify the specific CFR unit being changed.
- Place amendments in CFR numbering order.
- Use one of the standard terms to describe the change.
- Address all regulatory text set out in your document.

For extensive changes, revise the text in full rather than prepare fragmentary amendments. The reader will then have the complete text of the amended unit.

Don't use the word "proposed" in each amendatory instruction. Use it only in the words of issuance. (See section 1.7.)

C0010545

## Use of "Amend."

"Amend" means that an existing CFR unit is changed. Because it is an introductory term, it cannot stand alone. Use it with one of the specific amendatory terms to precisely describe the change to the CFR unit.

Example 40: Amend.

Amend §791.27 to revise paragraph (b)(3) and to add paragraph (d)(4) to read as follows:

## Specific amendatory terms.

Use the following terms in amendatory language. Each term is a precise instruction to change a CFR unit.

- Add.
- Redesignate.
- Remove.
- Republish.
- Reserve.
- Revise.
- Withdraw.

**Add.** "Add" means that a new CFR unit is inserted in the CFR.

Example 41: Add.

Add part 1812 to read as follows:

Add §5.26 under the undesignated center heading "How To Apply For a Permit" to read as follows:

Add §20.89 to subpart H to read as follows:

In §18.13, add paragraph (e) to read as follows:

Add new paragraph (f)(5) to §210.14 to read as follows:

Add §4.8(a)(3)(iii) to read as follows:

1-25

C0010546

**Redesignate.** "Redesignate" transfers a CFR unit to a vacant position and assigns a new designation. A redesignation table may also be used.

Example 42: Redesignate.

PART 80 [REDESIGNATED AS PART 90 AND AMENDED]

2. Redesignate part 80 as part 90 and amend the references as indicated in the table below:

3. In §100.5, redesignate paragraphs (a) through (c) as paragraphs (d) through (f) and add new paragraphs (a) through (c) to read as follows:

4. Redesignate part 20 as part 30 and revise it to read as follows:

§§226.3 through 226.5 [Removed]

§§226.6 through 226.8 [Redesignated as §§226.3 through 226.5]

5. Remove §§226.3 through 226.5 and redesignate §§226.6 through 226.8 as §§226.3 through 226.5, respectively.

§45.3 [Amended]

6. In §45.3, redesignate paragraphs (a) through (c) as paragraphs (a)(1) through (a)(3). In redesignated paragraph (a)(1), further redesignate paragraphs (1) and (2) as paragraphs (a)(1)(i) and (ii).

**Remove.** "Remove" means that an existing CFR unit is being taken out of the CFR.

Example 43: Remove.

§300.12 [Removed]

Remove §300.12.

§495.73 [Amended]

In §495.73, remove paragraphs (a)(5) and (e).

**Republish.** "Republish" means that an unchanged CFR unit is set out for the convenience of the reader, often to provide the context for an amendment. Therefore, you must present the republished text accurately.

Example 44: Republish.

In §2.1, the introductory text of paragraph (a) is republished and paragraphs (a)(1) and (a)(3) are revised to read as follows:

**Reserve.** "Reserve" is a term used to fill in gaps in CFR numbering. Removing a subpart or a paragraph may leave a gap which could confuse the reader. To avoid confusion in your

1-26

C0010547

amendatory language, you should remove and reserve the subpart or paragraph. (See example 45.)

> Example 45: Reserve (when removing a CFR unit).
>
> ```
> Subpart Q--[Removed and Reserved]
> ```
>
> ```
>     Remove and reserve subpart Q, consisting of §§103.10 through 103.25.
> ```

You may also use "reserve" when adding or revising a CFR unit to indicate where future text will be added. (See example 46.)

> Example 46: Reserve (when adding or revising a CFR unit).
>
> ```
>     Add and reserve subpart E and add subpart F, consisting of §§25.100
> through 25.130, to read as follows:
> ```

**Revise.** "Revise" means that an existing CFR unit is replaced in its entirety. It is important that you specifically identify the CFR unit being revised.

> Example 47: Revise.
>
> ```
>     Revise part 105 to read as follows:
> ```
>
> ```
>     Revise §80.100(e)(1)(iii) to read as follows:
> ```
>
> ```
>     In §15.4, revise paragraph (b) and the introductory text of paragraph
> (f)(2) to read as follows:
> ```

**Withdraw.** "Withdraw" indicates that a previously published proposed rule will not be issued as a final rule and will not become effective or enforceable.

## Addition or revision of a part or subpart.

**Parts.** If you add or revise a part, use these elements in the order shown. (See example 48.)

- Amendatory language.
- Part heading.
- Table of contents.
- Authority citation.
- Regulatory text.

1-27

C0010548

**Subparts.** If a part has a single authority citation at the end of the table of contents and you want to add or revise a subpart in that part, use these elements in the order shown:

- Part heading.
- Authority citation for the part.
- Amendatory language.
- Subpart heading.
- Table of contents.
- Regulatory text.

or

If each subpart in a part has its own authority citation and you want to add or revise a subpart in that part, use these elements in the order shown:

- Part heading.
- Amendatory language.
- Subpart heading and table of contents.
- Subpart heading.
- Authority citation for the subpart.
- Regulatory text.

Example 48: Revision of a part.

Revise part 3 to read as follows:                    Amendatory Language

PART 3—SERVICES TO THE PUBLIC                        Part Heading

Sec.                                                 Table of Contents
3.1 Information services.
3.2 Public inspection of documents.
3.3 Reproduction and certification of
copies of acts and documents.

Authority: 44 U.S.C. 1506; sec. 6,                   Authority Citation
E.O. 10530, 19 FR 2709, 3 CFR, 1954–1958
Comp., p. 189.

§ 3.1 Information services.                           Regulatory Text

(a) The Office of the Federal Register
(OFR) provides information on:

(1) Publications in §2.5 of this chapter;
and

1-28

C0010549

(2) Original acts and documents filed with the OFR.

(b) The OFR cannot provide excessive information or do extensive research.

(c) The staff may not summarize or interpret substantive text of any act or document.

§ 3.2 Public inspection of documents.

(a) During the OFR's office hours, documents filed with the OFR pursuant to law are available for public inspection at 800 North Capitol Street, NW., Suite 700, Washington, DC. There are no formal inspection procedures or requirements.

(b) By direction of the Director of the Office of the Federal Register, the OFR staff must file for public inspection documents received and processed not later than the working day preceding the publication day for that document.

(c) By direction of the Director of the Office of the Federal Register, the OFR staff must place on the original and certified copies of each document a notation of the day and hour when it was filed and made available for public inspection.

(d) Customers may view, photocopy, or make excerpts of documents on public inspection.

§ 3.3 Reproduction and certification of copies of acts and documents.

The regulations for the public use of records in the National Archives and Records Administration (36 CFR parts 1252 through 1258) also govern the furnishing of reproductions of acts and documents and certificates of authentication for them. Section 1258.14 of those regulations provides for the advance payment of appropriate fees for reproduction services and for certifying reproductions.

## Amendment to a section.

If you amend a section, use these elements in the order shown:

- Part heading.
- Authority citation.
- Amendatory language.
- Section heading.
- Regulatory text.

C0010550

If you add or revise a section, use the format shown in example 49.

If you add a section to a part which contains subparts or undesignated center headings, identify the subpart or undesignated center heading which will contain the new section.

Example 49: Revision of a section.

PART 133--TOLLS FOR USE OF CANAL                    Part Heading

   1. The authority citation for part          Authority Citation
133 is revised to read as follows:

   Authority: 22 U.S.C. 3791; E.O.
12215,45 FR 36043, 3 CFR, 1980 Comp.,
p. 257.

   2. Section 133.34 is revised to            Amendatory Language
read as follows:

§133.34 What are the tolls for vessels         Section Heading
in ballast?

   In order for a vessel to secure the        Regulatory Text
reduced rate of toll for vessels in
ballast, it may not carry any passengers or
cargo nor any fuel for its own consumption
in a quantity which exceeds:

   (a) 125 percent of the volume of its
engine room as measured and as shown on its
Panama Canal tonnage certificate; or

   (b) The spaces on the vessel which are
available for the carriage of fuel.

**Multiple Amendments.** Describe **all** changes to one section in a single instruction, and display changed text for the section immediately following the instruction. (See instruction 2 in example 51.) If there are many changes to one section, use a list format. (See example 50.)

Example 50.

§941.103 [Amended]

   3. Amend §941.103 as follows:

   a. Remove the definitions of "Allocation area", "Application",
"Central city allocation area", "Community", "Field Office", "Housing
Assistance Plan", "Household type", and "Housing type":
   b. Remove the parenthetical phrase "(in the form prescribed by HUD)"
from the definition "Construction Contract" and "Contract of sale"; and

1-30

C0010551

    c. Remove from the definition of "Total development cost (TDC)" the term "The Field Office" and add in its place the term "HUD", and remove from that definition the parenthetical sentence at the end.

When there are changes to several sections, use separate numbered instructions for each section, and display the changed text for each section after the instruction. (See instructions 2 through 4 in example 51.)

    Example 51: Changes to several sections.

    PART 1258--FEES

    1. The authority citation for part 1258 continues to read as follows:

    Authority: 44 U.S.C. 2116(c).

    2. Amend §1258.2 by revising paragraphs (a) and (c)(3) to read as follows:

§1258.2 Applicability.

    (a) Except as stated in this section, fees for the reproduction of NARA administrative records, archival records, donated historical materials, and records filed with the Office of the Federal Register are in §1258.12.

* * * * *

    (c) * * *

    (3) Motion picture, sound, and video recording materials are among the holdings of the National Archives and Records Administration. Obtain prices for reproduction of these materials from the Motion Picture and Sound and Video Branch, National Archives and Records Administration, Washington, DC 20408.

* * * * *

    3. Amend §1258.4 by revising paragraph (b) to read as follows:

§1258.4 Exclusions.

* * * * *

1-31

C0010552

(b) When NARA wishes to disseminate information about its activities to the general public through press, radio, television, and newsreel representatives;

* * * * *

4. Amend §1258.10 by revising paragraph (a) to read as follows:

§1258.10 Mail orders.

(a) The agency charges a minimum fee of $6.00 per order for reproductions it mails to the customer.

* * * * *

Group all amendments to the same CFR unit together in one instruction. (See examples 52 and 53.)

Example 52.

Revise paragraphs (a), (d), (e), and (n) of §150.5 to read as follows:

Example 53.

Remove and reserve §§33.1, 33.5 and 33.10.

**Introductory text.** If you revise the introductory text of a section or a paragraph, and not the whole section or paragraph, specify the introductory text. (See example 54.)

Example 54.

In §1020.3, revise paragraph (a) introductory text, paragraphs (a)(1) and (a)(4) to read as follows:

§1020.3 What are the qualifications and duties of the Small Business Ombudsman?

(a) The Chairman will appoint a senior, full-time Commission employee as Small Business Ombudsman. The Ombudsman must:

(1) Know the Commission's statutes and regulations;

* * * * *

(4) Perform the Ombudsman duties in addition to, and consistently with, other Commission responsibilities.

* * * * *

1-32

C0010553

## 1.14 Asterisks.

If you add or revise only certain units of a section, the amendatory language must state exactly which units are added or revised, and only those units are printed. Use asterisks to represent text which is not changed.

**Use of 5 asterisks.** Use 5 asterisks to show that a whole paragraph, including its subordinate paragraphs, is unchanged.

In example 55, the 5 asterisks before revised paragraph (d) show that paragraphs (a), (b) and (c) remain unchanged. The 5 asterisks that follow revised paragraph (d) show that the remaining text in the section is also unchanged.

Example 55: Use of 5 asterisks.

Revise paragraph (d) of §166.15 to read as follows:

§ 166.15 State status.

*  *  *  *  *

(d) The following States issue licenses under cooperative agreements with the Animal and Plant Health Inspection Service, but do not have primary enforcement responsibility under the Act: Kentucky, Maryland, Puerto Rico, Texas, and Washington.

*  *  *  *  *

C0010554

**Use of 3 asterisks.** Use 3 asterisks when you change text at a subordinate level. This shows that the higher level paragraphs remain unchanged.

In example 56, the 5 asterisks before paragraph (b) show that paragraph (a) remains unchanged. The 3 asterisks following "(b)" show that (b)(1) through (b)(4) remain unchanged, and the 3 asterisks following "(5)" show that the introductory text of (b)(5) is unchanged.

The 5 asterisks that follow revised paragraph (b)(5)(i) show that the remaining text in the section is unchanged.

Example 56: Use of 3 asterisks.

Revise §202.3(b)(5)(i) to read as follows:

§ 202.3 Registration of copyright.

* * * * *

(b) * * *

(5) * * *

(i) The Library of Congress receives two complimentary copies promptly after publication of each issue of the serial.

* * * * *

**We strongly recommend that you use no more than 3 paragraph levels.** Use of more than 3 paragraph levels makes your rule hard to read and use. (See the paragraph structure chart in example 38.)

**The smallest unit you may revise is a sentence.** When you revise only a sentence of a paragraph, use 3 asterisks to show that the remaining sentences in the paragraph are unchanged. (See example 57.)

Example 57.

Revise the first sentence of §416.916 to read as follows:

§ 416.916 What will happen if I fail to submit medical and other evidence?

You (and, if you are a child, your parent, guardian, relative, or other person acting on your behalf) must cooperate in furnishing us with, or in helping us to obtain or identify, available medical or other evidence about your impairment(s). * * *

Example 58: Use of both 3 and 5 asterisks in the same document.

PART 216--REGULATIONS GOVERNING THE TAKING          Part Heading

1-34

C0010555

AND IMPORTING OF MARINE MAMMALS

1. The authority citation for part 216 continues to read as follows:                        Authority Citation

Authority: 16 U.S.C. 1361–1407.

2. Revise paragraph (b)(1)(v), the first sentence of paragraphs (b)(3) and (c)(2), and paragraph (c)(4)(i) introductory text; and add paragraph (b)(1)(vi) to §216.24 to read as follows:                        Amendatory Language

§ 216.24 Taking and related acts incidental to commercial fishing operations.                        Section Heading

\* \* \* \* \*                        Indicates Paragraph (a) Unchanged

(b) \* \* \*                        Indicates Paragraph (b) Introductory Text Unchanged

(1) \* \* \*                        Indicates Paragraphs (b)(1) Introductory Text And (b)(1)(i) through (iv) Unchanged

(v) Category 5: Other gear. Commercial fishing operations utilizing trolling, gill nets, hook and line gear, and any gear not classified under paragraphs (b)(1)(i) and (b)(1)(ii) of this section.                        Revises Paragraph (b)(1)(v)

(vi) Category 6: Commercial passenger fishing vessel operation. Commercial fishing operations from a commercial passenger fishing vessel for the purpose of active sport fishing as defined in §216.3.                        Adds Paragraph (b)(1)(vi)

\* \* \* \* \*                        Indicates Paragraph (b)(2) Unchanged

1–35

C0010556

(3) Submit the original and two copies of the application for general permit to the Assistant Administrator. * * *

Revises First Sentence of Paragraph (b)(3) Indicates Remainder of Paragraph (b)(3) Unchanged

* * * * *

Indicates Paragraphs (b)(4) through (7) Unchanged

(c) * * *

Indicates Paragraph (c) Introductory Text and (c)(1) Unchanged

(2) Operator's certificate of inclusion. You must hold a valid operator's certificate of inclusion if you are the person in charge of and actually controlling fishing operations (after this referred to as the operator) on a vessel engaged in commercial fishing operations for which a Category 2 or Category 6 general permit is required under this subpart. You may not transfer this certificate. You have a valid certificate only for a vessel having a valid vessel certificate of inclusion for the same category. In order to receive a certificate of inclusion, the operator must satisfactorily complete required training. You must renew your operator's certificate of inclusion annually.

Revises Paragraph (c)(2).

* * * * *

Indicates Paragraph (c)(3) Unchanged

(4) * * *

Indicates Paragraph (c)(4) Introductory Text Unchanged

(i) Category 1, 3, 4, 5, and 6 applications:

Revises Paragraph (c)(4)(i) Introductory Text

* * * * *

Indicates Remainder of Section Unchanged

1-36

C0010557

## 1.15 Cross-references.

We permit you to cross-reference your own or another agency's rules in limited situations. If you are applying the referenced rules to current or future situations, you may only reference rules that are **currently in effect**.

If you must modify the referenced rules, you cannot use a cross-reference. You must publish the modified rules in full.

You may cross-reference the rules of another agency only if the reference meets any of the following conditions specified in 1 CFR 21.21:

- The reference is required by court order, statute, Executive order, or reorganization plan;
- The reference is to rules promulgated by an agency with the exclusive legal authority to regulate in a subject matter area, but the referencing agency needs to apply those rules in its own programs;
- The reference is informational or improves clarity rather than being regulatory;
- The reference is to test methods or consensus standards produced by a Federal agency that have replaced or preempted private or voluntary test methods or consensus standards in a subject matter area; or
- The reference is to the departmental level from a subagency.

When cross-referencing, you must identify the CFR unit being cited by the proper CFR unit designation in each reference. Do not use a nonspecific reference, such as "herein," "above," or "below." Example 59 illustrates the proper style for each common type of cross-reference.

Example 59: CFR cross-references.

References to a different TITLE

| In title 6, when referencing title 1, chapter I | write ... | 1 CFR chapter I |
|---|---|---|
| In title 6, when referencing title 1, chapter I, part 2 | write ... | 1 CFR part 2 |
| In title 6, when referencing title 1, chapter I, part 2, §2.7 | write ... | 1 CFR 2.7 |
| In title 6, when referencing title 1, chapter I, part 2, §2.7, paragraph (a)(2) | write ... | 1 CFR 2.7(a)(2) |

1-37

C0010558

References within the same TITLE

| | | |
|---|---|---|
| In chapter I, when referencing chapter II | write ... | chapter II of this title |
| In part 100 (chapter I), when referencing part 300 (chapter III) | write ... | part 300 of this title |
| In §250.10 (chapter I), when referencing §300.19 (chapter III) | write ... | §300.19 of this title |

References within the same CHAPTER

| | | |
|---|---|---|
| In part 20, when referencing part 30 | write ... | part 30 of this chapter |
| In §20.10, when referencing subpart A of part 30 | write ... | part 30, subpart A of this chapter |
| In §20.10, when referencing §30.19 | write ... | §30.19 of this chapter |

References within the same PART

| | | |
|---|---|---|
| In §20.5, when referencing subpart A of part 20 | write ... | subpart A of this part |
| In §20.5, when referencing §20.15 | write ... | §20.15 |
| In §20.5, when referencing §20.15, paragraph (a) | write ... | §20.15(a) |
| In §20.5, when referencing Appendix A to part 20 | write ... | Appendix A of this part |

References within the same SECTION

| | | |
|---|---|---|
| In paragraph (a), when referencing paragraph (b) | write ... | paragraph (b) of this section |
| In paragraph (a), when referencing paragraph (b)(1) | write ... | paragraph (b)(1) of this section |
| In paragraph (a)(1), when referencing paragraph (a)(2) | write ... | paragraph (a)(2) of this section |
| In paragraph (a)(1)(i), when referencing paragraph (a)(1)(ii) | write ... | paragraph (a)(1)(ii) of this section |

Example 60: Citing text within a section.

Note. For purposes of this example, we display citations in bold type. Do not do this in your document.

1-38

C0010559

§ 233.17 Noncompliance and program reporting by the Director.

The Director must prepare quarterly and annual reports as detailed in paragraphs (a) and (b) of this section and must submit them to the Regional Administrator.

(a) Quarterly reports for State 404 programs. The Director must submit noncompliance reports for section 404 discharges specified under §233.24(f)(1)(i) through (iv) containing the following information:

(1) Name, location, and permit number of each noncomplying permittee; and

(2) A brief description and date of each instance of noncompliance, which must include the following:

(i) Any unauthorized discharges of dredged or fill material subject to the State's jurisdiction or any noncompliance with permit conditions; and

(ii) A description of investigations conducted and of any enforcement actions taken or contemplated.

(b) Annual report for State 404 programs. The State Director must submit an annual report assessing the cumulative impacts of the State's permit program on the integrity of State regulated waters. This report must include:

(1) The number and nature of individual permits issued by the State during the year;

(2) The number of acres for each of the categories of waters in paragraph (b)(1) of this section which were filled or which received any discharge of dredge material during the year;

(3) The number and nature of permits issued under emergency conditions, as provided in §234.38 of this chapter; and

(4) The approximate number of persons in the State discharging dredged or fill material under general permits and an estimate of the cumulative impacts of these activities.

C0010560

*Signature Block*

## 1.16 Who can sign my document?

Your agency determines who may sign a document submitted for publication in the *Federal Register*.

The signer must sign in ink. (See section 8.5.) We recommend that the signer use blue ink. A signature in black ink is often difficult to distinguish from a photocopy.

Type the name and title of the person signing the document directly beneath the handwritten signature. (See example 61.)

When a person signs a document for another person, type the name and title of the person who actually signs the document beneath the signature. (See example 62.)

We will reject a document signed by one person for another. We will not accept your document if you sign someone else's name and you place your initials by the signature.

Example 61.

*Cynthia James*
Cynthia James,
D i r e c t o r.

Example 62.

*Thomas Shadwell*
Thomas Shadwell,
Deputy D i r e c t o r.

or

*Thomas Shadwell*
Thomas Shadwell,
Acting D i r e c t o r.

1-40

C0010561

Do not place a signature block on a page by itself. Placing text on the signature page helps to ensure the integrity of the document.

You may place the signature block either at the end of the document (See example 63.) or between the preamble and the rest of the document. (See example 64.)

     Example 63.

        Preamble
        Text
        Signature

     Example 64.

        Preamble
        Signature
        Text

## 1.17 Do I need a signature date?

We recommend but do not require a signature date. When you furnish one, use the date of actual signature. We will not accept a postdated signature or change a signature date. If there is a problem with a signature date, we will return your document to your Liaison Officer.

C0010562

*Style and Format Requirements*

## 1.18 What should my proposed rule document look like?



7515–01

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

36 CFR Part 1200

Official Seals

AGENCY: ＊ ＊ ＊

ACTION: ＊ ＊ ＊

SUMMARY: ＊ ＊ ＊

DATES: ＊ ＊ ＊

ADDRESSES: ＊ ＊ ＊

FOR FURTHER INFORMATION CONTACT: ＊ ＊ ＊

SUPPLEMENTARY INFORMATION: ＊ ＊ ＊

*Signature*
Type Name,
Title.

Certified to be a true
Copy of the Original
*Signature*

Certified to be a true
Copy of the Original
*Signature*

1–42

C0010563

**Capitals.** Type in all capital letters:

- The name of the agency or cabinet-level department (but not the name of the subagency) in the heading of a document.
- "FEDERAL REGISTER" in the parenthetical for dates that we are to compute.
- Preamble captions:

Example 65: Preamble captions.

AGENCY:
ACTION:
SUMMARY:
DATES:
ADDRESSES:
FOR FURTHER INFORMATION CONTACT:
SUPPLEMENTARY INFORMATION:

**Copies.** Provide legible copies.

**Correction or adhesive tape.** Do not use correction or adhesive tape.

**Double-spacing.** Type the text of your document double-spaced.

**Headings.**

- Type document headings centered or flush with the left margin.
- Type section headings:
  - Flush with the left margin.
  - Underlined.
  - On a line separate from the text of the section.
  - Using the § symbol.

**Margins.**

- One inch at the top, bottom, and right side.
- One and one-half inches on the left side.

**Page numbers.** Number the pages consecutively in one of the following places:

- Centered top.
- Centered bottom.
- Upper right-hand corner.

**Paper.** You must prepare your documents on $8\frac{1}{2}$" × 11" white paper.

C0010564

**Quotation marks.** Use quotation marks for names of books, journals, articles, and similar items.

**Quoted material.** Type quoted material:

- Single-spaced.
- Centered-block style.
- Without quotation marks.

**Single-sided copy.** You must type your document on one side only.

**Single-spacing.** Type the following single-spaced:

- Quoted material.
- Footnotes.
- Tables of contents.
- Examples.
- Tables.
- Notes to Tables.
- Authority citations.
- Notes.
- Formulas.

**Underlining.** Underlining instructs the printer to present material in italics. Use underlining for:

- Definitions. (Underline only the terms.)
- Paragraph headings.
- Scientific terms.
- Ordering statements.
- Court cases.
- The section heading in the text of the rule (the heading will appear in bold type in the *Federal Register*).
- Federal Register, when referring to the name of the publication (except type in all capital letters in the parenthetical for dates that we are to compute).

Do not use underlining for:

- Emphasis.
- Names of books.
- Foreign phrases.

**Abbreviations.**

Use the following abbreviations in the *Federal Register:*

- FR is *Federal Register:* (Do not use Fed. Reg. or F.R.) (See example 66.)
- CFR is Code of Federal Regulations. (Do not use C.F.R.) (See example 67.)

C0010565

- U.S.C. is United States Code.
- Pub. L. is Public Law. (Do not use P.L.)
- Stat. is U.S. Statutes at Large.
- a.m. or p.m. is time designation.
- E.O. is Executive order.
- Proc. is Proclamation.
- sec. is section of a Public Law or the United States Code.

Use the abbreviations for "Pub. L.", "E.O.", and "Proc." only in the authority citation. All other times you must spell them out. (See examples 28 and 29.)

### § Symbol.

Use the § symbol only for a CFR section and §§ symbol only for multiple sections. However, do not use a § symbol to begin a sentence; instead, spell out the word. Do not use the § symbol or the word "section" when the reference follows a title number and CFR as in 36 CFR 1200.1.

### Style.

Use the "U.S. Government Printing Office Style Manual" as a guide for punctuation, capitalization, spelling, compounding, and other style matters. You may obtain the GPO Style Manual from the Superintendent of Documents, Government Printing Office.

### References.

If your document relates to a previously published *Federal Register* document, you must cite the earlier document. A reference in a preamble to a previously published *Federal Register* document must identify the volume number, page number, and date of the issue in which the document appeared. (See example 66.)

Example 66: Reference to a previously published *Federal Register* document.

```
6x FR 12345, Jul. 23, 199x
```

A reference in a preamble to material contained in the CFR should identify the CFR title and part or section number. (See example 67.)

Example 67: Reference to material contained in the CFR.

```
36 CFR part 1200
36 CFR 1200.1
```

C0010566

1.19 Example of a proposed rule document.

---

7515–01

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

36 CFR Part 1254

RIN 3095–AA37

Use of NARA Research Rooms

AGENCY: National Archives and Records Administration.

ACTION: Notice of proposed rulemaking.

SUMMARY: The National Archives and Records Administration (NARA) proposes to amend its regulations on the use of personal equipment and other types of personal items that may be brought into research rooms in the National Archives and Records Administration Building and Washington National Records Center. We also propose to add procedures for use of the self–service high–volume copier in the NARA Building. These changes enhance the security of records being used by the public and ensure proper handling of records while they are being reproduced.

DATES: Submit comments on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

ADDRESSES: Send comments to Director, Program Policy and Evaluation Division, National Archives and Records Administration, Washington, DC 20408.

1

---

1-46

C0010567

FOR FURTHER INFORMATION CONTACT: Nan Archives, 202-000-0000.

SUPPLEMENTARY INFORMATION: This proposed rule is not a major rule for the purposes of Executive Order 12866. As required by the Regulatory Flexibility Act, NARA certifies that this proposed rule will not have a significant impact on small business entities.

List of Subjects in 36 CFR Part 1254

Archives and records.

For the reasons set forth in the preamble, NARA proposes to amend 36 CFR part 1254 as follows:

PART 1254--AVAILABILITY OF RECORDS AND DONATED HISTORICAL MATERIALS

1. The authority citation for part 1254 continues to read as follows:

Authority: 44 U.S.C. 2101-2118.

2. Add § 1254.26 to read as follows:

§ 1254.26 Additional rules for use of certain research rooms in the National Archives and Records Administration Building and the Washington National Records Center.

(a) You must follow these procedures for use of all archival research rooms in the National Archives and Records

2

1-47

C0010568

Administration Building and in the Washington National Records Center except the Microfilm Research Room and the Motion Pictures Research Room in the National Archives and Records Administration Building. These procedures are in addition to the procedures specified elsewhere in this part.

(b) All researchers entering the National Archives and Records Administration Building must complete the Equipment Log at the guard's desk in the lobby in order to bring personal typewriters, tape recorders, cameras, etc., into the building. The guard uses the log as evidence of personal ownership and checks your equipment against the log to verify ownership of equipment before you can leave the building.

(c) Researchers must present a valid researcher identification card to the guard or research room staff on entering the building.

Dated: July 2, 199x.

*Signature*

Type name,

Title.

3

1-48

C0010569

## 1.20 Checklist for proposed rule documents.

Use the following checklist to review your proposed rule document before you submit it to us:

**Billing code.** Is the billing code at the top of the first page in the right-hand corner? (See sections 1.3, 1.18, and 1.19.)

**Headings.** Are the correct headings used? (See section 1.4.)

**Preamble.** Are all required elements of the preamble included? Does the SUMMARY answer all three questions? (See section 1.5.)

**List of subjects.** Are subject terms listed for each CFR part affected? Are they placed at the end of the preamble? (See section 1.6.)

**Words of issuance.** Have you provided a link between the preamble and the proposed regulatory text? (See section 1.7)

**Authority citation.** Is the authority citation correctly placed in the document? ( See section 1.11.)

**Amendatory language.** (See section 1.13.)

- Does it specify the exact CFR unit being changed?
- Does it use the correct terms?

**Table of contents.** Is the table of contents included for each subpart or part being set out in full? (See section 1.10.) Do entries agree with the regulatory text?

**Paragraphs.** Are all paragraphs of regulatory text indented and lettered or numbered correctly? (See section 1.12.)

**Asterisks.** Have you set out section headings and asterisks for partial section amendments? (See section 1.14)

**Cross-references.** (See section 1.15.)

- Is the correct style used?
- Do references meet the our criteria?

1-49

C0010570

**Tables and illustrations.** (See chapter 7)

- Are they placed exactly where they are to be printed?
- Are they completely legible?
- Are charts and maps of photographic quality?

**OMB Control Number.** If included with the regulatory text, is it placed properly and in the correct style? (See section 8.19.)

**Signature and title.** (See section 116.)

- Is the original signature (handwritten in ink) included on the document? (One person may not sign for another or initial a signature.)
- Is the signer's name and title typed beneath the signature?
- If a signature date is given, is it correct?

**Quality.** (See section 1.18.)

- Are original(s) and certified copies legible?
- Is the document free of correction or adhesive tape?
- Are ink changes printed, dated, and initialed on all three copies? (See chapter 4.)
- Is the document double-spaced?

**Page numbers.** Are all pages numbered consecutively? (See section 1.18.)

**Matching copies and certification.** (See sections 1.18 and 8.5.)

- Are the original and two copies identical? Are all pages included?
- Are the copies properly signed or certified?

**Disks.** (See chapter 5.) If you have included a disk with your document:

- Is every document on a separate disk?
- Is the file on the disk identical to the signed original document?
- Did you include the verification/certification letter, stating that the file and document are identical?
- Is your document the only file on the disk?
- Did you save the file to the disk in ASCII or WordPerfect 6.1 format?
- Does the disk have a label that identifies your agency, the document's subject, the file name, and file format?
- Is the disk virus-free?
- Are the file and disk free of password protection or other security measures?

C0010571

# Federal Register Document Drafting Handbook

October 1998 Revision

## Chapter 2: How do I write a document for the rules category?

2.1 What types of documents go in the rules category?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–3

2.2 What are the requirements for a document in the rules category?  . . . . . . . . . . . . . . . . .  2–3

*Billing Code*

2.3 What is a billing code and how do I get one?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–4

*Headings*

2.4 What information should go in the headings section at the beginning of my rule?  . . . . . . .  2–4

*Preamble*

2.5 What are the preamble requirements for a document in the rules category? . . . . . . . . . . . .  2–6
- AGENCY caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–7
- ACTION caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–7
- SUMMARY caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–8
- DATES caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–9
- ADDRESSES caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–14
- FOR FURTHER INFORMATION CONTACT caption  . . . . . . . . . . . . . . . . . . . . . .  2–16
- SUPPLEMENTARY INFORMATION caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–17

*List of Subjects*

2.6 What is the List of Subjects and what am I required to do with it?  . . . . . . . . . . . . . . . . . .  2–18

*Words of Issuance*

2.7 What are "words of issuance"?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2–19

C0010572

*Regulatory Text*

2.8 What do I include in the regulatory text? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-20
2.9 Headings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-20
2.10 Table of contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-21
2.11 Authority citation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-22
2.12 Numbering of rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-27
2.13 Amendatory language . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-28
2.14 Asterisks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-40
2.15 Cross-references . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-44

*Signature Block*

2.16 Who can sign my document? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-47
2.17 Do I need a signature date? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-48

*Style and Format Requirements*

2.18 What should my rule document look like? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-49
2.19 Example of a rule document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-53

*Interim Rule and Direct Final Rule*

2.20 Interim rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-57
2.21 Direct final rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-58

*Checklist for rule documents*

2.22 Checklist for rule documents. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2-60

C0010573

# Chapter 2: How do I write a document for the rules category?

Notes: In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration, and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this chapter as models for style, not content. Although many of these are single-spaced for visual impact, you must double-space your document.

## 2.1 What types of documents go in the rules category?

This category contains documents having general applicability and legal effect. The terms "rules" and "regulations" have the same meaning within the Federal Register publication system. Typical documents in this category are:

- Documents that amend the CFR by adding new text or by revising or removing existing text.
- Temporary rule documents that are effective immediately for a short or definable period of time.
- Interim rule documents that are effective immediately and may request comments.
- Direct final rule documents that request comments before the rule becomes effective.
- Documents that affect other documents previously published in the rules category. These documents:
  - Correct a previously published rule.
  - Change the effective date.
  - Change the comment deadline of an interim rule or direct final rule.
  - Suspend a previously published rule.
  - Withdraw a rule not yet in effect.
  - Petition for reconsideration.
- Documents that have no regulatory text and do not amend the CFR but affect your agency. These documents include:
  - General policy statements.
  - Interpretations of agency rules.
  - Clarifications of agency rules.
  - Waivers of agency rules that are generally applicable.

## 2.2 What are the requirements for a document in the rules category?

A document published in the rules category should include the following items:
- Billing Code.
- Headings.
- Preamble.
- List of Subjects.
- Words of Issuance.
- Regulatory Text.
- Signature Block.

*Billing Code*

2-3

C0010574

### 2.3 What is a billing code and how do I get one?

The Government Printing Office (GPO) assigns each agency that publishes in the *Federal Register* a billing code which GPO uses to bill your agency for printing costs. Your agency must identify an individual as your Printing Officer, the liaison between your agency and GPO for all billing matters. GPO gives your Printing Officer the billing code for your agency.

Your billing code must appear on each document submitted for publication in the *Federal Register*:

- Obtain your billing code from your agency Printing Officer.
- Type the billing code at the top of the first page of the original(s) and the certified copies of each document.
- Type a "P" (WordPerfect), "F" (Coded), or "U" (Uncoded or ASCII) after your billing code when submitting a disk with your document. (See chapter 5.)
- Remember that your billing code may change each year.

### *Headings*

### 2.4 What information should go in the headings section at the beginning of my rule?

Begin each rule document with headings that identify your agency and the subject matter of your document. The headings of a rule document also identify the CFR title and part your document amends. Present the headings for a rule document in this format.

- Department Name.
- Subagency Name.
- CFR Citation.
- Agency Docket Number (optional).
- Regulation Identifier Number (RIN).
- Subject Heading.

or

- Agency Name.
- CFR Citation.
- Agency Docket Number (optional).
- Regulation Identifier Number (RIN).
- Subject Heading.

The "Department" and "Subagency" headings for a document must reflect the department and subagency names as shown in the CFR chapter the document that amends. If your agency is not a cabinet-level department, do not use a subagency heading.

If the CFR chapter is assigned to a subagency of a cabinet-level department, the department name must still appear in the document headings. (See example 1.)

C0010575

The "CFR Citation" heading contains the number of the CFR title and the number of each part the document amends. Even if the document affects only one paragraph within a part, include that part number.

The "Agency Docket Number" heading is the internal file number your agency may assign. This heading is optional.

The "RIN Number" is assigned by the Regulatory Information Service Center and identifies each regulatory action listed in the Unified Agenda of Federal Regulatory and Deregulatory Actions.

The "Subject Heading" is a brief statement describing the document. You may use the CFR part heading if it describes the content of the document. However, use more specific information when the document amends several parts or when the part heading is too general.

Example 1: Headings for a rule document from a cabinet-level department.

| | |
|---|---|
| DEPARTMENT OF COMMERCE | Department Name |
| National Oceanic and Atmospheric Administration | Subagency Name |
| 15 CFR Part 946 | CFR Citation |
| RIN 0648-AI90 | RIN Number |
| Coastal Energy Impact Program | Subject Heading |

Example 2: Headings for a rule document from a non-cabinet agency.

| | |
|---|---|
| FEDERAL RESERVE SYSTEM | Agency Name |
| 12 CFR Part 220 | CFR Citation |
| [No. 85-959] | Agency Docket Number (Optional) |
| RIN 0648-FR22 | RIN Number |
| Credit by Brokers and Dealers | Subject Heading |

2-5

C0010576

If you issue a follow-up document, duplicate the headings of the earlier document, and add a distinguishing phrase to the subject heading.

Example 3: Headings for a follow-up rule document.

| | |
|---|---|
| FEDERAL RESERVE SYSTEM | Agency Name |
| 12 CFR Part 220 | CFR Citation |
| [No. 85-959] | Agency Docket Number (Optional) |
| RIN 0648-FR22 | RIN Number |
| Credit by Brokers and Dealers; Confirmation of Effective Date | Subject Heading |

If there are multiple agencies and CFR citations in the heading, see section 8.14.

## *Preamble*

## 2.5 What are the preamble requirements for a document in the rules category?

Each agency document published in the rules category of the *Federal Register* must contain a preamble. The preamble follows the subject heading of the document. It explains the basis and purpose of the regulatory text, but contains no regulatory text. It arranges basic information on the "who, what, where, when, and why" of a document for the reader's convenience. The preamble captions are:

- AGENCY:
- ACTION:
- SUMMARY:
- DATES:
- ADDRESSES:
- FOR FURTHER INFORMATION CONTACT:
- SUPPLEMENTARY INFORMATION:

These captions must appear in the order shown. An explanation and examples of what must appear within each caption follow.

C0010577

## AGENCY caption.

The AGENCY caption states the "who" of a document by identifying the agency issuing it.

This caption usually repeats the name of the agency as carried in the document's headings. When the name of a subagency and cabinet-level department appear together, carry the subagency name first and then the department's commonly used acronym or shortened name. For organizational clarity, you may choose to include in this caption the name of an office which is not listed in the document's headings.

> Example 4.
>
> ```
> AGENCY: Office of the Secretary, USDA.
> AGENCY: National Archives and Records Administration.
> AGENCY: Consumer Product Safety Commission.
> AGENCY: Environmental Protection Agency.
> AGENCY: National Park Service, Interior.
> AGENCY: Bureau of Public Debt, Fiscal Service, Treasury.
> ```

## ACTION caption.

The ACTION caption identifies the type of document. It does not summarize the substance of a document.

Example 5 shows typical ACTION captions for a rule document. Others are possible.

> Example 5.
>
> ```
> ACTION: Final rule.
> ACTION: Final rule; delay of effective date.
> ACTION: Final rule; suspension of effectiveness.
> ACTION: Final rule; confirmation of effective date.
> ACTION: Final rule; correction.
> ACTION: Final rule; interpretation.
> ACTION: Final rule; petition for reconsideration.
> ACTION: Interim rule.
> ACTION: Interim rule with request for comments.
> ACTION: Direct final rule.
> ACTION: Temporary rule.
> ACTION: Policy statement.
> ACTION: Interpretation.
> ACTION: Clarification.
> ```

C0010578

**SUMMARY caption.**

Under the SUMMARY caption you explain the "what," "why," and "effect" of the document. In the SUMMARY, you must answer these three questions:

- What action is being taken?
- Why is this action necessary?
- What is the intended effect of this action?

Use the following guidelines in preparing a SUMMARY.

- Use language a non-expert will understand.
- Describe what the document does, not how it affects the CFR.
- Refer to an act of Congress by the popular name of the act.
- Do not use legal citations.
- State what your document does; do not include regulatory history or extensive background.
- Do not include qualifications, exceptions, or specific details.
- Be brief.

You may not use the SUMMARY to prove a point or argue a case. Supporting information, details, discussion of the regulatory history, and precise legal citations are essential in an adequate preamble but do not belong in the SUMMARY. Extended discussion of the rule belongs in the SUPPLEMENTARY INFORMATION section.

Example 6.

SUMMARY: The Coast Guard amends the uninspected vessel rules by requiring emergency position indicating radio beacons (EPIRBs). The Emergency Position Indicating Radio Beacons on Uninspected Vessels Requirements Act amends the shipping laws of the United States by requiring uninspected commercial vessels to have the number and type of EPIRBs prescribed by rule. These rules ensure rapid and effective search and rescue during emergency situations.

SUMMARY: This document amends the Customs rules by adding Pakistan to the list of nations whose vessels may transport empty cargo vans, empty lift vans, and empty shipping tanks between points embraced within the coastwise laws of the United States. The Department of State supplied Customs with evidence that Pakistan places no restrictions on the carriage of empty cargo vans, empty lift vans, and empty shipping tanks by vessels of the United States between ports in Pakistan. This amendment recognizes the United States granting reciprocal privileges for vessels registered in Pakistan.

C0010579

## DATES caption.

The DATES caption presents the "when" of a document. Include the dates that are essential to the document.

Include the following dates, if appropriate:

- Effective dates.
- Comment deadlines for an interim rule or direct final rule.
- Extension of comment deadlines on an interim rule or direct final rule.
- Expiration dates.
- Compliance dates.
- Confirmation of effective date.
- Other dates the public may need to know.

Place no more than four dates under the caption "DATES."

Example 7: Format in rule with four dates.

DATES:

Effective Date: July 10, 199x.

Compliance Workshops:

1. March 26, 199x, 9:30 a.m. to 5 p.m., Philadelphia, PA.

2. April 3, 199x, 9:30 a.m. to 5 p.m., Chicago, IL.

3. April 8, 199x, 9:30 a.m. to 5 p.m., Atlanta, GA.

If you have more than four dates, place them in the SUPPLEMENTARY INFORMATION section of the preamble under a heading such as "Compliance Workshops." **This requirement generally does not apply to effective dates.**

Example 8.

DATES: See Supplementary Information section for Compliance Workshop dates.

Do not include information other than dates in the DATES caption. Place any discussion of meeting agenda, content of material available for inspection, etc. in the SUPPLEMENTARY INFORMATION section.

Remember that DATES and ADDRESSES are separate captions. All date information must appear in the DATES caption.

C0010580

**Effective dates**. Provide an effective date for each rule document. (See example 9.) You must provide an effective date for each regulatory change if the date is not the same. (See example 10.)

The effective date is the date that amendments in the rule document affect the current CFR. The current CFR consists of the rules published in the latest CFR volume and any effective amendments published in the *Federal Register* since the revision date of the latest CFR volume.

Example 9.

DATES: Effective [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Example 10.

DATES: This rule is effective November 22, 199x, except for § 22.5(a) which is effective December 23, 199x.

OFR computes and inserts dates tied to *Federal Register* publication or OFR filing using the "Table of Effective Dates and Time Periods." This table appears in the Reader Aids section of the first *Federal Register* issue each month. In computing the date, we count the day after publication as the first day. When a date falls on a weekend or a Federal holiday, we use the next Federal business day. If we are to compute and insert a date, present the date as shown in example 11. We compute dates based **only** on OFR filing or publication in the *Federal Register*.

.

Example 11.

DATES: This rule is effective [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

If a specific effective date is dependent upon Congressional action or a dispositive Federal Court decision, your agency must promptly publish a *Federal Register* document announcing the establishment of or change to the effective date. (See example 12.)

Example 12.

DATES: This rule takes effect either March 4, 199x, or later if Congress takes certain adjournments. If you want to know the effective date of this rule, call or write the [INSERT AGENCY] contact person. The [INSERT AGENCY] will publish a document announcing the effective date in the <u>Federal Register</u>.

DATES: This rule has been classified as a major rule subject to congressional review. The effective date is [INSERT DATE 90 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]. However, at the conclusion of the congressional review, if the effective date has been changed, the [INSERT AGENCY] will publish a document in the <u>Federal Register</u> to establish the actual effective date or to terminate the rule.

C0010581

**Compliance dates and applicability dates.** Some rules include both an effective date and a compliance or applicability date. Your effective date is the date that your amendments affect the current CFR. Your compliance or applicability date is the date that the affected person must start following the rule. Place the compliance or applicability date after the effective date. (See example 13.)

Example 13: DATES sections that include applicability or compliance dates.

DATES: This regulation is effective [INSERT DATE 90 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER]. However, compliance for juice other than apple juice or apple cider is not required until [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

DATES: Effective Date: This rule is effective on July 30, 199x.

Applicability Date: Subpart A of part 124 applies to all applications for 8(a) business development program pending as of July 30, 199x.

DATES: EFFECTIVE Date: This rule is effective [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Compliance Date: Any labels that require revision as a result of these revocations shall comply no later than January 1, 199x.

DATES:

Effective Date: [INSERT 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Comment Date: Comments due on or before [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Compliance Date: Mandatory compliance [INSERT DATE 120 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

C0010582

This table summarizes the differences between effective dates and compliance or applicability dates.

| An Effective Date: | A Compliance or Applicability Date: |
|---|---|
| Addresses the CFR placement. | Addresses the person who must comply. |
| Is the date the rule affects the current CFR. | Is the date the person must comply. |
| Is required by OFR. | Is not required by OFR. |
| Must appear in DATES; may appear in CFR text. | May appear in DATES and CFR text. |

**Information collection requirements.** If a rule contains information collection requirements which are not yet effective, use the wording in example 14.

Example 14.

DATES: Effective June 1, 199x, except for §232.48(g) which contains information collection requirements that have not been approved by OMB. The Environmental Protection Agency will publish a document in the Federal Register announcing the effective date.

**Delays and Stays.** In this discussion of Delays and Stays, the term "Delay" is interchangeable with "Postpone," as is "Compliance Date" with "Applicability Date."

**Delay of effective dates.** You may Delay only effective dates that have not yet taken place.

If you did not include the effective date as part of the CFR text, you need only announce the Delay in the DATES section:

Example 15.

DATES: The effective date of the rule amending 47 CFR Part 600 published at 64 FR 12345, May 15, 1999 is delayed until May 15, 2000.

If the Delay is indefinite, you must state that you will furnish the date in a future *Federal Register.*

Example 16.

DATES: The effective date of §201.64, added at 6x FR 12345, July 23, 199x, is delayed indefinitely. The Administration will publish a document in the Federal Register announcing the new effective date.

C0010583

If you also stated the effective date as part of CFR text, you must also amend the CFR text:

Example 17.

Section 600.1 is amended in paragraph (c) by removing the date "July 1, 199x" and adding in its place "September 1, 199x."

**Stay of CFR text.** You may Delay only effective dates that have not yet taken place. If the effective date has already taken place, you must Stay the CFR unit instead.

Example 18.

Effective [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER], 21 CFR 101.65(d)(2)(ii)(C) and (d)(4)(ii)(B) are stayed until January 1, 199x.

If, when Staying an amendment or revision to CFR text, you wish to restore the previous text, you must add the previous text back to the CFR, using a CFR paragraph or section number different from the Stayed text.

**Stay or Delay of compliance dates.** If you decide to Delay a compliance date:

If you originally stated the compliance date in the DATES section but not in the CFR text, you may state that the date is Delayed or Postponed:

Example 19.

DATES: The compliance date for the rule amending 21 CFR Part 600 published at 64 FR 12345 on May 15, 1999 is delayed until May 15, 2000.

If the date is indefinite, you must state that you will furnish the date in a future *Federal Register.*

If the compliance date is in the CFR text and the effective date of the CFR change has passed, you may Stay (not Delay) the CFR text unit.

If you decide to change a compliance date that is in the CFR text, you must amend the CFR in a formal amendment.

Example 20.

Section 20.5 is amended in paragraph (e) by removing the date "March 1, 199x" and adding in its place "March 15, 199x."

C0010584

Use the following table to help decide whether to Stay or Delay effective dates or
compliance dates.

| Delay | Stay |
|---|---|
| Use Delay when an effective date or compliance date has not yet passed: | Use Stay when an effective date or compliance date has passed: |
| **Effective Date.** State the Delay in the DATES section.<br><br>If you have also stated the effective date in CFR text, amend the CFR. | **Effective Date.** You must Stay the CFR unit or amend the CFR.<br><br>You may not Stay an effective date after that date has passed. |
| **Compliance Date.** State the Delay in the DATES section.<br><br>If you have also stated the compliance date in CFR text, amend the CFR. | **Compliance Date:** You may Stay a compliance date, even after it has passed (a compliance date affects the user, not the CFR).<br><br>State the Stay of compliance in the DATES section. |

## ADDRESSES caption.

The ADDRESSES caption contains the "where" of the document. Include any address that the
public needs to know. You may include addresses for:

- Mailing public comments on an interim rule or direct final rule.
- Hand-delivering public comments on an interim rule or direct final rule.
- Attending a public hearing (or meeting).
- Examining any material available for public inspection.

Do not include information other than addresses in the ADDRESSES caption. Place any
discussion of how to submit comments, how to register for a meeting, meeting agenda, content of
material available for inspection, etc. in the SUPPLEMENTARY INFORMATION section. If you
are accepting electronic comments, place electronic addresses in the ADDRESSES section, and
detailed requirements in the SUPPLEMENTARY INFORMATION section. (See examples 25
and 26.)

This caption is optional for a rule document unless you are requesting comments on an interim
rule, post-publication review of the effectiveness of an interim rule, or a direct final rule.

C0010585

Place no more than four addresses under the caption "ADDRESSES."

Example 21: Format in rule with four addresses.

ADDRESSES: The compliance workshop locations are:

1. Philadelphia -- Ramada Inn (Meadows Ballroom, Section A & B), 76 Industrial Highway, Essington, PA 19029.

2. Chicago -- O'Hare Ramada Inn (Penthouse Ballroom, 9th Floor), 6600 Mannheim Road, Des Plaines, IL 60018.

3. Atlanta -- Ramada Inn Central (Georgian Ballroom), I-85 at Monroe Drive, Atlanta, GA 30324.

4. Denver -- Main Post Office Building (2nd Floor Auditorium, Room 269), 1823 Stout Street, Denver, CO 80202.

If you have more than four addresses, place them in the SUPPLEMENTARY INFORMATION section of the preamble under a heading such as "Compliance Workshops."

Example 22.

ADDRESSES: See Supplementary Information section for Compliance Workshop addresses.

Remember that ADDRESSES and DATES are separate captions. All address information must appear in the ADDRESSES caption.

Example 23.

ADDRESSES: Address all comments concerning this interim rule to Nell C. Commentary, Commissioner, Rehabilitation Services Administration, Mary E. Switzer Building, Room 3325, 330 C Street SW., Washington, DC 20202-2735.

Send a copy of any comments that concern information collection requirements to the Office of Information and Regulatory Affairs, OMB, Room 3002, New Executive Office Building, Washington, DC 20503; Attention: Daniel J. Information.

Example 24.

ADDRESSES: Mail comments and requests to testify to Hearing Clerk, Room 000, Department of XXXXX, Washington, DC 20000; the hearing will be held in Room 000, 000 Independence Avenue, SW., Washington, DC.

C0010586

Place detailed information about electronic access and filing in the SUPPLEMENTARY
INFORMATION section of the preamble under a heading such as "Electronic Access and Filing
Addresses."

Example 25.

ADDRESSES: Submit electronic comments and other data to
oppdocket@epamail.epa.gov. See SUPPLEMENTARY INFORMATION for file
formats and other information about electronic filing.

Example 26.

SUPPLEMENTARY INFORMATION:

* * * * *                                         [Asterisks Indicate Text Not Reprinted.]

                         Electronic Access and Filing

     You may submit comments and data by sending electronic mail (E-mail)
to: oppdocket@epamail.epa.gov.

     Submit comments as an ASCII file avoiding the use of special
characters and any form of encryption. The OPP also accepts comments and
data on disks in WordPerfect 5.1 file format or ASCII file format.
Identify all comments and data in electronic form by the docket number
[PP 4F4327/R2253]. You may file electronic comments on this proposed
rule online at many Federal Depository Libraries. File an electronic
copy of objections and hearing requests with the Hearing Clerk at:
oppdocket@epamail.epa.gov.

## FOR FURTHER INFORMATION CONTACT caption.

Under the FOR FURTHER INFORMATION CONTACT caption, you must include the name
and telephone number of a person within your agency who can answer questions about the
document. You may list two or more persons to contact concerning different aspects of a
document.

Example 27.

FOR FURTHER INFORMATION CONTACT: John Regwriter, 202-000-0000.

or

FOR FURTHER INFORMATION CONTACT:

     Technical information: John Regwriter, 202-000-0000.

     Legal information: Mary Regulatory, 202-000-0001.

C0010587

SUPPLEMENTARY INFORMATION caption.

In this section, include the regulatory history of this rulemaking, and a statement of the rule's basis and purpose. Present this information in language that the reader can easily understand, with descriptive headings to highlight and organize topics. If a reference to the *Federal Register* or Code of Federal Regulations is necessary, use the format shown in examples 78 and 79.

You may use the SUPPLEMENTARY INFORMATION section to provide additional information that is required by law, agency policy, or Executive order.

Answering some of these questions may help you draft your SUPPLEMENTARY INFORMATION. Some of the questions **only apply to an interim rule** requesting comments or to a rule for which your agency is doing a post-publication review of the rule's effectiveness.

- What law or directive authorizes the rule?
- What existing regulations address the problem?
- What problem does the rule address?
  - What issues are connected with the problem?
  - What facts, surveys, or studies identify and define the problem?
- How does this rule attempt to solve the problem?
  - Were other solutions considered?
  - Why was this solution chosen?
  - Is this solution cost-effective?
  - How will this solution affect the regulated parties?
- Does this rule contain penalties for noncompliance?
  - Are penalty provisions essential?
  - Can the requirements be monitored?
  - Can the penalty provisions be enforced?
- Have you identified other documents in this rulemaking, and included their *Federal Register* citations? (See example 78.)
  - Did you publish an Advance Notice of Proposed Rulemaking?
  - Did you publish a proposed rule?
  - Have you announced meetings or hearings?
- Have you discussed all necessary regulatory analysis and review requirements?
- What other statutes apply to this rulemaking?

C0010588

- How will public participation be handled?
  - How was public participation handled?
  - Are there special instructions for mailing public comments?
  - Are there formal or informal hearings?
  - Are there procedures for requesting a public hearing?
  - Are there any instructions for filing comments or making oral presentations?
  - Will transcripts of the hearing be made available?
- Have you used subject headings to break up a lengthy SUPPLEMENTARY INFORMATION section? For example:
  - Background.
  - Statutory authority.
  - Discussion of comments.
  - Related documents.
  - Topical headings.
  - Drafting information.
  - Public participation.

## *List of Subjects*

### 2.6 What is the List of Subjects and what am I required to do with it?

Each rule document must contain a list of index terms (List of Subjects) for each CFR part number cited in the document's heading. These terms are contained in the "Federal Register Thesaurus of Indexing Terms," available at http://www.nara.gov/fedreg/, under "Document Drafting Resources." The terms provide a common vocabulary for indexing the rulemaking documents of all agencies and are the basis of the "CFR Index" prepared by the OFR. We will provide you with a list of appropriate terms for its existing CFR parts. For new CFR parts, you should select appropriate terms from the Thesaurus. You may include additional terms not contained in the Thesaurus for either existing or new CFR parts as long as you also include appropriate Thesaurus terms. When you select a term that is not in the Thesaurus, ask yourself, "Would I search for the subject matter using this term?"

The List of Subjects is the last item in the SUPPLEMENTARY INFORMATION section of the preamble. Put the List of Subjects terms in alphabetical order and separate them with commas. Capitalize only the first word of each term. End the terms with a period. (See example 28.)

You do not need a list of subjects for a document that:

- Has no regulatory text.
- Only presents nomenclature changes.
- Corrects a previous document.

You must include all the established Thesaurus terms for a part that you are removing from the CFR. A List of Subjects is set out separately for each CFR part affected. (See example 29.)

2-18

C0010589

However, if the terms used are identical for several CFR parts, you may consolidate. (See example 29.)

> Example 28: Format for document citing a single CFR part.
>
> List of Subjects in 40 CFR Part 262
>
> Hazardous waste, Imports, Labeling, Packaging and containers, Reporting and recordkeeping requirements.
>
> Example 29: Format for document citing two or more CFR parts.
>
> List of Subjects
>
> 15 CFR Part 370
>
> Administrative practice and procedure, Exports.
>
> 15 CFR Parts 372 and 386
>
> Exports, Reporting and recordkeeping requirements.

## *Words of Issuance*

## 2.7 What are "words of issuance"?

The words of issuance provide:

- The tie between this rule and the CFR units that it affects.
- The bridge between the preamble of this document and the regulatory changes.

Words of issuance are always in the present tense.

> Example 30.
>
> For the reasons stated in the preamble, the Federal Energy Regulatory Commission amends 18 CFR chapter I as set forth below:
>
> For the reasons discussed in the preamble, the Nuclear Regulatory Commission amends 10 CFR part 430 as follows:

C0010590

*Regulatory Text*

## 2.8 What do I include in the regulatory text?

Regulatory text is the section of your document that sets out your agency's changes to the CFR.
It can include:

- Headings.
- Table of Contents.
- Authority citation.
- Numbering of rules.
- Amendatory language.
- Asterisks.
- Cross-references.

## 2.9 Headings.

Provide a heading for each part, subpart, section, and appendix that you amend. You may use a
heading for a paragraph. A heading is a brief statement that accurately describes the content of the
CFR unit. A change in the heading requires an amendment to the CFR.

Example 31: Headings in regulatory text.

| | |
|---|---|
| PART 970--DEEP SEABED MINING REGULATIONS FOR EXPLORATION LICENSES | Part |
| Subpart A--What Applications Must I complete to Obtain My Exploration Licenses? | Subpart Heading (Optional) |
| §970.103 Which deep seabed mining activities are prohibited and which ones are restricted? | Section |

**Part.** Each part heading should contain subject terms that identify the agency's rules in a manner
consistent with the terms used by other agencies to identify similar material. The OFR has
developed a thesaurus of subject terms that we use to index the CFR and related publications. Use
the Thesaurus to obtain subject terms that identify the content of the rule document, and use the
appropriate subject terms in the part heading.

**Subpart.** You may use subpart headings to separate ideas within a part. Subparts are not
required.

2-20

C0010591

**Undesignated center heading.** You may use undesignated center headings to break up a large subpart and group together sections concerning a particular subject area. Undesignated center headings are not required.

**Appendix.** An appendix may appear at the section, subpart, or part level. Designate each appendix with a capital letter, identify whether it belongs to a section, subpart, or part, and give it a descriptive heading. Do not carry the heading for an appendix to a section in the table of contents. If your agency has established a uniform designation system for its appendices, follow the established system. (See chapter 7.)

> Example 32: Appendix headings.
>
> Appendix B to Subpart A of Part 915 -- Illustrations of Infant Highchair Designs
>
> Appendix A to §315.2 --Model Air Pollution Control Plan
>
> Appendix A to Part 2 -- Flammability Statistics for Floor-Cleaning Fluids

**Section.** Descriptive section headings are signposts for the reader. They help readers identify the particular regulatory text that applies to them. End each section heading with a period or question mark.

**Paragraph.** You may use headings at the paragraph level. Be consistent. If you use a heading for one paragraph, be sure to use a heading for all paragraphs at that level. End paragraph headings with a period and underline them in the document. In the *Federal Register,* the underlined headings are printed in italics.

## 2.10 Table of contents.

You need a table of contents for a document that:

- Adds a new part or subpart.
- Revises an existing part or subpart.

Include the following in your table of contents:

- Section headings.
- Subpart headings.
- Undesignated center headings.
- Appendix headings to parts and subparts.

Table of contents entries are identical to the section headings, subpart headings, undesignated center headings, and appendix headings in the regulatory text. Do not list paragraph headings or appendix-to-section headings in the table of contents.

C0010592

Do not provide a table of contents in a document that adds or amends a single section or miscellaneous sections. We change the table of contents when these amendments are included in the CFR.

## 2.11 Authority citation.

You must cite the authority that authorizes your agency to change the CFR. Give the authority citation in the shortest form. Placement of the authority citation depends on what unit of the CFR you are amending.

There are two types of authority:

- Statutory:
  - Public law.
  - United States Code.
- Nonstatutory:
  - Presidential Executive order.
  - Presidential Administrative order.
  - Presidential Memorandum.
  - Agency delegation, policy, or directive.
  - Office of Management and Budget circular.
  - CFR regulations.

Your agency is responsible for maintaining accurate and current authority citations.

Present the authority citation at one of two central places:

- Part level, or
- Subpart level.

You may give citations of authority for particular subparts and sections within the central authority citation. (See examples 33 and 34.)

Example 33.

```
Authority: 42 U.S.C. 2201; 45 U.S.C. 5841.
Subpart A also issued under 5 U.S.C. 552; 31 U.S.C. 9701.
Subpart B also issued under 5 U.S.C. 552a.
Subpart C also issued under 5 U.S.C. 552b.
```

C0010593

Example 34.

    A u t h o r i t y : 42 U.S.C. 2111, 2112, 2201, 2232, 2233, 2236, 2282, 5841, 5842, 5846.
    Section 30.7 also issued under 42 U.S.C. 5851.
    Section 30.34(b) also issued under 42 U.S.C. 2234.
    Section 30.61 also issued under 42 U.S.C. 2237.

## Statutory authority.

Each citation of statutory authority must use the United States Code citation, if one exists. To determine the United States Code citation, use one of the following:

- The current edition of the United States Code or its supplement.
- The slip law, for recently signed public laws.

Example 35.

    A u t h o r i t y : 44 U.S.C. 2101–2118; 50 U.S.C. 6909.

We generally recommend that you use only the United States Code citation. (See example 35.). When a United States Code citation does not exist (for example, for appropriations laws), you must cite the section of the public law, if appropriate, the public law, and the U.S. Statutes at Large. Do not cite the popular name of a public law. (See example 36.)

Example 36.

    A u t h o r i t y : Sec. 8067, Pub. L. 98–473, 98 Stat. 1937.

If you choose to cite the public law and the U.S. Statutes at Large in addition to the United States Code, present them in the order shown in example 37.

Example 37.

    A u t h o r i t y : Sec. 8, Pub. L. 98–328, 82 Stat. 470 (34 U.S.C. 21).

If you cite two different laws where one has a United States Code citation and the other does not, place the United States Code citation first. (See example 38.)

Example 38.

A u t h o r i t y : 42 U.S.C. 2996; Pub. L. 104–208, 110 Stat. 3009; Pub. L. 104–134, 110 Stat. 1321.

C0010594

### Nonstatutory authority.

Cite nonstatutory authority by document designation, *Federal Register* citation, and CFR citation. (See example 39.)

Example 39.

    Authority: E.O. 12731, 55 FR 42547, 3 CFR, 1990 Comp., p. 306; 5 CFR 2635.105.

If you include both statutory and nonstatutory citations in the same authority citation, place the statutory citation first. (See example 40.)

Example 40.

    Authority: 8 U.S.C. 1161(f); 29 U.S.C. 1801-1872; Secretary's Order 6-84, 49 FR 32473.

If you need to deviate from the standard authority citation format, submit a letter requesting the deviation and explaining the need to the Director of the Federal Register.

### Placement of the authority citation.

**Whole CFR part.** If a document adds or revises an entire CFR part, place the authority citation directly after the table of contents and before the regulatory text. (See example 41.)

Example 41.

PART 54--ALLOTMENTS FOR CHILD AND SPOUSAL SUPPORT

Sec.
54.1 Purpose.
54.2 Applicability and scope.
54.3 Definitions.
54.4 Policy.
54.5 Responsibilities.
54.6 Procedures.

    Authority: 15 U.S.C. 1673; 37 U.S.C. 101; 42 U.S.C. 665.

C0010595

**CFR section.** If a document amends only certain sections within a CFR part, set out the authority citation for the part as the **first numbered item** in the list of amendments for the part. (See examples 42 and 43.)

Example 42.

PART 4--SERVICES TO THE PUBLIC

1. The authority citation for part 4 is revised to read as follows:

Authority: 44 U.S.C. 1508.

Example 43.

PART 4--SERVICES TO THE PUBLIC

1. The authority citation for part 4 continues to read as follows:

Authority: 44 U.S.C. 1502.

**Subparts.** If a document adds or revises an entire subpart, using the **same** authority citation as the CFR part, set out the authority citation for the part as the first numbered item in the list of amendments for the part. (See examples 42 and 43.)

If a document adds or revises an entire subpart using a **different** authority citation, set out the authority citation for the subpart directly after the heading to the subpart and before the regulatory text of the subpart. (See example 44.)

Example 44.

Subpart B--Supportive Services for                Table of Contents
Minority, Disadvantaged, and Women
Business Enterprises

Sec.
230.201 Purpose.
230.202 Definitions.
230.203 Policy.

2-25

C0010596

Subpart B--Supportive Services for Minority, Disadvantaged, and Women Business Enterprises

Subpart Heading

Authority: 23 U.S.C. 101, 140(c), 304, 315; 49 CFR 1.48(b).

Subpart B Authority Citation

§230.201 Purpose.

Text of Section

This subpart prescribes the policies, procedures, and guidance to develop, conduct, and administer supportive services assistance programs for minority, disadvantaged, and women business enterprises.

* * * * *

[Asterisks Indicate Text Not Reprinted.]

**Parts removed.** If you remove a part in a rule document, you must give your agency's authority for the action. Place the authority in the "words of issuance." (See examples 45 and 46.)

Example 45.

Accordingly, under the authority 10 U.S.C. 8013, amend XX CFR chapter VII by removing part 837.

Example 46.

Under 42 U.S.C. 541 and as discussed in the preamble, amend XX CFR chapter II as follows:

2-26

C0010597

## 2.12 Numbering of rules.

The regulatory text of your document must conform with the structure of the CFR.

**Code of Federal Regulations structure.** The basic structure of the CFR consists of a hierarchy of designated CFR units. The CFR numbering system is **not** based on a decimal numbering system. The following table illustrates the CFR structure.

| CFR Unit | CFR Designation | Description |
|----------|-----------------|-------------|
| Title | 12 | Broad area subject to Federal regulation |
| Chapter | III | Rules of a single issuing agency |
| Part | 303 | Unified body of rules concerning a single function or specific subject |
| Section | 303.1 | Short presentation of one regulatory function. The section is the basic unit of the CFR. The content of a section is a short, simple presentation of a single regulatory function. |

Each section number includes the number of the part followed by a period and a sequential number.

> Example 47: Section number.
>
> §25.1.

Hyphenated numbers (§117-2.1 or §117-3.15) or numbers with alpha characters (part 115a, §115a.1, or §115.1a) are not permitted in designating units within the CFR system.

The Director of the OFR must approve any deviation from standard CFR structure. Submit a request for approval in writing before you begin drafting.

**Paragraph structure of a section.** If you have more than one paragraph, designate each one as shown in example 48. Indent each designated paragraph within a section.

The paragraph structure within a section allows six levels of designation. **We strongly recommend that you do not use more than 3 paragraph levels.** Use of more than 3 paragraph levels makes your rule hard to read and use. Use more sections as a drafting technique to avoid using excessive paragraph levels. Use the paragraph structure chart in example 48.

Sections consisting of a single paragraph or the introductory text of a section do not require a designation. However, we no longer permit an undesignated concluding paragraph.

Indicate italics by underlining in a typewritten document.

C0010598

Example 48: Paragraph structure of a section.

```
level 1    (a), (b), (c), etc.
level 2    (1), (2), (3), etc.
level 3    (i), (ii), (iii), etc.
level 4    (A), (B), (C), etc.
level 5    (1), (2), (3), etc.
level 6    (i), (ii), (iii), etc.
```

**Definitions.** For a discussion of definitions, see section 8.15.

**Notes.** Label notes in CFR text to show whether they apply to the whole section or to the preceding paragraph. (See example 49.)

Example 49.

```
Note to §30.1.
Note to paragraph (f).
Note to paragraph (b)(2).
```

## 2.13 Amendatory language.

A rule document often makes changes or additions to the CFR. The regulatory text of a document must fit into the current text of the CFR. You should precisely identify and describe the changes made to the CFR. While the words of issuance describe the general effect of the document, the amendatory language uses standard terms to give specific instructions on how to change the CFR. Do not include in the amendatory language a discussion of why the changes are made. This belongs in the SUPPLEMENTARY INFORMATION section.

Your agency's current CFR text is not necessarily what appears in the latest edition of the CFR, since your agency publishes changes to the CFR in the daily *Federal Register.*

C0010599

The "List of CFR Sections Affected" (LSA) is a cumulative **monthly** numerical index to rules and proposed rules. Use it to determine if any changes have been made since the revision date of your CFR. The "CFR Parts Affected" is a cumulative **daily** numerical index to rules and proposed rules published in the Reader Aids section of the *Federal Register.* Use it to check for changes in any month not covered by the LSA.

Before you begin drafting amendatory language, consult the latest version of the CFR and the LSA, and the latest *Federal Register* for any month not covered by your LSA. This gives you the current and official version of the CFR regulations you are changing.

Base amendatory language on the current text of a rule. You must:

- Identify the specific CFR unit being changed.
- Place amendments in CFR numbering order.
- Use one of the standard terms to describe the change.
- Address all regulatory text set out in your document.

For extensive changes, revise the text in full rather than prepare fragmentary amendments. The reader will then have the complete text of the amended unit.

## Use of "Amend."

"Amend" means that an existing CFR unit is changed. Because it is an introductory term, it cannot stand alone. Use it with one of the specific amendatory terms to precisely describe the change to the CFR unit.

Example 50: Amend.

    Amend §791.27 to revise paragraph (b)(3) and to add paragraph (d)(4) to read as follows:

## Specific amendatory terms.

Use the following terms in amendatory language. Each term is a precise instruction to change a CFR unit.

- Add.
- Correct.
- Nomenclature change.
- Redesignate.
- Remove.
- Republish.
- Reserve.
- Revise.
- Stay or Suspend.
- Withdraw.

**Add.** "Add" means that a new CFR unit is inserted in the CFR.

2-29

C0010600

Example 51: Add.

Add part 1812 to read as follows:

Add §5.26 under the undesignated center heading "How To Apply For a Permit" to read as follows:

Add §20.89 to subpart H to read as follows:

In §18.13, add paragraph (e) to read as follows:

Add new paragraph (f)(5) to §210.14 to read as follows:

Add §4.8(a)(3)(iii) to read as follows:

**Correct.** The term "correct" fixes a clerical or typographical error in a recently published document. Corrections to the regulatory text must identify the CFR unit being corrected. (See chapter 4.)

Example 52: Correct.

Nonregulatory text:

On page 00000, in the second column, on line 5, correct the reference "§39.10(a)(1)" to read "§44.10".

Regulatory text:

§20.15 [Corrected]

On page 00000, in the third column, in §20.15(c)(1), correct "Director" to read "Acting Director".

**Delay.** Do not use "Delay" in amendatory language. Use it in the preamble under the DATES caption to Delay an effective date that has not yet taken place. See section 2.5, and see also "Stay or Suspend" in this section.

C0010601

**Nomenclature change.** A nomenclature change directs a change to a term or phrase throughout a CFR unit. It is commonly used to change an office designation or the title of an agency official.

Example 53: Nomenclature Change.

§720.7 [Amended]

In 12 CFR 720.7(c)(2) remove the words "Deputy Administrator" and add, in their place, the words "Vice-Chairman of the National Credit Union Administration Board".

§§720.7, 720.20, 720.22, 720.24, 720.26, and 720.27 [Amended]

In addition to the amendments set forth above, in 12 CFR part 720 remove the words "Assistant Administrator for Administration" and add, in their place, the words "Director of the Office of Administration" in the following places:

a. Section 720.7(a)(1), (c)(2), and (c)(3);

b. Section 720.20(b) introductory text;

c. Section 720.22(a);

d. Section 720.24(a) and (b)(3);

e. Section 720.26(a); and

f. Section 720.27(a) and (c).

PART 315--[AMENDED]

In part 315, revise all references to "Domestic Commerce" to read "Domestic Business Development".

§§780.40, 780.41, and 780.42 [Amended]

In the table below, for each section indicated in the left column, remove the title indicated in the middle column from wherever it appears in the section, and add the title indicated in the right column:

| Section | Remove | Add |
|---|---|---|
| 780.40 | Assistant Secretary for Housing Production and Mortgage Credit | Assistant Secretary for Housing |
| 780.41 | Assistant Secretary for Housing Production and Mortgage Credit (HPMC) -- Federal Housing Commissioner | Assistant Secretary for Housing -- Federal Housing Commissioner |
| 780.42 | Deputy Assistant Secretary for Housing Production and Mortgage Credit -- Deputy Federal Housing Commissioner | Deputy Assistant Secretary for Housing -- Deputy Federal Housing Commissioner |

2-31

**Redesignate.** "Redesignate" transfers a CFR unit to a vacant position and assigns a new designation. A redesignation table may also be used.

Example 54: Redesignate.

PART 80 [REDESIGNATED AS PART 90 AND AMENDED]

2. Redesignate part 80 as part 90 and amend the references as indicated in the table below:

3. In §100.5, redesignate paragraphs (a) through (c) as paragraphs (d) through (f) and add new paragraphs (a) through (c) to read as follows:

4. Redesignate part 20 as part 30 and revise it to read as follows:

§§226.3 through 226.5 [Removed]

§§226.6 through 226.8 [Redesignated as §§226.3 through 226.5]

5. Remove §§226.3 through 226.5 and redesignate §§226.6 through 226.8 as §§226.3 through 226.5, respectively.

§45.3 [Amended]

6. In §45.3, redesignate paragraphs (a) through (c) as paragraphs (a)(1) through (a)(3). In redesignated paragraph (a)(1), further redesignate paragraphs (1) and (2) as paragraphs (a)(1)(i) and (ii).

**Remove.** "Remove" means that an existing CFR unit is being taken out of the CFR.

Example 55: Remove.

§300.12 [Removed]

Remove §300.12.

§495.73 [Amended]

In §495.73, remove paragraphs (a)(5) and (e).

**Republish.** "Republish" means that an unchanged CFR unit is set out for the convenience of the reader, often to provide the context for an amendment. Therefore, you must present the republished text accurately.

Example 56: Republish.

In §2.1, the introductory text of paragraph (a) is republished and paragraphs (a)(1) and (a)(3) are revised to read as follows:

**Reserve.** "Reserve" is a term used to fill in gaps in CFR numbering.

2-32

C0010603

Removing a subpart or a paragraph may leave a gap which could confuse the reader. To avoid confusion in your amendatory language, you should remove and reserve the subpart or paragraph. (See example 57.)

You may also use "reserve" when adding or revising a CFR unit to indicate where future text will be added. (See example 58.)

Example 57: Reserve (when removing a CFR unit).

```
Subpart Q--[Removed and Reserved]

    Remove and reserve subpart Q, consisting of §§103.10 through 103.25.
```

Example 58: Reserve (when adding or revising a CFR unit).

```
    Add and reserve subpart E and add subpart F, consisting of §§25.100
through 25.130, to read as follows:
```

**Revise.** "Revise" means that an existing CFR unit is replaced in its entirety. It is important that you specifically identify the CFR unit being revised.

Example 59: Revise.

```
    Revise part 105 to read as follows:

    Revise §80.100(e)(1)(iii) to read as follows:

    In §15.4, revise paragraph (b) and the introductory text of paragraph
(f)(2) to read as follows:
```

**Stay or Suspend.** "Stay" or "Suspend" stops a CFR unit temporarily or indefinitely. The amendatory language must cite the CFR unit affected. The content of the CFR unit is not changed. During the suspension, the CFR unit is not in effect or enforceable. Consult with us when using the term "Stay." For a discussion of Stays versus Delays, see the DATES caption in section 2.5.

**Withdraw.** "Withdraw" indicates that a previously published rule which is not in effect is removed from the Federal Register publication system and will not become effective or enforceable.

C0010604

### Addition or revision of a part or subpart.

**Parts**. If you add or revise a part, use these elements in the order shown. (See example 60.)

- Amendatory language.
- Part heading.
- Table of contents.
- Authority citation.
- Regulatory text.

**Subparts**. If a part has a single authority citation at the end of the table of contents and you want to add or revise a subpart in that part, use these elements in the order shown:

- Part heading.
- Authority citation for the part.
- Amendatory language.
- Subpart heading.
- Table of contents.
- Regulatory text.

**or**

If each subpart in a part has its own authority citation and you want to add or revise a subpart in that part, use these elements in the order shown:

- Part heading.
- Amendatory language.
- Subpart heading and table of contents.
- Subpart heading.
- Authority citation for the subpart.
- Regulatory text.

C0010605

Example 60: Revision of a part.

Revise part 3 to read as follows:                    Amendatory Language

PART 3--SERVICES TO THE PUBLIC                       Part Heading

Sec.                                                 Table of Contents
3.1 Information services.
3.2 Public inspection of documents.
3.3 Reproduction and certification of
copies of acts and documents.

Authority: 44 U.S.C. 1506; sec. 6,                   Authority Citation
E.O. 10530, 19 FR 2709, 3 CFR, 1954-1958
Comp., p. 189.

§ 3.1 Information services.                           Regulatory Text

(a) The Office of the Federal Register
(OFR) provides information on:

(1) Publications in §2.5 of this chapter; and

(2) Original acts and documents filed with the OFR.

(b) The OFR cannot provide excessive information or do extensive
research.

(c) The staff may not summarize or interpret substantive text of any
act or document.

§ 3.2 Public inspection of documents.

(a) During the OFR's office hours, documents filed with the OFR
pursuant to law are available for public inspection at 800 North Capitol
Street, NW., Suite 700, Washington, DC. There are no formal inspection
procedures or requirements.
(b) By direction of the Director of the Office of the Federal
Register, the OFR staff must file for public inspection documents
received and processed not later than the working day preceding the
publication day for that document.

(c) By direction of the Director of the Office of the Federal
Register, the OFR staff must place on the original and certified copies
of each document a notation of the day and hour when it was filed and
made available for public inspection.

(d) Customers may view, photocopy, or make excerpts of documents on
public inspection.

§ 3.3 Reproduction and certification of copies of acts and documents.

C0010606

The regulations for the public use of records in the National Archives and Records Administration (36 CFR parts 1252 through 1258) also govern the furnishing of reproductions of acts and documents and certificates of authentication for them. Section 1258.14 of those regulations provides for the advance payment of appropriate fees for reproduction services and for certifying reproductions.

## Amendment to a section.

If you amend a section, use these elements in the order shown:

- Part heading.
- Authority citation.
- Amendatory language.
- Section heading.
- Regulatory text.

If you add or revise a section, use the format shown in example 61.

If you add a section to a part which contains subparts or undesignated center headings, identify the subpart or undesignated center heading which will contain the new section.

Example 61: Revision of a section.

PART 133--TOLLS FOR USE OF CANAL                    Part Heading

    1. The authority citation for part 133 is revised to read as follows:                    Authority Citation

    Authority: 22 U.S.C. 3791; E.O. 12215,45 FR 36043, 3 CFR, 1980 Comp., p. 257.

2-36

C0010607

2. Section 133.34 is revised to read as follows:

<div align="right">Amendatory Language</div>

§133.34 What are the tolls for vessels in ballast?

<div align="right">Section Heading</div>

In order for a vessel to secure the reduced rate of toll for vessels in ballast, it may not carry any passengers or cargo nor any fuel for its own consumption in a quantity which exceeds:

<div align="right">Regulatory Text</div>

(a) 125 percent of the volume of its engine room as measured and as shown on its Panama Canal tonnage certificate; or

(b) The spaces on the vessel which are available for the carriage of fuel.

**Multiple amendments.** Describe **all** changes to one section in a single instruction, and display changed text for the section immediately following the instruction. (See instruction 2 in example 63.) If there are many changes to one section, use a list format. (See example 62.)

Example 62.

§941.103 [Amended]

3. Amend §941.103 as follows:

a. Remove the definitions of "Allocation area", "Application", "Central city allocation area", "Community", "Field Office", "Housing Assistance Plan", "Household type", and "Housing type";

b. Remove the parenthetical phrase "(in the form prescribed by HUD)" from the definition "Construction Contract" and "Contract of sale"; and

c. Remove from the definition of "Total development cost (TDC)" the term "The Field Office" and add in its place the term "HUD", and remove from that definition the parenthetical sentence at the end.

C0010608

When there are changes to several sections, use separate numbered instructions for each section, and display the changed text for each section after the instruction. (See instructions 2 through 4 in example 63.)

Example 63: Changes to several sections.

PART 1258--FEES

1. The authority citation for part 1258 continues to read as follows:

Authority: 44 U.S.C. 2116(c).

2. Amend §1258.2 by revising paragraphs (a) and (c)(3) to read as follows:

§1258.2 Applicability.

(a) Except as stated in this section, fees for the reproduction of NARA administrative records, archival records, donated historical materials, and records filed with the Office of the Federal Register are in §1258.12.

* * * * *

(c) * * *

(3) Motion picture, sound, and video recording materials are among the holdings of the National Archives and Records Administration. Obtain prices for reproduction of these materials from the Motion Picture and Sound and Video Branch, National Archives and Records Administration, Washington, DC 20408.

* * * * *

3. Amend §1258.4 by revising paragraph (b) to read as follows:

§1258.4 Exclusions.

* * * * *

(b) When NARA wishes to disseminate information about its activities to the general public through press, radio, television, and newsreel representatives;

* * * * *

2-38

C0010609

4. Amend §1258.10 by revising paragraph (a) to read as follows:

§1258.10 Mail orders.

(a) The agency charges a minimum fee of $6.00 per order for reproductions it mails to the customer.

* * * * *

Group all amendments to the same CFR unit together in one instruction. (See examples 64 and 65.)

Example 64.

Revise paragraphs (a), (d), (e), and (n) of §150.5 to read as follows:

Example 65.

Remove and reserve §§33.1, 33.5 and 33.10.

**Introductory text.** If you revise the introductory text of a section or a paragraph, and not the whole section or paragraph, specify the introductory text. (See example 66.)

Example 66.

In §1020.3, revise paragraph (a) introductory text, and paragraphs (a)(1) and (a)(4) to read as follows:

§1020.3 What are the qualifications and duties of the Small Business Ombudsman?

(a) The Chairman will appoint a senior, full-time Commission employee as Small Business Ombudsman. The Ombudsman must:

(1) Know the Commission's statutes and regulations;

* * * * *

(4) Perform the Ombudsman duties in addition to, and consistently with, other Commission responsibilities.

* * * * *

C0010610

## 2.14 Asterisks.

If you add or revise only certain units of a section, the amendatory language must state exactly which units are added or revised, and only those units are printed. Use asterisks to represent text which is not changed.

**Use of 5 asterisks.** Use 5 asterisks to show that a whole paragraph, including its subordinate paragraphs, is unchanged.

In example 67, the 5 asterisks before revised paragraph (d) show that paragraphs (a), (b) and (c) remain unchanged. The 5 asterisks that follow revised paragraph (d) show that the remaining text in the section is also unchanged.

Example 67: Use of 5 asterisks.

Revise paragraph (d) of §166.15 to read as follows:

§ 166.15 State status.

\* \* \* \* \*

(d) The following States issue licenses under cooperative agreements with the Animal and Plant Health Inspection Service, but do not have primary enforcement responsibility under the Act: Kentucky, Maryland, Puerto Rico, Texas, and Washington.

\* \* \* \* \*

**Use of 3 asterisks.** Use 3 asterisks when you change text at a subordinate level. This shows that the higher level paragraphs remain unchanged.

In example 68, the 5 asterisks before paragraph (b) show that paragraph (a) remains unchanged. The 3 asterisks following "(b)" show that (b)(1) through (b)(4) remain unchanged, and the 3 asterisks following "(5)" show that the introductory text of (b)(5) is unchanged.

C0010611

The 5 asterisks that follow revised paragraph (b)(5)(i) show that the remaining text in the section is unchanged.

Example 68: Use of 3 asterisks.

Revise §202.3(b)(5)(i) to read as follows:

§ 202.3 Registration of copyright.

* * * * *

(b) * * *

(5) * * *

(i) The Library of Congress receives two complimentary copies promptly after publication of each issue of the serial.

* * * * *

**We strongly recommend that you use no more than 3 paragraph levels.** Use of more than 3 paragraph levels makes your rule hard to read and use. (See paragraph structure chart in example 48.)

**The smallest unit you may revise is a sentence.** When you revise only a sentence of a paragraph, use 3 asterisks to show that the remaining sentences in the paragraph are unchanged. (See example 69.)

Example 69.

Amend §416.916 by revising the first sentence to read as follows:

§ 416.916 What will happen if I fail to submit medical and other evidence?

You (and, if you are a child, your parent, guardian, relative, or other person acting on your behalf) must cooperate in furnishing us with, or in helping us to obtain or identify, available medical or other evidence about your impairment(s). * * *

2-41

C0010612

Example 70: Use of both 3 and 5 asterisks in the same document.

| | |
|---|---|
| PART 216--REGULATIONS GOVERNING THE TAKING AND IMPORTING OF MARINE MAMMALS | Part Heading |
| 1. The authority citation for part 216 continues to read as follows: | Authority Citation |
| Authority: 16 U.S.C. 1361-1407. | |
| 2. Revise paragraph (b)(1)(v), the first sentence of paragraphs (b)(3) and (c)(2), and paragraph (c)(4)(i) introductory text; and add paragraph (b)(1)(vi) to §216.24 to read as follows: | Amendatory Language |
| § 216.24 Taking and related acts incidental to commercial fishing operations. | Section Heading |
| * * * * * | Indicates Paragraph (a) Unchanged |
| (b) * * * | Indicates Paragraph (b) Introductory Text Unchanged |
| (1) * * * | Indicates Paragraphs (b)(1) Introductory Text And (b)(1)(I) through (Iv) Unchanged |
| (v) Category 5: Other gear. Commercial fishing operations utilizing trolling, gill nets, hook and line gear, and any gear not classified under paragraphs (b)(1)(i) and (b)(1)(ii) of this section. | Revises Paragraph (b)(1)(v) |
| (vi) Category 6: Commercial passenger fishing vessel operation. Commercial fishing operations from a commercial passenger fishing vessel for the purpose of active sport fishing as defined in §216.3. | Adds Paragraph (b)(1)(vi) |
| * * * * * | Indicates Paragraph (b)(2) Unchanged |
| (3) Submit the original and two copies of the application for general permit to the Assistant Administrator.* * * | Revises First Sentence of Paragraph (b)(3) Indicates Remainder of Paragraph (b)(3) Unchanged |

2-42

C0010613

* * * * *                                         Indicates Paragraphs
                                                  (b)(4) through (7)
                                                  Unchanged

   (c) * * *                                      Indicates Paragraph (c)
                                                  Introductory Text and
                                                  (c)(1) Unchanged

   (2) Operator's certificate of inclusion.       Revises Paragraph
You must hold a valid operator's certificate      (c)(2).
of inclusion if you are the person in charge
of and actually controlling fishing operations
(after this referred to as the operator) on a
vessel engaged in commercial fishing operations
for which a Category 2 or Category 6 general
permit is required under this subpart. You may
not transfer this certificate. You have a valid
certificate only for a vessel having a valid
vessel certificate of inclusion for the same
category. In order to receive a certificate
of inclusion, the operator must satisfactorily
complete required training. You must renew your
operator's certificate of inclusion annually.

* * * * *                                         Indicates Paragraph
                                                  (c)(3) Unchanged

   (4) * * *                                       Indicates Paragraph
                                                  (c)(4) Introductory
                                                  Text Unchanged

   (i) Category 1, 3, 4, 5, and 6                  Revises Paragraph
applications:                                      (c)(4)(i)
                                                  Introductory Text

* * * * *                                         Indicates Remainder of
                                                  Section Unchanged

2-43

C0010614

## 2.15 Cross–references.

We permit you to cross-reference your own or another agency's rules in limited situations. If you are applying the referenced rules to current or future situations, you may only reference rules that are **currently in effect**.

If you must modify the referenced rules, you cannot use a cross-reference. You must publish the modified rules in full.

You may cross-reference the rules of another agency only if the reference meets any of the following conditions specified in 1 CFR 21.21:

- The reference is required by court order, statute, Executive order, or reorganization plan;
- The reference is to rules promulgated by an agency with the exclusive legal authority to regulate in a subject matter area, but the referencing agency needs to apply those rules in its own programs;
- The reference is informational or improves clarity rather than being regulatory;
- The reference is to test methods or consensus standards produced by a Federal agency that have replaced or preempted private or voluntary test methods or consensus standards in a subject matter area; or
- The reference is to the departmental level from a subagency.

When cross-referencing, you must identify the CFR unit being cited by the proper CFR unit designation in each reference. Do not use a nonspecific reference, such as "herein," "above," or "below." Example 71 illustrates the proper style for each common type of cross-reference.

Example 71: CFR cross–references.

References to a different TITLE

| | | |
|---|---|---|
| In title 6, when referencing title 1, chapter I | write ... | 1 CFR chapter I |
| In title 6, when referencing title 1, chapter I, part 2 | write ... | 1 CFR part 2 |
| In title 6, when referencing title 1, chapter I, part 2, §2.7 | write ... | 1 CFR 2.7 |
| In title 6, when referencing title 1, chapter I, part 2, §2.7, paragraph (a)(2) | write ... | 1 CFR 2.7(a)(2) |

C0010615

References within the same TITLE

| | | |
|---|---|---|
| In chapter I, when referencing chapter II | write . . . | chapter II of this title |
| In part 100 (chapter I), when referencing part 300 (chapter III) | write . . . | part 300 of this title |
| In §250.10 (chapter I), when referencing §300.19 (chapter III) | write . . . | §300.19 of this title |

References within the same CHAPTER

| | | |
|---|---|---|
| In part 20, when referencing part 30 | write . . . | part 30 of this chapter |
| In §20.10, when referencing subpart A of part 30 | write . . . | part 30, subpart A of this chapter |
| In §20.10, when referencing §30.19 | write . . . | §30.19 of this chapter |

References within the same PART

| | | |
|---|---|---|
| In §20.5, when referencing subpart A of part 20 | write . . . | subpart A of this part |
| In §20.5, when referencing §20.15 | write . . . | §20.15 |
| 7In §20.5, when referencing §20.15, paragraph (a) | write . . . | §20.15(a) |
| In §20.5, when referencing Appendix A to part 20 | write . . . | Appendix A of this part |

References within the same SECTION

| | | |
|---|---|---|
| In paragraph (a), when referencing paragraph (b) | write . . . | paragraph (b) of this section |
| In paragraph (a), when referencing paragraph (b)(1) | write . . . | paragraph (b)(1) of this section |
| In paragraph (a)(1), when referencing paragraph (a)(2) | write . . . | paragraph (a)(2) of this section |
| In paragraph (a)(1)(i), when referencing paragraph (a)(1)(ii) | write . . . | paragraph (a)(1)(ii) of this section |

Example 72: Citing text within a section.

Note. For purposes of this example, we display citations in bold type. Do not do this in your document.

2-45

C0010616

§ 233.17 Noncompliance and program reporting by the Director.

The Director must prepare quarterly and annual reports as detailed in paragraphs (a) and (b) of this section and must submit them to the Regional Administrator.

(a) Quarterly reports for State 404 programs. The Director must submit noncompliance reports for section 404 discharges specified under §233.24(f)(1)(i) through (iv) containing the following information:

(1) Name, location, and permit number of each noncomplying permittee; and

(2) A brief description and date of each instance of noncompliance, which must include the following:

(i) Any unauthorized discharges of dredged or fill material subject to the State's jurisdiction or any noncompliance with permit conditions; and

(ii) A description of investigations conducted and of any enforcement actions taken or contemplated.

(b) Annual report for State 404 programs. The State Director must submit an annual report assessing the cumulative impacts of the State's permit program on the integrity of State regulated waters. This report must include:

(1) The number and nature of individual permits issued by the State during the year;

(2) The number of acres for each of the categories of waters in paragraph (b)(1) of this section which were filled or which received any discharge of dredge material during the year;

(3) The number and nature of permits issued under emergency conditions, as provided in §234.38 of this chapter; and

(4) The approximate number of persons in the State discharging dredged or fill material under general permits and an estimate of the cumulative impacts of these activities.

2-46

C0010617

*Signature Block*

## 2.16 Who can sign my document?

Your agency determines who may sign a document submitted for publication in the *Federal Register.*

The signer must sign in ink. (See section 8.5.) We recommend that the signer use blue ink. A signature in black ink is often difficult to distinguish from a photocopy.

Type the name and title of the person signing the document directly beneath the handwritten signature. (See example 73.)

When a person signs a document for another person, type the name and title of the person who actually signs the document beneath the signature. (See example 74.)

We will reject a document signed by one person for another. We will not accept your document if you sign someone else's name and you place your initials by the signature.

Example 73.

*Cynthia James*
C y n t h i a   J a m e s,
D i r e c t o r.

Example 74.

*Thomas Shadwell*
Thomas  S h a d w e l l,
Deputy  D i r e c t o r.

or

*Thomas Shadwell*
Thomas  S h a d w e l l,
Acting  D i r e c t o r.

2-47

C0010618

Do not place a signature block on a page by itself. Placing text on the signature page helps to ensure the integrity of the document.

You may place the signature block either at the end of the document (See example 75.) or between the preamble and the rest of the document. (See example 76.).

Example 75.

```
Preamble
Text
Signature
```

Example 76.

```
Preamble
Signature
Text
```

## 2.17 Do I need a signature date?

We recommend but do not require a signature date. When you furnish one, use the date of actual signature. We will not accept a postdated signature or change a signature date. If there is a problem with a signature date, we will return your document to your Liaison Officer.

2-48

C0010619

## *Style and Format Requirements*

### 2.18 What should my rule document look like?



2-49

**Capitals.** Type in all capital letters:

- The name of the agency or cabinet-level department (but not the name of the subagency) in the heading of a document.
- "FEDERAL REGISTER" in the parenthetical for dates that we are to compute.
- Preamble captions:

Example 77: Preamble captions.

AGENCY:

ACTION:

SUMMARY:

DATES:

ADDRESSES:

FOR FURTHER INFORMATION CONTACT:

SUPPLEMENTARY INFORMATION:

**Copies.** Provide legible copies.

**Correction or adhesive tape.** Do not use correction or adhesive tape.

**Double-spacing.** Type the text of your document double-spaced.

**Headings.**

- Type document headings centered or flush with the left margin.
- Type section headings:
  - Flush with the left margin.
  - Underlined.
  - On a line separate from the text of the section.
  - Using the § symbol.

**Margins.**

- One inch at the top, bottom, and right side.
- One and one-half inches on the left side.

**Page numbers.** Number the pages consecutively in one of the following places:

- Centered top.
- Centered bottom.
- Upper right-hand corner.

**Paper.** You must prepare your documents on $8\frac{1}{2}$" × 11" white paper.

2-50

C0010621

**Quotation marks.** Use quotation marks for names of books, journals, articles, and similar items.

**Quoted material.** Type quoted material:

- Single-spaced.
- Centered-block style.
- Without quotation marks.

**Single-sided copy.** You must type your document on one side only.

**Single-spacing.** Type the following single-spaced:

- Quoted material.
- Footnotes.
- Tables of contents.
- Examples.
- Tables.
- Notes to Tables.
- Authority citations.
- Notes.
- Formulas.

**Underlining.** Underlining instructs the printer to present material in italics. Use underlining for:

- Definitions (underline only the terms)
- Paragraph headings
- Scientific terms
- Ordering statements
- Court cases
- The section heading in the text of the rule (the heading will appear in bold type in the *Federal Register*)
- Federal Register, when referring to the name of the publication (except type in all capital letters in the parenthetical for dates that we are to compute).

Do not use underlining for:

- Emphasis
- Names of books
- Foreign phrases.

2-51

C0010622

### Abbreviations.

Use the following abbreviations in the *Federal Register*:

- FR is *Federal Register*. (Do not use Fed. Reg. or F.R.) (See example 78.)
- CFR is Code of Federal Regulations. (Do not use C.F.R.) (See example 79.)
- U.S.C. is United States Code.
- Pub. L. is Public Law. (Do not use P.L.)
- Stat. is U.S. Statutes at Large.
- a.m. or p.m. is time designation.
- E.O. is Executive order.
- Proc. is Proclamation.
- sec. is section of a Public Law or the United States Code.

Use the abbreviations for "Pub. L.", "E.O.", and "Proc." only in the authority citation. All other times you must spell them out. (See examples 37 and 39.)

### § Symbol.

Use the § symbol only for a CFR section and §§ symbol only for multiple sections. However, do not use a § symbol to begin a sentence; instead, spell out the word. Do not use the § symbol or the word "section" when the reference follows a title number and CFR as in 36 CFR 1200.1.

### Style.

Use the "U.S. Government Printing Office Style Manual" as a guide for punctuation, capitalization, spelling, compounding, and other style matters. You may obtain the GPO Style Manual from the Superintendent of Documents, Government Printing Office.

### References.

If your document relates to a previously published *Federal Register* document, you must cite the earlier document. A reference in a preamble to a previously published *Federal Register* document must identify the volume number, page number, and date of the issue in which the document appeared. (See example 78.)

Example 78. Reference to a previously published *Federal Register* document.

```
6x FR 12345, Jul. 23, 199x
```

A reference in a preamble to material contained in the CFR should identify the CFR title and part or section number. (See example 79.)

Example 79. Reference to material contained in the CFR.
```
36 CFR part 1200
36 CFR 1200.1
```

C0010623

2.19 Example of a rule document.

---

7515-01

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

36 CFR Part 1253

RIN 3095-AA64

Suitland Research Room Closure

AGENCY: National Archives and Records Administration.

ACTION: Final rule.

SUMMARY: The National Archives and Records Administration (NARA) will close the Suitland Research Room at the Washington National Records Center and establish an appointment system for using archival records remaining in the Washington National Records Center. We will also establish new public research room hours at the Washington National Records Center. The use of the research room has declined since moving the archival records of the Washington National Records Center to archival facilities in Washington, DC, and College Park, MD. After May 1, researcher use of the remaining archival records at the Washington National Records Center is expected to be no more than three visits per week.

DATES: [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

1

---

2-53

C0010624

FOR FURTHER INFORMATION CONTACT: Sharon Records, 301-000-0000.

SUPPLEMENTARY INFORMATION: Beginning May 6, 199x, researchers must make advance arrangements for the use of any archival Federal records remaining in the Washington National Records Center. The last transfer of archival records from Suitland is August 30, 199x. Call the Suitland Reference Branch at 301-000-0000, Monday through Friday, 8:00 a.m. to 4:30 p.m. for information on the availability of archival records or advance arrangements to use archival records which have not yet been closed for move preparation. Normally NARA requires one-day notice. When feasible you may make same day arrangements.

Agencies or researchers needing access to agency records still stored at the Washington National Records Center continue to call 301-000-0000 or 301-000-0001 for appointments.

After May 3, 199x, shuttle service for researchers from the National Archives and Records Administration Building in Washington, DC to the Washington National Records Center will be discontinued.

It is not cost-effective to operate the research room on its current schedule, 8:00 a.m. to 4:30 p.m., Monday through Friday, for the expected use of the room. There will be little or no impact on the public because archival records will continue to be made available to researchers.

2

2-54

C0010625

The National Archives and Records Administration considers this rule to be a procedural rule which is exempt from notice-and-comment under 5 U.S.C. 533(b)(3)(A).

This rule is not a significant rule for purposes of Executive Order 12866 and has not been reviewed by the Office of Management and Budget. As required by the Regulatory Flexibility Act, NARA certifies that these regulatory amendments will not have a significant impact on small business entities.

List of Subjects in 36 CFR Part 1253

Archives and records.

For the reasons set forth in the preamble, amend part 1253 of title 36 of the Code of Federal Regulations as follows:

PART 1253--LOCATION OF RECORDS AND HOURS OF USE

1. The authority citation for part 1253 continues to read:

Authority: 44 U.S.C. 2104(a).

2. Revise §1253.4 to read as follows:

§1253.4 Washington National Records Center.

Washington National Records Center, 4205 Suitland Road, Suitland, MD. Mailing address: Washington National Records Center, 4205 Suitland Road, Washington, DC 20409-0002. Hours: 8:30 a.m. to 4 p.m., Monday through Friday. From May 6,

3

2-55

C0010626

199x, through August 30, 199x, make appointments to use archival records at the center by calling the Suitland Reference Branch at 301-000-0000.

Dated: March 27, 199x.

*Signature*

Type name,

Title.

4

2-56

C0010627

*Interim Rule and Direct Final Rule*

## 2.20 Interim rule.

The interim rule responds to an emergency situation and is usually followed by a rule document which confirms that the interim rule is final and may include further amendments. You may request comments in an interim rule and address the comments received in the final rule that adopts the interim rule as final. Or, based on the comments, you may decide to keep the interim rule effective while going through proposed rulemaking. If an interim rule is in effect as of the revision date of the CFR Title it amends, we will include it in the CFR.

Example 80: Interim rule adopted as final without change.

PART 78 -- BRUCELLOSIS

Accordingly, the interim rule amending 9 CFR part 78 which was published at 6x FR 12345 on February 11, 199x, is adopted as a final rule without change.

Example 81: Interim rule adopted as final with change.

Accordingly, the interim rule amending 9 CFR part 51 which was published at 6x FR 12345 on November 26, 199x, is adopted as a final rule with the following change:

PART 51 -- ANIMALS DESTROYED BECAUSE OF BRUCELLOSIS

1. The authority citation for part 51 continues to read as follows:

Authority: 42 U.S.C. 594.

2. Amend §51.9 by revising paragraph (h) to read as follows:

§51.9 Claims not allowed.

* * * * *

(h) In the opinion of the Veterinarian in charge, a brucellosis reactor animal may remain in the herd if a reasonable search has been made for the brucellosis reactor animal and the brucellosis reactor animal could not be found and removed.

2-57

C0010628

## 2.21 Direct final rule.

A direct final rule is not preceded by a proposed rule. It may be used for routine and noncontroversial regulations that your agency believes will not generate adverse comment. A direct final rule becomes effective on a specific future date, unless adverse comment is received on the rule within a specified comment period before that date. If adverse comment is received, your agency withdraws the rule before its effective date.

A confirmation document is optional. If you receive no adverse comment, your agency is not required to confirm the effective date of the direct final rule, unless you stated in the rule that you would follow-up with a confirmation document.

**Special requirements.** In addition to the general requirements for rule documents, some special requirements apply. You must:

- Provide both an effective date and a comment date.
- Explain that the rule is conditional on the nonreceipt of adverse comments.
- State that if your agency does receive adverse comments, it will publish a timely *Federal Register* document that withdraws the rule.
- Provide an address for comments.

See example 82 for a recommended DATES caption in a direct final rule.

Example 82: DATES caption in a direct final rule.

```
DATES: This rule is effective [INSERT DATE 90 DAYS AFTER DATE OF
PUBLICATION IN THE FEDERAL REGISTER] without further action, unless
adverse comment is received by [INSERT DATE 30 DAYS AFTER DATE OF
PUBLICATION IN THE FEDERAL REGISTER]. If adverse comment is received,
[YOUR AGENCY] will publish a timely withdrawal of the rule in the
Federal Register.
```

**Withdrawal of a direct final rule.** A "timely withdrawal" means that your agency commits to publish a document in the Rules category of the *Federal Register* withdrawing the direct final rule **on or before** its effective date. If you fail to withdraw the rule by its effective date, you must amend the CFR to restore the previous regulatory text or remove any text added by the direct final rule.

Allow enough time between the close of the comment period and the rule's effective date to prepare and publish a withdrawal document, if one is needed. We recommend you allow at least 60 days between the close of the comment period and the effective date.
Withdraw the **entire** rule if a withdrawal is necessary. Withdrawing only a portion can be confusing to the regulated public. If partial withdrawal is essential, you may only withdraw text that was to be added -- at the CFR paragraph level or higher -- or an entire amendatory instruction and the text that follows it.

C0010629

If you must withdraw a direct final rule, you may issue another direct final rule, or a separate proposed rule document, on the same subject.

You may publish a companion proposed rule document in the same issue of the *Federal Register* as the direct final rule. Then, if you withdraw the direct final rule, that proposed rule can be the prerequisite for a regular final rule. This technique may minimize delays in establishing a final effective date.

Example 83: DATES caption in a withdrawal of a direct final rule.

DATES: The direct final rule published at 6x FR 12345, May 15, 199x is withdrawn, effective [SPECIFY A DATE ON OR BEFORE THE EFFECTIVE DATE OF THE DIRECT FINAL RULE].

C0010630

## 2.22 Checklist for rule documents.

Use the following checklist to review your rule document before you submit it to us:

**Billing code.** Is the billing code at the top of the first page in the right-hand corner? (See sections 2.3, 2.18, and 2.19.)

**Headings.** Are the correct headings used? (See section 2.4.)

**Preamble.** Are all required elements of the preamble included? Does the SUMMARY answer all three questions? (See section 2.5.)

**List of subjects.** Are subject terms listed for each CFR part affected? Are they placed at the end of the preamble? (See section 2.6.)

**Words of issuance.** Have you provided a link between the preamble and the regulatory text? Do not use "proposed" in a rule document's words of issuance . (See section 2.7)

**Authority citation.** Is the authority citation correctly placed in the document? ( See section 211.)

**Amendatory language.** (See section 2.13.)
- Does it specify the exact CFR unit being changed?
- Does it use the correct terms?

**Table of contents.** Is the table of contents included for each subpart or part being set out in full? (See section 2.10.) Do entries agree with the regulatory text?

**Paragraphs.** Are all paragraphs of regulatory text indented and lettered or numbered correctly? (See section 2.12.)

**Asterisks.** Have you set out section headings and asterisks for partial section amendments? (See section 1.14)

**Cross-references.** (See section 2.15.)
- Is the correct style used?
- Do references meet our criteria?

**Tables and illustrations.** (See chapter 7)
- Are they placed exactly where they are to be printed?
- Are they completely legible?
- Are charts and maps of photographic quality?

C0010631

**OMB Control Number.** If included with the regulatory text, is it placed properly and in the correct style? (See section 8.19.)

**Signature and title.** (See section 2.16.)

- Is the original signature (handwritten in ink) included on the document? (One person may not sign for another or initial a signature.)
- Is the signer's name and title typed beneath the signature?
- If a signature date is given, is it correct?

**Quality.** (See section 2.18.)

- Are original(s) and certified copies legible?
- Is the document free of correction or adhesive tape?
- Are ink changes printed, dated, and initialed on all three copies? (See chapter 4.)
- Is the document double-spaced?

**Page numbers.** Are all pages numbered consecutively? (See section 2.18.)

**Matching copies and certification.** (See sections 2.18 and 8.5.)

- Are the original and two copies identical? Are all pages included?
- Are the copies properly signed or certified?

**Disks.** (See chapter 5.) If you have included a disk with your document:

- Is every document on a separate disk?
- Is the file on the disk identical to the signed original document?
- Did you include the verification/certification letter, stating that the file and document are identical?
- Is your document the only file on the disk?
- Did you save the file to the disk in ASCII or WordPerfect 6.1 format?
- Does the disk have a label that identifies your agency, the document's subject, the file name, and file format?
- Is the disk virus-free?
- Are the file and disk free of password protection or other security measures?

C0010632

# Federal Register Document Drafting Handbook

October 1998 Revision

## Chapter 3: How do I write a document for the notices category?

3.1 What types of documents go in the notices category?  . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-3

3.2 What are the requirements for a document in the notices category?  . . . . . . . . . . . . . . . .  3-3

*Billing Code*

3.3 What is a billing code and how do I get one?  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-3

*Headings*

3.4 What information should I include in the headings section of my notice?  . . . . . . . . . . . . .  3-4

*Authority Citation*

3.5 Must I cite the authority that authorizes my agency to issue a notice?  . . . . . . . . . . . . . . .  3-5

*Text*

3.6 Must I use the preamble format in my notice document?  . . . . . . . . . . . . . . . . . . . . . . . .  3-7
- AGENCY caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-7
- ACTION caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-8
- SUMMARY caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-8
- DATES caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-9
- ADDRESSES caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-10
- FOR FURTHER INFORMATION CONTACT caption . . . . . . . . . . . . . . . . . . . . . . . .  3-12
- SUPPLEMENTARY INFORMATION caption  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-12

*Signature Block*

3.7 Who can sign my document? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-13

3.8 Do I need a signature date? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3-14

C0010633

*Style and Format Requirements*

3.9 What should my notice document look like? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-15

3.10 Example of a notice document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-19

*Sunshine Act Meetings and Privacy Act Documents*

3.11 Sunshine Act meetings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-21

3.12 Privacy Act documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-23

*Checklist for Notice Documents*

3.13 Checklist for notice documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-24

C0010634

# Chapter 3: How do I write a document for the notices category?

**Notes:** In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration, and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this chapter as models for style, not content. Although many of these are single-spaced for visual impact, you must double-space your document.

## 3.1 What types of documents go in the notices category?

Use the notices category to provide information of public interest.

This category contains documents that do not have regulatory text, do not impose requirements with general applicability and legal effect, and do not affect a rulemaking proceeding. Some notices are required to be published by law.

Typical notice documents announce:
- Meetings.
- Availability of applications.
- Issuance or revocation of a license.
- Grant application deadlines.
- Availability of certain environmental impact statements.
- Certain petitions.
- Orders or decisions affecting named parties.

## 3.2 What are the requirements for a document in the notices category?

A document published in the notices category should include the following items:

- Billing Code.
- Headings.
- Authority Citation.
- Text.
- Signature Block.

*Billing Code*

## 3.3 What is a billing code and how do I get one?

The Government Printing Office (GPO) assigns each agency that publishes in the *Federal Register* a billing code which GPO uses to bill your agency for printing costs. Your agency must identify an individual as your Printing Officer, the liaison between your agency and GPO for all billing matters. GPO gives your Printing Officer the billing code for your agency.

C0010635

Your billing code must appear on each document submitted for publication in the *Federal Register.*

- Obtain your billing code from your agency Printing Officer.
- Type the billing code at the top of the first page of the original(s) and the certified copies of each document.
- Type a "P" (WordPerfect), "F" (Coded), or "U" (Uncoded or ASCII) after your billing code when submitting a disk with your document. (See chapter 5.)
- Remember that your billing code may change each year.

## *Headings*

### 3.4 What information should I include in the headings section of my notice?

Begin each notice document with headings that identify your agency and the subject matter of the document. Present headings for a notice document in this format.

- Department Name.
- Subagency Name.
- Agency Docket Number (optional).
- Subject Heading.

**or**

- Agency Name.
- Agency Docket Number (optional).
- Subject Heading.

The "Department" and "Subagency" headings for a document reflect the names of the issuing agency.

If your agency is a cabinet-level department, the subordinate agency is the Subagency heading. If your agency is not a cabinet-level department, you do not need a Subagency heading.

The "Agency Docket Number" heading is the internal file number your agency may assign. This heading is optional.

The "Subject Heading" is a brief statement describing the contents of the document.

C0010636

Example 1: Headings for a notice document from a cabinet–level department.

DEPARTMENT OF AGRICULTURE                          Department Name

Food Safety and Inspection Service                 Subagency Name

[Docket No. 85–008N]                               Agency Docket Number
                                                   (optional)

Transportation Accidents                           Subject Heading

Example 2: Headings for a notice document from a non cabinet–level agency

FEDERAL RESERVE SYSTEM                             Agency Name

[No. 85–959]                                       Agency Docket Number
                                                   (optional)

ABC Corporation                                    Subject Heading

If you issue a follow-up document, duplicate the headings of the earlier document, and add a distinguishing phrase to the subject heading.

Example 3: Headings for a follow-up notice.

FEDERAL RESERVE SYSTEM                             Agency Name

[No. 85–959]                                       Agency Docket Number
                                                   (optional)

ABC Corporation; Additional Filings               Subject Heading

## *Authority Citation*

### 3.5 Must I cite the authority that authorizes my agency to issue a notice?

You must cite the authority that authorizes your agency to issue your notice.

There are two types of authority:

- Statutory:
  - Public Law.
  - United States Code.
- Nonstatutory:
  - Presidential Executive order.
  - Presidential Administrative order.
  - Presidential Memorandum.
  - Agency delegation, policy, or directive.
  - Office of Management and Budget circular.

3-5

C0010637

- CFR regulations.

Give the authority citation in the shortest form. The authority citation may appear within the notice or in a parentheses on a separate line at the end of the notice before the signature block.

**Statutory authority.** For notices **only**, you may cite a public law, popular law name, or the U.S. Statutes at Large.

Each citation of statutory authority must use the United States Code citation, if one exists. To determine the United States Code citation, use one of the following:

- The current edition of the United States Code or its supplement.
- The slip law, for recently signed public laws.

Example 4.

    Authority: 44 U.S.C. 2101–2118; 50 U.S.C. 6909.

We generally recommend that you use only the United States Code citation. (See example 4.). When a United States Code citation does not exist (for example, for appropriations laws), you must cite the section of the public law, if appropriate, the public law, and the U.S. Statutes at Large. (See example 5.)

Example 5.

    Authority: Sec. 8067, Pub. L. 98–473, 98 Stat. 1937.

If you choose to cite the public law and the U.S. Statutes at Large in addition to the United States Code, present them in the order shown in example 6.

Example 6.

    Authority: Sec. 8, Pub. L. 98–328, 82 Stat. 470 (34 U.S.C. 21).

If you cite two different laws where one has a United States Code citation and the other does not, place the United States Code citation first. (See example 7.)

Example 7.

    Authority: 42 U.S.C. 2996; Pub. L. 104–208, 110 Stat. 3009; Pub. L. 104–
    134, 110 Stat. 1321.

**Nonstatutory authority.** Cite nonstatutory authority by document designation, *Federal Register* citation, and CFR citation. (See example 8.)

3-6

C0010638

Example 8.

```
(Authority: E.O. 12731, 55 FR 42547, 3 CFR, 1990 Comp., p. 306; 5 CFR
2635.105)
```

If you include statutory and nonstatutory citations in the same authority citation, place the statutory citation first. (See example 9.)

Example 9.

```
(Authority: 8 U.S.C. 1161(f); 29 U.S.C. 1801-1872; Secretary's Order
6-84, 49 FR 32473)
```

## *Text*

### 3.6 Must I use the preamble format in my notice document?

You may present the text of your notice document in any organized and logical format. Your use of our preamble format to present the text of a notice is optional. However, we recommend that you use the following preamble format.

- AGENCY:
- ACTION:
- SUMMARY:
- DATES:
- ADDRESSES:
- FOR FURTHER INFORMATION CONTACT:
- SUPPLEMENTARY INFORMATION:

If you use the preamble captions, follow the order shown. You may omit preamble captions which are not applicable. Present the remaining captions in the proper sequence. Do not create new captions. Place material not identified by the existing captions in the SUPPLEMENTARY INFORMATION section. An explanation and examples of what must appear within each caption follow:

### AGENCY caption.

The AGENCY caption states the "who" of a document by identifying the agency issuing it.

This caption usually repeats the name of the agency as carried in the document's headings. When the name of a subagency and Cabinet-level department appear together, carry the subagency name first and then the department's commonly used acronym or shortened name. For organizational clarity, you may choose to include in this caption the name of an office which is not listed in the document's headings.

Example 10.

3-7

C0010639

AGENCY: Office of the Secretary, USDA.
AGENCY: National Archives and Records Administration.
AGENCY: Consumer Product Safety Commission.
AGENCY: Environmental Protection Agency.
AGENCY: National Park Service, Interior.
AGENCY: Bureau of Public Debt, Fiscal Service, Treasury.

## ACTION caption.

The ACTION caption identifies the type of document. It does not summarize the substance of a document.

The following examples represent typical captions for a notice document. Others are possible.

Example 11.

ACTION: Notice.
ACTION: Announcement of meeting.
ACTION: Availability of survey.
ACTION: Solicitation of applications.

## SUMMARY caption.

Under the SUMMARY caption you explain the "what," "why," and "effect" of the document.

In the SUMMARY, you should answer these three questions.

- What action is being taken?
- Why is this action necessary?
- What is the intended effect of this action?

Use the following guidelines in preparing a SUMMARY.

- Use language a non-expert will understand.
- Refer to an act of Congress by the popular name of the act.
- Do not use legal citations.
- State what your document does; do not include extensive background.
- Do not include qualifications, exceptions, or specific details.
- Be brief.

You may not use the SUMMARY to prove a point or argue a case. Supporting information, details, discussions, and precise legal citations do not belong in the SUMMARY. Extended discussion of the notice document belongs in the SUPPLEMENTARY INFORMATION section.

## DATES caption.

The DATES caption presents the "when" of a document. Include the dates that are essential to the document.

3-8

C0010640

Include the following dates, when appropriate:

- Comment deadlines.
- Extension of comment deadlines.
- Request for a hearing (or meeting) deadline.
- Public hearing (or meeting) dates.
- Other dates the public may need to know.

OFR computes and inserts dates tied to *Federal Register* publication or OFR filing using the "Table of Effective Dates and Time Periods." This table appears in the Reader Aids section of the first *Federal Register* issue each month. In computing the date, we count the day after publication as the first day. When a date falls on a weekend or a Federal holiday, we use the next Federal business day. If we are to compute and insert a date, present the date as shown in example 12. We compute dates based **only** on OFR filing or publication in the *Federal Register*.

Example 12.

DATES: Submit comments on or before [INSERT DATE 60 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Example 13.

DATES: The agency must receive comments on or before [INSERT DATE 30 DAYS AFTER DATE OF PUBLICATION IN THE FEDERAL REGISTER].

Place no more than four dates under the caption "DATES."

Example 14: Format in notice with four dates.

DATES: The meeting dates are:

1. March 26, 199x, 9:30 a.m. to 5 p.m., Philadelphia, PA.
2. April 3, 199x, 9:30 a.m. to 5 p.m., Chicago, IL.
3. April 8, 199x, 9:30 a.m. to 5 p.m., Atlanta, GA.
4. April 15, 199x, 9:30 a.m. to 5 p.m., Denver, CO.

If you have more than four dates, place them in the SUPPLEMENTARY INFORMATION section of the preamble under a heading such as "Meetings".

Example 15.

DATES: See Supplementary Information section for meeting dates.

Do not include information other than dates in the DATES caption. Place any discussion of meeting agenda, content of material available for inspection, etc. in the SUPPLEMENTARY INFORMATION section.

C0010641

Remember that DATES and ADDRESSES are separate captions. All date information should appear in the DATES caption.

## ADDRESSES caption.

The ADDRESSES caption contains the "where" of the document. Include any address that the public needs to know. You may include addresses for:

- Mailing public comments.
- Hand-delivering public comments.
- Attending a public hearing (or meeting).
- Examining any material available for public inspection.

Do not include information other than addresses in the ADDRESSES caption. Place any discussion of how to submit comments, how to register for a meeting, meeting agenda, content of material available for inspection, etc. in the SUPPLEMENTARY INFORMATION section. If you are accepting electronic comments, place electronic addresses in the ADDRESSES section, and detailed requirements in the SUPPLEMENTARY INFORMATION section. (See examples 20 and 21.)

Place no more than four addresses under the caption "ADDRESSES."

Example 16: Format in notice with four addresses.

ADDRESSES: The meeting locations are:

1. Philadelphia -- Ramada Inn (Meadows Ballroom, Section A & B), 76 Industrial Highway, Essington, PA 19029.

2. Chicago -- O'Hare Ramada Inn (Penthouse Ballroom, 9th Floor), 6600 Mannheim Road, Des Plaines, IL 60018.

3. Atlanta -- Ramada Inn Central (Georgian Ballroom), I-85 at Monroe Drive, Atlanta, GA 30324.

4. Denver -- Main Post Office Bldg. (2nd Floor Auditorium, Room 269), 1823 Stout Street, Denver, CO 80202.

If you have more than four addresses, place them in the SUPPLEMENTARY INFORMATION section of the preamble under a heading such as "Meetings."

Example 17.

ADDRESSES: See Supplementary Information section for meeting addresses.

Remember that ADDRESSES and DATES are separate captions. All address information must appear in the ADDRESSES caption.

C0010642

Example 18.

ADDRESSES: Address all comments concerning this notice to Nell C.
Carney, Commissioner, Rehabilitation Services Administration, Mary E.
Switzer Building, Room 3325, 330 C Street SW., Washington, DC
20202-2735.

Example 19.

ADDRESSES: Mail comments and requests to participate to Meeting Clerk,
Room 000, Department of XXXXX, Washington, DC 20000; the meeting will be
held in Room 000, 000 Independence Avenue, SW., Washington, DC.

Place detailed information about electronic access and filing in the SUPPLEMENTARY
INFORMATION section of the preamble under a heading such as "Electronic Access and Filing
Addresses."

Example 20.

ADDRESSES: Submit electronic comments and other data to
oppdocket@epamail.epa.gov. See SUPPLEMENTARY INFORMATION for file
formats and other information about electronic filing.

Example 21.

SUPPLEMENTARY INFORMATION:

* * * * *                                      [Asterisks Indicate Text Not Reprinted.]

Electronic Access and Filing Addresses

You may submit comments and data by sending electronic mail (e-mail)
to: oppdocket@epamail.epa.gov

Submit comments as an ASCII file avoiding the use of special
characters and any form of encryption. The OPP also accepts comments and
data on disks in WordPerfect 5.1 file format or ASCII file format.
Identify all comments and data in electronic form by the docket number
[PP 4F4327/R2253]. You may file electronic comments on this notice
online at many Federal Depository Libraries.

File an electronic copy of objections and hearing requests with the
Hearing Clerk at: oppdocket@epamail.epa.gov

## FOR FURTHER INFORMATION CONTACT caption.

Under the FOR FURTHER INFORMATION CONTACT caption, you should include the name
and telephone number of a person within your agency who can answer questions about the
document. You may list two or more persons to contact concerning different aspects of a
document.

3-11

C0010643

Example 22.

FOR FURTHER INFORMATION CONTACT: John Noticewriter, 202-000-0000.

**or**

FOR FURTHER INFORMATION CONTACT:

Technical Information: John Noticewriter, 202-000-0000.

Logistical Information: Mary B. Helpful, 202-000-0001.

## SUPPLEMENTARY INFORMATION caption.

In this section, include background information and necessary details in language easily
understood by the reader. Use descriptive headings to highlight topics or organize text. If a
reference to the *Federal Register* or Code of Federal Regulations is necessary, use the format
shown in examples 28 and 29.

You may use the SUPPLEMENTARY INFORMATION section to provide additional
information to satisfy law, agency policy, or Executive order.

C0010644

*Signature Block*

## 3.7 Who can sign my document?

Your agency determines who may sign a document submitted for publication in the *Federal Register.*

The signer must sign in ink. (See section 8.5.) We recommend that the signer use blue ink. A signature in black ink is often difficult to distinguish from a photocopy.

Type the name and title of the person signing the document directly beneath the handwritten signature. (See example 23.)

When a person signs a document for another person, type the name and title of the person who actually signs the document beneath the signature. (See example 24.)

We will reject a document signed by one person for another. We will not accept your document if you sign someone else's name and you place your initials by the signature.

    Example 23.

       *Cynthia James*
       Cynthia James,
       <u>Director</u>.

    Example 24.

       *Thomas Shadwell*
       Thomas Shadwell,
       <u>Deputy Director</u>.

or

       *Thomas Shadwell*
       Thomas Shadwell,
       <u>Acting Director</u>.

Do not place a signature block on a page by itself. Placing text on the signature page helps to ensure the integrity of the document.

C0010645

Place the signature block either at the end of the document (See example 25.) or between the preamble and the rest of the document. (See example 26.)

Example 25.

    Preamble
    Text
    Signature

Example 26.

    Preamble
    Signature
    Text

## 3.8 Do I need a signature date?

We recommend but do not require a signature date. When you furnish one, use the date of actual signature. We will not accept a postdated signature or change a signature date. If there is a problem with a signature date, we will return your document to your Liaison Officer.

3-14

C0010646

*Style and Format Requirements*

### 3.9 What should my notice document look like?



3-15

C0010647

**Capitals.** Type in all capital letters:

- The name of the agency or cabinet-level department (but not the name of the subagency) in the heading of a document.
- "FEDERAL REGISTER" in the parenthetical for dates that we are to compute.
- Preamble captions.

Example 27.

AGENCY:
ACTION:
SUMMARY:
DATES:
ADDRESSES:
FOR FURTHER INFORMATION CONTACT:
SUPPLEMENTARY INFORMATION:

**Copies.** Provide legible copies.

**Correction or adhesive tape.** Do not use correction or adhesive tape.

**Double-spacing.** Type the text of your document double-spaced.

**Headings.** Type document headings centered or flush with the left margin.

**Margins**

- One inch at the top, bottom, and right side.
- One and one-half inches on the left side.

**Page numbers.** Number the pages consecutively in one of the following places:

- Centered top.
- Centered bottom.
- Upper right-hand corner.

**Paper.** You must prepare your documents on $8\frac{1}{2}" \times 11"$ white paper.

**Quotation marks.** Use quotation marks for names of books, journals, articles, and similar items.

**Quoted material.** Type quoted material:

- Single-spaced.
- Centered-block style.
- Without quotation marks.

**Single-sided copy.** You must type your document on one side only.

C0010648

**Single-spacing.** Type the following single-spaced:

- Quoted material.
- Footnotes.
- Tables of contents.
- Examples.
- Tables.
- Notes to tables.
- Notes.
- Formulas.
- Authority citations.

**Underlining.** Underlining instructs the printer to present material in italics. Use underlining for:

- Definitions (underline only the terms).
- Scientific terms.
- Ordering statements.
- Court cases.
- <u>Federal Register</u>, when referring to the name of the publication (except type in all capital letters in the parenthetical for dates that we are to compute).

Do not use underlining for:

- Emphasis.
- Names of books.
- Foreign phrases.

## Abbreviations.

Use the following abbreviations in the *Federal Register*:

- FR is Federal Register. Do not use Fed. Reg. or F.R. (See example 28.)
- CFR is Code of Federal Regulations. Do not use C.F.R. (See example 29.)
- U.S.C. is United States Code.
- Pub. L. is public law. (Do not use P.L.)
- Stat. is U.S. Statutes at Large.
- a.m. or p.m. is time designation.
- E.O. is Executive order.
- Proc. is Proclamation.
- sec. is section of a public law or the United States Code.

Use the abbreviations for "Pub. L.", "E.O.", and "Proc." only in the authority citation. All other times you must spell them out. (See examples 6 and 8.)

C0010649

### § Symbol.

Use the § symbol only for a CFR section and §§ symbol only for multiple sections. However, do not use a § symbol to begin a sentence; instead, spell out the word. Do not use the § symbol or the word "section" when the reference follows a title number and CFR as in 36 CFR 1200.1.

### Style.

Use the "U.S. Government Printing Office Style Manual" as a guide for punctuation, capitalization, spelling, compounding, and other style matters. You may obtain the GPO Style Manual from the Superintendent of Documents, Government Printing Office.

### References.

If your document relates to a previously published *Federal Register* document, you must cite the earlier document. A reference in a notice document to a previously published *Federal Register* document must identify the volume number, page number, and date of the issue in which the document appeared. (See example 28.)

> Example 28. Reference to a previously published *Federal Register* document.
>
> 6x FR 12345, Jul. 23, 199x

A reference in a notice document to material contained in the CFR should identify the CFR title and part or section number. (See example 29.)

> Example 29. Reference to material contained in the CFR.
>
> 36 CFR part 1200
> 36 CFR 1200.1

3-18

C0010650

## 3.10 Example of a notice document.

---

7515-01

NATIONAL ARCHIVES AND RECORDS ADMINISTRATION

Public Meeting With Interested Vendors for Ordering
Reproductions of Still Photographs, Aerial Film, Maps, and
Drawings

AGENCY: National Archives and Records Administration.

ACTION: Notice of meeting.

SUMMARY: The National Archives and Records Administration (NARA)
will hold a meeting to discuss the continued privatization of
reproduction services for still pictures, aerial film, maps, and
drawings. On March 6, 199x, NARA began a test phase of new
procedures for the delivery of reproduction services for records
which NARA customers request from the Still Picture Branch,
the Cartographic and Architectural Branch, and the Nixon
Presidential Materials Staff. The National Archives and
Records Administration permitted vendors to set up work
stations in College Park, MD, where the still photographs,
cartographic, and architectural records are housed and made
available. The three units referred customer requests for
reproduction of these media to the vendors, who determined fees,
collected payments, performed the copying work, and mailed the
reproductions to the customers. The purpose of this one-year

1

---

3-19

C0010651

trial program was to: verify the degree to which the
privatization of the reproduction order fulfillments could
improve customer service; and ascertain the extent
to which digital scanning can satisfy requirements from
NARA's customers. The program is extended for one more year,
with some changes. All vendors interested in the program,
including vendors already participating, are invited to attend
the next scheduled meeting. A follow-up meeting has also been
scheduled to answer any remaining questions from possible
vendors, and to distribute copies of the memorandum of
agreement.

DATES: The meeting will be held on Wednesday, January 24, 199x,
at 2 p.m. The follow-up meeting will be held on Thursday,
February 15, 199x, at 2 p.m.

ADDRESSES: The meetings will be held in Archives II, Lecture
Rooms D and E, located at 8601 Adelphi Road, College Park, MD.

FOR FURTHER INFORMATION CONTACT: Michael Meetings, 301-000-0000.

Dated: January 2, 199x.

*Signature*

Type name,
Title.

2

3-20

C0010652

*Sunshine Act Meetings and Privacy Act Documents*

## 3.11 Sunshine Act meetings.

The Government in the Sunshine Act requires certain agencies to publish notices of meetings (See Appendix C). The law requires that these notices be publicly announced one week prior to the meeting and submitted immediately for publication in the *Federal Register.* To speed publication, we have developed standard formats for Sunshine Act documents.

Sunshine Act documents received before 4 p.m. are published on a 2-day publication schedule and Sunshine Act documents received after 4 p.m. are placed on a 3-day publication schedule.

> Format 1 -- Announces a meeting either completely open
> or completely closed to the public.
>
> Billing Code
> [NAME OF YOUR AGENCY]
> Sunshine Act Meetings
> TIME AND DATE:
> PLACE:
> STATUS:
> MATTERS TO BE CONSIDERED:
> CONTACT PERSON FOR MORE INFORMATION:
> [SIGN]
> Type name,
> Title.

C0010653

Format 2 -- Announces a meeting that is partially open
and partially closed to the public.

Billing Code

[NAME OF YOUR AGENCY]

Sunshine Act Meetings

TIME AND DATE:

PLACE:

STATUS: Parts of this meeting will be open to the public. The rest of
the meeting will be closed to the public.

MATTERS TO BE CONSIDERED:

PORTIONS OPEN TO THE PUBLIC:

PORTIONS CLOSED TO THE PUBLIC:

CONTACT PERSON FOR MORE INFORMATION:

[SIGN]

Type name,

Title.


Format 3 -- Announces a change to a previously
announced meeting.

Billing Code

[NAME OF YOUR AGENCY]

Sunshine Act Meetings

FEDERAL REGISTER CITATION OF PREVIOUS ANNOUNCEMENT:

PREVIOUSLY ANNOUNCED TIME AND DATE OF THE MEETING:

CHANGES IN THE MEETING:

CONTACT PERSON FOR MORE INFORMATION:

[SIGN]

Type name,

Title.

C0010654

### 3.12 Privacy Act documents.

The Privacy Act requires each agency to publish its systems of records in the *Federal Register.*
(See Appendix C.) Each system of records has specific information which we identify as data
elements. We provide a standard caption heading for each data element. Include all information
required in a system of records notice under one of these data elements. You must present the
data element as shown including capitalization and punctuation. Do not use any other data
elements. The system of records data elements follows:

[YOUR AGENCY'S UNIQUE SYSTEM NUMBER]

System name:

Security classification:

System location:

Categories of individuals covered by the system:

Categories of records in the system:

Authority for maintenance of the system:

Purpose(s):

Routine uses of records maintained in the system, including categories
of users and the purposes of such uses:

Disclosure to consumer reporting agencies:

Policies and practices for storing, retrieving, accessing, retaining,
and disposing of records in the system:

Storage:

Retrievability:

Safeguards:

Retention and disposal:

System manager(s) and address:

Notification procedure:

Record access procedures:

Contesting record procedures:

Record source categories:

Exemptions claimed for the system:

C0010655

*Checklist for notice documents*

### 3.13 Checklist for notice documents.

Use the following checklist to review your notice document before you submit it to us:

**Billing code.** Is the billing code at the top of the first page in the right-hand corner? (See sections 3.3, 3.10, and 3.11.)

**Headings.** Are the correct headings used? (See section 3.4.)

**Preamble.** Are all elements of the preamble included? Does the SUMMARY answer all three questions? (See section 3.7.)

**Authority citation.** Do you have your authority citation? (See section 3.5.)

**References.** Is the correct style used? (See section 3.10.)

**Tables and illustrations.** (See chapter 7.)

- Are they placed exactly where they are to be printed?
- Are they completely legible?
- Are charts and maps of photographic quality?

**Signature and title.** (See section 3.8.)

- Is the original signature (handwritten in ink) included on the document? (One person may not sign for another or initial a signature.)
- Is the signer's name and title typed beneath the signature?
- If signature date is given, is it correct?

**Quality.** (See section 3.10.)

- Are the original(s) and certified copies legible?
- Is the document free of correction or adhesive tape?
- Are ink changes printed, dated, and initialed on all three copies?
- Is the document double-spaced?

**Page numbers.** Are all pages numbered consecutively? (See section 3.10.)

**Matching copies and certification.** (See section 3.10.)

- Are the original(s) and two certified copies identical? Are all pages included?
- Are the copies properly signed or certified?

C0010656

**Disks.** (See chapter 5.) If you have included a disk with your document:

- Is every document on a separate disk?
- Is the file on the disk identical to the signed original document?
- Did you include the verification/certification letter, stating that the file and document are identical?
- Is your document the only file on the disk?
- Did you save the file to the disk in ASCII or WordPerfect 6.1 format?
- Does the disk have a label that identifies your agency, the document's subject, the file name, and file format?
- Is the disk virus-free?
- Are the file and disk free of password protection or other security measures?

3-25

C0010657

# Federal Register Document Drafting Handbook

October 1998 Revision

## Chapter 4: How do I correct my document?

*Correcting a Document Before Publication*

4.1 Correcting a document before submission  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-1
4.2 Correcting a document after submission but before publication  . . . . . . . . . . . . . . . . . . .  4-1
4.3 Withdrawing a document from publication . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-2

*Correcting a Document After Publication*

4.4 OFR corrections to a published document  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-3
4.5 Agency corrections to a published document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-3
4.6 Corrections to a rule  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-4
4.7 Corrections to a proposed rule . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-8
4.8 Corrections to a notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4-10

**Notes:** In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration, and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this chapter as models for style, not content. Although many of these are single-spaced for visual impact, you must double-space your document.

## *Correcting a Document Before Publication*

### 4.1 Correcting a document before submission.

If you find an error before you submit your document to the OFR, you or your agency's Federal Register Liaison Officer may make a legible ink change to the document. Write your initials and the date in the right-hand margin where you made the change.

### 4.2 Correcting a document after submission but before publication.

If you find a substantive error in a document that you have submitted to us that is not yet published, immediately contact your agency's Federal Register Liaison Officer.

**Before filing.** If we have not yet filed the document for public inspection, your Liaison Officer may make simple corrections by telephoning the OFR or by submitting corrected pages, a corrected disk, and a verification/certification letter.

C0010658

**After filing.** If we have filed the document for public inspection, your Liaison Officer may correct it **only** by submitting a letter detailing the change. (See Appendix A for a model letter.)

An official with authority to sign *Federal Register* documents or the Liaison Officer must sign this letter. It must reach the OFR **before 12 noon** of the workday before the document's scheduled publication date. The Liaison Officer must also telephone us as soon as possible to confirm that the letter has been sent.

When we receive your letter, we time-stamp it and place it on public inspection with the document it corrects. The document and letter remain on inspection until the end of the day the corrected document appears in the *Federal Register.* The OFR retains both the original document and the letter of correction.

**Extensive changes are difficult to make in the final production stages.** If you need to make extensive changes, we may withdraw the document from publication.

## 4.3 Withdrawing a document from publication.

If necessary, you may completely withdraw a document from publication. If we have not placed the document on file for public inspection, we will return it to you. If we have already placed the document on file for public inspection, we will withdraw it from publication, but the document remains on file through the originally scheduled publication date, and we cannot return it to you.

**Before filing.** If we have not yet filed the document for public inspection, your Liaison Officer may telephone the OFR during regular office hours (8:45 a.m. to 5:15 p.m. ET) to request that we withdraw the document from publication.

The Liaison Officer must follow up immediately with a letter requesting the withdrawal and telling us how to return the document to you. (See Appendix A for a model letter.) An official with authority to sign Federal Register documents or the Liaison Officer must sign this letter.

We will not withdraw the document until we receive your letter.

**After filing.** If we have filed the document for public inspection, your Liaison Officer may withdraw it from publication only by submitting a letter requesting the withdrawal. (See Appendix A for a model letter.) An official with authority to sign Federal Register documents or the Liaison Officer must sign this letter. The Liaison Officer must also telephone us as soon as possible to confirm that the letter has been sent.

The letter must reach the OFR during regular office hours (8:45 a.m. to 5:15 p.m. ET) **before noon** on the workday **before** the document's scheduled publication date. We will not withdraw the document until we receive your letter.

C0010659

When we receive your letter, we time-stamp it and place it on public inspection with the document it withdraws. The document and letter remain on inspection until the end of the day on which the document was originally scheduled to publish. The OFR retains both the original document and the letter of withdrawal.

If you decide to publish the document on a later date, you must submit a new document for publication (original and certified copies or duplicate originals).

## *Correcting a Document After Publication*

### 4.4 OFR corrections to a published document.

As soon as possible after publication, proofread the published document against a copy of the document that you submitted.

If you find a significant printing error, your Liaison Officer must call us to arrange for a correction. We will prepare and publish a correction that conforms to your original document. We use a unique correction format and place our corrections in a separate section of the *Federal Register* to reduce confusion. **Do not use the OFR format to prepare your agency's corrections.**

### 4.5 Agency corrections to a published document.

As soon as possible after publication, proofread the published document against a copy of the document that you submitted.

If you find an error in your original document, you must issue a signed document correcting the error. Use the format appropriate for the section of the *Federal Register* where the original document appeared. **Do not use the OFR format to prepare your agency's corrections.**

C0010660

### 4.6 Corrections to a rule.

**Nonsubstantive errors.** If you discover obvious misspellings or other **nonsubstantive** errors in CFR text as set out in a rule document, your Liaison Officer should contact our Code of Federal Regulations unit. We sometimes make these corrections in the next edition of the CFR without requiring a *Federal Register* correction.

**Substantive errors.** You must publish a document in the *Federal Register* to correct substantive errors in your original document. A document that corrects a previously published rule must:

- Repeat the agency headings of the document being corrected.
- Carry a CFR heading for only the CFR parts affected by the correction (list all CFR parts if the preamble is corrected).
- Repeat the subject heading of the document being corrected with a semicolon and the word "Correction" added at the end.
- Follow the preamble requirements for a rule. The effective date for a rule correction may not be earlier than the effective date of the rule you are correcting.
- Cite the *Federal Register* date, page, column, CFR section, paragraph, and line or sentence in the correcting instruction.
- Present a correction to an entire sentence or larger unit of CFR text as an amendment. Use the amendatory term "correct," set out the section heading, and use asterisks. See sections 2.13, Amendatory Language, and 2.14, Asterisks, of this handbook.

There are two different formats for correcting regulatory text in a rule document. Both require signed documents. The format used depends on whether the revision date of the CFR volume affected has occurred since the original rule document was published.

C0010661

If the revision date of the CFR volume has not occurred since the original rule was published, use the format for corrections to the *Federal Register.*

Example 1: Corrections to the *Federal Register.*

The revision date of CFR Title 40, containing EPA Regulations, occurs on July 1. Suppose that on July 15 EPA discovers it must correct the regulatory text in a final rule that it published in the July 3 *Federal Register.* Because the CFR revision date will not occur until next July 1, the amendments made by the July 3 rule are not printed in the latest revision of 40 CFR. Therefore, EPA publishes a correction to the *Federal Register,* and uses the format in this Example 1.

6560-50

ENVIRONMENTAL PROTECTION AGENCY

40 CFR Part 799

[OPPTS-00173A; FRL-5379-5]

Technical Amendments to TSCA Regulations to Update Addresses; Correction

AGENCY: Environmental Protection Agency.

ACTION: Final rule; correction.

SUMMARY: The Environmental Protection Agency published in the <u>Federal Register</u> of July 3, 199x, a document concerning updating addresses in the Toxic Substances Control Act (TSCA) regulations. Inadvertently §799.1285 was amended. This document removes that amendment.

DATES: Effective on [INSERT DATE OF PUBLICATION IN THE FEDERAL REGISTER].

FOR FURTHER INFORMATION CONTACT: Susan Regulatory, 202-000-0000; TDD: 202-000-0001; E-mail: TSCA_Hotline@epamail.epa.gov.

SUPPLEMENTARY INFORMATION: The EPA published a document in the <u>Federal Register</u> of June 19, 199x, (xx FR 31924) removing §799.1285. In FR Doc. 9x-16287, published in the <u>Federal Register</u> of July 3, 199x, (xx FR 34462), §799.1285 was inadvertently amended. This correction removes the amendment published on July 3, 199x.

In rule FR Doc. 9x-16287 published on July 3, 199x, (xx FR 34462) make the following correction. On page 34467, in the first column, remove amendatory instruction c. and the amendment to §799.1285.

Dated: June 14, 199x.

[SIGN]

Type name,
<u>Title</u>.

If the revision date of the CFR volume has occurred since the original rule was published, use the format for correcting amendments to the CFR (sometimes called "technical amendments").

4-5

C0010662

Example 2: Correcting amendment to the CFR.

The revision date of CFR Title 26, containing IRS Regulations, occurs on April 1. Suppose that on April 15 IRS discovers it must correct the regulatory text in a final rule that it published in the March 26 *Federal Register.* Because the April 1 revision date has already occurred, the amendments made by the March 26 rule are already printed in the latest revision of 26 CFR. Therefore, IRS publishes correcting amendments to the CFR and uses the format in this Example 2.

DEPARTMENT OF THE TREASURY

Internal Revenue Service

26 CFR Part 1

[T.D. 8323]

RIN 1545-AL06

Information Reporting on Real Estate Transactions; Correction

AGENCY: Internal Revenue Service, Treasury.

ACTION: Correcting amendments.

SUMMARY: This document contains corrections to the final regulations (T.D. 12345), which were published in the Federal Register of Thursday, March 26, 199x, (xx FR 12345). The regulations related to the information reporting requirements for real estate transactions contained in section 6045(e) of the Internal Revenue Code.

DATES: Effective on January 1, 199x.

FOR FURTHER INFORMATION CONTACT: Arthur E. Tax, 202-000-0000 (not a toll-free call).

SUPPLEMENTARY INFORMATION:

Background

    The final regulations that are the subject of these corrections superseded §1.6045-3T on the effective date and affect persons required to make returns of information under section 6045(e) of the Internal Revenue Code. Section 6045(e) was added to the Internal Revenue Code by section 1521 of the Tax Reform Act of 1986 (Public Law 99-514, 100 Stat. 2746). Section 6045(e) was amended by section 1015(e) of the Technical and Miscellaneous Revenue Act of 1988 (Public Law 100-647, 102 Stat. 3342).

Need for Correction

    As published, the final regulations contain errors which may prove to be misleading and need to be clarified.

List of Subjects in 26 CFR Part 1

    Income taxes, Reporting and recordkeeping requirements.

4-6

C0010663

Accordingly, 26 CFR part 1 is corrected by making the following correcting amendments:

PART 1--INCOME TAXES

1. The authority citation for part 1 continues to read as follows:

Authority: 26 U.S.C. 7805.

2. Revise paragraph (b)(2)(ii) of §1.6045-2 to read as follows:

§1.6045-2 Furnishing statement required with respect to certain substitute payments.

* * * * *

(b) * * *

(2)* * *

(ii) Determination of whether a person is described in paragraph (b)(2)(i) of this section. The determination of whether a person is described in paragraph (b)(2)(i) of this section shall be made in the manner provided in Sec. 5f.6045-1(c)(3)(i)(B) of the Temporary Income Tax Regulations under the Tax Equity and Fiscal Responsibility Act of 1982.

* * * * *

4-7

C0010664

3. Revise paragraph (a)(4)(vii) of §1.6045-2 to read as follows:

§1.6045-2 Furnishing statement required with respect to certain substitute payments.

(a) * * *

(4) * * *

(vii) The term exempt-interest dividend means an exempt-interest dividend as defined in section 852(b)(5)(A).

* * * * *

§1.6045-4 [Corrected]

4. In §1.6045-4, paragraph (r), example (4)(i), in the first sentence, remove the figure "$20,000" and add, in its place, "$10,000".

Dated: December 14, 199x

[SIGN]

Type name,
Title.

## 4.7 Corrections to a proposed rule.

A document that corrects a previously published proposed rule must:

- Repeat the agency headings of the document being corrected.
- Carry a CFR heading for only the CFR parts affected by the correction (list all CFR parts if the preamble is corrected).
- Repeat the subject heading of the document being corrected, followed by a semicolon and the word "Correction."
- Follow the preamble requirements for a proposed rule.
- Cite the *Federal Register* date, page, column, CFR section, paragraph, and line or sentence in the correcting instruction.
- Present a correction to an entire sentence or larger unit of CFR text as an amendment. Use the amendatory term "correct," set out the section heading, and use asterisks. See sections 1.13, Amendatory Language, and 1.14, Asterisks, of this handbook.

C0010665

Example 3: Proposed rule correction.

4310-02

DEPARTMENT OF THE INTERIOR

Bureau of Indian Affairs

25 CFR Part 290

RIN 1076-AD14

Tribal Revenue Allocation Plans; Correction

AGENCY: Bureau of Indian Affairs, Interior.

ACTION: Proposed rule; correction.

SUMMARY: This document corrects the preamble to a proposed rule published in the Federal Register of June 7, 199x, regarding Tribal Revenue Allocation Plans. This correction clarifies that the proposed rule applies prospectively to plans submitted for approval from the effective date of the final rule.

FOR FURTHER INFORMATION CONTACT: Nancy Jones, 202-000-0000.

Correction

    In proposed rule FR Doc. 9x-14061, beginning on page 12345 in the issue of June 7, 199x, make the following correction, in the Supplementary Information section. On page 12346 in the 3rd column, add at the end of the second paragraph the following:

"This rule applies to Tribal Revenue Allocation Plans submitted and approved after the effective date of the final rule. You need not resubmit previously approved Tribal Revenue Allocation Plans for review and approval by the BIA. The previously approved plans remain in effect. However, submit amendments to approved Tribal Revenue Allocation Plans to the BIA for approval under the proposed regulation."

Dated: July 1, 199x.

[SIGN]

Type name,
Title.

4-9

C0010666

## 4.8 Corrections to a notice.

A correction to a notice document must:

- Repeat the agency and subject headings of the document being corrected with a semicolon and the word "Correction" at the end of the subject heading.
- Cite the *Federal Register* date, page, column, and location (paragraph, sentence, or line) in the correction instruction.

Example 4: Notice correction.

7710–12

POSTAL SERVICE

Specification for Postal Security Devices and Indicia (Postmarks); Correction

AGENCY: Postal Service.

ACTION: Notice; correction.

SUMMARY: The Postal Service published a document in the <u>Federal Register</u> of July 2, 199x, concerning request for comments on specifications for postal security devices and indicia (postmarks). The document contained incorrect dates.

FOR FURTHER INFORMATION CONTACT: John Stamp, 202–000–0000.

Correction

In the <u>Federal Register</u> of July 2, 199x, in FR Doc. 9x–12345, on page 23456, in the second column, correct the "Dates" caption to read:

DATES: Submit comments on the two specifications on or before September 30, 199x. Submit comments addressing intellectual property issues on or before August 15, 199x. A general meeting on this subject is planned for July 19, 199x, in Washington, DC. Interested parties may submit questions by July 17, 199x.

Dated: July 5, 199x.

[SIGN]

Type name,
<u>Title</u>.

4–10

C0010667

**Federal Register Document Drafting Handbook**
*January 2011 Revision*

## Chapter 5: Can I Submit a Computer File?

5.1 Can I submit a computer file for publication in the *Federal Register?* ......... 5-1

5.2 What are the requirements for submitting computer files? ....................... 5-2

    Document drafting guidelines ............................................... 5-2

    File format ............................................................. 5-2

    Billing code ........................................................... 5-3

5.3 What are the specific requirements for electronic originals? .................... 5-3

5.4 What are the specific requirements for certified electronic copies? ........... 5-4

    Verification / Certification letter ......................................... 5-4

    Type of disk .......................................................... 5-4

    Disk preparation ...................................................... 5-5

    Disk labeling ......................................................... 5-5

5.5 How do I make changes to an electronic submission? .............................. 5-5

5.6 Checklist for submitting a computer file .................................... 5-6

*Notes:* In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration (NARA) and "you" or "your" refer to federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this chapter as models for style, not content. Although many of these examples are single-spaced, you must double-space your document.

## 5.1 Can I submit a computer file for publication in the *Federal Register?*

You should submit a computer file as an electronic original document (digitally authenticated) or as an electronic certified copy on disk or CD.

Electronic originals must be digitally signed, and can be submitted via e-mail or the web. Submitting an electronic original eliminates the need for paper copies. For more information, *see section 5.3.*

Electronic certified copies, submitted on disk (CD, floppy diskette), accompany a paper original and certified paper copies. For more information, *see section 5.4.*

C0010668

**Note:** For continuity of operations purposes, including pandemic readiness, agencies should implement our currently available digital signature technology for *Federal Register* documents. The Federal Register system is a National Essential Function, which must be sustained under all conditions. Agencies should make digitally signed *Federal Register* documents a part of their daily business process to satisfy Presidential continuity directives (NSPD-51/HSPD-20).

***We will add at least one extra day to the publication schedule for documents submitted in paper-only form, to allow time for conversion to electronic form.*** Paper-only submissions qualify as technical impediments under 1 CFR 17.7 and will be processed under the deferred publication schedule. Conforming documents, submitted in paper with a certified copy on disk or sent as a digitally signed document, will continue to be published on the regular three day schedule.

## 5.2 What are the requirements for submitting computer files?

*Document drafting guidelines.*

Follow the drafting guidelines in Chapter 1, 2, or 3 of this handbook when you draft any *Federal Register* document, whether you plan to submit it on paper or as a computer file.

*File format.*

OFR accepts electronic originals or electronic certified copies in MS-Word format. We will not erase any hidden data or "scrub" your documents before they are displayed online for public inspection. Your agency is responsible for any underlying metadata in your documents before and after they arrive at the Office of the Federal Register.

Make sure that your documents do not have any comments or remaining "tracked" changes left in them from the agency editing process.  Also, you must remove or disable any macros.  We will not accept macro-enabled documents or documents with comments or remaining tracked changes for publication.

> *MS-Word.*  MS-Word is the word processing application you should use to create your document file, prepared according to your agency's requirements, with no GPO typesetting codes. The OFR can process files created from the 2003, 2007, and 2010 editions of MS-Word.  If you have a newer version of MS-Word, contact us to see if we can accept it.

> *Metadata.* Metadata is hidden information embedded in an MS-Word document and can include personal information about the author of the document.

C0010669

**Macros**. Macros are sets of computer instructions that will automatically run in MS-Word, usually used to generate or format content.

## Billing code.

For detailed information about billing codes, *see section 1.3, 2.3, or 3.3 of this handbook.* To assist GPO in billing your agency correctly, change the final letter of the billing code to reflect the document's file format. For MS-Word, use "P."

| **Example 5.1: Billing code for electronic documents.** |
| --- |
| BILLING CODE 4000-01-P |

## 5.3 What are the specific requirements for electronic originals?

You may submit electronic original documents via e-mail or the web. These must be signed with a medium assurance level digital signature certificate, cross-certified by the Federal Bridge Certification Authority. Because this electronic file is the original document, submitting in this manner eliminates the need for paper copies.

You must agree to comply with OFR's procedures for submitting electronic originals and your agency must acquire appropriate digital signature certificates. For up-to-date information, contact OFR's Technical Services Staff at (202) 741-6020.

OFR only accepts MS-Word files as digitally signed originals.

## Graphics, appendices, and annexes

If your document contains graphics, appendices, or annexes, include them in the document where they should appear in print. Do not send them as separate files in addition to your text.

C0010670

## 5.4 What are the specific requirements for certified electronic copies?

If you submit a signed paper original and two certified paper copies, you may include a certified electronic copy on CD-ROM or floppy diskette. Submitting this certified electronic copy may reduce your printing costs and promote accuracy.

Certified electronic copies must follow these requirements:

### Certification letter.

The certified electronic copy on disk should be saved from the same file used to print the signed paper original. Include a certification letter certifying that the electronic copy on disk is an identical version of the enclosed paper original. The Certifying Officer, Liaison Officer, or signer of the document may sign this letter. *(See Appendix A for a model letter.)*

*Note:* Certifying a disk as a true copy is a formal legal attestation. Certifiers must take extraordinary care to ensure that the copy on disk is exactly the same as the signed paper original. The certified copy is used as evidentiary material, both for Public Inspection and in the published edition of the *Federal Register,* and is relied upon by the regulated public. It will stand as evidence of your agency's action, unless your agency discovers and corrects discrepancies in a timely manner. If OFR finds any discrepancies in the certified disk copy prior to publication, we may immediately remove the document from production stream, and issue notice of the agency error if the document has been placed on public inspection.

### Type of disk.

### CD-ROM.

OFR accepts certified electronic copies on CD-ROM and similar optical disk formats. Finalize the CD so it can be read without proprietary software.

### High Density 3.5 Diskettes.

OFR accepts certified electronic copies on high density (HD), 3.5 inch diskettes, formatted for PC. We cannot accept double density (DD) diskettes. Use new or reformatted diskettes to ensure that we receive a readable diskette with no extra files. Scan the diskette to ensure that it is virus-free.

OFR does not accept any other type of disk, including flash drives and SD cards.

C0010671

### *Disk Preparation.*

If the document spans two or more files, merge these as a single file, in sequence to match the paper original. If files are too large to fit on floppy diskette, submit it on CD-ROM.

Submit only one document per disk. Send a separate disk and include a separate certification letter for each document.

The certified electronic copy must be the only file on the disk. Delete drafts, supporting documents, and any other files before you send the disk to OFR.

Do not submit password protected or encrypted files or files with track-changes or comments.

Do not submit files with metadata.

Do not submit macro-enabled files.

### *Disk Labeling.*

Include the following information on the label of the disk:

> Name of your agency.
>
> Name of the file on the disk.
>
> File format: MS-Word.

Subject heading, CFR citation, or agency docket number, tying it to the paper document.

---

### 5.5 How do I make changes to an electronic submission?

To correct any document, you must follow the procedures in *section 4.2*. The following requirements also apply to documents accompanied by disk submissions.

If the changes are extensive, we may require you to submit a new original document, a new certified electronic copy, and a new certification letter, or we may return your submission to you for correction and resubmission.

C0010672

Case No. 1:19-cv-01512-CMA    Document 71-17    filed 04/26/22    USDC Colorado    pg 832 of 1016

## 5.6 Checklist for Electronic Submissions

✓ Submit only one file per disk.

✓ Use a CD-ROM or High Density 3.5" diskette.

✓ If your document contains graphics, appendices, or annexes, include them in the document where they should appear in print. Do not send them as separate files in addition to your text.

✓ Do not submit a "read only" file.

✓ Do not submit a macro-enabled file.

✓ When drafting your document do not use the automatic formatting features of your word-processing program.

✓ Accept all tracked changes before submitting the electronic file.

✓ Make sure there are no comments in the file before submitting it.

✓ Take the necessary precautions regarding the metadata before submitting the file.

C0010673

**Federal Register Document Drafting Handbook**
*January 2011 Revision*

## Chapter 6: What is Incorporation by Reference, and How do I do it?

6.1 Purpose  ...................................................  6-1

6.2 Eligibility  ...............................................  6-2

6.3 How to submit a request  ..............................  6-3

6.4 Drafting requirements  .................................  6-5

6.5 Formatting your incorporation by reference  ......  6-6

6.6 Removing an incorporation by reference from the CFR  ............................  6-11

6.7 Checklist  ................................................  6-13

*Notes:* In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration (NARA), and "you" or "your" refer to federal agencies that prepare documents for publication in the *Federal Register*.

Use the examples in this chapter as models for style, not content.  Although many of these examples are single-spaced, you must double-space your document.

## 6.1 Purpose.

Incorporation by reference (IBR) allows Federal agencies to comply with the requirement to publish rules in the *Federal Register* by referring to materials already published elsewhere.  The legal effect of incorporation by reference is that the material is treated as if it were published in the *Federal Register*.  This material has the force and effect of law, just like regulations published in the CFR.  Congress authorized incorporation by reference in the Freedom of Information Act to reduce the volume of material published in the *Federal Register* and Code of Federal Regulations (CFR).  Incorporation by reference is only available if the regulations are published in the CFR.

> We encourage regulation drafters and agency liaisons to contact us as early as possible when considering using an incorporation by reference in a regulation.  Since this is a technical subject area, it sometimes creates confusion that can significantly delay IBR request review and approval of your final rule document.

C0010674

Federal Register Document Drafting Handbook
*2011 Revision*

Chapter 6: What is Incorporation by Reference, and How do I do it?

## 6.2 Eligibility.

The Director of the Federal Register decides when an agency may incorporate material by reference *in a final rule to be codified in the CFR.* The Director may approve an IBR request if the material:

Is published data, criteria, standards, specifications, techniques, illustrations, or similar material;

Is reasonably available to and usable by the class of persons affected by the publication;

Does not reduce the usefulness of the Federal Register publication system;

Benefits the Federal Government and members of affected classes; and

Substantially reduces the volume of material published in the *Federal Register.*

### *Web-based materials.*

We may, in some cases, approve web-based materials. You must clearly identify the materials, including a version number and date (when applicable). You must also provide a paper or read-only electronic copy for our records. If you want to submit an electronic copy, contact the legal staff at the OFR for the proper procedure. Finally, we encourage you to establish a means of storing and archiving the material within your agency. Web-based materials must meet all other IBR requirements.

### *Software/applications.*

We may approve open-source code for applications. You must clearly identify the version and provide us a read-only copy of the code. The application code must meet all other IBR requirements. We will not approve software in application-form.

> Please contact us as soon as possible if you are considering IBR'ing web-based materials or software/applications so that we can resolve any issues related to your IBR request.

C0010675

We will approve an agency-produced publication for IBR, only if:

> We are satisfied that it meets the requirements above and possesses other unique or highly unusual qualities; or

> It is impossible or impractical to print using the Federal Register/Code of Federal Regulations printing system.

We will **not** approve an IBR of any of the following materials;

> Material published previously in the *Federal Register;* or

> Material published in the United States Code.

## 6.3 How to submit a request.

You must request our approval for each IBR before you publish the related final rule, and you may not publish the final rule before receiving our approval. Request approval by submitting a letter to the Director of the Federal Register. *See Example 6.1.* **Make sure to use the mailing address found in the sample letter.  However, you may hand deliver or courier your IBR package to our office in Washington DC.**

Among the signatures we will accept are those from OFR liaison officers, program staff, or an agency attorney.  The request letter does not have to be signed by the head of your agency.

We must receive your request at least 20 working days before you submit the rule document to us for publication.  The 20-day period begins when we receive:

> A letter requesting approval of the incorporation;

> A copy of the material to be incorporated; and
> A copy of your *DRAFT* rule document that uses the proper language of incorporation.

***Failure to follow this procedure will delay the processing of your request.*** IBR approval requests do not qualify for expedited processing.

We will notify you of the decision to approve or disapprove an IBR request within 20 working days after you submitted the request and all required materials.

Before you submit a request, carefully review your materials to make sure they are:

> Legible;

> Complete; and

> Clearly identified by the title, date, edition, author, publisher, and identification number of the publication.

C0010676

| **Example 6.1: Incorporation by reference request.** |
| --- |

*AGENCY LETTERHEAD*

December 25, 2xxx

Raymond A. Mosley, Director
Office of the Federal Register (NF)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Mosley:

In accordance with 1 CFR part 51, we request that you approve the incorporation by reference of the material listed below into Title(s) XX of the Code of Federal Regulations (CFR).  An original copy of the material is enclosed. The following material will be referenced in [LIST EACH SECTION (including your centralized IBR section if you have one) WHERE THE MATERIAL WILL BE REFERENCED.  THIS REFERENCE SHOULD INCLUDE DETAILS TO ANY SUBPARAGRAPH LEVELS, FOR EXAMPLE 63.1234(c)(1)(ii)(B)]:

[INSERT THE NAME OF EACH STANDARD TO BE INCORPORATED INCLUDING TITLE, DATE, AUTHOR, PUBLISHER, AND IDENTIFICATION NUMBER OF THE PUBLICATION.]

We have also enclosed a draft of the final rule that incorporates the material into the CFR.

Please contact [INSERT NAME] of my staff at [TELEPHONE NUMBER] or by email at [INSERT EMAIL ADDRESS] if you have any questions.

Sincerely,

[SIGN]

Type name,
Title

C0010677

Federal Register Document Drafting Handbook
2011 Revision

Chapter 6: What is Incorporation by Reference, and How do I do it?

## 6.4 Drafting requirements.

The regulatory text in your rule must do all of the following:

Include the words "incorporation by reference."

Identify the standard and/or material to be incorporated, by title, date, edition, author, publisher, and identification number of the publication. This must EXACTLY match the title page or cover sheet of your document.

Contain statements of availability stating where:

The document can be inspected at your agency AND

Where copies can be purchased from the publisher.

Include in the statements of availability:

Agency address where the public can view the material AND

Agency phone number for questions from the public regarding the material;

Publisher address, phone number, email, and internet address

Refer to 5 U.S.C. 552(a) and include a statement that the Director of the Federal Register approves the incorporation by reference. *See Example 6.2.*

---

**Example 6.2: Incorporation by reference language.**

You must proceed in accordance with [INSERT THE NAME OF THE STANDARD AND/OR MATERIAL TO BE INCORPORATED INCLUDING TITLE, DATE, EDITION, AUTHOR, PUBLISHER, AND IDENTIFICATION NUMBER OF THE PUBLICATION]. The Director of the Federal Register approves this incorporation by reference in accordance with 5 U.S.C. 552(a) and 1 CFR part 51. You may obtain a copy from [PUBLISHER CONTACT INFORMATION]. You may inspect a copy at [AGENCY CONTACT INFORMATION] or at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030, or go to: http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.

---

C0010678

The preamble of the rule document must refer to incorporation by reference in both the DATES section and in the List of Subjects.

The DATES section must include an approval statement that indicates the effective date of the IBR as approved by the Director of the Federal Register.  It is not necessary to name each publication in the DATES section.  ***The effective date of the document and the effective date of the incorporation by reference are always the same date.***  *See Example 6.3.*

---

**Example 6.3: Preamble DATES caption language.**

DATES: This regulation is effective July 3, 200x.  The incorporation by reference of certain publications listed in the rule is approved by the Director of the Federal Register as of July 3, 200x.

---

The List of Subjects at the end of the preamble *(see section 2.6)* must include the term "Incorporation by reference."

If your agency needs to update material incorporated by reference, you must:

Publish an amendment to the CFR in the *Federal Register;*

Give the Office of the Federal Register a copy of the incorporated material, as amended or revised, for our files; and

Request an updated approval from the Director of the Federal Register in writing, in the format provided above.

If your agency removes the rule containing the IBR or the rule does not go into effect, you must notify the Director of the Federal Register in writing within 5 working days.

C0010679

Case No. 1:19-cv-01512-CMA    Document 71-17    filed 04/26/22    USDC Colorado    pg 839 of 1016

Federal Register Document Drafting Handbook
2011 Revision

Chapter 6: What is Incorporation by Reference, and How do I do it?

## 6.5 Formatting your incorporation by reference.

*One standard incorporated in one section.*

If you are incorporating a single document by reference, place the required IBR language immediately after the first reference that you make in the document.  *See Example 6.4.*

---

**Example 6.4: One standard incorporated in one section.**

**Title 33: Navigation and Navigable Waters**
PART 1 01—MARITTME SECURITY: GENERAL
Subpart C—Communication (Port—Facility—Vessel)

**§ 101.310 Additional communication devices.**

(a) *Alert Systems.* Alert systems, such as the ship security alert system required in Safety of Life at Sea ("SOLAS") Chapter XI-2, Regulation 6 may be used to augment communication and may be one of the communication methods listed in a vessel or facility security plan under part 104, 105, or 106 of this subchapter.  SOLAS Chapter XI-2, Regulation 6 (2006) is incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 5 1.  To enforce any edition other than that specified in this section, the Coast Guard must publish notice of change in the *Federal Register* and the material must be available to the public.  All approved material is available for inspection at [INSERT NAME, ADDRESS OF AGENCY, PROGRAM OFFICE OR DIVISION, AND PHONE NUMBER WHERE COPIES ARE ON FILE] and is available from the International Maritime Organization (IMO) Publications Section, 4 Albert Embankment, London SE 1 7SR, United Kingdom,  ADD PHONE  NUMBER AND WEBSITE IF AVAILABLE].  It is also available for inspection at the National Archives and Records Administration (NARA).  For information on the availability of this material at NARA, call 202-741 -6030 or go to http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.
(b) *Automated Identification Systems (AIS).*  AIS may be used to augment communication, and may be one of the communication methods listed in a vessel security plan under part 104 of this subchapter.  * * *

* *  * * *

---

C0010680

Federal Register Document Drafting Handbook
2011 Revision

Chapter 6: What is Incorporation by Reference, and How do I do it?

### *How to incorporate multiple standards.*

When you incorporate multiple standards into your document, you can include the IBR statements in any of the following ways:

> By using the format above for each document;

> By including the IBR statement for the documents in a separate paragraph or

> By including the IBR statement for the documents in a separate section (what we call a "Centralized IBR section").

### *Using a separate paragraph.*

If you decide to include the IBR statement in a separate paragraph, the paragraph must be either the first or last paragraph within the section. *See example 6.5.*

---

**Example 6.5: Multiple standards incorporated by reference in one section.**

**Title 46: Shipping**
PART 183—ELECTRICAL INSTALLATION
Subpart A—General Provisions

**§ 183.130 Alternative standards.**

(a) A vessel, other than a high speed craft, of not more than 19.8 meters *(65 feet)* in length carrying not more than 12 passengers, may comply with the following requirements instead of complying with the requirements of this part in their entirety:
(1) Section 183.420; and
(2) The following American Boat and Yacht Council (ABYC) Projects where applicable:
(i) E-8, "Alternating Current (AC) Electrical Systems on Boats;"
(ii) E-9, "Direct Current (DC) Electrical Systems on Boats;" and
(iii) A-16, "Electrical Navigation Lights."
(b) A vessel with an electrical installation operating at less than 50 volts may meet the requirements in 33 CFR 183.430 instead of those in §1 83.340 of this part.
(c) The standards required in this section are incorporated by reference into this section with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Coast Guard must publish notice of

---

C0010681

> change in the *Federal Register* and the material must be available to the
> public.  All approved material is available for inspection at [INSERT
> NAME OF AGENCY, PROGRAM OFFICE OR DIVISION, AND PHONE
> NUMBER WHERE COPIES ARE ON FILE] and is available from the
> sources indicated below. It is also available for inspection at the National
> Archives and Records Administration (NARA).  For information on the
> availability of this material at NARA, call 202-741-6030 or go to
> http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_
> locations.html.
> (1) The following standards are available from the American Boat and
> Yacht Council (ABYC), 3069 Solomons Island Rd., Edgewater, MD 21037,
> [ADD PHONE NUMBER AND WEBSITE IF AVAILABLE].
>  (i) E-8, "Alternating Current (AC) Electrical Systems on Boats" (1994).
> (ii) E-9, "Direct Current (DC) Electrical Systems on Boats" (2000).
> (iii) A-1 6, "Electrical Navigation Lights" (2001).
> (2) [Reserved]

*Using a separate section.*

If you are incorporating multiple standards by reference in a part or subpart, you can create a
separate incorporation by reference section.  A centralized IBR section allows you to publish the
standard approval language and list the publisher information only once for a group of
sections.  A centralized incorporation by reference section must:

> Contain the required approval language in the first paragraph;

> List each publisher along with its address information in "(a)" level paragraphs

> List the publisher's incorporated standards separately in "(1)" level paragraphs under
> the publisher's information paragraph.  *See example* 6.6.

> > Include all the required information about the standard; and

> > List all sections that require the use of the standard.

To help us process your request in a timely manner, your request letter should include cross
references to the subparagraph level in the section that requires the use of the standard, 40 CFR
63.17(b)(1)(iii)(A).  However, your centralized IBR section should cross reference to the
paragraph level, 40 CFR 63.17(b).

In specific sections where you require the use of the standard, add the following phrase after
the standard's title, "(incorporated by reference, see [INSERT THE CENTRALIZED IBR
SECTION NUMBER])."  The cross reference back to the centralized IBR section allows the

C0010682

reader to quickly find the approval language and information regarding the standard's publisher.

A poorly drafted centralized IBR section may create problems for you. It can be difficult to amend, especially if the centralized incorporation by reference section and the section that requires the use of the standard do not cross-reference each other.

---

**Example 6.6: Multiple standards incorporated by reference in multiple sections.**

**Title 46: Shipping**
PART 107—INSPECTION AND CERTIFICATION
Subpart B—Inspection and Certification

**§ 107.1 15 Incorporation by reference.**

(a) Certain material is incorporated by reference into this part with the approval of the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51. To enforce any edition other than that specified in this section, the Coast Guard must publish notice of change in the Federal Register and the material must be available to the public. All approved material is available for inspection at [INSERT NAME OF AGENCY, PROGRAM OFFICE OR DIVISION, AND PHONE NUMBER WHERE COPIES ARE ON FILE], and is available from the sources listed below. It is also available for inspection at the National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202-741-6030 or go to http://www.archives.gov/federal_register/code_of_federal_regulations/ibr_locations.html.
(b) The American Bureau of Shipping, ABS Plaza, 16855 Northchase Drive, Houston, TX 77060, [ADD PHONE NUMBER AND WEBSITE IF AVAILABLE].
(1) Rules for Building and Classing Mobile Offshore Drilling Units, 1978, IBR approved for § 107.205(b).
(2) U.S. Supplement to ABS Rules for Mobile Offshore Drilling Units, November 1, 1998, IBR approved for § 107.205(b).(c) The American Petroleum Institute, 1220 L Street NW., Washington, D.C. 20005-4070.
(1) API RP2D - Recommended Practice for Operation and Maintenance of Offshore Cranes, 1972 ("API RP2D"), IBR approved for § 107.259.
(2) API Spec 2C - Specification for Offshore Cranes, 1972 ("API Spec 2C"),

---

C0010683

IBR approved for § 107.309.

\* \* \* \* \*

**Title 46: Shipping**
PART 107—INSPECTION AND CERTIFICATION
Subpart B—Inspection and Certification

**§ 107.259 Crane inspection and testing.**

(a) Each crane must be inspected and tested in accordance with Section 3 of the API RP 2D (incorporated by reference, see § 107.1 15), except that the rated load test must be performed in accordance with § 107.260.
(b) The tests are witnessed and the inspections are conducted by— \* \* \*

\* \* \*

## 6.6 Removing an incorporation by reference from the CFR.

If your agency needs to remove material incorporated by reference, you must:

Notify the Director of the Federal Register in writing *(see example 6.7);* and

Provide a copy of the draft rule removing that material to the Office of the Federal Register *before* you submit the rule for publication. If you are removing material from a centralized IBR, make sure you remove the affected paragraphs from that centralized section using the correct amendatory instructions *(see example 6.8 and Chapter 2.13)*.

C0010684

Federal Register Document Drafting Handbook
*2011 Revision*

Chapter 6: What is Incorporation by Reference, and How do I do it?

---

**Example 6.7: Notification of removal of material
incorporated by reference in the CFR.**

---

*AGENCY LETTERHEAD*

December 25, 2xxx

Raymond A. Mosley, Director
Office of the Federal Register (NF)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Mosley:

In accordance with 1 CFR 51.11, we are removing the standards listed
below from the following CFR sections [LIST EACH SECTION WHERE
THE MATERIAL IS CURRENTLY REFERENCED.  THIS REFERENCE
SHOULD INCLUDE DETAILS TO ANY SUBPARAGRAPH LEVELS,FOR
EXAMPLE 63.1234(c)(1)(ii)(B)]:

[INSERT THE NAME OF EACH STANDARD INCORPORATED
INCLUDING TITLE, DATE, AUTHOR, PUBLISHER, AND
IDENTIFICATION NUMBER OF THE PUBLICATION.]

We have also enclosed a draft of the final rule that removes this [these]
material(s) from the CFR.

Please contact [INSERT NAME] of my staff at [TELEPHONE NUMBER]
or by email at [INSERT EMAIL ADDRESS] if you have any questions.

Sincerely,

[SIGN]

Type name,
Title

---

C0010685

---

**Example 6.8: Amendatory instructions to remove standards from a centralized IBR section.**

PART 63—NATIONAL EMISSION STANDARDS FOR HAZARDOUS AIR POLLUTANTS FOR SOURCE CATEGORIES

1. The authority citation for part 63 continues to read as follows:

   Authority: 42 U.S.C. 7401 et seq.

2. Amend § 63.14 by removing paragraphs (a)(5) and (e)(27).

---

## 6.7 Checklist.

Assemble your IBR approval request package, including:

- ✓ One copy of your unsigned *DRAFT* final rule;

- ✓ A signed IBR approval request letter (including the CFR title and ALL affected CFR sections); and

- ✓ Complete copies of all standards—including title pages

Submit the package *at least 20* working days before you want to have the final rule published.

C0010686

# Federal Register Document Drafting Handbook
October 1998 Revision

# Chapter 7: Illustrations, Forms, Footnotes, Appendices, and Tables

7.1 Format, placement, and quality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–1
7.2 Illustrations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–2
7.3 Forms . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–2
7.4 Redesignation tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–3
7.5 Distribution and derivation tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–3
7.6 If/Then tables . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–6
7.7 Footnotes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–8
7.8 Appendices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7–9

**Notes:** In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration, and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this chapter as models for style, not content. Although many of these are single-spaced for visual impact, you must double-space your document.

## 7.1 Format, placement, and quality.

If you submit tables, illustrations, or forms in your document you must:

- Submit legible material.
- Submit original artwork (camera copy) for photographing.
- Place the table, illustration, or form exactly where it is to appear in the printed document. Do not split sentences or paragraphs.
- Prepare tables and forms according to the "United States Government Printing Office Style Manual."

C0010687

## 7.2 Illustrations.

Illustrations include maps, diagrams, graphs, or other pictorial material.

- All details of an illustration, such as captions, numbers, place names, and keys, must be completely legible.
- If you amend an illustration, submit a completely new illustration with the amendatory document.
- If you want the original artwork for a proposed rule or notice returned, attach a letter and a self-addressed envelope to the original document asking the OFR to return the artwork. We do not return original artwork for a rule; we use it in the CFR.
- If you have several illustrations in a CFR part, the OFR recommends placing them at the end of the part. Place a heading before the illustrations. (See example 1.) Label each illustration. (See example 2.)

Example 1.

Illustrations  to  Part  312

Example 2.

Figure  1  --  Ramp  Specification  for  Wheelchairs

## 7.3 Forms.

Because forms are usually photographed for publication in the *Federal Register* and then reduced for inclusion in the CFR, in a rule document, the OFR accepts only forms that are completely legible and suitable for use as camera copy for publication. To ensure that forms are acceptable for publication, follow these steps:

- If the form is pre-printed, obtain an original form, not a photocopy.
- If you type the form yourself, use the original typed pages or a legible copy (first generation photocopy).
- If the form has printing on both sides of the page, prepare a collated, one-sided set of pages. Use an original form for each page. Lightly cross through the page not being printed with an editor's blue pencil. This pencil will not photocopy.
- If an overlay is used, attach one overlay to each page of the form.
- Place all original artwork in the copy of the document labeled "Printer's Copy." Using an editor's blue pencil, **on the "Printer's Copy" only** , number your pages in order on the back of each page to be photographed. Make clear and legible photocopies of the form as prepared for the "Printer's Copy" and insert them in the original document and in the second duplicate copy.

Remember, when your artwork is reduced for the *Federal Register* and, if a rule document, for the CFR, every word in the artwork must be legible.

C0010688

## 7.4 Redesignation tables.

When you rearrange and renumber your agency's rules, you may use a redesignation table. A redesignation table is a listing of the old CFR unit numbers with the corresponding new CFR unit numbers.

You may use a redesignation table in the amendatory instruction of a rule or proposed rule document. (See example 3.)

When you publish the rule document, your agency may request that the table be placed in the finding aids section of the appropriate CFR volume by contacting the CFR staff of the Office of the Federal Register.

Example 3: Redesignation table

§§1475.12 through 1475.20 [Redesignated]

Redesignate §§1475.12 through 1475.20 as follows:

| Old section | New section |
|-------------|-------------|
| 1475.12 | 1475.13 |
| 1475.13 | 1475.14 |
| 1475.14 | 1475.15 |
| 1475.15 | 1475.17 |
| 1475.16 | 1475.18 |
| 1475.17 | 1475.19 |
| 1475.18 | 1475.20 |
| 1475.19 | 1475.21 |
| 1475.20 | 1475.22 |

## 7.5 Distribution and derivation tables.

When you reorganize, rewrite, and set out rules on a large scale, you may want to use distribution and derivation tables in your preamble. (See examples 4 and 5.)

Distribution and derivation tables are complementary. A distribution table shows where each piece of the original material went and/or indicates why it is no longer needed. A derivation table shows where each piece of the revised material comes from. You may decide to use either or both.

Place distribution and derivation tables in the preamble under the SUPPLEMENTARY INFORMATION caption. Do not include them in the regulatory text as part of an amendatory instruction. Instead, use specific amendatory terms to state which CFR units are being removed, revised, or added. (See example 6.) For a complete discussion of amendatory terms, see sections 1.13 and 2.13.

C0010689

Your Liaison Officer may request that derivation or distribution tables be placed in the Finding
Aids section at the back of the appropriate CFR volume by contacting our CFR staff.

Example 4: Distribution table.

```
Old section                    New section
-- -- --                       Parts 11 and 12 (subchapter D)
3.4(a)                         11.1
3.4(b) introductory text       Removed
3.4(b)(1)                      Removed
3.4(b)(2)                      Removed
3.4(b)(3)                      11.2
3.4(b)(4) through (b)(8)       11.3 through 11.7
7.1                            12.1(a)
7.4                            12.1(b)
7.5                            12.1(c)
7.6                            12.1(d)
8.8                            12.2
9.3(a)                         12.3(a)
9.3(b)                         12.3 (b) and (c)
9.3(c)                         Removed
```

Example 5: Derivation table

```
New section    Old section
250.1          250.210(a).
250.3          250.210(b) (1st sentence).
250.5          250.210(b) (1st para.)(2d sentence preceding
                   the words "...or the reasonable...").
               250.210(c)(except last sentence).
250.7          250.210(c) last sentence.
250.9          250.210(b)(2d para.)(1st sentence).
250.11         250.210(b)(2d para.)(except 1st sentence).
250.13         250.210(b)(1st para.)(2d sentence after
                   "...such capital expenditures..." and next to
                   last sentence).
250.15         250.210(b)(1st para.)(last sentence).
250.17         250.210(d).
```

7-4

C0010690

Example 6: Amendatory instructions for changes described in example 4.

PART 3--SERVICES TO THE PUBLIC

1. The authority citation for part 3 continues to read as follows:

Authority: 44 U.S.C. 1506; sec. 6, E.O. 10530, 19 FR 2709, 3 CFR, 1954-1958 Comp., p. 189.

§3.4 [Removed]

2. Remove §3.4.

PART 7--[REMOVED]

3. Remove part 7.

PART 8--CODE OF FEDERAL REGULATIONS

4. The authority citation for part 8 continues to read as follows:

Authority: 44 U.S.C. 1506, 1510; sec. 6, E.O. 10530, 19 FR 2709, 3 CFR, 1954-1958 Comp., p. 189.

§8.8 [Removed]

5. Remove §8.8.

PART 9--THE UNITED STATES GOVERNMENT MANUAL

6. The authority citation for part 9 continues to read as follows:

Authority: 44 U.S.C. 1506; sec. 6, E.O. 10530, 19 FR 2709, 3 CFR, 1954-1958 Comp., p. 189.

7. Revise the part heading to read as shown above.

§9.3 [Removed]

8. Remove §9.3.

C0010691

        9. Add new subchapter D, consisting of parts 11 and 12, to read as
follows:

SUBCHAPTER D--AVAILABILITY OF OFFICE OF THE FEDERAL REGISTER
PUBLICATIONS

PART 11--SUBSCRIPTIONS

Sec.
11.1 Subscription by the public.
11.2 Federal Register.
11.3 Code of Federal Regulations.
11.4 The United States Government Manual.
11.5 Public Papers of the Presidents of the United States.
11.6 Weekly Compilation of Presidential Documents.
11.7 Federal Register Index.
11.8 LSA (List of CFR Sections Affected).

    Authority: 44 U.S.C. 1506; sec. 6, E.O. 10530, 19 FR 2709, 3 CFR,
1954-1958 Comp., p. 189.

* * * * *                    [Asterisks Indicate text not included in this example.]

## 7.6 If / Then tables.

If/Then tables present regulatory text in a columnar format. Each column must have a heading.
The column heading may:

- Identify the type of information presented in each column (See example 7); or
- When read with the entry in the column present a complete sentence (See example 8).

Designate each entry in the If/Then table for ease of amendment (change).

If you do not designate each entry in the If/Then table, you can change the table **only by revising
it** (reprinting the table in its entirety with the changes integrated). This is costly if your table is
large.

Whichever type of If/Then table you use, be sure that each entry presents a complete and logical
thought.

C0010692

Example 7: Column headings that identify the information in the entries.

§114.103 Who may file a claim?

(a) If a claim is based on factors listed in the first column, then it may be presented by persons listed in the second column.

| Claim factors | Claim presenters |
|---|---|
| (1) Injury to or loss of property................. | The owner of the property, his or her duly authorized agent, or legal representative. |
| (2) Personal injury........... | The injured person, his or her duly authorized agent, or legal representative. |
| (3) Death..................... | The executor, administrator, or legal representative of the decedent's estate, or any other person entitled to assert the claim under applicable state law. |
| (4) Loss wholly compensated by an insurer with rights as a subrogee. | The parties individually, as their interests appear, or jointly. |

* * * * *

7-7

C0010693

Example 8: Column headings that form a complete sentence when read with the entry.

§107.1150 <u>Maximum amount of Leverage for a Section 301(c) Licensee.</u>

   (a) <u>Maximum amount of Leverage</u>. If you are a Section 301(c) Licensee, use the following table to determine the maximum amount of Leverage you may have outstanding at any time:

| If your Leverageable Capital is: | Then your maximum Leverage is: |
|---|---|
| (1) Not over $15,000,000...... | 300% of Leverageable Capital. |
| (2) Over $15,000,000 but not over $30,000,000......... | $45,000,000 + [200% of (Leverageable Capital - $15,000,000)]. |
| (3) Over $30,000,000 but not over $45,000,000......... | $75,000,000 + [100% of (Leverageable Capital - $30,000,000)]. |
| (4) Over $45,000,000.......... | $90,000,000. |

\* \* \* \* \*

## 7.7 Footnotes.

Number footnotes separately for each unit listed below:

- Preamble
- Each CFR part
- Table
- Illustration
- Form
- Appendix

The first footnote in a CFR part starts with "1." The first footnote in each appendix starts with "1."

Number the footnotes in the preamble to a rule or proposed rule document independently from the footnotes in the regulatory text. Type footnotes to tables, illustrations, and forms at the end of the table, illustration, or form and not at the bottom of the page on which they appear.

Whenever a footnote number appears in regulatory text or tables, print the text of the footnote even if there is no change to the footnote.

Do not include formulas or tables in footnotes.

Make footnotes in a rule explanatory, not regulatory.

C0010694

If you remove a footnote in the regulatory text, you must redesignate the remaining footnotes to close the gap. You cannot remove and reserve a footnote, nor can you add a footnote with an alpha character, for example, "9c."

Remember to separately number the footnotes for illustrations, forms, tables, and appendices. If you remove an illustration, form, table, or appendix, it will not disrupt the footnote numbering of the regulatory text.

## 7.8 Appendices.

**Rules and proposed rules.** Use an appendix to improve the quality or use of a rule but not to impose requirements or restrictions.

Use an appendix to present:

- Supplemental, background, or explanatory information which illustrates or amplifies a rule that is complete in itself.
- Forms or charts which illustrate the regulatory text.

You may not use the appendix as a substitute for regulatory text. Present regulatory material as an amendment to the CFR, not disguised as an appendix. Material in an appendix may not:

- Amend or affect existing portions of CFR text; or
- Introduce new requirements or restrictions into your regulations.

An appendix may appear at the part, subpart, or section level. Designate each appendix, identify whether it belongs to a part, subpart, or section, and give it a descriptive heading. (See example 9.) If you have an appendix to a part or subpart, list the appendix heading in the table of contents. Do not carry the heading for an appendix to a section in the table of contents. A complete appendix heading should:

- Conform to a uniform system of designation for appendixes throughout your agency's rules;
- Indicate the CFR unit to which the appendix is attached; and
- Provide a brief, descriptive subject heading.

Example 9.

Appendix A to Part 430 -- Insulation Adequacy Evaluation Criteria

Appendix B to Subpart C of Part 430 -- Test Procedures for Tire Traction

Appendix C to §430.4 -- Tire Tread Chart

Designate each paragraph in the text of an appendix. You may use the CFR numbering system or develop an alternate **logical** numbering system.

C0010695

Place the appendix immediately following the CFR unit to which it is appended.

You may include an appendix at the end of a rule document and direct that the appendix not be reprinted in the CFR. However, do not reference in the regulatory text an appendix which will not appear in the CFR. If you do not want the appendix to appear in the CFR, place a note before the appendix heading stating you are not printing it in the CFR. (See example 10.)

Example 10.

Note: The following appendix will not appear in the Code of Federal Regulations.

APPENDIX HEADING

7-10

C0010696

# Federal Register Document Drafting Handbook

October 1998 Revision

## Chapter 8: Frequently Asked Questions

*Federal Register Contacts*

8.1 Who is my agency's contact with the Federal Register Office? . . . . . . . . . . . . . . . . . . . . . 8-2

8.2 Who is my agency's contact with the Government Printing Office? . . . . . . . . . . . . . . . . . 8-2

*Receipt, Filing, and Publication Schedules*

8.3 How many copies of my document must I submit? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-2

8.4 Where do I deliver my document? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-3

8.5 How can I get proof of receipt of my document? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4

8.6 When is my document filed for public inspection? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4

8.7 How can I get emergency filing? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4

8.8 How can I delay filing? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-4

8.9 How do I know if my document is on file for public inspection? . . . . . . . . . . . . . . . . . . . 8-4

8.10 How do I correct or withdraw a document before publication? . . . . . . . . . . . . . . . . . . . 8-5

8.11 When will my document be published? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-5

8.12 Can I get emergency publication? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-6

*Drafting Options*

8.13 Can a rule, proposed rule, or notice be combined in the same document? . . . . . . . . . . . . 8-6

8.14 How can my agency issue a document jointly with one or more other agencies? . . . . . . . 8-6

8.15 How do I write a definitions section? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-7

8.16 How do I refer to a publication that is not incorporated by reference in my
document? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-7

8.17 May I quote other material? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-7

8.18 What is an OMB control number and where do I put it? . . . . . . . . . . . . . . . . . . . . . . . . . 8-8

8.19 How can I get extra copies of a document that appeared in the *Federal Register*? . . . . . 8-9

C0010697

# Chapter 8: Frequently Asked Questions

**Notes:** In this chapter, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration, and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register*.

Use the examples in this chapter as models for style, not content. Although many of these are single-spaced for visual impact, you must double-space your document.

## *Federal Register Contacts*

### 8.1 Who is my agency's contact with the Federal Register Office?

Your agency must designate a Federal Register Liaison Officer and a Certifying Officer (1 CFR 16.1). Each Officer must have an Alternate.

Your agency must notify the Director of the Federal Register, in writing, of the name, title, address, telephone, and fax numbers of each person designated. You must also notify the Director of the Federal Register of any changes. (See Appendix A for a model letter.)

The Liaison Officer is the main contact between the agency and the OFR. Therefore, your agency should choose a person who is directly involved in the regulatory program. The Liaison Officer and the Alternate resolve any problems concerning documents that you submit for publication in the *Federal Register* or other problems concerning your agency's rules in the CFR.

The Certifying Officer ensures that copies of original documents and any disks submitted for publication are true and accurate copies. The Certifying Officer signs a statements at the bottom of the signature page on each copy: "Certified to be a true copy of the original." (See example 1.) The Certifying Officer also signs the certification letter that accompanies a disk. (See Appendix A for a model letter.)

### 8.2 Who is my agency's contact with the Government Printing Office?

The GPO requires that your agency designate a Printing Officer who is the liaison between your agency and GPO in all billing matters.

## *Receipt, Filing, and Publication Schedules*

### 8.3 How many copies of my document must I submit?

You must send one original and two certified copies **or** three originals of each document for filing and publication in the *Federal Register*. An official authorized to sign documents for publication in the *Federal Register* must sign the original document in ink. The OFR suggests using blue ink since a black ink signature may look like a photocopy.

C0010698

**One Original and two certified copies.** If you send one original document, you must also submit two certified copies. Submit legible, complete, and single-sided copies that are identical to the original.

Certified copies are not signed by the issuing official. The name and title of the issuing official are typed or stamped on the signature page. The agency also places a signed certification statement on the signature page. (See example 1.) The agency's Certifying Officer signs the certification statement. The Certifying Officer attests that the copies are identical to the original document. Certification means that the copies match the original document ensuring that they are identical and complete.

> Example 1: Certification statement.
>
> Certified to be a true copy of the original document.
>
> (Signature of Certifying Officer)

**Three originals.** You may choose to provide three identical original documents that the issuing official has signed in ink, with name and title typed below. In this case, you need no certification statement because all documents are originals.

## 8.4 Where do I deliver my document?

**U.S. Mail.** Address U.S. mail to:

FEDERAL REGISTER (NF)
NATIONAL ARCHIVES AND RECORDS ADMINISTRATION
700 PENNSYLVANIA AVE NW
WASHINGTON DC 20408-0001

Do not address U.S. mail to 800 N. Capitol St.

**Hand delivery.** Deliver letters or documents in person or by messenger to:

Office of the Federal Register
800 North Capitol Street, NW., Suite 700
Washington, DC 20001.
(Three blocks north of Union Station Metro)

We are open to accept deliveries **only** between 8:45 a.m. and 5:15 p.m. ET, Monday through Friday, except Federal holidays.

C0010699

### 8.5 How can I get proof of receipt of my document?

Normally, you submit an original and two certified copies or three originals; if you want proof of receipt of your document, you must submit an additional copy of the document. An OFR staff person will place a stamp indicating receipt on this extra copy. Your messenger may wait for the stamped copy or you may submit a stamped or franked, self-addressed envelope so that the OFR may mail it to you.

### 8.6 When is my document filed for public inspection?

The OFR files each document for public inspection at 8:45 a.m. on the workday before the date of publication (44 U.S.C. 1503 and 1504, see Appendix C). Our public inspection docket is located at:

> Office of the Federal Register
> 800 North Capitol Street, NW., Suite 700
> Washington, DC.

Anyone may inspect or copy filed documents during our business hours, 8:45 a.m. to 5:15 p.m. ET, Monday through Friday, except for Federal holidays.

We recommend that you notify your public affairs office that we do not release information concerning a document to the public until the document is on file for public inspection.

### 8.7 How can I get emergency filing?

You may request earlier filing in writing. (See Appendix A for a model request.) We are able to file documents for public inspection **only** during official business hours, 8:45 a.m. to 5:15 p.m. ET, Monday through Friday, except for Federal holidays.

We place a document on file for public inspection only after we have reviewed it, resolved any problems, and assigned it a publication date.

### 8.8 How can I delay filing?

You can only delay the filing of your document if you also delay the publication date. You may request a filing time later than 8:45 am, but the document cannot be published on the next working day. Each document must be on public inspection by 8:45 a.m. on the working day before the date of publication.

### 8.9 How do I know if my document is on file for public inspection?

You can see a list of documents currently on file for public inspection at http://www.nara.gov/fedreg. Select the link for "Public Inspection List." **You will only get a list of documents, not the text of those documents.** We update this list on a regular basis.

8-4

C0010700

## 8.10 How do I correct or withdraw a document before publication?

If it is necessary for you to correct or withdraw a document that you have submitted to us for publication, immediately contact your agency's Liaison Officer. See Chapter 4 for detailed requirements and procedures.

## 8.11 When will my document be published?

The OFR assigns a publication date once a document meets our publication requirements.

**Regular schedule.** The OFR normally assigns each document to the regular publication schedule. Documents received before 2 p.m. are on a 3-day schedule, and those received after 2 p.m. are on a 4-day schedule.

Example 2: Regular publication schedule.

| If we receive a document before 2 p.m. on: | We file it for public inspection at 8:45 a.m. on: | And publish it in the *Federal Register* on: |
|---|---|---|
| Monday | Wednesday | Thursday |
| Tuesday | Thursday | Friday |
| Wednesday | Friday | Monday |
| Thursday | Monday | Tuesday |
| Friday | Tuesday | Wednesday |

This table does not reflect the changes caused by Federal holidays.

**Sunshine Act meeting notices.** (See section 3.11.) Sunshine Act meeting notices received before 4 p.m. are published on a 2-day publication schedule and Sunshine Act meeting notices received after 4 p.m. are placed on a 3-day publication schedule.

**Deferred schedule.** The OFR assigns your document to the deferred schedule if:

- You request delayed publication;
- The length of the document requires additional review and processing time. (A document of 100 double-spaced pages or more requires additional time.);
- The complexity of the document requires additional review and processing time; or
- Technical printing considerations require additional time for publication.

C0010701

## 8.12 Can I get emergency publication?

If you need emergency publication, make your request by letter explaining the need for emergency handling. The letter must accompany the document. We do not approve all emergency requests. (See Appendix A for a model letter.)

### *Drafting Options*

## 8.13 Can I combine a rule, proposed rule, or notice in the same document?

No, the OFR does not accept any document for publication that combines material that would appear in different categories of the *Federal Register*. In cases where two categories are involved, submit two separate documents that cross-reference each other. (See example 3 for a model cross reference statement.)

You may request that the two documents be published in the same separate part of a *Federal Register* issue. (See Appendix A, Request for Special Handling Form.)

Example 3. Cross reference statement.

        A [RULE, PROPOSED RULE, NOTICE] relating to [SUBJECT MATTER] is
    published elsewhere in this issue of the <u>Federal Register</u>.

## 8.14 How can my agency issue a document jointly with one or more other agencies?

Your Liaison Officer must consult with us in advance for assistance when preparing common or jointly issued documents. An authorized official from each agency must sign a jointly issued or common rule document. Identify each agency in the heading and preamble of the document. Carry the agencies in numerical order by CFR title number in both the heading and regulatory text.

C0010702

Example 4: Adoption of identical regulations

TENNESSEE VALLEY AUTHORITY

18 CFR Part 1312

DEPARTMENT OF AGRICULTURE

Forest Service

36 CFR Part 296

Archaeological Resources Protection Act of 1979; Final Uniform Regulations

AGENCIES: Tennessee Valley Authority, and Forest Service, USDA.

ACTION: Final rule.

SUMMARY: These final regulations establish uniform procedures for implementing provisions of the Archaeological Resources Protection Act. * * *

## 8.15 How do I write a definitions section?

In sections or paragraphs containing only definitions, we recommend that you do not use paragraph designations if you list the terms in alphabetical order. Begin the definition paragraph with the term that you are defining. If a definition contains subordinate paragraphs, number these paragraphs (1), (2), (3), etc. Underline the term to indicate italics. **Do not include substantive regulatory provisions in a definition.**

## 8.16 How do I refer to a publication that is not incorporated by reference in my document?

If you provide an informational reference to a publication in your document that is not incorporated by reference, include a statement of availability which:

- Identifies the title, edition, author, and publisher; and
- Contains the address where a copy may be obtained.

## 8.17 May I quote other material?

It is not appropriate to quote laws and rules in the text of *Federal Register* documents. Laws may be paraphrased and rules may be cross-referenced if they meet the requirements in section 1.15 or 2.15.)

C0010703

## 8.18 What is an OMB control number and where do I put it?

The Paperwork Reduction Act (see Appendix C) requires that all agencies submit their
information collection requirements and related forms to the Office of Management and Budget
(OMB) for review. If OMB approves the information collection requirements, it assigns them a
control number. You may either codify this OMB control number in the CFR or you may include
it in the SUPPLEMENTARY INFORMATION section of the preamble.

To codify an OMB control number in the CFR:

- Place the approval statement and number parenthetically at the end of the appropriate
  section. (See example 5.);
- Display the number in a section devoted to OMB control numbers. (See example 6.); or
- Display the number in a CFR part devoted to OMB control numbers. (See example 7.)

Example 5: OMB number at the end of the appropriate section.

§264.51 Purpose and implementation of contingency plan.

    (a) You as the owner or operator must have a contingency plan for
your facility. You must design your contingency plan to minimize hazards
to human health or the environment from fires, explosions, or any
unplanned sudden or non-sudden release of hazardous waste or hazardous
waste constituents to air, soil, or surface water.

    (b) You must execute the provisions of the plan immediately whenever
there is a fire, explosion, or release of hazardous waste or hazardous
waste constituents which could threaten human health or the environment.
You must send XXX an annual report of the number of occurrences of
hazards to human health or to the environment in your facility.

(Approved by the Office of Management and Budget under control number
2050-0011)

Example 6: Section devoted to OMB numbers.

§ 1942.500 OMB control number.

    The information collection requirements in this part are approved by
the Office of Management and Budget and assigned OMB control number
0575-0123.

Example 7: Part devoted to OMB numbers.

PART XX-OMB CONTROL NUMBERS

Sec.
§ XX.1 What is an OMB control number?
§ XX.2 Table of approved OMB control numbers in this chapter.

    Authority: 44 U.S.C. 3501 et seq.

8-8

C0010704

<u>§ XX.1 What is an OMB Control Number?</u>

[EXPLANATION OF OMB CONTROL NUMBERS]

<u>§ XX.2 Table of approved OMB control numbers in this chapter.</u>

This table lists the OMB Control Numbers assigned to the rules in this chapter.

```
CFR cite     OMB control no.
§3541.5      2050-11
```

## 8.19 How can I get extra copies of a document that appeared in the *Federal Register*?

Your agency can purchase extra copies of a separate part of a *Federal Register,* or of an entire issue, by requesting a press overrun from GPO. These copies are available shortly after the issue is printed.

To arrange for an overrun of a separate part of a *Federal Register,* your Federal Register Liaison Officer must, when submitting a document to OFR:

- Request its publication as a separate part. (See Appendix A, Request for Special Handling.)
- Request from us its publication date and separate part number. (See Appendix A, Request for Special Handling.)
- Provide the publication date and separate part number to your agency's GPO Printing Officer.

Your Printing Officer orders the overrun by submitting a Standard Form 1 (SF-1) to GPO before noon on the workday before the publication date.

C0010705

**Federal Register Document Drafting Handbook**
*July 2012 Revision*

## Appendix A: Model Letters

Emergency publication request...........................................................................................................A-2

Emergency filing request. ..................................................................................................................A-3

Special Handling Request...................................................................................................................A-4

Disk Verification / Certification. ......................................................................................................A-5

Correcting a Document After Filing.................................................................................................A-6

Withdrawing a Document From Publication

   Before filing:.....................................................................................................................................A-7

   After filing:........................................................................................................................................ A-8

Federal Register Liaison Officer / Certifying Officer Designation.................................................A-9

For incorporation by reference, see Chapter 6

*Notes:* In this appendix, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration (NARA), and "you" or "your" refer to federal agencies that prepare documents for publication in the *Federal Register.*

Use the examples in this appendix as models for style, not content.

We offer these model letters to help you prepare written requests regarding Federal Register documents and other matters.

U.S. Mail. Address U.S. mail to:

  FEDERAL REGISTER (F)
  NATIONAL ARCHIVES AND RECORDS ADMINISTRATION
  8601 ADELPHI ROAD
  COLLEGE PARK, MD 20740-6001

Hand delivery. Deliver letters in person or via messenger service to:

  Office of the Federal Register
  800 North Capitol Street, NW., Suite 700
  Washington, DC 20001.
  (Three blocks north of Union Station Metro)

C0010706

We accept hand deliveries only between 8:45 a.m. and 5:15 p.m. ET,
Monday through Friday, except Federal holidays.

## EMERGENCY PUBLICATION REQUEST.

---

*AGENCY LETTERHEAD*

December 25, 2xxx

Charley Barth, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Barth:

Please publish this [RULE, PROPOSED RULE, OR NOTICE] concerning
[INSERT SUBJECT (including agency docket number, and, for rules and
proposed rules, RIN number)] on the emergency publication schedule.

[EXPLAIN WHY YOU NEED EMERGENCY PUBLICATION.]

[GIVE ANY SPECIAL PRINTING AND/OR PROCESSING
INSTRUCTIONS.]

Call [INSERT YOUR NAME] at [TELEPHONE NUMBER] to confirm
the publication date and for answers to any questions.

Sincerely,

[SIGN]

Type name,
Title

---

C0010707

---

## EMERGENCY FILING REQUEST.

---

> *AGENCY LETTERHEAD*
>
>
> December 25, 2xxx
>
> Charley Barth, Director
> Office of the Federal Register (F)
> The National Archives and Records Administration
> 8601 Adelphi Road
> College Park, MD 20740-6001
>
> Dear Mr. Barth:
>
> Please immediately file for public inspection this  [RULE, PROPOSED
>
> RULE, OR NOTICE] oncerning  [INSERT SUBJECT (including agency
> docket number, and, for rules and proposed rules, RIN number)].
>
> [EXPLAIN WHY YOU NEED IMMEDIATE FILING.]
>
> [GIVE ANY SPECIAL PRINTING AND/OR PROCESSING
> INSTRUCTIONS.]
>
> Call  [INSERT YOUR NAME]  at  [TELEPHONE NUMBER]  to confirm
> the publication date and file time and for answers to any questions.
>
> Sincerely,
>
> [SIGN]
>
> Type name,
> Title

C0010708

**Federal Register Document Drafting Handbook**        Appendix A: Model Letters
*July 2012 Revision*

## SPECIAL HANDLING REQUEST.

I request the following special handling for this document:

&#9744;    **Deferred publication date:** Please publish this document on _____.

&#9744;    **Emergency publication:** Attached is a letter requesting and explaining why we need emergency publication.

&#9744;    **Immediate Filing:** Attached is a letter requesting and explaining why we need immediate filing.

&#9744;    **Separate part:** Please publish this document in a separate part of the Federal Register and call to tell me the separate part number.

Signed_____

Telephone number_____

A-4

C0010709

## DISK VERIFICATION / CERTIFICATION.

One of the following agency officials may sign your letter:

- Federal Register Liaison Officer or Alternate;
- Federal Register Certifying Officer or Alternate; or
- Signer of the document. (See chapter 5.)

---

*AGENCY LETTERHEAD*

December 25, 2xxx

Charley Barth, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Barth:

This is to certify that the file furnished with the [RULE, PROPOSED RULE, NOTICE] concerning [INSERT SUBJECT (including agency docket number, and, for rules and proposed rules, RIN number)] is a true copy of the original signed document.

[GIVE ANY SPECIAL PRINTING AND/OR PROCESSING INSTRUCTIONS.]

Sincerely,

[SIGN]

Type name,
Title

---

C0010710

## CORRECTING A DOCUMENT AFTER FILING.

*AGENCY LETTERHEAD*

December 25, 2xxx

Charley Barth, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Barth:

Please make the following corrections to the  [RULE, PROPOSED RULE, OR NOTICE] concerning  [INSERT SUBJECT (including agency docket number, and, for rules and proposed rules, RIN number)]  that is currently on public inspection and scheduled to publish in the Federal Register on  [INSERT DATE]:

1. On page 6, second paragraph, line 7, remove the phrase "outgoing mail".

2. On page 15, after the heading "Introduction" add the sentence:

   "Indicated in the report is the percentage of correctly manually processed boxes versus correctly electronically processed boxes."

If you have any questions, please contact  [INSERT NAME]  at [TELEPHONE NUMBER].

Sincerely,

[SIGN]

Type name,
Title

C0010711

**Federal Register Document Drafting Handbook**        Appendix A: Model Letters
*July 2012 Revision*

## WITHDRAWING A DOCUMENT FROM PUBLICATION.

*Before filing:*

---

*AGENCY LETTERHEAD*

December 25, 2xxx

Charley Barth, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Barth:

Please withdraw from publication the  [RULE, PROPOSED RULE, NOTICE]  concerning INSERT SUBJECT (including agency docket number, and, for rules and proposed rules, RIN umber)]  which we submitted on  [INSERT DATE].

A messenger will pick up this document. Print the following return information on the envelope:

[INSERT RETURN INFORMATION]

Sincerely,

[SIGN]

Type name,
Title

---

A-7

C0010712

*After filing:*

---

### *AGENCY LETTERHEAD*

December 25, 2xxx

Charley Barth, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Barth:

Please withdraw from publication the  [RULE, PROPOSED RULE, OR
NOTICE]  concerning INSERT SUBJECT (including agency docket
number, and, for rules and proposed rules, RIN umber)]  which is
currently on public inspection and scheduled to publish in the Federal
Register on  [INSERT DATE].

[GIVE LEGAL JUSTIFICATION FOR REMOVING DOCUMENT FROM
PUBLIC INSPECTION.]

Sincerely,

[SIGN]

Type name,
Title

---

A-8

C0010713

## FEDERAL REGISTER LIAISON OFFICER / CERTIFYING OFFICER DESIGNATION.

---

*AGENCY LETTERHEAD*

December 25, 2xxx

Charley Barth, Director
Office of the Federal Register (F)
The National Archives and Records Administration
8601 Adelphi Road
College Park, MD 20740-6001

Dear Mr. Barth:

The [NAME OF AGENCY] designates the following individuals to work with the Office of the Federal Register:

Liaison Officer: [NAME, TITLE, ADDRESS, TELEPHONE NUMBER]

Alternate Liaison Officer: [NAME, TITLE, ADDRESS, TELEPHONE NUMBER]

Certifying Officer: [NAME, TITLE, ADDRESS, TELEPHONE NUMBER]

Alternate Certifying Officer: [NAME, TITLE, ADDRESS, TELEPHONE NUMBER]

The agency fax number is [FAX NUMBER].

Sincerely,

[SIGN]

Type name,
Title

---

C0010714

# Federal Register Document Drafting Handbook
October 1998 Revision

## Appendix B: What Services Does the Office of the Federal Register Provide?

### Liaison Officer training.

If you are a Federal Register Liaison Officer, contact us for more information.

### Other services for agency regulations staff.

Contact your agency's Federal Register Liaison Officer to arrange:

- Preliminary consultation on large projects, such as reorganizations or major revisions or additions.
- Technical assistance in drafting complex documents,
- Requests for special formatting.

### Online publications.

Our publications are available online via the GPO Access system, at http://www.gpo.gov/nara.

### Online information.

Visit our page on the National Archives and Records Administration (NARA) site, http://www.nara.gov/fedreg, for:

- Links to our publications on GPO Access.
- A description of our publications system, including prices and ordering information.
- A list of documents currently on file for public inspection.
- Federal Register indexes and tables of contents.
- Research information about public laws and presidential documents.
- A schedule of our public workshops.
- Our role in the electoral college and constitutional amendment processes.

C0010715

### Document drafting resources.

Persons who use this handbook may find this area of our WWW site of special interest. From http://www.nara.gov/fedreg, select "Document Drafting Resources," for:

- This Federal Register Document Drafting Handbook.
- "Drafting Legal Documents," our guide to legal writing.
- The Federal Register Thesaurus of Indexing Terms.
- A link to our regulations in Title 1 of the CFR, online via GPO Access.

Select "Plain Language Tools" for information on compliance with the President's Memorandum on Plain Language in Government Writing.

### Public workshops.

Our three-hour workshop, "The Federal Register: What It Is and How To Use It," open to the general public, covers:

- The regulatory process.
- The relationship between the daily *Federal Register* and the Code of Federal Regulations (CFR).
- A "tour" of a typical *Federal Register* issue, and CFR volume.
- An introduction to Federal Register finding aids.
- An introduction to online Federal Register publications and research tools.

Although these workshops are free, you must have a reservation to attend. For schedules and reservation information, see the inside front cover of the *Federal Register,* or from http://www.nara.gov/fedreg, select "Public Workshops."

B-2

C0010716

# Federal Register Document Drafting Handbook

October 1998 Revision

## Appendix C: Laws That Affect Federal Register Publication

This Appendix lists laws that you will use to determine what documents your agency may need to publish in the *Federal Register*, or the procedures you will use to publish in the *Federal Register*, or the procedures you will use to conduct a rulemaking. These laws are:

- Federal Register Act (44 U.S.C. chapter 15)
- Administrative Procedure Act (5 U.S.C. subchapter II)
- Federal Advisory Committee Act (5 U.S.C. appendix)
- Freedom of Information Act (5 U.S.C. 552)
- Privacy Act (5 U.S.C. 552a)
- Government in the Sunshine Act (5 U.S.C. 552b(e)(3))
- Negotiated Rulemaking Act (5 U.S.C. 561 *et seq.*)
- Small Business Regulatory Fairness Enforcement Act (5 U.S.C. 801 *et seq.*)
- Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*)
- Paperwork Reduction Act (44 U.S.C. 3501 *et seq.*)

The Federal Register Act and the Freedom of Information Act require that documents published in the *Federal Register* be official agency actions.

The Federal Register Act (44 U.S.C. chapter 15) requires publication of the following documents in the *Federal Register*:

- Presidential proclamations and Executive orders, except those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees of a Federal agency. For purposes of the act, every document that prescribes a penalty has general applicability and legal effect.
- Documents or classes of documents that the President may determine from time to time to have general applicability and legal effect.
- Documents or classes of documents that may be required to be published by Act of Congress.
- Documents authorized to be published by regulations except for comments and news items.

C-1

C0010717

The Freedom of Information Act (5 U.S.C. 552) requires publication of the following documents in the *Federal Register*:

- Descriptions of central and field organizations of each Federal agency;
- Descriptions of the course and method by which each Federal agency's functions are channeled and determined;
- Rules of procedure and a description of forms available;
- Substantive rules of general applicability;
- Statements of general policy or interpretations of general applicability; and
- Each amendment, revision, or repeal of the above materials.

The Freedom of Information Act also authorizes the Director of the Federal Register to approve the incorporation by reference of eligible material in the *Federal Register.*

The regulations of the Administrative Committee of the Federal Register provide that whenever the Director of the Federal Register finds that publication of a document would be in the public interest, the document may be published in the *Federal Register.*

C-2

C0010718

# Federal Register Document Drafting Handbook

October 1998 Revision

## Appendix D: What s New in This October 1998 Revision?

This revision of the Document Drafting Handbook is the result of feedback from Liaison Officers and other agency employees, as well as our own experience using the April 1997 revision. We expanded and clarified many sections, added new examples, and added some entirely new topics. This revision does not announce major new procedures or impose new requirements.

The most significant changes include:

- A detailed discussion of effective and compliance dates, a well as Stays and Delays, in the DATES caption in section 2.5.
- New sections 2.20, Interim rule, and 2.21, Direct final rule.
- An expanded and rearranged Chapter 4, corrections, including, in new section 4.6, Corrections to a rule, a discussion, with examples, of Technical CFR Amendment versus Federal Register correction, according to the CFR revision date.
- Revised Chapter 5, Disk submissions.

We have edited many sections to employ plain language techniques, such as using personal pronouns and active voice, and phrasing headings as questions. For example, many former references to "The OFR" now read "we" or "our." We have codified undesignated material in shorter chapters as numbered sections, and divided long sections into shorter ones.

In the chapter-by-chapter list of changes that follows, section numbers are **old numbers from the April 1997 revision**, unless we use "new section."

### Chapter 1: How do I write a document for the proposed rules category?

**1.4 Headings.** We rewrote this section to clarify different requirements for cabinet departments and non-cabinet agencies, and added an example to illustrate follow-up headings.

**1.5 Preamble requirements.** We now  include the E-mail address for electronic filing under the ADDRESSES caption, and continue to suggest that you keep detailed information under SUPPLEMENTARY INFORMATION.

C0010719

**1.6 List of subjects.** We deleted reference to the FREND Bulletin board.

**1.8 Regulatory text.** We divided former section 1.8 into new sections 1.8 through 1.15.

**Authority citation.** In new section 1.11, we rewrote the section on "statutory authority," and added new headings and titles.

**Numbering of rules.** We added a new item about "Notes" at the end of new section 1.12.

**Amendatory language.** In new section 1.13, we now treat the term "Amend" separately from the list of specific amendatory terms. We deleted "correct," "nomenclature change," "stay," and "suspend" from chapter 1, because these terms do not appear in proposed rules.

**Asterisks.** In new section 1.14, we expanded and reorganized our explanations of how asterisks represent unchanged regulatory text.

**Cross references.** In new section 1.15 we rewrote much of our explanation of how and when to use cross-references.

**1.13 Checklist for proposed rule documents.** To this checklist, redesignated as new section 1.20, we added new items for "words of issuance" and "asterisks," and revised the item for "disks."


**Chapter 2 : How do I write a document for the rules category.**

**2.1 What types of documents go in the rules category?** We amended this section to include references to direct final rules.

**2.4 Headings.** We rewrote this section to clarify different requirements for cabinet departments and non-cabinet agencies, and added an example to illustrate follow-up headings.

**2.5 Preamble requirements.** We amended the ACTION caption to include direct final rules.

We now include the E-mail address for electronic filing under the ADDRESSES caption, and continue to suggest that you keep detailed information under SUPPLEMENTARY INFORMATION.

We rewrote and expanded the DATES caption to distinguish more clearly between Effective Dates and Compliance Dates, and to discuss in some detail the difference between Delays and Stays.

**2.6 List of subjects.** We deleted reference to the FREND Bulletin board.

D-2

C0010720

**2.8 Regulatory text.** We divided former section 2.8 into new sections 2.8 through 2.15.

**Authority citation.** In new section 2.11, we rewrote the section on "statutory authority," and added new headings and titles.

**Numbering of rules.** We added a new item about "Notes" at the end of new section 2.12.

**Amendatory language.** In new section 2.13, we now treat the term "Amend" separately from the list of specific amendatory terms. We combined "stay," and "suspend" because they have the same meaning, and included under "Delay" a cross reference to the DATES caption in section 2.5.

**Asterisks.** In new section 2.14, we expanded and reorganized our explanations of how asterisks represent unchanged regulatory text.

**Cross references.** In new section 2.15 we rewrote much of our explanation of how and when to use cross-references.

**Interim Rule and Direct Final Rule.** We added this new undesignated heading, and new sections 2.20 and 2.21.

**2.13 Checklist for proposed rule documents.** To this checklist, redesignated as new section 2.22, we added items for "words of issuance" and "asterisks," and revised the item for "disks."


### Chapter 3 : How do I write a document for the notices category?

**3.4 Headings.** We rewrote this section to clarify different requirements for cabinet departments and non-cabinet agencies, and added an example to illustrate follow-up headings.

**3.5 Authority citation.** We rewrote this section to clarify our requirements.

**3.6 and 3.7 Preamble.** We combined these two sections into new 3.6, and renumbered all remaining sections.

**3.11 Examples of Notice Documents.** We divided material from old section 3.11 into new sections 3.10, 3.11, and 3.12. The "Typical Notice Document" from old section 3.11 appears as new section 3.10.

**Sunshine Act Meetings.** We designated this material, part of old section 3.11, as new section 3.11.

**Privacy Act Documents.** We designated this material, part of old section 3.11, as new 3.12.

**3.12 Checklist for notice documents.** We revised the item for "disks."

D-3

C0010721

## Chapter 4 : How do I correct my document?

We designated bulleted topics as numbered sections, added italic headings, and rewrote and reorganized the entire chapter.

New section 4.3, withdrawing a document before publication, is based on old section 8.12.

We expanded our descriptions of agency corrections in new sections 4.5, 4.6, 4.7, and 4.8, especially in section 4.6 regarding correcting codified text before and after CFR revision date has passed.

## Chapter 5 : Disk documents

We completely rewrote and reorganized chapter 5, to clarify the difference between uncoded and fully coded documents, and to provide more detail about how to label and prepare disk submissions. We no longer state that we will accept MS Word documents, and we provide detailed instructions about how to save these as ASCII files.

## Chapter 6 : What is Incorporation by Reference, and how do I do it?

Although we codified the old bulleted entries as numbered sections, and did some minor editing, we made no major changes or additions to Chapter 6.

## Chapter 7 : Illustrations, Forms, Footnotes, Appendices, and Tables

We codified the old bulleted entries as numbered sections, and divided the old item, tables, into 7.4 Redesignation tables, 7.5 Distribution and derivation tables, and 7.6 If/Then tables. Other than minor editorial changes, we made no major additions or revisions to this chapter.

## Chapter 8 : Frequently Asked Questions

We rewrote many of the question titles, and made editorial changes throughout this chapter.

We rearranged the material in old 8.3 through 8.12, receipt, filing, and publication schedules, to follow the path of a document through our production process.

We deleted old 8.3, fax-on-demand, and replaced it with new 8.9, online public inspection list.

We rewrote and moved the material on withdrawing a document in old 8.12 to new 4.3.

C0010722

### Appendix A: Model letters

We added introductory material to Appendix A, and revised the address in all letters to comply with U.S. Postal Service and National Archives and Records Administration guidelines.

### Appendix B: What Services Does the Office of the Federal Register Provide?

We rewrote and rearranged this section to include information about resources available on the World Wide Web, and to emphasize the role of the Federal Register Liaison Officer as the main point of contact to arrange many or our services.

### Appendix C: Laws That Affect Federal Register Publication

We made no changes to Appendix C.

### Making Regulations Readable

We changed the World Wide Web address at the end of this section.

C0010723

**Federal Register Document Drafting Handbook**
*2009 Revision*

## Appendix E: Procedure for Submittal of Documents to the Federal Register During a Continuity Emergency

*If the Office of the Federal Register facility at 800 N. Capitol Street is not operational.*

**E.1** Where do I submit documents for publication if the Office of the Federal Register facility at 800 N. Capitol Street is not operational? ................................................. E-2

*If the Office of the Federal Register's facilities at 800 N. Capitol Street and GPO's N. Capitol Street buildings are not operational.*

**E.2** Where do I submit documents for publication if the Office of the Federal Register's facilities at 800 N. Capitol Street and GPO's N. Capitol Street buildings are not operational? ..................................................................................................... E-3

**E.3** Directions to the Alternate OFR/GPO Work Site in Laurel, MD ........................... E-4

**E.4** Directions to the NARA/OFR COOP Site in Rocket Center, WV ........................... E-4

*For more information.*

**E.5** Where do I direct questions about this? ....................................................... E-5

***Note:*** In this appendix, "we," "our," or "OFR" refer to the Office of the Federal Register, National Archives and Records Administration (NARA), and "you" or "your" refer to Federal agencies that prepare documents for publication in the *Federal Register.*

C0010724

*If the Office of the Federal Register facility at 800 N. Capitol Street is not operational.*

## E.1 Where do I submit documents for publication if the Office of the Federal Register facility at 800 N. Capitol Street is not operational?

If the Office of the Federal Register building at 800 N. Capitol Street, NW is destroyed, unsafe, or without power, or otherwise unavailable, the OFR will move to the 7th floor of the main Government Printing Office (GPO) building.

The OFR can be reached at 202-512-0625 at GPO. OFR phone lines also may be redirected to answer at GPO's switchboard (main OFR number: 202-741-6000). OFR email addresses ending in "@gpo.gov" will continue to function. OFR email addresses ending in "@nara.gov" should also be accessible.

Redirect document deliveries to:
Government Printing Office
7th Floor, Proof Room (C-741)
732 North Capitol Street
Washington, D.C. 20401

OFR will advise agencies of current conditions via *Federal Register* liaison officers who will be contacted by email and fax. OFR will use its web sites (www.federalregister.gov, www.archives.gov/federal-register), the GPO web site (www.gpo.gov), and press releases to inform agencies and the public.

*Federal Register* regulations and document drafting requirements remain in place by law. Agencies must continue to submit original signed paper documents with two certified copies (and disk whenever possible). ***Alternatively, agency signers enrolled in OFR's digital signature program may submit electronically authenticated documents via email or web portal (www.fedreg.gov).*** Contact the OFR Information Services and Technology unit at 202-741-6020 for information about digital signature certificates offered or accepted by GPO.

Depending on the nature and duration of the emergency, OFR will prioritize the publication of documents with preference given to those relating to essential governmental functions. Agencies may be advised not to submit non-essential notices and proposed rules until normal operations resume.

If an attack or threat of attack on the United States severely affects *Federal Register* operations, the President may declare a national security emergency and activate the Emergency Federal Register (EFR) system in place of the daily *Federal Register*. See 44 U.S.C. 1505(c) and E.O. 12656. The purpose of the EFR is to preserve the rule of law and a constitutional form of government, as per NSPD-51/HSPD-20. The *Federal Register* would continue to carry out its basic functions at an alternate location, identified in this document, or at a classified location. Agencies would be

C0010725

informed of status of the emergency publication system through pre-established COOP/COG channels.

*Note:* the EFR can only be activated under extreme national security conditions, and only the President may authorize suspension of the regular *Federal Register* publication system.

In an order activating the EFR system, the President specifies how the alternate publication system is to function and may authorize procedural modifications. Only those documents having the highest national priority will be published in the EFR. GPO may not be involved.

The OFR would activate a public web site, http://Emergency-Federal-Register.gov, to provide legal notice of Presidential actions, administrative rules and orders, and Acts of Congress. The OFR's emergency continuity website redirects to www.archives.gov/federal-register when inactive. Copies of the EFR also would be distributed to agency COOP sites and the media.

*If the Office of the Federal Register's facilities at 800 N. Capitol Street and GPO's N. Capitol Street buildings are not operational.*

## E.2 Where do I submit documents for publication if the Office of the Federal Register's facilities at 800 N. Capitol Street and GPO's N. Capitol Street buildings are not operational?

If both the OFR and GPO buildings on North Capitol Street, NW are destroyed, unsafe, or without power, or otherwise unavailable, the OFR and GPO will move to alternate work sites. The local alternate site is in Laurel, MD at a GPO Book Warehouse. The regional alternate site is in Rocket Center, WV (near Cumberland, MD).

OFR will email and fax to agency liaison officers and COOP contacts the current operating status of the Federal Register. OFR will utilize its web sites (www.federalregister.gov, www.archives.gov/federal-register, the GPO web site (www.gpo.gov), and press releases to keep agencies and the public informed.

*Note:* For flu pandemic or similar conditions, OFR and GPO have plans to continue operations on North Capitol Street with reduced on-site staff and teleworkers, rather than relocating to an alternate site.

C0010726

## E.3 Directions to the Alternate OFR/GPO Work Site in Laurel, MD.

*From New York Ave in NW Washington, or the Washington Beltway (I-495):*

Take the Baltimore-Washington Parkway north (MD-295).

At the MD-197 (Laurel/Bowie) exit, take the ramp for Laurel 0.3 miles.

Bear LEFT at Laurel/Bowie Road, and go 2.2 miles.

Turn LEFT onto Cherry Lane, and go 0.6 miles.

Look for the GPO Book Warehouse entrance to the right.

The OFR phone number at Laurel is: 301-317-3953.  Additional lines are: 301-317-9635, 301-317-7940, and 301-317-9641; the OFR fax number at Laurel is: 301-317-6883. OFR's DC phone lines may be redirected to answer at Laurel.  OFR email addresses ending in "@gpo.gov" should continue to function.  OFR email addresses ending in "@nara.gov" should be accessible.

## E.4 Directions to the NARA/OFR COOP Site in Rocket Center, WV.

The NARA/OFR COOP site is located at the Allegany Ballistics Laboratory (ABL) in Rocket Center, WV. The facility is operated by Alliant Techsystems (ATK), for the Naval Sea Systems Command (NAVSEA).  The NARA/OFR COOP site is approximately 145 miles from downtown Washington, DC.

*From the Washington Beltway:*

Take I-270 W toward Frederick.

Take exit 32 to merge onto I-70 W toward Hagerstown

Take exit 1A on the left to merge onto I-68 W/US-40 W toward Cumberland

Take exit 42 for Greene St/US-220 S

Turn left at MD-956/Patriot Pkwy (signs for MD-956 E).

Continue on WV-956 410 ft to Allegany Ballistics Lab Turn left into plant entrance and proceed to security check point.

NARA/OFR's mailing address is Robert C. Byrd Hilltop Office Complex, 610 State Route 956, Building 494, Rocket Center, WV, 26726. COOP Phones: 304-726-7800 (Operator); 304-726-7859 (OFR editor direct dial); 304-726-7863 (Managing Editor).

OFR will advise agencies of current conditions via *Federal Register* liaison officers who will be contacted by email and fax.  OFR will use its web sites (www.federalregister.gov, www.archives.gov/federal-register), the GPO web site (www.gpo.gov), and press releases to inform agencies and the public.

C0010727

*Federal Register* regulations and document drafting requirements remain in place by law. Agencies must continue to submit original signed paper documents with two certified copies (and disk whenever possible). ***Alternatively, agency signers enrolled in OFR's digital signature program may submit electronically authenticated documents via email or web portal (www.fedreg.gov).*** Contact the OFR Information Services and Technology unit at 202-741-6020 for information about digital signature certificates offered or accepted by GPO.

Depending on the nature and duration of the emergency, OFR will prioritize the publication of documents with preference given to those relating to essential governmental functions. Agencies may be advised not to submit non-essential notices and proposed rules until normal operations resume.

If an attack or threat of attack on the United States severely affects *Federal Register* operations, the President may declare a national security emergency and activate the Emergency Federal Register (EFR) system in place of the daily *Federal Register*. See 44 U.S.C. 1505(c) and E.O. 12656. The purpose of the EFR is to preserve the rule of law and a constitutional form of government, as per NSPD-51/HSPD-20. The *Federal Register* would continue to carry out its basic functions at an alternate location identified in this document or a classified location. Agencies would be informed of status of the emergency publication system through pre-established COOP/COG channels.

*Note:* the EFR can only be activated under extreme national security conditions, and only the President may authorize suspension of the regular Federal Register publication system.

In an order activating the EFR system, the President specifies how the alternate publication system is to function and may authorize procedural modifications. Only those documents having the highest national priority will be published in the EFR. GPO may not be involved.

The OFR would activate a public web site, http://Emergency-Federal-Register.gov, to provide legal notice of Presidential actions, administrative rules and orders, and Acts of Congress. The OFR's emergency continuity website redirects to www.archives.gov/federal-register when inactive. Copies of the EFR also would be distributed to agency COOP sites and the media.

## *For more information.*

## E.5 Where do I direct questions about this?

Please direct any questions about this to the Legal Affairs and Policy Unit at 202-741-6030 or Fedreg.legal@nara.gov.

C0010728

# Federal Register Document Drafting Handbook
October 1998 Revision

# Making Regulations Readable

> **Note:** These instructions will help you comply with the President's Memorandum of June 1, 1998 -- Plain Language in Government Writing .
>
> In the Memorandum, the President directs the Federal Government to send a clear message about what it is doing, what it requires, and what services it offers.
>
> Remember, plain language saves the Government and the private sector time, effort and money. For more in-depth guidance on the elements of plain language, read the National Partnership for Reinventing Government's "Writing User-Friendly Documents,." available at http://www.blm.gov/nhp/NPR/wrtg_idx.html.

Readable regulations help the public find requirements quickly and understand them easily. They increase compliance, strengthen enforcement, and decrease mistakes, frustration, phone calls, appeals, and distrust of government. Everyone gains.

Of the seven techniques below for writing readably, two do the most to improve the look and sound of a regulation:

- Sections as questions and answers.
- "You" for whoever must comply.

You may wish to introduce these techniques when subparts or more of your regulations come due for revision. They will cause some stylistic inconsistency, but it will be temporary. Over time, you will improve entire regulations and, in turn, public productivity and Government credibility.

MRR-1

C0010729

## Craft the table of contents

The most difficult and most important part of writing a regulation comes at the start, as you think out the simplest way to get the results you seek. Your best tool is the table of contents. It is the outline that helps you to:

C *Include key topics.* Headings for sections and higher divisions appear in the table of contents, your reader's road map. Put key topics there, not in paragraphs. Aim the content at readers new to your regulation. You will be more likely to spell things out. When the Federal Communications Commission revised its regulation on citizens band radios, it added some recommended practices to the required ones and eliminated an entire handbook that had explained the earlier, spare regulation.

C *Group related topics.* Group long runs of sections, roughly ten or more, into parts or subparts. Typical groupings are by functions, organizations, and process stages. An especially helpful grouping is by type of readers. A regulation on loans might devote separate parts to borrowers, lenders, and the overseeing agency so each type of reader can go right to topics of interest. (The writer's challenge is to isolate each group's duties and avoid excessive repetition.)

C *Follow a logical order.* What do your readers need to know first, second, third, and so on? In the regulation on loans, sections might flow in many ways: from major matters to minor ones, from usual practices to rare or temporary ones, and (the most common way) from first step to last.

• *Avoid gaps, overlaps, and contradictions.* Can your reader move easily from one section to the next? Take these consecutive section headings: "Application," "Applicable criminal histories," and "Employment application." If *you* were a day-care operator who had to read those headings, could *you* tell them apart?

When you revise a regulation, go through it to strike outdated requirements and insert new ones. Your computer's redline function will help you keep track of changes. But once a regulation has undergone many piecemeal changes, the best revisions start with a blank computer screen. Rethink the content and structure with a reader's convenience in mind.

## Use questions and other informative headings

Few readers study a regulation from beginning to end; most want to go right to whatever interests them. Like drivers on unfamiliar roads, they need lots of signs.

You will give readers those signs by using lots of sections. Section headings offer the double advantage of appearing in both the text and the table of contents. Headings are not required for paragraphs, but they are a good idea.

MRR-2

C0010730

Beware of any heading that is a vague word or two. It forces readers new to your regulation to study whatever follows in search of what might apply to them. A key to clarity is longer, informative headings:

- For "Uses," try "Where you may use an off-highway vehicle."
- For "Scope," try "What does this regulation cover?"

Questions, with their subjects and predicates, make headings uncommonly informative. They provide a consistent way not only to identify topics but to say something about them. Many people think in question and answers, which makes them a natural way to design sections. Writers report that questions and answers promote step-by-step thinking that helps them spot omissions."I" questions and "you" answers help readers see where they fit into the writing. Examples:

§3172.1 May I apply for a spacing unit?

You may apply for a spacing unit if....

§101.1. What special definitions apply to this part?

Applicant means someone who....

## Limit levels of paragraphs

Different levels of paragraphs clarify relative importance, allow pinpoint citations, and simplify revisions all while taking up little or no extra space. They are useful for identifying everything from steps and items to conditions and exceptions.

But avoid excessive levels of paragraphs. Rarely use three designated levels (a)(1)(i) and never use more. Create more sections instead. The example on the right simplifies the text and adds a heading to the table of contents:

§211.14 Who is liable? ...

(a) an owner is liable for...
  (1) The amount set by.
    (i) The percentage of...
    (ii) The portion of...

  (2) The special assessment by...
(b) An operator is liable for...

§211.14 How is an owner liable?

(a) The amount set by...
  (1) The percentage of...
  (2) The portion of.........
(b) The special assessment by...

§211.15 How is an operator liable?

MRR-3

C0010731

## Use more tables and illustrations

If-then tables display complex relationships simply. Their side-by-side arrangement helps writers and readers alike to sort out multiple options, steps, conditions, and choices. Study the next example for its capitalization, punctuation, paragraph designations, and limited use of lines (horizontal ones only, solid and dotted):

(d) To see whether your transportation is an incidental expense or separately reimbursable, follow this table:

| IF YOU... | AND IF YOU... | THEN TRANSPORTATION IS... |
|---|---|---|
| (1) don't discuss business at the place where you obtain a meal | can obtain a suitable meal at your place of lodging or business | an incidental expense |
| (2) don't discuss business at the place where you obtain a meal | can't obtain a suitable meal at your place of lodging or business | separately reimbursable |
| (3) do discuss business at the place where you obtain a meal | | separately reimbursable |

Flow charts, with their boxes and branches, clarify complex processes. Whether or not one appears in your regulation you should imagine a flow chart for your regulation to make sure you understand how all the parts fit the whole.

## Use "you" for whoever must comply

Look for opportunities to write directly to "you," whoever must comply. The direct approach turns vague, passive statements of fact into pointed directions: "The plan must be followed [by whom?]" becomes "You must follow the plan" or "Follow the plan." With a fix on who is responsible, "you" will come naturally.

Write to one reader. Though you may regulate many thousands of people, only one of them reads your writing at any one time.

Here are a few ways to identify the "you":

- Use a definitions section. "You means a licensee."
- Use a section heading. "As a contracting officer, may I...?"
- Answer a section heading. "Who must follow this regulation? This regulation tells you, a lending institution, how to..."

To announce a new "you," use a heading or "if you are..." clause. Both appear in the following example:

MRR-4

C0010732

§211.13 Who is liable for royalties due on a lease?

This section establishes who is liable for royalty payments due on production from a lease:

(a) *Record title owner*. If you are a title owner of a lease, you are liable for...

(b) *Operating rights owner*. If you own operating rights that were...

"You" is easiest to use in simple procedures and hardest when different readers share overlapping duties. Still, the word so focuses thinking and writing that it is among your most powerful tools.

## Rely on active verbs

Limit passive verbs to a few per page. Sentences written with them do severe damage because they rarely say who or what does the verb's action. They assert vaguely that things "must *be requested*" or "may *be submitted*" or "will *be decided*." By whom? A passive verb has two parts:

- Any form of *to be (am, is, are, was, were, be, being, been)* PLUS
- The past participle of a main verb (most end in *-ed*).

Here are some ways to turn passive verbs into active ones:

- Put a doer before the verb. For "An arrangement must *be established*," try "You must establish an arrangement." For "After the forms *are received* by the control staff, they *are copied*," try "After the control staff receives the forms, the control staff copies them."
- Drop part of the verb. "The cancellation clause must be [~~included~~] in the basic contract."
- Change the verb. For "If you press Control-N, you *are shown* a blank screen," try "...you see a blank screen" or "...the computer shows you a blank screen.."

## Control your sentences

Three techniques will help you write sentences that are clear in a single reading.

First, average about 15 words a sentence, and let any one sentence run beyond 30 words only if it ends in a parallel list. To keep the average down, use fewer words and more periods:

[~~It has been determined that~~] [~~t~~] (*T*)his is not a major amendment under Executive Order 12291 [~~because this amendment~~] (. *It*) will not result in an annual effect on the economy of $100 million or more [~~or a significant~~] (. *Nor will it significantly*) increase ~~in~~ costs for consumers; industry; or Federal, State, and local government agencies.

Second, put two or more complicated qualifications *after* the main clause. In the next example, the original sentence forces readers to hold too much in their minds before they reach the late main clause. The revision puts the main clause first (and, for a further improvement, it should list the two conditions vertically).

MRR-5

C0010733

(*The courts generally will not find fraudulent intent when*) [~~When~~] a taxpayer turns over all books and records or otherwise makes a full and complete disclosure of all of the facts to a third party to whom he or she has given the task of preparing the return [~~, the courts generally will not find fraudulent intent.~~]

Third, keep subjects and verbs together and compound verbs together. In the next example, the original sentence interrupts the compound verb "may take." The interruption belongs elsewhere but not right after "The Director," where it would separate the subject and verb.

(*In accordance with the provisions set forth in part 104 of this chapter, the*) [~~The~~] Director may [~~, in accordance with the provisions set forth in part 104 of this chapter,~~] take action against counsel for improper conduct in the course of an investigation.

Further improvements include shrinking "in accordance with the procedures set forth in" to "under" and "in the course of" to "during." Improvements like these last ones and a good many others are covered in the expanded NPR guidance "Writing User-Friendly Documents," available at http://www.blm.gov/nhp/NPR/wrtg_idx.html.

MRR-6

C0010734



U.S. Forest Service • Rocky Mountain Region

C0010735

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Wednesday, September 26, 2012 10:11 AM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Smith, Janelle -FS |
| **Cc:** | Dallas, Dan -FS |
| **Subject:** | draft news release |
| **Attachments:** | nr_12sept26 vwc comment extension.doc |

For review and edits. I figured I would send this out tomorrow once we know everything got to the Fed. Reg. okay.

C0010736



San Luis Valley
Bureau of Land Management

San Luis Valley Public Lands

Rio Grande
National Forest

Contact: Michael Blakeman, (719) 852-6212

**News Release**

**--FOR IMMEDIATE RELEASE—**

**September 27, 2012**

**Forest Service extends comment period on Village at Wolf Creek Access Project**

**Monte Vista, Colo., September 27, 2012 –** The Rio Grande National Forest (RGNF) is extending the 45-day comment period on the Village at Wolf Creek Access Project Draft Environmental Impact Statement (DEIS) ten more days to October 11.

"Although we have received over 250 comments on the DEIS thus far, I decided to extend the comment period ten days in response to a request for an extension from local environmental organizations," said Rio Grande National Forest Supervisor Dan Dallas.

The DEIS includes analyses of the land exchange as the proposed action, an access alternative, and a no-action alternative. The proposed land exchange involves approximately 204 federal acres and 178 non-federal acres within the boundaries of the Rio Grande National Forest. Part of the federal land proposed for exchange would connect the private land to U.S. Highway 160, thus precluding the need for securing access across the national forest.

The primary benefits of the land exchange proposal over the previous easement access proposal include scaled down development on the private land, relocation of most of the proposed private land development to an area farther away from the ski area, and a net gain to the Forest Service via acquisition of wetlands and perennial stream habitat for wildlife.

LMJV previously sought a right-of-way access across RGNF from U.S. Highway 160 to their private land. Since their private land is surrounded by National Forest System land, LMJV is entitled by federal statute to have granted to them by the Forest Service a right-of-way for access commensurate with the reasonable use and enjoyment of their property.

Comments should be submitted by October 11, 2012. Comments may be emailed to: comments-rocky-mountain-rio-grande@fs.fed.us. Please include "Village at Wolf Creek Access Project DEIS" in the subject line of the e-mail. Hardcopy comments should be addressed to:
　　　　Village at Wolf Creek Access Project
　　　　c/o Tom Malecek, Divide District Ranger

C0010737

Rio Grande National Forest
13308 West Highway 160
Del Norte, CO 81132

For more information about the proposed Village at Wolf Creek Access Project, visit the Rio
Grande National Forest website at www.fs.usda.gov/riogrande.

###

**Blakeman, Mike -FS**

| | |
|---|---|
| **From:** | Blakeman, Mike -FS |
| **Sent:** | Wednesday, September 26, 2012 10:45 AM |
| **To:** | Malecek, Thomas -FS; Dyer, Harold D -FS; Blackwolf, Guy E -FS |
| **Cc:** | Dallas, Dan -FS |
| **Subject:** | VWC comments |

This is from the Village website at http://thevillageatwolfcreek.com/landexchange.html

On August 17, 2012, the Rio Grande National Forest released the Village at Wolf Creek Access Project Draft Environmental Impact Statement ("DEIS") disclosing the environmental, social and economic impacts of the proposed Village at Wolf Creek land exchange, an access alternative, and a no-action alternative. The Forest Service has identified the land exchange as their Preferred Alternative.

We are asking you, the public, to convey your support of this land exchange to the Forest Service in the form of letters and emails by October 1, 2012.

Please click here to send your comments to the Forest Service in support of the land exchange.

SUPPORT

C0010739

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9642-000001

C0010740

**Jerry Powell**

| | |
|---|---|
| **From:** | Jerry Powell |
| **Sent:** | Wednesday, September 26, 2012 2:40 PM |
| **To:** | Weiwild@aol.com; Ghormley, Randy -FS |
| **Subject:** | RE: WCV Sep2612 draft BA |

Rick,
Thanks for sending the BA.
Jerry

Jerry Powell, M.S.
Certified Ecologist
Certified Wildlife Biologist
Wildlife Specialties LLC
P.O. Box 1231, Lyons CO 80540
303-710-1286

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Wednesday, September 26, 2012 8:50 AM
**To:** rghormley@fs.fed.us
**Cc:** jerry.powell@wildlifespecialtiesllc.com
**Subject:** WCV Sep2612 draft BA

Rnady,

Attached is the Sep2612 draft BA that should be close to what we submit to FWS. I have accepted all TC's that were active in the prior Sep1412 draft that you did not comment on. The only active changes in the current doc are those responding to your comments on the prior Sep1412 draft that you sent me on Sep2112. They are limited to sections:

3.2.4, p 28-32
7.2.2.4, p 104-
7.2.2.5, p 116

There are some SRLMD consistency analyses where you questioned my former analysis, but gave me no direction for changes. In those sections, I brought your comments over from your draft and refined those sections. Please review them and let me know what you think.

Please call or email me if you have any questions.
Please acknowledge receipt of the attached file(s).
Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

In a message dated 9/21/2012 12:28:27 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

Hi Rick.  Attached are my comments on the Sept 14 draft WCV BA.  Primary comments involve the CMs section and the SRLA consistency section.  You'll see that in the CMs section, I would like to see a general addition that offers other compensatory measures (funding research efforts to inform future CMs that are more associated with the section 7 "take" issue i.e. like the lynx winter rec study, camera sets or snow track efforts to better fine-tune lynx crossing areas, etc).  Now that we have reversed course and determined that the village build-out effects are an indirect effect of the land exchange decision (interrelated/interdependent) the consistency analysis should mirror Alt. 3 like you had it previously.  The biggest change here is that Alt. 2 is now inconsistent with Standard ALL S1, which will require a site-specific plan amendment.

I will be off at 2 pm today.  In the office most of next week.  I'm sure I'll be talking with you soon.

Talk to you soon.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 14, 2012 9:10 AM
**To:** Ghormley, Randy -FS
**Subject:** Draft WCV BA

Randy,

Attached is a largely complete draft BA that would go to the FWS.  Track changes are active.  This is an update of the "WCVBA Aug2712 preNEPA draft final" (the last version that you commented on) where I accepted all of those changes before starting the update.  I have made all the revisions that we discussed at the public hearings (and many more).

As a result of now considering private Village effects as indirect under section 7 rather than reasonably certain under section 10, I found one substantive change to project effects from the prior analysis.  I tentatively find Alternative 2's direct effects to be inconsistent with SRLMD (2009) Objective LINK O1.  Please see the discussion on Pages 122 and 123 (which I have carried to other portions of the document).

You might also review section 3.2.4 Alt. 2 Conservation Strategy (pp. 25-27) that I brought into the Proposed Action.  The basis of the CMs in that section are those adverse effects that would likely result from implementation of the Proposed Action at full build out.  Those adverse project effects are summarized to facilitate CM development by the three parties.  Some CMs are fleshed out where they may be needed to ameliorate or achieve Alternative 2 consistency with SRLMD (2009).  After your review and agreement, I will revise that section into a several page document that you can submit to the FWS and Applicant so that they understand what the impacts are so they can develop appropriate CMs.  I will organize those impacts by which Federal agency would hold discretionary authority over their implementation and enforcement of the CMs.

Please call or email me if you have any questions.

Please acknowledge receipt of the attached file(s).

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302

C0010742

phone & fax: (303) 442-6144; weiwild@aol.com

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010743

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Wednesday, September 26, 2012 4:15 PM |
| **To:** | Weiwild@aol.com |
| **Cc:** | jerry.powell@wildlifespecialtiesllc.com |
| **Subject:** | RE: WCV Sep2612 draft BA |

Got it Rick.  Will get back with you soon.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Wednesday, September 26, 2012 8:50 AM
**To:** Ghormley, Randy -FS
**Cc:** jerry.powell@wildlifespecialtiesllc.com
**Subject:** WCV Sep2612 draft BA

Rnady,

Attached is the Sep2612 draft BA that should be close to what we submit to FWS.  I have accepted all
TC's that were active in the prior Sep1412 draft that you did not comment on.  The only active changes in
the current doc are those responding to your comments on the prior Sep1412 draft that you sent me on
Sep2112.  They are limited to sections:

3.2.4, p 28-32
7.2.2.4, p 104-
7.2.2.5, p 116

There are some SRLMD consistency analyses where you questioned my former analysis, but gave me no
direction for changes.  In those sections, I brought your comments over from your draft and refined those
sections.  Please review them and let me know what you think.

Please call or email me if you have any questions.
Please acknowledge receipt of the attached file(s).
Thank you,

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144;  weiwild@aol.com

In a message dated 9/21/2012 12:28:27 P.M. Mountain Daylight Time, rghormley@fs.fed.us writes:

Hi Rick.  Attached are my comments on the Sept 14 draft WCV BA.  Primary comments involve the
CMs section and the SRLA consistency section.  You'll see that in the CMs section, I would like to see
a general addition that offers other compensatory measures (funding research efforts to inform
future CMs that are more associated with the section 7 "take" issue i.e. like the lynx winter rec

C0010744

study, camera sets or snow track efforts to better fine-tune lynx crossing areas, etc). Now that we have reversed course and determined that the village build-out effects are an indirect effect of the land exchange decision (interrelated/interdependent) the consistency analysis should mirror Alt. 3 like you had it previously. The biggest change here is that Alt. 2 is now inconsistent with Standard ALL S1, which will require a site-specific plan amendment.

I will be off at 2 pm today. In the office most of next week. I'm sure I'll be talking with you soon.

Talk to you soon.

---

**From:** Weiwild@aol.com [mailto:Weiwild@aol.com]
**Sent:** Friday, September 14, 2012 9:10 AM
**To:** Ghormley, Randy -FS
**Subject:** Draft WCV BA

Randy,

Attached is a largely complete draft BA that would go to the FWS. Track changes are active. This is an update of the "WCVBA Aug2712 preNEPA draft final" (the last version that you commented on) where I accepted all of those changes before starting the update. I have made all the revisions that we discussed at the public hearings (and many more).

As a result of now considering private Village effects as indirect under section 7 rather than reasonably certain under section 10, I found one substantive change to project effects from the prior analysis. I tentatively find Alternative 2's direct effects to be inconsistent with SRLMD (2009) Objective LINK O1. Please see the discussion on Pages 122 and 123 (which I have carried to other portions of the document).

You might also review section 3.2.4 Alt. 2 Conservation Strategy (pp. 25-27) that I brought into the Proposed Action. The basis of the CMs in that section are those adverse effects that would likely result from implementation of the Proposed Action at full build out. Those adverse project effects are summarized to facilitate CM development by the three parties. Some CMs are fleshed out where they may be needed to ameliorate or achieve Alternative 2 consistency with SRLMD (2009). After your review and agreement, I will revise that section into a several page document that you can submit to the FWS and Applicant so that they understand what the impacts are so they can develop appropriate CMs. I will organize those impacts by which Federal agency would hold discretionary authority over their implementation and enforcement of the CMs.

Please call or email me if you have any questions.

Please acknowledge receipt of the attached file(s).

*Rick Thompson*

Wildlife Biologist, Western Ecosystems, Inc., 905 West Coach Road, Boulder, CO 80302
phone & fax: (303) 442-6144; weiwild@aol.com

---

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may

violate the law and subject the violator to civil or criminal penalties. If you believe you have received this
message in error, please notify the sender and delete the email immediately.

C0010746

**Custer, Matthew S -FS**

| | |
|---|---|
| **From:** | Custer, Matthew S -FS |
| **Sent:** | Thursday, September 27, 2012 8:46 AM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | FW: Draft Wolf Creek Pass ESA - thoughts/considerations for your use (or not) - as needed |

I've asked for direction from Line about this. I am recommending we send a letter to CDoT requesting they fix the phase 1 analysis and proceed to a phase 2.

I also think that this information should be included in the analysis for the proposed land exchange.

---

**From:** Muenchow, Kurt A -FS
**Sent:** Wednesday, September 26, 2012 4:33 PM
**To:** Custer, Matthew S -FS
**Cc:** Lloyd, Brian A -FS; Malecek, Thomas -FS
**Subject:** RE: Draft Wolf Creek Pass ESA - thoughts/considerations for your use (or not) - as needed

Last thing I do before I am out until next month!

I'm not sure, but is this the report to be used to document "environmental baseline" conditions for a new SUP? If so, we probably might consider additional documentation of historical environmental conditions that may be present.

Things to question/consider:

- "OUT-of -SCOPE" conditions – the ASTM standard allows for identification of "out-of-scope" conditions that may be RECs. The CDOT did not task TetraTech to identify or note any of these "out-of-scope" conditions. Based on my observations & historical knowledge of the site, several such conditions may exist (and are indicated below as "OoSC"). Depending on the purpose of this report, the USFS may or may not care about these potential OoSC RECs (Out-of-Scope environmental conditions). (Out-of-Scope refers to environmentally-significant conditions that may not be "discovered" by following the standard, ASTM Phase I site assessment standards/requirements.)
- Where there is petroleum (gasoline & diesel) release(s), there may be other (un-regulated) releases associated with the spill. Gas additives like EDB &tc. were commonly-used, and may pose a significant environmental risk (even though these chemicals do not happen to be explicitly-regulated in the State of CO UST program.) while we know petroleum (BTEX) is present at concentrations above regulatory standards, other chemical contaminants are also likely to be present. When this is the case, a responsible PHASE I recommendation is to continue to a PHASE II site assessment (sampling).
- The floor drains in the maintenance shop were not adequately explained. These floor drains pre-date the hook-up to the Wolf Creek Ski Area WWTP. Where do they drain? Where are the waste determination(s) &/or maintenance record(s) for the "septic tanks" in the report? Is there an oil/water separator in this system? Floor drains that are inadequately managed (including documentation) may be considered RECs, as they may indicate a CWA "Class V Injection Well" (subsurface discharge) condition. Additional (PHASE II) work would "pull the string" on this issue. Floor drain(s) observed in the Wolf Creek Pass Ski Area should similarly be evaluated.

C0010747

- I observed significant staining on the floors in the maintenance building. This was not mentioned nor addressed in the report. A Phase II assessment would evaluate this condition thoroughly.
- I disagree with the "de-minimis" conclusion regarding stained soils BEHIND the maintenance garage/salt shed. The report shows only one, when I observed several, distinct/separate stained areas. The location & number of these areas indicates poor operational practice(s)/control(s) – a PHASE II would evaluate this further, and either provide data/information to disprove or justify the report's "de-minimis" determination. Poor historical operational practices directly-lead to the current GW REC (contamination), and any indication of continuation of such practices is direct evidence of "...threat to .. the environment...". The report's assertion that the staining is from "parking lot run-off may be true for the pictured staining (in which case, why isn't non-point-source discharge(s) from CWA mentioned as a possible REC?), but was clearly Not the case for other, separate locations of soil staining adjacent to & behind the CDOT structures. Finally, given the immediate proximity of such discharges (pad run-off or operational spills) to the creek behind the CDOT buildings, these stained soils should be further evaluated (PHASE II) before determining "de-minimis" release.
- Forest specialist(s) should advise the Ranger if the creek adjacent (behind) the CDOT buildings is a "sensitive" area (headwaters? Wetlands? ESA? Botany/hydrologist/biologist input). If the creek is a concern, then several OoSC that are present may be of concern – maintenance yard runoff directly to the creek (salt, sand and hard-surface runoff). These are OoSC because the AsTM standard for Phase I does not recognize "pollutants & contaminants". These still may be of concern to the USFS.
- My observation of the wastewater system indicated the possibility (likelihood?) of seasonal discharge from the pumping station into the creek, when snow-melt might inundate/fill the subsurface vault.
- I observed several pipes 4" PVC) along the slope behind the CDOT buildings – these are not mentioned in the report. Unknown, point-source discharges could be a REC. "As-Built" plans and/or tracing/testing (PHASE II) could determine the origin of these piped discharges.
- Seasonal sand (& salt) loadings into the creek behind the CDOT buildings was obvious to me from my site walks, but is not mentioned in this report – they might be considered OoSC's, but, again, may be of concern to the USFS.
- One objection I have to the methodology is the application of ASTM definitions for "owner" and/or "operator". In my mind, the USFS s/b considered the "owner" (NFS-managed lands), & CDOT/Ski Area are "operators". Since this is the case, the "owner" (USFS) was not interviewed nor provided opportunity to share known/suspected RECs & OoSCs that may be of concern...
- Another objection to methodology includes the "Environmental Liens/activity and Use Limitations" – clearly, the SUP (& USFS regulations) impose specific activity & use limitations. Seems to me that the T&Cs of the SUP s/b included in this section. The SUP is a "land use restriction" (but may be another one of those OoSCs – not within the "ASTM" definition).
- If USFS and SUP files were not consulted (publically-available documents) for the Historical Uses & History of the property, this is a gross oversight that s/b rectified.
- Section 5.1 – "landowner" questionnaire? Was USFS contacted as "landowner" of NFS-managed lands?
- Assessing the condition of the CDOT salt/sand shed & maintenance garage as "good" is overly-generous. I believe they are in "fair" condition. (I can see through various holes in each structure to the outside!)
- Listing of all hazardous materials observed (with quantities) was not done – "drums present &tc. does not provide sufficient info. If this is OoSC, then perhaps it also begs a "Phase II" evaluation.
- Funny how the light9ing in photo 10 does not clearly show the highly-0stained floor I observed! I also like the indication of "operational" practices represented by the rag stuffed into the drum's bung... This picture is not representative of this part of the building. I also don't see any pictures of the storage shelves that had various chemicals/containers stacked on them (in the maintenance bldg.).
- Operational records (used oil recovery contract, shipping papers/bills of lading) s/b produced to indicate lack of REC associated with "used oil management"...

OK, time's up, gotta go!

---

**From:** Custer, Matthew S -FS
**Sent:** Wednesday, September 26, 2012 3:07 PM
**To:** Muenchow, Kurt A -FS
**Subject:** RE: Draft Wolf Creek Pass ESA

Kurt – can you review this for us down here?

---

**From:** Flurkey, Andy [mailto:Andy.Flurkey@dot.state.co.us]
**Sent:** Wednesday, September 26, 2012 2:59 PM
**To:** Custer, Matthew S -FS; Fischer, Travis; Mallonee, Franchesca; Muenchow, Kurt A -FS; Muraro, Matt
**Cc:** Santangelo, Theresa
**Subject:** FW: Draft Wolf Creek Pass ESA

Attached is a draft of the phase I site assessment for the CDOT facility at Wolf Creek Pass. Kindly review the document and get me your comments by October 10th. I will pass all comments on to the author on the 10th. Thank you.

---

**From:** Buckmaster, Richard [mailto:Richard.Buckmaster@tetratech.com]
**Sent:** Wednesday, September 26, 2012 1:33 PM
**To:** Flurkey, Andy
**Subject:** Draft Wolf Creek Pass ESA

Hi Andy,

Attached is the draft Phase I ESA for Wolf Creek Pass. Please let me know about any comments and changes that are needed before I finalize it.

Thanks!
Rich

**Richard A. Buckmaster** | Geologist
Direct: 303.980.3518 | Cell: 720.427.8916 | Main: 303.988.2202 | Fax: 303.980.3539
richard.buckmaster@tetratech.com

**Tetra Tech CES, Inc.** | **Consulting and Engineering**
143 Union Blvd. Suite 1010 | Lakewood, CO 80228 | www.tetratech.com

PLEASE NOTE: This message, including any attachments, may include privileged, confidential and/or inside information. Any distribution or use of this communication by anyone other than the intended recipient is strictly prohibited and may be unlawful. If you are not the intended recipient, please notify the sender by replying to this message and then delete it from your system.

 **Think Green - Not every email needs to be printed.**

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Thursday, September 27, 2012 12:10 PM |
| **To:** | Blakeman, Mike -FS; Dyer, Harold D -FS; Dallas, Dan -FS; Wehrli, Christopher L -FS |
| **Cc:** | Malecek, Thomas -FS |
| **Subject:** | 1950; Request for Comment Period Extension - Village at Wolf Creek Land Exchange DEIS |
| **Attachments:** | FS_correspondence.doc |

The following Correspondence is archived in the Records database. Any enclosures will follow the letter in this message.

*(See attached file: FS_correspondence.doc)*

To open this document in the Records database, click on this link ->

To access all documents in the National Records Database, click on this link ->

C0010750

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.9646-000001

C0010751

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9646-000002

C0010752



| United States Department of Agriculture | Forest Service | Rio Grande National Forest | Divide Ranger District 13308 West Highway 160 Del Norte, CO 81132 (719)657-3321 (719)657-6038 TTY http://www.fs.fed.us/r2/riogrande |
|---|---|---|---|

**File Code:** 1950
**Date:** September 27, 2012

Josh Pollock
Executive Director
Rocky Mountain Wild
1536 Wynkoop Street, Suite 303
Denver, CO 80202

Dear Mr. Pollock:

Thank you for your letter, dated September 21, requesting an additional 30 days to comment on the Village at Wolf Creek Access Draft Environmental Impact Statement (DEIS). As stated in your letter, there are many people very interested in the DEIS who want to make sure they have a thorough understanding of the project, and document, in order to make substantive comments.

To date, we have received hundreds of comments from a wide variety of interested publics who have taken the time to understand the project and draft EIS in order to provide their comments within the 45 day comment period. While I appreciate your request for an additional 30 days to comment, I feel the 45 day comment period, which included three public meetings, is sufficient as I have received so many comments to date.

However, in the interest of ensuring a thorough understanding and wanting to receive substantive comments from as diverse a public as possible, I am willing to extend the comment period an additional 10 days. This would push the deadline for email comments to October 11, and hard copy comments would need to be faxed or postmarked by this date.

As always, my staff and I are available by phone, email or in person to answer questions concerning the DEIS.

Thank you for your interest in this project.


Sincerely,


*/s/ Thomas M. Malecek*
THOMAS M. MALECEK
District Ranger



**It's Cool to Be Safe**

Printed on Recycled Paper 

C0010753

C0010754

**Jason Marks**

| | |
|---|---|
| **From:** | Jason Marks |
| **Sent:** | Thursday, September 27, 2012 12:38 PM |
| **To:** | Malecek, Thomas -FS; david@westerneco.com |
| **Cc:** | Schaefers, Julie -FS |
| **Subject:** | RE: Full Economic Study for V@WC? |

I have absolutely no concerns with sending out the full report (email or hard copy).

Jason

Jason Marks
*Senior Project Manager*
 SE GROUP
PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel   (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,
We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

C0010755

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010756

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.55813-000001

C0010757

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.55813-000002

C0010758

**David Johnson**

---

| | |
|---|---|
| **From:** | David Johnson |
| **Sent:** | Thursday, September 27, 2012 1:25 PM |
| **To:** | 'Jason Marks'; Malecek, Thomas -FS |
| **Cc:** | Schaefers, Julie -FS |
| **Subject:** | RE: Full Economic Study for V@WC? |

Tom,

We have a digital copy of the Economic Study and can make a hard copy and send it to you, unless Jason has a hard copy that he could send to send it to you.

David Johnson
Ecologist



**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
david@westerneco.com  ·  www.westerneco.com

---

**From:** Jason Marks [mailto:jmarks@segroup.com]
**Sent:** Thursday, September 27, 2012 12:38 PM
**To:** Malecek, Thomas -FS; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** RE: Full Economic Study for V@WC?

I have absolutely no concerns with sending out the full report (email or hard copy).

Jason

Jason Marks
*Senior Project Manager*

PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel   (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,
We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.
No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.2221 / Virus Database: 2441/5294 - Release Date: 09/27/12

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.56750-000001

C0010761

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.56750-000002

C0010762

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.56750-000003

C0010763

**Jason Marks**

| | |
|---|---|
| **From:** | Jason Marks |
| **Sent:** | Thursday, September 27, 2012 1:47 PM |
| **To:** | David Johnson; Malecek, Thomas -FS |
| **Cc:** | Schaefers, Julie -FS |
| **Subject:** | RE: Full Economic Study for V@WC? |

We only have it electronically.

Jason Marks
*Senior Project Manager*

SE GROUP

PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel   (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

---

**From:** David Johnson [mailto:david@westerneco.com]
**Sent:** Thursday, September 27, 2012 1:25 PM
**To:** Jason Marks; 'Malecek, Thomas -FS'
**Cc:** 'Schaefers, Julie -FS'
**Subject:** RE: Full Economic Study for V@WC?

Tom,

We have a digital copy of the Economic Study and can make a hard copy and send it to you, unless Jason has a hard copy that he could send to send it to you.

David Johnson
Ecologist



**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax*
david@westerneco.com   ·   www.westerneco.com

---

**From:** Jason Marks [mailto:jmarks@segroup.com]
**Sent:** Thursday, September 27, 2012 12:38 PM
**To:** Malecek, Thomas -FS; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** RE: Full Economic Study for V@WC?

C0010764

I have absolutely no concerns with sending out the full report (email or hard copy).

Jason

Jason Marks
*Senior Project Manager*

SE GROUP

PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel  (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,
We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

No virus found in this message.
Checked by AVG - www.avg.com
Version: 2012.0.2221 / Virus Database: 2441/5294 - Release Date: 09/27/12

C0010766

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.49911-000001

C0010767

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.49911-000002

C0010768

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.49911-000003

C0010769

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.49911-000004

C0010770

**McGinn, Diana -FS**

| | |
|---|---|
| **From:** | McGinn, Diana -FS |
| **Sent:** | Thursday, September 27, 2012 2:04 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | Wolf Creek & CARA - I didn't leave myself a role with this project |

Dave, I think I made you the project leader, but did not assign myself a role – so I don't have access to the project.  You'll have to go in a make me a team member or something…☺

*Diana McGinn*
*Vegetation Planner/Silviculturist*
*Rio Grande National Forest*
*1803 W. Hwy 160*
*Monte Vista CO 81144*
*Office: 719-852-6241*
Cell: 719-850-2368

C0010771

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9648-000001

C0010772

**FS-CARA-help**

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Thursday, September 27, 2012 4:32 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | CARA Attention Needed – Potentially Offensive Letter Content Review |

Your Draft EIS Comment for the Village at Wolf Creek Land Exchange Proposal Project has the Public Reading Room turned on and has received Letter #57, which contains terms that have been identified as potentially offensive.

The potentially offensive content HAS NOT been published on your public website. Instead, it has been moved to a holding area where you can review it and decide whether the letter should be published in your public reading room.

To view and manage this letter, log into PALS at this link: http://apps.fs.fed.us/pals/, click on the "CARA Login" button, select your project, and go to the Reading Room Management tool.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

C0010773

**Smith, Janelle -FS**

| | |
|---|---|
| **From:** | Smith, Janelle -FS |
| **Sent:** | Thursday, September 27, 2012 5:19 PM |
| **To:** | Vann, R E -FS; McClure, Tom -FS; Gates, Terri -FS; Ratzlaff, Jace I -FS; Kurtz, Kathy -FS |
| **Subject:** | FW: VWC news release |
| **Attachments:** | nr_12sept27 vwc comment extension.doc |

FYI – announcement of 10-day comment period extension for the Village at Wolf Creek Access Project.

Janelle Smith
US Forest Service, Rocky Mountain Region
External Affairs
303.275.5359 (office)
720.289.7587 (mobile)
janellesmith@fs.fed.us

---

**From:** Blakeman, Mike -FS
**Sent:** Thursday, September 27, 2012 5:14 PM
**Subject:** VWC news release

The attached went out to CO media today.

Mike Blakeman
Public Affairs Specialist
SLV Public Lands Center
719-852-6212

C0010774



San Luis Valley Public Lands

San Luis Valley
Bureau of Land Management

Rio Grande
National Forest

Contact: Michael Blakeman, (719) 852-6212

**News Release**

**--FOR IMMEDIATE RELEASE—**

**September 27, 2012**

**Forest Service extends comment period on Village at Wolf Creek Access Project**

**Monte Vista, Colo., September 27, 2012 –** The Rio Grande National Forest (RGNF) is extending the 45-day comment period on the Village at Wolf Creek Access Project Draft Environmental Impact Statement (DEIS) ten more days to October 11.

"Although we have received over 250 comments on the DEIS thus far, I decided to extend the comment period ten days in response to a request for an extension from local and regional environmental organizations," said Rio Grande National Forest Supervisor Dan Dallas.

The DEIS includes analyses of the land exchange as the proposed action, an access alternative, and a no-action alternative. The proposed land exchange involves approximately 204 federal acres and 178 non-federal acres within the boundaries of the Rio Grande National Forest. Part of the federal land proposed for exchange would connect the private land to U.S. Highway 160, thus precluding the need for securing access across the national forest.

The primary benefits of the land exchange proposal over the previous easement access proposal include scaled down development on the private land, relocation of most of the proposed private land development to an area farther away from the ski area, and a net gain to the Forest Service via acquisition of wetlands and perennial stream habitat for wildlife.

LMJV previously sought a right-of-way access across RGNF from U.S. Highway 160 to their private land. Since their private land is surrounded by National Forest System land, LMJV is entitled by federal statute to have granted to them by the Forest Service a right-of-way for access commensurate with the reasonable use and enjoyment of their property.

Comments should be submitted by October 11, 2012. Comments may be emailed to: comments-rocky-mountain-rio-grande@fs.fed.us. Please include "Village at Wolf Creek Access Project DEIS" in the subject line of the e-mail. Hardcopy comments should be addressed to:
        Village at Wolf Creek Access Project
        c/o Tom Malecek, Divide District Ranger

C0010775

Rio Grande National Forest
13308 West Highway 160
Del Norte, CO 81132

For more information about the proposed Village at Wolf Creek Access Project, visit the Rio Grande National Forest website at www.fs.usda.gov/riogrande.

###

**Ghormley, Randy -FS**

---

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Thursday, September 27, 2012 6:07 PM |
| **To:** | kurt_broderdorp@fws.gov |
| **Subject:** | FW: VWC news release |
| **Attachments:** | nr_12sept27 vwc comment extension.doc |

Fyi regarding your favorite project

---

**From:** Blakeman, Mike -FS
**Sent:** Thursday, September 27, 2012 5:14 PM
**Subject:** VWC news release

The attached went out to CO media today.

Mike Blakeman
Public Affairs Specialist
SLV Public Lands Center
719-852-6212

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010777



San Luis Valley Public Lands

San Luis Valley
Bureau of Land Management

Rio Grande
National Forest

Contact: Michael Blakeman,  (719) 852-6212

**News Release**

**--FOR IMMEDIATE RELEASE—**

**September 27, 2012**

**Forest Service extends comment period on Village at Wolf Creek Access Project**

**Monte Vista, Colo., September 27, 2012 –**The Rio Grande National Forest (RGNF) is extending the 45-day comment period on the Village at Wolf Creek Access Project Draft Environmental Impact Statement (DEIS) ten more days to October 11.

"Although we have received over 250 comments on the DEIS thus far, I decided to extend the comment period ten days in response to a request for an extension from local and regional environmental organizations," said Rio Grande National Forest Supervisor Dan Dallas.

The DEIS includes analyses of the land exchange as the proposed action, an access alternative, and a no-action alternative. The proposed land exchange involves approximately 204 federal acres and 178 non-federal acres within the boundaries of the Rio Grande National Forest. Part of the federal land proposed for exchange would connect the private land to U.S. Highway 160, thus precluding the need for securing access across the national forest.

The primary benefits of the land exchange proposal over the previous easement access proposal include scaled down development on the private land, relocation of most of the proposed private land development to an area farther away from the ski area, and a net gain to the Forest Service via acquisition of wetlands and perennial stream habitat for wildlife.

LMJV previously sought a right-of-way access across RGNF from U.S. Highway 160 to their private land. Since their private land is surrounded by National Forest System land, LMJV is entitled by federal statute to have granted to them by the Forest Service a right-of-way for access commensurate with the reasonable use and enjoyment of their property.

Comments should be submitted by October 11, 2012. Comments may be emailed to: comments-rocky-mountain-rio-grande@fs.fed.us. Please include "Village at Wolf Creek Access Project DEIS" in the subject line of the e-mail. Hardcopy comments should be addressed to:
        Village at Wolf Creek Access Project
        c/o Tom Malecek, Divide District Ranger

C0010778

Rio Grande National Forest
13308 West Highway 160
Del Norte, CO 81132

For more information about the proposed Village at Wolf Creek Access Project, visit the Rio Grande National Forest website at www.fs.usda.gov/riogrande.

###

**Miller, Jeffrey H -FS**

| | |
|---|---|
| **From:** | Miller, Jeffrey H -FS |
| **Sent:** | Friday, September 28, 2012 3:56 PM |
| **To:** | Dallas, Dan -FS; Dyer, Harold D -FS |
| **Subject:** | Fw: Comment on Wolf Creek |

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/28/2012 03:55 PM -----

**Deth Last NameDeth**
**<dethcivic@yahoo.com>**

09/28/2012 01:58 AM

Please respond to
Deth Last NameDeth
<dethcivic@yahoo.com>

To Mailroom R2 Rio Grande
cc
Subject Comment on Wolf Creek

I think this should not be allowed, the sale of any National Forest or Park land should never happen, it was protected for a reason, not just until the right buyer/price came along, if anything it should be that the developer should have to give 5 times the land in trade or huge amounts of extra money simply because the land next to the highway is worth much more in value and they would be screaming if the deal was the other way around. It is time to stand up, say NO and realize that our environment and especially the National Forests and Parks are much more than material possessions to be used and abused, bought and sold. Again, it was put aside for a reason !! We also have many ski resorts and surrounding communities/villages that are hurting and struggling for the business in this economy as well, why build more. Thank you for listening. Sincerley, Dylan O'Brien

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9652-000001

C0010781

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.9652-000002

C0010782

**FS-CARA-help**

| | |
|---|---|
| **From:** | FS-CARA-help |
| **Sent:** | Saturday, September 29, 2012 4:23 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | CARA Attention Needed – Potentially Offensive Letter Content Review |

Your Draft EIS Comment for the Village at Wolf Creek Land Exchange Proposal Project has the Public Reading Room turned on and has received Letter #68, which contains terms that have been identified as potentially offensive.

The potentially offensive content HAS NOT been published on your public website. Instead, it has been moved to a holding area where you can review it and decide whether the letter should be published in your public reading room.

To view and manage this letter, log into PALS at this link: http://apps.fs.fed.us/pals/, click on the "CARA Login" button, select your project, and go to the Reading Room Management tool.

Click on the link below to access CARA:

http://apps.fs.fed.us/pals/

Thank you,
CARA Support Team
cara-help@fs.fed.us

C0010783

**Malecek, Thomas -FS**

---

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Sunday, September 30, 2012 6:52 PM |
| **To:** | Ghormley, Randy -FS |
| **Subject:** | RE: Rare plant analysis BA/BE (WER 2012) |

Randy, thanks if you would, to the lady below, Julia, and her work address is shown as well.  Thanks/!

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Ghormley, Randy -FS
**Sent:** Monday, September 24, 2012 6:02 PM
**To:** Malecek, Thomas -FS; Julia Hanson
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Hi folks.  The plant BE for WCV Land Exchange proposal has been reviewed and the contractor has made the final edits.  So it's basically complete.  Please let me know if I need to mail a hardcaopy and I will do so.

---

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 24, 2012 8:57 AM
**To:** Julia Hanson
**Cc:** Ghormley, Randy -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, thanks for the info, we can get you what you are looking for, and will likely send a hard copy rather than electronic, unless you will be in the area and can pick it up.  Let me know, thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Julia Hanson [mailto:jhanson@sme-env.com]
**Sent:** Monday, September 24, 2012 8:46 AM
**To:** Malecek, Thomas -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Tom
I am working on the CDOT lease renewal parcel on Wolf Creek Pass, specifically plant surveys. The plant analysis and survey info within the Proposed Wolf Creek Village DEIS and BA/BE is helpful due to the adjacent location. I have reviewed the DEIS and was looking for the BA/BE. Thanks!

**Julia Hanson**
**Biologist/Botanist**

C0010784



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee
(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person
responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this
communication is strictly prohibited. If you have received this communication in error, please notify us immediately by
telephone and destroy this email and attachments.

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** Julia Hanson
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today.  Can you tell me what plant survey and for whom are you working?  I will look
into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)

----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | Julia Hanson | To | Mailroom R2 Rio Grande |
| | <jhanson@sme-env.com> | cc | |
| | 09/17/2012 10:27 AM | Subject | Rare plant analysis BA/BE (WER 2012) |

Dan
I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation
that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within
the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**

C0010785



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee (s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010786

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.25762-000001

C0010787

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.25762-000002

C0010788

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.25762-000003

C0010789

**Schaefers, Julie -FS**

| | |
|---|---|
| **From:** | Schaefers, Julie -FS |
| **Sent:** | Monday, October 01, 2012 8:35 AM |
| **To:** | Ng, Kawa -FS |
| **Subject:** | FW: Full Economic Study for V@WC? |
| **Importance:** | High |

Do you have any thoughts??  You spent more time with the study than I did (which is to say, I spent none!)

*************************************
Julie Schaefers
Regional Social Scientist
USDA Forest Service - Rocky Mountain Regional Office
740 Simms, Golden  CO  80401
phone - 303-275-5194
fax - 303-275-5134
email - jschaefers@fs.fed.us
*******************************************

---

**From:** Malecek, Thomas -FS
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks (jmarks@segrp.com); david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,
We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

C0010790

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

C0010791

**Schaefers, Julie -FS**

| | |
|---|---|
| **From:** | Schaefers, Julie -FS |
| **Sent:** | Monday, October 01, 2012 8:36 AM |
| **To:** | Ng, Kawa -FS |
| **Subject:** | FW: Full Economic Study for V@WC? |

Jason's comment/thoughts -

**************************************
Julie Schaefers
Regional Social Scientist
USDA Forest Service - Rocky Mountain Regional Office
740 Simms, Golden  CO  80401
phone - 303-275-5194
fax - 303-275-5134
email - jschaefers@fs.fed.us
**************************************

**From:** Jason Marks [mailto:jmarks@segroup.com]
**Sent:** Thursday, September 27, 2012 12:38 PM
**To:** Malecek, Thomas -FS; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** RE: Full Economic Study for V@WC?

I have absolutely no concerns with sending out the full report (email or hard copy).

Jason

Jason Marks
*Senior Project Manager*
SE GROUP
PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel   (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the

C0010792

Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,
We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010793

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.149147-000001

C0010794

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.149147-000002

C0010795

**Ng, Kawa -FS**

| | |
|---|---|
| **From:** | Ng, Kawa -FS |
| **Sent:** | Monday, October 01, 2012 9:12 AM |
| **To:** | Schaefers, Julie -FS |
| **Subject:** | RE: Full Economic Study for V@WC? |

The latest version's (August 2012) DEIS has some really important clarifications on pages 4-180 and 4-181. Those are disclaimers that the county might want to read *before* digging into the econ specialist report, which <u>lacked</u> those important disclaimers (as of the version from May 24th 2012).
Is there a newer version of the econ specialist report since the May 24th one? If not, perhaps attaching those two pages (4-180, 4-181) ALONG with the full report might be worth considering.

~Kawa

---

**From:** Schaefers, Julie -FS
**Sent:** Monday, October 01, 2012 8:36 AM
**To:** Ng, Kawa -FS
**Subject:** FW: Full Economic Study for V@WC?

Jason's comment/thoughts -

*************************************
Julie Schaefers
Regional Social Scientist
USDA Forest Service - Rocky Mountain Regional Office
740 Simms, Golden  CO  80401
phone - 303-275-5194
fax - 303-275-5134
email - jschaefers@fs.fed.us
*************************************

---

**From:** Jason Marks [mailto:jmarks@segroup.com]
**Sent:** Thursday, September 27, 2012 12:38 PM
**To:** Malecek, Thomas -FS; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** RE: Full Economic Study for V@WC?

I have absolutely no concerns with sending out the full report (email or hard copy).

Jason

Jason Marks
*Senior Project Manager*



PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel   (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,
We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010797

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.149149-000001

C0010798

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.149149-000002

C0010799

**Schaefers, Julie -FS**

| | |
|---|---|
| **From:** | Schaefers, Julie -FS |
| **Sent:** | Monday, October 01, 2012 9:18 AM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | Ng, Kawa -FS |
| **Subject:** | FW: Full Economic Study for V@WC? |

Tom – Kawa spent time actually reading and review the economic reports (me – not so much)
So I asked him if he had any thoughts …

Maybe not a concern with releasing the whole report – but Kawa's thought to give some additional pointers
of important sections they should be sure and review might be a good idea…

*************************************
Julie Schaefers
Regional Social Scientist
USDA Forest Service - Rocky Mountain Regional Office
740 Simms, Golden  CO  80401
phone - 303-275-5194
fax - 303-275-5134
email - jschaefers@fs.fed.us
*************************************

**From:** Ng, Kawa -FS
**Sent:** Monday, October 01, 2012 9:12 AM
**To:** Schaefers, Julie -FS
**Subject:** RE: Full Economic Study for V@WC?

The latest version's (August 2012) DEIS has some really important clarifications on pages 4-180 and 4-181.
Those are disclaimers that the county might want to read *before* digging into the econ specialist report,
which lacked those important disclaimers (as of the version from May 24th 2012).
Is there a newer version of the econ specialist report since the May 24th one? If not, perhaps attaching those
two pages (4-180, 4-181) ALONG with the full report might be worth considering.

~Kawa

**From:** Schaefers, Julie -FS
**Sent:** Monday, October 01, 2012 8:36 AM
**To:** Ng, Kawa -FS
**Subject:** FW: Full Economic Study for V@WC?

Jason's comment/thoughts -

*************************************

C0010800

Julie Schaefers
Regional Social Scientist
USDA Forest Service - Rocky Mountain Regional Office
740 Simms, Golden  CO  80401
phone - 303-275-5194
fax - 303-275-5134
email - jschaefers@fs.fed.us
*****************************************

---

**From:** Jason Marks [mailto:jmarks@segroup.com]
**Sent:** Thursday, September 27, 2012 12:38 PM
**To:** Malecek, Thomas -FS; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** RE: Full Economic Study for V@WC?

I have absolutely no concerns with sending out the full report (email or hard copy).

Jason

Jason Marks
*Senior Project Manager*

S E   G R O U P

PO Box 2729 / 323 West Main Street   Suite 201
Frisco   Colorado   80443
Tel   (970) 668-3398, ext 102
Cell (970) 406-0520
jmarks@segroup.com
www.segroup.com

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Thursday, September 27, 2012 12:25 PM
**To:** Jason Marks; david@westerneco.com
**Cc:** Schaefers, Julie -FS
**Subject:** FW: Full Economic Study for V@WC?
**Importance:** High

Jason and David, is there anything in the "full report" socioecon that I would be concerned over if we gave to
Archuleta County?  Would it be better to email or hard copy mail?  I prefer hard copy so he cannot take bits
and pieces and email them around.  PLEASE let me know what you think, as I would like to response or have
something in the mail by tomorrow.

PS, just sent out a letter extending the comment period by 10 days, sent a copy to David.  Will aslo be in the
Fed Reg hopefully on MOnday

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Michael whiting [mailto:whitinginpagosa@yahoo.com]
**Sent:** Tuesday, September 18, 2012 9:46 AM
**To:** Malecek, Thomas -FS
**Subject:** Full Economic Study for V@WC?

Tom,

C0010801

We really need that full study to be able to comment intelligently and in time!
Can/will you email it to me?

*Michael E. Whiting*
*Clarity, Tranquility, Courage.*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010802

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.53384-000001

C0010803

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.53384-000002

C0010804

| | |
|---|---|
| **From:** | Ghormley, Randy -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GHORMLEY, RANDY571BF5F2-6509-49E4-BFB6-71EB33F7B225> |
| **Sent:** | Monday, October 01, 2012 9:38 AM |
| **To:** | Malecek, Thomas -FS |
| **Subject:** | RE: Rare plant analysis  BA/BE (WER 2012) |
| **Attachments:** | image001.jpg; image002.gif; image003.gif |

Will do Tom.  I need to get the revised final from Rae, she is in this week.

**From:** Malecek, Thomas -FS
**Sent:** Sunday, September 30, 2012 6:52 PM
**To:** Ghormley, Randy -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Randy, thanks if you would, to the lady below, Julia, and her work address is shown as well.  Thanks/!

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Ghormley, Randy -FS
**Sent:** Monday, September 24, 2012 6:02 PM
**To:** Malecek, Thomas -FS; Julia Hanson
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Hi folks.  The plant BE for WCV Land Exchange proposal has been reviewed and the contractor has made the final edits.  So it's basically complete.  Please let me know if I need to mail a hardcaopy and I will do so.

**From:** Malecek, Thomas -FS
**Sent:** Monday, September 24, 2012 8:57 AM
**To:** Julia Hanson
**Cc:** Ghormley, Randy -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, thanks for the info, we can get you what you are looking for, and will likely send a hard copy rather than electronic, unless you will be in the area and can pick it up.  Let me know, thanks

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Julia Hanson [mailto:jhanson@sme-env.com]
**Sent:** Monday, September 24, 2012 8:46 AM
**To:** Malecek, Thomas -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

1

C0010805

Tom
I am working on the CDOT lease renewal parcel on Wolf Creek Pass, specifically plant surveys. The plant analysis and survey info within the Proposed Wolf Creek Village DEIS and BA/BE is helpful due to the adjacent location. I have reviewed the DEIS and was looking for the BA/BE. Thanks!

**Julia Hanson**
**Biologist/Botanist**



**ENVIRONMENTAL CONSULTANTS**
679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

---

**From:** Malecek, Thomas -FS [mailto:tmalecek@fs.fed.us]
**Sent:** Friday, September 21, 2012 1:56 PM
**To:** Julia Hanson
**Cc:** Dyer, Harold D -FS; Dallas, Dan -FS
**Subject:** RE: Rare plant analysis BA/BE (WER 2012)

Julia, just got your email today.  Can you tell me what plant survey and for whom are you working?  I will look into seeing what info we may be able to provide after hearing back from you.

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

**From:** Miller, Jeffrey H -FS **On Behalf Of** FS-Mailroom R2 Rio Grande
**Sent:** Monday, September 17, 2012 4:20 PM
**To:** Dallas, Dan -FS; Day, Ronnie -FS; Malecek, Thomas -FS
**Subject:** Fw: Rare plant analysis BA/BE (WER 2012)


----- Forwarded by Jeffrey H Miller/R2/USDAFS on 09/17/2012 04:19 PM -----

| | | |
|---|---|---|
| **Julia Hanson <jhanson@sme-env.com>** | To | Mailroom R2 Rio Grande |
| 09/17/2012 10:27 AM | cc | |
| | Subject | Rare plant analysis BA/BE (WER 2012) |

2

Dan

I am working on a plant survey near Wolf Creek ski area and would like to review the BA /BE Evaluation that was completed for the Village at Wolf Creek. It was mentioned within the DEIS as available within the project file. I am wondering if it is available through the website or upon request. Thank you,

**Julia Hanson**
**Biologist/Botanist**



679 E 2nd Avenue/ Unit E2
Durango,CO 81301
(p) 970-403-0581
(f) 970-259-0050
jhanson@sme-env.com

CONFIDENTIAL NOTICE: The information contained in this email and attachments is intended for the use of the addressee(s) and contains information that is confidential and/or privileged. If you are not the intended recipient or the person responsible for delivering it to the intended recipient, any disclosure, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone and destroy this email and attachments.

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010807

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.29953-000001

C0010808

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29953-000002

C0010809

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.29953-000003

C0010810

| | |
|---|---|
| **From:** | Rea Orthner <rea@westerneco.com> |
| **Sent:** | Monday, October 01, 2012 10:57 AM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | 'David Johnson' |
| **Subject:** | Final Draft of Plant BA/BE Wolf Creek |
| **Attachments:** | image002.jpg |

Hi Randy,

The pdf version of the Final Draft of the Plant BA/BE for the Wolf Creek Access project will be emailed to you later today. I have a MS word version I can send you now if you would like to make any track changes.  Please let me know.

I did incorporate all of Andy Kratz's comments.  Also there is a discussion of the least moonwort (Botrychium simplex var. compositum) in the Final Draft of the EIS in the Vegetation Section (see page 3-42).

Per our conversation earlier this morning, I will discuss the relative importance of the green-stem phenotype of Botrychium lanceolatum with Steve Popovich to see if this phenotype is worth mentioning in any greater detail in the BA/BE and/or EIS.  I hope to speak with Steve later today.

Sorry for the delay in getting you the Final Draft of the plant BA/BE.

Please don't hesitate to contact me if you have any further questions.

Rea



**REA ORTHNER**
**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax · 720.289.1665 mobile*
rea@westerneco.com    ·    www.westerneco.com

1

C0010811

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.25763-000001

C0010812

**Mark Pearson**

| | |
|---|---|
| **From:** | Mark Pearson |
| **Sent:** | Monday, October 01, 2012 11:04 AM |
| **To:** | Malecek, Thomas -FS |
| **Cc:** | Dallas, Dan -FS; Wanda_Cason@MarkUdall.Senate.Gov; John_Whitney@bennet.senate.gov |
| **Subject:** | Comments on Village at Wolf Creek DEIS |
| **Attachments:** | Pearson comments VWC.pdf |

Dear Mr. Malecek:

My comments on the Village at Wolf Creek are attached, and were mailed
hard copy today as well (with copies of references).

Mark Pearson

C0010813

October 1, 2012

Thomas Malecek
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO, 81144

Re: Draft EIS for Village at Wolf Creek Access Project

Dear Mr. Malecek:

I am writing to offer my comments on the DEIS for the Village at Wolf Creek Access Project. I strongly encourage you to adopt the No Action Alternative. This in fact is the only alternative that comports with the Forest Service's mission and obligation to manage the public's national forests in trust for the America people.

I am writing as an individual with extensive history and knowledge of the region from many years of residence in Durango. I am also writing as a member of several conservation groups, including San Juan Citizens Alliance and Rocky Mountain Wild, in the event these comments are useful to those groups in pursuing additional administrative options relative to the agency's decision.

A decision by the Forest Service to authorize Red McCombs' desired Village at Wolf Creek would rate among the most destructive, long-lasting, and irreversible impacts to the entire Southern Rocky Mountains. Whereas decisions to authorize timber sales or even oil and gas leases are ultimately reparable, even if over a span of a century, the decision to approve an entire new town – the highest altitude town in North America for that matter – in a crucial landscape linkage for wildlife is permanent, and eventually orders of magnitude more destructive.

The proposed action is not in the best interest of the public owners of the Rio Grande National Forest. Authorizing development of a new town numbering in the thousands of residents in the heart of the principal lynx movement corridor in the Southern Rockies will devastate the value of this crucial landscape linkage. More fundamentally, there is no justification provided for why it serves the public interest to exchange the public's national forest to accommodate this particular private inholder's development while dozens of other similarly situated private inholdings in the Rio Grande NF provide reasonable use and enjoyment to their owners via seasonable access over gravel roads and via snowmobiles in winter.

The environment of the San Juan Mountains, and the public resources of the Rio Grande National Forest, will not be improved after this discretionary Forest Service decision to authorize and assist construction of homes and lodging for thousands of new residents atop Wolf Creek Pass. There are no circumstances under which the Forest Service can describe this discretionary activity as a benefit to the public.

C0010814

Fundamentally, Red McCombs wants premium highway frontage for his real estate development investments. That however does not enhance the public's resources in the Rio Grande National Forest, and the exchange should be rejected outright.

The DEIS lacks critical analysis in several key areas. First, there is no discussion or analysis of similarly situated private inholdings and the access provided by the Forest Service for the reasonable use and enjoyment of those parcels. Second, the analysis of the Wolf Creek lynx linkage corridor occurs only in the static circumstances of our current climate; the DEIS lacks any awareness or acknowledgement of USFS climate change adaptation directives and requirements. Third, even if the land exchange were to be pursued, there is no discussion or analysis of why the Forest Service believes that high, dry, and buildable public lands are worth less per acre that unbuildable wetlands; the trade-off of 204.4 acres of current federal lands for 177.8 acres of wetland-covered private lands does not jive with agency appraisal requirements. Fourth, the preferred alternative is an arbitrary and capricious decision that is contrary to provided evidence and science.

**1) Analysis of Similarly Situated Private Inholdings**

The structure of the DEIS is fundamentally flawed by labeling one road access alternative as the "ANILCA access alternative" while the other existing road access alternative is described as No Action. The No Action alternatively equally serves the ANILCA requirements for providing reasonable access to LMJV and Mr. McCombs for use and enjoyment of the property. The DEIS labeling of alternatives incorrectly advances an interpretation that only one mode of access meets ANILCA requirements.

The DEIS describes the agency's requirements for providing access under ANILCA:

> "a route and method of access to non-Federal land that provides for reasonable use and enjoyment of the non-Federal land consistent with similarly situated non-Federal land and that minimizes damage or disturbance to National Forest System lands and resources. " (DEIS at 1-15)

The DEIS further describes the process by which the Rio Grande National Forest will determine whether to approve the requested access:

> "The authorizing officer shall determine what constitutes reasonable use and enjoyment of the lands based on contemporaneous uses made of similarly situated lands in the area and any other relevant criteria." (DEIS at 1-16)

That is the last reference in the DEIS to the topic of "similarly situated lands." The public cannot comment upon the reasonableness and logic of the agency's decision without any knowledge of what "similarly situated lands" in the area were used for comparison purposes to make your determination.

The Rio Grande National Forest contains many, many examples of similarly situated private inholdings.  For example, there are many private inholdings on Beaver Creek, Alamosa

2

C0010815

River headwaters, Red Mountain Creek, Lime Creek and others. Private owners and the Rio Grande National Forest have apparently determined that reasonable use and enjoyment of similarly situated inholdings is in many cases for a seasonally accessible cabin and associated semi-primitive recreational uses. Owners access their properties by gravel road during summer months, and access by oversnow vehicle during winter months. This mode of access is widely accepted as adequate for reasonable use and enjoyment of similarly situated properties on the Rio Grande National Forest.

There are no apparent, similarly situated inholdings on the Rio Grande National Forest which are utilized for year-round resort developments to the tune of 1,711 units, which may include two hotels with 200 units, 16 condominiums with 821 units, 46 townhomes with 522 units, 138 single family lots, and 221,000 ft$^2$ of commercial space, as described in the DEIS for the maximum development scenarios. If the Rio Grande National Forest is basing its decision on its belief that similarly situated lands in the area dictate an interpretation that all such inholdings deserve year-round highway access for reasonable use and enjoyment as multi-thousand unit resort developments, then the agency is obligated, under NEPA, to be transparent with the public and reveal this information in the DEIS.

The lack of any discussion or analysis of what similarly situated lands the agency used for its determination of reasonable use and enjoyment is a critical omission in the DEIS. The Forest Service must describe what specific, similarly situated parcels it based its analysis on for determining access necessary for reasonable use and enjoyment in the manner proposed by Mr. McCombs. In previous decisions regarding access under ANILCA, forests in Region 1 have specifically identified the similarly situated lands in the area upon which they relied for their determination of reasonable access, as required by regulation.

The pretext behind the land exchange is that the seasonally accessible private inholding as currently configured doesn't meet the development desires of Mr. McCombs. However, this is not the public's problem to fix.  It is not a reasonable expectation that the public will convey new property that is more desirably situated for expansive commercial and real estate development contiguous to a federal, paved highway simply because the property owned does not meet that owner's desired development goals.

To put it in context, I own patented mining claims within the Uncompahgre National Forest. One of my properties is situated high in Governor Basin, on nearly vertical slopes accessible by rough four-wheel-drive road at over 12,000 feet in elevation. I may reasonably want to use and enjoy my property with a nice, backcountry cabin or even a mini-McMansion, and thus I insist on year-round road access to a buildable site down along a creek on nice flat ground. Can I similarly come to the Forest Service and demand that in the name of ANILCA you must trade to me a prime piece of real estate, with excellent road access and improved ability to build, simply because I argue that I cannot otherwise use and enjoy my existing property the way I want to? I would think not, yet that is precisely the argument advanced by the Forest Service in reaching its preferred alternative to support the land exchange demanded by Mr. McCombs.

3

C0010816

**2) Climate Change Analysis and Agency Directives**

The DEIS fails to analyze the anticipated consequences of climate change on the affected environment, and most specifically, the Wolf Creek Pass Lynx Linkage (WCPLL). Instead, the DEIS assesses the value of the Wolf Creek Landscape Linkage in a static climate. However, climate change projections predict that "the climate of the mountains migrates upwards in elevation," a point which the DEIS acknowledges (DEIS at 3-69). Further substantiation is provided by Ray et al in a report completed for the Colorado Water Conservation Board (Climate Change in Colorado: A Synthesis to Support Water Resources Management and Adaptation for the Colorado Water Conservation Boar, by Andrea J. Ray, Joseph J. Barsugli, Kristen B. Averyt, Martin Hoerling, and Klaus Wolter, 2008).

The DEIS does not mention climate change as a significant issue for analysis. This absence is surprising given the extensive emphasis accorded to climate change impacts and adaptation as detailed in recent Forest Service policy pronouncements. Chief Tidwell's stated goal for the agency is to "Ensure our national forests and private working lands are conserved, restored, and made more resilient to climate change, while enhancing our water resources." (http://www.fs.fed.us/climatechange)

The DEIS omits any mention or discussion of the Forest Service's National Roadmap for Responding to Climate Change (USDA Forest Service, 2011). One of the agency's strategic imperatives is adaptation, defined by your agency as "enhance the capacity of forests and grasslands to adapt to the environmental stresses of climate change and maintain ecosystem services." A development of 8,000 or more residents atop Wolf Creek Pass is a major stress on the otherwise intact ecosystems on the Rio Grande National Forest.

The Forest Service's climate change roadmap has explicit recommendations for management necessary to preserve the existence of species on the national forests. However, the Rio Grande National Forest's preferred alternative in the DEIS directly conflicts with this policy direction. Per the Chief's climate change roadmap, "To protect all these species and more, the Forest Service will need to make habitats more resilient to climate change and increase connectivity among them." (National Roadmap at 24)

> "Climate Change Impacts: Animals Adapted to Cold
> Many animal species occupy a geographic range within certain thermal limits. **Because the Forest Service manages many cold, higher elevation landscapes, it plays an important role in sustaining populations of cold-adapted species.** As annual temperatures rise, animals will shift northward or move to higher elevations. For example, many species in the Great Basin, in particular butterflies and pika, will be forced into smaller, more isolated patches of high-elevation habitats. Similarly, many trout and char populations will be forced into smaller, more isolated headwaters; some might disappear. Woodland caribou in northern Idaho occupy the southern extent of their range. Northward migration would eliminate them from the Continental United States. **To protect all these species and more, the Forest Service will need to make habitats more resilient to climate change and increase connectivity among them**. Failure will mean the disappearance of these

4

C0010817

species from the National Forest System." (National Roadmap at 24) (emphasis added)

The Chief has charged national forests, including the Rio Grande National Forest, with explicit responsibilities in analysis and planning of activities such as that described in the DEIS:

> "**Addressing climate change in planning and analysis by doing the following:**
> – Incorporating climate-related vulnerabilities and uncertainties into land management and project-level environmental analyses.
> – Discussing how a range of uncertain future climate conditions might affect the expected consequences of proposed activities." (National Roadmap at 25)

The DEIS fails to meet this charge because of the absence of any analysis or discussion about the impact of future climate conditions on the viability of the WCPLL by the proposed activity of the Village at Wolf Creek.

Forest Service policy further requires focus and attention to improved connectivity. The preferred alternative in the DEIS explicitly destroys connectivity. (DEIS 4-102)As directed by the Chief in the National Roadmap:

> "**Connect habitats** to improve adaptive capacity**.**
> – Collaborate with partners to develop strategies that identify priority locations for maintaining and restoring habitat connectivity. Seek partnerships with private landowners to provide migration corridors across private lands.
> – Remove or modify physical impediments to the movement of species most likely to be affected by climate change.
> – Manage forest and grassland ecosystems to decrease fragmentation.
> – Continue to develop and restore important corridors for fish and wildlife." (National Roadmap at 26)

The Rio Grande National Forest cannot comply with agency direction to maintain and restore habitat connectivity and to remove physical impediments to the movement of species, such as lynx, likely to be affected by climate change by authorizing a discretionary activity such as a land exchange that will diminish connectivity and create additional physical impediments to movement at WCPLL.

The lack of any analysis in the DEIS, much less the "hard look" required by NEPA, of the consequence of climate change to the future significance of the Wolf Creek Pass Lynx Linkage shortchanges the public's interest. Protecting key areas of connectivity is one of the most pressing management concerns in an era of rapidly changing climate. The Rio Grande National Forest must assess the proposed land exchange against the Forest Service's legal and policy mandates for managing for resilient habitat in the face of climate change.

Critical factors for protecting habitat resilience are to reduce stresses on the ecosystem,

5

C0010818

and to protect and enhance habitat connectivity. The DEIS's preferred alternative for a land exchange, whose stated purpose is to facilitate the construction of a multi-season resort housing thousands of visitors and residents, is diametrically in opposition to the Forest Service's inherent duties for protecting public resources, particularly in the context of climate change. Thousands of year-round residents and visitors housed atop Wolf Creek Pass, in the heart of the most significant landscape connection in the Southern Rocky Mountains, creates an intolerable, immense and entirely avoidable human stress on the ecosystem. The Rio Grande NF cannot proceed with this exchange and conform to its agency climate change policy goals.

Establishing a new, year-round high-altitude commercial and residential development in the midst of the Wolf Creek Pass landscape corridor will permanently and irretrievably destroy the value of this corridor for habitat connectivity. The DEIS appropriately notes the significance of the WCPLL with repeated references:

> "Lynx are heavily using the WCPLL area as a dispersal corridor and the viability of this linkage is important to the recovery of lynx in Colorado." (DEIS 3-66)

> "The Wolf Creek Pass area appears to have functioned as the principal linkage for lynx moving between the South San Juan Wilderness and the main body of the San Juan Core area to the northwest, with few lynx relocations in the immediate vicinity of the Hwy 160 corridor, probably because of more rapid and extended movements and less residency time." (DEIS at 3-66)

> "The WCPLL is an analysis area where potential qualitative impacts that could result from pending management decisions related to the proposed development could influence lynx movements through the WCPLL and habitat connectivity with surrounding habitat blocks."  (3-66)

Unfortunately, the selected action of a land exchange is contrary to the underlying science documented in the DEIS.

Current science predicts the vulnerability of critical landscapes for lynx survivability in the forecasted future climate. USDA Forest Service research describes the impact of climate change on lynx:

> "The conservation of vulnerable areas for lynx will require intensive natural resource management intervention." (Gonzalez et al 2007)[1]

---

[1] Gonzalez, Patrick; Neilson, Ronald P.; McKelvey, Kevin S.; Lenihan, James M.; Drapek, Raymond J. Potential Impacts of Climate Change on Habitat and Conservation Priority Areas for *Lynx Canadensis* (Canada Lynx).

C0010819

The DEIS apparently notes the expected impact of climate change on lynx, although the Rio Grande National Forest's preferred alternative will exacerbate this concern:

> "Climate Change. Climate change is reducing the snow pack in western North American mountains and is shifting the distribution of boreal forest northward and up mountain slopes. As a result, climate change is altering the geographic location and distribution of potential lynx habitat, threatening the long-term viability of lynx in the contiguous United States." (DEIS 3-69)

The DEIS summarizes the negative impacts of the Village at Wolf Creek on lynx connectivity across Wolf Creek Pass, even in the absence of considering climate change, and predicts reduced landscape connectivity:

> "In summary, the indirect and reasonably certain Village development effects could result in appreciable, year-round increases in vehicular traffic on Hwy 160 that could increase lynx highway mortality probabilities, rising to the level of 'take'. Greater lynx avoidance of the Hwy 160 corridor could further inhibit effective habitat use along the highway, impairing the ability of lynx to maintain adjacent home ranges, and impairing some local and dispersing movements, which may lead to reduced landscape connectivity between large habitat blocks in the San Juan Core Area and the designated WCPLL that are important to the Southern Rockies lynx population." (DEIS 4-102)

Authorizing an entire new city in the primary high-elevation lynx corridor in the Southern Rockies is a management decision contrary to the scientifically identified actions necessary to conserve the Wolf Creek Pass Lynx Linkage in light of ongoing climate change. This runs contrary to the policy direction of the Forest Service as spelled out in the National Roadmap.

**3) Transparency of appraisal values and comparables**

As noted in the DEIS, Forest Service regulations require that values for exchange purposes be determined by appraisal. Forest Service appraisal guidelines and policies are provided in the Forest Service Manual (FSM 5410).

The DEIS does not provide any description, analysis or justification for details of the proposed land exchange. The Forest Service is proposing to exchange 204.4 acres of national forest lands of forests and dry meadows while receiving only 177.8 acres that are largely wetlands and limited usefulness for construction of homes, hotels, and condos. (DEIS at 2-1)

The DEIS must reveal to the public what the appraised "highest and best use" is for the parcels under consideration. The DEIS nowhere describes the highest and best use that is the basis for analysis of the land exchange. Presumably, real estate development for hotels, resort homes, and condos is the evaluated highest and best use since that is the intended use of the lands desired by the exchange proponent.

7

C0010820

If real estate development for hotels, homes, and condos is the highest and best use of the parcels, then the ratio of exchanged lands on its surface is not logical. The Rio Grande National Forest is trading away a larger amount of public land that is readily developable for hotels, homes and condos and is adjacent to a paved state highway for a smaller amount of private land that is encumbered by wetlands and has only seasonable access by a gravel road.

To be specific, the DEIS describes that the Forest Service is exchanging a parcel with 1.02 acres of wetlands (the high, dry land located adjacent to a paved highway) for non-federal lands that contain 23.72 acres of fen wetlands. What appraisal system was used to value fen wetlands at a higher dollar value per acre for real estate development than dry forests and meadows?

The Rio Grande National Forest's preferred alternative is not a logical and rational outcome based on the underlying evidence of the character and development potential of the federal and non-federal parcels.

**4) Preferred alternative is counter to the evidence before the agency**

Courts have routinely rejected agency decisions when the selected action is clearly contrary to the expressed science. One recent reiteration of this precept was Judge Sullivan's decision to reject a winter use management plan put forth by Yellowstone National Park as clearly contrary to the underlying science on which the agency relied. (Greater Yellowstone Coalition v. Kempthorne, 577 F. Supp. 2d 183, 193 (D.D.C. 2008)

Under the Administrative Procedure Act, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). While this standard does not empower courts to substitute their judgment for that of the agency, it requires "a thorough, probing, in-depth review" of challenged decisions. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Accordingly, an administrative action must be vacated where the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 446 (D.C.Cir.1995)

The Rio Grande National Forest risks violating the APA by adopting an arbitrary and capricious decision to authorize a discretionary land exchange that ignores key aspects of the issue, such as climate change impacts and agency policy directives for assessing climate change impacts. The preferred alternative runs counter to the evidence before the Forest Service relative to habitat connectivity, fragmentation, and the future increased importance of the WCPLL in a changing climate.

C0010821

In summary, the Rio Grande National Forest's preferred alternative of a land exchange with the Village at Wolf Creek is not in the public's interest, is destructive of public resources, and does not comply with the Forest Service's legal and policy mandates. It should be rejected in favor of the No Action Alternative.

Sincerely yours,

Mark Pearson
219 E. Story Street
Bozeman, MT 59715
mpearson@frontier.net


cc: Senator Michael Bennet
    Senator Mark Udall

C0010822

## Dallas, Dan -FS

| | |
|---|---|
| **From:** | Dallas, Dan -FS |
| **Sent:** | Monday, October 01, 2012 11:17 AM |
| **To:** | Capps, Kenneth - OGC |
| **Cc:** | Dyer, Harold D -FS; Malecek, Thomas -FS |
| **Subject:** | FW: Comments on Village at Wolf Creek DEIS |
| **Attachments:** | Pearson comments VWC.pdf |

This one has some substantive comments in it.  FYI.

**Dan S. Dallas**
Forest Supervisor/Center Manager
1803 W. Hwy 160
Monte Vista, CO  81144
(719) 852-6247 office
(719) 852-6298 fax
(719) 850-2355 cell

---

**From:** Mark Pearson [mailto:mpearson@frontier.net]
**Sent:** Monday, October 01, 2012 11:04 AM
**To:** Malecek, Thomas -FS
**Cc:** Dallas, Dan -FS; Wanda_Cason@MarkUdall.Senate.Gov; John_Whitney@bennet.senate.gov
**Subject:** Comments on Village at Wolf Creek DEIS

Dear Mr. Malecek:

My comments on the Village at Wolf Creek are attached, and were mailed
hard copy today as well (with copies of references).

Mark Pearson

C0010823

October 1, 2012

Thomas Malecek
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO, 81144

Re: Draft EIS for Village at Wolf Creek Access Project

Dear Mr. Malecek:

I am writing to offer my comments on the DEIS for the Village at Wolf Creek Access Project. I strongly encourage you to adopt the No Action Alternative. This in fact is the only alternative that comports with the Forest Service's mission and obligation to manage the public's national forests in trust for the America people.

I am writing as an individual with extensive history and knowledge of the region from many years of residence in Durango. I am also writing as a member of several conservation groups, including San Juan Citizens Alliance and Rocky Mountain Wild, in the event these comments are useful to those groups in pursuing additional administrative options relative to the agency's decision.

A decision by the Forest Service to authorize Red McCombs' desired Village at Wolf Creek would rate among the most destructive, long-lasting, and irreversible impacts to the entire Southern Rocky Mountains. Whereas decisions to authorize timber sales or even oil and gas leases are ultimately reparable, even if over a span of a century, the decision to approve an entire new town – the highest altitude town in North America for that matter – in a crucial landscape linkage for wildlife is permanent, and eventually orders of magnitude more destructive.

The proposed action is not in the best interest of the public owners of the Rio Grande National Forest. Authorizing development of a new town numbering in the thousands of residents in the heart of the principal lynx movement corridor in the Southern Rockies will devastate the value of this crucial landscape linkage. More fundamentally, there is no justification provided for why it serves the public interest to exchange the public's national forest to accommodate this particular private inholder's development while dozens of other similarly situated private inholdings in the Rio Grande NF provide reasonable use and enjoyment to their owners via seasonable access over gravel roads and via snowmobiles in winter.

The environment of the San Juan Mountains, and the public resources of the Rio Grande National Forest, will not be improved after this discretionary Forest Service decision to authorize and assist construction of homes and lodging for thousands of new residents atop Wolf Creek Pass. There are no circumstances under which the Forest Service can describe this discretionary activity as a benefit to the public.

Fundamentally, Red McCombs wants premium highway frontage for his real estate development investments. That however does not enhance the public's resources in the Rio Grande National Forest, and the exchange should be rejected outright.

The DEIS lacks critical analysis in several key areas. First, there is no discussion or analysis of similarly situated private inholdings and the access provided by the Forest Service for the reasonable use and enjoyment of those parcels. Second, the analysis of the Wolf Creek lynx linkage corridor occurs only in the static circumstances of our current climate; the DEIS lacks any awareness or acknowledgement of USFS climate change adaptation directives and requirements. Third, even if the land exchange were to be pursued, there is no discussion or analysis of why the Forest Service believes that high, dry, and buildable public lands are worth less per acre that unbuildable wetlands; the trade-off of 204.4 acres of current federal lands for 177.8 acres of wetland-covered private lands does not jive with agency appraisal requirements. Fourth, the preferred alternative is an arbitrary and capricious decision that is contrary to provided evidence and science.

**1) Analysis of Similarly Situated Private Inholdings**

The structure of the DEIS is fundamentally flawed by labeling one road access alternative as the "ANILCA access alternative" while the other existing road access alternative is described as No Action. The No Action alternatively equally serves the ANILCA requirements for providing reasonable access to LMJV and Mr. McCombs for use and enjoyment of the property. The DEIS labeling of alternatives incorrectly advances an interpretation that only one mode of access meets ANILCA requirements.

The DEIS describes the agency's requirements for providing access under ANILCA:

> "a route and method of access to non-Federal land that provides for reasonable use and enjoyment of the non-Federal land consistent with similarly situated non-Federal land and that minimizes damage or disturbance to National Forest System lands and resources. " (DEIS at 1-15)

The DEIS further describes the process by which the Rio Grande National Forest will determine whether to approve the requested access:

> "The authorizing officer shall determine what constitutes reasonable use and enjoyment of the lands based on contemporaneous uses made of similarly situated lands in the area and any other relevant criteria." (DEIS at 1-16)

That is the last reference in the DEIS to the topic of "similarly situated lands." The public cannot comment upon the reasonableness and logic of the agency's decision without any knowledge of what "similarly situated lands" in the area were used for comparison purposes to make your determination.

The Rio Grande National Forest contains many, many examples of similarly situated private inholdings.  For example, there are many private inholdings on Beaver Creek, Alamosa

2

River headwaters, Red Mountain Creek, Lime Creek and others. Private owners and the Rio Grande National Forest have apparently determined that reasonable use and enjoyment of similarly situated inholdings is in many cases for a seasonally accessible cabin and associated semi-primitive recreational uses. Owners access their properties by gravel road during summer months, and access by oversnow vehicle during winter months. This mode of access is widely accepted as adequate for reasonable use and enjoyment of similarly situated properties on the Rio Grande National Forest.

There are no apparent, similarly situated inholdings on the Rio Grande National Forest which are utilized for year-round resort developments to the tune of 1,711 units, which may include two hotels with 200 units, 16 condominiums with 821 units, 46 townhomes with 522 units, 138 single family lots, and 221,000 $ft^2$ of commercial space, as described in the DEIS for the maximum development scenarios. If the Rio Grande National Forest is basing its decision on its belief that similarly situated lands in the area dictate an interpretation that all such inholdings deserve year-round highway access for reasonable use and enjoyment as multi-thousand unit resort developments, then the agency is obligated, under NEPA, to be transparent with the public and reveal this information in the DEIS.

The lack of any discussion or analysis of what similarly situated lands the agency used for its determination of reasonable use and enjoyment is a critical omission in the DEIS. The Forest Service must describe what specific, similarly situated parcels it based its analysis on for determining access necessary for reasonable use and enjoyment in the manner proposed by Mr. McCombs. In previous decisions regarding access under ANILCA, forests in Region 1 have specifically identified the similarly situated lands in the area upon which they relied for their determination of reasonable access, as required by regulation.

The pretext behind the land exchange is that the seasonally accessible private inholding as currently configured doesn't meet the development desires of Mr. McCombs. However, this is not the public's problem to fix. It is not a reasonable expectation that the public will convey new property that is more desirably situated for expansive commercial and real estate development contiguous to a federal, paved highway simply because the property owned does not meet that owner's desired development goals.

To put it in context, I own patented mining claims within the Uncompahgre National Forest. One of my properties is situated high in Governor Basin, on nearly vertical slopes accessible by rough four-wheel-drive road at over 12,000 feet in elevation. I may reasonably want to use and enjoy my property with a nice, backcountry cabin or even a mini-McMansion, and thus I insist on year-round road access to a buildable site down along a creek on nice flat ground. Can I similarly come to the Forest Service and demand that in the name of ANILCA you must trade to me a prime piece of real estate, with excellent road access and improved ability to build, simply because I argue that I cannot otherwise use and enjoy my existing property the way I want to? I would think not, yet that is precisely the argument advanced by the Forest Service in reaching its preferred alternative to support the land exchange demanded by Mr. McCombs.

3

C0010826

**2) Climate Change Analysis and Agency Directives**

The DEIS fails to analyze the anticipated consequences of climate change on the affected environment, and most specifically, the Wolf Creek Pass Lynx Linkage (WCPLL). Instead, the DEIS assesses the value of the Wolf Creek Landscape Linkage in a static climate. However, climate change projections predict that "the climate of the mountains migrates upwards in elevation," a point which the DEIS acknowledges (DEIS at 3-69). Further substantiation is provided by Ray et al in a report completed for the Colorado Water Conservation Board (Climate Change in Colorado: A Synthesis to Support Water Resources Management and Adaptation for the Colorado Water Conservation Boar, by Andrea J. Ray, Joseph J. Barsugli, Kristen B. Averyt, Martin Hoerling, and Klaus Wolter, 2008).

The DEIS does not mention climate change as a significant issue for analysis. This absence is surprising given the extensive emphasis accorded to climate change impacts and adaptation as detailed in recent Forest Service policy pronouncements. Chief Tidwell's stated goal for the agency is to "Ensure our national forests and private working lands are conserved, restored, and made more resilient to climate change, while enhancing our water resources." (http://www.fs.fed.us/climatechange)

The DEIS omits any mention or discussion of the Forest Service's National Roadmap for Responding to Climate Change (USDA Forest Service, 2011). One of the agency's strategic imperatives is adaptation, defined by your agency as "enhance the capacity of forests and grasslands to adapt to the environmental stresses of climate change and maintain ecosystem services." A development of 8,000 or more residents atop Wolf Creek Pass is a major stress on the otherwise intact ecosystems on the Rio Grande National Forest.

The Forest Service's climate change roadmap has explicit recommendations for management necessary to preserve the existence of species on the national forests. However, the Rio Grande National Forest's preferred alternative in the DEIS directly conflicts with this policy direction. Per the Chief's climate change roadmap, "To protect all these species and more, the Forest Service will need to make habitats more resilient to climate change and increase connectivity among them." (National Roadmap at 24)

> "Climate Change Impacts: Animals Adapted to Cold
> Many animal species occupy a geographic range within certain thermal limits. **Because the Forest Service manages many cold, higher elevation landscapes, it plays an important role in sustaining populations of cold-adapted species.** As annual temperatures rise, animals will shift northward or move to higher elevations. For example, many species in the Great Basin, in particular butterflies and pika, will be forced into smaller, more isolated patches of high-elevation habitats. Similarly, many trout and char populations will be forced into smaller, more isolated headwaters; some might disappear. Woodland caribou in northern Idaho occupy the southern extent of their range. Northward migration would eliminate them from the Continental United States. **To protect all these species and more, the Forest Service will need to make habitats more resilient to climate change and increase connectivity among them**. Failure will mean the disappearance of these

4

C0010827

species from the National Forest System." (National Roadmap at 24) (emphasis added)

The Chief has charged national forests, including the Rio Grande National Forest, with explicit responsibilities in analysis and planning of activities such as that described in the DEIS:

> "**Addressing climate change in planning and analysis by doing the following:**
> – Incorporating climate-related vulnerabilities and uncertainties into land management and project-level environmental analyses.
> – Discussing how a range of uncertain future climate conditions might affect the expected consequences of proposed activities." (National Roadmap at 25)

The DEIS fails to meet this charge because of the absence of any analysis or discussion about the impact of future climate conditions on the viability of the WCPLL by the proposed activity of the Village at Wolf Creek.

Forest Service policy further requires focus and attention to improved connectivity. The preferred alternative in the DEIS explicitly destroys connectivity. (DEIS 4-102)As directed by the Chief in the National Roadmap:

> "**Connect habitats** to improve adaptive capacity**.**
> – Collaborate with partners to develop strategies that identify priority locations for maintaining and restoring habitat connectivity. Seek partnerships with private landowners to provide migration corridors across private lands.
> – Remove or modify physical impediments to the movement of species most likely to be affected by climate change.
> – Manage forest and grassland ecosystems to decrease fragmentation.
> – Continue to develop and restore important corridors for fish and wildlife."
> (National Roadmap at 26)

The Rio Grande National Forest cannot comply with agency direction to maintain and restore habitat connectivity and to remove physical impediments to the movement of species, such as lynx, likely to be affected by climate change by authorizing a discretionary activity such as a land exchange that will diminish connectivity and create additional physical impediments to movement at WCPLL.

The lack of any analysis in the DEIS, much less the "hard look" required by NEPA, of the consequence of climate change to the future significance of the Wolf Creek Pass Lynx Linkage shortchanges the public's interest. Protecting key areas of connectivity is one of the most pressing management concerns in an era of rapidly changing climate. The Rio Grande National Forest must assess the proposed land exchange against the Forest Service's legal and policy mandates for managing for resilient habitat in the face of climate change.

Critical factors for protecting habitat resilience are to reduce stresses on the ecosystem,

5

C0010828

and to protect and enhance habitat connectivity. The DEIS's preferred alternative for a land exchange, whose stated purpose is to facilitate the construction of a multi-season resort housing thousands of visitors and residents, is diametrically in opposition to the Forest Service's inherent duties for protecting public resources, particularly in the context of climate change. Thousands of year-round residents and visitors housed atop Wolf Creek Pass, in the heart of the most significant landscape connection in the Southern Rocky Mountains, creates an intolerable, immense and entirely avoidable human stress on the ecosystem. The Rio Grande NF cannot proceed with this exchange and conform to its agency climate change policy goals.

Establishing a new, year-round high-altitude commercial and residential development in the midst of the Wolf Creek Pass landscape corridor will permanently and irretrievably destroy the value of this corridor for habitat connectivity. The DEIS appropriately notes the significance of the WCPLL with repeated references:

> "Lynx are heavily using the WCPLL area as a dispersal corridor and the viability of this linkage is important to the recovery of lynx in Colorado." (DEIS 3-66)

> "The Wolf Creek Pass area appears to have functioned as the principal linkage for lynx moving between the South San Juan Wilderness and the main body of the San Juan Core area to the northwest, with few lynx relocations in the immediate vicinity of the Hwy 160 corridor, probably because of more rapid and extended movements and less residency time." (DEIS at 3-66)

> "The WCPLL is an analysis area where potential qualitative impacts that could result from pending management decisions related to the proposed development could influence lynx movements through the WCPLL and habitat connectivity with surrounding habitat blocks." (3-66)

Unfortunately, the selected action of a land exchange is contrary to the underlying science documented in the DEIS.

Current science predicts the vulnerability of critical landscapes for lynx survivability in the forecasted future climate. USDA Forest Service research describes the impact of climate change on lynx:

> "The conservation of vulnerable areas for lynx will require intensive natural resource management intervention." (Gonzalez et al 2007)[1]

---

[1] Gonzalez, Patrick; Neilson, Ronald P.; McKelvey, Kevin S.; Lenihan, James M.; Drapek, Raymond J. Potential Impacts of Climate Change on Habitat and Conservation Priority Areas for *Lynx Canadensis* (Canada Lynx).

6

The DEIS apparently notes the expected impact of climate change on lynx, although the Rio Grande National Forest's preferred alternative will exacerbate this concern:

> "Climate Change. Climate change is reducing the snow pack in western North American mountains and is shifting the distribution of boreal forest northward and up mountain slopes. As a result, climate change is altering the geographic location and distribution of potential lynx habitat, threatening the long-term viability of lynx in the contiguous United States." (DEIS 3-69)

The DEIS summarizes the negative impacts of the Village at Wolf Creek on lynx connectivity across Wolf Creek Pass, even in the absence of considering climate change, and predicts reduced landscape connectivity:

> "In summary, the indirect and reasonably certain Village development effects could result in appreciable, year-round increases in vehicular traffic on Hwy 160 that could increase lynx highway mortality probabilities, rising to the level of 'take'. Greater lynx avoidance of the Hwy 160 corridor could further inhibit effective habitat use along the highway, impairing the ability of lynx to maintain adjacent home ranges, and impairing some local and dispersing movements, which may lead to reduced landscape connectivity between large habitat blocks in the San Juan Core Area and the designated WCPLL that are important to the Southern Rockies lynx population." (DEIS 4-102)

Authorizing an entire new city in the primary high-elevation lynx corridor in the Southern Rockies is a management decision contrary to the scientifically identified actions necessary to conserve the Wolf Creek Pass Lynx Linkage in light of ongoing climate change. This runs contrary to the policy direction of the Forest Service as spelled out in the National Roadmap.

**3) Transparency of appraisal values and comparables**

As noted in the DEIS, Forest Service regulations require that values for exchange purposes be determined by appraisal. Forest Service appraisal guidelines and policies are provided in the Forest Service Manual (FSM 5410).

The DEIS does not provide any description, analysis or justification for details of the proposed land exchange. The Forest Service is proposing to exchange 204.4 acres of national forest lands of forests and dry meadows while receiving only 177.8 acres that are largely wetlands and limited usefulness for construction of homes, hotels, and condos. (DEIS at 2-1)

The DEIS must reveal to the public what the appraised "highest and best use" is for the parcels under consideration. The DEIS nowhere describes the highest and best use that is the basis for analysis of the land exchange. Presumably, real estate development for hotels, resort homes, and condos is the evaluated highest and best use since that is the intended use of the lands desired by the exchange proponent.

7

If real estate development for hotels, homes, and condos is the highest and best use of the parcels, then the ratio of exchanged lands on its surface is not logical. The Rio Grande National Forest is trading away a larger amount of public land that is readily developable for hotels, homes and condos and is adjacent to a paved state highway for a smaller amount of private land that is encumbered by wetlands and has only seasonable access by a gravel road.

To be specific, the DEIS describes that the Forest Service is exchanging a parcel with 1.02 acres of wetlands (the high, dry land located adjacent to a paved highway) for non-federal lands that contain 23.72 acres of fen wetlands. What appraisal system was used to value fen wetlands at a higher dollar value per acre for real estate development than dry forests and meadows?

The Rio Grande National Forest's preferred alternative is not a logical and rational outcome based on the underlying evidence of the character and development potential of the federal and non-federal parcels.

**4) Preferred alternative is counter to the evidence before the agency**

Courts have routinely rejected agency decisions when the selected action is clearly contrary to the expressed science. One recent reiteration of this precept was Judge Sullivan's decision to reject a winter use management plan put forth by Yellowstone National Park as clearly contrary to the underlying science on which the agency relied. (Greater Yellowstone Coalition v. Kempthorne, 577 F. Supp. 2d 183, 193 (D.D.C. 2008)

Under the Administrative Procedure Act, federal agency actions are to be held unlawful and set aside where they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *See* 5 U.S.C. § 706(2)(A). While this standard does not empower courts to substitute their judgment for that of the agency, it requires "a thorough, probing, in-depth review" of challenged decisions. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Accordingly, an administrative action must be vacated where the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983); *see also Daingerfield Island Protective Soc'y v. Babbitt,* 40 F.3d 442, 446 (D.C.Cir.1995)

The Rio Grande National Forest risks violating the APA by adopting an arbitrary and capricious decision to authorize a discretionary land exchange that ignores key aspects of the issue, such as climate change impacts and agency policy directives for assessing climate change impacts. The preferred alternative runs counter to the evidence before the Forest Service relative to habitat connectivity, fragmentation, and the future increased importance of the WCPLL in a changing climate.

8

C0010831

In summary, the Rio Grande National Forest's preferred alternative of a land exchange with the Village at Wolf Creek is not in the public's interest, is destructive of public resources, and does not comply with the Forest Service's legal and policy mandates. It should be rejected in favor of the No Action Alternative.

Sincerely yours,

Mark Pearson
219 E. Story Street
Bozeman, MT 59715
mpearson@frontier.net


cc: Senator Michael Bennet
    Senator Mark Udall

C0010832

**Ghormley, Randy -FS**

| | |
|---|---|
| **From:** | Ghormley, Randy -FS |
| **Sent:** | Monday, October 01, 2012 11:35 AM |
| **To:** | Rea Orthner |
| **Cc:** | 'David Johnson' |
| **Subject:** | RE: Final Draft of Plant BA/BE Wolf Creek |

Thank you Rae.  I'll wait for the pdf later today.

---

**From:** Rea Orthner [mailto:rea@westerneco.com]
**Sent:** Monday, October 01, 2012 10:57 AM
**To:** Ghormley, Randy -FS
**Cc:** 'David Johnson'
**Subject:** Final Draft of Plant BA/BE Wolf Creek

Hi Randy,

The pdf version of the Final Draft of the Plant BA/BE for the Wolf Creek Access project will be emailed to you later today.  I have a MS word version I can send you now if you would like to make any track changes.  Please let me know.

I did incorporate all of Andy Kratz's comments.  Also there is a discussion of the least moonwort (Botrychium simplex var. compositum) in the Final Draft of the EIS in the Vegetation Section (see page 3-42).

Per our conversation earlier this morning, I will discuss the relative importance of the green-stem phenotype of Botrychium lanceolatum with Steve Popovich to see if this phenotype is worth mentioning in any greater detail in the BA/BE and/or EIS.  I hope to speak with Steve later today.

Sorry for the delay in getting you the Final Draft of the plant BA/BE.

Please don't hesitate to contact me if you have any further questions.

Rea



***REA ORTHNER***
***WESTERN ECOLOGICAL RESOURCE, INC.***
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax · 720.289.1665 mobile*
rea@westerneco.com  ·  www.westerneco.com

C0010833

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010834

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.19322-000001

C0010835

**Malecek, Thomas -FS**

**From:**          Malecek, Thomas -FS
**Sent:**          Monday, October 01, 2012 1:07 PM
**To:**            Jeff Berman
**Cc:**            Dyer, Harold D -FS
**Subject:**       RE: Village Land Exchange Comments


Jeff, thanks.  And also, to let you know, we did extend the comment period for an addl 10 days, in case you know of others who are gearing up for the previous deadline of 10/1, now it is 10/11

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

_____

**From:** Jeff Berman [mailto:jeff.berman@yahoo.com]
**Sent:** Monday, October 01, 2012 1:05 PM
**To:** Malecek, Thomas -FS
**Subject:** Village Land Exchange Comments

Kindly reply to acknowledge receipt of the attached comments (provided as a pdf file).

Thank you for your time and consideration,

Jeff Berman

C0010836

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, October 01, 2012 1:07 PM |
| **To:** | Jeff Berman |
| **Cc:** | Dyer, Harold D -FS |
| **Subject:** | RE: Village Land Exchange Comments |

Jeff, thanks.  And also, to let you know, we did extend the comment period for an addl 10 days, in case you know of others who are gearing up for the previous deadline of 10/1, now it is 10/11

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Jeff Berman [mailto:jeff.berman@yahoo.com]
**Sent:** Monday, October 01, 2012 1:05 PM
**To:** Malecek, Thomas -FS
**Subject:** Village Land Exchange Comments

Kindly reply to acknowledge receipt of the attached comments (provided as a pdf file).

Thank you for your time and consideration,

Jeff Berman

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010837

**Malecek, Thomas -FS**

| | |
|---|---|
| **From:** | Malecek, Thomas -FS |
| **Sent:** | Monday, October 01, 2012 1:07 PM |
| **To:** | Dyer, Harold D -FS |
| **Subject:** | FW: Village Land Exchange Comments |
| **Attachments:** | DEIS Village Comments Berman.pdf |

Tom Malecek
Divide District Ranger
Rio Grande NF
(719) 657-6007; cell 850-2356

---

**From:** Jeff Berman [mailto:jeff.berman@yahoo.com]
**Sent:** Monday, October 01, 2012 1:05 PM
**To:** Malecek, Thomas -FS
**Subject:** Village Land Exchange Comments

Kindly reply to acknowledge receipt of the attached comments (provided as a pdf file).

Thank you for your time and consideration,

Jeff Berman

**Jeffrey A. Berman**

USDA Forest Service
Rio Grande National Forest
1803 W. Highway 160
Monte Vista, CO, 81144
via email: tmalecek@fs.fed.us

October 1, 2012

To whom it may concern:

Please accept these comments on the proposed Village at Wolf Creek land exchange decision and analysis. I have been following and at times have been an active participant in the various proposals for development in the vicinity of Wolf Creek pass. For the past seven years I have sat on the board of the La Plata Electric Association (the input provided herein is strictly my own), and work as a solar system designer. I also have a degree in electrical engineering, and provide these comments with some level of engineering, financial, and legal knowledge.

For the Forest Service to approve the land exchange, it should have to demonstrate with a high burden of proof that
   a) the land exchange is in the public interest
   b) that access is required to the site given current circumstances

As outlined herein, a full and honest assessment of potential benefits, risks, and impacts – including the likelihood (or lack thereof) of several substantial public interest and legal issues not addressed in the DEIS, would easily lead to a determination that the land exchange is not in the public interest, nor is access required under the circumstances currently before the decision maker.

Public Interest Determination

The Forest Service is required to make a decision in the public interest. Such a determination necessarily includes benefits and consequences and a weighing of the two against each other. The DEIS and land exchange proponent argue that certain benefits will accrue from the preferred alternative, notably preservation of many acres of wetlands, including significant fen wetlands. Anyone that has visited the area during the summer months however (when residents and visitors would most likely be vacationing at the Village) would understand the significance of mosquitoes that the area contains, very likely given the significant wetlands, including wetlands that the DEIS argues will be preserved. Comfort for Village residents and visitors thus would inevitably require mosquito control. For any effective job to be done in this regard, much or all of the wetlands would have to be sprayed, killing not only mosquitoes but other insects that support various wildlife. As such, the "preservation" of sterilized wetlands cited as a benefit in the public interest calculation would be dubious at best.

**Jeffrey A. Berman**

The Forest Service disclaims responsibility for assessing the financial viability of the
development:

> *EIS at 1.7.4: Financial viability - not the responsibility of the Forest Service to
> assess.*

Yet many of the benefits claimed by the applicant as the basis for the land exchange
assume success of the development (i.e. creating jobs, generating revenue,
bolstering the economy via short-term and ongoing influx of outside money, and
local municipality tax revenue). The Forest Service cannot assume these benefits
will come to pass without any analysis of the financial viability of the development
though.

So two of the most prominently claimed benefits of the land exchange are arguably
dismissed. The Forest Service must weigh the likelihood of such benefits (economic
development), or lack thereof, and factor extenuating circumstances (e.g. mosquito
spraying) in its public interest determination.

Rather than provide the benefits proclaimed by the DEIS and the applicant the
development may actually expose the residents of the San Luis Valley, notably
members of the San Luis Valley Rural Electric Cooperative, to significant financial
risk. In 2010, Grand Valley Power lost a legal battle from Gateway Canyon Resort,
forcing the rural electric cooperative's members to foot the bill for a not
insignificant power line upgrade (the Unaweep power line). Wolf Creek may be
similarly situated, yet the DEIS fails to discuss or assess the potential for a similar
outcome, which could induce rate increases upon SLVREC members as in the Grand
Valley case. Key questions in making this assessment include whether SLVREC has
such an upgrade in their long range workplans, what other loads exist on the line
(including Wolf Creek and the potential ski area expansion there), and the current
status of the existing power lines (i.e. capacity, usage, etc). Yet the DEIS fails to
disclose whether any of these factors were considered in its conclusions about
potential costs to others in the area. Not only should potential benefits (dubious in
my opinion as noted above), but public ***risks*** must also be assessed and factored
into the "public benefit" equation.

<u>Connected Actions</u>

The DEIS Fails to Assess Connected Actions. The DEIS claims that the preferred
alternative will result in development occurring on the exchanged parcel. Said
development will require or can be reasonably expected to result in the following
impacts that the DEIS fails to assess the impacts of:
- Power Needs / Utility corridors
- Energy supply and offsite air-quality impacts
- Mosquito spraying
- Natural gas transport
- Communications Infrastructure

C0010840

**Jeffrey A. Berman**

Each of the build-out options noted on page 11-7 is a connected action to the land exchange decision, and must be assessed as part of this analysis. However, the DEIS only minimally discloses such, much less providing a reasoned analysis of the effects and impacts of these connected actions.

<u>Power Needs</u>

The DEIS fails to adequately, or at all, assess and disclose how the power requirements of the Village would be met, without which it cannot make a reasoned determination that the existing power infrastructure would be adequate, necessitating on-site power production and its attendant air quality and other impacts, or power line expansion and its connected action impacts.

The DEIS claims that electricity that the existing power lines would be sufficient for the low density development:

> *Section 2.4.1.1: Under the Low Density Development Concept… It is also assumed that each home would have a septic system and that electricity would be provided from adjacent power lines owned by the San Luis Valley Rural Electric Cooperative that provides electricity to WCSA. Furthermore, telephone, cable TV and fiber optics would likely be included in the road system.*

The DEIS's Moderate and High Density Development discussion doesn't mention the sources of power, except as a footnote in Appendix 11:

> Page 11-6 (Appendix 11): *Moderate Density Development Concept… "SLVREC has the infrastructure to provide power for the moderate and a portion of the maximum density development concept… The maximum density development concept will likely require an additional power supply. An analysis of the effect of that power option would be completed in the future when the power source has been identified."*

Meanwhile, the DEIS at Page 11-7 acknowledges that for the maximum build-out of the Village, additional power infrastructure would be needed:

> *Potential Maximum Build-Out Options include:*
> 1. *SLVREC - Can and are willing to provide power, will require infrastructure upgrade with easement, No additional easements from Forest Service required*
> 2. *Propane: Requires shipment of propane to project site*
> 3. *Liquid Natural Gas (LNG): On-site generator, Requires shipment of LNG to project site, Requires gas distribution facility*
> 4. *Natural Gas Pipeline: Pipeline to be extended from gas supplies west of project site and perhaps to San Luis Valley*

**Jeffrey A. Berman**

First, for the low density development how did the Forest Service draw the conclusion that existing power lines are adequate? Similarly for upgrades required for the high density development, and that SLVREC would provide power? The DEIS fails to disclose this, or provide any electrical load assessment for any of the development densities. It is impossible to comment on this aspect of the analysis without that information being disclosed. While the cooperative is required by law to serve those in its service territory, the details of a line expansion or upgrade such as this – technical, contractual, legal, and financial – are  at all vs. other possibilities (such as power from the west of Wolf Creek Pass via La Plata Electric Association). These questions are critical in making such a determination, and whether such an upgrade is feasible at all.

Specifically, what infrastructure upgrade would be required of SLVREC, and what easement would be required, if not of the Forest Service? How have these determinations been made? It seems unlikely that at this point in the process the applicant has performed the requisite studies necessary to determine actual power demand. Without a reasoned assessment of peak demand for a Village of thousdans of residents more acclimated to warmer climates (and thus using much more electricity at altitude for heating, hot tubs, etc), the Forest Service cannot plausibly make such a determination.

The Forestwide Standards and Guidelines for Utility Corridors, Chapter 3, page III-38-39: Standard: 12 states: *Proposals to use designated utility corridors will be authorized without alternative-route analysis, subject to site-specific environmental analysis.* As such, one could argue that an alternative route would not be required for analysis, but the upgrade to the corridor itself, if taking place off of private lands and if the corridor crosses federal lands, would require additional environmental analysis. Therefore, the DEIS acknowledges that in order to supply electric power for the maximum development this additional environmental analysis would be considered a connected action. Without a load and power supply capacity analysis however, said conclusion could also apply to the medium and even low development density concepts as well.

Tri-State Generation and Transmission, which provides power to SLVREC and other rural electric distribution cooperatives in the region, has recently argued that natural gas fired power plants run less efficiently and with higher emissions at altitude (e.g. the Front Range of Colorado, at around 5,000' in altitude). Has the applicant or Forest Service assessed the feasibility of building and operating a natural gas fired power plant at the site, as the maximum build-out options discussion notes will be needed?

Regarding propane, there is no discussion of how many truck trips per day/week/month would be required. There is no discussion of safety concerns over hauling propane or natural gas over mountain roads in adverse weather conditions.

C0010842

**Jeffrey A. Berman**

Meanwhile, the DEIS fails to provide any information about the location and circumstances regarding a natural gas pipeline noted to the west of the project site. Who owns the pipeline, and what is its capacity in comparison with the projected Village (and cumulative effects from ski area expansion) load for instance? If this option is necessary to supply heat and/or power for the Village, the environmental analysis associated with installing a pipeline to the San Luis Valley also must be considered a connected action. There was no discussion or analysis in the DEIS addressing the possibilities, necessity, or potential environmental affects of these options.

To do so, a load analysis must be performed to assess the adequacy of existing infrastructure, and at what point of increased load expansion of that infrastructure would be necessary. This must be considered a connected action, and must per various CFR requirements be assessed as part of the land exchange proposal. Only then can a fair assessment of the energy demands of the Village resulting from the preferred alternative be made, and the sources of that energy be assessed. Then any other permits, effects, and impacts of these connected actions must be made and disclosed in the EIS process. It is impossible to draw the Forest Service's conclusions cited herein without such an analysis.

Conclusion

In all likelihood, the developer will at some point hand over management of the Village to a newly formed HOA or metro-district. Should the development not maintain it's property values or having cash flow problems, as so many other similar developments have over the years (Beech Mountain in NC, Tamarack Resort in Idaho, Sol Vista CO), this HOA or metro-district will go broke. Most notably, this already happen with McCombs own previous development at Cuchara Ski Area, just one mountain range away. If it does stay afloat and maintained by McCombs, even he with his great wealth (or more likely his descendants) will at some point tire of funneling cash into the development. Particularly if the development is having management and cash flow challenges as so many other similar developments, and also have power flow demands, they will likely be forced to seek the whole of SLVREC to pay for power line upgrades should they be necessary.

On the basis of a fair and complete public benefits test that includes both potential benefits and risks, weighed on their likelihood of occurring, is necessary to fairly assess any possible public benefit of the land exchange. The DEIS fails to do so. Such a reasonable assessment would certainly find that in the aggregate the land exchange is NOT in the public interest, and should be denied accordingly.

The DEIS at 1.3, states "The Forest Service is evaluating the land exchange as a means of meeting the legal requirement for access." I am saddened to see the USDA continue to maintain that reasonably use and enjoyment must be defined as providing access for McCombs' proposed development, many orders of magnitude

C0010843

**Jeffrey A. Berman**

in size, scope, and attendant impacts than that proferred as part of the original land exchange. and made public in Mineral County in the late 1980's.

What would pressure the Forest Service to continue to recommend decisions that in one form or another make possible the Village at Wolf Creek development, with all its likelihood of problems in the future, as so many other ski resort developments have been fated to find, ironically including McCombs own previous attempt at such?

Is it political pressure? Difficulty in saving face in changing tune? A weighing of the legal abilities of each of the likely challengers to whatever decision is made? While impossible to be so frank in a public process so legally constrained, I hope that at least the decision makers – at whichever level of the USDA that is really happening – will fairly consider these questions. In that event, I don't see how you can come to any decision other than "No Thanks".

The Forest Service should change course, acknowledge the arguments made herein (in the Final EIS but also in its public arguments) that a careful weighing of all factors including those noted herein finds that the land exchange is not in the public interest, and that "reasonable use and enjoyment" does not require that access be provided for a development so many orders of magnitude larger than that originally proferred in gaining approval for the first land exchange back in 1986.

Sincerely,

Jeffrey A. Berman

**Rea Orthner**

---

| | |
|---|---|
| **From:** | Rea Orthner |
| **Sent:** | Monday, October 01, 2012 3:41 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | 'David Johnson' |
| **Subject:** | RE: Final Draft of Plant BA/BE Wolf Creek |

Randy,

I just spoke with Steve Popovich and said it is worth mentioning the green-stem Botrychium lanceolatum. Therefore I updated the BA/BE with some additional information on this taxon.  The Final Draft you will receive shortly incorporates this additional info. Steve also offered to review the BA/BE.  Let us know if you want us to send the BA/BE to him or anyone else.  For now, I will assume you will take care of additional reviews.

Sincerely,

Rea

---

**From:** Ghormley, Randy -FS [mailto:rghormley@fs.fed.us]
**Sent:** Monday, October 01, 2012 11:35 AM
**To:** Rea Orthner
**Cc:** 'David Johnson'
**Subject:** RE: Final Draft of Plant BA/BE Wolf Creek

Thank you Rae.  I'll wait for the pdf later today.

---

**From:** Rea Orthner [mailto:rea@westerneco.com ]
**Sent:** Monday, October 01, 2012 10:57 AM
**To:** Ghormley, Randy -FS
**Cc:** 'David Johnson'
**Subject:** Final Draft of Plant BA/BE Wolf Creek

Hi Randy,

The pdf version of the Final Draft of the Plant BA/BE for the Wolf Creek Access project will be emailed to you later today.  I have a MS word version I can send you now if you would like to make any track changes.  Please let me know.

I did incorporate all of Andy Kratz's comments.  Also there is a discussion of the least moonwort (Botrychium simplex var. compositum) in the Final Draft of the EIS in the Vegetation Section (see page 3-42).

Per our conversation earlier this morning, I will discuss the relative importance of the green-stem phenotype of Botrychium lanceolatum with Steve Popovich to see if this phenotype is worth mentioning in any greater detail in the BA/BE and/or EIS.  I hope to speak with Steve later today.

Sorry for the delay in getting you the Final Draft of the plant BA/BE.

Please don't hesitate to contact me if you have any further questions.

Rea

C0010845



**REA ORTHNER**
**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax · 720.289.1665 mobile*
*rea@westerneco.com  ·  www.westerneco.com*

This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

This document family member (or some of its attachments if any) has not been
included in this production. ID: 0.7.329.25765-000001

C0010847

| | |
|---|---|
| **From:** | Ghormley, Randy -FS </O=MMS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=GHORMLEY, RANDY571BF5F2-6509-49E4-BFB6-71EB33F7B225> |
| **Sent:** | Monday, October 01, 2012 3:53 PM |
| **To:** | Rea Orthner |
| **Cc:** | 'David Johnson' |
| **Subject:** | RE: Final Draft of Plant BA/BE Wolf Creek |
| **Attachments:** | image001.jpg |

Thank you Rea.  On one hand we already had Andy Kratz, Regional Botanist (until December, when he is retiring) review it, but we will be looking for a journey-level botanist to review and sign off on it eventually.  I just left Steve a phone message asking him if he'd be willing to do so.  So go ahead and send it to him, explaining that Andy has already reviewed, as perhaps he may sign off on it as well.

Looking forward to the draft today.  Yes I will take care of additional reviews if any are needed.  Thanks.

**From:** Rea Orthner [mailto:rea@westerneco.com]
**Sent:** Monday, October 01, 2012 3:41 PM
**To:** Ghormley, Randy -FS
**Cc:** 'David Johnson'
**Subject:** RE: Final Draft of Plant BA/BE Wolf Creek

Randy,

I just spoke with Steve Popovich and said it is worth mentioning the green-stem Botrychium lanceolatum. Therefore I updated the BA/BE with some additional information on this taxon.  The Final Draft you will receive shortly incorporates this additional info. Steve also offered to review the BA/BE.  Let us know if you want us to send the BA/BE to him or anyone else.  For now, I will assume you will take care of additional reviews.

Sincerely,

Rea

**From:** Ghormley, Randy -FS [mailto:rghormley@fs.fed.us]
**Sent:** Monday, October 01, 2012 11:35 AM
**To:** Rea Orthner
**Cc:** 'David Johnson'
**Subject:** RE: Final Draft of Plant BA/BE Wolf Creek

Thank you Rae.  I'll wait for the pdf later today.

**From:** Rea Orthner [mailto:rea@westerneco.com]
**Sent:** Monday, October 01, 2012 10:57 AM
**To:** Ghormley, Randy -FS
**Cc:** 'David Johnson'
**Subject:** Final Draft of Plant BA/BE Wolf Creek

Hi Randy,

1

C0010848

The pdf version of the Final Draft of the Plant BA/BE for the Wolf Creek Access project will be emailed to you later today.  I have a MS word version I can send you now if you would like to make any track changes.  Please let me know.

I did incorporate all of Andy Kratz's comments.  Also there is a discussion of the least moonwort (Botrychium simplex var. compositum) in the Final Draft of the EIS in the Vegetation Section (see page 3-42).

Per our conversation earlier this morning, I will discuss the relative importance of the green-stem phenotype of Botrychium lanceolatum with Steve Popovich to see if this phenotype is worth mentioning in any greater detail in the BA/BE and/or EIS.  I hope to speak with Steve later today.

Sorry for the delay in getting you the Final Draft of the plant BA/BE.

Please don't hesitate to contact me if you have any further questions.

Rea




*REA ORTHNER*
**WESTERN ECOLOGICAL RESOURCE, INC.**
*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax · 720.289.1665 mobile*
rea@westerneco.com   ·   www.westerneco.com


This electronic message contains information generated by the USDA solely for the intended recipients. Any unauthorized interception of this message or the use or disclosure of the information it contains may violate the law and subject the violator to civil or criminal penalties. If you believe you have received this message in error, please notify the sender and delete the email immediately.

C0010849

This document family member (or some of its attachments if any) has not been included in this production. ID: 0.7.329.19325-000001

C0010850

**David Johnson**

| | |
|---|---|
| **From:** | David Johnson |
| **Sent:** | Monday, October 01, 2012 3:57 PM |
| **To:** | Ghormley, Randy -FS |
| **Cc:** | Rea Orthner |
| **Subject:** | Wolf Creek BA-BE for Plants |
| **Attachments:** | July 2012 Draft Plant BA-BE Village at Wolf Creek.pdf |

Randy,

Please find attached the Draft Biological Assessment/Biological Evaluation for Plants for the Village at Wolf Creek Access Project, updated to include additional information on the green-stem *Botrychium lanceolatum*.

David Johnson
Ecologist



**WESTERN ECOLOGICAL RESOURCE, INC.**

*711 Walnut Street, Boulder, Colorado  80302*
*303.449.9009 office · 303.449.9038 fax · 303.803.3070 mobile*
david@westerneco.com  ·  www.westerneco.com

C0010851



C0010852

*Draft Biological Assessment /Biological Evaluation for Plants*



**United States Department of Agriculture**

**Forest Service**



# Draft
# Biological Assessment / Biological Evaluation for Plants

# Village at Wolf Creek Access Project

**USDA Forest Service**
**Rocky Mountain Region**
**Rio Grande National Forest**
**Divide Ranger District**
**Mineral County, Colorado**

**July 2012**

**Prepared by:**

_____
NAME:  Rea Orthner                    Date
TITLE:   Ecologist/Botanist
Western Ecological Resource, Inc.
711 Walnut Street, Boulder, CO  80302

**Approved by:**

_____
NAME:  Randy Ghormley                    Date
TITLE: Wildlife Program Manager
Rio Grande National Forest & San Luis Public Lands Center
1803 W. Highway 160
Monte Vista, CO 81144

C0010853

*Draft Biological Assessment /Biological Evaluation for Plants*

C0010854

# TABLE OF CONTENTS

1.0  INTRODUCTION ......................................................................................................................... 1

2.0  ANALYSIS AREA ...................................................................................................................... 1

   2.1  Spruce-Fir Forests ............................................................................................................... 3

   2.2  Upland Meadows & Clearings ............................................................................................. 3

   2.3  Volcanic Tuff Barrenlands ................................................................................................... 4

   2.4  Riparian/Wetland Habitats ................................................................................................... 4

      2.4.1  Forested Riparian/Wetland Habitats ............................................................................ 4

      2.4.2  Scrub-Shrub Riparian/Wetland Habitats ..................................................................... 5

      2.4.3  Herbaceous Riparian/Wetland Habitats ...................................................................... 5

   2.5  Aquatic Sites ........................................................................................................................ 6

   2.6  Disturbed/Barren ................................................................................................................. 6

3.0  DESCRIPTION OF ALTERNATIVES ...................................................................................... 6

   3.1  Alternative 1. No Action ...................................................................................................... 6

   3.2  Alternative 2. Land Exchange (Proposed Action) ............................................................... 8

   3.3  Alternative 3.  ANILCA Road Access ............................................................................... 10

4.0  PRE-FIELD REVIEW .............................................................................................................. 10

   4.1  Threatened, Endangered, Proposed and Candidate Plant Species ...................................... 12

   4.2  Region Two Sensitive Plant Species .................................................................................. 12

5.0  FIELD RECONNAISSANCE .................................................................................................. 14

   5.1  Methods .............................................................................................................................. 14

   5.2  Results ................................................................................................................................ 14

6.0  EFFECTS ANALYSIS ............................................................................................................. 15

   6.1  R2 Sensitive Plant Species ................................................................................................. 15

7.0  MITIGATION MEASURES ..................................................................................................... 15

8.0  DETERMINATION .................................................................................................................. 15

   8.1  Threatened, Endangered, and Proposed and Candidate Plants ........................................... 15

   8.2  Sensitive Plants .................................................................................................................. 16

9.0  APPENDICES .......................................................................................................................... 17

   APPENDIX  A.  Comparison of Development Concepts for Alternative 2 - Land Exchange &
   Alternative 3 - ANILCA Road Access[#] ................................................................................... 18

   APPENDIX B.   Sensitive Plant Species Descriptions – Species Documented on the Rio Grande
   National Forest ......................................................................................................................... 20

   APPENDIX C.  Sensitive Plant Species Descriptions – Species Not Documented on the Rio Grande
   National Forest ......................................................................................................................... 24

   APPENDIX D.  Pertinent / Cited Literature ............................................................................. 29

   APPENDIX E.  Plant Species List for Analysis Area ............................................................... 35

C0010855

*Draft Biological Assessment /Biological Evaluation for Plants*

## LIST OF FIGURES

Figure 1.  Analysis Area Location Map. .................................................................................................................2

Figure 2.  Alternative 1. No-Action ....................................................................................................................7

Figure 3.  Alternative 2.  Land Exchange...........................................................................................................9

Figure 4.  Alternative 3.  ANILCA Road Access. ..............................................................................................11

## LIST OF TABLES

Table 1.  Vegetation Types within the Analysis Area .........................................................................................3

Table 2.  Pre-field checklist of USFS R2 Sensitive plant species ....................................................................12

Table 3.  Determination Summary for USFS R2 Sensitive Plant Species Potentially Present within the Analysis Area .......................................................................................................................................................15

C0010856

# 1.0 INTRODUCTION

The organization of this Biological Assessment (BA) / Biological Evaluation (BE) is as follows:

1.0    Introduction,

2.0    Analysis Area,

3.0    Alternatives,

4.0    Pre-field Review,

5.0    Field Reconnaissance,

6.0    Effects Analysis,

7.0    Mitigation Measures, and

8.0    Determination.

In addition, there are four Appendices to this document, as follows:

A.    Village at Wolf Creek Action Alternative Details

B.    Sensitive Plant Species Descriptions – species documented on the Rio Grande National Forest (Rio Grande NF),

C.    Sensitive Plant Species Descriptions – species not documented on the Rio Grande NF, and

D.    Pertinent/Cited Literature.

The policy regarding BEs and BAs is described in Forest Service Manual (FSM) 2672.4 and 50 Code of Federal Regulations (CFR) §402.12, respectively.   The purpose of this BA/BE is to assess the effects of the proposed project on National Forest System (NFS) lands on Federally listed Threatened, Endangered, Proposed, and Candidates for Federal listing, and Forest Service (USFS) designated Sensitive plants (collectively referred to as TES plants).  In general, the intent of the Forest Service is to not undertake actions that would lead to adverse impacts on these species.

# 2.0 ANALYSIS AREA

The Village at Wolf Creek Access Project site (hereafter referred to as the *Analysis Area*) is the specific boundary evaluated for direct, indirect, and cumulative effects (Figure 1).  The center of the Analysis Area is located at Latitude 37º 28' 15" N and Longitude 106º 46' 45" W (Alberta Park).  The Analysis Area is dominated by Engelmann spruce – subalpine fir (*Picea engelmannii – Abies lasiocarpa* var. *lasiocarpa* syn. *A. bifolia)* forests, subalpine meadows and clearings, volcanic tuff barrenlands, and riparian/wetland habitats.   The elevation of the Analysis Area ranges from approximately 10,160 to 10,880 feet.  The majority of the Analysis Area lies within the Wolf Creek Ski Area (WCSA) Special Use Permit Area and is comprised of both private Village at Wolf Creek lands and NFS lands.  The Analysis Area is located east of the Continental Divide in the Rio Grande River Drainage Basin.

C0010857