**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Christine M. Arguello**

Civil Action No. 19-cv-01512-CMA

ROCKY MOUNTAIN WILD,
SAN LUIS VALLEY ECOSYSTEM COUNCIL,
SAN JUAN CITIZENS ALLIANCE, and
WILDERNESS WORKSHOP,

       Petitioners,

v.

DAN DALLAS, in his official capacity as Forest Supervisor,
TAMARA WHITTINGTON, in her official capacity as Deputy Regional Forester,
BRIAN FEREBEE, in his official capacity as Regional Forester,
UNITED STATES FOREST SERVICE, a Federal Agency within the U.S. Department of Agriculture,
ANNE TIMBERMAN, in her official capacity as Western Colorado Supervisor, and
U.S. FISH AND WILDLIFE SERVICE, a federal agency within the Department of the Interior,

       Respondents,

LEAVELL-MCCOMBS JOINT VENTURE,

       Respondent Intervenor.

---

**ORDER VACATING AGENCY ACTION**

---

       This case involves Leavell-McCombs Joint Venture's ("Intervenor" or "LMJV") plans to develop resort facilities on its parcel of land, formerly part of the Rio Grande National Forest, in Wolf Creek, Colorado. Intervenor's plans have been frustrated for thirty-five years by the fact that its parcel is fully surrounded by federal land, which limits Intervenor's ability to access and develop its property.

For the last twenty years, Intervenor has been involved in litigation in state and federal trial and appellate courts over LMJV's plans to develop its property. This case represents Intervenor's third attempt to obtain access to its inholding. Petitioners Rocky Mountain Wild, San Luis Valley Ecosystem Council, and Wilderness Workshop (collectively "Petitioners") seek review of Respondents United States Forest Service's ("USFS") and U.S. Fish and Wildlife Services' ("FWS") (with the individual defendants, "Respondents") final agency decision to grant Intervenor an access road to its property. (Doc. # 59.)

Although the Court recognizes that USFS "must take some action to provide" Intervenor with access to its inholding, *see Rocky Mountain Wild v. Dallas*, 17-1366, 2018 WL 11225766, at *4 (10th Cir. 2018), the Court finds that the law of the case doctrine requires setting aside the agency action in this case. As another judge in this District found—when considering a nearly identical Administrative Record— Respondents "failed to consider important aspects of the issues before them, offered an explanation for their decision that runs counter to the evidence, failed to base their decision on consideration of the relevant factors, and based their decision on an analysis that is contrary to the law." *Rocky Mountain Wild v. Dallas*, 15-cv-01342-RPM, 2017 WL 6350384, at *9 (D. Colo. May 19, 2017).

# I.   **BACKGROUND**

## A.   **THE 1986 LAND EXCHANGE**

### 1.   The March 1986 Decision Notice Approving the Land Exchange

In 1986, Intervenor—then known as Leavell Properties, Inc.—proposed

exchanging eight parcels of private land it held in Saguache County, Colorado, totaling

1,631 acres, for 420 acres of United Sates Forest Service ("USFS") land adjacent to the

Wolf Creek Ski Area and the Rio Grande National Forest, located in Mineral County.

(Doc. # 27-2 at W01153.)[1]

Intervenor proposed the exchange for the purpose of "potential development . . .

to compliment the Wolf Creek Ski Area." (*Id.* at W01156.) Specifically, Intervenor stated

that developments would be "built around a resort core," would "include commercial

amenities and a hotel in addition to condos and other residential structures built around

common areas," and would be formed to take advantage of the summer season as well

as winter season. (Doc. # 27-3 at W01339.) Further, "[i]n connection with the proposal,

[Intervenor's] agent provided what it called a 'liberal but reasonable' development

scenario of 208 units providing occupancy for 834 skiers," which was described as a

"worst case" scenario, "assuming maximum additional demand and minimum additional

supply over the anticipated build-out period." (Doc. # 71-30 at W01317.)

After obtaining an environmental assessment of the proposed land exchange

(Doc. # 27-2 at W01150), USFS initially issued a Decision Notice on February 20, 1986,

---

[1] All of the exhibits filed at Doc. ## 27–34 and 71 constitute the Administrative Record in this matter. The Court cites to the docket number of the exhibit (*e.g.*, Doc. # 27-2) and the page number from the Administrative Record (*e.g.*, at W0001).

determining *not* to undertake the land exchange. (Doc. # 27-3 at W01362). Although USFS observed that the proposed land exchange "has a number of public benefits," USFS noted "a great number of concerns" about the land exchange, including "environmental, social, and economic impacts resulting from development that are not all that clear." (*Id.* at W01364.)

Two weeks later, on March 6, 1986, USFS abruptly reversed its decision and issued a new Decision Notice approving the land exchange.[2] (Doc. # 27-3 at W01366-69.) The new decision acknowledged that the February 1986 decision was based on "the fact that development of the Federal tract could be in derogation of the Wolf Creek Ski Area and other adjacent National Forest System lands," but USFS concluded that Intervenor's agreement in principle to certain mitigation measures would "alleviate this concern." (Doc. # 27-3 at W01368.) USFS also concluded that Mineral County would regulate certain components of Intervenor's development, in addition to "other local, state and Federal agencies [that] will have review and approval authority for many components of any development plans that are proposed." (*Id.*)

2.     The Amended Decision Notice and Creation of the Inholding

In September 1986, after receiving the results of a final appraisal of the exchanged parcels, USFS amended the Decision Notice. (Doc. # 27-3 at W01370; Doc. # 71-37 at W12662.) The amended Decision Notice reduced the federal parcel

---

[2] The USFS did not explain its rapid about-face. However, one USFS official stated in an email in 2014 that "[i]t is commonly understood that [an individual affiliated with Intervenor] brought political pressure to bear to realize his dream to develop the ski area." (Doc. # 31-23 at C0021685.)

conveyed to Intervenor from 420 acres to 300 acres. (*Id.*) This adjustment of the

exchanged land had the unintended consequence of eliminating Intervenor's access to

its parcel of land via Highway 160, creating the inholding. (Doc. # 71-33 at W10725.)

Although the original tract of land had direct access to Highway 160, the new parcel of

land does not. Rather, Intervenor's land is now accessible only by Forest Service Road

("FSR") 391. (*Id.*) Vehicle access on FSR 391 is, however, limited to the summer

months. (*Id.*) FSR 391 is closed to motorized traffic during the winter, when it serves as

a ski trail. (*Id.*)

3.    The 1987 Scenic Easement

The land exchange was conditioned on Intervenor donating an easement over

the exchanged land. The easement was granted in May 1987. (Doc. # 34-1 at

VWC04091; Doc. # 27-3 at W01403.) Although the easement is called a Scenic

Easement, it contains greater restrictions than the name suggests. The easement's

stated purpose was "to provide a specific level of control of the type of development on

said land to assure that said development is compatible with the Wolf Creek Ski Area,"

but it was not intended to "conflict with or intrude upon the land use controls of the State

of Colorado, Mineral County," or other local government. (Doc. # 27-3 at W01403.)

The easement limits development on Intervenor's land to "a mix of residential,

commercial, and recreational uses typical to an all-season resort village." (Doc. # 34-1

at VWC04091 (internal quotations omitted). The easement also sets forth several

development requirements, including: (1) architectural styling specifications for all

buildings and structures on the land; and (2) numerous restrictions on the use of the

land. (Doc. # 27-3 at W01404.) The easement provides that the grantee has final approval of development plans. (*Id.*)

## B.    INTERVENOR'S DEVELOPMENT ATTEMPTS & LITIGATION

In the years following the land exchange, Intervenor has sought to develop its planned resort, which has resulted in years of protracted litigation.

### 1.    Mineral County Development Approval & Lawsuit

In 2000, the Mineral County Board of Commissioners approved Intervenor's preliminary plans for a year-round resort development. (Doc. # 27-4 at W01458-59; Doc. # 71-37 at W12662-63.) In October 2004, the Mineral County Board of Commissioners approved Intervenor's development plan, approving 2,200 residential units, over 500,000 square feet of commercial space, and up to 10,000 inhabitants. (Doc. # 27-4 at W01458-59.)

Mineral County's approval was challenged in state court. The district court for Mineral County determined that the County violated Colorado law by approving the development plan before establishing that Intervenor had adequate access to the public highway system. (Doc. # 27-4 at W01453.) The Colorado Court of Appeals affirmed the district court, holding that a local authority cannot approve a subdivision unless the applicant has "at least year-around wheeled vehicular access" between State Highway 160 and the planned development. *Wolf Creek Ski Corp. v. Bd. of Cty. Comm'rs of Min. Cty.*, 170 P.3d 821, 829 (Colo. App. 2007). Thus, because FSR 391 does not have year-round access, the development plan did not satisfy state law. *Id.*

In light of the Colorado Court of Appeals decision, Intervenor has attempted to obtain year-round wheeled vehicular access to its land for the last twenty years. This, too, has resulted in repeated litigation.

2.      The 2001 Request for an Easement

In 2001—at the same time it sought approval for its land development proposal—Intervenor applied to the USFS for a right-of-way or easement across USFS land. After preparation of an Environmental Impact Statement ("EIS"), USFS granted Intervenor a right-of-way in 2006. (Doc. # 71-33 at W10725–26.) Two of the petitioners in this lawsuit filed a lawsuit to challenge the right-of-way. *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213 (D. Colo. 2007). After the court granted the petitioners' request for a preliminary injunction (*id.*), the parties reached a settlement. USFS agreed to prepare a new EIS for any access request by Intervenor. (Doc. # 71-33 at W10726.)

3.      The 2010 Proposed Land Exchange

In 2010, Intervenor proposed a new land exchange as an alternative to an easement. (Doc. # 71-33 at W10726.) Under the proposal, Intervenor agreed to exchange approximately 177 acres of its existing parcel for approximately 205 acres of federal land. (Doc. # 27-8 at W02344.) The exchange would obviate the need for access via an easement across USFS land because it would create a direct connection between Intervenor's land and Highway 160. The land exchange proposal included a developmental plan, described as "Option 1," which projected a total of 1,711 residential units on the property at full build-out. (Doc. # 27-5 at W01551.)

As an alternative to the land exchange, Intervenor simultaneously submitted an application for an easement or right-of-away across USFS land that would serve as the primary access road from Intervenor's existing land to Highway 160. (Doc. 27-5 at W01549, W01578.) Intervenor requested USFS to address this application under the Alaska National Interest Land Conservation Act ("ANILCA"). With the ANILCA application, Intervenor provided two potential road configurations and development plans, Options 2 and 3. (Doc. # 27-5 at W01551.) Option 2 contemplates 1,850 residential units on Intervenor's land, and Option 3 contemplates 1,981 units on the land. (*Id.*)

**C.     ANALYSIS OF THE LAND EXCHANGE & EASEMENT PROPOSAL**

USFS conducted a Feasibility Analysis of the proposed land exchange and easement proposal. (Doc. # 27-7 at 2211.) With respect to the easement proposal, USFS noted that Intervenor's proposal "includes an easement to be granted by the United States, if necessary, for any improvements needed for construction of a highway interchange which may fall outside of the current [Colorado Department of Transportation] easement for Highway 160." (*Id.* at W02213.) Further, USFS noted:

> At this time, the need for such an easement is not known, as the design of a grade-separated interchange has not been completed. The environmental analysis will include the exchange proposal as well as any and all portions of land outside the exchange proposal that may be impacted by the grade separated interchange. A grade separated interchange design that is sufficient to handle maximum potential Village buildout will be designed and approved as part of the ensuing analysis.
>
> As an alternative, the proponent has asked for commitment by the United States to add such additional easement area, if needed, to the existing CDOT easement. This approach would simplify the exchange process as

the effects should be considered as part of any [National Environmental Policy Act] analysis.

(*Id.*)

Further, the Feasibility Analysis recommended that the land exchange be evaluated "in contrast to the grant of an easement for access to the property." (*Id.* at W02224.) Based on the Feasibility Analysis, Defendant Dallas and another individual determined that "when weighed against [Intervenor's] existing ANILCA access right and subsequent request for a road easement, this exchange appears in the public interest." (*Id.*)

### a.  NEPA Analysis & Final Record of Decision

Based on the Feasibility Analysis, USFS conducted a review under the National Environmental Policy Act ("NEPA"). (Doc. # 27-8 at W02343.) After receiving comments on a draft EIS, USFS issued its final EIS ("FEIS") in November 2014. (Doc. # 71-33 at W10694–W11326; Doc. # 71-34 at W11327-W11463.)

The FEIS stated that the Purpose and Need for Action is to "allow [Intervenor] to access its property to secure reasonable use and enjoyment thereof as provided in ANILCA and USFS regulations, while minimizing environmental effects to natural resources within the project area." (Doc. # 71-33 at W10725.) Further, after acknowledging that Intervenor proposed the land exchange in addition to road access, USFS stated that it "is evaluating the land exchange as a means of providing legal access." (*Id.*)

After review, USFS issued a Final Record of Decision dated May 15, 2015 (the "2015 ROD"). (Doc. # 71-37.) USFS ultimately concluded that reasonable use of the

LMJV parcel was as an all-season resort, including commercial and residential properties in support of the ski area. (Doc. # 71-37 at W12675.) USFS also concluded that seasonal access on FSR 391 was not adequate for that use. (*Id.*) Thus, USFS considered two action alternatives for Intervenor's reasonable use: (1) the land exchange alternative; and (2) and an "ANILCA Road Access" alternative, granting a right-of-way or easement for a new snow-plowed road from Highway 160 to Intervenor's inholding. (Doc. # 71-37 at W10699). Under both, USFS also considered granting Intervenor's a right-of-way extending Tranquility Road from the existing ski area parking lot to LMJV's inholding to provide for limited, restricted and off-season use or emergency access. (*Id.* at W10698-99.)

As required by NEPA, USFS also considered a "no action" alternative under which land ownership would not change and LMJV would not receive additional access. Ultimately, USFS selected the land exchange alternative.

### b.  The Land Exchange Lawsuit

Petitioners to this action, along with a fourth party, brought suit challenging the 2015 ROD. *Rocky Mountain Wild*, 2017 WL 6350384, at *1 (the "Land Exchange Lawsuit"). The arguments in the Land Exchange Lawsuit are substantially similar to the arguments in the instant action.

In the Land Exchange Lawsuit, the petitioners challenged the Land Exchange based on NEPA, ANILCA, Forest Service Land Exchange Regulations, the Southern Rockies Lynx Amendment to the National Forest Management Act, the Endangered Species Act ("ESA"), and the Forest Service regulations governing administrative review

of objections. *Id.* The court in the Land Exchange Lawsuit engaged in a detailed

analysis of the FEIS, which is directly relevant to this action. With respect to the scope

of the FEIS, the court noted:

> The FEIS"s stated Scope of Analysis of the development concepts of the
> action alternatives emphasized the Forest Service's expressly-limited role
> in analyzing only the effects of the land exchange, and the Forest
> Service's explicit disclaimer of any power to control or regulate the
> potential development of the federal property once it was transferred to
> LMJV: "*It is important to clarify that development on private lands is not a*
> *component of either of the Action Alternatives.*" *Id.*, W10752 (emphasis in
> original). Future development was therefore considered as a "connected
> action" for NEPA purposes, but analyzed only as an "indirect effect" of
> either the proposed exchange or the alternative proposed ANILCA access.
>
> This limited scope of analysis was based on the premise that the "Forest
> Service has no authority to regulate the degree or density of development
> on private land" FEIS, W10761; *see also id.*, 10752 ("The Rio Grande
> [National Forest] has no jurisdiction on private lands."). The Forest Service
> further reasoned that "Mineral County has the authority to regulate the use
> and development of the LMJV"s private land in the future"; while the
> Forest Service stated that its own "legal obligation is to accommodate the
> private landowner with access considered to be adequate with respect to
> reasonable use and enjoyment of the property." *Id.*, W10761.
>
> Accordingly, the Forest Service analyzed potential future development
> "concepts" as an "indirect effect" of the proposed land exchange, while
> disclaiming again that *"the Forest Service will not, and cannot, approve a*
> *specific level of development on private lands, the range of development*
> *concepts is simply included to provide estimates of potential indirect*
> *effects.*" *Id.* (emphasis in original)

*Rocky Mountain Wild*, 2017 WL 6350384, at *5 (citing to same Administrative Record in

this action). The Court observed that the 2015 ROD was based on a "limited statement

of Purpose and Need—'to allow the LMJV to access its property to secure reasonable

use and enjoyment thereof'" as provided by certain regulations. *Id.* at *6 (citation to

Administrative Record omitted). Further, the court noted that USFS asserted that it had no authority to regulate the development of Intervenor's land. *Id.*

With respect to USFS's ESA consultation with the FWS—which is the same ESA relied upon in the instant action—the court noted that the ESA analysis was undertaken pursuant to Section 7, instead of Section 10. Usually, "[w]hen there is no 'federal nexus' to a proposed action and strictly private action is contemplated, such as development on private land, the typical procedure is an application by the private party under Endangered Species Act Section 10. Section 10 requires the applicant to follow specific procedures including preparation of a habitat conservation plan and separate NEPA analysis of the development." *Id.* at *7.

In this case, although Intervenor was granted status as an applicant and was originally told that it would have to comply with Section 10 requirements, USFS reversed course. *Id.* at *7. After Intervenor resisted being required to comply with Section 10 of the ESA, USFS's "initial determination was reversed later in 2012 to permit LMJV to avoid the more rigorous Section 10 consultation, despite the Forest Service's insistence that there would be no federal involvement in LMJV's private development." *Id.* at *7.

"[T]he Forest Service considered the proposed federal action for Endangered Species Act purposes to be the land exchange, alone. As a result, the Forest Service determined that upon completion of the exchange it would have no involvement in or control over LMJV's intended development. This raised a question whether Section 7 procedures could apply to any consideration of LMJV's development activities." *Id.* at *7.

Pursuant to the Section 7 consultation, FWS issued a Biological Opinion regarding the

Canada lynx:

> The FWS did not anticipate that the land exchange itself would result in any direct effects to the Canada lynx, but found that construction of the Village would have adverse effects on lynx that were "reasonably certain to occur." *Id.*, W05511. In particular, the FWS found that the Village would lead to greater traffic on Highway 160, potentially leading to an increase in lynx mortality in highway crossings, and fragmenting lynx habitat by impeding movement between habitat on the north and south sides of Highway 160. *Id.*, W05518-19.

*Id.* (citing the Administrative Record).

Due to the anticipated adverse effects of Intervenor's development, FWS

obtained Intervenor's commitment to certain conservation measures. *Id.* at *8. However,

FWS did not obtain specific information regarding Intervenor's conservation strategy. *Id.*

FWS's Biological Opinion acknowledged:

> [A]lthough the conservation strategy "establishes a framework for implementation of measures to minimize adverse effects" caused by LMJV's project, "there is some uncertainty regarding what specific measures will be implemented, and when implementation will occur." *Id.*, W05522. It stated that the planned studies would help prioritize specific measures, but "a decision on what measures will be implemented, and when implementation of any specific measures will occur is yet to be determined." *Id.* As a result, the FWS anticipated an increase in lynx mortality until implementation of conservation measure began to reduce the mortality rate, and acknowledged that it was not possible to quantify reduction in the mortality rate at this time. *Id.*

> The FWS concluded that, with the conservation measures, the land exchange and subsequent construction of the Village were not likely to jeopardize the "continued existence of the lynx within the contiguous United States population segment," and that since no critical habitat has been designated for this species in Colorado, none would be affected. *Id.*, W05524.

> Accordingly, the FWS issued an Incidental Take Statement (ITS) pursuant to Sections 7 and 9 of the Endangered Species Act. The ITS afforded

> LMJV protection from Section 9 liability, and allowed for the "take" of one lynx in addition to the baseline level of two lynx presumed to be killed per six-year period, provided LMJV implements the agreed conservation measures and complies with specified reporting obligations. *Id.*, W05525-27. The FWS also imposed certain monitoring and reporting requirements on LMJV concerning lynx impact and details of the development and implementation of the required conservation measures. *Id.*

*Id.* at *8 (citing to and quoting the administrative record).

After an extensive summary of the Administrative Record, the court in the Land Exchange Lawsuit engaged in detailed analysis of USFS's decision-making process. The court determined that: (1) USFS's NEPA analysis was "contrary to law and directly contradicted" by USFS's actions in conveying the land in 1987; (2) USFS erred as a matter of law "in determining that ANILCA limited its power to restrict or regulate the nature, scope or density of LMJV's development of federal property being conveyed to it," because ANILCA did not control the land exchange; (3) USFS erred by failing to consider whether to reserve rights or interests to restrict development; and (4) USFS and FWS failed to comply with the ESA because it evaluated the land exchange under Section 7 instead of Section 10, and even if Section 7 was correct, its measures were inadequate, *id.* at *10–13.

Thus, the court in the Land Exchange Lawsuit issued an order setting aside the land exchange. The court determined that "Defendants failed to consider important aspects of the issues before them, offered an explanation for their decision that runs counter to the evidence, failed to base their decision on consideration of the relevant factors, and based their decision on an analysis that is contrary to law." *Id.* at *9.

Respondents and Intervenor appealed, but Respondents ultimately dismissed their case. *Rocky Mountain Wild*, 2018 WL 11225766, at *1. Intervenor objected to dismissal of the appeal. Although the Tenth Circuit dismissed the appeal without reaching the merits of the appeal, the Court noted that USFS is statutorily obligated to take some action to provide Intervenor with access to its inholding. *Id.* at *4.

       4.    The 2019 Right-of-Way Alternative

While the appeal was pending, Intervenor wrote to USFS "seeking immediate year-round access to its private property." (Doc. # 71-49 at VWC04090.) USFS considered the request and prepared a Supplemental Information Report to determine if the FEIS would need to be supplemented since it considered the right-of-way. (*Id.*). Despite the decision in the Land Exchange Lawsuit, USFS did not obtain a new EIS. Rather, USFS determined that any "changed conditions and new information would not present a significantly different picture of the environmental effects and a supplement to the EIS was not warranted." (*Id.*) Thus, USFS issued a draft ROD adopting the right-of-way alternative for public comment. After a public comment period, USFS signed the second final Record of Decision in February 2019 (the "2019 ROD"). USFS granted Intervenor a right-of-way over approximately 3.7 acres of National Forest Service Land for a year-round road, along with a 530-foot extension of Tranquility Road to allow for emergency access to LMJV's parcel. (Doc. # 71-49 at VWC04097-99.)

USFS concluded that adoption of the right-of-way alternative discharged its statutory obligations and cured the defects identified in the 2015 land exchange. (*Id.* at

VWC04097). The 2019 ROD grants Intervenor a right-of-way to construct an access
road across Forest Service land from Highway 160 to the inholding.

     5.    Current Litigation Regarding the 2019 ROD

Petitioners initiated this case on May 28, 2019, challenging the 2019 ROD. (*Id.*)
Respondents maintain that Intervenor is statutorily entitled to access its parcel under
the ANILCA. Petitioners, on the other hand, allege that Respondents "have taken final
agency action to issue private interests in federal lands and granted access necessary
to build a massive resort development without considering or taking the steps necessary
to reduce and eliminate impacts to the surrounding National Forest System lands."
(Doc. # 1 at 4.) Petitioners brought claims pursuant to, *inter alia*, NEPA and ANILCA.

## II.    STANDING

Before turning to the merits of Petitioner's arguments, the Court must address
whether Petitioner's have standing to pursue this case. Intervenor makes a conclusory
allegation regarding standing, asserting that Intervenor's all-season resort is entirely on
private land, and as a result, "Petitioners do not have standing to challenge LMJV's use
of its private property." (Doc. # 61 at 21.)

In general, the Court need not address conclusory arguments that are
unsupported by legal authority. *See, e.g.*, *Arizona Pub. Serv. Co. v. U.S. E.P.A.*, 562
F.3d 1116, 1130 (10th Cir. 2009) (declining to address "unsupported, conclusory
arguments"). Further, it is noteworthy that Intervenor has not previously challenged
Petitioners' standing. *Rocky Mountain Wild*, 2017 WL 6350384, at *9 (noting that the
petitioners' standing in the Land Exchange Lawsuit "is not contested.") Nonetheless,

because the Court has an independent duty to ensure that it has subject matter jurisdiction to consider a case, the Court will briefly address Petitioners' standing. *Gentry v. Kostecki*, No. 20-CV-1284-WJM-STV, 2022 WL 168704, at *3 (D. Colo. Jan. 19, 2022) ("The Court has a duty to independently monitor its subject matter jurisdiction at every stage of litigation.") (citation omitted).

Under Article III of the Constitution, which limits federal courts to deciding "cases" or "controversies," a party must suffer an "injury in fact" from a governmental action. The party invoking federal jurisdiction bears the burden of establishing standing. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Further, because NEPA does not contain a private right of action for those seeking to enforce its procedural requirements and a plaintiff must rely on the Administrative Procedure Act ("APA") to bring such an action, a plaintiff must establish prudential standing in addition to Article III standing by showing that it has "suffer[ed] legal wrong" or that it is "adversely affected or aggrieved . . . within the meaning of a relevant statute" by some final agency action. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

"To establish an injury-in-fact from failure to perform an allegedly improper NEPA analysis, a litigant must show: 1) that in making its decision without following the NEPA's procedures, the agency created an increased risk of actual, threatened or imminent environmental harm; and 2) that this increased risk of environmental harm injures its concrete interest." *Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1265 (10th Cir. 2002). Further, "[a] litigant shows an injury to its concrete interest by

demonstrating either a geographical nexus to or actual use of the site of agency action." *Id.*

The Court finds that Petitioners have met their burden to establish Article III and prudential standing. Petitioners have sufficiently alleged a concrete and particularized injury in fact "fairly traceable" to the 2019 ROD that would likely be redressed by a favorable decision. Petitioners submitted four declarations, outlining alleged harms caused by the agency action and development of Intervenor's land. (*See* Doc. ## 59-1, 59-2, 59-3, 59-4.) As noted in prior litigation involving the same parties and subject matter, "[t]he Declarations submitted by Plaintiffs meet Plaintiffs' burden of establishing an actual or imminent injury that is concrete and particularized rather than conjectural or hypothetical, a causal connection that is fairly traceable to the conduct complained of, and a likelihood of redressability in the event of a favorable decision." *Rocky Mountain Wild v. Dallas*, 2017 WL 6350384, at *9 (quoting *Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009)). Accordingly, Petitioners have standing to pursue this action.

### III.    STANDARD OF REVIEW

The APA permits judicial review of final agency actions. *Biodiversity Legal Found. v. Babbitt*, 146 F.3d 1249 (10th Cir.1998). The Court determines whether the agency "examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1576 (10th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983)).

While the standard of review is deferential to agencies, it does not "shield

[agency actions] from a thorough, probing, in-depth review." *Citizens to Pres. Overton Park v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Agency actions can be set aside as arbitrary and capricious for several reasons: the agency relied on factors Congress did not intend for it to consider; the agency completely failed to consider pertinent aspects of the problem; or the agency's explanation for its action is counter to the evidence before it or is so implausible that it can be neither a difference of opinion nor a product of agency expertise. *State Farm*, 463 U.S. at 43. However, "[t]he ultimate standard of review is a narrow one. The Court is not empowered to substitute its judgment for that of the agency." *Volpe*, 401 U.S. at 416. Moreover, the Court grants controlling weight to the agency's application and interpretation of its own regulations, unless plainly erroneous. *Thomas Jefferson v. Shalala*, 512 U.S. 504, 512 (1994). So long as the agency articulated a rational basis for its interpretation and application, and considered all the relevant factors, the Court will uphold the agency's action. *Copart, Inc. v. Admin. Review Bd., U.S. Dep't of Labor*, 495 F.3d 1197, 1202 (10th Cir. 2007).

## IV.   <u>ANALYSIS</u>

"Law of the case doctrine permits a court to decline the invitation to reconsider issues already resolved earlier in the life of a litigation." *Entek GRB, LLC v. Stull Ranches, LLC*, 840 F.3d 1239, 1240 (10th Cir. 2016). It is "a judicial doctrine designed to promote decisional finality. Once a court decides an issue, the doctrine comes into play to prevent the re-litigation of that issue in subsequent proceedings in the same cases." *Pittsburg & Midway Coal Mining Co. v. Watchman,* 52 F.3d 1531, 1536 n.4

(10th Cir. 1995) (citing *Arizona v. California*, 460 U.S. 605, 618-19 (1983)). Further, "[a] legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity to do so existed, [generally] becomes the law of the case." *Entek GRB, LLC*, 840 F.3d at 1242 (quoting *Concrete Works of Colo., Inc. v. City & Cty. of Denver*, 321 F.3d 950, 992 (10th Cir. 2003)).

The decision to apply law of the case doctrine "remains a matter of judicial discretion." *Id.* at 1242. However, the Tenth Circuit has identified three narrow circumstances that justify a departure from the law of the case doctrine: (i) where new and different evidence has changed the court's analysis; (ii) an intervening change in controlling authority; and (iii) a clearly erroneous prior decision that would cause manifest injustice. *Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir. 1996) (citing *United States v. Monsisvais,* 946 F.2d 114, 117 (10th Cir. 1991)).

Aside from a new ROD and Biological Opinion, Respondents rely on a virtually identical administrative record to support the decisions in this case and in the Land Exchange Lawsuit. Respondents and Intervenor have not presented new and different evidence which would change the Court's analysis, have not presented an intervening change in controlling authority, and have not demonstrated that the prior decision was clearly erroneous such that it would cause manifest injustice. For the same reasons the court in the Land Exchange Lawsuit set aside agency action, the law of the case doctrine dictates setting aside agency action in this case as well. Thus, the Court next addresses Petitioners' challenges to the 2019 ROD and analyzes how law of the case impacts this Court's decision.

A.       **NATIONAL ENVIRONMENTAL POLICY ACT**

NEPA is the centerpiece of environmental regulation in the United States.
Compliance with NEPA is required if the federal government's involvement in a project
constitutes "major federal action." 42 U.S.C. § 4332(2)(C). "Major federal action" is
defined as "actions by the federal government . . . and nonfederal actions 'with effects
that may be major and which are potentially subject to Federal control and
responsibility.'" *Ross v. Federal Hwy. Admin.*, 162 F.3d 1046, 1051 (10th Cir. 1998)
(citations omitted). In effect, "major federal action" means that the federal government
has the "actual power" to control the project. *Id.*

Agencies must take a "hard look" at environmental consequences and satisfy
various procedural requirements before acting. *Robertson v. Methow Valley Citizens
Council*, 490 U.S. 332, 350-51 (1989). By focusing both agency and public attention on
the environmental effects of proposed actions, NEPA facilitates informed decision-
making by agencies and allows the political process to check those decisions. *Marsh v.
Or. Natural Res. Council*, 490 U.S. 360, 371 (1989); *Sierra Club*, 287 F.3d at 1262.

Once it is determined that major federal action is contemplated and that an EIS is
necessary, the involved federal agency must consider the scope of the EIS. 40 C.F.R.
§ 1508.25. To determine the proper scope, the agency "shall consider 3 types of
actions, 3 types of alternatives, and 3 types of impacts." *Id.* One category of actions is
"connected actions," which "means that they are closely related and therefore should be
discussed in the same impact statement." *Id.*, § 1508.25(a)(1). Alternatives that must be
discussed include a "no action alternative," "[o]ther reasonable courses of action," and

mitigation measures. *Id.*, § 1508.25(b). Impacts that must be discussed are direct, indirect, and cumulative impacts. *Id.*, § 1508.25(c).

In the Land Exchange Lawsuit, the court faulted USFS's environmental analysis because it was limited to the indirect impact of LMJV's proposed development. The court determined that USFS's "reasoning and the resulting limitation on the scope of the environmental analysis reflected in the FEIS and [2015] ROD were contrary to law and directly contradicted by the Forest Service's own prior actions in the history of LMJV's acquisition and ownership of its private inholding." *Rocky Mountain Wild*, 2017 WL 6350384, at *10. Specifically, in light of the Scenic Easement and history related to granting the initial land exchange, the Court found that USFS had certain powers to control development on the inholding.

In this case, given that USFS relied upon the same flawed FEIS, and its reasons set forth in the 2019 ROD are substantially the same, the same issues are present in this litigation and law of the case governs this Court's analysis. The USFS's NEPA analysis was deficient because it limited its review of Intervenor's development as an indirect impact because USFS considered the development a private action. However, the court in the Land Exchange Lawsuit determined that in light of the history of the inholding and the Scenic Easement, there was no legal or logical basis for Respondents' position that USFS had no power to limit or regulate lands being conveyed to LMJV. *Id.* at *10–11.

That same analysis holds true in this case. The right-of-way was based on the same legally deficient FEIS and a similarly deficient ROD. In the 2019 ROD, USFS

reiterated its position that it cannot regulate Intervenor's private land and the development does not represent agency action. (Doc. # 71-49 at VCC04104.) Similarly, USFS reasserted that it cannot regulate Intervenor's private land development. (*See, e.g.*, Doc. # 71-49 at VWC04092.) However, as set forth by the court in the Land Exchange Lawsuit, USFS's position is contrary to the Scenic Easement granted to USFS. Although USFS tries to downplay the scope of the Scenic Easement, the Scenic Easement grants USFS certain development controls. Thus, as already determined by one court based on the same FEIS, "Defendants abdicated [their duty] by disclaiming that they had the power" to regulate development of Intervenor's land. *Rocky Mountain Wild*, 2017 WL 6350384, at *11.

Further, USFS's continued reliance on the deficient FEIS is particularly problematic because it has not complied with the regulatory requirements set forth by NEPA. "To fulfill its purpose, an EIS must provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." *Or. Nat. Desert Ass'n v. Bureau of Land Mgmt.*, 625 F.3d 1092, 1100 (9th Cir. 2010) (internal quotation and citation omitted). The court in the Land Exchange Lawsuit already determined that USFS's FEIS was arbitrary and capricious with respect to the land exchange because it misconstrued USFS's powers to regulate Intervenor's development in light of the Scenic Easement. Thus, USFS frustrated the purpose of NEPA by continuing to rely upon an uninformed FEIS to issue the 2019 ROD. *See, e.g.*, *Robertson*, 490 U.S. at 351; *Westlands Water Dist. v. U.S.*

*Dep't of Interior*, 376 F.3d 853, 872 (9th Cir. 2004) (noting that the "touchstone" for reviewing an EIS under NEPA is "whether an EIS's selection and discussion of alternatives fosters informed decision-making and informed public participation.") (citation and internal quotations omitted). Thus, as with the 2015 ROD, the 2019 ROD was arbitrary and capricious.[3]

## B.    ENDANGERED SPECIES ACT

The ESA was passed in 1973 to preserve ecosystems upon which threatened and endangered species depend and "to halt and reverse the trend toward species extinction." *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978); 16 U.S.C. § 1531(b). The ESA's "core purpose" is to prevent the extinction of a species by preserving and protecting the habitat upon which it depends from the intrusive activities of humans. *Tennessee Valley Auth.*, 437 U.S. at 184.

Section 9 of the ESA makes it unlawful to "take"—meaning, *inter alia*, to harm, wound, or kill—members of an endangered species. 16 U.S.C. §§ 1532(19),

---

[3] Respondents and Intervenor spend significant mileage urging the Court to apply its prior orders on Petitioner's Motion to Dismiss and Motion for Reconsideration. (Doc. ## 24, 55.) Respondents and Intervenor argue that this Court previously determined that the order in the Land Exchange Lawsuit has no bearing in this case. However, the Court's statement that the Land Exchange Lawsuit order "has little bearing on the instant case" pertained to its analysis of the plain language of ANICLA. As set forth in the Land Exchange Lawsuit, USFS's authority to regulate the land is derived from its Scenic Easement, not ANICLA. *Rocky Mountain Wild*, 2017 WL 6350384, at *11. Further, the plain language of ANICLA does not change the fact that a court previously determined that the FEIS was deficient. Moreover, the Court's review of the record for purposes of the Motion to Dismiss was much more limited than the analysis it has undertaken for purposes of the issues addressed in this order. For purposes of this order, the Court has reviewed approximately 70,000 pages contained in the administrative record spanning more than twenty-five years of litigation history. Thus, the Court finds that, for purposes of this order, the court's Order in the Land Exchange Lawsuit is the law of the case.

1538(a)(1)(B). The ESA provides two procedures, however, by which "take" of an endangered or threatened species may be authorized, and liability under Section 9 may be avoided.

Section 7 requires inter-agency consultation in connection with any action "authorized, funded, or carried out" by a federal agency that may jeopardize endangered or threatened species or their habitat. 16 U.S.C. § 1536(a)(2). Section 7 and its implementing regulations "apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. § 402.03; *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1104 (10th Cir. 2010). "Action" is defined as "all activities or programs of any kind authorized or carried out, in whole or in part, by Federal agencies...." 50 C.F.R. § 402.02. In a Section 7 consultation, if the FWS as consulting agency makes a "no jeopardy" determination, it must include an incidental take statement in its Biological Opinion that, among other things, "[s]pecifies the impact, *i.e.*, the amount or extent, of such incidental take on the species." 50 C.F.R. § 402.14(i)(1)(i); 16 U.S.C. § 1536(b)(4). If the amount of take specified in the ITS is exceeded, the action agency must reinitiate Section 7 consultation. 50 C.F.R. § 402.16(a).

Section 10 applies where there is no "federal nexus." In such cases, the FWS may issue an incidental take permit ("ITP") allowing a private person to "take" a species listed under Section 9, but avoid liability, "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B); 50 C.F.R. § 17.32(b). However, rigorous procedures must be met for a Section 10

permit, which may not be issued unless the applicant submits a habitat conservation

plan specifying the likely impacts resulting from the activity, the steps the applicant will

take to minimize and mitigate such impacts, the funding that will be available to

implement such steps, alternatives considered and why they are not being used, and

such other measures as the agency may require. 16 U.S.C. § 1539(a)(2)(A).

Opportunity for public comment is also required, as well as specific findings supporting

permit issuance. 16 U.S.C. § 1539(a)(2)(B).

In the original Biological Opinion discussed in the Land Exchange Lawsuit, USFS

consulted with FWS under Section 7, allowing Intervenor to avoid the more onerous

requirements of Section 10, despite initially stating that Intervenor would be required to

comply with Section 10. The court in that lawsuit summed up the inconsistencies in

USFS's position:

> There is, at the very least, a serious issue whether this procedure
> complied with the Endangered Species Act. The Forest Service's position
> in connection with its NEPA and ANILCA analyses of the land exchange
> was that the agency would have no involvement or control in development
> of LMJV's private land after the exchange, and therefore there was no
> federal action requiring full NEPA analysis of the development. That
> position, however, raised a dilemma because it logically suggested that
> LMJV's development lacked the necessary federal nexus for purposes of
> Section 7 of the Endangered Species Act. The Forest Service and FWS
> determined that Section 7 consultation would still suffice, even though the
> only continuing federal agency involvement was not by the "action
> agency"—the Forest Service—but rather was the FWS's limited role in
> overseeing LMJV's compliance with the conservation measures imposed
> in connection with the ITS.
>
> The upshot of this determination was that, on one hand, LMJV avoided
> more scrupulous federal review of its development plans under NEPA by
> virtue of the Forest Service's narrow definition of the scope of federal
> action as not including the development; while, on the other hand, LMJV
> also avoided the onus of Endangered Species Act Section 10 compliance

by virtue of the determination that there <u>was</u> a sufficient federal nexus to
the development for that purpose.

*Rocky Mountain Wild*, 2017 WL 6350384, at *13–14.

Examining the legislative history and secondary sources, the court in the Land
Exchange Lawsuit determined that Section 10 compliance likely should have been
required for Intervenor's private development, and there was little precedent for allowing
a non-federal party to comply with Section 7. *Id.* However, the Court declined to
determine whether the "take" authorization was legal because it determined that the
conservation measures were inadequate under Section 7. *Id.*

After the opinion in the Land Exchange Lawsuit, USFS and FWS consulted on a
new Biological Opinion under Section 7. (Doc. # 33-2 at USFWS_000195.) Once again,
Intervenor did not have to comply with the more rigorous components of Section 10.
The 2018 Biological Opinion—incorporated into the 2019 ROD—expressly recognizes
that development resulting from USFS's approval of the Easement will adversely impact
an endangered species, but it fails to comply with the statutory requirements for the
protection of that species, resulting in an abuse of discretion.

Respondents argue that Section 7 was the appropriate analysis here because
the ANILCA access road is the federal action leading to the "take" of the lynx and
development of Intervenor's land is the "indirect action." (Doc. # 62 at 43–45.) However,
as set forth by the court in the Land Exchange Lawsuit, the legislative history makes
clear that Intervenor should have to comply with Section 10 of the ESA for its private
development. *Rocky Mountain Wild*, 2017 WL 6350384, at *14.

Indeed, Respondents' decision to consult under Section 7, instead of Section 10, is undermined by USFS's internal discussions attempting to justify Section 7 application instead of Section 10. *Rocky Mountain Wild*, 2017 WL 6350384, at *14 n.17 (citing Administrative Record at  FWS3831-32 (FWS email seeking a "citation, presumabl[y] from some precedent, for our extending section 7 over the private land actions that result in take of listed species" and "that would explain the pathway for the applicant to receive the Section 7 exemption through our [Biological Opinion] for effects occurring on private lands"); C11441 (Forest Service email: "The twist the counsels decided to do on section 7/10 are sure to be of interest."); C12331-32 (Forest Service to FWS email: referring to the determination that FWS would "by virtue of some currently unidentified existing precedent, maintain discretionary authority over the private village development," and stating that "some verbage [sic] better explaining our unique section 7 agreement process for this project will be needed at some point")).

Accordingly, the Court finds that the conservation strategy provided by the Biological Opinion and incorporated into the 2019 ROD was an abuse of discretion and contrary to law.

## C.   Vacatur is the Appropriate Remedy

Respondents and Intervenors urge the Court to order procedural remedies instead of vacatur. (Doc. ## 61 at 53-54; 62 at 58-59.) However, where agency action is arbitrary or capricious, vacatur of agency action is an appropriate form of injunctive relief. *WildEarth Guardians v. United States Bureau of Land Mgmt.*, 870 F.3d 1222, 1239 (10th Cir. 2017); *High Country Conservation Advocs. v. United States Forest*

*Serv.*, 951 F.3d 1217, 1229 (10th Cir. 2020). Further, the party seeking to avoid vacatur of agency action bears the burden of showing entitlement to such extraordinary relief by presenting extraordinary facts that would support an exception. *Nat'l Parks Conservation Ass'n v. Semonite*, 916 F.3d 1075, 1082 (D.C. Cir. 2019). In this case, no extraordinary facts exist. A court already outlined the deficiencies contained in the FEIS. Nonetheless, Respondents chose to rely upon a deficient FEIS to reach the decision in the 2019 ROD. Thus, because the decision was arbitrary and capricious, vacatur is appropriate.[4]

## V.     CONCLUSION

For the foregoing reasons, the Court finds and concludes that Respondents' actions violated the APA. Accordingly, it is ORDERED that the February 2019 Record of Decision is VACATED, and the case is REMANDED to the United States Forest Service for proceedings consistent with this Order.

DATED: October 20, 2022

BY THE COURT:

CHRISTINE M. ARGUELLO
Senior United States District Judge

---

[4] Petitioners assert a number of additional deficiencies in their opening brief. However, because the Court is setting aside the agency action, the Court need not address these additional deficiencies.